**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 1 0 2022

TAMMY H. DOWNS, CLERK
By: _____
DEP CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

DON LLOYD COOK,

          Plaintiff,

v.

RYAN WINGO, individually,
JEFF SHEELER, individually,
JOHN S. JOE, individually,
WILLIAM J. BRYANT, individually and
JOHN DOES 1-5, individually,

          Defendants.

Case No.: 4:22-CV-548-KGB

***_JURY TRIAL DEMANDED_**

This case assigned to District Judge Baker
and to Magistrate Judge Harris

## COMPLAINT

NOW COMES Plaintiff, DON LLOYD COOK, by and through his attorneys, LAUX LAW

GROUP, and for his cause of action against the above-captioned defendants, states as follows:

### JURISDICTION AND VENUE

1.     This action arises under the United States Constitution, particularly under the First,

Fourth and Fourteenth Amendments, and under law, including the Civil Rights Act of 1871,

pursuant to 42 U.S.C. § 1983. This Honorable Court has jurisdiction by virtue of 28 U.S.C. §§

1331 and 1367. Venue is founded in this Court upon 28 U.S.C. § 1391 as the acts of which Plaintiff

complains arose in this District.

### PARTIES

2.     At all relevant times, DON LLOYD COOK ("PLAINTIFF") was a citizen of the

United States of America and was, therefore, entitled to all legal and constitutional rights afforded

citizens of the United States of America.

3.      On June 1, 2020, and at all relevant times, RYAN WINGO ("WINGO") was employed by the State of Arkansas as an Arkansas State Police (ASP) Trooper First Class and was acting under the color of state law, within the scope of his employment.  On information and belief, at all relevant times, including June 1, 2020, WINGO was a member of the ASP's Emergency Response Team (ERT), a specialized unit designated to respond to emergency incidents such as natural disasters, security threats and/or public health crises.

4.      On June 1, 2020, and at all relevant times, JEFF SHEELER ("SHEELER") was employed by the State of Arkansas as an ASP trooper at the rank of lieutenant and was acting under the color of state law, within the scope of his employment.  On June 1, 2020, and at all relevant times, SHEELER was a supervisory team member of ASP's Special Weapons and Tactics (SWAT) unit.

5.      On June 1, 2020, and at all relevant times, JOHN S. JOE ("JOE") was employed by the State of Arkansas as an ASP trooper at the rank of lieutenant and was acting under the color of state law, within the scope of his employment.  On June 1, 2020, and at all relevant times, JOE was a supervisory ERT member.

6.      On June 1, 2020, and at all relevant times, including several years prior thereto, WILLIAM J. BRYANT ("COL. BRYANT"), who holds the rank of colonel in ASP, was the ASP Director and was acting under the color of state law, within the scope of his  employment.  COL. BRYANT was appointed to the position of ASP Director by Governor Asa Hutchinson in 2015.

7.      On June 1, 2020, and at all relevant times, the State of Arkansas delegated to COL. BRYANT final policy-making authority in terms of creating, adopting, implementing and/or enforcing ASP policies.  At all relevant times, pursuant to the authority vested in ASP directors,

COL. BRYANT was empowered to terminate ASP troopers for cause, to discipline ASP troopers or, if warranted, to modify an ASP trooper's employment duties for public safety reasons.

8.     On information and belief, on June 1, 2020, and at all relevant times, JOHN DOES 1-5, and each of them, were employed by the State of Arkansas as ASP troopers and were acting under the color of state law, within the scope of their employment.  Though JOHN DOES 1-5 are currently unidentified by PLAINTIFF, he alleges herein that each of them engaged in various tortious and unconstitutional acts and omissions which caused his physical and emotional pain and injuries.  On information and belief, PLAINTIFF avers that the true identities of JOHN DOES 1-5 will be ascertained during court-ordered discovery in the matter.

9.     At all relevant times, the State of Arkansas is and was empowered, funded and directed to pay § 1983 civil rights judgments for compensatory damages, actual damages and attorney fees for which any State of Arkansas employee acting within the scope of his or her employment is found liable.

10.     The acts and/or omissions of which PLAINTIFF complains constitute civil rights causes against WINGO, SHEELER, JOE, COL. BRYANT and JOHN DOES 1-5 (hereafter collectively "DEFENDANTS"), and each of them.  The State of Arkansas is therefore a primary or secondary indemnification party regarding the acts and/or omissions of DEFENDANTS of which PLAINTIFF herein complains.

<u>BACKGROUND FACTS</u>

11.     On June 1, 2020, and at all relevant times, PLAINTIFF, an accomplished data security lawyer, resided for years in a well-kept single family home on the northwest side of Little Rock, Arkansas without incident.  In June 2020, PLAINTIFF, a tax-paying Arkansan and father

of three, was a member of several esteemed professional associations, such as the International Association of Privacy Professionals and the Pulaski County Bar Association.

12.     One of PLAINTIFF's sons has an autism spectrum disorder (ASD) diagnosis, a condition affecting 2.3% of 8-year-old children in 2018, per the U.S. Center for Disease Control. Because of well-documented[1] instances of excessive force by police officers against persons with ASD—even children and teens—as well as the rapidity with which misunderstandings during encounters can lead to suspect fatalities, PLAINTIFF is interested in advancing public discourse on police reform generally but he also has a personal investment in the topic.

13.     PLAINTIFF's citizen concerns—and also those of a protective parent—are what fueled his decision to drive to the Arkansas State Capitol ("Capitol") on June 1, 2020 and to participate in public protest of what he considered to be an clear example of police excessive force: the May 25, 2020 in-custody restraint asphyxia death of a 46-year-old African American father of five, George Floyd, caused by Minneapolis police officers.

14.     Regardless of the intensity of his position on this matter of public interest—and without consideration of any personal investment driving his desire for increased police accountability—PLAINTIFF, a U.S. citizen, has a constitutional right to peacefully protest.

<u>The May 25, 2020 In-Custody Death of George Floyd Sparked Public Demonstrations Across the Globe, Including a Peaceful June 1, 2020 Protest on the Capitol in Little Rock</u>

15.     George Floyd's May 25, 2020 death sparked impassioned public protests directed at historical police violence and a general lack of police accountability (hereafter "George Floyd

---

[1] See *The Police Need to Understand Autism*, Silberman, S., *New York Times*, September 19, 2017; see also *13-Year-Old Boy With Autism Disorder Shot By Salt Lake City Police*, Treisman, R., National Public Radio (NPR), September 9, 2020.

protests") which began in Minneapolis the day after Mr. Floyd's in-custody death and developed in cities throughout the United States and abroad.

16.     The George Floyd protests were in response to a matter of public interest: a pattern of perceived violations of Fourth Amendment protections by police officers in the United States.

17.     Arkansas in June 2020 was not immune to the anger, frustrations and fear of police violence voiced by protesters of Mr. Floyd's death.  Indeed, in February 2015, Philander Smith College students marched from the historically black college to the LRPD Arch St. station in protest of the officer-involved shooting death of Vietnam veteran, Eugene Ellison, by a Little Rock officer.  More recently, in April 2019, local citizens by the hundreds protested the LRPD officer-involved shooting of a Little Rock motorist, Bradley Blackshire.

18.     By May 30, 2020, the George Floyd protests began to gain traction in Little Rock, and ASP decided to stage reporting ASP ERT in a designated area.

19.     According to ASP Lt. Bobby G. Brown (hereafter "Lt. Brown"), the decision to stage the ASP ERT in an area during the George Floyd protests was not based upon an analysis of relevant public safety factors pertinent to Little Rock.

20.     Instead, according to Lt. Brown, "[t]he decision to stage the ERT was based on the trend in the county where peaceful and lawful protests turned to civil unrest due to a few individuals whose only intent was to cause criminal behavior."

21.     The George Floyd protests were unique compared to prior protests of police excessive force insofar as the George Floyd protesters' racial demographic was heterogenous, comprised of individuals of every race, creed, color and orientation. *See Image No. 1 below.*

5



**Image No. 1: Little Rock protesters begin to gather on the Capitol steps on June 1, 2020 in response to the death of George Floyd.** (*Photo courtesy of The Heat Magazine*)

22.     A sizable contingency of state and local politicians, clergy members and other civic leaders was also in attendance lending voice to the George Floyd protests.  For instance, on the evening of June 1, 2020, Little Rock Mayor Frank Scott Jr. joined a group of concerned citizen protesters near the Capitol during a George Floyd protest on that date ("06/01/20 Floyd Protest").  *See Image No. 2 below.*



**Image No. 2: Little Rock Mayor Frank Scott participating in the 06/01/20 Floyd Protest.**  (*Photo courtesy of KATV*)

23.     The 06/01/20 Floyd Protest was largely non-violent.

24.     On information and belief, there were no reports of serious ASP trooper injuries or fatalities occurring during the 06/01/20 Floyd Protest.

### On June 1, 2020, Exercising His First Amendment Right to Free Speech, PLAINTIFF Drove to Downtown Little Rock and Participated in the 06/01/20 Floyd Protest at the Capitol

25.     On June 1, 2020, around 7:00 pm, PLAINTIFF saw news coverage of the 06/01/20 Floyd Protest which was then underway at the Capitol. Because it was a matter of public interest— particularly for him—and because it is his First Amendment right as an American, PLAINTIFF decided to participate in the 06/01/20 Floyd Protest.

26.     On June 1, 2020, around 9:00 pm, after parking his car in the general vicinity, PLAINTIFF approached the Capitol grounds on foot and observed a relatively scant group of protesters and bystanders. PLAINTIFF walked the area for about an hour, hoping to connect with a friend he believed was in attendance but he never found her.

27.     PLAINTIFF wore a salmon-colored short-sleeved golf shirt and a pair of beige cargo shorts while participating in the 06/01/20 Floyd Protest.

28.     On June 1, 2020, PLAINTIFF engaged in peaceful protest.

29.     On June 1, 2020, at approximately 10:30 pm, PLAINTIFF heard dispersal instructions given by law enforcement over a loudspeaker and he began to vacate the area.

30.     PLAINTIFF continued walking away from the Capitol along with other protesters, while ASP troopers—some of whom were armed with high-powered weapons—began advancing.

31.     Sensing a palpable atmosphere shift occasioned by the ASP troopers' advance, PLAINTIFF quickened his pace generally north, occasionally raising his hands in the air.

32.     Around that time, on information and belief, JOE acted as a scene commander and directed subordinate ASP troopers as the troopers deployed munitions—beanbag projectiles—at peaceful protesters, many of whom were attempting to leave the Capitol grounds.

7

33.     Soon, ASP troopers began lobbing tear gas cannisters in the direction of the protesters, including PLAINTIFF, and, under JOE's command at the scene, ASP troopers, including WINGO, began discharging bean bag projectiles at the protesters.

34.     Around 10:30 pm, PLAINTIFF continued to walk away from Capitol to the north. *See Image Nos. 3-5 below* (*Video stills courtesy of The Heat Magazine*).





**Image No. 3: PLAINTIFF (red arrow) walking away from Capitol.**

**Image No. 4: PLAINTIFF (red arrow) continues his walk to his car.**

**Image No. 5: PLAINTIFF (red arrow) climbs steps, headed north.**

35.     As PLAINTIFF walked northbound away from the Capitol, he traversed a set of shallow concrete steps adjacent to a building north of the Capitol rotunda. S*ee Image no. 5 above; see also Image No. 6 below.*



**Image No. 6: Overhead of Capitol grounds, including the concrete steps traversed by PLAINTIFF as he was leaving Capitol grounds and walking to his car.**

36.    PLAINTIFF then briefly traveled west along a concrete walkway before turning to his right and heading northbound again. *See Image No. 7 below.*



**Image No. 7: Overhead of Capitol grounds with greater focus on the concrete steps and PLAINTIFF's northbound route of travel.**

37. After traversing the concrete steps to the north of the Capitol and briefly walking westerly, PLAINTIFF turned to his right and continued walking northbound while ASP troopers lobbed tear gas cannisters in his direction. *See Image Nos. 8-10 below.*



Image No. 8: PLAINTIFF (red arrow) still walking away from Capitol.



Image No. 9: A tear gas cannister lands near PLAINTIFF (red arrow).



Image No. 10: PLAINTIFF (red arrow) continues walk toward his car.

<u>While Following ASP Troopers' Dispersal Orders, PLAINTIFF is Violently Struck in the Face and Mouth by a Bean Bag Projectile Fired at Him by WINGO</u>

38. However, as he walked away, attempting to return to his parked car, PLAINTIFF briefly turned his head toward the sound of ASP troopers and, at that moment, he was violently struck in the face by a lead-filled bean bag projectile. The powerful impact of the blow to PLAINTIFF's face knocked him down and caused him to lose consciousness.

39. On June 1, 2020, PLAINTIFF was struck in the face by a bean bag projectile fired by WINGO.

40. When WINGO aimed his weapon and fired his bean bag projectile at PLAINTIFF, he was intending to hit PLAINTIFF's head, neck or chest.

41. PLAINTIFF was not wearing a white shirt when he was struck by WINGO's bean bag projectile on June 1, 2020. PLAINTIFF was not wearing red shorts when he was struck by WINGO's bean bag projectile on June 1, 2020.

42.     On June 1, 2020, upon regaining consciousness after being struck with WINGO's bean bag projectile, PLAINTIFF realized he was face down on the ground, with law enforcement officers on his back, holding his wrists together.  At that time, PLAINTIFF told the officers that he was leaving the area as instructed and not doing anything to warrant the use of force.

43.     PLAINTIFF engaged in no illegal conduct at the 06/01/20 Floyd Protest.

44.     No ASP trooper observed PLAINTIFF do anything illegal on June 1, 2020.

45.     WINGO's decision to fire his bean bag projectile at PLAINTIFF violated accepted police protocol and ASP policies governing the use of such weapons because PLAINTIFF was not engaging or threatening to engage in violence.

46.     JOE's decision to authorize the use of bean bag shotguns, munitions and other less-than-lethal weapons violated accepted police supervisory protocol and ASP policies governing the use of such weapons because the circumstances known to JOE did not indicate their use.

ASP Troopers Were on Notice on June 1, 2020 that Bean Bag Projectiles Were Inappropriate for Use on Non-Violent Protesters Because of the Increased Risk of Serious Physical Injury

47.     In June 2020, a typical bean bag round consisted of a fabric pillow filled with lead shot and weighed about 1.4 ounces.  *See Image Nos. 11-12 below.*



**Image No. 11: Bean bag projectile shell casing (right) and lead-filled bean bag round. (left).**



**Image No. 12: Lead shot (pellets) contained inside bean bag round.**

48.     In June 2020, lead-filled bean bag rounds were typically fired from a tactical 12-gauge shotgun.  *See Image No. 13 below.*



**Image No. 13: Tactical 12-gauge bean bag shotgun exemplar which, on information and belief, is similar to the firearm used by WINGO at the 06/01/20 Floyd Protest.**

49.     Typically, in June 2020, bean bag rounds fired from tactical 12-gauge bean bag shotguns had a range of about 70 feet.

50.     By June 2020, ASP troopers were on notice that firing bean bag rounds at an individual can potentially cause serious physical injuries and, in some cases, death.

51.     By June 2020, ASP troopers were on notice that the likelihood of serious physical injuries and death increases when bean bag rounds are discharged recklessly and/or not in accordance with manufacturer recommendations.

52.     Prior to June 2020, ASP troopers were trained that beanbag projectiles should generally be used only in direct fire with the aim of striking the lower abdomen or legs.

53.     Prior to June 2020, ASP troopers were trained that beanbag projectiles should only be used to address an imminent threat of injury to either a law enforcement officer or a member of the public.

54.     By June 2020, ASP troopers were on notice that the force of a bean bag projectile to a person's chest can break ribs, causing a potential heart puncture.  By June 2020, ASP troopers

were on notice that when fired at one's head, bean bag projectiles can break the skull, jawbone, neck, nose and/or rupture eyeballs.

55.     By June 2020, ASP troopers were on notice that individuals struck in the head by bean bag projectiles can experience fractured skulls, traumatic brain injuries and seizures as a result of the impact.

### PLAINTIFF Receives Emergency Medical Treatment on the Scene from MEMS before His Transport to UAMS Where He Undergoes Facial Surgery the Following Day

56.     At approximately 10:54 pm, Metropolitan Emergency Medical Services (MEMS) was advised regarding a possible trauma patient located at the intersection of 7th St. and Martin Luther King Jr. Dr., and this patient was PLAINTIFF.

57.     When MEMS personnel arrived at the area where PLAINTIFF was located, Clayton Goodard, a MEMS emergency medical technician, exited his MEMS medical pickup and observed PLAINTIFF, sitting alone on a curb of the intersection. At that time, Mr. Goodard also observed multiple police officers in the vicinity of PLAINTIFF, who was not handcuffed, zip-tied or physically restrained as he sat on the curb.

58.     No ASP troopers spoke to Mr. Goodard about PLAINTIFF or made any reference to him about any criminal conduct committed by PLAINTIFF.

59.     No ASP troopers explained to Mr. Goodard how PLAINTIFF sustained his injuries.

60.      Mr. Goodard helped PLAINTIFF stand up, walked PLAINTIFF over to his MEMS pickup truck and sat him in the flatbed of the truck so that he could examine PLAINTIFF's injuries and provide him emergency medical treatment.

61.     Subsequent to June 1, 2020, Mr. Goodard was asked if he detected any pepper spray odor or residue on PLAINTIFF when he provided emergency medical treatment to him on that date, and he responded that he did not.

13

62.     After providing PLAINTIFF with preliminary emergency medical treatment at the scene, Mr. Goodard transported PLAINTIFF to an awaiting MEMS ambulance for transport to the University of Arkansas for Medical Services (UAMS) hospital.

63.     As a result of being struck with WINGO's bean bag projectile, PLAINTIFF suffered serious physical injuries to his head, face, jaw and teeth.

64.     PLAINTIFF's injuries were so severe that UAMS admitted him as an inpatient and scheduled him for emergency surgery, which he underwent on June 3, 2020.   PLAINTIFF's medical course at UAMS included, *inter alia*, emergency medical treatment, x-rays and CT scans, an open wound/fracture debridement procedure, dental ridge fracture repair and mandible fracture repair.

65.     The bean bag round that struck PLAINTIFF's face embedded in his mouth and was removed during surgery.   The bean bag round was preserved and is in the possession of PLAINTIFF's counsel.   *See Image Nos. 14-16 below.*

  

**Image No. 14: WINGO's bean bag round (in cannister) which struck PLAINTIFF.**

**Image No. 15: WINGO's bean bag round (compressed) which struck PLAINTIFF.**

**Image No. 16: WINGO's bean bag round (unfurled) which struck PLAINTIFF.**

66.     There are no notations contained in PLAINTIFF's UAMS medical records indicating that any medical professional or UAMS staff member detected pepper spray odor or residue on PLAINTIFF's person when he was admitted to UAMS on June 1, 2020.

67.     Following his June 2, 2020 emergency surgery—which was necessitated to treat the injuries he sustained as a result of being struck in the face by WINGO's bean bag projectile—PLAINTIFF was discharged from UAMS on June 3, 2020. *See Image Nos. 17-18 below.*

 

**Image No. 17: PLAINTIFF in his hospital bed following his June 3, 2020 surgery at UAMS.**

**Image No. 18: PLAINTIFF stands outside UAMS after his June 3, 2020 hospital discharge.**

68.     Neither WINGO nor SHEELER submitted or signed an incident report on June 1, 2020 regarding PLAINTIFF's actions on that date.

69.     Between June 3, 2020 and November 25, 2020, PLAINTIFF was never contacted by ASP regarding his participation in the 06/01/20 Floyd Protest or any illegal conduct in which he was alleged to have engaged at the 06/01/20 Floyd Protest.

70.     On June 5, 2020, Judge Melanie H. Martin ordered multiple Arkansas law enforcement agencies—including ASP—and the Pulaski County Prosecutor's Office to preserve all video and audio recordings from the George Floyd protests from May 25, 2020 onward, a period including the 06/01/20 Floyd Protest.  See June 5, 2020 Little Rock District Court Criminal Division Order, attached hereto as **Exhibit 1**.

15

An ASP Lawyer Gives WINGO, SHEELER and/or JOE a Copy of PLAINTIFF's
Videotaped Statement from his Claims Commission Case Which Leads to
PLAINTIFF's Arrest for Alleged Illegal Activities at the 06/01/20 Floyd Protest

71.     On November 25, 2020, almost six months after the 06/01/20 Floyd Protest,
PLAINTIFF filed a claim with Arkansas Claims Commission ("Commission") seeking
compensation for medical expenses related to the injuries he sustained on June 1, 2020.

72.     Prior to November 25, 2020, neither WINGO nor SHEELER submitted or signed
an incident report regarding PLAINTIFF's alleged actions during the 06/01/20 Floyd Protest.

73.     Prior to November 25, 2020, neither WINGO nor SHEELER submitted or signed
a use of force report regarding any force used upon PLAINTIFF on June 1, 2020.

74.     On May 4, 2021, during the pendency of PLAINTIFF's claim, an ASP Attorney
had him give a videotaped statement regarding his involvement in the 06/01/20 Floyd Protest.

75.     On information and belief, the ASP attorney's act of videotaping a claimant's
unsworn statement in a claims commission case was out of the ordinary and was done for the
purpose of providing a defense for WINGO, SHEELER and/or JOE—or for otherwise protecting
the troopers—in PLAINTIFF's claims case and/or any subsequent civil or criminal litigation
related to their conduct on June 1, 2020.

76.     On information and belief, the ASP attorney provided WINGO, SHEELER and/or
JOE with copies of PLAINTIFF's May 4, 2021 videotaped statement and/or allowed WINGO,
SHEELER and/or JOE access or view PLAINTIFF's videotaped statement.

On May 28, 2021, SHEELER Submits a Signed Affidavit Seeking a Warrant of Arrest
for PLAINTIFF Based on Allegations that PLAINTIFF Used Force or Threatened
to Use Force on June 1, 2020 Prior to Being Struck by WINGO's Bean Bag Projectile

77.     On May 28, 2021, close to a year after the 06/01/20 Floyd Protest, SHEELER
submitted an affidavit to a judge in an effort to obtain an arrest warrant for PLAINTIFF related to

alleged criminal activity by PLAINTIFF at the protest.  See May 28, 2021 SHEELER Arrest

Warrant Affidavit, attached hereto as **Exhibit 2.**

78.   There is a boxed space designated on Exhibit 2 in which the attesting officer is to

describe the particular criminal offense the subject of the warrant request is alleged to have

committed.

79.   In this boxed space on Exhibit 2, SHEELER handwrote a description of *Obstructing*

*Governmental Operations* ("*Obstructing*"), Arkansas Code Annotated (A.C.A.) § 5-54-102(b)(1)

which includes a showing that a suspect obstructed government operations "by using or threatening

to use physical force."  *See Image No. 19 below.*



**Image No. 19: SHEELER's handwritten description of A.C.A. § 5-54-102(b)(1) which includes
the language "using or threatening to use physical force."**

80.   According to Exhibit 2, at some point after May 4, 2021, SHEELER had an

opportunity to view PLAINTIFF's videotaped statement, and SHEELER claims that after viewing

the statement, he "was able to positively identify [PLAINTIFF]."

81.   Parts of Exhibit 2 reflect misrepresentations made by SHEELER.

82.   The misrepresentations made by SHEELER in Exhibit 2 include the following false

statements about PLAINTIFF:

      a)  That PLAINTIFF was struck in the back with pepper balls fired
          by ERT members;

      b)  That PLAINTIFF was wearing a white shirt and red shorts;

      c)  That, around the time he was being struck with pepper balls,
          PLAINTIFF "[s]uddenly…turned and began shouting at the

17

ERT Members in an aggressive manner and began to approach the line with clenched fists";

d) That SHEELER fired a foam impact round at PLAINTIFF's upper thigh from a distance of approximately 20 yards; and

e) That SHEELER's foam impact round struck PLAINTIFF in the upper thigh/groin area and stopped PLAINTIFF's advance.

83.   A "pepperball" is a frangible pepper spray projectile containing a powdered chemical that is fired from a gun and explodes upon contact, irritating one's eyes and nose in a manner similar to pepper spray.

84.   Per statute, *Obstructing Governmental Operations*, A.C.A. § 5-54-102(b)(1), obstructing governmental operations by using or threatening to use physical force is a Class A misdemeanor and reads in pertinent part:

(a) A person commits the offense of obstructing governmental operations if the person: (1) Knowingly obstructs, impairs, or hinders the performance of any governmental function;

\*\*\*\*\*

(b) (1) Obstructing governmental operations by using or threatening to use physical force is a Class A misdemeanor.

\*\*\*\*\*

(3) Otherwise, obstructing governmental operations is a Class C misdemeanor.

85.   The misrepresentations contained in Exhibit 2 were intentional and made by SHEELER to attempt to justify WINGO's use of force against PLAINTIFF by falsely portraying PLAINTIFF as a threatening physical aggressor which would support fraudulent § 5-54-102(b)(1) Class A misdemeanor charges.

86.   Further, a more serious Class A misdemeanor charge—unlike a lower Class C charge—would also serve to accomplish one of WINGO, SHEELER and/or JOE's goals which

was to intimidate PLAINTIFF, frustrate his Claims Commission case and further chill his First Amendment rights.

87.     Despite the attestations in his affidavit which supported a *Class A* misdemeanor, SHEELER was given an arrest warrant for PLAINTIFF on a charge of violating *Obstructing Governmental Operations*, A.C.A. § 5-54-102(a)(1) which is a *Class C* misdemeanor.  See 31st State District Court North Little Rock Warrant of Arrest for Don Lloyd Cook, Case No. NLCRC-21-1221, Warrant No. NL-21-1050, attached hereto as **Exhibit 3**.

### On July 23, 2021, PLAINTIFF was Arrested at his Northwest Little Rock Residence, Handcuffed and Transported to Pulaski Co. Jail in his Pajamas

88.     On July 23, 2021—more than a year after the actions alleged in PLAINTIFF's arrest warrant, and almost two (2) months after the issuance of the warrant—ASP trooper B. Sims (#7372) and ASP trooper Merz (#4585) went to PLAINTIFF's home and arrested him when he answered his front door.  They then escorted PLAINTIFF, handcuffed, to their awaiting marked ASP police vehicle.  *See Image No. 20 below.*



**Image No. 20: Six (6) photographs of ASP troopers arresting PLAINTIFF at his home on July 23, 2021.** (*Photos courtesy of Arkansas Times*)

19

89. WINGO and SHEELER intended to arrest PLAINTIFF at his home in this way not as a matter of protocol but rather as a means to intimidate PLAINTIFF and to cast him in an unfavorable light to the public, including his neighbors.

90. Exhibit 3 was served upon PLAINTIFF almost two (2) months after its issuance.

91. The arrest warrant served upon PLAINTIFF—Exhibit 3—is incomplete insofar as the individual certifying the perfection of service failed to indicate the method of service or whether the warrant was returned unexecuted or recalled.

92. In a January 18, 2022 *Arkansas Times* article, the following statement is attributed to ASP Spokesman, Bill Sadler:

> One of the two state troopers present at the time of the [July 23, 2021] arrest was there to confirm [PLAINTIFF's] identity since that particular trooper was present [on June 1, 2020] when [PLAINTIFF] failed to comply with the order to disperse.

93. In January 2022, Mr. Sadler publicly stated that an ASP trooper with firsthand knowledge of PLAINTIFF's alleged failure to comply with dispersal orders was present during the arrest.

94. Neither WINGO nor SHEELER's name appear on PLAINTIFF's arrest report. See PLAINTIFF's July 23, 2020 Arrest Report, attached hereto as **Exhibit 4.**

95. Neither WINGO nor SHEELER was present at the time of PLAINTIFF's July 23, 2021 arrest at PLAINTIFF's home.

96. Neither WINGO nor SHEELER confirmed PLAINTIFF's identity at his home on July 23, 2021 at the time of his arrest.

97.     After being arrested at his home, PLAINTIFF was taken by ASP troopers to Pulaski County jail where he was booked on a Class C misdemeanor charge of *Obstructing Governmental Operations*, A.C.A. § 5-54-102, fingerprinted and placed in a jail cell.

98.     PLAINTIFF hired a criminal defense attorney to defend the charges filed against him by WINGO, SHEELER and/or others in Case No. NLCRC-21-1221 ("criminal case"), expending significant sums of money to do so.  On July 28, 2021, through his lawyer, PLAINTIFF entered a plea not guilty to *Obstructing Governmental Operations*, A.C.A. § 5-54-102, a Class C misdemeanor.  See Entry of Appearance, Waiver of Arraignment and Not Guilty Plea in Case No. NLCRC-21-1221, attached hereto as **Exhibit 5**.

99.     At some point after July 28, 2021, during the pendency of his criminal case, PLAINTIFF became aware of two (2) ASP incident reports bearing report numbers of #A-06/20-0696C and #A-06/20-0069P which were signed by WINGO and SHEELER, respectively.  See ASP Incident Report No. A-06/20-0696C attached hereto as **Exhibit 6**; see ASP Incident Report No. A-06/20-0069P, attached hereto as **Exhibit 7**.

100.    Exhibit 6 and Exhibit 7 are official ASP documents, generated in the course of official police business.  ASP troopers, including WINGO and SHEELER, were required to be truthful in incident reports generated in the course of official police business at all times.

101.    On information and belief, WINGO drafted Exhibit 6 at some point after November 25, 2020.

102.    On information and belief, SHEELER drafted Exhibit 7 at some point after November 25, 2020.

21

WINGO's Incident Report (Exhibit 6) Dated June 1, 2020 Describes the Force Used Against
PLAINTIFF During the 06/01/20 Floyd Protest and Contains Material Conflicts

103.   Exhibit 6 reflects an incident time of 10:38 pm and a call time of 11:00 pm. Based

Exhibit 6, WINGO did not know the first or last name of the individual described in the narrative

portion of his report when he drafted it.

104.   As of the time of the instant filing, it is WINGO's position that PLAINTIFF is the

individual that WINGO described in the narrative portion of Exhibit 6.

105.   In Exhibit 6, WINGO indicates PLAINTIFF's height as 0 feet, 0 inches and

PLAINTIFF's weight to be 275 pounds.

106.   In Exhibit 6, WINGO states that he was tasked to ERT and deployed to the Capitol

"to disperse protesters…that have become violent and destructive."

107.   In Exhibit 6, WINGO described the moments leading up to his use of force against

PLAINTIFF as follows:

> As [ERT] advanced, [PLAINTIFF] started to approach the left side
> of the line where there were very few ERT members to arrest
> [PLAINTIFF].
>
> As [PLAINTIFF] advanced towards us, he was struck with a
> PepperBall system to deter him from advancing any further. Despite
> being struck multiple times by PepperBalls, [PLAINTIFF]
> continued to advance towards us. I then attempted to strike
> [PLAINTIFF] with my Less Lethal 12 gauge Shotgun loaded with
> BeanBag projectiles to prevent [PLAINTIFF] from advancing any
> further.
>
> Due to the poor lighting at night, wearing a gas mask and a face
> shield, and the thickness of the CS Gas that was deployed, it took
> multiple shots before striking [PLAINTIFF]. After being struck
> with a BeanBag projectile, [PLAINTIFF] finally stopped advancing
> towards us and went to the ground.
>
> After [PLAINTIFF went] to the ground, an ERT arrest team went to
> [PLAINTIFF]'s location and placed him under arrest.

22

108.    According to WINGO, and as reflected in Exhibit 6, he fired his bean bag gun in PLAINTIFF's direction multiple times.

109.    According to WINGO, and as reflected in Exhibit 6, WINGO was unaware that PLAINTIFF was struck in the face by one of his beanbag projectiles until after the Capitol grounds were cleared of protestors.

110.    According to WINGO, and as reflected in Exhibit 6, after PLAINTIFF was arrested by an ERT arrest team, PLAINTIFF was taken to a MEMS ambulance and assessed by MEMS personnel.

111.    In his report which is attached hereto as Exhibit 6, WINGO does not identify the individual(s) that took PLAINTIFF to the MEMS ambulance where he was assessed.

112.    According to WINGO, and as reflected in Exhibit 6, after PLAINTIFF was assessed by MEMS personnel, he was released by MEMS personnel before he could be transported to Pulaski County detention center.

113.    According to WINGO, and as reflected in Exhibit 6, it was brought to his attention after June 1, 2020 that PLAINTIFF "was struck by a foam baton round that caused [PLAINTIFF] to fall forward and then get struck with the 12ga BeanBag projectile" WINGO fired.

114.    Regarding the source of WINGO's later understanding that PLAINTIFF was struck by a foam baton prior to being struck with his beanbag projectile, WINGO identified SHEELER's incident report, which is attached hereto as Exhibit 7.

115.    It was WINGO's intention on June 1, 2020 to arrest and criminally charge PLAINTIFF on that date.

116.    According to WINGO, the reason PLAINTIFF was not arrested on June 1, 2020 is because he was released from the scene by MEMS personnel before he could be transported to jail.

117.    The incident report which is Exhibit 6 contains space for reporting officers to provide details on any injuries a suspect may have sustained and whether he or she was medically transported from the scene.

118.    In the space on Exhibit 6 designated for information on whether a suspect sustained injuries requiring medical transportation, WINGO indicated "No," and in terms of identifying any involved emergency medical services company or hospital of destination, WINGO wrote "N/A."

### SHEELER's Incident Report (Exhibit 7) Dated June 1, 2020 Describes Multiple Instances of Force Used Against PLAINTIFF, Including WINGO's Use of Force

119.    Exhibit 7 reflects an incident time of 10:45:00 pm and a call time of 10:45:00. Based on Exhibit 7, SHEELER did not know the first or last name of the individual described in the narrative portion of his report when he drafted it.

120.    As of the time of the instant filing, it is SHEELER's position that PLAINTIFF is the individual that SHEELER described in the narrative portion of Exhibit 7.

121.    In Exhibit 7, SHEELER indicates PLAINTIFF's height as 5 feet, 9 inches and PLAINTIFF's weight to be 165 pounds.

122.    The incident date and call date portions of Exhibit 7 are not typewritten like the rest of the document entries but, instead, are handwritten and initialed. *See Image No. 21 below.*

**Incident Report Form**
**Arkansas Uniform**

| | | | | Incident Report Number |
|---|---|---|---|---|
| | | | | S 1 3 | A-0623 0069P |
| **S** | Incident Type | Incident Date | | Incident Time |
| **U** | USE OF FORCE | 6-1-2020 | | 10:45:00 PM |
| **M** | Call Location | Call Date | | Call Time |
| **M** | ARKANSAS STATE CAPITOL | 6-1-2020 | | 10:45:00 PM |
| **A** | Incident County | Incident Address | | |
| **R** | PULASKI | WOODLANE AND CAPITOL AVENUE | | |

**Image No. 21: SHEELER's report reflects a handwritten incident date and call date.**

123.    In Exhibit 7, SHEELER states that he "was providing protection for the Arkansas State Police Emergency Response Team (ERT)" during the demonstration at the Capitol in "a SWAT capacity as both the overall commander and a functioning member of the team."

124.    In Exhibit 7, SHEELER stated that his "primary mission was to provide lethal protection for members on the ground and [his] secondary mission was less lethal protection with a 40 mm single launcher for foam impact munitions."

125.    In Exhibit 7, SHEELER made the following statements:

> I observed the left side of the line of ERT members engaging [PLAINTIFF] who was refusing commands to leave the area with pepperball.  [PLAINTIFF] was wearing a white shirt and red shorts. The rounds were hitting him in the back as he was being driven from the area.  Suddenly he turned and began shouting at the ERT members in an aggressive manner and began to approach the line with clenched fists.  He appeared very agitated.

> I fired one (1) foam impact round at [PLAINTIFF's] upper left thigh from a distance of approx. 20 yards.   The round struck [PLAINTIFF] in the upper thigh/groin area and stopped his advance. Almost simultaneously [PLAINTIFF] was engaged with a bean bag round from a member of ERT on the line and [PLAINTIFF] collapsed on the lawn and did not move.  Members of an ERT arrest team advanced and took [PLAINTIFF] into custody after a few seconds.  [PLAINTIFF] was conscience (sic) but was suffering an obvious injury to his mouth which was bleeding profusely.

> ERT members moved [PLAINTIFF] behind the bear to ger him medical attention and I did not see him again.  I learned later that he was turned over to MEMS for treatment but law enforcement lost

25

track of him in the chaos and he was not booked into the Pulaski
County jail.

126.    According to SHEELER, as reflected in Exhibit 7, SHEELER engaged in efforts to
identify PLAINTIFF after the June 1, 2020 incident but those efforts were unsuccessful.

127.    It was SHEELER's intention on June 1, 2020 to arrest and criminally charge
PLAINTIFF on that date.

128.    According to SHEELER, the reason PLAINTIFF was not arrested on June 1, 2020
is because "law enforcement lost track of him in the chaos."

129.    Exhibit 7 contains space for reporting officers to provide details on any injuries a
suspect may have sustained and whether he or she was medically transported from the scene.

130.    In the space designated for information on whether a suspect sustained injuries
requiring medical transportation, SHEELER indicated "No."  SHEELER left blank the spaces on
Exhibit 7 designated for providing the identity of any involved emergency medical services
company or hospital of destination.

131.    On information and belief, no one other than PLAINTIFF was struck in the face by
a beanbag projectile during the 06/01/20 Floyd Protest.

132.    PLAINTIFF's criminal case did not proceed to trial; instead PLAINTIFF and the
State of Arkansas entered into a pretrial diversion agreement in which the state conditionally
agreed to dismiss the Class C misdemeanor charge against him.

133.    On March 30, 2022, because PLAINTIFF satisfied his responsibilities under the
pretrial diversion agreement, his criminal case was dismissed.

WINGO'S EMPLOYMENT HISTORY PRIOR TO JUNE 2020 REFLECTS
DEMONSTRATED UNTRUTHFULNESS WHICH MAKES HIM UNSUITABLE
TO INTERACT WITH THE PUBLIC IN HIS PROFESSIONAL CAPACITY

WINGO's May 2019 Highway Traffic Stop of U.S. Armed Forces Veteran Proves That WINGO
Has a History of Untruthfulness During Official Police Business

134.   On May 10, 2019, U.S. Armed Forces veteran, Charles Donner, drove with his wife,

Brittany, on an Arkansas highway when an ASP patrol car driven by WINGO performed an abrupt

U-turn in front of him.  Irritated by WINGO's high-speed maneuver which he considered reckless,

and exercising his First Amendment rights, Mr. Donner honked his horn at WINGO.

135.   Angered by Mr. Donner's expression of frustration, WINGO abandoned whatever

purportedly suspicious activity he previously identified and quickly did a second U-turn—a full

360° turn—returning him to his initial direction of travel but now behind Mr. Donner's vehicle, a

red Hyundai.

136.   Though Mr. Donner had violated no law, WINGO nonetheless activated his

oscillating lights, signaling to Mr. Donner to pull over, which Mr. Donner did.

137.   However, after Mr. Donner pulled over to the side of the road as instructed,

WINGO inexplicably accelerated his ASP patrol car, striking the rear bumper of Mr. Donner's

stationary vehicle ("Donner incident").  *See Image No. 22 below.*



**Image No. 22: WINGO striking Charles Donner's vehicle
after ordering Mr. Donner to pull over on the highway.**

138.   After hitting Dr. Donner's vehicle with his ASP patrol car, WINGO ordered Mr. Donner to drive to an adjacent vacant lot, which he did.  WINGO followed Mr. Donner to the lot and called ASP dispatch to report the incident.  WINGO's description of the incident included his statement that he "[h]ad a car slam on its brakes in front of me."

139.   WINGO was untruthful with ASP dispatch when he reported the Donner incident.

140.   During his call to dispatch, WINGO did not tell dispatch that his vehicle struck the vehicle in front of him.

141.   WINGO omitted a material fact from his communications with ASP dispatch insofar as he failed to mention that he struck Mr. Donner's vehicle.

142.   After completing his call to ASP dispatch, WINGO exited his ASP patrol car and approached Mr. Donner's vehicle.  Once at Mr. Donner's driver side door, WINGO began to engage the Donners.

143.   WINGO was untruthful with the Donners regarding material aspects of the Donner incident.

144.   After WINGO's discussion with Mr. Donner, other ASP troopers arrived on the scene.  WINGO was untruthful with the responding ASP troopers when he described the facts of the Donner incident to them.

<u>The Placement of WINGO's Name on a Prosecutor's List of Officers Whose Employment History is Reviewed Prior to Testifying in Court Proves Notice of WINGO's Untruthfulness</u>

145.   Prior to June 1, 2020, WINGO's name had been placed on a list in the Pulaski County Prosecutor's Office which has been described by prosecutors as "a starting point for an inquiry" based on "many different sources of information" "that cause [Pulaski County

Prosecutor's Office] to want to check with a law enforcement agency about the status of a particular officer."

146.   This list is comprised of officers about whom prosecutors inquire when they are concerned about the professional backgrounds of the officers affecting the credibility of the officers' trial testimony.

147.   On information and belief, WINGO is the only ASP officer whose name has been placed on the prosecutor's list.

<u>PLAINTIFF SUFFERED PERMANENT PHYSICAL, MENTAL AND EMOTIONAL</u>
<u>DAMAGES AS A RESULT OF WINGO'S EXCESSIVE FORCE</u>

148.   PLAINTIFF's physical injuries are substantial and include a severe concussion, cervical inflammation and pain, great facial pain and the loss of many teeth.  The serious physical injuries to PLAINTIFF's mouth, teeth and jaw required extensive oral surgery to repair and rebuild, including the surgical placement of tooth implants and a titanium plate in PLAINTIFF's lower jaw, supported by screws and other hardware.  *See Image No. 23 below.*



**Image No. 23: Radiological images of the injuries PLAINTIFF suffered to his teeth and jaw at the 06/01/20 Floyd Protest.**

149.   Additionally, PLAINTIFF has suffered permanent facial disfigurement as a result of the injuries he sustained on June 1, 2020.  The incident resulted in psychological trauma to

PLAINTIFF, causing him to seek out and receive the services of a clinical psychologist. As a result of the incident, PLAINTIFF was diagnosed with post-traumatic stress disorder (PTSD).

150. PLAINTIFF is a lawyer and his injuries caused him to lose substantial income. PLAINTIFF has been forced to expend thousands of dollars in medical expenses, including out-of-pocket medical costs, related to the injuries he suffered on June 1, 2020.

151. Moreover, PLAINTIFF's children were traumatized because they did not know the whereabouts of their punctual and reliable father for several hours. They feared he was dead or seriously injured and this, too, caused PLAINTIFF emotional distress and consternation.

## COUNT I
### RYAN WINGO
### VIOLATION OF FOURTH AMENDMENT–EXCESSIVE FORCE

152. PLAINTIFF hereby restates and realleges all preceding paragraphs as if fully set forth again in this paragraph.

153. WINGO, acting under color of law, unreasonably applied physical force to PLAINTIFF by shooting him in the face with a beanbag projectile, restraining his freedom of movement such that he was unable to leave the scene without the assistance of others, and thereby effected a seizure of PLAINTIFF under the Fourth Amendment.

154. The force used by WINGO was objectively excessive because under the circumstances—in which PLAINTIFF was leaving the Capitol grounds after engaging in peaceful protest, as ordered—it was not reasonably necessary for any purpose.

155. PLAINTIFF was not posing a threat to the safety of WINGO, SHEELER or others, had not committed any violent crime, and was neither actively resisting arrest nor attempting to evade arrest by flight.

156.   To determine whether the force used to seize a suspect was excessive and thus unreasonable, courts looks to the totality of the circumstances, which include: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officer or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

157.   In *Mitchell v. Morton City*, 28 F.4th 8RX88 (8th Cir. 2022), the Eighth Circuit Court of Appeals stated, "…we have held time and again that, if a person is not suspected of a serious crime, is not threatening anyone, and is neither fleeing nor resisting arrest, then it is unreasonable for an officer to use more than *de minimus* force against him."

158.   In *Mitchell*, the Eighth Circuit Court of Appeals held that it is "clearly established" that the use of more then *de minimus* force on suspected trespassers who are suspected to have obstructed a government function violates the Fourth Amendment.

159.   It is clearly established in the Eighth Circuit that the use of force more than *de minimis* force in circumstances where an individual is suspected of nonviolent misdemeanors violates the Fourth Amendment.

160.   Prior to June 2020, reasonable law enforcement officers knew that to fire a shotgun loaded with a lead-filled bean bag at a person, regardless of whether one was aiming at the person's face, was to use more than to *de minimus* force against the person.

161.   Therefore, complaint allegations that a law enforcement officer fired a bean bag projectile at a peaceful protester which caused significant injuries to that person, are sufficient to state a claim of excessive force against the officer.

162.   On June 1, 2020, and at all relevant times, PLAINTIFF was engaged in peaceful protest—neither committing a serious crime nor threatening anyone's safety or fleeing or resisting arrest—when he was violently struck in the face with a 12g bean bag projectile fired by WINGO.

163.   On June 1, 2020, WINGO used excessive force against PLAINTIFF's person, causing him great injury, anxiety, stress, mental anguish, pain and suffering.

164.   The force used by WINGO was unnecessary and unreasonable, and PLAINTIFF's great injury, anxiety, stress, mental anguish, pain and suffering resulted directly from the use of said force which was excessive.

165.   By reason of the conduct of WINGO, PLAINTIFF was deprived of rights, privileges and immunities secured to him by the Fourth and Fourteenth Amendments to the United States Constitution, and laws enacted thereunder.

166.   The violence committed by WINGO, and inflicted upon PLAINTIFF was unnecessary, objectively unreasonable and excessive and was, therefore, in violation of PLAINTIFF's Fourth Amendment Rights. Therefore, WINGO is liable to PLAINTIFF in damages pursuant to 42 U.S.C. § 1983, including conscious pain and suffering, punitive damages and attorney fees.

## COUNT II
## RYAN WINGO, JEFF SHEELER AND JOHN S. JOE
## FIRST AMENDMENT RETALIATION CLAIM

167.   PLAINTIFF hereby restates and realleges all preceding paragraphs as if fully set forth again in this paragraph.

168.   At the time he was shot by WINGO, PLAINTIFF was engaged in activity protected by the First Amendment's guarantees freedom of speech and assembly.

169.   WINGO shot PLAINTIFF in the face with a beanbag projectile—an adverse action, taken under color of law, that would chill a person of ordinary firmness from continuing to speak and assemble.

32

170.     WINGO was motivated to shoot PLAINTIFF at least in part by PLAINTIFF's exercise of his First Amendment rights.

171.     Shooting PLAINTIFF was objectively unreasonable under the circumstances.  In the alternative, WINGO and SHEELER, and each of them, lacked probable cause to shoot PLAINTIFF and/or cause him to be shot.

172.     JOE was motivated to authorize the usage of less-than-lethal weapons by ASP troopers, such as WINGO, at least in part by PLAINTIFF's exercise of his First Amendment rights.

173.     PLAINTIFF intends to continue participating in in protests of police violence to the maximum extent he is physically able.

174.     However, PLAINTIFF cannot do this because there is still a significant risk that he will be subject to retaliation by WINGO, SHEELER and JOE, and each of them, based on his First Amendment activities or excessive force in violation of the Fourth Amendment.

175.     PLAINTIFF reasonably fears such retaliation and/or excessive force based on his firsthand experience of how JOE authorizes the usage of less-than-lethal weapons on non-violent protesters and how WINGO and SHEELER, and each of them, treat non-violent protesters who are following dispersal orders.

176.     To prevail on a First Amendment retaliation claim, a plaintiff must show that the defendant would not have taken the adverse action but for harboring "retaliatory animus" against the plaintiff because of his exercise of his First Amendment rights.

177.     At the time he was injured by WINGO, PLAINTIFF was participating in the 06/01/20 Floyd Protest; a public protest of chronic excessive force committed by police officers, an overall lack of police accountability and an institutional tolerance within Arkansas' law enforcement apparatus of egregious, often violent, police misconduct.

33

178.    On June 25, 2020, Lt. Brown drafted a memorandum to ASP Division Commander, Major Jason Aaron, wherein he expressly identified the reason protesters took to the streets of Little Rock between May 30, 2020 and June 7, 2020: they "were protesting for change in the nations (sic) police after the death of George Floyd, who died while in police custody."

179.    It cannot be denied that WINGO and SHEELER, both ASP troopers, are police officers and, therefore, PLAINTIFF asserts herein that WINGO and SHEELER represent the "police" by the protesters sought to "change" and, in fact, WINGO and SHEELER were the focus of the frustration, anger and orchestrated chants expressed by PLAINTIFF and many others during the 06/01/20 Floyd Protest.

180.    WINGO and SHEELER's unconstitutional response to PLAINTIFF's protected conduct and speech was not the result of a misunderstanding of their official duties nor a misapprehension of the confines of the protections afforded by the United States Constitution.

181.    Rather, WINGO and SHEELER's unconstitutional response to PLAINTIFF's protected conduct and speech was the result of WINGO and SHEELER's animus toward the sentiments advanced by the George Floyd protests and, obviously, PLAINTIFF, who was participating in the advancement of those sentiments on June 1, 2020.

182.    By reason of the conduct of WINGO, PLAINTIFF was deprived of rights, privileges and immunities secured to him by the First and Fourteenth Amendments to the United States Constitution, and laws enacted thereunder.

183.    As a result of the acts and omissions described above, PLAINTIFF was subjected to excessive force and caused personal injuries, great pain, fear, apprehension and emotional distress.  Therefore, WINGO and SHEELER are liable to PLAINTIFF in damages under 42 U.S.C. § 1983.

## COUNT III
## JOHN S. JOE AND JOHN DOES 1-5
## FAILURE TO INTERVENE

184.    PLAINTIFF hereby restates and realleges all preceding paragraphs as if fully set forth again in this paragraph.

185.    A police officer may be liable if he does not intervene to prevent the use of excessive force when(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.

186.    JOE authorized the usage of less-than-lethal weapons—including the deployment of beanbag projectiles—during the 06/01/20 Floyd Protest, despite fact that this level of force was excessive and inappropriate given the circumstances.

187.    For a substantial amount of time, JOE knew ASP troopers, including WINGO, were firing beanbag projectiles at non-violent protesters during the 06/01/20 Floyd Protest but did not intervene.

188.    For a substantial amount of time, JOE was in vicinity of ASP troopers who fired beanbag projectiles at non-violent protesters during the 06/01/20 Floyd Protest but did not intervene.

189.    For a substantial amount of time, JOHN DOES 1-5 observed ASP troopers, such as WINGO, using beanbag projectiles on non-violent protesters prior to WINGO shooting PLAINTIFF and causing his injuries but did not intervene.

190.    JOE and JOHN DOES 1-5, and each of them, had the opportunity and means to prevent WINGO from causing PLAINTIFF's serious injuries during the 06/01/20 Floyd Protest.

191.    As a result of the acts and omissions described above, PLAINTIFF was subjected to excessive force and caused personal injuries, great pain, fear, apprehension and emotional distress.  Therefore, JOHN S. JOE and JOHN DOES 1-5 are liable to PLAINTIFF in damages under 42 U.S.C. § 1983.

**COUNT IV**
**WILLIAM J. BRYANT**
**SINGLE ACT SUPERVISORY LIABILITY**

192.    PLAINTIFF hereby restates and realleges all preceding paragraphs as if fully set forth again in this paragraph.

193.    In June 2020, WINGO was a five-year veteran of ASP and, at all relevant times, including prior to June 1, 2020, COL. BRYANT, had actual notice that WINGO's background and employment history include at least one (1) demonstrable instance of making false statements during official police matters and engaging in untruthfulness during interactions with tax-paying Arkansans.

194.    At all relevant times, including prior to June 2020, COL. BRYANT was aware that WINGO was untruthful regarding the facts of the Donner incident.

195.    On information and belief, WINGO was untruthful regarding the facts of the Donner incident because WINGO knew that he committed police misconduct and sought to avoid discipline and/or accountability for his police misconduct.

196.    On information and belief, COL. BRYANT did not appropriately discipline WINGO for the constitutional violations committed by WINGO during the Donner incident, nor for the false statements about the Donner incident made by WINGO.

197.    Knowingly making false statements about a traffic stop to dispatch operators constitutes untruthfulness during official police business.

36

198.   COL. BRYANT knew in June 2020, and at all relevant times, that WINGO's ASP trooper assignments would necessarily involve interactions between WINGO and members of the public.

199.   WINGO's misconduct during the Donner incident—as well as his attempts to conceal this misconduct—foreshadowed that WINGO would continue to make false statements to avoid future misconduct, such as intentionally discharging a bean bag projectile to PLAINTIFF's face despite the lack of any objectively reasonable basis to use such force and then providing false statements to conceal the misconduct.

200.   Appropriate scrutiny and appreciation of WINGO's background and employment history prior to June 1, 2020 would have led a reasonable final policymaker—like COL. BRYANT—to conclude the plainly obvious consequence of the decision to continue WINGO's employment was that WINGO would continue to engage police misconduct and then make false statements to avoid discipline or accountability for the police misconduct.

201.   There was a direct link between WINGO's employment history and the unreasonable risk of increased excessive force during interactions with members of the public that WINGO posed.

202.   COL. BRYANT's decision to retain WINGO on the ASP trooper staff in June 2020 and PLAINTIFF's constitutional injuries are closely connected, with WINGO's background and employment history being the link.

203.   In June 2020, and at all relevant times, COL. BRYANT further disregarded the unreasonable risk that WINGO would commit excessive force during interactions with members of the public—such as PLAINTIFF—by allowing WINGO to participate in ERT where a firm

understanding of, and respect for, the constitutional limitations on uses of force is essential to performing tasks potentially associated with emergency responses.

204.    The acts and omissions of COL. BRYANT described above were the moving force behind WINGO's violations of PLAINTIFF's constitutional rights and proximately caused PLAINTIFF's personal injuries, great pain, fear, apprehension and emotional distress.

205.    The acts and omissions described above also proximately caused a deprivation of the rights, privileges and immunities secured to PLAINTIFF by the Fourth and Fourteenth Amendments to the United States Constitution, and laws enacted thereunder.

206.    As a result of the acts and omissions described above, PLAINTIFF was subjected to excessive force and caused personal injuries, great pain, fear, apprehension and emotional distress.  Therefore, COL. BRYANT is liable to PLAINTIFF in damages under 42 U.S.C. § 1983.

### COUNT V
### RYAN WINGO AND JEFF SHEELER
### FALSE ARREST

207.    PLAINTIFF hereby restates and realleges all preceding paragraphs as if fully set forth again in this paragraph.

208.    WINGO and SHEELER, and each of them, did not have a reasonable belief that PLAINTIFF committed the crime(s) described in their respective incident reports and, therefore, neither WINGO nor SHEELER acted in good faith in pursuing PLAINTIFF's arrest on July 23, 2021.

209.    WINGO and SHEELER's arrest of PLAINTIFF was not lawful because it was not supported by probable cause.

210.    WINGO and SHEELER'S incident reports (Exhibit 6 and Exhibit 7) contain material misrepresentations.

211.     WINGO and SHEELER therefore committed unlawful violations of PLAINTIFF's personal liberty which consisted of detention without sufficient statutory authority. WINGO and SHEELER's conduct was intentional.

212.     PLAINTIFF was a party to a pretrial diversion agreement. Thus, PLAINTIFF was never convicted of—and therefore, *a fortiori*, never sentenced on—the charges brought against him by WINGO and SHEELER.

213.     Further, even if the Eighth Circuit considered a pretrial diversion agreement to constitute a "conviction or sentence"—which it does not—the success of § 1983 claim premised thereupon nonetheless would not imply the invalidity of the agreement.

214.     In the Eighth Circuit, a pretrial diversion agreement is simply a contract in which the state agrees to forego prosecution in consideration for a defendant agreeing not to commit certain proscribed infractions for a specified period of time.

215.     The success of such a § 1983 claim would imply nothing about whether the pretrial diversion agreement with the state was a valid contract. Therefore, the favorable-termination requirement is inapplicable, and the § 1983 claim is not barred by the doctrine promulgated in *Heck v. Humphrey*, 512 U.S. 477, 114 S. Ct. 2364 (1994).

216.     By reason of the conduct of WINGO and SHEELER, PLAINTIFF was subjected to an unlawful detention and caused personal injuries, great pain, fear, apprehension and emotional distress. Therefore, WINGO and SHEELER, and each of them, are liable to PLAINTIFF for false arrest.

## COUNT VI
## RYAN WINGO, JEFF SHEELER, JOHN S. JOE AND JOHN DOES 1-5
## CIVIL CONSPRIRACY TO VIOLATE CONSTITUTIONAL RIGHTS

217.   PLAINTIFF hereby restates and realleges all preceding paragraphs as if fully set forth again in this paragraph.

218.   WINGO, SHEELER, JOE and JOHN DOES 1-5 conspired, under color of law, to deprive PLAINTIFF of his First, Fourth and Fourteenth Amendment rights.

219.   WINGO, SHEELER, JOE and JOHN DOES 1-5 reached an agreement, acted in concert and committed overt acts in furtherance of the conspiracy.  WINGO, SHEELER, JOE and JOHN DOES 1-5, and each of them, targeted non-violent protesters they perceived as antagonistic to police and repeatedly utilized excessive force to interfere with the exercise of their constitutionally protected right to protest police violence.

220.   In the alternative, WINGO, SHEELER, JOE and JOHN DOES 1-5, and each of them, engaged in indiscriminate unlawful use of less-lethal projectiles during the George Floyd protests.

221.   One of those overt acts—WINGO shooting PLAINTIFF in the face with a beanbag projectile—directly and proximately caused PLAINTIFF significant physical and emotional injury.

222.   As set forth above, DEFENDANTS did, in fact, violate PLAINTIFF's First, Fourth and Fourteenth Amendment rights.  The acts and omissions described above also proximately caused a deprivation of the rights, privileges and immunities secured to PLAINTIFF by the U.S. Constitution, and laws enacted thereunder.

40

WHEREFORE, Plaintiff, DON LLOYD COOK, by and through his attorneys, LAUX

LAW GROUP, and requests judgment against the Defendants, RYAN WINGO, JEFF SHEELER,

JOHN S. JOE and WILLIAM J. BRYANT, JOHN DOES 1-5, and each of them:

1. A declaration that WINGO's actions violated PLAINTIFF's rights under the First, Fourth and Fourteenth Amendments;

2. That DEFENDANTS be required to pay PLAINTIFF's compensatory damages;

3. That DEFENDANTS be required to pay actual damages;

4. That DEFENDANTS be required to pay attorney fees per 42 U.S.C. § 1988; and

5. That PLAINTIFF have any other such relief as this Honorable Court deems just and proper.

Respectfully submitted,

/s/ Michael J. Laux
Michael J. Laux
E. Dist. Arkansas Bar No. 6278834
One of the Attorneys for PLAINTIFF
LAUX LAW GROUP
400 W. Capitol Avenue, Suite 1700
Little Rock, Arkansas 72201
Telephone: (501) 242-0750
Facsimile: (501) 372-3482
E-mail: mlaux@lauxlawgroup.com
          mikelaux@icloud.com

**Little Rock District Court**
**Criminal Division**

### IN THE DISTRICT COURT OF LITTLE ROCK, ARKANSAS
### FIRST DIVISION-CRIMINAL

JUN - 5 2020

Time: 1255 pm

### IN RE: EVIDENCE REGARDING ARRESTS INVOLVING DEMONSTRATIONS
### BEGINNING MAY 25, 2020

The Court anticipates that Motions for Discovery and Motions for Preservation of Evidence will be filed in these cases.   These cases have drawn significant public interest.  In order to ensure the availability of evidence for all parties during the anticipated trials of these matters and to avoid litigation concerning the notice and length of time for the preservation of evidence, the Court hereby orders the Little Rock Police Department, the Pulaski County Sheriff's Office, the North Little Rock Police Department, the Sherwood Police Department, the Arkansas State Police, the Arkansas Highway Police, the Arkansas State Capitol Police, the Arkansas Game and Fish Commission, and the Prosecuting Attorney to preserve all evidence connected with any demonstrations and arrests which began May 25, 2020.    This includes, but is not limited to, all digital and analog recordings from 911 calls, dash cameras, body cameras or any other devices used to record video or audio.   The Court requests the Prosecuting Attorney coordinate the preservation of such evidence with the involved law enforcement agencies.

Orders for Preservation of Evidence will be entered as the Court assigns case numbers.

**IT IS SO ORDERED.**

Judge Melanie H. Martin
Little Rock District Court-1ˢᵗ Div.

6-5-2020
Date

**Exhibit 1**

Prosecuting Attorney's Form Affidavit          Case Number: _NLCAC-21 1221_

Form supplied     North Little Rock City Attorney's Office     Date: _____
by:

# IN THE DISTRICT COURT OF NORTH LITTLE ROCK, PULASKI COUNTY, ARKANSAS
## AFFIDAVIT FOR WARRANT OF ARREST FOR THE FOLLOWING PERSON:

| Don L.  Cook | 7/7/1962 W/M | |
|---|---|---|
| POTENTIAL DEFENDANT'S NAME | DOB/RACE/SEX | _____Felony |
| 63 Lefever Lane Little Rock, AR 72227 | | |
| ADDRESS | PHONE NUMBER | X Misd. |
| 925922352 | | |
| AR Driver's License | SSN | _____Violation |

| | 5-10 | 195 | Brown | Brown |
|---|---|---|---|---|
| FBI Number | Height | Weight | Hair Color | Eye Color |

- Pursuant to Rule 7.1 of the Arkansas Rules of Criminal Procedure, the undersigned affiant(s) being duly sworn, deposes and says that he has reason to believe that the above-named person has committed the offense of, violating, Arkansas Code Ann. **Code Number. Code Title.** Code. Obstructing Gov. operations 5-54-102 -(a)(1)- Knowingly obstructs, impairs or hinders the performance of a governmental function. (b)(1) Obstructing governmental operations by using or threatening to use physical force is a Class A Misdemeanor

## FACTS CONSTITUTING REASONABLE CAUSE

I, Lieutenant Jeff Sheeler, of the Arkansas State Police, hereby swear and affirm that the following is true and accurate to the best of my knowledge:

### FACTS OF ARREST AND FACTS RELEVANT TO CHARGE

Obstructing Governmental Operations (5-54-102)

On 6/1/2020, at approximately 10:45pm, I was providing protection for the Arkansas State Police Emergency Response Team (ERT) and the Arkansas National Guard ERT during the violent Protest at the Arkansas State Capitol building and grounds. I was in a SWAT Capacity as both the overall commander and a functioning member of the team. I was stationed on top of the Bear and was supporting the turret operator (Trooper Baethke). My primary mission was to provide lethal protection for members on the ground and my secondary mission was less lethal protection with a 40 mm single launcher for foam impact munitions.

Continued on Page 2 of 3 page document

**Exhibit 2**

Page 2 of 3 document

Case Number: _____

Date: _____

As the ERT Teams and SWAT approached and passed the Capitol steps at the intersection of Capitol Avenue and Woodlane, I observed the left side of the line of ERT members engaging a white male who was refusing commands to leave the area with peperball. He was wearing a white shirt and red shorts. The rounds were hitting him in the back as he was being driven from the area. Suddenly he turned and began shouting at the ERT Members in an aggressive manner and began to approach the line with clenched fists. He appeared very agitated.

I fired one (1) foam impact round at his upper left thigh from a distance of approximately 20 yards. The round struck him in the upper thigh/groin area and stopped his advance. Almost simultaneously he was engaged with a bean bag round from a member of ERT on the line and collapsed on the lawn and did not move. Members of an ERT arrest team advanced and took him into custody after a few seconds. He was conscience but was suffering an obvious injury to his mouth which was bleeding profusely.

ERT members moved him behind the BEAR to him medical attention and I did not see him again. I learned later that his was turned over to MEMS for treatment but law enforcement lost track of him in the chaos and he was not booked into the Pulaski County Jail. Efforts to identify him with MEMS records had been negative. A ten o'clock (pm) curfew was in effect on this date and time.

Upon viewing a video recording taken on May 4, 2021, of Don Cook being questioned by ASP Attorney Mary Claire McLaurin regarding these events, I was able to positively identify him as the individual referenced in my report. The video conference took place in association with an Arkansas Claims Commission case, No. 210648 , in which Don Lloyd Cook (DOB: 7/7/1962) filed a claim against the Arkansas State Police alleging that he suffered injuries to his face from a non-lethal projectile at the exact time, date, and location as the events referenced in the incident report.

I swear that the allegations contained herein are the truth, the whole truth and nothing but the truth.

1. *Lt Jeff Sheeler #457*   2. _____
**Affiant's Signature**                        Affiant's Signature
Lieutenant Jeff Sheeler
**Print Name**                                 Print Name
1 State Police Plaza Dr. Little Rock, AR 72209
**Address**                                    Address
501-618-8282
**Phone**                                      Phone

Subscribed and sworn to before me this *28* day of *May* . 202*0*
District Court Clerk        By *Tamara Newson*

**Page 3 of 3 document**

Case Number: _____

Date: _____

(Deputy Clerk)

I hereby find that this sworn affidavit demonstrates reasonable and probable cause for the issuance of a warrant of arrest for the above-named individual for the above-stated offense.

_____            _____
District Judge                                          District Court, Pulaski County, AR

Cook, Don Lloyd II

### IN THE 31ST STATE DISTRICT COURT, NORTH LITTLE ROCK DEPT, ARKANSAS
### 31ST STATE DISTRICT JUDGE, NORTH LITTLE ROCK, DIV 1

# WARRANT OF ARREST
### CITY ARREST WARRANT - AREA 1

**Case Number:** NLCRC-21-1221

**Warrant No.:** NL-21-1050

#### Total Bond to Collect:

**Date Printed:** May 28, 2021

The State of Arkansas, To Any Law Enforcement Officer in the State:

IT APPEARING that there are reasonable grounds for believing that **DON LLOYD,2ND COOK** has committed the following offenses:

**5-54-102 OBSTRUCTING GOVERNMENTAL**
  **OPERATIONS**
  **A(AN) CLASS C MISDEMEANOR** . . .
  **VIOLATION DATE: 01-JUN-20 - - CITY**

in the County of PULASKI, you are hereby commanded to arrest and bring the above named person before the 31ST STATE DISTRICT COURT, NORTH LITTLE ROCK DEPT.

Given under my hand and seal of said court this May 28, 2021.

☐ CASH BOND
☐ PROFESSIONAL BOND
☐ NO CONTACT WITH AFFIANT
☐ MANDATORY APPEARANCE
☐ OTHER: _____

_____
Judge or Clerk

| | |
|---|---|
| **Defendant's Last Known Address:** | Sex: M          Race: WHITE |
| DON LLOYD,2ND COOK | Height: 70 inches 5'10 Weight: 195 lbs. |
| 63 LEFEVER LANE | Eye color: BROWN   Hair color: BROWN |
| LITTLE ROCK  AR 72227 | D.L. State: AR   D.L. Number: 925922352 |
| | Date of Birth: 07/07/1962 |
| | System ID: 925922352 |

### WARRANT RETURN

**BOND POSTED:$**_____  ☐ CASH  ☐ RECOGNIZANCE  ☐PROF  ☐10%

I certify that I have served the within warrant of arrest on the **23** day of **July**, 20 **21**.

at _____

by: ☐ taking into my custody the within named **DON LLOYD,2ND COOK** .
  ☐ delivering a copy of this warrant of arrest to the within named **DON LLOYD,2ND COOK** personally and releasing the accused upon promise to appear in the **31ST STATE DISTRICT COURT, NORTH LITTLE ROCK DEPT** on the court date stated herein.
  ☐ Warrant returned unexecuted
  ☐ Warrant recalled

B.S.MS. 7372 /CSA Merz 4565
Arresting Officer and Agency
SID Number:_____
Arrest Tracking Number:_____

| |
|---|
| **COURT DATE:**_____at ___:___ a.m./p.m. |
| I promise to appear in said court at said time and place. |
| I understand the above and that my signature is not an |
| admission of guilt. |
| |
| Signature: |

### ATN IS REQUIRED FOR FELONIES AND CLASS A MISDEMEANORS (A.C.A. 12-12-1006)

# Exhibit 3

## NORTH LITTLE ROCK ARREST / DISPOSITION REPORT

| DEFENDANT IDENTIFICATION | Arresting Agency Name **NORTH LITTLE ROCK POLICE** | NCIC Code **ARO600300** |
|---|---|---|

**Name** Last Cook   **First** Don   **Middle** Lloyd 2nd

**Aliases**

**Street Address** 123 Liefever Ln.   **Phone No.**

**City & State** Little Rock  AR.   72227

**Computer Use - CSN**   **F.B.I. No.**

**Social Security No.**   **Driver License No./State** 925922352-AR

**Sex** ☑M ☐F   **Race** ☑White ☐Black   ☐American Indian or Alaskan Native ☐Asian or Pacific Islander ☐Unknown   **Ethnicity** ☐Hispanic ☑Not Hispanic   **Date of Birth** mo. 07 day 07 yr 62   **Age** 59   **Place of Birth** Unknown

**Hair** Bro   **Eyes** Bro   **Weight** 195   **Height** 5'10   **Scars and Marks**

**Complexion**   **Build**   **Employer/Occupation**

**Name of Nearest Relative**   **Phone No.**

**Street Address**   **City, State, Zip**

---

### ARREST

**PLEASE PRESS HARD - YOU ARE MAKING FOUR COPIES**

**Place of Arrest** PCSO Southside   **Arresting Officers** B.Sims 7372/CSA Merz 4585

| Date of Arrest 7-23-21 | Time of Arrest 08 45 | Bail Amount Set Ø | Offense No 21-57198 | Agency Received From State Police | Agency Transferred To PCSO |
|---|---|---|---|---|---|

| No. | Computer USE-SRN | Case/Docket No. | Statute No. | Counts | Charge Desc. | Law Enforcement Action | Date of Action |
|---|---|---|---|---|---|---|---|
| 1 | NLCRC | 21-1050 | S-54-102 | 1 | Obstruction | CML | 7-23-21 |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |

**Facts of Arrest (Explain in Detail)**   Fingerprint Card? ☐Yes ☐No   More Charges? ☐Yes ☐No

Warrant # NL-21-1050 Served. Transported by State Police on their charges.

**Court Date** 8-10-21 @ 0900   **Court Trying Case** Criminal   **Right Thumb Print**

| Complainant and Witness Names | Address | Phone |
|---|---|---|
| Complainant | Home | |
| | Business | |
| Witness | Home | |
| | Business | |
| Witness | Home | |
| | Business | |

**TRAVELING COPY**

**Exhibit 4**

**IN THE DISTRICT COURT OF NORTH LITTLE ROCK, ARKANSAS
CRIMINAL DIVISION**

STATE OF ARKANSAS                                          PLAINTIFF

VS.                                No.  NLCRC-21-1221

DON LLOYD COOK                                             DEFENDANT

<u>**ENTRY OF APPEARANCE, WAIVER OF
ARRAIGNMENT AND NOT GUILTY PLEA**</u>

COMES NOW the undersigned counsel, attorney for the above-named Defendant

and hereby enters their appearance, waives formal arraignment in the above styled matter,

enters a plea of not guilty and requests notification of the trial/preliminary hearing setting.

Respectfully submitted,

DIGBY LAW FIRM
316 N. Main Street
Benton, AR  72015
Office:  (501) 500-9292
Email:  Bobby@DigbyLawFirm.com

BOBBY R. DIGBY II (2005222)
Daniel S. Marks (2020116)

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was delivered on July 28, 2021, to the
following:

Austin Kempker
Prosecuting Attorney

BOBBY R. DIGBY II
DANIEL S. MARKS

**Exhibit 5**

# Incident Report Form
# Arkansas Uniform

| | |
|---|---|
| | Incident Report Number |
| | 5.1.0 A-06/20-0696C |

**SUMMARY**

| Incident Type | Incident Date | Incident Time |
|---|---|---|
| Use of Force | 6/1/2020 | 10:38 PM |

| Call Location | Call Date | Call Time |
|---|---|---|
| Arkansas State Capital Building | 6/1/2020 | 11:00 PM |

| Incident County | Incident Address | |
|---|---|---|
| PULASKI | 500 Woodlane St | |

| Incident City | Incident State | Incident Zip Code |
|---|---|---|
| LITTLE ROCK | AR | 72201 |

| Number of Subjects | Number of Vehicles |
|---|---|
| 1 | 0 |

**SUBJECT 1**

The Subject is

## Suspect

| Last Name | First Name | MI | Suffix |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

| Address | City | State | Zip Code |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

| License Status | DL Number | DL State | DL Endorsements | DL Class | DL Restrictions |
|---|---|---|---|---|---|
| Unknown | N/A | N/A | None | N/A | None |

| Telephone Number | DOB | Race | Sex |
|---|---|---|---|
| N/A | N/A | CAUCASIAN | Male |

| Height | Weight | Hair Color | Eye Color |
|---|---|---|---|
| 0'0 | 275 | N/A | N/A |

| Employer | Work Number |
|---|---|
| N/A | N/A |

| Work Address | Work City | Work State | Work Zip Code |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

| Injury Transported | Transported By |
|---|---|
| ☐Yes  ☑No | N/A |

| Hospital Name | Hospital City | Hospital State |
|---|---|---|
| N/A | N/A | N/A |

Additional Information
N/A

N
A
R
R
A
T
I
V
E

On June 1, 2020 while tasked to the Emergency Response Team (ERT), we were requested to deploy to the State Capital Building to disperse protestors from the grounds that have become violent and destructive.

As we arrived to the State Capital Building, protestors began to throw multiple hard objects at us.

We informed the protestors the gathering had became unlawful and that they needed to leave the area or be arrested. After giving dispersal orders multiple times, we began to advance on the crowd and deploy CS Gas to disperse the crowd.

As we advanced, a unknown white male started to approach the left side of the line where there were very few ERT members to arrest the unknown male.

As unknown male advanced towards us, he was struck with a PepperBall system to deter him from advancing any further. Despite being struck multiple times by PepperBalls, the unknown male continued to advance towards us. I then attempted to strike the unknown male with my Less Lethal 12 gauge Shotgun loaded with BeanBag projectiles to prevent him from advancing any further.

Due to the poor lighting at night, wearing a gas mask and a face shield, and the thickness of the CS Gas that was deployed, it took multiple shots before striking the unknown male. After being struck with a BeanBag projectile, the unknown male finally stopped advancing towards us and went to the ground.

After going to the ground, an ERT arrest team went to the unknown male's location and placed him under arrest.

After the State Capital Building's Grounds were cleared of the protestors, it was brought to my attention that the BeanBag projectile that struck the unknown male had unintentionally struck him in the face.

After being arrested, the unknown male was taken to a MEMS Ambulance and assessed by their personnel. After being assessed, the unknown male was released by MEMS personnel from the ambulance before he could be transported to Pulaski County Detention Center.

At a later date, it was brought to my attention that the same unknown male was stuck by a foam baton round that caused him to fall forward and then get struck with the 12ga BeanBag projectile. Reference Incident Report A-06/20-0696P.

O
F
F
I
C
E
R

| Rank | Officer Last Name | | Officer First Name | Officer MI | Officer Suffix |
|------|-------------------|---|--------------------|------------|----------------|
| TFC | Wingo | | Ryan | N/A | N/A |
| Officer Signature | | Officer Department | | | |
| | | STATE POLICE TROOP K | | | |
| | | Officer Badge Number | | | |
| | | 549 | | | |
| Rank | Supervisor Last Name | | Supervisor First Name | Supervisor MI | Officer Suffix |
| Lieutenant | BROWN | | BOBBY | N/A | N/A |
| Supervisor Signature | | Supervisor Department | | | |
| | | STATE POLICE TROOP K | | | |
| | | Supervisor Badge Number | | | |
| | | 269 | | | |

# Incident Report Form
## Arkansas Uniform

| | Incident Report Number |
|---|---|
| | 5.1.0 A-06/20-0069P |

**S U M M A R Y**

| Incident Type | Incident Date | Incident Time |
|---|---|---|
| USE OF FORCE | 6-1-2020 | 10:45:00 PM |

| Call Location | Call Date | Call Time |
|---|---|---|
| ARKANSAS STATE CAPITOL | 6-1-2020 | 10:45:00 PM |

| Incident County | Incident Address |
|---|---|
| PULASKI | WOODLANE AND CAPITOL AVENUE |

| Incident City | | Incident State | Incident Zip Code |
|---|---|---|---|
| LITTLE ROCK | | AR | 72204 |

| Number of Subjects | Number of Vehicles |
|---|---|
| 1 | 0 |

**S U B J E C T 1**

The Subject is

## Suspect

| Last Name | First Name | MI | Suffix |
|---|---|---|---|
| UNK | UNK | | |

| Address | City | State | Zip Code |
|---|---|---|---|
| UNKNOWN | | | 00000 |

| License Status | DL Number | DL State | DL Endorsements | DL Class | DL Restrictions |
|---|---|---|---|---|---|
| Unknown | UNKNOWN | | | | |

| Telephone Number | DOB | Race | Sex |
|---|---|---|---|
| | | CAUCASIAN | Male |

| Height | Weight | Hair Color | Eye Color |
|---|---|---|---|
| 5' 9" | 165 | BRN - Brown | |

| Employer | Work Number |
|---|---|
| | |

| Work Address | Work City | Work State | Work Zip Code |
|---|---|---|---|
| | | | |

| Injury Transported | Transported By |
|---|---|
| ☐ Yes  ☑ No | |

| Hospital Name | Hospital City | Hospital State |
|---|---|---|
| | | |

Additional Information

ON 06/01/2020, AT APPROXIMATELY 10:45 PM, I WAS PROVIDING PROTECTION FOR THE ARKANSAS STATE POLICE EMERGENCY RESPONSE TEAM (ERT) AND THE ARKANSAS NATIONAL GUARD ERT DURING THE VIOLENT PROTESTS AT THE ARKANSAS STATE CAPITOL BUILDING AND GROUNDS. I WAS IN A SWAT CAPACITY AS BOTH THE OVERALL COMMANDER AND A FUNCTIONING MEMBER OF THE TEAM. I WAS STATIONED ON TOP OF THE BEAR AND WAS SUPPORTING THE TURRET OPERATOR (TROOPER BAETHKE). MY PRIMARY MISSION WAS TO PROVIDE LETHAL PROTECTION FOR MEMBERS ON THE GROUND AND MY SECONDARY MISSION WAS LESS LETHAL PROTECTION WITH A 40 MM SINGLE LAUNCHER FOR FOAM IMPACT MUNITIONS.

AS THE ERT TEAMS AND SWAT APPROACHED AND PASSED THE CAPITOL STEPS AT THE INTERSECTION OF CAPITOL AVENUE AND WOODLANE, I OBSERVED THE LEFT SIDE OF THE LINE OF ERT MEMBERS ENGAGING A WHITE MALE WHO WAS REFUSING COMMANDS TO LEAVE THE AREA WITH PEPPERBALL. HE WAS WEARING A WHITE SHIRT AND RED SHORTS. THE ROUNDS WERE HITTING HIM IN THE BACK AS HE WAS BEING DRIVEN FROM THE AREA. SUDDENLY HE TURNED AND BEGAN SHOUTING AT THE ERT MEMBERS IN AN AGGRESSIVE MANNER AND BEGAN TO APPROACH THE LINE WITH CLENCHED FISTS. HE APPEARED VERY AGITATED.

I FIRED ONE (1) FOAM IMPACT ROUND AT HIS UPPER LEFT THIGH FROM A DISTANCE OF APPROX. 20 YARDS. THE ROUND STRUCK HIM IN THE UPPER THIGH/GROIN AREA AND STOPPED HIS ADVANCE. ALMOST SIMULTANEOUSLY HE WAS ENGAGED WITH A BEAN BAG ROUND FROM A MEMBER OF ERT ON THE LINE AND COLLAPSED ON THE LAWN AND DID NOT MOVE. MEMBERS OF AN ERT ARREST TEAM ADVANCED AND TOOK HIM INTO CUSTODY AFTER A FEW SECONDS. HE WAS CONSCIENCE BUT WAS SUFFERING AN OBVIOUS INJURY TO HIS MOUTH WHICH WAS BLEEDING PROFUSELY.

ERT MEMBERS MOVED HIM BEHIND THE BEAR TO GET HIM MEDICAL ATTENTION AND I DID NOT SEE HIM AGAIN. I LEARNED LATER THAT HE WAS TURNED OVER TO MEMS FOR TREATMENT BUT LAW ENFORCEMENT LOST TRACK OF HIM IN THE CHAOS AND HE WAS NOT BOOKED INTO THE PULASKI COUNTY JAIL.

EFFORTS TO IDENTIFY HIM WITH MEMS RECORDS HAVE BEEN NEGATIVE TO THIS POINT

| Rank | Officer Last Name | | Officer First Name | Officer MI | Officer Suffix |
|---|---|---|---|---|---|
| LT | Sheeler | | Jeff | | |
| Officer Signature | | Officer Department | | | |
| | | STATE POLICE TROOP A | | | |
| | | Officer Badge Number | | | |
| | | 457 | | | |
| Rank | Supervisor Last Name | | Supervisor First Name | Supervisor MI | Officer Suffix |
| SGT | Williams | | Coty | N/A | N/A |
| Supervisor Signature | | Supervisor Department | | | |
| | | STATE POLICE TROOP A | | | |
| | | Supervisor Badge Number | | | |
| | | 329 | | | |

PICTURE