DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 1 of 64

```
1              IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF ARKANSAS
2                         CENTRAL DIVISION

3      _____

4      DON LLOYD COOK                          Plaintiff

5      VS               Case Number:  4:22-CV-00548-KGB-PSH

6      RYAN WINGO, JEFF SHEELER,
       JOHN S. JOE, and WILLIAM J. BRYANT       Defendants
7      _____

8

9                         ---o---

10                       DEPOSITION

11                          OF

12                      DON L. COOK

13                        ---o---

14              Wednesday, August 16, 2023

15                        ---o---

16

17

18

19

20

21

22

23

24

25
```



**Page 2**

```
1           A P P E A R A N C E S
2
3   ON BEHALF OF THE PLAINTIFF:
4     MICHAEL J. LAUX, ESQUIRE
5         Laux Law Group
          400 West Capitol Avenue, Suite 1700
6         Little Rock, Arkansas 72201
7
8   ON BEHALF OF THE DEFENDANTS:
9     JUSTIN BRASCHER, ESQUIRE
      JOHN PAYNE, ESQUIRE
10
          Office of the Attorney General
11        323 Center Street, Suite 200
          Little Rock, Arkansas 72201
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1             I N D E X
                                          PAGE
2   WITNESS:  DON LLOYD COOK
3     EXAMINATION
        By Mr. Brascher.....................004
4     EXAMINATION
        By Mr. Payne.......................166
5     EXAMINATION
        By Mr. Laux........................168
6   FURTHER EXAMINATION
        By Mr. Brascher....................181
7
8
9
10
11          E X H I B I T S
12  NUMBER      DESCRIPTION              PAGE
13    1         Drawing                   066
      2         Facebook post             066
14
15
16
17
18
19
20
21
22
23
24
25  COURT REPORTER'S CERTIFICATE.................184
```

**Page 4**

```
1           The deposition of DON LLOYD COOK was taken before
2   me, Leigh Ann Cook, Certified Court Reporter within and
3   for the County of Conway, State of Arkansas, duly
4   commissioned and acting on Wednesday, August 16, 2023,
5   beginning at the hour of 10:20 a.m. at the Office of the
6   Arkansas Attorney General, 323 Center Street, Suite 200,
7   Little Rock, Arkansas.
8           Said deposition being taken in accordance with
9   the Federal Rules of Civil Procedure and pursuant to the
10  provisions of the Arkansas Rules of Civil Procedure at
11  instance of counsel for the Defendant in the
12  above-styled cause pending in the United States District
13  Court, Eastern District of Arkansas, Central Division.
14                   ---o---
15           P R O C E E D I N G S
16  THEREUPON,
17           DON LLOYD COOK,
18  was called as a witness, and having been first duly
19  sworn, was examined, and testified as follows:
20                   EXAMINATION
21  BY MR. BRASCHER:
22  Q.     All right.  Mr. Cook, I appreciate you being
23  here.  My name is Justin Brascher, and just so that
24  we've got everyone on the record, I'm joined by Mr. John
25  Payne, he's another attorney in our office.  You're here
```

**Page 5**

```
1   and you're represented by counsel, Mr. Laux.  Is that
2   correct?
3   A.     That is correct.
4   Q.     Okay.  And we also have the court reporter here.
5   My understanding is that you used to be an attorney.  Is
6   that right?
7   A.     Well, I am an attorney.
8   Q.     Okay.
9   A.     I'm not currently practicing right now.  I do
10  some legal research work.
11  Q.     Okay.
12  A.     And privacy consulting.
13  Q.     Okay.  So then you understand, generally, how a
14  deposition works?
15  A.     Basically.
16  Q.     Have you ever taken part in a deposition
17  yourself?
18  A.     I have one, maybe two.
19  Q.     Okay.  So you're aware then that I won't talk
20  over you, as long as you don't talk over me, and that
21  way the court reporter can get --
22  A.     Right.
23  Q.     -- a clean record?
24  A.     And I don't nod.
25  Q.     Yes.
```



**Page 6**

1        MR. LAUX:  Let him get the question out
2  too.
3  BY MR. BRASCHER:
4  Q.    But yes, uh-huhs, huh-uhs, those sorts of things
5  don't come through on the record.
6  A.    Right.
7  Q.    If I ask a question and you don't understand
8  quite what I'm asking, totally fine.  Tell me I don't
9  understand the question, ask me to repeat it or
10  rephrase, and I can do so.
11  A.    Yes.
12  Q.    If you answer a question, is it fair for me to
13  assume then that that means that you understood the
14  question?
15  A.    Yes.
16  Q.    Okay.  Are you currently on or have you recently
17  taken any medications, anything like that?
18  A.    No.
19  Q.    Okay.  Have you recently ingested, you know, any
20  mind-altering drugs, alcohol, or anything like that?
21  A.    No.
22  Q.    You understand these are just formalities that
23  I've got to make sure we're clear on?
24  A.    I do.
25  Q.    You understand that at any point if you need to

**Page 7**

1  take a break, that's fine, but I would just ask that you
2  finish answering whatever question I've asked you and
3  then we can take a break.
4  A.    I understand.
5  Q.    All right.
6        MR. BRASCHER:  Before we start, I want to
7  make sure, just so we're upfront about
8  everything, Mr. Laux, you remember we signed --
9  we had filed a joint protective order request in
10  relation to security camera footage back in
11  April.  Finally got signed on Friday.
12        MR. LAUX:  You know, it's funny, I saw
13  that come up and I was, like, What is that?  I
14  thought it was already entered.
15        MR. BRASCHER:  Yeah.  I had -- so I hadn't
16  sent you -- I hadn't sent it to you because I was
17  waiting for the protective order to be filed.  So
18  this is security camera footage from the Capitol.
19  I wanted to give it to you now.  If you want to
20  take a moment before we go into this and review
21  it, you're more than welcome to, but I wanted to
22  make sure that I was openly disclosing this to
23  you.
24        MR. LAUX:  I appreciate that.  How many
25  hours of footage is on there?

**Page 8**

1        MR. BRASCHER:  It is less than hour.  It's
2  closer to 20, 25 minutes.
3        MR. LAUX:  So you're basically saying I
4  could break for 20 or 25 minutes and watch that
5  if I needed to?
6        MR. BRASCHER:  Correct.
7        MR. LAUX:  I also received an email from
8  your office this morning that I was not able to
9  open in an elevator.  Is that this?
10        MR. BRASCHER:  That's this.
11        MR. LAUX:  Okay.  Do you plan on asking
12  questions of Mr. Cook about that footage?
13        MR. BRASCHER:  I had planned to asked him
14  a few questions, yes.
15        MR. LAUX:  Then I should probably watch
16  it.
17        MR. BRASCHER:  Okay.  So this is the
18  thumbdrive.  You're welcome to watch it when we
19  get around to that point in the deposition or
20  you're welcome to watch it now.
21        MR. LAUX:  I think just watch it now.
22        MR. BRASCHER:  Okay.  So this is it.  Do
23  you have a device where you would be capable of
24  watching it?
25        MR. LAUX:  I believe I do.

**Page 9**

1        MR. BRASCHER:  Okay.  If we will -- we'll
2  take a break.  You can do in that in here.
3  That's perfectly fine.  Like I said, it shouldn't
4  take that long and then we can come back in at
5  that point.  Is that good with everybody?
6        MR. LAUX:  Sounds good.  Thank you.
7        MR. BRASCHER:  All right.
8        (Short break taken.)
9        MR. BRASCHER:  Okay.  So Mr. Laux, you've
10  had an opportunity to view that video now?
11        MR. LAUX:  I've reviewed it to the extent
12  that I think I need to for this particular
13  deposition.  I will need to review it further in
14  light of other party depositions.
15        MR. BRASCHER:  Fair enough.  So we are
16  good to proceed now?
17        MR. LAUX:  Yes, sir.
18        THE WITNESS:  Yes.
19  BY MR. BRASCHER:
20  Q.    Okay.  So Mr. Cook, to the best of your
21  understanding, let's start with this, what is this case
22  about?
23  A.    This case is about there's basically -- in
24  reviewing the complaint, there's four basic counts and a
25  couple of supervisory issues; false imprisonment, a

DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023
Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 4 of 64
10..13

**Page 10**

1  Civil Rights essentially protest, the conspiracy, and
2  the excessive use of force are the four main ones, and
3  then there's a couple of counts involving supervisory
4  issues.
5  Q.    So I'm going to say that back just so that I'm --
6  we can all be on the same page here.  You mentioned
7  false imprisonment, civil --
8  A.    False arrest, I believe is the correct term.
9  Q.    I understand.  You said Civil Rights.  Right?
10 A.    Uh-huh.  Yes.
11 Q.    Okay.  What were the other two you mentioned,
12 conspiracy?
13 A.    Excessive use of force.
14 Q.    Okay.  You said conspiracy.  Right?
15 A.    Yes.
16 Q.    Okay.  And then you mentioned supervisory claims.
17 Right?
18 A.    Yes.
19 Q.    Okay.  I want to start with getting to know a bit
20 about you.  So where were you born?
21 A.    Sacramento, California.
22 Q.    What brought you out to Arkansas?
23 A.    My father was an Air Force officer and the family
24 was originally from Arkansas.
25 Q.    When did you move out to Arkansas?

**Page 11**

1  A.    1968.
2  Q.    Okay.  And how old were you at that time?
3  A.    I was five and a half years old.
4  Q.    Any siblings?
5  A.    One brother.
6  Q.    One brother.  Did you live in Arkansas for your
7  whole childhood?
8  A.    Yes.
9  Q.    What about where did you go to college?
10 A.    I went to the University of Arkansas for
11 undergraduate.
12 Q.    And what decree did you receive from there?
13 A.    I received a business degree in what -- in human
14 -- human resources.
15 Q.    Human resources?
16 A.    Uh-huh.
17 Q.    Did you immediately go to law school after that?
18 A.    Yes.
19 Q.    Where did you go to law school?
20 A.    University of Arkansas.
21 Q.    And did you receive a JD from there?
22 A.    Yes, I did.
23 Q.    So is it fair to assume then all in due time you
24 were about 25 when you graduated from law school?
25 A.    Yes.  Roughly.

**Page 12**

1  Q.    What year about would that be?  I know that's
2  probably going a ways back, but do you remember?
3  A.    It was 1987.  I was a December graduate.
4  Q.    Okay.  Oh.  A December graduate.  Okay.  That
5  means you were going beating people a little ahead of
6  the curve there?
7  A.    A little bit.
8  Q.    Okay.  So what sort of law did you start
9  practicing after graduating law school?
10 A.    Whatever came in the door.
11 Q.    Sure.  I think I've heard that referred to as
12 threshold law before, something along those lines.
13 Okay.  And about how long did you practice before you
14 developed a specific sort of practice?
15 A.    I practiced for about -- starting in 1989 to
16 about 1993, I did primarily -- I did a lot of child
17 related stuff.
18 Q.    Okay.
19 A.    A lot of appointed work from the courts on child
20 welfare cases.
21 Q.    Child welfare, so custody and that sort of stuff?
22 A.    More like abused children and that sort of thing.
23 Q.    Okay.  And so you did that you said from '89 to
24 '93 about --
25 A.    And then --

**Page 13**

1          MR. LAUX:  Let him finish his question.
2          MR. BRASCHER:  Not a problem.  I
3  appreciate it.
4  BY MR. BRASCHER:
5  Q.    After '93, did something change?
6  A.    I went to graduate school.
7  Q.    Oh.  Okay.  In what?
8  A.    I got a Master's of business administration.
9  Q.    From which school?
10 A.    The University of Arkansas.
11 Q.    And what changed then after you got that MBA?
12 A.    I went and got a -- entered a PhD program.
13 Q.    Okay.  And PhD in what?
14 A.    Marketing.
15 Q.    And was that also at the University of Arkansas?
16 A.    That was Virginia Tech.
17 Q.    Virginia Tech.  And did you move to Virginia --
18 A.    Yes.
19 Q.    -- to do that?  How long were you in Virginia?
20 A.    Until 1999.
21 Q.    Okay.  So from when to when exactly were you
22 in --
23 A.    1994, I believe, to 1999.
24 Q.    Okay.  So you're in Virginia from '94 to '99.  I
25 guess I should also ask, were you ever married?

DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00549-KGB  Document 19-6  Filed 09/28/23  Page 5 of 64

14..17

Page 14

1   A.   Yes.
2   Q.   When were you married?
3   A.   1993.
4   Q.   1993.  So before you moved out to Virginia?
5   A.   Yes.
6   Q.   Who were you married to?
7   A.   Elizabeth Jacoby.
8   Q.   Okay.  So you were married '93.  Did she -- I'm
9   assuming that she came out to Virginia with you?
10  A.   Yes.
11  Q.   What was her line of work?
12  A.   She was a registered nurse actually -- yes.
13  Q.   So you were in Virginia for five years.  Were you
14  in the PhD program the entire time?
15  A.   Yes.
16  Q.   And you said that was in marketing.  Right?
17  A.   Yes.
18  Q.   So then in '99, I'm assuming you got your PhD in
19  marketing?
20  A.   No.  I had not received it in 1999.
21  Q.   Okay.  Did you ever --
22  A.   Yes.
23  Q.   -- receive the PhD?
24            MR. LAUX:  Let him finish.  Let him
25       finish.

Page 15

1            THE WITNESS:  Sorry.
2            MR. LAUX:  It's okay.  You're doing a good
3       job.
4            MR. PAYNE:  You're actually both kind of
5       doing it.  You're probably driving the court
6       reporter crazy.
7            MR. BRASCHER:  I will do my best to slow
8       down.
9   BY MR. BRASCHER:
10  Q.   So what happened in 1999 that led you to leave
11  Virginia?
12  A.   I received a job offer.
13  Q.   From whom?
14  A.   Louisiana Tech University.
15  Q.   And did you accept that job offer?
16  A.   Yes.
17  Q.   So you moved down to Louisiana Tech?
18  A.   Yes.
19  Q.   Had you completed -- had you completed the PhD
20  program yet at that time?
21  A.   No.
22  Q.   So you moved down to Louisiana Tech.  Did you
23  continue in the PhD program?
24  A.   Yes.
25  Q.   Okay.  Got you.  What was the job at Louisiana

Page 16

1   Tech?
2   A.   Assistant professor.
3   Q.   Teaching?
4   A.   Marketing and consuming behavior.
5   Q.   Okay.  So when did you receive the PhD officially
6   from Virginia Tech?
7   A.   2003.
8   Q.   So following that -- so how long were you at
9   Louisiana Tech?
10  A.   I was there one year.
11  Q.   One year.  And so to 2000, approximately.  Where
12  did you go after that?
13  A.   Atlanta, Georgia.
14  Q.   And what was the job in Atlanta, Georgia?
15  A.   Georgia State University.
16  Q.   Teaching again?
17  A.   Yes.
18  Q.   Assistant professor again?
19  A.   Yes.
20  Q.   What subjects?
21  A.   Online consuming behavior, online marketing,
22  marketing-related courses.
23  Q.   How long were you there?
24  A.   Three years.
25  Q.   So 2003 approximately?

Page 17

1   A.   Yes.
2   Q.   And where did you go in 2003?
3   A.   University of New Mexico.
4   Q.   And what was the job in --
5   A.   Assistant professor.
6   Q.   Teaching?
7   A.   Marketing courses.
8   Q.   How long were you in New Mexico?
9   A.   Two years.  Two and a -- two and one-half years.
10  Q.   Okay.  Was Ms. Jacoby going around with you this
11  entire time?
12  A.   Yes.
13  Q.   Did you have any children at this time?
14  A.   Yes.
15  Q.   How many and what were their names?
16  A.   Dylan.
17  Q.   How is that spelled?
18  A.   D-y-l-a-n.
19  Q.   Okay.
20  A.   George and Zoey.
21  Q.   Okay.  If you mind me asking, what years were
22  they born?
23  A.   Dylan 2001, George and Zoey 2005.
24  Q.   Are they twins?
25  A.   Yes.



**Page 18**

1  Q.   So you were in New Mexico until when again, what
2  year?
3  A.   2005.
4  Q.   Okay.  And in 2005, where did you go?
5  A.   Well, actually, it was 2006.
6  Q.   Oh.  Okay.
7  A.   Little Rock, Arkansas.
8  Q.   Came back to Arkansas?
9  A.   Yes.
10  Q.   And what was the job in Arkansas?
11  A.   It was -- I'm trying to think of the title.
12  Q.   Sure.
13  A.   Consultant, privacy consultant.
14  Q.   With whom?
15  A.   Axciom.
16  Q.   And this entire time you had a JD.  Right?
17  A.   Yes.  That's correct.
18  Q.   Were you practicing at all?
19  A.   No.
20  Q.   Did you have any active Bar licenses?
21  A.   Yes.
22  Q.   What states did you --
23  A.   Arkansas.
24  Q.   Okay.  So when you came back to Arkansas in '06,
25  you had an active Bar license?

**Page 19**

1  A.   Yes.
2  Q.   How long were you a privacy consultant?
3  A.   For Axciom?
4  Q.   Yes, for Axciom.  I'm sorry.  Yes.
5  A.   Until 2007.
6  Q.   So approximately a year?
7  A.   18 months.
8  Q.   Okay.  Where did you go after Axciom?
9  A.   Feeva Technology.
10  Q.   Is that also in the Little Rock area?
11  A.   San Francisco, California.
12  Q.   Okay.  So they're now out in California.  Okay.
13  How long were you in San Francisco for Feeva Technology?
14  A.   I did not move to San Francisco.
15  Q.   Oh.  I'm sorry.  Working remotely?
16  A.   Uh-huh.
17  Q.   I guess even in '07, '08 people were working
18  remotely?
19  A.   Yes.
20  Q.   Okay.  So did you stay in Little Rock area while
21  working for Feeva Technology?
22  A.   I would travel back and forth.
23  Q.   Sure.  That makes sense.
24        MR. LAUX:  I'm sorry to interrupt.  It's
25        Feeva?

**Page 20**

1        THE WITNESS:  Feeva, F-e-e-v-a.
2        MR. BRASCHER:  Oh.  My apologies.
3  BY MR. BRASCHER:
4  Q.   Okay.  I wasn't sure if it was Feeva or like --
5  A.   I may ask you to speak up from time to time.
6  Q.   Not a problem.  I've been told I can do that.
7  A.   Okay.
8  Q.   So you were working for Feeva?
9  A.   Yes.
10  Q.   Okay.  And about how long did you work for Feeva?
11  A.   Three years.
12  Q.   Three years.  And during that time would you
13  still say you were a resident of the Little Rock area?
14  A.   Yes.
15  Q.   So about 2010 is when you'd say you stopped
16  working for Feeva?
17  A.   Yes.
18  Q.   And who did you begin working for in 2010?
19  A.   I worked briefly for myself and I did a brief
20  tour at Walmart.
21  Q.   Okay.  While working for yourself, what were you
22  doing?
23  A.   General practice.
24  Q.   Okay.  So you were practicing as an attorney at
25  that time?

**Page 21**

1  A.   Yes.
2  Q.   For Walmart what were you doing?
3  A.   I was -- I was a director for privacy.
4  Q.   So as a director for privacy, would you say you
5  were practicing law or --
6  A.   No.
7  Q.   Were you doing the two at the same time or were
8  they separate?
9  A.   Separate.  And it was a very brief period.
10  Q.   Okay.  About how long?
11  A.   A month or so.
12  Q.   Oh.  Okay.  Very brief?
13  A.   Uh-huh.
14  Q.   Is this in 2011?
15  A.   2000- -- I'm trying to remember the time.
16  Walmart was 2011.
17  Q.   So is there a reason it was so brief at Walmart?
18  A.   Yes.
19  Q.   What is that reason?
20  A.   I was newly divorced and I was trying to drive
21  back and forth between Fayetteville, where I lived, and
22  Little Rock every weekend to see my children.
23  Q.   And that eventually just wasn't working?
24  A.   It did not work.
25  Q.   So when did you get divorced?

DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00549-KGB   Document 19-6   Filed 09/28/23   Page 7 of 64

22..25

Page 22

```
 1   A.   2010.
 2   Q.   Have you remarried since?
 3   A.   No.
 4   Q.   And the three children, Dylan, George, and Zoey,
 5   those are your only children?
 6   A.   Yes.
 7   Q.   So following the brief Walmart gig, did you come
 8   back to Little Rock?
 9   A.   Yes.
10   Q.   And what was your work when you came back to
11   Little Rock?
12   A.   I attempted to set-up a practice and shortly
13   thereafter I went to work for a consulting company.
14   Q.   So were you doing both simultaneously?
15   A.   No.
16   Q.   What consulting company?
17   A.   Lunarline.
18   Q.   And that was started in what year, '13?
19   A.   No.  We were still in 2011, I believe.
20   Q.   Okay.  And how long were you at Lunarline?
21   A.   I was there one year.
22   Q.   After Lunarline, where did you go?
23   A.   I was back in Little Rock.
24   Q.   Okay.  Where was Lunarline?
25   A.   It was in Washington, DC area.
```

Page 23

```
 1   Q.   Did you move to Washington, DC?
 2   A.   I did not.
 3   Q.   You were remote, still a resident of Little Rock,
 4   maybe you traveled to DC on occasion?
 5   A.   I did.
 6   Q.   Okay.  So after Lunarline, you took a job in
 7   Little Rock?
 8   A.   I opened up a practice.
 9   Q.   So you opened a general practice in 2012.  About
10   how long did you have that general practice?
11   A.   Less than a year.
12   Q.   Less than a year.  Okay.  Then what job did you
13   take?
14   A.   I went to Gill, Ragon, Owen.
15   Q.   And what are they?
16   A.   They're a law firm here in Little Rock.
17   Q.   Okay.  You'll have to forgive me.  I'm new to the
18   area so I don't know all the firms around here yet.
19   So Gill, Ragon, Owen, and what was your areas of
20   practice for them?
21   A.   Privacy law.
22   Q.   Privacy law.  And you started there, would you
23   say, in '12 or '13?
24   A.   I believe December 2012.
25   Q.   Okay.  How long were you there?
```

Page 24

```
 1   A.   Three years.
 2   Q.   Were you an associate, a partner, of counsel?
 3   A.   I was counsel.
 4   Q.   You were counsel.  So what year were you no
 5   longer at Gill, Ragon, Owen?
 6   A.   I left in 2015.
 7   Q.   Was the leaving amicable?
 8   A.   Yes.
 9   Q.   Okay.  What did you do for work after '15?
10   A.   I went to Scottrade in St. Louis, Missouri.
11   Q.   Were you working remotely or did you move?
12   A.   I moved.
13   Q.   You moved to St. Louis.  Okay.  So you moved to
14   St. Louis in '15.  What was your job with Scottrade?
15   A.   Associate vice president of privacy.
16   Q.   How long were you at Scottrade?
17   A.   One year.
18   Q.   Okay.  And you lived in St. Louis for that one
19   year?
20   A.   Yes.
21   Q.   If my math is correct, you had kids who were 14
22   and 10ish at that time?
23   A.   Yes.  About right.
24   Q.   So how did you balance that?
25   A.   I drove back and forth to St. Louis every
```

Page 25

```
 1   weekend.
 2   Q.   I'm assuming the kids were still in Little Rock?
 3   A.   They stayed with their mother.
 4   Q.   Okay.  So you were there for a year, then what
 5   happened?
 6   A.   I came back to Little Rock.
 7   Q.   Okay.  So in '16 you came back to Little Rock,
 8   where were you working there?
 9   A.   For myself.
10   Q.   Okay.  General practice?
11   A.   Yes.
12   Q.   Any specific areas that you feel like you
13   focussed on?
14   A.   Not really.  I just --
15   Q.   Whatever --
16   A.   Yeah.
17   Q.   Sorry.  I totally screwed up the court reporter
18   there.  Whatever sort of work came through the door?
19   A.   Yes.
20   Q.   Okay.  And how long did you have that?
21   A.   Let's -- approximately four years.
22   Q.   Okay.  So from '16 to '20 about?
23   A.   Yeah.
24   Q.   Was this your job on the -- when the incident in
25   question here, June 1st, 2020, is that what you were
```

**DON LLOYD COOK vs RYAN WINGO, et al.**
Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 8 of 64
COOK, DON L. on 08/16/2023                                      26..29

Page 26

```
 1  doing for employment?
 2  A.    No.
 3  Q.    Okay.  When did your employment change?
 4  A.    In February of 2020.
 5  Q.    Okay.  And what became your employment in
 6  February of 2020?
 7  A.    I started work as a consultant.
 8  Q.    Okay.  For whom?
 9  A.    Arcon Resources.
10  Q.    And what do they do?
11  A.    They are a general consulting firm.  They
12  contract out to different companies and different
13  entities.
14  Q.    And were you focussed on, again, I suppose,
15  marketing or privacy?
16  A.    Privacy.
17  Q.    Privacy.  Okay.  So that started in February of
18  2020?
19  A.    That is correct.
20  Q.    How long was that your occupation?
21  A.    Until December of -- the fall of 2021.
22  Q.    Okay.  What changed in the fall of '21?
23  A.    I resigned for health reasons.
24  Q.    Okay.  What specific health reasons, if any?
25  A.    I was having difficulty focussing.  I was
```

Page 27

```
 1  extremely emotional at the time.
 2  Q.    Okay.  Have you started working anywhere else
 3  since then?
 4  A.    Yes.
 5  Q.    Where do you -- do you currently work?
 6  A.    Yes.
 7  Q.    Where do you currently work?
 8  A.    I am working for a consulting company.
 9  Q.    What is the name of that company?
10  A.    Motion Resources.
11  Q.    So if I can backtrack really quick, you said that
12  you were having trouble focussing?
13  A.    Right.
14  Q.    Correct?
15  A.    Yes.
16  Q.    You were incredibly emotional.  Correct?
17  A.    Yes.
18  Q.    Is that connected to the incident in question
19  here in this claim related to June 1st, 2020?
20  A.    Yes.
21  Q.    Okay.  The other thing I wanted to ask you is
22  currently, where do your children live?  Where does your
23  exwife live?
24  A.    Okay.  My exwife lives in Little Rock.
25  Q.    Okay.
```

Page 28

```
 1  A.    My children are -- one is in Vermont.
 2  Q.    Okay.
 3  A.    One is in Boston, both attending college.
 4  Q.    Okay.
 5  A.    My daughter will be moving to New York this
 6  weekend.
 7  Q.    To go to college?
 8  A.    Yes.
 9  Q.    Good for her.  Then just to burrow down just a
10  little bit, you were saying difficulty focussing,
11  extremely emotional, can you be a little bit more
12  specific since you say that this relates to the June
13  1st, 2020 incident, about how that was affecting you?
14  A.    Yes.  After the arrest in June of 2021, it became
15  difficult for me to focus on work.  I developed a lot of
16  anxieties, driving bothered me, focussing on tasks
17  bothered me.
18  Q.    Okay.
19  A.    My emotional control was -- I would cry for no
20  reason.
21  Q.    Just any time of the day?
22  A.    Sometimes.
23  Q.    Where was that emotional pain coming from?
24  A.    Fear.
25  Q.    Fear?
```

Page 29

```
 1  A.    Uh-huh.
 2  Q.    Could you be a little bit more specific for me?
 3  A.    Fear that I would get pulled over, fear that I
 4  would have interactions with the police, fear that
 5  something terrible would happen.
 6  Q.    And you said that these started after the arrest
 7  in July of '21?
 8  A.    It became much worse after that.
 9  Q.    Became much worse.  Okay.  So some of this
10  existed prior to July of '21?
11  A.    Some of it did.
12  Q.    Okay.
13        MR. PAYNE:  You're saying July of '21,
14     it's '20, isn't it?
15        MR. LAUX:  Well, he was arrested a year
16     after the incident.
17        MR. PAYNE:  Got it.  My bad.  Thank you.
18  BY MR. BRASCHER:
19  Q.    So we've got June of 2020, July of 2021?
20  A.    Yes.
21  Q.    You're saying there was still some of this in
22  that time period?
23  A.    Yes.
24  Q.    Okay.  Walk me through what your emotional state
25  was in that time period then.
```

**DON LLOYD COOK vs RYAN WINGO, et al.**
Case 4:22-cv-00549-KGB   Document 19-6   Filed 09/28/23   Page 9 of 64
COOK, DON L. on 08/16/2023                                          30..33

**Page 30**

1   A.    It was very difficult. I was trying to decide
2 what to do in terms of this case and in terms of my
3 life, in general, whether to stay in Arkansas or to try
4 to leave -- and I may need a break in a minute. I had
5 anxieties. I felt like I wasn't working to my full
6 capacity. And after July it just -- it got worse. And
7 every time I saw blue lights, I saw a police car, I
8 froze up inside. And it just became more and more
9 difficult to function until I eventually left the job I
10 was in.

11   Q.    And that was in February of '22. Right?

12   A.    No. That was in the fall of 2021.

13   Q.    Fall of '21, you're right. Yep. Okay.

14   A.    I need to take a break for a minute, if we can.

15          MR. BRASCHER: No problem.

16          MR. PAYNE: Let's go off the record.

17          (Short break taken.)

18 BY MR. BRASCHER:

19   Q.    Mr. Cook, you had a minute to take a break and
20 collect yourself. Are you good to continue answering
21 questions?

22   A.    Yes.

23   Q.    All right. I would like to move to a different
24 topic now.

25   A.    Yes.

**Page 31**

1   Q.    Let's talk about George Floyd and the protests of
2 May and June of 2020.

3   A.    Yes.

4   Q.    In general, what were your thoughts on the death
5 of George Floyd?

6   A.    That it was due to excessive force by the police.

7   Q.    Did you have any thoughts about what this meant
8 for the United States as a country at large?

9   A.    I thought it meant we had a problem we needed to
10 address.

11   Q.    And what was that problem?

12   A.    That there was excessive use of force and it was
13 occurring, at least in this situation, in a very public
14 environment.

15   Q.    And was that the first time that you had thought
16 that?

17   A.    No.

18   Q.    Was this a belief you had held prior to the death
19 of George Floyd?

20   A.    It was a concern.

21   Q.    It was a concern. Would you say that it became
22 more than a concern after George Floyd? Is that what
23 you're saying?

24   A.    Yes.

25   Q.    It was a concern then, what would you label it as

**Page 32**

1 after the death of George Floyd?

2   A.    An opportunity.

3   Q.    An opportunity for what?

4   A.    To have a conversation to improve the situation.

5   Q.    A conversation about what?

6   A.    About excessive use of force and police training.

7   Q.    Okay. What did you think needed to happen to
8 improve the situation?

9   A.    Better training, taking police out of situations
10 where they were asked to make mental health judgements,
11 and more accountability.

12   Q.    Okay. Those were your thoughts in May of 2020 as
13 these sort of protests were going on?

14   A.    Yes.

15   Q.    What were your thoughts on -- obviously, the
16 protests and demonstrations were quite prevalent in the
17 news and everything like that. I'm sure you were aware
18 of them as they were going on?

19   A.    Yes.

20   Q.    What were your thoughts about them?

21   A.    That the protests might generate some progress.

22   Q.    Did you think that any of the protests ever got
23 out of hand?

24   A.    Possibly.

25   Q.    Possibly?

**Page 33**

1   A.    I don't recall a specific memory.

2   Q.    Okay. You say possible, do you mean it's
3 possible that you could have thought that at some point?

4   A.    It's possible that some of the protests got out
5 of hand but I don't have a specific memory of that.

6   Q.    Okay. So you attended the protests the night of
7 June 1st?

8   A.    Yes.

9   Q.    Had you attended any protests prior?

10          MR. LAUX: Just object to the form of the
11         question but you can answer if you can.

12          THE WITNESS: Are you referring to George
13         Floyd protests or protests in general?

14 BY MR. BRASCHER:

15   Q.    Well, actually, let's do both. Let's start more
16 broadly. Had you attended large protesting or
17 demonstrations in the course of your life prior to June
18 of 2020?

19   A.    I recall some sort of protest at the University
20 of Arkansas when I was an undergraduate.

21   Q.    Okay. Do you know what the topic of the protest
22 was?

23   A.    I do not recall. I want to say it was about
24 Nicaragua.

25   Q.    Okay.

DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 10 of 64

34..37

**Page 34**

1          MR. LAUX:  About what?
2          THE WITNESS:  Nicaragua.
3          MR. PAYNE:  Hey, put a time stamp on that
4     as best you can.  Ask a question.
5  BY MR. BRASCHER:
6     Q.    Do you know exactly -- you said when you were an
7  undergraduate.  Do you know when -- what years were you
8  an undergraduate?
9     A.    '80 through '85.
10    Q.    '80 through '85.  So do you remember what year
11  about between '80 and '85?
12    A.    I want to say '82, '83.
13    Q.    '82, '83.  Okay.  So we've got that.  Any other
14  protests or large scale demonstration that you can
15  remember --
16    A.    Not that I recall.
17    Q.    -- attending?  And I'm just going to ask that you
18  let -- I'll make sure to let you finish, just let me
19  finish for our poor court reporter here.
20          None that you recall?
21    A.    (Indicating.)
22    Q.    Okay.  Now, let's fast forward back to May of
23  2020.  Did you attend any other protests or
24  demonstrations in relation to either George Floyd or
25  police brutality in general prior to June the 1st?

**Page 35**

1     A.    No.
2     Q.    So the demonstration on June 1st that you said
3  you were present and were a member of, that was at the
4  first demonstration in relation to George Floyd that you
5  were present at?
6     A.    Yes.
7     Q.    Let's back up then.  Had you considered going to
8  the demonstrations that had been occurring a couple of
9  nights before in Little Rock?
10    A.    I had.
11    Q.    What was your thought process?
12    A.    I thought it was important but I did not attend.
13    Q.    Was there a specific reason for not attending?
14    A.    Busy.
15    Q.    Busy.  With anything specific that you can
16  remember or --
17    A.    My son.
18    Q.    Your son.  Let me ask, is there anything specific
19  about your son that was requiring your attention?
20    A.    My -- my oldest son is on the autism spectrum.
21    Q.    Okay.  I just want to make sure I'm not
22  interrupting you?
23    A.    No.
24    Q.    Can I ask?
25    A.    (Indicating.)

**Page 36**

1     Q.    Okay.  I will ask another question.  Your son is
2  on the autism spectrum.  Does he require full-time care?
3  Is it at that level?
4     A.    No.
5     Q.    Okay.  He simply -- sometimes he needs help.  Is
6  that --
7     A.    He is intellectually off the charts, social
8  skills are poor.
9     Q.    We're in a deposition so I've just got to narrow
10  down on things like this.  By off the charts, do you
11  mean he's quite intelligent?
12    A.    He is very smart.
13    Q.    But that he struggles socially?
14    A.    (Indicating.)
15    Q.    And by that, do you mean struggles having
16  conversations with people?
17    A.    Interactions.  Reacting the way most people would
18  react.
19    Q.    Sure.  So when you say I needed to help my son,
20  is it help him navigate --
21    A.    Spending time.
22    Q.    -- social circumstances?  Spending time with him?
23    A.    (Indicating.)
24    Q.    Okay.  So when you say you're helping him, you're
25  saying you're spending time with him?

**Page 37**

1     A.    Yes.
2     Q.    So then on a couple of nights prior where
3  there were demonstrations, May 30th, May 31st, you were
4  spending time with your son?
5     A.    I was talking to him.  I do not remember whether
6  I was physically with him.
7     Q.    Okay.  So you may have been talking to him on the
8  phone?
9     A.    Right.
10    Q.    Okay.  May have been talking to him on the phone,
11  may have been present with him on May 30th and May 31st?
12    A.    Yes.
13    Q.    Let's go to June 1st then and I just kind of want
14  to make sure I've got the timeline.  What did you do
15  during the day on June 1st?
16    A.    I worked.
17    Q.    You worked.  Did you work at home or --
18    A.    Worked --
19    Q.    -- an office building?
20    A.    -- at home.
21    Q.    So you worked at home on June 1st, from about
22  when to when?
23    A.    I don't recall.  Usually I started in the morning
24  until afternoon, typical work hours.
25    Q.    Okay.  And let me -- actually, let me back up to

Page 38

1  the couple of nights before.  So you're saying -- do you
2  remember exactly where you were on those nights?
3  A.    I believe I was home.
4  Q.    Okay.  And so you don't recall if maybe your son
5  was with you at home or maybe you were talking on the
6  phone?
7  A.    I don't -- I just remember the concern and I
8  actually do not remember those days in any particular
9  detail.
10  Q.    Okay.  So we go to June 1st, you worked during
11  the day.  About 4 o'clock, is that a rough guess for
12  when your day stopped?
13  A.    Probably a little later, if it was a typical day.
14  Q.    Okay.  So 5 o'clock?
15  A.    Yeah.
16  Q.    What did you do after your workday was done?
17  A.    Sometime later that day I went to meet a friend
18  for dinner.
19  Q.    Who is the friend?
20  A.    Daniel Marks.
21  Q.    Can you spell the last name for me?
22  A.    D-a-n-i-e-l M-a-r-k-s.
23  Q.    How long have you known Daniel Marks?
24  A.    Probably about ten years now.
25  Q.    How did the two of you know each other?

Page 39

1  A.    We met through mutual friends.
2  Q.    So you met Mr. Marks for dinner.  Where did you
3  meet him?
4  A.    US Pizza Company.
5  Q.    I know there's multiple locations.  Which
6  location was this?
7  A.    The Heights.
8  Q.    The Heights one?
9  A.    Uh-huh.
10  Q.    Okay.  All right.  Do you remember what you had?
11  A.    Pizza.
12  Q.    Okay.  Did you have any -- what did you have to
13  drink?
14  A.    I had a couple of beers.
15  Q.    A couple of beers.  And so again, I've just got
16  to narrow it down.  By a couple of beers, are you saying
17  you had two beers?
18  A.    I don't have an exact memory.
19  Q.    Okay.  So a couple could be two, could be three?
20  A.    I don't have an exact number.
21  Q.    Okay.  So you say a couple, would it be fair
22  maybe if we say a few?
23        MR. LAUX:  Objection, form.  You can
24     answer.
25        THE WITNESS:  Like I say, I don't have an

Page 40

1     exact memory.
2  BY MR. BRASCHER:
3  Q.    All right.  Okay.  Do you remember how much pizza
4  you had?
5  A.    We hate a whole pizza.
6  Q.    Ate a whole pizza.  Did you order a medium, a
7  large?
8  A.    A large.  And possibly an appetizer.
9  Q.    Okay.  Okay.  You were with Mr. Marks.  Did you
10  -- do you frequent US Pizza Company?
11  A.    Used to.
12  Q.    Used to.  You don't anymore?
13  A.    I no longer live in Little Rock.
14  Q.    Fair enough.  Where do you live now?
15  A.    Brattleboro, Vermont.
16  Q.    And you said one of your sons is there.  Right?
17  A.    Yes.
18  Q.    Is it the same area?
19  A.    Close.
20  Q.    Okay.  And when did you move to Vermont?
21  A.    October of last year.
22  Q.    Okay.  You used to frequent -- how often would
23  you go to US Pizza Company, would you say?
24  A.    At least once a week.
25  Q.    At least once a week.  Would it be fair to say

Page 41

1  that you knew some of the people that worked there?
2  A.    Yes.
3  Q.    Would it be fair to say they knew you?
4  A.    Yes.
5  Q.    Would you call yourself a regular?
6  A.    Yes.
7  Q.    Would you and Mr. Marks -- would Mr. Marks also
8  frequent --
9  A.    Me, mostly.
10  Q.    -- US Pizza Company?  You mostly.  Would you go
11  by yourself sometimes?
12  A.    Sometimes.
13  Q.    And sometimes you'd go with other people?
14  A.    Yes.
15  Q.    Would you often -- when you went -- when you
16  went, would you drink alcohol when you'd go?
17  A.    Yes.
18  Q.    What would you normally drink?
19  A.    Beer.
20  Q.    Beer.  How many drinks on an average night would
21  you think?
22  A.    A couple.
23  Q.    A couple.  Is it a similar situation where, like,
24  I don't know exactly but a couple is a rough estimate?
25  A.    That's -- yes.

**Page 42**

1  Q.   With Mr. Marks, you said that the two of you had
2  a pizza and some beer, potentially an appetizer?
3  A.   Yes.
4  Q.   Who paid for the meal?
5  A.   I did.
6  Q.   You did?
7  A.   Yes.
8  Q.   What did you use to pay for the meal?
9  A.   I don't recall.
10  Q.   Okay.  So cash, credit card?
11  A.   One or the other.
12  Q.   One or the other.  It may have been cash, may
13  have been a credit card?
14  A.   Yes.
15  Q.   Okay.  Could it have been a check?
16  A.   No.
17  Q.   I don't know.  Some people still use checks.
18  A.   No.
19  Q.   Okay.  All right.  So cash or credit card.  Then
20  so you paid for you and Mr. Marks.  Did you interact or
21  talk to anyone else while you were at US Pizza Company?
22  A.   Whoever the server was.
23  Q.   Okay.  And you don't recall who the server was
24  that night?
25  A.   No.

**Page 43**

1  Q.   What did you do -- you finished your pizza,
2  finished drinking your beers, what did you do next?
3  A.   Drove towards the Capitol.
4  Q.   So you left US Pizza Company, did Mr. Marks leave
5  as well?
6  A.   Yes.
7  Q.   Had you shown up in separate cars or together?
8  A.   Separate.
9  Q.   Separate cars.  Did you leave in separate cars?
10  A.   Yes.
11  Q.   You said you drove towards the Capitol.  At what
12  point did you make your mind up you were going to go to
13  the Capitol that evening?
14  A.   Before I left.
15  Q.   Before you left?
16  A.   US Pizza.
17  Q.   Before you left US Pizza.  Is it fair to say that
18  while you were at US Pizza, you decided to go to the
19  Capitol?
20  A.   Yes.
21  Q.   Okay.  Did Mr. Marks decide to go to the Capitol?
22  A.   No.
23  Q.   Okay.  Did you express to Mr. Marks that you
24  intended to go to the Capitol?
25  A.   Yes.

**Page 44**

1  Q.   What were his thoughts, if you can remember?
2  A.   I don't recall anything specific.
3  Q.   Did he tell you whether to go or not to go?
4  A.   No.
5  Q.   Did he express a reason why he wasn't going to
6  go?
7  A.   He had to go home.
8  Q.   He had to go home.  Did you ever -- did you ask
9  him to come with you or did you just tell him, I'm going
10  to go to the Capitol?
11  A.   I'm not sure.
12  Q.   Okay.  Did he try to talk you out of it?
13  A.   No.
14  Q.   I want to backtrack really quick.  You said you
15  frequented US Pizza Company?
16  A.   Yes.
17  Q.   And that you would go there and have a couple of
18  drink, a couple of beers?
19  A.   Yes.
20  Q.   Did you ever drink to intoxication while you were
21  at US Pizza Company?
22  A.   Yes.
23  Q.   On more than one occasion?
24  A.   I'm not sure.  But yes.
25  Q.   I'm just asking, was it one time, was it more

**Page 45**

1  than once, was it regular?
2  A.   More than once.
3  Q.   More than once.  So could you -- I was just
4  trying to narrow it because you said that you go to US
5  Pizza at least weekly -- or I'm sorry, did go to US
6  Pizza Company at least weekly.
7  A.   Uh-huh.
8  Q.   So let's say you're going there once a week, out
9  of those once a week visits, how many times do you think
10  you would drink to intoxication?
11  A.   Occasionally.
12  Q.   Occasionally.  Okay.  One out of every five?
13  A.   You know, I don't know.  I was not keeping track.
14  Q.   Sure.  All right.  So you talked to Mr. Marks.
15  You hop in your car.  What car were you driving?
16  A.   I was driving -- it would have been the same -- a
17  Nissan Pathfinder -- not Pathfinder, Nissan Rogue.
18  Q.   A Nissan Rogue.  Okay.  So you're driving a
19  Nissan Rogue.  What color?
20  A.   White.
21  Q.   I'm sorry?
22  A.   White.
23  Q.   White.  Okay.  Driving a white Nissan Rogue, you
24  drive from US Pizza Company to the Capitol?
25  A.   Close to the Capitol.

DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:23-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 13 of 64

46..49

**Page 46**

1  Q.    Close to the Capitol.  Where did you park?

2  A.    Several blocks away, about two to three blocks

3  away.

4  Q.    And why did you park where you parked?

5  A.    So I could leave.

6  Q.    Leave?

7  A.    The protest.  So I could leave easily.

8  Q.    Got you.  So you parked -- your intention was to

9  park far enough away from where the protest was

10  occurring that you could then get out easily afterwards?

11  A.    Yes.

12  Q.    Okay.  So you're in a Nissan Rogue, you pull up,

13  what do you observe as you arrive?

14  A.    As I got -- well, not much when I parked.  As I

15  got closer, I saw people.

16  Q.    Okay.  So when you parked you didn't -- did you

17  see anything that would be considered out of the

18  ordinary?

19  A.    No.

20  Q.    So you picked a spot -- did you know where the

21  protest was occurring?

22  A.    I knew it was on the Capitol grounds.

23  Q.    And how did you know this?

24  A.    I had heard that.

25  Q.    From?

**Page 47**

1  A.    I don't recall the source.

2  Q.    Okay.

3  A.    But I knew the protest was going to be on the

4  Capitol grounds.

5  Q.    So when you got there, your intent was to head to

6  the Capitol grounds?

7  A.    Yes.

8  Q.    About what time of evening was this?

9  A.    After 8:00.

10  Q.    After 8:00.  Before 8:30, is that --

11  A.    I believe so.

12  Q.    So we'll say between 8:00 and 8:30.  Is that

13  fair?

14  A.    That's -- I believe so.

15  Q.    Okay.  So you arrive between 8:00 and 8:30 and

16  how far did you have to walk to see the protesters?

17  A.    A couple of blocks.

18  Q.    Couple of blocks.  And you were walking the

19  direction of the Capitol?

20  A.    I was walking west.

21  Q.    West?

22  A.    Yes.

23  Q.    Okay.  And was that in the direction of the

24  Capitol?

25  A.    Yes.

**Page 48**

1  Q.    So you're walking west in the direction of the

2  Capitol.  You walk a couple of blocks, then you began to

3  see protestors?

4  A.    Yes.

5  Q.    About how many?

6  A.    There were quite a few.  It was hard to get an

7  estimate.  They were scattered.

8  Q.    Okay.  By scattered, can you be a little more

9  specific for me?

10  A.    Like, on the grounds, on the street.

11  Q.    And let's just be as specific as possible.  The

12  Capitol grounds, do you mean, kind of, the grassy area

13  that's around the Capitol?

14  A.    Sidewalks in front, the street.  I don't recall

15  if there were people on the grass maybe -- there were

16  some people on the grass, I believe.

17  Q.    Okay.  So I just want to make sure we're working

18  from the same definitions here.  So when you say Capitol

19  grounds, you're referring to that street that's right by

20  the Capitol as well?

21  A.    In front of the Capitol, I believe it's Woodward.

22  Q.    Sure.  Yes.

23  A.    That area.  And up closer to the building but not

24  all the way to the Capitol building.

25  Q.    Okay.  When we say Capitol grounds, that's what

**Page 49**

1  you're referring to?

2  A.    Yes.  The area surrounding the Capitol.

3  Q.    Okay.  As well as kind of the grassy area and the

4  sidewalks and such?

5  A.    Yes.

6  Q.    Okay.  So you saw people on the Capitol grounds

7  meaning that area?

8  A.    Yes.

9  Q.    And then you say they were scattered?

10  A.    There were -- yes.

11  Q.    More or less than 50?

12  A.    Oh.  More.

13  Q.    More or less than 200?

14  A.    More.

15  Q.    More or less than 500?

16  A.    Not sure.  But possibly.  Very likely.

17  Q.    Is 500 a rough approximation or would you say

18  maybe 700 is a better approximation?

19          MR. LAUX:  Object, foundation.  You can

20    answer.

21          THE WITNESS:  I'm not sure.  There were a

22    lot of people.

23  BY MR. BRASCHER:

24  Q.    Okay.  I'm just trying to get the best guess.

25  A.    You know, I don't have a guess on crowd size.

DON LLOYD COOK v RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:23-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 14 of 64

50..53

**Page 50**

1  Q.    Okay.  But quite likely more than 500.  Is that
2  what you're telling me?
3  A.    Yes.
4  Q.    Would you say less or more than a thousand?
5  A.    I don't have any -- I'm not sure.
6  Q.    Okay.  So you show up, crowd scattered.  Did you
7  see any police presence when you first arrived?
8  A.    Yes.
9  Q.    Where were they in relation to the protestors?
10  A.    They were at the other end of the Capitol
11  grounds, towards the south end.
12  Q.    Okay.  So they were down towards the south end?
13  A.    Yes.
14  Q.    The protestors were on the Capitol grounds area.
15  Where were you -- in relation to where you were
16  approaching from, where were both parties?
17  A.    I'm not sure I understand the question.
18  Q.    Sure.  If we were using, like, the old o'clock
19  method, right, and you're approaching, I'm trying to
20  figure out where the protestors were in relation to you,
21  where the police presence was in relation to you, as you
22  were approaching the protest.
23  A.    Where would the Capitol be in terms of your
24  o'clock?
25  Q.    Well, I'm thinking in what direction you're

**Page 51**

1  walking.
2  A.    Okay.  I'm walking towards the Capitol.
3  Q.    Okay.
4  A.    The Capitol is 12 o'clock.
5  Q.    Sure.
6  A.    Police are at 9 o'clock.
7  Q.    Okay.
8  A.    Protestors are 12:00 to 3:00.
9  Q.    Got it.  Okay.  Got it.  That makes sense.  So
10  you see them both.  Was there -- as you were
11  approaching, were you noticing any signs of conflict
12  between the two parties, between the police presence and
13  the protestors?
14        MR. LAUX:  Object to the form.  You can
15    answer.
16        THE WITNESS:  No overt conflict.
17  BY MR. BRASCHER:
18  Q.    Sorry.  So no overt conflict?
19  A.    (Indicating.)
20  Q.    Okay.  Conflict that wasn't overt?
21  A.    Yelling.
22  Q.    Yelling.  Okay.  Tension, I assume?
23  A.    Little bit.
24  Q.    Do you recall anything specific that was being
25  yelled?

**Page 52**

1  A.    No.
2  Q.    Were both sides yelling?
3  A.    I was not close -- I could only hear one side.
4  Q.    And that side being the protestors?
5  A.    Yeah.
6  Q.    Were you closer to the protestors than to the
7  police?
8  A.    Yes.
9  Q.    Would it be fair to say you were on the
10  protestors' side, if there were two sides?
11  A.    Yes.
12  Q.    What did you do as you approached the protestors?
13  A.    I walked around and looked to see if I knew
14  anybody.
15  Q.    Did you have any signs or any other
16  demonstratives with you?
17  A.    No.
18  Q.    Did you have any weapons with you?
19  A.    No.
20  Q.    Did you have anything that could be used as a
21  weapon --
22  A.    No.
23  Q.    -- with you?  What were you wearing?
24  A.    I was wearing some white khaki shorts and a
25  salmon pink shirt.

**Page 53**

1  Q.    You arrived, you said you started looking for
2  people.  Would you say you were in amongst the crowd at
3  this point?
4  A.    Yes.
5  Q.    While you're in amongst the crowd, did you
6  observe any conflict, overt conflict, between the police
7  presence and the protestors?
8  A.    Not at that time.
9  Q.    Not at that time.  Okay.  What time of night
10  would you say it is now?
11  A.    It's starting to get dark.
12  Q.    So between 8:30 and 9:00?
13  A.    Probably closer to 9:00.
14  Q.    Okay.  So we're coming up on 9 o'clock?
15  A.    (Indicating.)
16  Q.    How long were you present, in amongst the crowd,
17  I should say.
18  A.    About an hour, little more.
19  Q.    Did you yell anything --
20  A.    No.
21  Q.    -- while you -- I'm sorry.  I'll just finish the
22  question here for her.
23        Did you yell anything while you were in amongst
24  the crowd?
25  A.    No.

DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 15 of 64

54..57

**Page 54**

1  Q.    Did you throw anything at the officers?

2  A.    No.

3  Q.    Did you do anything that would be considered an

4  overt act towards the officers while you were in amongst

5  the crowd?

6  A.    No.

7  Q.    So you're in amongst the crowd.  How long would

8  you say you were in amongst the crowd?

9              MR. LAUX:  Object, asked and answered.

10       You can answer again.

11             THE WITNESS:  Approximately an hour.

12 BY MR. BRASCHER:

13 Q.    Fair to say 8:45 to 9:45?

14 A.    I would have been there in that period of time.

15 Q.    What were you doing for that hour?

16 A.    Walking.

17 Q.    Did the crowd move during that hour?

18 A.    Yes.

19 Q.    Where did they move from and to?

20 A.    All over.

21 Q.    All over the Capitol grounds --

22 A.    Yes.

23 Q.    -- or all over -- okay.  So they covered the

24 entire Capitol grounds?

25 A.    I'm not sure.

**Page 55**

1  Q.    I'm just trying to get an idea what you mean by

2  all over.

3  A.    People were moving around.  I could only see in

4  the area I was at.

5  Q.    And where were you at?

6  A.    I was over in front of the Capitol in the street

7  -- near the street and the stairs.

8  Q.    Okay.  Did you ever go onto the street?

9  A.    Yes.

10 Q.    Now, during all of this, did police ever issue

11 commands over, like, a megaphone or anything like that?

12 A.    Yes.

13 Q.    What sort of commands did they issue?

14 A.    At some point they started asking people to

15 leave.

16 Q.    Do you recall about what time that happened?

17 A.    It was after dark.  I don't recall an exact time.

18 Q.    Do you recall whether there was a curfew in place

19 at this time?

20 A.    I believe there was a curfew at 10 o'clock.  I'm

21 not -- I'm not sure.

22 Q.    So about how long had you been there when the

23 police began to ask people to go home?

24 A.    45 minutes, an hour.  Probably an hour.

25 Q.    Okay.  But prior to them asking people to go

**Page 56**

1  home, did they issue any other commands over a megaphone

2  or anything like that?

3  A.    There was -- I'm not sure.  There was a lot of

4  noise.

5  Q.    Did you observe any overt conflict back and forth

6  between the two parties for the hour that you were

7  present?

8  A.    I saw one man throw a water bottle.

9  Q.    Okay.  Do you know if the water bottle was frozen

10 or not?

11 A.    I have no idea.

12 Q.    And just so that we're clear, by one man, you

13 mean one man who was in the protestor group?

14 A.    Yes.

15 Q.    And he threw it towards the officers?

16 A.    Yes.

17 Q.    Okay.  In relation -- was that near when they

18 told people to go home?

19 A.    Yes.

20 Q.    How close was that to when they told people to go

21 home?

22 A.    Probably roughly about the same time.

23 Q.    Okay.  So guy throws the water bottle and then

24 after that, the police tell people it's time to go home?

25 A.    I believe so.

**Page 57**

1  Q.    So it's about 9:45 at this time?

2  A.    I'm not sure.

3  Q.    So I just want to drill in specifically on

4  locations here.  You drove the Nissan Rogue, and you

5  said you parked two or three blocks away?

6  A.    Yes.

7  Q.    Do you remember specifically where you parked?

8  A.    No, I do not.

9  Q.    You do not.  Do you remember what street you

10 parked on?

11 A.    No.  I remember looking at a building so I would

12 recognize it.

13 Q.    Okay.  Do you remember what building you were

14 parked by?

15 A.    No.  Like -- you know, no.  I do not remember the

16 distinct building.

17 Q.    Okay.  Can you give me a general area where you

18 were parked?

19 A.    I don't remember the street names but I was, like

20 I said, approximately two to three blocks east of the

21 Capitol.

22 Q.    Okay.  Two or three blocks east of the Capitol?

23 A.    Yes.

24 Q.    We'll eventually get through all the events of

25 that night but how did you -- did you end up departing

DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 16 of 64

58..61

Page 58

1   that evening in your Nissan Rogue?
2   A.      No.
3   Q.      Okay.  How did you end up getting your Nissan
4   Rogue back?
5   A.      My exwife picked it up the next day.
6   Q.      Was it in the same spot that you had left it?
7   A.      Yes.
8   Q.      Okay.  And that spot was two to three blocks --
9   A.      Yes.
10  Q.      -- east of the Capitol?  Okay.  So water bottle
11  gets lobbed, police say time to go home everybody.  How
12  would you describe how the police acted in that command
13  from that point forward?
14          MR. LAUX:  Object to foundation and form.
15      You can answer.
16          THE WITNESS:  They started moving towards
17      the crowd.
18  BY MR. BRASCHER:
19  Q.      How did they move towards the crowd?
20  A.      In a line.
21  Q.      So a line of officers?
22  A.      (Indicating.)
23  Q.      What speed were they moving forward?
24  A.      Walk.
25  Q.      What did you perceive to be the purpose of what

Page 59

1   they were doing?
2   A.      To force people off the grounds.
3   Q.      And what were your thoughts in the moment about
4   this?
5   A.      It was time to leave.
6   Q.      So you felt it's time to go?
7   A.      Yes.
8   Q.      So it was your intention to comply with the
9   police commands to leave?
10  A.      Yes.
11  Q.      So where did you go?
12  A.      I started walking to the north.
13  Q.      Okay.  Were you still on the Capitol grounds?
14  A.      I was on the street area by the stairs.
15  Q.      Okay.  Street area by the stairs.  Got you.  What
16  direction were you walking?
17  A.      North.
18  Q.      North.  Were you walking towards where your car
19  was parked?
20  A.      I was just trying to walk north away from the
21  crowd, away from the police.
22  Q.      Okay.  So you were walking north and you're at
23  the Capitol so you're walking north of the Capitol then.
24  Right?
25  A.      I was -- I was walking north, parallel to the

Page 60

1   Capitol.
2   Q.      Okay.  Would that be in the direction of where
3   your car was?
4   A.      Not -- no.
5   Q.      So you weren't walking necessarily towards
6   your car, you were just walking away?
7   A.      I was walking away.
8   Q.      So you're walking, you're still on the
9   Capitol grounds at this point?
10  A.      Yes.
11  Q.      And then about how long are you walking before
12  you encounter any sort of police presence?
13          MR. LAUX:  I'm going to object to the form
14      of the question.  You can answer.
15          THE WITNESS:  The police were there the
16      entire time.  They were not close to me.  I was
17      walking towards several -- a couple of minutes
18      away from the crowd and from the police.
19  BY MR. BRASCHER:
20  Q.      Okay.  We can step off for just a second, I'm
21  going to que up the video.  I just have a couple of
22  questions for you about it.  Okay?
23  A.      Okay.
24          MR. LAUX:  Are you referring to the video
25      that you disclosed this morning?

Page 61

1           MR. BRASCHER:  I am, yes.
2           MR. LAUX:  Okay.
3           MR. PAYNE:  We are off the record.
4           (Short break taken.)
5   BY MR. BRASCHER:
6   Q.      Okay.  So I'm showing you, Mr. Cook, this is a
7   security video of the night in question of June 1st.
8           (Whereupon, the video was played.)
9   BY MR. BRASCHER:
10  Q.      You can see up in the upper left-hand corner
11  here --
12          MR. LAUX:  I'm sorry to interrupt but
13      maybe just identify the file name?
14          MR. BRASCHER:  It is BLM-Capitol_06012020
15      -- meaning June 1st, 2020 -- underscore B.
16          MR. LAUX:  Okay.  Thank you.
17          MR. BRASCHER:  And I am currently playing
18      -- we're at timestamp two minutes and there are
19      -- obviously, there's individuals walking around.
20      So I am going to back up.  I'll say a specific
21      timestamp here when we get there.
22          (Brief pause.)
23  BY MR. BRASCHER:
24  Q.      So at -- right here.  Okay.  We're at 2 minutes
25  and 39 seconds on the video.  Mr. Cook, can you identify

**DON LLOYD COOK vs RYAN WINGO, et al.**
Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 17 of 64
**COOK, DON L. on 08/16/2023**
62..65

Page 62

1  is that you that is in the pink shirt with the white
2  shorts in this video?
3  A.    I can't -- I can't tell.
4  Q.    Do you recall being in this particular area where
5  we've got the three flags of the Capitol, we've got the
6  grassy area on the left, we've got the road where the
7  police --
8  A.    That's the road.
9  Q.    Yes.  Do you remember the name of the road?
10  A.    I think it's Woodward.
11  Q.    Woodlawn, does that right?
12  A.    Woodward or Woodrow?  No, it's not Woodrow.
13  That's the street I was talking about.
14  Q.    Okay.  So this is the street?
15  A.    Uh-huh.
16  Q.    This is the area here.  I'm going to play this
17  for just a few seconds, I want you to tell me if you
18  think that looks like you, the particular person I
19  pointed out here.  Okay?
20        (Whereupon, the video was played.)
21        THE WITNESS:  Possibly.  There's not much
22     definition.  Yes, it's possible.
23  BY MR. BRASCHER:
24  Q.    And you see -- you see that that person appears
25  to be wearing a pink polo shirt and white shorts?

Page 63

1  A.    I don't know.
2  Q.    Okay.  Here we go at timestamp 3:13, that same
3  individual is now here.  Can you identify that
4  individual now?
5  A.    I can't see a face.
6  Q.    Does that -- well, does what that individual
7  appears to be wearing match what you remember to be
8  wearing on that evening?
9  A.    Looks similar.
10  Q.    Okay.  Could that be you?
11  A.    Yes.
12  Q.    Okay.  Do you remember being in this particular
13  area on that night?
14  A.    Yes.
15  Q.    Okay.  I want to ask you one other question.  Do
16  you remember being filmed by anyone that night?
17  A.    No.
18  Q.    Okay.
19        MR. LAUX:  Late objection to the
20     foundation, but that's fine.
21        MR. BRASCHER:  Okay.  That's all -- that's
22     all I've got.  Thank you.
23  BY MR. BRASCHER:
24  Q.    All right.  So where we were, the police have
25  asked people to go home?

Page 64

1  A.    Yes.
2  Q.    And the street that we just saw in that video,
3  like I said, I believe -- does Woodlawn sound like the
4  right name to you?
5  A.    You know, I'm not sure.  Wood something.
6  Q.    Sure.  Let's do this, let me do this, since we're
7  struggling with the street names, I'm going to tear you
8  off a piece of paper here.
9        MR. LAUX:  We will stipulate to that being
10     Woodlawn.
11        MR. PAYNE:  I think it's lane, Woodlane,
12     for the record, if we're going to stipulate.
13  BY MR. BRASCHER:
14  Q.    I'm just going to ask -- all I'm trying to do is
15  get an idea of where your car was in relation to the
16  Capitol.  Do you mind drawing out for me what you
17  remember kind of the layout of everything being?
18        MR. LAUX:  Just a foundational objection
19     but do the best you can.
20        THE WITNESS:  Okay.  This is the Capitol.
21     This is the street that runs up to the steps.
22     These are streets running north and south.
23  BY MR. BRASCHER:
24  Q.    So which one of these is Woodlane?
25  A.    I probably need one more here.  I think this

Page 65

1  would be Woodlane.
2  Q.    Woodlane.  Okay.
3  A.    My car was approximately over here.
4  Q.    Okay.  Thank you.
5        MR. BRASCHER:  Can we just get this marked
6     as an exhibit?
7        MR. LAUX:  And maybe -- you know what,
8     maybe put a north where north is.
9        MR. BRASCHER:  Yeah.
10        MR. PAYNE:  I'd label the whole thing
11     better actually.  Let him do it.
12        MR. LAUX:  Yeah.
13  BY MR. BRASCHER:
14  Q.    Can you write where the Capitol is?
15  A.    Uh-huh.
16  Q.    And then can you write which road would be
17  Woodlane?
18  A.    Uh-huh.
19  Q.    Okay.  And then this is your car here?
20  A.    Yeah.
21  Q.    Can you just you just write car for me?
22  A.    Yeah.
23  Q.    Thank you.
24        MR. BRASCHER:  We will mark this as
25     Exhibit 1.

DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:23-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 18 of 64

66..69

**Page 66**

1      (WHEREUPON, the above-mentioned document
2    was marked as Exhibit Number 1 to the deposition
3    and is attached hereto.)
4      MR. BRASCHER:  Thank you.
5  BY MR. BRASCHER:
6  Q.    One other thing I wanted to ask you about --
7      MR. BRASCHER:  And I guess we'll have this
8    marked -- can we have this marked as Exhibit 2.
9    And this was also -- I have another copy, and
10   this was provided by Plaintiff's counsel, I
11   believe it's Bates numbered 135.
12     MR. LAUX:  Thank you.
13     MR. BRASCHER:  PF135.
14     (WHEREUPON, the above-mentioned document
15   was marked as Exhibit Number 2 to the deposition
16   and is attached hereto.)
17 BY MR. BRASCHER:
18 Q.    Take a look at that for me.  Do you know a
19 Charles Willis?
20 A.    I did.
21 Q.    You did?
22 A.    Yes.
23 Q.    Are you not in contact anymore?
24 A.    He is deceased.
25 Q.    Okay.  My condolences.  So Mr. Willis -- were you

**Page 67**

1  friends on Facebook with Mr. Willis?
2  A.    Yes.
3  Q.    Do you recognize that Facebook post?  And if
4  you're struggling reading it, I can read it out loud.
5  A.    Hang on.  It's just -- yes.  I remember that
6  post.
7  Q.    Okay.  So you agree with me -- I'm going to read
8  it out loud, the post reads, I hope that Minneapolis cop
9  gets charged with murder for holding his knee on that
10 man's neck until he died after he kept saying he can't
11 breath and bystanders telling the cop to get off his
12 neck, an unarmed man committing a nonviolent forgery
13 crime, period.  I'm all for police and I respect them
14 but some of them are punk bitches who only are tough
15 guys because they got a badge, period.  He needs to go
16 to prison, period.
17     Do you recall that being the post?
18 A.    Yes, I do.
19 Q.    Did you like that post?  And by like, I mean the
20 Facebook act of clicking the like button.
21 A.    I don't remember.  I probably did.
22 Q.    Okay.  You see here that the blue -- in this
23 particular exhibit, that the blue like button is
24 highlighted?
25 A.    Yes.

**Page 68**

1  Q.    And so you did like that post?
2  A.    Yes.
3      MR. LAUX:  Object to the foundation.
4    That's fine.
5  BY MR. BRASCHER:
6  Q.    Did you comment on this post?
7  A.    Yes.
8  Q.    And did your comment read, This one is pretty
9  clear cut.  He killed someone who was not a threat over
10 a minor offense.  Jail for a long time.
11 A.    Yes.
12 Q.    So you liked Mr. Willis' post?
13 A.    Yes.
14 Q.    Does that mean that you agree with what he said?
15 A.    Not all of it.
16 Q.    Not all of it.  What don't you agree with?
17 A.    I don't like him referring to the officers as
18 punk ass bitches.
19 Q.    Is that a term that you would not use?
20 A.    That is a term I would not use.
21 Q.    So you didn't agree with that part of the post
22 but you still liked the post?
23 A.    I acknowledged the post.
24 Q.    You acknowledged the post?
25 A.    Yes.

**Page 69**

1  Q.    So when you like someone's Facebook post, are you
2  liking it because you agree with it or why are you
3  liking someone's Facebook post?
4      MR. LAUX:  Object to the foundation.  You
5    can answer.
6      THE WITNESS:  Depends on the post.
7    Sometimes you just like to acknowledge a post.
8    You don't want to love it, but you want to
9    acknowledge it.
10 BY MR. BRASCHER:
11 Q.    Okay.  So in this case, you were simply
12 acknowledging --
13 A.    I was simply --
14 Q.    -- the post?
15 A.    -- acknowledging it.
16 Q.    Okay.  So you're headed back.  You said you're
17 headed north?
18 A.    Yes.
19 Q.    Okay.  What happens?
20 A.    I'm walking, I'm going through tear gas, and all
21 of a sudden I'm on the ground.
22 Q.    Okay.  Be specific for me, where are you when
23 this happens?
24 A.    Walking along one of the sidewalks.  I think I
25 might have gotten out on the grass -- I was out on the

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 19 of 64

**Page 70**

1   grass.
2   Q.    You were out on the grass?
3   A.    I was either on the sidewalk or at the edge.
4   Q.    Okay.  Were you along Woodlane or were you on a
5   different road because --
6   A.    No.  I was along --
7   Q.    -- you said you were headed north?
8   A.    -- I was parallel to that.
9   Q.    You were parallel to Woodlane?
10  A.    Yes.
11  Q.    Okay.  So you were headed north you said --
12  A.    Yes.
13  Q.    -- along Woodlane?
14  A.    Parallel.
15  Q.    Parallel to Woodlane?
16  A.    Yes.
17  Q.    Meaning, were you on one of the sidewalks?
18  A.    I was up -- I was between Woodlane and the
19  Capitol building on one of the sidewalks.
20  Q.    Were you on the sidewalks or the grass or --
21  A.    I'm not sure.
22  Q.    Okay.
23  A.    Well, it depends on what -- I'm not sure.
24  Q.    How long between when the police said, hey, time
25  to go home and when this where you said tear gas and I'm

**Page 71**

1   on the ground, about how much time elapsed?
2   A.    A few minutes.
3   Q.    A few minutes meaning, like, five minutes?
4   A.    Possibly.
5   Q.    Okay.  We're talking -- I'm just -- three
6   minutes, five minutes?
7   A.    Three to five minutes.
8   Q.    Okay.  So three to five minutes, from when they
9   say it's time to go home and you're walking north on
10  Woodlane or parallel to Woodlane was your --
11  A.    Yes.
12  Q.    Okay.  You're either on the sidewalk or on the
13  grass?
14  A.    Yes.
15  Q.    Then so as far as you recall, you're walking
16  through tear gas.  Was that tear gas coming from the
17  officers?
18  A.    Yes.
19  Q.    Tear gas from the officers.  The line, you said
20  there was a line.  Right?
21  A.    Yes.
22  Q.    On what side of the line were you on?
23  A.    I was on the north side.
24  Q.    Meaning, were you on what would be the police
25  side of the line?

**Page 72**

1   A.    I was on the protestor side.
2   Q.    You were on the protestor side of the line?
3   A.    Yes.
4   Q.    Okay.  Did you feel or hear anything being said
5   to you by police?
6   A.    No.
7   Q.    Was anything being targeted at you by police?
8   A.    No.
9         MR. LAUX:  I just object to the form of
10        the question.  You can answer if you can.
11  BY MR. BRASCHER:
12  Q.    Your answer is no?
13  A.    No.
14  Q.    All the sudden, you're on the ground?
15  A.    Yes.
16  Q.    Okay.  Did you ever turn and face the police?
17  A.    No.
18  Q.    So your back was to them the entire time?
19  A.    Except when I turned to look.
20  Q.    And you turned.  When did you turn to look?
21  A.    There was not an exact time.  Periodically.
22  Q.    Okay.  So as you're walking down -- parallel down
23  Woodlane, occasionally, you would turn around over your
24  shoulder and look?
25  A.    Yes.

**Page 73**

1   Q.    Every 30 seconds or so?
2   A.    Probably.
3   Q.    So you're walking and every 30 seconds or so you
4   turn around and look?
5   A.    Yes.
6   Q.    And then you keep walking?
7   A.    Yes.
8   Q.    When you suddenly, boom, I'm on the ground, had
9   you turned around and looked or were you completely
10  facing the other direction?
11  A.    I believe I turned around and looked.
12  Q.    You believe you turned around and looked?
13  A.    Yes.
14  Q.    How sure are you that you turned around and
15  looked?
16  A.    90 percent.
17  Q.    You're 90 percent sure that you turned around and
18  looked?
19  A.    Yes.
20  Q.    Okay.  So you turned around and looked and then,
21  bam, you ended up on the ground?
22  A.    Yes.
23  Q.    Okay.  So you turned around and looked, did you
24  see anything coming towards you?
25  A.    No.

Page 74

1   Q.      Okay.  So over which shoulder were you looking?
2   A.      Right.
3   Q.      Over your right shoulder.  Okay.  Which would be
4   the direction of the street?
5   A.      Yes.
6   Q.      Okay.  So you're looking over your right
7   shoulder, street side, okay.  And then, bam, something
8   hits you and you're on the ground?
9   A.      Yes.
10  Q.      Okay.  And you didn't see where it was coming
11  from or what it was?
12  A.      No.
13  Q.      Okay.  Did your feet stop moving?  Had you
14  stopped or were you in a walking motion --
15  A.      I was --
16  Q.      -- the entire time?
17  A.      -- walking.
18  Q.      You were walking the entire time?
19  A.      Yes.
20  Q.      Okay.  Did your direction ever change at any
21  point?
22  A.      I don't know.
23  Q.      Prior to when you were on the ground, obviously,
24  were you walking straight north or did your direction
25  ever change?

Page 75

1   A.      I was walking generally north.
2   Q.      Generally north.  Okay.  I'm just trying to
3   figure out if at one point you were maybe going in a
4   slightly different direction or whether you were just
5   going straight down the sidewalk the entire time?
6   A.      My intention was to go straight.
7   Q.      Your intention was to go straight?
8   A.      Yes.
9   Q.      Okay.  By your intention was to go straight, does
10  that mean you were going straight or...
11  A.      Yes.  I believe so.
12  Q.      Okay.  So you're going straight.  We don't
13  remember if you were on the sidewalk or the grass?
14  A.      No.
15  Q.      Okay.  When you end up on the ground, do you
16  remember whether you were on --
17  A.      I was on --
18  Q.      -- the sidewalk or the grass?
19  A.      -- the grass.
20          MR. LAUX:  Let him finish.
21  BY MR. BRASCHER:
22  Q.      Sorry.  Let's just get this -- I'm going to
23  restate the question.
24  A.      Yes.
25  Q.      Do you remember whether you were on the sidewalk

Page 76

1   or the grass?
2   A.      I was on the grass.
3   Q.      You were on the grass?
4   A.      Yes.
5   Q.      Okay.  So at some point you were walking down the
6   sidewalk and then you ended up on the grass?
7   A.      Yes.
8   Q.      Do you recall how that happened?
9   A.      No.
10  Q.      Okay.  And it wasn't necessarily the force of the
11  blow that moved you from the sidewalk to the grass?
12  A.      I don't know.
13  Q.      Because you were sitting -- okay.  Because you
14  were saying you turned around, bam, I'm the ground.  So
15  is it fair to say when you got hit, you were on the
16  grass?
17  A.      I don't know.
18  Q.      Okay.  You're down on the ground, are you in
19  pain?
20  A.      Yes.
21  Q.      From where?
22  A.      My face.
23  Q.      And where in your face did you get hit?
24  A.      Right here.
25  Q.      Sorry.  Can we verbalize that?

Page 77

1   A.      I cannot -- the jaw area, lower jaw -- well,
2   about an inch below my ear and about an inch towards my
3   nose.
4   Q.      Okay.  So it seems like where you're pointing,
5   somewhere along the cheekbone there?
6   A.      Yes.
7           MR. PAYNE:  On what side?
8   BY MR. BRASCHER:
9   Q.      On the right side of your face.  Is that correct?
10  A.      Yes.
11  Q.      Okay.  So on the right side of your face, along
12  the cheekbone side, like you said, about an inch down
13  and an inch over?
14  A.      Approximately.
15  Q.      Okay.  And that's where you were feeling pain at
16  that point?
17  A.      My whole face.
18  Q.      Your whole face is in pain?
19  A.      Yes.
20  Q.      You're on the ground.  Was there a point where
21  you lost consciousness?
22  A.      I am not sure.
23  Q.      Okay.  You're on the ground, what do you recall
24  next?
25  A.      Somebody on top of me pulling my arms behind my

**Page 78**

1   back.
2   Q.     How much time elapsed between you're hit, you're
3   on the ground, and someone's on top of you?
4   A.     I don't know.
5   Q.     So you don't know necessarily from how far away
6   you got hit?
7   A.     No.
8   Q.     And you don't know when someone got on top of you
9   in relation to when you got hit?
10  A.     No.
11  Q.     When the person's on top of you, what happened?
12  A.     They pull my arms behind my back and put zip
13  cuffs on me.
14  Q.     Zip cuffs.  Okay.  So by zip cuffs, you mean zip
15  ties?
16  A.     Yes.
17  Q.     How quickly did that happen?
18  A.     I'm not sure.
19  Q.     Were you on your stomach?
20  A.     Yes.
21  Q.     Okay.  Were both arms pulled behind your back?
22  A.     Yes.
23  Q.     Was anything said to you while this was
24  happening?
25  A.     I don't recall.

**Page 79**

1   Q.     Were you told that you were under arrest?
2   A.     No.
3   Q.     Were you read any rights?
4   A.     No.
5   Q.     You were zip tied -- or zip cuffed is the term
6   you used?
7   A.     Yes.
8   Q.     Your face is down on the ground.  Was your face
9   touching the ground?
10  A.     Yes.
11  Q.     Basically, belly down on the grass.  Right?
12  A.     Yes.
13  Q.     About how far from the sidewalk would you
14  estimate that you were?
15  A.     I'm not sure.
16  Q.     Okay.  So you don't know if it was five feet or
17  thirty feet?
18  A.     I do not know.
19  Q.     So if we went out and walked to the Capitol
20  today, would you be able to point out to me the specific
21  spot where you got hit?
22  A.     No.
23  Q.     Or the specific spot that you got cuffed?
24  A.     No.
25  Q.     Okay.  Officer pulls you up.  Right?  Or what

**Page 80**

1   happens when the officer is standing on top of you at
2   that point?
3              MR. LAUX:  I'll just object to the
4          foundation.  You can answer.
5              THE WITNESS:  The officers hauled me up.
6   BY MR. BRASCHER:
7   Q.     I'm sorry.  By hauled you up, can we define what
8   exactly happened?
9   A.     Grabbed me by the arms and yanked me up, straight
10  up on my feet.
11  Q.     Okay.  So did you get up of your own volition or
12  did they get you up?
13  A.     They pulled me up.
14  Q.     Okay.  Multiple officers?
15  A.     Two.
16  Q.     Two officers.  Do you have any idea who these
17  officers were?
18  A.     No.
19  Q.     Did they ever identify themselves to you?
20  A.     No.
21  Q.     Two officers pulled you up.  Did they stand you
22  up?
23  A.     Yes.
24  Q.     Were you standing on your own two feet at this
25  point?

**Page 81**

1   A.     They had my arms.
2   Q.     Okay.  Were your feet on the ground?
3   A.     Yes.
4   Q.     At this point were they saying anything to you?
5   A.     No.
6   Q.     Then what happens?
7   A.     They walked me over to some kind of, like,
8   staging area or command post or something.
9   Q.     Okay.  And by walked you over, were they holding
10  your arms and --
11  A.     Yes.
12  Q.     -- then you were moving your feet?
13  A.     Yes.
14  Q.     They weren't dragging you?
15  A.     No.
16  Q.     You were walking but they had your arms --
17  A.     Yes.
18  Q.     -- kind of guiding you where to go?
19  A.     Yes.
20  Q.     You said the staging area.  So did you go behind
21  sort of the police line at this point?
22             MR. LAUX:  Object to the form.  You can
23         answer.
24             THE WITNESS:  I'm not sure.  But yes.
25  BY MR. BRASCHER:

**Page 82**

1 Q. Yes?

2 A. Yes.

3 Q. Okay. So you were behind the police line?

4 A. I -- I don't know.

5 Q. Okay. You weren't part of the protestor group

6 anymore --

7 A. No.

8 Q. -- at this point. Right?

9 A. No.

10 Q. The police didn't take you over to where the --

11 where, say, the protestor --

12 A. No.

13 Q. -- group was?

14 A. No.

15          MR. LAUX: Object to the foundation.

16 BY MR. BRASCHER:

17 Q. Okay. So you called this the staging area. What

18 was there?

19 A. I just remember there were, like, some chairs,

20 some type of folding table, I think, like, a building

21 tent type thing.

22 Q. Okay.

23 A. And I remember there was one guy sitting over

24 there.

25 Q. Did you see any emergency vehicles?

**Page 83**

1 A. I don't recall.

2 Q. Any ambulances or first aid vehicles --

3 A. No.

4 Q. -- of that sort? No, you don't recall, or no,

5 you didn't see anything?

6 A. I don't recall.

7 Q. Okay. You said that there was a guy?

8 A. Yeah.

9 Q. Do you recall --

10 A. Yes.

11 Q. -- anything about this guy?

12 A. No. He was sitting in a chair and I just

13 remember there was a person sitting in a chair.

14 Q. What was this guy wearing?

15 A. Blue.

16 Q. Blue, like a first aid officer blue?

17 A. Possibly. I don't know. He was just wearing

18 blue.

19 Q. Did it look like he was wearing a uniform?

20 A. No.

21 Q. It looked like he was just wearing regular street

22 clothes?

23 A. No. I mean, yes, uniform but --

24 Q. Well --

25 A. Yes. Uniform.

**Page 84**

1 Q. Yes, it looked like he was wearing a uniform?

2 A. Yes.

3 Q. Did it look like this person might be a medical

4 professional?

5 A. Couldn't tell.

6 Q. Okay. So you go back to the staging area and you

7 say there's one guy there?

8 A. Yes.

9 Q. Who looks like he's wearing a uniform, may or may

10 not be a medical professional?

11 A. Yes.

12 Q. And you get brought back there by two officers.

13 Right?

14 A. Yes.

15 Q. Who did not identify themselves?

16 A. Did not.

17 Q. Were you ever told at any point that you were

18 under arrest?

19 A. No.

20 Q. But you were zip cuffed?

21 A. Yes.

22 Q. Okay. What did the two officers do with you?

23 A. I'm not sure. My last memory for a couple of

24 minutes was the gentleman sitting there, and then my

25 next clear memory is somebody asking me which hospital

**Page 85**

1 do I want to go to.

2 Q. So let me zero in on just a few things

3 there if you don't mind. So the officers bring you

4 back, you don't recall, did they sit you down somewhere?

5 A. No.

6 Q. They just stood there with you?

7 A. That's -- yes.

8 Q. For a couple of minutes they just stood there

9 with you?

10 A. I'm not sure the time.

11 Q. Okay. How long do you approximate that you were

12 there with the officers?

13          MR. LAUX: Object to the form of the

14      question. You can answer.

15          THE WITNESS: Several minutes. Probably

16      less than five minutes.

17 BY MR. BRASCHER:

18 Q. So approximately five minutes --

19 A. Yes.

20 Q. -- you're standing there with two officers.

21 They're not saying anything to you?

22 A. No.

23 Q. Okay. And they're just standing there. Were

24 they doing anything?

25 A. I just remember standing.



DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 23 of 64

86..89

**Page 86**

1  Q.    Okay.  Do you remember if they were doing
2  anything?
3  A.    No.
4  Q.    No, you don't remember, or no, they weren't doing
5  anything?
6  A.    No, they weren't doing anything.
7  Q.    No, they weren't doing anything.  So for five
8  minutes, you stood there zip cuffed, two officers, one
9  on either side of you each holding an arm, and y'all
10  just chilled there for five minutes?
11  A.    Yes.
12  Q.    Okay.  And there was one other guy sitting there?
13  A.    Yes.
14  Q.    And he didn't do anything towards you guys,
15  didn't say anything?
16  A.    We spoke.
17  Q.    You spoke.  What did you speak about?
18  A.    I said, I wasn't doing anything.
19  Q.    And what did he say?
20  A.    You shouldn't have been out after curfew.
21  Q.    Okay.  Was that the whole interaction?
22  A.    That was the entire interaction.
23  Q.    And do you know who this individual was?
24  A.    No.
25  Q.    Did he ever identify himself?

**Page 87**

1  A.    No.
2  Q.    Okay.  And we don't know who he was even working
3  for?
4  A.    No.
5  Q.    Okay.  And so that was the only interaction for
6  five minutes?
7  A.    Yes.
8            MR. LAUX:  Object to the form.
9  BY MR. BRASCHER:
10  Q.    After five minutes, then what happened?
11  A.    I don't know.
12  Q.    You don't know?
13  A.    I don't know.
14  Q.    Okay.  At some point, obviously, you were no
15  longer in the custody of the police officers.  Do you
16  recall how that happened?
17  A.    No.
18  Q.    You called the whole thing a staging area.
19  A.    Yes.
20  Q.    What led you to -- what leads you to call it a
21  staging area?
22  A.    I don't know.  It was just -- it looked like some
23  sort of -- I mean, like, ready area.
24  Q.    Ready area.  And so you said there were some
25  tents?

**Page 88**

1  A.    Like a pavilion type thing is what I'd --
2  Q.    So the kind of thing you fit like 200 people
3  under, like a --
4  A.    No.
5  Q.    -- wedding tent sort of thing?
6  A.    No.
7  Q.    No?  Okay.  I'm trying to figure out what you
8  mean by a pavilion tent.
9  A.    Well, I mean, something maybe the size of this
10  room.
11  Q.    Okay.  All right.  So you would fit -- okay.  So
12  if you're doing, like, your afternoon cookout, and you
13  got all the food, you put it under a tent like that?
14  A.    Yes.
15  Q.    Okay.  So there's a tent about -- okay, I don't
16  know, 20 feet by 10 feet?
17  A.    I don't know.
18  Q.    What else was there again?
19  A.    I just remember it seemed like there was a table,
20  a folding table type thing, and chairs.
21  Q.    And this was all underneath the tent?
22  A.    I'm not sure.
23  Q.    So where you were standing with the officers?
24  Were you underneath the tent?
25  A.    No.

**Page 89**

1  Q.    No.  Okay.  Was this area roped off in any way?
2  A.    I don't know.
3  Q.    And you said you don't recall whether there were
4  emergency vehicles there or not?
5  A.    No.
6  Q.    And you don't recall were there police vehicles
7  there or anything like that?
8  A.    I don't recall.
9  Q.    Okay.  Do you recall where this area was?
10  A.    It was towards -- it seemed to be that we walked
11  from where I was, south.  So it would have been towards
12  the south end of the Capitol.
13  Q.    Toward the -- okay.  And you don't know -- did
14  you walk past the Capitol?
15  A.    I don't recall.
16  Q.    Okay.  And you don't know any of the streets that
17  you were on?
18  A.    No.
19  Q.    Okay.  So you were there with the two officers
20  and then all of a sudden you were not, and we don't know
21  how you got there?
22  A.    Is that a question?
23  Q.    I'm just making sure.  So you don't know how you
24  ended up away from the police officers?
25  A.    No.

DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 24 of 64

90..93

**Page 90**

1  Q.     And at some point, I assume you lost the zip
2  cuffs?
3             MR. LAUX:  Object to the form of the
4      question and the foundation.
5             THE WITNESS:  Yes.
6  BY MR. BRASCHER:
7  Q.     So at some point you no longer had zip cuffs on?
8  A.     Yes.
9  Q.     And once you didn't have -- you don't know how
10 those got taken off of you?
11 A.     No.
12 Q.     The next thing that you do remember, where were
13 you?
14 A.     In the back of what I believe was an ambulance.
15 Q.     Okay.  And you don't know where the ambulance
16 came from?
17 A.     No.
18 Q.     You don't know who got you in the ambulance?
19 A.     No.
20 Q.     You don't know who called the ambulance?
21 A.     No.
22 Q.     So an ambulance showed up and you just got in a
23 random ambulance?
24             MR. LAUX:  Object to the form.
25             THE WITNESS:  I don't know.

**Page 91**

1  BY MR. BRASCHER:
2  Q.     Okay.  You're in the ambulance, did you know
3  where the ambulance was going?
4  A.     They asked me.
5  Q.     They asked you where to go?
6  A.     They asked me, What hospital do you want go to.
7  Q.     And you said that was the next thing that you
8  remember?
9  A.     Uh-huh.
10 Q.     What hospital do you want to go to?
11 A.     Yes.
12 Q.     And this was actually while you were in the
13 ambulance?
14 A.     Yes.
15 Q.     So you got in the ambulance, and then they asked,
16 What hospital do you want to go to?
17 A.     When they asked me, I was in the ambulance.
18 Q.     Then who asked you that question?
19 A.     I don't know.  Just -- it was a person.
20 Q.     A person.  Were they --
21 A.     Just a voice.
22 Q.     Okay.  You don't remember what they were wearing?
23 A.     No.
24 Q.     Just a voice coming in saying --
25 A.     Yes.

**Page 92**

1  Q.     -- what hospital?  Were you on a gurney?
2  A.     I believe so.  Yes.
3  Q.     So you were laid out?
4  A.     Yes.
5  Q.     Okay.  Flat on your back?
6  A.     I believe -- no.
7  Q.     No?
8  A.     Slight incline.
9  Q.     Okay.  Did you have anything on?  Did you have an
10 oxygen mask on or something like that?
11 A.     I don't know.
12 Q.     Did you have anything -- did you have anything
13 inserted in your arm or anything that was taking your
14 pulse?
15 A.     I don't know.
16 Q.     At what point did you realize you'd been hit in
17 the face?
18 A.     When they pulled me up off the ground.
19 Q.     Okay.  I'm assuming you were bleeding from your
20 face?
21 A.     Yes.
22 Q.     Probably a good deal of blood?
23 A.     I don't know.
24 Q.     Were you ever given a towel or anything or a
25 bandage or anything to put on your face?

**Page 93**

1             MR. LAUX:  Object to the foundation.
2             THE WITNESS:  I don't know.  I do not
3      recall any bandage.
4  BY MR. BRASCHER:
5  Q.     So while you were in the ambulance --
6  A.     Yes.
7  Q.     -- was there anything on your face at that point?
8  A.     I don't recall.
9  Q.     Okay.  So outside of the face, did you have any
10 other injuries on you that you had sustained?
11 A.     No.
12 Q.     Okay.  So just the face?
13 A.     Just the face.
14 Q.     Just the face.  What hospital did you go to?  Did
15 you tell them a hospital to go to?
16 A.     I said the closest one.
17 Q.     Just the closest one?
18 A.     Yeah.
19 Q.     And you've lived in Little Rock awhile.  Right?
20 A.     Yeah.
21 Q.     I think if we do the math, probably 30 some odd
22 years you lived in Little Rock at least?
23 A.     Not quite that.  No.
24 Q.     Okay.  But more than 20?
25 A.     No.



DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 25 of 64

94..97

**Page 94**

1   Q.   No.  Okay.  More than 15?
2   A.   At that point -- not quite.
3   Q.   Okay.  More than 10?
4   A.   Yes.
5   Q.   Okay.  Did you ever have to go to a hospital in
6   Little Rock prior to this?
7   A.   No.
8   Q.   No?
9   A.   No.
10  Q.   Never have to go a hospital in Little Rock prior
11  to this?
12  A.   As in what capacity?
13  Q.   In any capacity, whether it's someone else you're
14  going there for or as a patient yourself?
15  A.   Yes.  I had been, yeah.
16  Q.   Okay.  So you knew of what some of the hospitals
17  in the area were?
18  A.   Yes.
19  Q.   But at that time, you were just, like, any
20  hospital, give me the closest one?
21          MR. LAUX:  Objection.
22          THE WITNESS:  Yes.
23          MR. LAUX:  Yeah.  That's fine.
24  BY MR. BRASCHER:
25  Q.   How long were you in the ambulance?

**Page 95**

1   A.   I don't know.
2   Q.   Then you just showed up at a hospital?
3   A.   Yes.
4   Q.   They got you out of the ambulance?
5   A.   I would -- I don't know.
6   Q.   You don't know whether they got you out of the
7   ambulance?
8   A.   I mean, I got from the ambulance to the emergency
9   room somehow.
10          MR. LAUX:  Just a --
11          MR. BRASCHER:  Okay.
12          MR. LAUX:  Just a late objection; form,
13      showed up.  You can continue.
14          MR. BRASCHER:  Sure.  Fair enough.
15  BY MR. BRASCHER:
16  Q.   Arrived at the hospital in the ambulance?
17  A.   Yes.
18  Q.   Somehow you got in but you don't recall what
19  happened?
20  A.   When?
21  Q.   Sorry.  Somehow you ended up in the hospital?
22  A.   Yes.
23  Q.   Somehow you got from the ambulance to the
24  hospital?
25  A.   Yes.

**Page 96**

1   Q.   But you don't recall how that happened?
2   A.   No.
3   Q.   Just to be clear, no, you --
4   A.   No, I do not know how I got from the ambulance to
5   the hospital.
6   Q.   Okay.
7   A.   Or to the emergency room.
8   Q.   So then you were in the emergency room?
9   A.   Yes.
10  Q.   How long before you were seen?
11  A.   Immediately.
12  Q.   Did you have anything on your face at this point?
13  A.   I don't recall.
14  Q.   So you don't recall if someone from the ER handed
15  you a bandage or anything like that?
16  A.   I do not know.
17  Q.   Okay.  So at that point, what hospital did you
18  arrive at?
19  A.   UAMS.
20  Q.   You were at UAMS.  Okay.  Do you remember what
21  kind of ambulance?
22  A.   No.
23  Q.   You don't remember what service it was?
24  A.   No.
25  Q.   Any of the individuals that were in the

**Page 97**

1   ambulance?
2   A.   No.
3   Q.   Okay.  Were you ever billed for the ambulance
4   ride that night?
5   A.   Yes.
6   Q.   You were billed?
7   A.   Yes.
8   Q.   Do you recall who billed you?
9   A.   MEMS.
10  Q.   MEMS.  So is it fair to say might have been a
11  MEMS ambulance?
12  A.   It would be fair to say they billed me.
13  Q.   Okay.  Did you get any other bills for this
14  night?
15  A.   UAMS.
16  Q.   UAMS gave you a bill?
17  A.   (Indicating.)
18  Q.   You said you were seen pretty much immediately in
19  the emergency room?
20  A.   Yes.  As far as -- yes, to the best of my
21  recollection.
22  Q.   And by immediately, do you mean I was only
23  sitting there a few minutes or...
24  A.   I don't know.
25  Q.   You don't know.  Okay.  Were you sitting in the



DON LLOYD COOK v. RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 26 of 64

98..101

**Page 98**

1   waiting room of the emergency room?
2   A.      I do not remember sitting in the waiting room.
3   Q.      Did they give you a room in the emergency room
4   with, like, a curtain?
5   A.      I don't know.
6   Q.      You were seen by a doctor?
7   A.      Yes.
8   Q.      And was it a doctor or a nurse, do you remember?
9   A.      Doctor.
10  Q.      You were seen by a doctor?
11  A.      Yes.
12  Q.      And pretty much from the moment you stepped foot
13  in there?
14  A.      My first memory after what I told you about the
15  ambulance, is being in the emergency room.
16  Q.      The doctor's in front of you, do you remember any
17  of your conversation with the doctor?
18  A.      I don't remember the conversation.  I remember
19  him using the forceps when he was cleaning out my face.
20  Q.      Okay.  In your face -- was there anything
21  imbedded in your face?
22  A.      Yes.
23  Q.      What was imbedded?
24  A.      A beanbag.
25  Q.      Okay.  How large was the beanbag?

**Page 99**

1   A.      Approximately this big.  Approximately, maybe --
2   I didn't have a feel for it at the time.
3   Q.      Okay.  Did you --
4   A.      Approximately the size of that bottle cap, the
5   one I'm pointing out there, which is about probably an
6   inch and a half in diameter, maybe a little -- roughly
7   that size but roundish.
8   Q.      How heavy was the beanbag?
9   A.      I did not hold it until later.
10  Q.      But at some point you did hold it?
11  A.      Yes.
12  Q.      Do you still have the beanbag?
13  A.      I believe Mr. Laux has it.
14          MR. BRASCHER:  Do you have it, Mr. Laux?
15          MR. LAUX:  We do.
16          MR. BRASCHER:  Okay.  That's fine.  At
17      some point we'd like to observe the beanbag.
18  BY MR. BRASCHER:
19  Q.      Okay.  So the beanbag imbedded itself.  Can you
20  describe the best you can where it imbedded itself?
21  A.      It was in the opposite side, this side, of my
22  cheek.
23  Q.      Okay.  So --
24  A.      Somewhere in the jaw.
25          MR. LAUX:  What side are you pointing to?

**Page 100**

1           THE WITNESS:  I'm pointing to my left
2       side.
3           MR. LAUX:  Thank you.
4   BY MR. BRASCHER:
5   Q.      Okay.  So the pain that you were describing
6   earlier, was on the right-hand side of your face about
7   an inch down and an inch over near the cheekbone area.
8   Is that right?
9   A.      No.
10  Q.      No.  I thought that's what we were --
11  A.      No.  The pain was my entire face.
12  Q.      Okay.  You described a specific spot earlier.
13  Right?  We talked about a specific spot on the right
14  side of your face?
15  A.      Impact.
16  Q.      Impact.  Okay.  So you felt an impact in that
17  specific spot on your face?
18  A.      I felt my entire face but most distinctly on the
19  right side.
20  Q.      Okay.  And in that specific spot that we were
21  talking about?
22  A.      Yes.
23  Q.      Right?
24  A.      Yes.
25  Q.      Now, you're saying that the beanbag was lodged on

**Page 101**

1   the opposite side of your face?
2   A.      Yes.
3   Q.      Okay.  Where on that left side of your face?
4   A.      I don't remember.
5   Q.      You don't know where the beanbag was lodged?
6   A.      No.
7   Q.      Okay.  You don't know was it in the lip, was it
8   up in the cheekbone?
9   A.      I don't remember.
10  Q.      Don't know.  Okay.  Did you have any scars
11  leftover from this?
12  A.      I'm missing part of my lip.
13  Q.      I see that.  Okay.
14  A.      I have my lower jaw is all false teeth now.
15  Q.      Okay.
16  A.      My face sags.  My right eye droops.
17  Q.      I just don't want to interrupt you.  Are you --
18  A.      Yes.
19  Q.      Okay.  So you've got the -- and forgive me if I'm
20  being callous, but I'm just trying to talk about the
21  injuries here.  You've got the missing -- the lip issue
22  right here, so it would be on the right side of your
23  face, just so we're being descriptive?
24  A.      Yes.
25  Q.      And that's the lower lip?

**DON LLOYD COOK vs RYAN WINGO, et al.**
Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 27 of 64
COOK, DON L. on 08/16/2023                                                102..105

Page 102

1  A.     Yes.
2  Q.     And you were hit -- you're saying that the
3  beanbag was lodged in the left side of your face?
4  A.     Yes.
5  Q.     Okay.  And that it's your right eye that you've
6  got a droop?
7  A.     Yes.
8  Q.     Okay.  And then the other -- you were discussing
9  the jaw?
10  A.     Yes.
11  Q.     And that you've got all false lower teeth now?
12  A.     Yes.
13  Q.     Okay.  So we talked about the beanbag.  Was that
14  pretty much immediately done that someone took the
15  beanbag out of your face?
16          MR. LAUX:  Object to the form.  You can
17      answer.
18          THE WITNESS:  I believe.  Yes.  To my
19      memory, yes.
20  BY MR. BRASCHER:
21  Q.     Did they take you to, like, an operating room to
22  do that?
23  A.     It was -- I don't know whether it was the
24  operating room or the ER or whether that's the same
25  thing.

Page 103

1  Q.     Okay.  Because I'm just trying to get an idea.
2  Obviously, you know, most ERs have, like, a waiting room
3  and a desk, and you know, where you check in.
4  A.     My memory was that I was in an ER, not a waiting
5  room.
6  Q.     Okay.  And this ER was probably -- was it laid
7  out in a way where you had different sections cornered
8  off for different people?
9  A.     I don't know.  All I recall is my area.
10  Q.     How large was your area?
11  A.     I would say the size of this room, maybe a tad
12  smaller.
13  Q.     And what was present in your area?
14  A.     A doctor, multiple, I assume, nurses, equipment,
15  monitors.
16  Q.     Was there, like, a table you were sitting on?
17  A.     I was on a gurney.
18  Q.     Okay.
19  A.     Or a bed.
20  Q.     Were you able to communicate with the doctors?
21  A.     Yes.
22  Q.     How well could you talk?
23  A.     You would have to ask the doctors.
24  Q.     Did you tell the doctors what had happened to
25  you?

Page 104

1  A.     I don't recall.
2  Q.     Okay.  I'm going to give --
3          MR. BRASCHER:  This is -- again, this has
4      already been discovered by Plaintiffs.  It's
5      Bates numbered starting at 74 and going to 124.
6          MR. LAUX:  Thank you.
7          MR. BRASCHER:  Yep.
8  BY MR. BRASCHER:
9  Q.     And if you'll just give me a second, there's a
10  specific page I'm looking for.  So if you go to page 84
11  in the Bates numbering.  So this is dated June 2nd of
12  2020, but it's a note from the admission on June 1st of
13  2020.  And again, we're on page 84 in the Bates
14  numbering.  And this appears to be from the doctor or
15  someone else who works at the hospital who had made
16  these notes and the trauma history.  And it says, The
17  patient is a 57 year old male who presented to UAMS via
18  EMS after being shot in the face by a projectile beanbag
19  by police.  The patient reports being on the sidelines
20  of a protest at which point a beanbag from a nonlethal
21  firearm -- and that's in quotes -- hit him and knocked
22  him to the ground.
23      So do you recall telling any of your physicians,
24  doctors, nurses, any of those people, what had gotten --
25  what had hurt you?

Page 105

1  A.     No.
2  Q.     Okay.  How do you think that they got this
3  information?
4          MR. LAUX:  Object; foundation.  You can
5      answer.
6          THE WITNESS:  When they pulled the beanbag
7      out of my face.
8  BY MR. BRASCHER:
9  Q.     Why would they put in quotes a beanbag from a
10  nonlethal firearm?
11  A.     I do not --
12          MR. LAUX:  Same objection.  Go ahead.
13          THE WITNESS:  I do not know.
14  BY MR. BRASCHER:
15  Q.     Okay.  How would they know that you got hit by
16  police?
17  A.     I don't know.
18  Q.     All right.  That's fine.  I appreciate that.  Do
19  you recall what, specifically, your injuries were from
20  that night?
21          MR. LAUX:  Object to the form.  You can
22      answer.
23          THE WITNESS:  I had my jaw was broken in
24      multiple places, several of my lower teeth were
25      completely knocked out, I believe there were

**Page 106**

1    three fractures in my jaw, I believe they said I
2    had a concussion, and that's -- that's really all
3    I recall from that time.  Later on, when I saw
4    the xrays, it did show that my jaw was broken
5    multiple places and that I had lost multiple
6    teeth.
7         MR. LAUX:  Sorry to interrupt.  Ms. Court
8    Reporter, could you read back his answer?
9    (Whereupon, the previous answer was read.)
10        MR. LAUX:  Oh.  Excellent.  Thank you.
11   BY MR. BRASCHER:
12   Q.   So that occurs.  How long were you at the
13   hospital?
14   A.   Three days.
15   Q.   Three days you were at the hospital?
16   A.   Uh-huh.
17   Q.   I assume that at some point you moved from the
18   emergency room to the hospital itself?
19   A.   Yes.
20   Q.   Do you recall when that happened?
21   A.   No.
22   Q.   You were in the emergency room, is that where the
23   beanbag got taken out?
24   A.   Yes.
25   Q.   I assume then at some point shortly thereafter,

**Page 107**

1    you at least got your wounds stitched up?
2    A.   Yes.
3    Q.   Did that occur in the emergency room or the
4    hospital?
5    A.   The emergency room.
6    Q.   Okay.  Then once that occurs, they stitched up
7    the wound, did anything else occur in the emergency room
8    before you moved to the hospital?
9    A.   I don't know.
10   Q.   Then the actual -- I assume there was a
11   reconstructive surgery that occurred?
12   A.   Yes.
13   Q.   That occurred in that three-day window --
14   A.   Yes.
15   Q.   -- that you were at the hospital?
16   A.   Uh-huh.
17   Q.   Had you been moved from the emergency room to the
18   hospital at that point?
19   A.   Yes.
20   Q.   You're in the hospital, do you remember how long
21   you'd been there when they did the reconstructive
22   surgery?
23   A.   No.
24   Q.   Okay.  So there was, obviously, a reconstructive
25   surgery and you mentioned false teeth.

**Page 108**

1    A.   Yes.
2    Q.   Since then, what other -- have there been other
3    surgeries that you've had to undergo --
4    A.   Yes.
5    Q.   -- due to this injury?  I'm sorry.  For the court
6    reporter purposes, I'll restate the question.
7         Are there other surgeries that you have had to
8    undergo in relation to the injuries you sustained on
9    June 1st, 2020?
10   A.   Yes.
11   Q.   Can you describe those surgeries for me?
12   A.   Yes.  There was one to clear out debris and teeth
13   by an oral surgeon.
14   Q.   I'm just going to narrow it down.  By clearing
15   out debris, you're saying remnants of teeth that were in
16   your mouth?
17   A.   Yes.
18   Q.   I'm sorry.  You can keep going.
19   A.   There was an attempted bone graft.
20   Q.   Of what bones?
21   A.   My jaw.  And then they pulled the remaining
22   teeth, that was another surgery.  And then there was the
23   implant surgery.
24   Q.   And you said attempted graft?
25   A.   Yes.

**Page 109**

1    Q.   Does that mean that it didn't work?
2    A.   It did not work.
3    Q.   And I am by no means a medical professional.
4    What do you mean it didn't work?
5    A.   I mean they -- the immediate front part of my
6    jaw, below where my front teeth would be, there is now a
7    gap and they tried to graft bone to grow in that space
8    and it did not take.
9    Q.   Okay.  You said you were in the hospital for
10   three days?
11   A.   I believe.  Yes.
12   Q.   Okay.  As soon as you got to the emergency room,
13   did you communicate with anyone?
14   A.   No.
15   Q.   Any family members or anything like that?
16   A.   No.
17   Q.   Didn't communicate with your exwife?
18   A.   I --
19        MR. LAUX:  Sorry.  Just object to the form
20   of the question, I think, when you got there.
21   But you can answer.
22   BY MR. BRASCHER:
23   Q.   When you arrived at the emergency room of UAMS,
24   did you -- when did you finally contact any of your
25   family members?

**Page 110**

1   A.    They contacted me.

2   Q.    How soon after you arrived?

3   A.    The next day.

4   Q.    The next day.  So that would be June 2nd?

5   A.    Yes.

6   Q.    In the morning?

7   A.    I'm not sure.

8   Q.    Morning, afternoon, evening?

9   A.    I believe -- my best recollection is morning.

10  Q.    Okay.  Did they call you, did they arrive at your
11  room?

12  A.    My exwife called me.

13  Q.    On a cell phone --

14  A.    Yes.

15  Q.    -- I'm assuming?  Okay.  How much communication
16  do you regularly have with your exwife?

17  A.    Very frequent.

18  Q.    Very frequent?

19  A.    Yes.

20  Q.    What is normally the reason for that
21  communication?

22  A.    We have three children.

23  Q.    And so the communications is largely related to
24  the children?

25  A.    We coparent.

**Page 111**

1   Q.    Was she calling you because she heard about what
2   happened?

3   A.    Yes.

4   Q.    How did she know what had happened?

5   A.    She told me that somebody from the hospital had
6   called her.

7   Q.    Is she listed as an emergency contact for you?

8   A.    I believe so.

9   Q.    Did anyone else get in touch with you?

10  A.    No.

11  Q.    So your exwife called you.  Did anyone arrive at
12  your room?

13  A.    No.

14  Q.    Did she call you again after that morning?

15  A.    Yes.

16  Q.    When was the next time that she called you?

17  A.    I believe the following day.

18  Q.    Okay.

19  A.    It might -- she might have called me again that
20  day.  I'm not sure.

21  Q.    So you are in the hospital at this point,
22  somewhere in those three days do you have the
23  reconstructive surgery.  Do you remember which day?

24  A.    I believe it was the third day.

25  Q.    Okay.  So the two days prior, you're in there,

**Page 112**

1   you've got, obviously, a wound, your exwife calls you a
2   couple of times, and did anyone else get in touch with
3   you?

4   A.    No.

5   Q.    Did you tell your exwife what had happened?

6   A.    She -- yes.

7   Q.    And what did you tell her had happened?

8   A.    I just told her I'd gotten hurt and I'd gotten
9   shot with a beanbag.

10  Q.    Okay.  So you got -- at that point, you had
11  concluded that you had been shot with a beanbag?

12  A.    I -- yes.

13  Q.    At what point had you concluded that you had been
14  shot with a beanbag?

15  A.    When the surgeon or the doctor pulled it out of
16  my jaw in front of me.

17  Q.    Even though it was on the -- not the side where
18  you felt the impact initially, it was on the other side?

19  A.    Could you repeat the question?

20  Q.    Sorry.  Not necessary.  I'll withdraw that.

21        So you told -- so when you told your wife what
22  had happened, you told her you had been shot by a
23  beanbag?

24  A.    Yes.

25  Q.    Did you tell her anything else?

**Page 113**

1   A.    I don't recall.

2   Q.    Did you tell her who had shot you?

3   A.    I don't recall.

4   Q.    In the three days you were in the hospital, did
5   you speak to anyone else, other than medical
6   professionals?

7   A.    I think I talked to my mother.

8   Q.    Did you call her or did she call you?

9   A.    I don't recall.

10  Q.    Were you in a position with your injury where
11  your hands were free?  Were you --

12  A.    Yes.

13  Q.    -- able to do things?  Were you able to get up
14  and walk around?

15  A.    I do not remember walking around but I got to the
16  bathroom somehow.

17  Q.    Okay.  So you were ambulatory enough that you
18  could get yourself to the bathroom?

19  A.    I don't recall.

20  Q.    But you did get to the bathroom somehow and get
21  back?

22  A.    Yes.

23  Q.    And your hands were sufficiently free --

24  A.    Yes.  My hands --

25  Q.    -- that you could grab --

**DON LLOYD COOK vs RYAN WINGO, et al.**
**COOK, DON L. on 08/16/2023**

114..117

Page 114

1  A.      -- were completely free.
2  Q.      And you were talking to people on the phone so
3  you were able to speak at that time?
4  A.      Yes.
5  Q.      So you had the surgery on the third day?
6  A.      I believe so.
7  Q.      Then what happened following the surgery?
8  A.      I was discharged.
9  Q.      So you had the surgery and then --
10  A.      No.  I mean, some recovery and then I was
11  discharged after the third day.
12  Q.      Okay.  So I'm wondering were you discharged the
13  same day you had the surgery?
14  A.      I'm not sure.
15  Q.      Okay.  Well, because if the surgery was on the
16  third day and you were there three days, you would have
17  been discharged the same day?
18  A.      I believe it would have been the morning of the
19  3rd.
20  Q.      Okay.  So you had the surgery the morning of the
21  third day?
22  A.      I believe so.
23  Q.      And then by the evening of the third day you were
24  out?
25  A.      I would have to go back and check but my best

Page 115

1  recollection.
2  Q.      Okay.  Then where did you go?
3  A.      Back to my house.
4  Q.      Were you picked up?
5  A.      Yes.
6  Q.      By whom?
7  A.      My exwife picked me up.
8  Q.      Was anyone with your exwife?
9  A.      I don't think so.
10  Q.      During the three days you were in the hospital,
11  did you speak to any of your children?
12  A.      No.
13  Q.      Did any of your children attempt to contact you?
14  A.      Everything went through my exwife.
15  Q.      Do your children have your phone number?
16  A.      Yes.
17  Q.      And I would assume they have phones of their own?
18  A.      Yes.
19  Q.      So you get picked up by your exwife.  Where did
20  your exwife take you?
21  A.      I believe back to my house.
22  Q.      And what happened to your Nissan Rogue?
23  A.      She and my daughter picked it up.
24  Q.      How did they know where it was?
25  A.      I told them approximately where it was.

Page 116

1  Q.      Okay.  So on that initial phone call, is that --
2  did you discuss --
3  A.      I don't remember whether it was the initial phone
4  call.
5  Q.      Okay.  You said they picked it up the day after?
6  A.      I believe that's correct.
7  Q.      So June 2nd?
8  A.      That's my best recollection.
9  Q.      And so then you would have had to talk to them
10  from the hospital on June 2nd to tell them where the car
11  was.  Right?
12  A.      Yeah.
13  Q.      And so that, obviously, would have been part of
14  whatever conversation you had with them about what had
15  happened?
16  A.      Yes.
17  Q.      Were there any other details with them about why
18  you were at the protest or what you were doing or
19  anything like that?
20  A.      Do not recall.
21  Q.      So you go back to your house.  Did she drop you
22  off or was there anyone else there at your house?
23  A.      Either she or my daughter stayed with me for some
24  time.
25  Q.      By some time, are we talking hours, days?

Page 117

1  A.      I would say -- I don't recall.
2  Q.      Okay.  So you don't know if anyone stayed the
3  night with you?
4  A.      My recollection is somebody did but I don't
5  remember who.
6  Q.      Either daughter or exwife?
7  A.      Probably exwife.
8  Q.      Okay.  And so after a day or two, then no one was
9  staying with you at that point?
10  A.      Yes.
11  Q.      Okay.  You mentioned some of the other surgeries.
12  Right?
13  A.      Yes.
14  Q.      What else did you do medically -- I'm trying to
15  think of the right word.  Were there any other medical
16  procedures that weren't necessarily surgeries that you
17  underwent because of this incident?
18  A.      I started seeing a psychiatrist.
19  Q.      When did you begin seeing the psychiatrist?
20  A.      I put that in discovery.  I do not recall the
21  exact date.
22  Q.      Can you give me a ball park?
23  A.      October, possibly November of that year.
24  Q.      Of 2020?
25  A.      I believe so.

**Page 118**

```
 1   Q.    Had you ever seen a psychiatrist prior to June
 2   2020?
 3   A.    No.
 4   Q.    Okay. And I guess I'll define seen as had you
 5   ever -- you had never been under the care of or had
 6   appointments or visitations with a psychiatrist prior to
 7   June of 2020?
 8   A.    No.
 9   Q.    You said earlier, and I just want to confirm,
10   that the main reason for visiting a psychiatrist was the
11   anxiety that you now have as a result of the June 2020
12   incident?
13   A.    Yes.
14   Q.    Did you ever have any issue with anxiety prior to
15   June of 2020?
16   A.    Yes.
17   Q.    Can you detail those issues for me?
18   A.    Yes. When I was first or second year out of law
19   school, I experienced chest pains.
20   Q.    You experienced chest pain when you were fresh
21   out of law school?
22   A.    I was practicing.
23   Q.    Okay. Okay. And you believe that those were in
24   relation to stress?
25   A.    Yes.
```

**Page 119**

```
 1   Q.    So because of those chest pains, you're saying
 2   you went and saw a psychiatrist -- or I'm sorry. Did
 3   you see anybody because of those chest pains?
 4   A.    I just went to -- I saw a doctor.
 5   Q.    Saw a doctor. What did the doctor prescribe for
 6   you?
 7   A.    To lower my stress.
 8   Q.    Only if we could. Right? Okay. Were you
 9   prescribed any medication?
10   A.    No.
11   Q.    Prior to June of 2020, had you ever been
12   prescribed any medication for anxiety?
13   A.    No.
14   Q.    And I know I used the term psychiatrist, but I
15   want to make it broader. Had you ever seen a therapist
16   of any kind?
17   A.    Yes.
18   Q.    What kind of therapist?
19   A.    Licensed social worker, Master's in, I assume,
20   psychology.
21   Q.    And when did you begin seeing that therapist?
22   A.    Shortly before I got divorced.
23   Q.    Okay. If I go back, so shortly before 2010. Is
24   2009 a fair --
25   A.    2009 would be probably...
```

**Page 120**

```
 1   Q.    Okay. Okay. So 2009, you began seeing a
 2   therapist?
 3   A.    Yes.
 4   Q.    What is the name of that therapist?
 5   A.    Jean Spiegal.
 6   Q.    Was that therapist here in Little Rock?
 7   A.    Yes.
 8   Q.    Do you know how Spiegal is spelled?
 9   A.    I believe S-p-i-e-g-a-l.
10   Q.    Okay. Any idea if he still practices?
11   A.    I saw her about a four years ago. She would be
12   in her 80s.
13   Q.    And I just realize you said she and so how is
14   Jean spelled?
15   A.    J-e-a-n.
16   Q.    And what was the reason for seeing the therapist
17   in 2009?
18   A.    Marriage.
19   Q.    Were both of you seeing her together or just you?
20   A.    We were -- she -- we were both seeing her but not
21   together.
22   Q.    Okay. Sure. So was the -- would you say that
23   the therapy sessions were marriage counseling sessions?
24   A.    No.
25         They were therapy sessions but as a result of the
```

**Page 121**

```
 1   struggles of your marriage?
 2   A.    Yes.
 3   Q.    How long did you see Ms. Spiegal?
 4   A.    Probably a year to a year and a half.
 5   Q.    So after the divorce was finalized, you kind of
 6   stopped seeing Ms. Spiegal?
 7   A.    Yes.
 8   Q.    Was it your idea or your wife's idea to see Ms.
 9   Spiegal?
10   A.    I do not recall.
11   Q.    Had you -- is that the only therapist that you
12   had been with prior?
13   A.    In undergraduate, I saw a therapist for a few
14   months.
15   Q.    Do you recall who that therapist was?
16   A.    Actually, John Childers. I believe John, but
17   Childers definitely.
18   Q.    And he was a therapist as well?
19   A.    Yes.
20   Q.    And what led you to see him?
21   A.    Depression.
22   Q.    Depression. What had you depressed?
23   A.    Uncertainty.
24   Q.    Uncertainty in life, in general?
25   A.    Uncertainty about my choice in school and choice
```

Page 122

1  of where I was living.
2      Q.    And you saw him for four to six months, is that a
3  fair --
4      A.    A few sessions.  Probably four to six sessions.
5          MR. PAYNE:  I hate to interrupt.  Are you
6      anywhere near a break, Justin?
7          MR. BRASCHER:  I'm sorry?
8          MR. PAYNE:  Are you anywhere near a break?
9          MR. BRASCHER:  I'm actually -- I need to
10     take one myself.  Can we go off the record and
11     take a break here?
12         (Short break taken.)
13  BY MR. BRASCHER:
14     Q.    Okay.  Where we left, we were talking about you
15  had seen a therapist while you were in undergrad --
16     A.    Yes.
17     Q.    -- at the University of Arkansas.  You said that
18  you had been dealing with some depression, some
19  uncertainty.  Is that right?
20     A.    Uh-huh.  That is correct.
21     Q.    Was there any anxiety involved in that?
22     A.    Yes.
23     Q.    So you could say one of the reasons for seeing a
24  therapist was anxiety?
25     A.    Yes.

Page 123

1      Q.    When you saw the therapist, in 2009, you started
2  seeing her while you and your exwife -- were you
3  separated at the time?
4      A.    No, we were not separated at the time.
5      Q.    Was it an attempt to try to fix the marriage?
6      A.    No.
7      Q.    How would you describe the reasons for going to
8  therapy?
9      A.    At that point, it was to work on the marriage,
10  but -- it was to work on the marriage.
11     Q.    Did you have anxiety issues at that time?
12     A.    Not particularly.
13     Q.    How long would you say you saw the therapist,
14  again, Ms. Spiegal, following your divorce?
15     A.    Probably four to five months.
16     Q.    Okay.  How many sessions a month?
17     A.    I think we did -- we were doing once a week.
18     Q.    So you recall those are the only times that you
19  had seen a therapist prior to June 2020?
20     A.    Yes.
21     Q.    When did you begin seeing a therapist in relation
22  to the June 2020 incident?
23     A.    I believe October or November of 2020.
24     Q.    Of 2020?
25     A.    I'm not sure of the exact date.

Page 124

1      Q.    But right in that ball park?
2      A.    Yes.
3      Q.    One question I have is -- and this is circling
4  way back, I'm just trying to confirm something.  So you
5  were in the hospital?
6      A.    Yes.
7      Q.    And they extracted the beanbag from, essentially,
8  your face?
9      A.    Yes.
10     Q.    When did you get in possession of the beanbag?
11     A.    Immediately after they extracted it.
12     Q.    They dropped it in your hand or...
13     A.    I asked for it.
14     Q.    You asked for the beanbag.  What was your reason
15  for asking for the beanbag?
16     A.    Instinct.
17     Q.    Instinct.  Is that your lawyer instinct, is that
18  what you're saying?
19     A.    I just saw it, and I felt it was important to
20  hang on to it.
21     Q.    What about it was important?
22     A.    Like I said, they pulled it out of my face in
23  front of me.
24     Q.    Is part of it being important as proof later?
25     A.    I had not thought it out to that level of detail.

Page 125

1  I saw it.  I knew it was important.  I made sure I got
2  it.
3      Q.    So did they put it in a plastic bag and give it
4  to you?
5      A.    A medicine bottle.
6      Q.    Got it.  And then it was in your possession from
7  that point forward?
8      A.    Yes.
9      Q.    When did it leave your possession?
10     A.    I had -- prior to engaging Mr. Laux, I had
11  engaged a law firm in Houston, Texas, and I had sent it
12  to them.
13     Q.    Did you get it back from them?
14     A.    They arranged for Mr. Laux to get it.
15     Q.    Okay.
16     A.    I never had it back in my possession.
17     Q.    When did it leave your possession?
18     A.    I would have to check the calendar or my notes.
19     Q.    Sure.  Do you feel like you can give me a ball
20  park?
21     A.    It was several months after it happened.
22     Q.    2020 or 2021?
23     A.    It was in, I believe, 2020.
24     Q.    Winter of 2020?
25     A.    That seems correct.

DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 33 of 64

126..129

**Page 126**

1  Q.   Did you -- when you began going to see the
2  psychiatrist, in this case, October or November of 2020
3  --
4  A.   Yes.
5  Q.   -- were you in possession of the beanbag at that
6  time?
7  A.   I do not recall.
8  Q.   So you don't recall whether you had
9  transferred --
10  A.   No.
11  Q.   Sorry.
12  A.   Pardon me.  Yes, I believe I still had it.
13  Q.   Okay.  So you began seeing the psychiatrist in
14  October or November of 2020, and then in the month or
15  two thereafter, then you relinquished possession of the
16  beanbag to the law firm in Houston, Texas?
17  A.   Yes.
18  Q.   You're seeing -- how often do you currently see a
19  psychiatrist?
20  A.   Not at all right now.
21  Q.   Not at all right now.  When did you stop seeing
22  the psychiatrist?
23  A.   September.
24  Q.   Of?
25  A.   Last year.

**Page 127**

1  Q.   Of 2022?
2  A.   (Indicating.)
3  Q.   Did you go to a psychiatrist of your own volition
4  or did someone refer you to a psychiatrist?
5  A.   I went of my own volition.
6  Q.   So it was not a doctor recommendation or anything
7  like that?
8  A.   No.
9  Q.   How did you determine which psychiatrist to go
10  to?
11  A.   I looked at the Google ratings.
12  Q.   Okay.  What psychiatrist are you going to right
13  now?
14  A.   Currently --
15        MR. LAUX:  Objection; form.  You can
16     answer.
17        THE WITNESS:  Currently, I'm not.
18  BY MR. BRASCHER:
19  Q.   Oh.  Right.  I'm sorry.  What psychiatrist were
20  you visiting?
21  A.   Dr. Leslie Smith.
22  Q.   So you were seeing Leslie Smith from roughly
23  October or November of 2020?
24  A.   Uh-huh.
25  Q.   To roughly September of 2022?

**Page 128**

1  A.   Yes.
2  Q.   And so you stopped seeing her when you moved to
3  Vermont?
4  A.   Him.
5  Q.   Oh.  I'm sorry.  You stopped seeing Mr. Smith --
6  Dr. Smith, I'm assuming, when you moved to Vermont?
7  A.   Yes.
8  Q.   Because you moved to Vermont in October of '22?
9  A.   Yes.
10  Q.   What was the reason for moving to Vermont?
11  A.   To be close -- well, I didn't want to be in
12  Arkansas anymore.
13  Q.   What were the reasons for not wanting to be in
14  Arkansas anymore?
15  A.   I didn't feel safe here.
16  Q.   And is that in relation to the June --
17  A.   Yes.
18  Q.   -- 2020 incident?  So at the time that you moved
19  in October of '22, you had a son in Vermont?
20  A.   Yes.
21  Q.   Is that right?  And your daughter was living?
22  A.   In Little Rock.
23  Q.   Your daughter was in Little Rock.  And then your
24  other son -- I'm sorry.  Which son is in Vermont?
25  A.   Dylan.

**Page 129**

1  Q.   Dylan is in Vermont.  Okay.  And George is living
2  -- at the time you moved, was George in Little Rock as
3  well?
4  A.   No.
5  Q.   No.  Where was George living?
6  A.   Boston University.
7  Q.   Boston University.  Okay.  So he was born in
8  2005?
9  A.   Uh-huh.
10  Q.   And in '22 he's in Boston University?
11  A.   If I've got the dates right.  Yes.
12  Q.   Okay.  Good for him.  Okay.  And then at the time
13  that you moved, Zoey was in Little Rock and where -- and
14  you said Zoey is now -- next week she's going to New
15  York?
16  A.   Hang on.  The twins were born in 2003.
17  Q.   Okay.  That makes the math make more sense.
18  A.   Don't know why I said 2005.
19  Q.   Okay.  And you said -- so it's Dylan that lives
20  in Vermont?
21  A.   Yes.
22  Q.   How close are you to Dylan now in terms of where
23  you live and where he lives?
24  A.   About 11 miles.
25  Q.   Do you see each other frequently?

DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB  Document 19-6  Filed 09/28/23  Page 34 of 64

130..133

**Page 130**

1  A.      Yes.

2  Q.      How frequently would you say?

3  A.      Usually most weekends.

4  Q.      Is the fact that Dylan lives in Vermont was that
5  some of the reason for you moving to Vermont?

6  A.      Yes.

7  Q.      Would you say that was the reason you moved to
8  Vermont?

9  A.      Yes.

10  Q.      So we've got the different surgeries related to
11  the jaw, got the psychiatry.  Any other -- I'm trying to
12  come up with the right word -- medical procedures or
13  anything medical really that you are currently
14  undergoing or did undergo because of this injury?

15  A.      No.

16  Q.      So we've got the different jaw surgeries and got
17  the psychiatry that's what you've underwent because of
18  the incidence on June 1st?

19  A.      Yes.

20  Q.      You were then arrested in July of '21?

21  A.      Yes.

22  Q.      Can you describe to me what happened?

23  A.      Yes.  Early in the morning, approximately to the
24  best of my recollection, 8 o'clock, I heard a pounding
25  on the upstairs door.  I went upstairs, I was in my

**Page 131**

1  pajamas, and there was a uniformed officer outside the
2  door.

3  Q.      I guess I'm confused.  Pounding on the -- do you,
4  like, sleep in the basement or are you saying --

5  A.      It's a two-story house.

6  Q.      Okay.

7  A.      I was on the lower level and the front door is on
8  the upper level.

9  Q.      Got it.  Okay.  You hear pounding on the front
10  door, open it, it's a police officer, what happened at
11  that point?

12  A.      I stepped outside.  My son was asleep on the top
13  level.

14  Q.      Which son?

15  A.      Dylan.  And I had both my dogs who were there, so
16  I stepped outside, and said, Can I help you.  And the
17  officer said, Are you Don Lloyd Cook.  I said, Yes, I
18  am.  He said, Put your hands behind your back, you're
19  under arrest.  And they cuffed me.  And then they told
20  me said, Well, if you need your cell phone or anything,
21  we can let you go back in and get that.  And he said,
22  But we'll have to come with you.  And I said, You're not
23  going inside.  And then the officer -- he asked me, Do
24  you have any idea what this is for.  I said, No.  And
25  after a few seconds, I thought that it had to be related

**Page 132**

1  to this incident.

2  Q.      By this incident, do you mean the June 1st
3  incident?

4  A.      Yes.

5  Q.      Do you remember who any of the officers were?

6  A.      I had never seen them before.

7  Q.      And right now here today can you recall who they
8  were?

9  A.      No.

10  Q.      So you said after a few seconds it dawned on you
11  what this could be in relation to.  Did you say anything
12  to that effect?

13  A.      I said very little after that.

14  Q.      They told you that you were placed under arrest?

15  A.      Yes.

16  Q.      And you were cuffed?

17  A.      Yes.

18  Q.      Were your rights read to you?

19  A.      I do not recall.  I don't believe so.

20  Q.      Your Miranda rights, you don't recall if your
21  Miranda rights were read to you?

22  A.      I do not remember Miranda rights ever being read
23  to me.

24  Q.      Okay.  What were you wearing when they arrested
25  you?

**Page 133**

1  A.      Blue pajamas.

2  Q.      Where did they take you at that point?

3  A.      Eventually, to Pulaski County jail.

4  Q.      Okay.  How long were you in the Pulaski County
5  jail?

6  A.      Four to five hours.

7  Q.      I'm assuming you bailed out at that point?

8  A.      No bail.

9  Q.      No bail.  Okay.  What was the eventual resolution
10  of that charge?

11  A.      Eventually, I was offered a plea bargain, and I
12  believe it was 90-day diversion and all charges were
13  dropped.

14  Q.      One of those diversion agreements where you keep
15  your nose clean and attend a class or something like
16  that?

17  A.      No class.

18  Q.      No class.  Just keep your nose clean and then it
19  dropped?

20  A.      Yes.

21  Q.      So do you remember what the charges were that you
22  were arrested on?

23  A.      Obstructing governmental operations.

24  Q.      Did they tell you what you had been arrested for?

25  A.      No.

ARKANSAS
REALTIME REPORTING

**Page 134**

1  Q.    At any point, did they tell you what you were
2  being --
3  A.    I believe at some point they said obstructing
4  governmental regulations -- or operations.
5  Q.    And you said at some point, do you recall what
6  point?
7  A.    No.
8  Q.    Could it have been while you were still outside?
9  A.    I believe so.
10  Q.    Okay.  So at some point while you're outside,
11  they told you what you were arrested for?
12  A.    I don't recall with certainty.
13           MR. LAUX:  Just object to the form.  But
14       you've already answered.
15  BY MR. BRASCHER:
16  Q.    So I think that's pretty much it on that issue.
17  So you said you took a diversion agreement and that all
18  charges were dropped.  Right?
19  A.    Yes.
20  Q.    So as part of that diversion agreement -- I used
21  to be a prosecutor, typically, you stipulate that the
22  facts are sufficient to find you guilty if you fail
23  diversion agreement.  Did that occur here?
24           MR. LAUX:  Object to the foundation.  You
25       can answer.

**Page 135**

1           THE WITNESS:  I did not see that.
2  BY MR. BRASCHER:
3  Q.    Okay.
4  A.    I essentially let my defense attorney handle
5  everything.
6  Q.    Who was your defense attorney?
7  A.    Bobby Digby.
8  Q.    Bobby Digby?
9  A.    Uh-huh.
10  Q.    And Daniel Marks.
11           MR. PAYNE:  What was that second name?
12           THE WITNESS:  Daniel Marks.
13  BY MR. BRASCHER:
14  Q.    Is this the same Mr. Marks that you were with --
15  A.    Yes, it is.
16  Q.    Okay.  Does Mr. Marks specialize in criminal
17  defense?
18  A.    Yes, he does.
19  Q.    Did Mr. Marks ever -- did you and him ever talk
20  about his thoughts on the George Floyd protests?
21  A.    Not in detail.
22  Q.    Not in detail, but in general?
23  A.    You know, I do not recall a specific conversation
24  about it.
25  Q.    Okay.

**Page 136**

1  A.    But we must have.
2  Q.    Did the topic come up on the night of June 1st
3  when you were having pizza together?
4  A.    Yes.
5  Q.    What were his thoughts?
6  A.    It looked bad.
7  Q.    Looked bad, that's --
8  A.    About it.
9  Q.    Okay.
10           MR. BRASCHER:  I guess, Mike, is there any
11       way -- trying to think how to get ahold of it.
12       Was there...
13  BY MR. BRASCHER:
14  Q.    I'll ask you first.  Was there a diversion
15  agreement that you signed?
16  A.    I don't recall signing but that I'm just not
17  sure.
18  Q.    Okay.
19           MR. LAUX:  For the record, I have tendered
20       everything relating to the underlying criminal
21       charge in my possession.
22           MR. BRASCHER:  Okay.  Fair enough.
23  BY MR. BRASCHER:
24  Q.    So you don't recall whether you signed a
25  diversion agreement.  You do recall that the charges

**Page 137**

1  were dropped?
2  A.    Yes.
3  Q.    Okay.  What court were the charges in?
4  A.    North Little Rock district court.
5  Q.    Okay.  Do you recall what the -- or do you have
6  any way of getting what the criminal cause number was
7  for that case?
8  A.    Mike has it.
9           MR. LAUX:  It should be in the material.
10           MR. BRASCHER:  Something that's been
11       turned over?
12           MR. LAUX:  Yeah.
13           MR. BRASCHER:  Okay.  All right.
14           MR. LAUX:  I mean, I don't know it by
15       heart.
16           MR. BRASCHER:  Okay.
17           THE WITNESS:  I believe it's attached to
18       the complaint.
19           MR. LAUX:  That's also true.
20           MR. BRASCHER:  Okay.
21           MR. LAUX:  For the record, I would check
22       out Plaintiff's Bates stamp 74 through -- shoot.
23       I'm sorry.  It is attached to -- the file number,
24       I'm sure, is attached to the complaint.  Do you
25       want me to just give you the file number if I

**Page 138**

1   have the complaint here?

2       MR. BRASCHER: Yeah. Sure.

3       MR. LAUX: So yeah, let's see here -- so

4   there are a number of exhibits attached to

5   Plaintiff's complaint and among them is -- among

6   them is exhibit number five, which bears a

7   caption of State of Arkansas versus Don Lloyd

8   Cook, and that's a case that's pending -- or that

9   was pending in district court of North Little

10  Rock, Arkansas, criminal division number

11  NLCRC-21-1221. And specifically, I'm looking at

12  the entry of appearance by Mr. Digby.

13      MR. BRASCHER: Okay. Thank you.

14      MR. LAUX: Sure.

15  BY MR. BRASCHER:

16  Q.   Okay. So let's see, what else was I going to --

17  did you have any other interaction with those two

18  officers that arrested you that morning?

19  A.   No.

20  Q.   Had you had any prior arrests?

21  A.   Yes.

22  Q.   What were those arrests?

23  A.   Early '80s, a DWI, public intoxication, two

24  separate incidents.

25  Q.   So you had a DWI in the early '80s and then

**Page 139**

1   you're saying there was a public intoxication?

2   A.   Yes.

3   Q.   Anything else?

4   A.   Early '90s, DWI, separate incident, public

5   intoxication.

6   Q.   Any others?

7   A.   No.

8   Q.   So to the best of your recollection, those are

9   the times that you had been arrested prior to July --

10  A.   Yes.

11  Q.   -- of 2021? What was the outcome of those cases?

12  A.   The '80s was taken under advisement and

13  dismissed.

14  Q.   Okay. So the DWI you're saying was dismissed?

15  A.   Yeah. Taken under advisement and dismissed.

16  Q.   What does that mean for it to be taken under

17  advisement?

18  A.   Essentially similar to a diversion agreement.

19  Q.   Got it. The public intoxication, was that also

20  early '80s or were --

21  A.   Yes.

22  Q.   Okay. We'll visit the outcome of that -- what

23  was the outcome of that?

24  A.   The same. Diversion, or advisement and

25  dismissed.

**Page 140**

1   Q.   What about the early '80s DWI?

2   A.   I believe it was -- diversion, or advisement and

3   dismissed.

4   Q.   And what about the public intoxication?

5   A.   Dismissed.

6   Q.   So you said that one -- was that one different

7   than the other ones?

8   A.   It was just straight dismissed.

9   Q.   So as far as you can remember, those are the only

10  criminal incidents --

11  A.   Yes.

12  Q.   -- that you've been involved in? You obviously

13  were involved in a divorce?

14  A.   Yes.

15  Q.   Have you been involved in any other suits?

16  A.   Yes.

17  Q.   What are those?

18  A.   Okay. I was sued at about 16 years old for a car

19  accident. Settled by the insurance company.

20      I was, around about 1990, sued by a former law

21  partner over the dissolution of a partnership. Finding

22  in my favor.

23      I was involved in a patent lawsuit against

24  Verizon Corporation around 2015. Ultimately Verizon

25  prevailed. A company, Feeva Technology, was actually

**Page 141**

1   the successor company, they own the rights to Feeva.

2       And also the Feeva, we were sued by a former

3   investor in 2012. And that case is still ongoing.

4   Q.   Okay. Let me drill into a couple of those. Sued

5   in 1990 for the dissolution, which you eventually

6   prevailed in?

7   A.   Yes.

8   Q.   So in 1990 -- so prior to you going out to

9   Virginia for the PhD. Right?

10  A.   Yes.

11  Q.   In fact, that would be prior to you getting the

12  Master's?

13  A.   Yes.

14  Q.   Okay. So in 1990, is that when you --

15  A.   Probably roughly 1990.

16  Q.   Okay. And you graduated law school in '87. Is

17  that right?

18  A.   Yes.

19  Q.   So what were you doing in '90?

20  A.   I was in a partnership originally with one

21  attorney and we had another attorney join and I left the

22  partnership.

23  Q.   Okay.

24  A.   And then there was later a lawsuit over some of

25  the assets.

DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 37 of 64

142..145

**Page 142**

1 Q.    Okay.  What was the name of the partnership?

2 A.    At that point, Green, Cook, and Kessle.

3 Q.    So Green, Cook, and Kessle.  What was it before

4 the third partner joined?

5 A.    Green, Cook.

6 Q.    Okay.  How long was Green and Cook around?

7 A.    About a year and a half to two years.

8 Q.    Okay.  So --

9 A.    Maybe a year.

10 Q.    '88 to '90?

11 A.    Probably '89 to '90.

12 Q.    And then you left shortly after Kessle joined?

13 A.    Yes.

14 Q.    What was the reason for that?

15 A.    Disagreeing on direction.

16 Q.    He wanted to do different things?

17 A.    Essentially, yes.  I did not like Kessle.

18 Q.    Okay.  Okay.  All right.  So if I take a look at

19 this here, so you went pretty much straight through

20 undergrad, law school, graduated law school in '87, and

21 you said you were basically doing the threshold law

22 stuff --

23 A.    Yes.

24 Q.    -- after that, and at what point -- and in '89

25 you teamed up with Green?

**Page 143**

1 A.    Probably '90.

2 Q.    That you teamed up with Green?

3 A.    Yeah.

4 Q.    So how long was it Green, Cook before it became

5 Green, Cook, Kessle?

6 A.    I'm going to say about a year.

7 Q.    So maybe the suit with Kessle was in '91?

8 A.    Either in '91 or '92.

9 Q.    Okay.  So you were doing the -- yeah, the

10 threshold -- is that essentially what that partnership

11 was even with Green, was it --

12 A.    Yeah.  We did bankruptcy, personal injury.

13 Q.    Sure.

14 A.    Whatever walked through the door.

15 Q.    And you went to Virginia in '94, after you left

16 that partnership, in now you're saying maybe '92?

17 A.    Yes.  Somewhere in there.

18 Q.    Then what were you doing until '94?

19 A.    I was working for the Lile Law Firm in

20 Springdale, Arkansas.

21 Q.    Okay.  And you went to Virginia in '94.  Right?

22 A.    I believe that's correct.

23 Q.    And that was the PhD program.  Right?

24 A.    Yes.

25 Q.    So when did you get the Master's?

**Page 144**

1 A.    That would have been '93.

2 Q.    So while all of this was going on and you're

3 working, first for the partnership, and then you got the

4 Master's?

5 A.    I had -- I was with the Lile Law Firm when I had

6 the opportunity to go get the Master's, unfortunately.

7 Q.    Okay.  So you left Kessle in -- or you left

8 Green, Cook, Kessle in '92?

9 A.    I believe so.

10 Q.    And then you went and joined the Lile Law Firm?

11 A.    That is correct.

12 Q.    In '92?

13 A.    Yes.  That would -- that's about right.

14 Q.    Okay.  And then how long were you with the Lile

15 Law Firm before you went to the Master's program?

16 A.    Nine months to a year.

17 Q.    Okay.  So then in '93, you joined the Master's

18 program?

19 A.    Yes.

20 Q.    Was it a one-year Master's program?

21 A.    Not always but in this case, it was one year and

22 I had a -- I did -- I'm trying to think of the right

23 term -- an independent study for the last class I had to

24 get.

25 Q.    Okay.  So --

**Page 145**

1 A.    So I did summer and maximum class loads.

2 Q.    Got you.  Okay.  You said the opportunity

3 presented itself.  What does that mean?

4 A.    My father found out he was dying, and he was a

5 professor at the university and got my brother and I and

6 said, You're really good at what you do, I don't know

7 how happy you are, but I love being a professor, and if

8 you would like to go back to grad school, I will give

9 each of you $50,000 to go to school.  So I went to John

10 Lile, who was one of the finest trial lawyers I ever saw

11 in my life, and he said, We love you but I don't know if

12 you'll ever get another chance like this, I'd go.  And I

13 went.

14 Q.    And that was in '93ish?

15 A.    '92, '93.

16 Q.    Right in there?

17 A.    Uh-huh.

18 Q.    And so then you applied to the Master's program?

19 A.    To -- yeah.

20 Q.    In marketing.  Right?

21 A.    Well, it was just a general MBA.

22 Q.    Oh.  That's right.  Yeah.  Yeah.  Yeah.  Okay.

23 And then you were doing the PhD program in Virginia for

24 five years?

25 A.    Uh-huh.

**DON LLOYD COOK, DON L.** vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 38 of 64

146..149

**Page 146**

1  Q.      And then you went -- what was the first school
2  you --
3  A.      Louisiana Tech University.
4  Q.      Louisiana Tech.  And you were there for one year?
5  A.      Yes.
6  Q.      Why did you leave Louisiana Tech?
7  A.      Because Georgia State made me an amazing offer.
8  Q.      More money?
9  A.      Not just more money, they were teaching an online
10 executive MBA program that was one of the best in the
11 world.
12 Q.      Okay.
13 A.      And they recruited me.
14 Q.      Went to Georgia State.  How long -- and you were
15 at Georgia State for?
16 A.      Three years.
17 Q.      For three years.  And why did you leave Georgia
18 State?
19 A.      The online program collapsed when the dot com
20 blew up.  And I wasn't getting to teach what I wanted to
21 teach.
22 Q.      Got you.  So you left and where did you go after
23 --
24 A.      University of New Mexico.
25 Q.      New Mexico.  Were you getting to teach what you

**Page 147**

1  were wanting to teach at New Mexico?
2  A.      More.
3  Q.      More.  What did you want to teach?
4  A.      I loved the online consumer -- I wanted to teach
5  consumer behavior.
6  Q.      Okay.  And you were trying to find a school that
7  would really give you that?
8  A.      I was trying to find a balance between a great
9  place to live and a great place to work.
10 Q.      What were you thoughts on New Mexico?
11 A.      Wonderful place to live, not so much a great
12 place to work.
13 Q.      What about Georgia State?
14 A.      Exactly the opposite.  Incredible place to work,
15 not a great place to live.
16 Q.      So you were trying to find that balance.  What
17 about Louisiana Tech?
18 A.      Neat place.  Small, small town.  Very small
19 world.
20 Q.      Okay.  I'm trying to remember, Louisiana Tech, is
21 that in Shreveport?
22 A.      Ruston.  About 10,000 people.
23 Q.      Got you.  Okay.  So you went to New Mexico, not a
24 great place to work.  What made it not a great place to
25 work?

**Page 148**

1  A.      They had just gotten rid of one dean, the next
2  dean lasted a year and a half.  They didn't have another
3  dean for four or five years after I left.
4  Q.      So not good leadership at the top?
5  A.      No.
6  Q.      Okay.  And then was it after New Mexico, you went
7  into consulting?
8  A.      Yes.
9  Q.      And you were a privacy consultant --
10 A.      At Acxiom.
11 Q.      -- for Acxiom?  Why did you leave Acxiom and go
12 to Feeva?
13 A.      I was actually laid off at Acxiom.
14 Q.      Oh.  Okay.  Was that around '08?
15 A.      2007.
16 Q.      2007.  Okay.  Then you got a job with Feeva
17 relatively quickly?
18 A.      There was -- I left one and I started the other
19 one immediately.
20 Q.      Oh.  Okay.  So laid off but you were able to get
21 the next job quickly?
22 A.      I had actually been recruited before I was laid
23 off.
24 Q.      Go you.  Okay.  So they had recruited you.
25 Before you were laid off, had you decided you were going

**Page 149**

1  to switch?
2  A.      Yes.
3  Q.      What was the reason for switching?
4  A.      Well, I saw the layoff coming.
5  Q.      Okay.
6  A.      Acxiom was not interested in doing privacy
7  consulting as a business.
8  Q.      Got you.  And Feeva was?
9  A.      Feeva wanted me to be their chief privacy
10 officer.
11 Q.      And how long were you at Feeva again?
12 A.      Three years.
13 Q.      And then why did you leave Feeva and go to
14 Lunarline?
15 A.      Like a lot of startups, we didn't make it.
16 Q.      So that Feeva collapsed as a company?
17 A.      It died.
18 Q.      Okay.  Then you joined Lunarline.  You were at
19 Lunarline for a year.  Were you able to get to Lunarline
20 pretty quickly from Feeva?
21 A.      I was at Walmart between Lunarline and --
22 Q.      That's right.  That's right.  And you were at
23 Walmart for a month?
24 A.      No.  Approximately four.
25 Q.      Four months?

DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 39 of 64

150..153

**Page 150**

1    A.    Uh-huh.

2    Q.    Okay.  At Walmart for about four months, and you
3    said that you left Walmart because of the commute?

4    A.    (Indicating.)

5    Q.    Was that the only reason?

6    A.    That was the biggest -- I was not happy there.

7    Q.    Not happy there because of the commute or were
8    there other reasons?

9    A.    That was the biggest reason.

10   Q.    So you left Walmart.  Were you able to get a job
11   at Lunarline pretty quickly after Walmart?

12   A.    Pretty quickly.  Month or two.

13   Q.    And what --

14   A.    Maybe three or four months.

15   Q.    What led you leaving Lunarline for Gill, Ragon,
16   Owen?

17   A.    That was mutual agreement.  They wanted much
18   faster growth in the privacy consulting than I was able
19   to produce.

20   Q.    Okay.  So it was decided between the two of
21   you --

22   A.    Yes.

23   Q.    -- to go your separate ways?  Got you.  What led
24   to the switch to join a law firm?

25   A.    I was back in Arkansas and I needed something to

**Page 151**

1    do.

2    Q.    How long were you -- what was the gap between
3    Lunarline and Gill, Ragon, Owen?

4    A.    A month and a half.

5    Q.    So you're at Gill, Ragon, Owen for a couple of
6    years?

7    A.    Yes.

8    Q.    What led to leaving Gill, Ragon, Owen?

9    A.    We were trying to set-up a data privacy practice
10   and the business wasn't there.

11   Q.    Got you.  Just not enough people that needed that
12   service?

13   A.    Too early.

14   Q.    Okay.  Left Gill, Ragon, Owen and then you went
15   to Scottrade?

16   A.    Yes.

17   Q.    And is that -- that was in St. Louis.  Right?

18   A.    Yes.

19   Q.    What led you to go to Scottrade?

20   A.    Just I wanted to be in the privacy business and
21   they were looking for an associate.  They were looking
22   for somebody to build their privacy team.

23   Q.    With Gill, Ragon, Owen, did you leave Gill,
24   Ragon, Owen or was it there's no work for you to do
25   here?

**Page 152**

1    A.    No, I left.

2    Q.    You left.  And how long was the gap between Gill,
3    Ragon, Owen and Scottrade?

4    A.    There was no gap.

5    Q.    No gap.  So you would figure it out with
6    Scottrade and then --

7    A.    Yes.

8          MR. LAUX:  Let him finish.

9    BY MR. BRASCHER:

10   Q.    And you were with Scottrade for a year?

11   A.    Yes.

12   Q.    What led you to leave Scottrade?

13   A.    I was driving between St. Louis and Little Rock
14   every weekend.

15   Q.    And then you were at Arcon?

16   A.    Yes.

17   Q.    And how long were you at Arcon?

18   A.    From February 2020 to either November or December
19   of 2021.

20   Q.    Okay.  So how long were you at Scottrade?

21   A.    That was one year.

22   Q.    From '15 to '16.  Right?

23   A.    Uh-huh.  July of 2015 to 2016.

24   Q.    So then where did you go in '16?

25   A.    I essentially set-up my own shop.

**Page 153**

1    Q.    That's right.  Okay.  And so you were again
2    doing, essentially, the threshold law type stuff?

3    A.    Yes.

4    Q.    From '16 to '20?

5    A.    Yes.

6    Q.    You obviously had quite a few jobs in the sort of
7    privacy, data privacy, industry?

8    A.    Yes.

9    Q.    Did anyone reach out to you from '16 to '20 to
10   try to bring you in?

11   A.    I did a couple of things.  I worked with a
12   nonprofit that we tried -- we tried to get off the
13   ground and still exists.  I had a couple of people reach
14   out to me in local startups that I tried to engage with
15   it.  Never got paid.  And I still went to some of the
16   conferences and talked to people.  My son was having a
17   difficult time and it was important for me to be close,
18   so I lived hand to mouth for a few years.

19   Q.    Then from 2020 -- you were working for Arcon from
20   '20 to the fall of '21?

21   A.    That's correct.

22   Q.    What led you to leave Arcon?

23   A.    I just couldn't do anything.  I couldn't
24   function.

25   Q.    And so that was in the fall of '21?

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 40 of 64

DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023                                                          154..157

**Page 154**

1  A.    Uh-huh.
2  Q.    When did you begin working again?
3  A.    I tried to take a job immediately after Arcon and
4  I couldn't do it.
5  Q.    Where was that?
6  A.    It was with ADP, the payroll company.
7  Q.    Oh.  Sure.  Okay.  And --
8  A.    I just couldn't -- I couldn't do it.
9  Q.    And that was in the spring of '22 or the fall of
10 '21?
11 A.    It was fall to spring.
12 Q.    So and then back half of '22, you moved to
13 Vermont?
14 A.    Yes.
15 Q.    Do you work in Vermont?
16 A.    I'm working part-time.
17 Q.    Part-time doing what?
18 A.    I'm doing legal research.
19 Q.    For?
20 A.    Motion Recruitment and I'm seconded to
21 Lexis-Nexis.
22 Q.    Oh.  Okay.
23 A.    I do have a correction.  I forgot a lawsuit.
24 Q.    Okay.
25 A.    I was -- we sued the Little Rock School District

**Page 155**

1  on behalf of my oldest son, Dylan.
2  Q.    Okay.  When was this?
3  A.    I'm trying to -- there were two suits.  I'm
4  trying to -- 2014.
5  Q.    What was the reason for the lawsuit?
6  A.    Failure to provide accommodations for his autism.
7  Q.    What was the outcome of that lawsuit?
8  A.    Won the first time.
9  Q.    There were multiple?
10 A.    Yeah.  Reached an agreement with -- or we reached
11 -- settled, and then later on the same sort of conduct
12 and substantial abuse was occurring, and we sued again,
13 and my exwife was -- I was directly involved in the
14 first one, I was not directly involved in the second.
15 Q.    Why weren't you directly involved in the second
16 one?
17 A.    I was in St. Louis.
18 Q.    Okay.  So it was more your wife taking the lead
19 on the second one?
20 A.    Yes.
21 Q.    Oh.  Yeah.  Who did you have represent you and
22 your son in those cases?
23 A.    It will take me just a minute and I'll come up
24 with the name.  I can see the face.  It will --
25       MR. PAYNE:  Was it Theresa Caldwell?

**Page 156**

1       THE WITNESS:  It was Theresa Caldwell.
2       MR. BRASCHER:  Okay.
3       MR. LAUX:  What name was that -- Theresa
4  Caldwell?
5       THE WITNESS:  Theresa Caldwell.
6       MR. PAYNE:  She handles quite a few IEP
7  lawsuits --
8       MR. LAUX:  Oh.  Is that right?
9       MR. PAYNE:  -- down here.
10      MR. BRASCHER:  I have a case against her
11 at the moment.
12      MR. PAYNE:  Would that have been both
13 lawsuits?
14      THE WITNESS:  Yes.
15      MR. BRASCHER:  Yeah.  I'll be seeing her
16 in court next month.
17 BY MR. BRASCHER:
18 Q.    Okay.  So you had Theresa Caldwell represent your
19 family and your son in those cases.  After you and your
20 wife got divorced, the kids' primary residence was with
21 their mother.  Is that right?
22 A.    Yes.  There were several years Dylan lived with
23 me.
24 Q.    Lived with you.  You were his primary residence?
25 A.    Yes.

**Page 157**

1  Q.    Were you in Little Rock when that --
2  A.    Yes.
3  Q.    -- was the case?  Okay.  When you left Little
4  Rock, to say, St. Louis --
5  A.    Yes.
6  Q.    -- does that mean Dylan then moved back --
7  A.    Back to his mother's.
8  Q.    -- in with his mother?  Okay.  For your other two
9  children, their mother has always been their primary
10 residence?
11 A.    Yes.
12      MR. BRASCHER:  I'm just going to take one
13 more break and then I don't think we have much
14 more.
15      MR. LAUX:  Okay.  Thank you.
16      (Short break taken.)
17      MR. BRASCHER:  Just a few more questions.
18 We're almost done.
19 BY MR. BRASCHER:
20 Q.    For the life of me, help me out again.  What do
21 you currently do?
22 A.    I am doing legal research for a firm called
23 Motion Recruitment and I'm seconded by them to
24 Lexis-Nexis.  I'm working on an artificial intelligence
25 program, and earlier, I was helping write privacy

DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 41 of 64

158..161

**Page 158**

1  policies.
2  Q.    Okay.  So Motion Research you said?
3  A.    Motion Recruitment.
4  Q.    Motion Recruitment.  What does Motion Recruitment
5  do?
6  A.    They're just a consulting firm.  They are
7  essentially, basically, head hunters.  They hire
8  consultants for companies to use contract labor.
9  Q.    Okay.  But you aren't doing the consulting part?
10 A.    I am just contract labor.
11 Q.    You're contract labor and you do the legal
12 research?
13 A.    I'm now doing research.  And like I said, I was
14 writing privacy policies for a little bit.  Now, I'm
15 helping out on AI, an artificial intelligence project
16 we're doing.
17 Q.    And so they rented you out to someone to do that?
18 A.    Basically, yes.
19 Q.    Okay.  Okay.  Now, and so that's -- you're rented
20 out to Lexis-Nexis.  Is that --
21 A.    Yes.
22 Q.    Okay.  Now I get how this works.  Okay.  So
23 they're an agency, they've got people, hey, we can get
24 you some people who can do this.  So Lexis-Nexis --
25 A.    Yes.

**Page 159**

1  Q.    -- comes to them and goes, Can you give us some
2  people?  They said, Here's Don Lloyd Cook?
3  A.    Yes.
4  Q.    Okay.  So where I'm going with this is you've
5  talked about the anxiety that you've had?
6  A.    Yes.
7  Q.    And that basically, the last couple of jobs that
8  you had in the Little Rock area, basically, you couldn't
9  perform them because of this anxiety?
10 A.    Yes.
11 Q.    So how does this anxiety manifest itself?
12 A.    Fear, inability to focus, sitting in front of my
13 computer and not being able to move.
14 Q.    Okay.  So you get a fear that overcomes you and
15 you're just frozen?
16 A.    Yes.
17 Q.    And you don't know when it's going to happen or
18 where it's coming from?
19        MR. LAUX:  I'm sorry.  Object to form.
20        THE WITNESS:  I know -- I think I know
21    where it's coming from but...
22 BY MR. BRASCHER:
23 Q.    Where is it coming from?
24 A.    The things that happened in June of 2020 and July
25 of 2021.

**Page 160**

1  Q.    Okay.  So yeah, what I'm trying to zero in on is,
2  I guess, is there any physical manifestations of this
3  anxiety?
4  A.    Tightness in the chest and almost an inability to
5  move.
6  Q.    Is there any pattern or timing to when these sort
7  of anxiety waves hit you?
8  A.    When I need to work, when I need to focus, when
9  it's not fun it's work.
10 Q.    Okay.  And is -- sorry.  Go ahead.
11 A.    When I have to perform.
12 Q.    Is it fair to say that it's that issue that
13 you're referring to, where this anxiety comes up when
14 you need to work?  Is that the reason that you've had to
15 leave the last couple of jobs that you've been at?
16 A.    Yes.
17 Q.    But that anxiety hasn't been an issue in the
18 current job that you have?
19 A.    It's not been as bad.
20 Q.    What's changed?
21 A.    This is easy stuff.
22 Q.    So the difficulty level of what you're doing?
23 A.    It's not difficult.
24 Q.    Okay.  You said that -- now, you were able from
25 between June of 2020 and July of 2021, you were working?

**Page 161**

1  A.    I was working.
2  Q.    And you were able to perform as you put it?
3  A.    I was doing okay.  I was not excelling.
4  Q.    Would you say that prior to June of 2020, you
5  were always excelling?
6  A.    Yes.
7  Q.    But you were working at a level where you were
8  still able to perform?
9  A.    Yes.
10 Q.    Then --
11 A.    Not --
12 Q.    Oh.  I'm sorry.  Were you going to say something?
13 A.    Not well.
14 Q.    And then a change occurred following July of '21
15 where --
16 A.    Yes.
17 Q.    -- now you're unable to work?
18 A.    Yes.
19 Q.    So I think it would be fair to say that there was
20 a significant change in how this anxiety was affecting
21 you following July of 2021?
22 A.    Yes.
23 Q.    So you're saying that the reason now that you're
24 good -- that you're good to have the job that you
25 currently have is because it's easy stuff?

Page 162

1  A.     Yes.
2  Q.     So do you think that you are still incapable of
3  working what you consider to be a more difficult or
4  rigorous job?
5  A.     I'm not sure.
6  Q.     The anxiety you've been referring to, do you
7  still have those sorts of attacks?
8  A.     Yes.
9  Q.     When do they come?
10 A.     It's, you know, whenever I feel stress and if I'm
11 worried about my son or if I'm worried about my job or
12 if I'm worried about I'm not making enough money
13 anymore.
14 Q.     So those sort of fear attacks, they still come?
15 A.     Yes.
16 Q.     Are you saying that before you got the job that
17 you currently have, the last couple of jobs that you
18 had, they only came when you were working?
19 A.     Typically.
20 Q.     They didn't necessarily come when you were
21 worried about your son or --
22 A.     No.
23 Q.     But now they do?
24 A.     Usually work.
25 Q.     Usually it's work related?

Page 163

1  A.     (Indicating.)
2  Q.     So because what you're doing now is easy work, is
3  it you're having less of them now?
4  A.     Yes.
5  Q.     And prior to September of '22, these were --
6  would you say they were almost exclusively work-related
7  attacks?
8  A.     Yes.
9  Q.     Would you say exclusively?
10 A.     Almost.
11 Q.     Had you had attacks like this prior to July of
12 '21?
13 A.     Not at this level.
14 Q.     What about prior to June of 2020?
15 A.     Nothing close.
16 Q.     Nothing close.  So you had anxiety attacks
17 before?
18 A.     I've had anxiety but never debilitating anxiety.
19 Q.     You said you'd had anxiety before, had you ever
20 seen anybody for it, got any treatment for it?
21        MR. LAUX:  Just object; asked and
22        answered.  You can answer again.
23        THE WITNESS:  No.
24 BY MR. BRASCHER:
25 Q.     Had it ever kept you -- had your anxiety ever

Page 164

1  kept you from being able to do anything prior to June of
2  2020?
3  A.     Not anytime in recent memory.  No.
4  Q.     Not anytime -- okay.
5  A.     If I wanted to go back to, say, 1991, yes.
6  Q.     Okay.
7  A.     Very temporarily.
8  Q.     What happened in 1991?
9  A.     I told you.  I had to go to the ER for chest
10 pains.
11 Q.     Right.  Okay.  And was that -- is that while
12 Green, Cook, Kessle was going on?
13 A.     That was prior --
14 Q.     That was prior to Green, Cook --
15 A.     -- to that.
16 Q.     Is that while Green and Cook was going on?
17 A.     No, it was actually, I -- I had a brief firm with
18 a couple of classmates.
19 Q.     Oh.  So it was another firm?
20 A.     Yes.
21 Q.     Okay.  Why did that firm break up?
22 A.     Oh.  One of the classmates returned to Texas, his
23 father had really severe health problems, and the other
24 one returned to Indiana, which was his home.
25 Q.     All right.  Last questions are related to prior

Page 165

1  to June of 2020, did you ever have any jaw or facial
2  surgery?
3  A.     I had two teeth removed when I lived in New
4  Mexico.
5  Q.     Okay.  And that would have been in the 2000s?
6  A.     Yeah.
7  Q.     Okay.
8  A.     And then shortly after I got back to Little Rock,
9  I had to have the upper ones in the same location
10 removed.
11 Q.     So you'd had four teeth removed?
12 A.     Yes.
13 Q.     Okay.  Any other dental or face-related surgeries
14 prior to June 2020?
15 A.     I had -- when I was in St. Louis, I had a skin
16 graft and a bone graft.
17 Q.     What were the reasons for that?
18 A.     Gum disease.
19 Q.     Is that it?
20 A.     To the best of my recollection, yes.
21 Q.     So had any of your teeth, other than the four you
22 had removed, been knocked out prior to June of 2020?
23 A.     No.  I've actually never had a cavity.
24 Q.     I haven't either.  That's a good club to be part
25 of.  I'm lucky.  We're lucky.

Page 166

1    So then had you ever had any jaw-related surgery
2  prior --
3  A.    No.
4  Q.    -- to June of 2020?  Any jaw-related injuries --
5  A.    No.
6  Q.    -- prior to 2020?  Okay.  Any significant
7  facial-related injuries prior to 2020?
8  A.    No.
9  Q.    Okay.
10            MR. BRASCHER:  I believe I pass the
11    witness.
12            MR. PAYNE:  Do you mind if I ask a couple
13    of questions just to avoid another break or would
14    you prefer us to take a break and --
15            MR. LAUX:  Typically, we don't like to
16    double team but that's okay.  That's okay.
17            MR. PAYNE:  That's fine.
18            MR. LAUX:  That's okay.
19            MR. PAYNE:  Up to you.
20            MR. LAUX:  If he's going to ask, you can
21    go ahead.
22            MR. PAYNE:  Thanks.
23                EXAMINATION
24  BY MR. PAYNE:
25  Q.    You said you had a couple of teeth removed in

Page 167

1  New Mexico?
2  A.    Uh-huh.
3            MR. LAUX:  Yes?
4            THE WITNESS:  Yes.
5  BY MR. PAYNE:
6  Q.    Why were those teeth removed?
7  A.    Gum disease.
8  Q.    And then you said you also had some later
9  treatment for gum disease?
10  A.    Yes.
11  Q.    Sometime after that.
12  A.    Yes.
13  Q.    When was that?
14  A.    When I was in St. Louis.  So it would have been
15  2015 to 2016.
16  Q.    You mentioned earlier that you've had difficulty
17  with a bone graft.  Is that correct?
18  A.    Yes.
19  Q.    Have any of your current physicians that you've
20  been working with since the incident in June of 2020,
21  have they related any of that difficulty to those prior
22  gum disease --
23  A.    No.
24  Q.    -- or prior to 2020?
25  A.    No.

Page 168

1  Q.    Okay.
2            MR. PAYNE:  That's all I've got.
3            MR. LAUX:  If I could get two minutes to
4    chat with my client briefly, I've got probably
5    less than ten -- about less than a dozen
6    questions and then I'm going to be done.  Thank
7    you.
8            (Short break taken.)
9                EXAMINATION
10  BY MR. LAUX:
11  Q.    So Mr. Cook, Mr. Brascher did a good job of
12  asking you a lot of questions and covering a lot of
13  bases.  I'm just going to go over my notes and ask you
14  some questions related.  It might be a little bit
15  disjointed but you'll be able the answer those
16  questions?
17  A.    Yes.
18  Q.    Okay.  In response to some of Mr. Brascher's
19  questions, you were estimating your observations or
20  beliefs of the size of the crowd that was assembled at
21  or near the Capitol on June 1st, 2020.  Do you remember
22  that line of questioning?
23  A.    Yes.
24  Q.    To the extent that you gave an estimation of the
25  people that you saw, was that your best estimate?

Page 169

1  A.    Yes.
2  Q.    To the extent that there's some type of an
3  official count by the State of Arkansas or some other
4  competent body, would you defer to that body?
5  A.    Yes.
6  Q.    Were you intoxicated at any time on the evening
7  of June 1st, 2020?
8  A.    No.
9  Q.    Did you suffer any bruising or any welts or any
10  type of physical injury to any part of your body other
11  than your face as a result of what occurred on June 1st,
12  2020?
13  A.    No.
14  Q.    At any time were you hit with multiple pepper
15  balls?
16  A.    No.
17  Q.    At any time were you hit with something called a
18  foam impact round?
19  A.    No.
20  Q.    What did you weigh on June 1st, 2020?
21  A.    About 195.
22  Q.    At any time on June 1st of 2020, were you wearing
23  a white shirt?
24  A.    No.
25  Q.    At any time on that date were you wearing red



**Page 170**

1  shorts?

2  A.    No.

3  Q.    The injuries that you received to your face on
4  June 1st, 2020, did those injuries require
5  transportation to a hospital?

6  A.    Yes.

7  Q.    At any time on June 1st, 2020, did you refuse any
8  law enforcement commands?

9  A.    No.

10  Q.    At any time on that date did you advance toward
11  any police officers?

12  A.    No.

13  Q.    You gave testimony regarding your direction of
14  travel after hearing commands from the State Police to
15  vacate the area.  Do you remember answering questions
16  about that?

17  A.    Yes.

18  Q.    And you drew a diagram, actually, which was
19  marked as Exhibit 1.  Is that true?

20  A.    Yes.

21  Q.    So if your car was parked to the east of the
22  Capitol, why would you go north instead of east when you
23  wanted to go and leave the premises?

24  A.    I was trying to put distance between myself, the
25  police, and the protestors, and my goal was to go away

**Page 171**

1  from the crowds and circle back around to my car.

2  Q.    So if I understand your testimony correctly, do
3  you mean to say that your direction then would have been
4  heading north to clear the crowd and then at some point
5  turning east and then south again?

6  A.    Yes.

7  Q.    Today you were shown a clip of video from the
8  Capitol building.  Do you recall that?

9  A.    Yes.

10  Q.    Had you ever seen that video prior to today?

11  A.    No.

12  Q.    Prior to being hit with the bean -- what we now
13  know is a beanbag projectile to your face, did you hear
14  any warning from any police officer telling you that a
15  use of force was imminent?

16  A.    No.

17         MR. BRASCHER:  Object to form.

18  BY MR. LAUX:

19  Q.    Prior to being hit in the face, did anyone say to
20  you -- did anyone -- well, strike that.

21         If I were to tell you that based on the record
22  that has been established in discovery, that you were
23  arrested on July 23rd of 2021, would you bicker with me
24  about that date?

25  A.    No.

**Page 172**

1  Q.    You'd accept that as the date you were arrested?

2  A.    Yes.

3  Q.    We've talked about July 2021, but I don't know if
4  we specified the date.  Do you accept that it was July
5  23rd?

6  A.    Yes.

7  Q.    Regarding the final resting spot or resting point
8  of the beanbag projectile in your face and on your
9  person, would you defer to medical professionals who
10  treated you?

11  A.    Yes.

12  Q.    When you went to the Capitol grounds on June the
13  1st, 2020, did you have a wallet on your person?

14  A.    Yes.

15  Q.    At that time did you have a state-issued driver's
16  license?

17  A.    Yes.

18  Q.    Was that driver's license in that wallet?

19  A.    Yes.

20  Q.    If you were searched, if your body was searched
21  and your clothing was searched incident to an arrest,
22  would your wallet have been discovered?

23  A.    Yes.

24         MR. BRASCHER:  Object to the form.

25  BY MR. LAUX:

**Page 173**

1  Q.    And if someone looked in your wallet on that
2  evening, would they have seen your driver's license?

3         MR. BRASCHER:  Object to the form.

4  BY MR. LAUX:

5  Q.    So to the extent that there's any mystery about
6  your identity, is it your testimony that that mystery
7  could have been solved merely by looking at your
8  driver's license?

9  A.    Yes.

10         MR. BRASCHER:  Object to the form.

11  BY MR. LAUX:

12  Q.    You testified regarding anxiety that you
13  experienced prior -- in your life, prior to June 1st,
14  2020.  Correct?

15  A.    Yes.

16  Q.    And whatever anxiety that was or was not, did
17  that anxiety prevent you from working?

18  A.    No.

19  Q.    Is it a fair statement to say you suffered
20  anxiety from the events of June 1, 2020, and that
21  anxiety was exacerbated around the time of your arrest?

22  A.    Yes.

23  Q.    And it was exacerbated because of your arrest?

24  A.    Yes.

25  Q.    Since June of 2020, have you come to know the

DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 45 of 64

174..177

**Page 174**

1  identity of any of the officers involved in the
2  incident?
3  A.      Yes.
4  Q.      And to your understanding, who are -- who is one
5  or more of the officers involved?
6  A.      Officers Sheeler and Wingo.
7  Q.      Are you aware of Officer Wingo's presence on the
8  internet at all?
9  A.      Yes.
10  Q.      When you testified regarding anxiety by being in
11  the proximity of police, did you mean in a general
12  sense?
13  A.      Yes.  And specific.
14  Q.      And what do you mean by in a specific sense?
15  A.      Officer Wingo.
16  Q.      Is it your understanding that Officer Wingo is a
17  Highway Patrol officer?
18  A.      Yes.
19  Q.      Did that at all contribute to your anxiety -- to
20  the anxiety that you suffered related to driving?
21  A.      Yes.
22  Q.      Whether you went to Vermont or elsewhere, is it a
23  fact that after this incident you wanted to leave
24  Arkansas?
25  A.      Yes.

**Page 175**

1  Q.      I just want to clear something up here, you
2  testified very candidly and openly about some
3  transgressions in your past and you kind of lumped them
4  together.  Am I correct that we're talking about two
5  incidents, both of which involved an alleged DUI and
6  public intoxication?
7  A.      Two different for each.
8  Q.      Okay.  So you're talking about two different
9  charges -- I'm sorry.  You're talking about four
10  different charges from two incidents?
11  A.      Four incidents, four charges.
12  Q.      And they're all occurring on separate dates?
13  A.      Yes.
14  Q.      Okay.  Then I got that wrong.  Thank you.  You
15  took a diversion option regarding the charge of
16  obstruction of governmental operations in this matter.
17  Correct?
18  A.      Yes.
19  Q.      Why did you take the diversion option?
20  A.      My defense attorney recommended it.
21  Q.      Any other reasons?
22  A.      No.
23  Q.      Was it traumatic to engage in the criminal
24  justice system following this?
25  A.      Yes.

**Page 176**

1  Q.      So was a benefit of -- taking the diversion
2  option, was a benefit of that the termination of the
3  criminal proceedings?
4          MR. BRASCHER:  Objection to form.
5          THE WITNESS:  Yes.
6  BY MR. LAUX:
7  Q.      Did you receive any advice or suggestions from
8  anyone other than your lawyer regarding the diversion
9  option?
10  A.      My psychiatrist.
11  Q.      What did your psychiatrist say about that?
12  A.      Get it behind you.
13  Q.      Can you elaborate on what you think your
14  psychiatrist or psychologist meant by that?
15          MR. BRASCHER:  Just object to form.
16          THE WITNESS:  The stress I was
17      experiencing, I would be better off to be past
18      it.
19  BY MR. LAUX:
20  Q.      Mr. Brascher was asking you questions about
21  physical manifestations of your injuries.  Do you
22  remember that?
23  A.      Yes.
24  Q.      I shouldn't say that.  Physical manifestations of
25  your anxiety.  Do you recall that?

**Page 177**

1  A.      Yes.
2  Q.      And is it a fact that your anxiety has caused you
3  to cry?
4  A.      Yes.
5  Q.      Is it a fact that your anxiety has caused you
6  periods of chills or sweats?
7  A.      Shaky.
8  Q.      Shaking?
9  A.      Uh-huh.
10  Q.      Have you ever had any problems related to slumber
11  that you associate with this incident?
12  A.      Yes.
13  Q.      Can you elaborate on that briefly?
14  A.      Sometimes I have trouble sleeping and --
15  depending on what I've seen that day.
16  Q.      I don't want to put words in your mouth but does
17  that mean to say that -- well, why don't I just ask you.
18          What are the types of things that you would see
19  that would trigger a problem in slumber on that evening,
20  for instance?
21  A.      For example, I stopped to help in an accident.
22  Q.      Are you talking about, like, a motor vehicle
23  accident?
24  A.      A motor vehicle accident.
25  Q.      When did this occur?

DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 46 of 64

178..181

**Page 178**

1  A.    I want to say spring of last year, near Cantrell
2  and Mississippi.
3  Q.    Okay.
4  A.    Here in Little Rock.
5  Q.    And what happened?
6  A.    A truck -- I was going northbound on Mississippi
7  and a truck came -- I had just changed lanes and a truck
8  came barrelling past me at a very, very high rate of
9  speed, hit a car immediately in front of me, the cars
10 locked up, went all the way across all four lanes.
11 Q.    Sorry.  The truck and the car locked up?
12 A.    Yeah.
13 Q.    Continue.
14 A.    Went across all four lanes and both vehicles
15 wound up in a front yard.  The vehicle that was struck
16 was burning, the truck was on its side, and I helped the
17 person out of the car.  And the police arrived.  And the
18 blue lights, it was very surreal.  It was very hard to
19 stay there and give my statement.  And ultimately one of
20 the passengers in the car passed away.
21 Q.    Despite the difficulties you encountered, did you
22 perform your civic duty and give a statement?
23 A.    Absolutely.
24 Q.    Mr. Brascher was asking you questions about your
25 current job and how you're able to perform that job in

**Page 179**

1  light of your anxiety and other injuries.  Do you recall
2  that?
3  A.    Yes.
4  Q.    Is it a fair statement that you needed to find a
5  job where the skill level was such that it could
6  accommodate your anxiety?
7  A.    Yes.
8  Q.    I saw you for the first time yesterday since a
9  few weeks or months.  True?
10 A.    Yes.
11 Q.    The time that I saw you before yesterday, you had
12 a beard?
13 A.    Yes.
14       MR. BRASCHER:  Objection to form.
15 BY MR. LAUX:
16 Q.    And you're not wearing a beard right now.  Why
17 did you grow a beard --
18 A.    To hide --
19 Q.    -- prior to yesterday?
20 A.    To hide the injuries to my face.
21 Q.    And why did you shave your beard?
22 A.    So those injuries could be seen today.
23 Q.    Today meaning at your deposition?
24 A.    Yes.
25 Q.    You didn't look at -- you didn't review the

**Page 180**

1  entirety of the video that we received this morning, did
2  you?
3  A.    No.
4  Q.    But among the portion that you did look at as
5  directed by Mr. Brascher, did you see anyone advancing
6  toward the police?
7  A.    No.
8  Q.    Did you see anyone absorbing multiple pepper
9  balls?
10 A.    No.
11 Q.    Did you see anyone absorbing a foam impact round?
12 A.    No.
13 Q.    Because of the charges that were brought against
14 you in July of 2021, did you need to hire a criminal
15 defense attorney?
16 A.    Yes.
17 Q.    Did you pay for that attorney out of pocket?
18 A.    Yes, I did.
19 Q.    Do you consider police brutality to be a matter
20 of public concern?
21 A.    Yes.
22       MR. BRASCHER:  Object to form.
23 BY MR. LAUX:
24 Q.    When you went to the Capitol grounds in June
25 2020, were you expressing your briefs on the matter of

**Page 181**

1  public concern?
2  A.    Yes.
3  Q.    Whether it's employment matters or listening to
4  your doctor's orders, have you done your very best to
5  mitigate your damages in this case?
6  A.    Yes.
7       MR. BRASCHER:  Object to form.
8       MR. LAUX:  That's all the questions I
9       have.
10      MR. BRASCHER:  Great.  I just have a
11      couple and then we can wrap it up.
12            FURTHER EXAMINATION
13 BY MR. BRASCHER:
14 Q.    You said that you had a surgery in New Mexico,
15 right, related to taking some teeth out?
16 A.    Yes.
17 Q.    And was it in New Mexico where you also had the
18 bone graft, the first attempted bone graft?  You said
19 that there was an attempted -- was it a skin graft?
20 A.    They did a skin graft and bone graft.
21 Q.    Okay.  Was that skin graft and bone graft -- what
22 year did that occur?
23 A.    Either 2015 or 2016.
24 Q.    Okay.  That's right.  I had '15 written down.  I
25 was making sure.  Was that first bone graft successful?

DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 47 of 64

182..184

**Page 182**

1   A.     Yes.

2   Q.     Okay.  Was it in the same spot they attempted to

3   do a bone graft the second time around?

4   A.     No.

5   Q.     What about the skin graft, was that successful?

6   A.     Yes.

7   Q.     The car crash you were referring to, where the

8   truck and the car ended up in the front yard, when did

9   that happen?

10  A.     I believe spring of last year.

11  Q.     Spring of 2022?

12  A.     Uh-huh.

13  Q.     Your attorney, Mr. Laux, mentioned something on

14  Facebook, I believe, in his line of questioning.  Did I

15  miss that?

16         MR. LAUX:  I don't think I said the word

17         Facebook.

18  BY MR. BRASCHER:

19  Q.     What specifically about Ryan Wingo -- you've said

20  he's led you to increased anxiety.  What about him has

21  led to that?

22  A.     I saw a video that was posted on the internet.

23  Q.     What did this video depict?

24  A.     It depicted Mr. Wingo stopping a car, I believe,

25  in the Hot Springs area, hitting the car from behind,

**Page 183**

1   and then lying about it to the officers who arrived

2   afterward.

3   Q.     And so watching that video gave you increased

4   anxiety?

5   A.     Yes.

6   Q.     You did not know when it occurred who the officer

7   was that had struck you.  Correct?

8          MR. LAUX:  Object to the form.  You can

9          answer.

10         THE WITNESS:  Could you clarify, please?

11  BY MR. BRASCHER:

12  Q.     Absolutely.  When you were initially hit by the

13  beanbag round, you didn't know who had fired the round?

14  A.     No.

15  Q.     Okay.

16         MR. BRASCHER:  I believe that's all I have

17         and I pass the witness.

18         MR. LAUX:  No more for me.

19         MR. BRASCHER:  We are done.  Thank you,

20         very much.

21         (WHEREUPON, this is the conclusion of the

22         testimony given in the above-styled cause on this

23         day.)

24

25

**Page 184**

1            C E R T I F I C A T E

2

3   STATE OF ARKANSAS      )

4                         )      ss

5   COUNTY OF CONWAY       )

6

7      I, LEIGH ANN COOK, Certified Court Reporter and
    Certified Shorthand Reporter, duly and qualified in and

8   for the State of Arkansas, do hereby certify that the
    foregoing proceedings were taken before me at the time

9   and place stated in the foregoing styled cause with the
    appearances as noted;

10

11     I further certify that the foregoing proceedings
    were reported in Stenotype and the foregoing pages

12  contain a true and correct transcript of the original
    Stenographic notes.

13

14     I further certify that I am neither attorney or
    counsel for, nor related to or employed by any of the

15  parties to the action in which this deposition is taken;
    and furthermore, that I am not a relative nor employee

16  of any attorney or counsel employed by the parties
    hereto or financially interested in the action.

17

18     IN WITNESS WHEREOF, I have hereunto set my hand
    and affixed my Official Seal this 21st day of August,

19  2023.

20

21

22                           LEIGH ANN COOK, CCR, CSR
                            LS Certificate Number 544

23

24

25

Case 4:23-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 48 of 64

DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Index: $50,000..9:00

**Exhibits**

**Don Cook Exhibit 1**  65:25
  66:2 170:19

**Don Cook Exhibit 2**  66:8,
  15

**$**

**$50,000**  145:9

**-**

**---o---**  4:14

**0**

**06**  18:24

**07**  19:17

**08**  19:17 148:14

**1**

**1**  65:25 66:2 170:19 173:20

**10**  55:20 88:16 94:3

**10,000**  147:22

**10:20**  4:5

**10ish**  24:22

**11**  129:24

**12**  23:23 51:4

**124**  104:5

**12:00**  51:8

**13**  22:18 23:23

**135**  66:11

**14**  24:21

**15**  24:9,14 94:1 152:22
  181:24

**16**  4:4 25:7,22 140:18
  152:22,24 153:4,9

**18**  19:7

**195**  169:21

**1968**  11:1

**1987**  12:3

**1989**  12:15

**1990**  140:20 141:5,8,14,15

**1991**  164:5,8

**1993**  12:16 14:3,4

**1994**  13:23

**1999**  13:20,23 14:20 15:10

**1st**  25:25 27:19 28:13 33:7
  34:25 35:2 37:13,15,21
  38:10 61:7,15 104:12 108:9
  130:18 132:2 136:2 168:21
  169:7,11,20,22 170:4,7
  172:13 173:13

**2**

**2**  61:24 66:8,15

**20**  8:2,4 25:22 29:14 88:16
  93:24 153:4,9,20

**200**  4:6 49:13 88:2

**2000**  16:11

**2000-**  21:15

**2000s**  165:5

**2001**  17:23

**2003**  16:7,25 17:2 129:16

**2005**  17:23 18:3,4 129:8,18

**2006**  18:5

**2007**  19:5 148:15,16

**2009**  119:24,25 120:1,17
  123:1

**2010**  20:15,18 22:1 119:23

**2011**  21:14,16 22:19

**2012**  23:9,24 141:3

**2014**  155:4

**2015**  24:6 140:24 152:23
  167:15 181:23

**2016**  152:23 167:15 181:23

**2020**  25:25 26:4,6,18 27:19
  28:13 29:19 31:2 32:12
  33:18 34:23 61:15 104:12,

13 108:9 117:24 118:2,7,11,
  15 119:11 123:19,22,23,24
  125:22,23,24 126:2,14
  127:23 128:18 152:18
  153:19 159:24 160:25 161:4
  163:14 164:2 165:1,14,22
  166:4,6,7 167:20,24 168:21
  169:7,12,20,22 170:4,7
  172:13 173:14,20,25 180:25

**2021**  26:21 28:14 29:19
  30:12 125:22 139:11 152:19
  159:25 160:25 161:21
  171:23 172:3 180:14

**2022**  127:1,25 182:11

**2023**  4:4

**21**  26:22 29:7,10,13 30:13
  130:20 153:20,25 154:10
  161:14 163:12

**22**  30:11 128:8,19 129:10
  154:9,12 163:5

**23rd**  171:23 172:5

**25**  8:2,4 11:24

**2nd**  104:11 110:4 116:7,10

**3**

**30**  73:1,3 93:21

**30th**  37:3,11

**31st**  37:3,11

**323**  4:6

**39**  61:25

**3:00**  51:8

**3:13**  63:2

**3rd**  114:19

**4**

**4**  38:11

**45**  55:24

**5**

**5**  38:14

**50**  49:11

**500**  49:15,17 50:1

**57**  104:17

**7**

**700**  49:18

**74**  104:5 137:22

**8**

**8**  130:24

**80**  34:9,10,11

**80s**  120:12 138:23,25
  139:12,20 140:1

**82**  34:12,13

**83**  34:12,13

**84**  104:10,13

**85**  34:9,10,11

**87**  141:16 142:20

**88**  142:10

**89**  12:23 142:11,24

**8:00**  47:9,10,12,15

**8:30**  47:10,12,15 53:12

**8:45**  54:13

**9**

**9**  51:6 53:14

**90**  73:16,17 141:19 142:10,
  11 143:1

**90-day**  133:12

**90s**  139:4

**91**  143:7,8

**92**  143:8,16 144:8,12 145:15

**93**  12:24 13:5 14:8 144:1,17
  145:15

**93ish**  145:14

**94**  13:24 143:15,18,21

**99**  13:24 14:18

**9:00**  53:12,13



DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023
Case 4:23-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 49 of 64
Index: 9:45..back

**9:45** 54:13 57:1

---

**A**

**a.m.** 4:5

**above-mentioned** 66:1,14

**above-styled** 4:12 183:22

**Absolutely** 178:23 183:12

**absorbing** 180:8,11

**abuse** 155:12

**abused** 12:22

**accept** 15:15 172:1,4

**accident** 140:19 177:21,23, 24

**accommodate** 179:6

**accommodations** 155:6

**accordance** 4:8

**accountability** 32:11

**acknowledge** 69:7,9

**acknowledged** 68:23,24

**acknowledging** 69:12,15

**act** 54:4 67:20

**acted** 58:12

**acting** 4:8

**active** 18:20,25

**actual** 107:10

**Acxiom** 148:10,11,13

**address** 31:10

**administration** 13:8

**admission** 104:12

**ADP** 154:6

**advance** 170:10

**advancing** 180:5

**advice** 176:7

**advisement** 139:12,15,17, 24 140:2

**affecting** 28:13 161:20

**afternoon** 37:24 88:12 110:8

**afterward** 183:2

**agency** 158:23

**agree** 67:7 68:14,16,21 69:2

**agreement** 134:17,20,23 136:15,25 139:18 150:17 155:10

**agreements** 133:14

**ahead** 12:5 105:12 160:10 166:21

**ahold** 136:11

**AI** 158:15

**aid** 83:2,16

**Air** 10:23

**alcohol** 6:20 41:16

**alleged** 175:5

**amazing** 146:7

**ambulance** 90:14,15,18, 20,22,23 91:2,3,13,15,17 93:5 94:25 95:4,7,8,16,23 96:4,21 97:1,3,11 98:15

**ambulances** 83:2

**ambulatory** 113:17

**amicable** 24:7

**Ann** 4:2

**answering** 7:2 30:20 170:15

**anxieties** 28:16 30:5

**anxiety** 118:11,14 119:12 122:21,24 123:11 159:5,9, 11 160:3,7,13,17 161:20 162:6 163:16,18,19,25 173:12,16,17,20,21 174:10, 19,20 176:25 177:2,5 179:1, 6 182:20 183:4

**anymore** 40:12 66:23 82:6 128:12,14 162:13

**anytime** 164:3,4

**apologies** 20:2

**appearance** 138:12

**appears** 62:24 63:7 104:14

**appetizer** 40:8 42:2

**applied** 145:18

**appointed** 12:19

**appointments** 118:6

**approached** 52:12

**approaching** 50:16,19,22 51:11

**approximate** 85:11

**approximately** 16:11,25 19:6 25:21 54:11 57:20 65:3 77:14 85:18 99:1,4 115:25 130:23 149:24

**approximation** 49:17,18

**April** 7:11

**Arcon** 26:9 152:15,17 153:19,22 154:3

**area** 19:10,20 20:13 22:25 23:18 40:18 48:12,23 49:2, 3,7 50:14 55:4 57:17 59:14, 15 62:4,6,16 63:13 77:1 81:8,20 82:17 84:6 87:18, 21,23,24 89:1,9 94:17 100:7 103:9,10,13 159:8 170:15 182:25

**areas** 23:19 25:12

**Arkansas** 4:3,6,7,10,13 10:22,24,25 11:6,10,20 13:10,15 18:7,8,10,23,24 30:3 33:20 122:17 128:12, 14 138:7,10 143:20 150:25 169:3 174:24

**arm** 86:9 92:13

**arms** 77:25 78:12,21 80:9 81:1,10,16

**arranged** 125:14

**arrest** 10:8 28:14 29:6 79:1 84:18 131:19 132:14 172:21 173:21,23

**arrested** 29:15 130:20 132:24 133:22,24 134:11 138:18 139:9 171:23 172:1

**arrests** 138:20,22

**arrive** 46:13 47:15 96:18 110:10 111:11

**arrived** 50:7 53:1 95:16 109:23 110:2 178:17 183:1

**artificial** 157:24 158:15

**asleep** 131:12

**ass** 68:18

**assembled** 168:20

**assets** 141:25

**Assistant** 16:2,18 17:5

**associate** 24:2,15 151:21 177:11

**assume** 6:13 11:23 51:22 90:1 103:14 106:17,25 107:10 115:17 119:19

**assuming** 14:9,18 25:2 92:19 110:15 128:6 133:7

**Ate** 40:6

**Atlanta** 16:13,14

**attached** 66:3,16 137:17, 23,24 138:4

**attacks** 162:7,14 163:7,11, 16

**attempt** 115:13 123:5

**attempted** 22:12 108:19,24 181:18,19 182:2

**attend** 34:23 35:12 133:15

**attended** 33:6,9,16

**attending** 28:3 34:17 35:13

**attention** 35:19

**attorney** 4:6,25 5:5,7 20:24 135:4,6 141:21 175:20 180:15,17 182:13

**August** 4:3

**autism** 35:20 36:2 155:6

**average** 41:20

**avoid** 166:13

**aware** 5:19 32:17 174:7

**awhile** 93:19

**Axciom** 18:15 19:3,4,8 149:6

---

**B**

**back** 7:10 9:4 10:5 12:2



18:8,24 19:22 21:21 22:8,
10,23 24:25 25:6,7 34:22
35:7 37:25 56:5 58:4 61:20
69:16 72:18 78:1,12,21
84:6,12 85:4 90:14 92:5
106:8 113:21 114:25 115:3,
21 116:21 119:23 124:4
125:13,16 131:18,21 145:8
150:25 154:12 157:6,7
164:5 165:8 171:1

**backtrack** 27:11 44:14

**bad** 29:17 136:6,7 160:19

**badge** 67:15

**bag** 125:3

**bail** 133:8,9

**bailed** 133:7

**balance** 24:24 147:8,16

**ball** 117:22 124:1 125:19

**balls** 169:15 180:9

**bam** 73:21 74:7 76:14

**bandage** 92:25 93:3 96:15

**bankruptcy** 143:12

**Bar** 18:20,25

**bargain** 133:11

**barrelling** 178:8

**based** 171:21

**basement** 131:4

**bases** 168:13

**basic** 9:24

**basically** 5:15 8:3 9:23
79:11 142:21 158:7,18
159:7,8

**Bates** 66:11 104:5,11,13
137:22

**bathroom** 113:16,18,20

**bean** 171:12

**beanbag** 98:24,25 99:8,12,
17,19 100:25 101:5 102:3,
13,15 104:18,20 105:6,9
106:23 112:9,11,14,23
124:7,10,14,15 126:5,16
171:13 172:8 183:13

**beard** 179:12,16,17,21

**bears** 138:6

**beating** 12:5

**bed** 103:19

**beer** 41:19,20 42:2

**beers** 39:14,15,16,17 43:2
44:18

**began** 48:2 55:23 120:1
126:1,13

**begin** 20:18 117:19 119:21
123:21 154:2

**beginning** 4:5

**behalf** 155:1

**behavior** 16:4,21 147:5

**belief** 31:18

**beliefs** 168:20

**belly** 79:11

**benefit** 176:1,2

**bicker** 171:23

**big** 99:1

**biggest** 150:6,9

**bill** 97:16

**billed** 97:3,6,8,12

**bills** 97:13

**bit** 10:19 12:7 28:10,11 29:2
51:23 158:14 168:14

**bitches** 67:14 68:18

**bleeding** 92:19

**blew** 146:20

**BLM-CAPITOL_06012020**
61:14

**blocks** 46:2 47:17,18 48:2
57:5,20,22 58:8

**blood** 92:22

**blow** 76:11

**blue** 30:7 67:22,23 83:15,
16,18 133:1 178:18

**Bobby** 135:7,8

**body** 169:4,10 172:20

**bone** 108:19 109:7 165:16
167:17 181:18,20,21,25
182:3

**bones** 108:20

**boom** 73:8

**born** 10:20 17:22 129:7,16

**Boston** 28:3 129:6,7,10

**bothered** 28:16,17

**bottle** 56:8,9,23 58:10 99:4
125:5

**Brascher** 4:21,23 6:3 7:6,
15 8:1,6,10,13,17,22 9:1,7,
9,15,19 13:2,4 15:7,9 20:2,3
29:18 30:15,18 33:14 34:5
40:2 49:23 51:17 54:12
58:18 60:19 61:1,5,9,14,17,
23 62:23 63:21,23 64:13,23
65:5,9,13,24 66:4,5,7,13,17
68:5 69:10 72:11 75:21 77:8
80:6 81:25 82:16 85:17 87:9
90:6 91:1 93:4 94:24 95:11,
14,15 99:14,16,18 100:4
102:20 104:3,7,8 105:8,14
106:11 109:22 122:7,9,13
127:18 134:15 135:2,13
136:10,13,22,23 137:10,13,
16,20 138:2,13,15 152:9
156:2,10,15,17 157:12,17,
19 159:22 163:24 166:10
168:11 171:17 172:24
173:3,10 176:4,15,20
178:24 179:14 180:5,22
181:7,10,13 182:18 183:11,
16,19

**Brascher's** 168:18

**Brattleboro** 40:15

**break** 7:1,3 8:4 9:2,8 30:4,
14,17,19 61:4 122:6,8,11,12
157:13,16 164:21 166:13,14
168:8

**breath** 67:11

**briefly** 20:19 168:4 177:13

**briefs** 180:25

**bring** 85:3 153:10

**broader** 119:15

**broadly** 33:16

**broken** 105:23 106:4

**brother** 11:5,6 145:5

**brought** 10:22 84:12
180:13

**bruising** 169:9

**brutality** 34:25 180:19

**build** 151:22

**building** 37:19 48:23,24
57:11,13,16 70:19 82:20
171:8

**burning** 178:16

**burrow** 28:9

**business** 11:13 13:8 149:7
151:10,20

**Busy** 35:14,15

**button** 67:20,23

**bystanders** 67:11

---

### C

**Caldwell** 155:25 156:1,4,5,
18

**calendar** 125:18

**California** 10:21 19:11,12

**call** 41:5 87:20 110:10
111:14 113:8 116:1,4

**called** 4:18 82:17 87:18
90:20 110:12 111:6,11,16,
19 157:22 169:17

**calling** 111:1

**callous** 101:20

**calls** 112:1

**camera** 7:10,18

**candidly** 175:2

**Cantrell** 178:1

**cap** 99:4

**capable** 8:23

**capacity** 30:6 94:12,13

**Capitol** 7:18 43:3,11,13,19,
21,24 44:10 45:24,25 46:1,
22 47:4,6,19,24 48:2,12,13,
18,20,21,24,25 49:2,6
50:10,14,23 51:2,4 54:21,24



DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 51 of 64

Index: caption..copy

55:6 57:21,22 58:10 59:13, 23 60:1,9 62:5 64:16,20 65:14 70:19 79:19 89:12,14 168:21 170:22 171:8 172:12 180:24

**caption** 138:7

**car** 30:7 45:15 59:18 60:3,6 64:15 65:3,19,21 116:10 140:18 170:21 171:1 178:9, 11,17,20 182:7,8,24,25

**card** 42:10,13,19

**care** 36:2 118:5

**cars** 43:7,9 178:9

**case** 9:21,23 30:2 69:11 126:2 137:7 138:8 141:3 144:21 156:10 157:3 181:5

**cases** 12:20 139:11 155:22 156:19

**cash** 42:10,12,19

**caused** 177:2,5

**cavity** 165:23

**cell** 110:13 131:20

**Center** 4:6

**Central** 4:13

**certainty** 134:12

**Certified** 4:2

**chair** 83:12,13

**chairs** 82:19 88:20

**chance** 145:12

**change** 13:5 26:3 74:20,25 161:14,20

**changed** 13:11 26:22 160:20 178:7

**charge** 133:10 136:21 175:15

**charged** 67:9

**charges** 133:12,21 134:18 136:25 137:3 175:9,10,11 180:13

**Charles** 66:19

**charts** 36:7,10

**chat** 168:4

**check** 42:15 103:3 114:25 125:18 137:21

**checks** 42:17

**cheek** 99:22

**cheekbone** 77:5,12 100:7 101:8

**chest** 118:19,20 119:1,3 160:4 164:9

**chief** 149:9

**child** 12:16,19,21

**Childers** 121:16,17

**childhood** 11:7

**children** 12:22 17:13 21:22 22:4,5 27:22 28:1 110:22,24 115:11,13,15 157:9

**chilled** 86:10

**chills** 177:6

**choice** 121:25

**circle** 171:1

**circling** 124:3

**circumstances** 36:22

**civic** 178:22

**civil** 4:9,10 10:1,7,9

**claim** 27:19

**claims** 10:16

**clarify** 183:10

**class** 133:15,17,18 144:23 145:1

**classmates** 164:18,22

**clean** 5:23 133:15,18

**cleaning** 98:19

**clear** 6:23 56:12 68:9 84:25 96:3 108:12 171:4 175:1

**clearing** 108:14

**clicking** 67:20

**client** 168:4

**clip** 171:7

**close** 40:19 45:25 46:1 52:3 56:20 60:16 128:11 129:22 153:17 163:15,16

**closer** 8:2 46:15 48:23 52:6 53:13

**closest** 93:16,17 94:20

**clothes** 83:22

**clothing** 172:21

**club** 165:24

**collapsed** 146:19 149:16

**collect** 30:20

**college** 11:9 28:3,7

**color** 45:19

**command** 58:12 81:8

**commands** 55:11,13 56:1 59:9 170:8,14

**comment** 68:6,8

**commissioned** 4:4

**committing** 67:12

**communicate** 103:20 109:13,17

**communication** 110:15,21

**communications** 110:23

**commute** 150:3,7

**companies** 26:12 158:8

**company** 22:13,16 27:8,9 39:4 40:10,23 41:10 42:21 43:4 44:15,21 45:6,24 140:19,25 141:1 149:16 154:6

**competent** 169:4

**complaint** 9:24 137:18,24 138:1,5

**completed** 15:19

**completely** 73:9 105:25 114:1

**comply** 59:8

**computer** 159:13

**concern** 31:20,21,22,25 38:7 180:20 181:1

**concluded** 112:11,13

**conclusion** 183:21

**concussion** 106:2

**condolences** 66:25

**conduct** 155:11

**conferences** 153:16

**confirm** 118:9 124:4

**conflict** 51:11,16,18,20 53:6 56:5

**confused** 131:3

**connected** 27:18

**consciousness** 77:21

**considered** 35:7 46:17 54:3

**conspiracy** 10:1,12,14

**consultant** 18:13 19:2 26:7 148:9

**consultants** 158:8

**consulting** 5:12 22:13,16 26:11 27:8 148:7 149:7 150:18 158:6,9

**consumer** 147:4,5

**consuming** 16:4,21

**contact** 66:23 109:24 111:7 115:13

**contacted** 110:1

**continue** 15:23 30:20 95:13 178:13

**contract** 26:12 158:8,10,11

**contribute** 174:19

**control** 28:19

**conversation** 32:4,5 98:17,18 116:14 135:23

**conversations** 36:16

**Conway** 4:3

**Cook** 4:1,2,17,22 8:12 9:20 30:19 61:6,25 131:17 138:8 142:2,3,5,6 143:4,5 144:8 159:2 164:12,14,16 168:11

**cookout** 88:12

**cop** 67:8,11

**coparent** 110:25

**copy** 66:9



DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 52 of 64

Index: corner..district

**corner** 61:10

**cornered** 103:7

**Corporation** 140:24

**correct** 5:2,3 8:6 10:8 18:17
24:21 26:19 27:14,16 77:9
116:6 122:20 125:25 143:22
144:11 153:21 167:17
173:14 175:4,17 183:7

**correction** 154:23

**correctly** 171:2

**counsel** 4:11 5:1 24:2,3,4
66:10

**counseling** 120:23

**count** 169:3

**country** 31:8

**counts** 9:24 10:3

**County** 4:3 133:3,4

**couple** 9:25 10:3 35:8 37:2
38:1 39:14,15,16,19,21
41:22,23,24 44:17,18 47:17,
18 48:2 60:17,21 84:23 85:8
112:2 141:4 151:5 153:11,
13 159:7 160:15 162:17
164:18 166:12,25 181:11

**courses** 16:22 17:7

**court** 4:2,13 5:4,21 15:5
25:17 34:19 106:7 108:5
137:3,4 138:9 156:16

**courts** 12:19

**covered** 54:23

**covering** 168:12

**crash** 182:7

**crazy** 15:6

**credit** 42:10,13,19

**crime** 67:13

**criminal** 135:16 136:20
137:6 138:10 140:10 175:23
176:3 180:14

**crowd** 49:25 50:6 53:2,5,
16,24 54:5,7,8,17 58:17,19
59:21 60:18 168:20 171:4

**crowds** 171:1

**cry** 28:19 177:3

**cuffed** 79:5,23 84:20 86:8
131:19 132:16

**cuffs** 78:13,14 90:2,7

**curfew** 55:18,20 86:20

**current** 160:18 167:19
178:25

**curtain** 98:4

**curve** 12:6

**custody** 12:21 87:15

**cut** 68:9

———————————

**D**

**D-A-N-I-E-L** 38:22

**D-Y-L-A-N** 17:18

**damages** 181:5

**Daniel** 38:20,23 135:10,12

**dark** 53:11 55:17

**data** 151:9 153:7

**date** 117:21 123:25 169:25
170:10 171:24 172:1,4

**dated** 104:11

**dates** 129:11 175:12

**daughter** 28:5 115:23
116:23 117:6 128:21,23

**dawned** 132:10

**day** 28:21 37:15 38:11,12,
13,17 58:5 110:3,4 111:17,
20,23,24 114:5,11,13,16,17,
21,23 116:5 117:8 177:15
183:23

**days** 38:8 106:14,15 109:10
111:22,25 113:4 114:16
115:10 116:25

**DC** 22:25 23:1,4

**deal** 92:22

**dealing** 122:18

**dean** 148:1,2,3

**death** 31:4,18 32:1

**debilitating** 163:18

**debris** 108:12,15

**deceased** 66:24

**December** 12:3,4 23:24
26:21 152:18

**decide** 30:1 43:21

**decided** 43:18 148:25
150:20

**decree** 11:12

**Defendant** 4:11

**defense** 135:4,6,17 175:20
180:15

**defer** 169:4 172:9

**define** 80:7 118:4

**definition** 62:22

**definitions** 48:18

**degree** 11:13

**demonstration** 34:14
35:2,4

**demonstrations** 32:16
33:17 34:24 35:8 37:3

**demonstratives** 52:16

**dental** 165:13

**departing** 57:25

**depending** 177:15

**depends** 69:6 70:23

**depict** 182:23

**depicted** 182:24

**deposition** 4:1,8 5:14,16
8:19 9:13 36:9 66:2,15
179:23

**depositions** 9:14

**depressed** 121:22

**depression** 121:21,22
122:18

**describe** 58:12 99:20
108:11 123:7 130:22

**describing** 100:5

**descriptive** 101:23

**desk** 103:3

**detail** 38:9 118:17 124:25

**debris** 135:21,22

**details** 116:17

**determine** 127:9

**developed** 12:14 28:15

**device** 8:23

**diagram** 170:18

**diameter** 99:6

**died** 67:10 149:17

**difficult** 28:15 30:1,9
153:17 160:23 162:3

**difficulties** 178:21

**difficulty** 26:25 28:10
160:22 167:16,21

**Digby** 135:7,8 138:12

**dinner** 38:18 39:2

**directed** 180:5

**direction** 47:19,23 48:1
50:25 59:16 60:2 73:10
74:4,20,24 75:4 142:15
170:13 171:3

**directly** 155:13,14,15

**director** 21:3,4

**Disagreeing** 142:15

**discharged** 114:8,11,12,17

**disclosed** 60:25

**disclosing** 7:22

**discovered** 104:4 172:22

**discovery** 117:20 171:22

**discuss** 116:2

**discussing** 102:8

**disease** 165:18 167:7,9,22

**disjointed** 168:15

**dismissed** 139:13,14,15,25
140:3,5,8

**dissolution** 140:21 141:5

**distance** 170:24

**distinct** 57:16

**distinctly** 100:18

**district** 4:12,13 137:4 138:9



DON LLOYD COOK vs RYAN WINGO, et al.
Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 53 of 64
COOK, DON L. on 08/16/2023
Index: diversion..Facebook

154:25

**diversion** 133:12,14 134:17,20,23 136:14,25 139:18,24 140:2 175:15,19 176:1,8

**division** 4:13 138:10

**divorce** 121:5 123:14 140:13

**divorced** 21:20,25 119:22 156:20

**doctor** 98:6,8,9,10,17 103:14 104:14 112:15 119:4,5 127:6

**doctor's** 98:16 181:4

**doctors** 103:20,23,24 104:24

**document** 66:1,14

**dogs** 131:15

**Don** 4:1,17 131:17 138:7 159:2

**door** 12:10 25:18 130:25 131:2,7,10 143:14

**dot** 146:19

**double** 166:16

**dozen** 168:5

**dragging** 81:14

**drawing** 64:16

**drew** 170:18

**drill** 57:3 141:4

**drink** 39:13 41:16,18 44:18, 20 45:10

**drinking** 43:2

**drinks** 41:20

**drive** 21:20 45:24

**driver's** 172:15,18 173:2,8

**driving** 15:5 28:16 45:15, 16,18,23 152:13 174:20

**droop** 102:6

**droops** 101:16

**drop** 116:21

**dropped** 124:12 133:13,19

**drove** 24:25 43:3,11 57:4

**drugs** 6:20

**due** 11:23 31:6 108:5

**DUI** 175:5

**duly** 4:3,18

**duty** 178:22

**DWI** 138:23,25 139:4,14 140:1

**dying** 145:4

**Dylan** 17:16,23 22:4 128:25 129:1,19,22 130:4 131:15 155:1 156:22 157:6

---

**E**

**ear** 77:2

**earlier** 100:6,12 118:9 157:25 167:16

**early** 130:23 138:23,25 139:4,20 140:1 151:13

**easily** 46:7,10

**east** 57:20,22 58:10 170:21, 22 171:5

**Eastern** 4:13

**easy** 160:21 161:25 163:2

**edge** 70:3

**effect** 132:12

**elaborate** 176:13 177:13

**elapsed** 71:1 78:2

**elevator** 8:9

**Elizabeth** 14:7

**email** 8:7

**emergency** 82:25 89:4 95:8 96:7,8 97:19 98:1,3,15 106:18,22 107:3,5,7,17 109:12,23 111:7

**emotional** 27:1,16 28:11, 19,23 29:24

**employment** 26:1,3,5 181:3

**EMS** 104:18

**encounter** 60:12

**encountered** 178:21

**end** 50:10,11,12 57:25 58:3 75:15 89:12

**ended** 73:21 76:6 89:24 95:21 182:8

**enforcement** 170:8

**engage** 153:14 175:23

**engaged** 125:11

**engaging** 125:10

**entered** 7:14 13:12

**entire** 14:14 17:11 18:16 54:24 60:16 72:18 74:16,18 75:5 86:22 100:11,18

**entirety** 180:1

**entities** 26:13

**entry** 138:12

**environment** 31:14

**equipment** 103:14

**ER** 96:14 102:24 103:4,6 164:9

**ERS** 103:2

**essentially** 10:1 124:7 135:4 139:18 142:17 143:10 152:25 153:2 158:7

**established** 171:22

**estimate** 41:24 48:7 79:14 168:25

**estimating** 168:19

**estimation** 168:24

**evening** 43:13 47:8 58:1 63:8 110:8 114:23 169:6 173:2 177:19

**events** 57:24 173:20

**eventual** 133:9

**eventually** 21:23 30:9 57:24 133:3,11 141:5

**exacerbated** 173:21,23

**exact** 39:18,20 40:1 55:17 72:21 117:21 123:25

**EXAMINATION** 4:20 166:23 168:9 181:12

**examined** 4:19

**Excellent** 106:10

**excelling** 161:3,5

**excessive** 10:2,13 31:6,12 32:6

**exclusively** 163:6,9

**executive** 146:10

**exhibit** 65:6,25 66:2,8,15 67:23 138:6 170:19

**exhibits** 138:4

**existed** 29:10

**exists** 153:13

**experienced** 118:19,20 173:13

**experiencing** 176:17

**express** 43:23 44:5

**expressing** 180:25

**extent** 9:11 168:24 169:2 173:5

**extracted** 124:7,11

**extremely** 27:1 28:11

**exwife** 27:23,24 58:5 109:17 110:12,16 111:11 112:1,5 115:7,8,14,19,20 117:6,7 123:2 155:13

**eye** 101:16 102:5

---

**F**

**F-E-E-V-A** 20:1

**face** 63:5 72:16 76:22,23 77:9,11,17,18 79:8 92:17, 20,25 93:7,9,12,13,14 96:12 98:19,20,21 100:6,11,14,17, 18 101:1,3,16,23 102:3,15 104:18 105:7 124:8,22 155:24 169:11 170:3 171:13,19 172:8 179:20

**face-related** 165:13

**Facebook** 67:1,3,20 69:1,3 182:14,17



DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 54 of 64

Index: facial..graft

**facial** 165:1

**facial-related** 166:7

**facing** 73:10

**fact** 130:4 141:11 174:23 177:2,5

**facts** 134:22

**fail** 134:22

**Failure** 155:6

**fair** 6:12 9:15 11:23 39:21 40:14,25 41:3 43:17 47:13 52:9 54:13 76:15 95:14 97:10,12 119:24 122:3 136:22 160:12 161:19 173:19 179:4

**fall** 26:21,22 30:12,13 153:20,25 154:9,11

**false** 9:25 10:7,8 101:14 102:11 107:25

**family** 10:23 109:15,25 156:19

**fast** 34:22

**faster** 150:18

**father** 10:23 145:4 164:23

**favor** 140:22

**Fayetteville** 21:21

**fear** 28:24,25 29:3,4 159:12, 14 162:14

**February** 26:4,6,17 30:11 152:18

**Federal** 4:9

**feel** 25:12 72:4 99:2 125:19 128:15 162:10

**feeling** 77:15

**feet** 74:13 79:16,17 80:10, 24 81:2,12 88:16

**Feeva** 19:9,13,21,25 20:1,4, 8,10,16 140:25 141:1,2 148:12,16 149:8,9,11,13,16, 20

**felt** 30:5 59:6 100:16,18 112:18 124:19

**figure** 50:20 75:3 88:7 152:5

**file** 61:13 137:23,25

**filed** 7:9,17

**filmed** 63:16

**final** 172:7

**finalized** 121:5

**finally** 7:11 109:24

**find** 134:22 147:6,8,16 179:4

**Finding** 140:21

**fine** 6:8 7:1 9:3 63:20 68:4 94:23 99:16 105:18 166:17

**finest** 145:10

**finish** 7:2 13:1 14:24,25 34:18,19 53:21 75:20 152:8

**finished** 43:1,2

**firearm** 104:21 105:10

**fired** 183:13

**firm** 23:16 26:11 125:11 126:16 143:19 144:5,10,15 150:24 157:22 158:6 164:17,19,21

**firms** 23:18

**fit** 88:2,11

**fix** 123:5

**flags** 62:5

**Flat** 92:5

**Floyd** 31:1,5,19,22 32:1 33:13 34:24 35:4 135:20

**foam** 169:18 180:11

**focus** 28:15 159:12 160:8

**focussed** 25:13 26:14

**focussing** 26:25 27:12 28:10,16

**folding** 82:20 88:20

**food** 88:13

**foot** 98:12

**footage** 7:10,18,25 8:12

**force** 10:2,13,23 31:6,12 32:6 76:10 171:15

**forceps** 98:19

**forgery** 67:12

**forgive** 23:17 101:19

**forgot** 154:23

**form** 33:10 39:23 51:14 58:14 60:13 72:9 81:22 85:13 87:8 90:3,24 95:12 102:16 105:21 109:19 127:15 134:13 159:19 171:17 172:24 173:3,10 176:4,15 179:14 180:22 181:7 183:8

**formalities** 6:22

**forward** 34:22 58:13,23 125:7

**found** 145:4

**foundation** 49:19 58:14 63:20 68:3 69:4 80:4 82:15 90:4 93:1 105:4 134:24

**foundational** 64:18

**fractures** 106:1

**Francisco** 19:11,13,14

**free** 113:11,23 114:1

**frequent** 40:10,22 41:8 110:17,18

**frequented** 44:15

**frequently** 129:25 130:2

**fresh** 118:20

**Friday** 7:11

**friend** 38:17,19

**friends** 39:1 67:1

**front** 48:14,21 55:6 98:16 109:5,6 112:16 124:23 131:7,9 159:12 178:9,15 182:8

**froze** 30:8

**frozen** 56:9 159:15

**full** 30:5

**full-time** 36:2

**fun** 160:9

**function** 30:9 153:24

**funny** 7:12

**G**

**gap** 109:7 151:2 152:2,4,5

**gas** 69:20 70:25 71:16,19

**gave** 97:16 168:24 170:13 183:3

**general** 4:6 20:23 23:9,10 25:10 26:11 30:3 31:4 33:13 34:25 57:17 121:24 135:22 145:21 174:11

**generally** 5:13 75:1,2

**generate** 32:21

**gentleman** 84:24

**George** 17:20,23 22:4 31:1, 5,19,22 32:1 33:12 34:24 35:4 129:1,2,5 135:20

**Georgia** 16:13,14,15 146:7, 14,15,17 147:13

**gig** 22:7

**Gill** 23:14,19 24:5 150:15 151:3,5,8,14,23 152:2

**give** 7:19 57:17 94:20 98:3 104:2,9 117:22 125:3,19 137:25 145:8 147:7 159:1 178:19,22

**goal** 170:25

**good** 9:5,6,16 15:2 28:9 30:20 92:22 129:12 145:6 148:4 161:24 165:24 168:11

**Google** 127:11

**governmental** 133:23 134:4 175:16

**grab** 113:25

**Grabbed** 80:9

**grad** 145:8

**graduate** 12:3,4 13:6

**graduated** 11:24 141:16 142:20

**graduating** 12:9

**graft** 108:19,24 109:7 165:16 167:17 181:18,19, 20,21,25 182:3,5



DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 55 of 64

Index: grass..inserted

**grass** 48:15,16 69:25 70:1, 2,20 71:13 75:13,18,19 76:1,2,3,6,11,16 79:11

**grassy** 48:12 49:3 62:6

**great** 147:8,9,11,15,24 181:10

**Green** 142:2,3,5,6,25 143:2, 4,5,11 144:8 164:12,14,16

**ground** 69:21 71:1 72:14 73:8,21 74:8,23 75:15 76:14,18 77:20,23 78:3 79:8,9 81:2 92:18 104:22 153:13

**grounds** 46:22 47:4,6 48:10,12,19,25 49:6 50:11, 14 54:21,24 59:2,13 60:9 172:12 180:24

**group** 56:13 82:5,13

**grow** 109:7 179:17

**growth** 150:18

**guess** 13:25 19:17 38:11 49:24,25 66:7 118:4 131:3 136:10 160:2

**guiding** 81:18

**guilty** 134:22

**gum** 165:18 167:7,9,22

**gurney** 92:1 103:17

**guy** 56:23 82:23 83:7,11,14 84:7 86:12

**guys** 67:15 86:14

---

**H**

**half** 11:3 99:6 121:4 142:7 148:2 151:4 154:12

**hand** 32:23 33:5 124:12 153:18

**handed** 96:14

**handle** 135:4

**handles** 156:6

**hands** 113:11,23,24 131:18

**hang** 67:5 124:20 129:16

**happen** 29:5 32:7 78:17 159:17 182:9

**happened** 15:10 25:5 55:16 76:8 78:11 80:8 87:10,16 95:19 96:1 103:24 106:20 111:2,4 112:5,7,22 114:7 115:22 116:15 125:21 130:22 131:10 159:24 164:8 178:5

**happening** 78:24

**happy** 145:7 150:6,7

**hard** 48:6 178:18

**hate** 40:5 122:5

**hauled** 80:5,7

**head** 47:5 158:7

**headed** 69:16,17 70:7,11

**heading** 171:4

**health** 26:23,24 32:10 164:23

**hear** 52:3 72:4 131:9 171:13

**heard** 12:11 46:24 111:1 130:24

**hearing** 170:14

**heart** 137:15

**heavy** 99:8

**Heights** 39:7,8

**held** 31:18

**helped** 178:16

**helping** 36:24 157:25 158:15

**hereto** 66:3,16

**hey** 34:3 70:24 158:23

**hide** 179:18,20

**high** 178:8

**highlighted** 67:24

**Highway** 174:17

**hire** 158:7 180:14

**history** 104:16

**hit** 76:15,23 78:2,6,9 79:21 92:16 102:2 104:21 105:15 160:7 169:14,17 171:12,19 178:9 183:12

**hits** 74:8

**hitting** 182:25

**hold** 99:9,10

**holding** 67:9 81:9 86:9

**home** 37:17,20,21 38:3,5 44:7,8 55:23 56:1,18,21,24 58:11 63:25 70:25 71:9 164:24

**hop** 45:15

**hope** 67:8

**hospital** 84:25 91:6,10,16 92:1 93:14,15 94:5,10,20 95:2,16,21,24 96:5,17 104:15 106:13,15,18 107:4, 8,15,18,20 109:9 111:5,21 113:4 115:10 116:10 124:5 170:5

**hospitals** 94:16

**Hot** 182:25

**hour** 4:5 8:1 53:18 54:11, 15,17 55:24 56:6

**hours** 7:25 37:24 116:25 133:6

**house** 115:3,21 116:21,22 131:5

**Houston** 125:11 126:16

**huh-uhs** 6:4

**human** 11:13,14,15

**hunters** 158:7

**hurt** 104:25 112:8

---

**I**

**idea** 55:1 56:11 64:15 80:16 103:1 120:10 121:8 131:24

**identify** 61:13,25 63:3 80:19 84:15 86:25

**identity** 173:6 174:1

**IEP** 156:6

**imbedded** 98:21,23 99:19, 20

**immediately** 11:17 96:11 97:18,22 102:14 124:11 148:19 154:3 178:9

**imminent** 171:15

**impact** 100:15,16 112:18 169:18 180:11

**implant** 108:23

**important** 35:12 124:19,21, 24 125:1 153:17

**imprisonment** 9:25 10:7

**improve** 32:4,8

**inability** 159:12 160:4

**incapable** 162:2

**inch** 77:2,12,13 99:6 100:7

**incidence** 130:18

**incident** 25:24 27:18 28:13 29:16 117:17 118:12 123:22 128:18 132:1,2,3 139:4 167:20 172:21 174:2,23 177:11

**incidents** 138:24 140:10 175:5,10,11

**incline** 92:8

**increased** 182:20 183:3

**Incredible** 147:14

**incredibly** 27:16

**independent** 144:23

**Indiana** 164:24

**Indicating** 34:21 35:25 36:14,23 51:19 53:15 58:22 97:17 127:2 150:4 163:1

**individual** 63:3,4,6 86:23

**individuals** 61:19 96:25

**industry** 153:7

**information** 105:3

**ingested** 6:19

**initial** 116:1,3

**initially** 112:18 183:12

**injuries** 93:10 101:21 105:19 108:8 166:4,7 170:3, 4 176:21 179:1,20,22

**injury** 108:5 113:10 130:14 143:12 169:10

**inserted** 92:13



**www.ArkansasRealtimeReporting.com**

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 56 of 64

DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Index: inside..Licensed

**inside** 30:8 131:23

**instance** 4:11 177:20

**instinct** 124:16,17

**insurance** 140:19

**intellectually** 36:7

**intelligence** 157:24 158:15

**intelligent** 36:11

**intended** 43:24

**intent** 47:5

**intention** 46:8 59:8 75:6,7, 9

**interact** 42:20

**interaction** 86:21,22 87:5 138:17

**interactions** 29:4 36:17

**interested** 149:6

**internet** 174:8 182:22

**interrupt** 19:24 61:12 101:17 106:7 122:5

**interrupting** 35:22

**intoxicated** 169:6

**intoxication** 44:20 45:10 138:23 139:1,5,19 140:4 175:6

**investor** 141:3

**involved** 122:21 140:12,13, 15,23 155:13,14,15 174:1,5 175:5

**involving** 10:3

**issue** 55:10,13 56:1 101:21 118:14 134:16 160:12,17

**issues** 9:25 10:4 118:17 123:11

---

**J**

**J-E-A-N** 120:15

**Jacoby** 14:7 17:10

**jail** 68:10 133:3,5

**jaw** 77:1 99:24 101:14 102:9 105:23 106:1,4 108:21

109:6 112:16 130:11,16 165:1

**jaw-related** 166:1,4

**JD** 11:21 18:16

**Jean** 120:5,14

**job** 15:3,12,15,25 16:14 17:4 18:10 23:6,12 24:14 25:24 30:9 148:16,21 150:10 154:3 160:18 161:24 162:4,11,16 168:11 178:25 179:5

**jobs** 153:6 159:7 160:15 162:17

**John** 4:24 121:16 145:9

**join** 141:21 150:24

**joined** 4:24 142:4,12 144:10,17 149:18

**joint** 7:9

**judgements** 32:10

**July** 29:7,10,13,19 30:6 130:20 139:9 152:23 159:24 160:25 161:14,21 163:11 171:23 172:3,4 180:14

**June** 25:25 27:19 28:12,14 29:19 31:2 33:7,17 34:25 35:2 37:13,15,21 38:10 61:7,15 104:11,12 108:9 110:4 116:7,10 118:1,7,11, 15 119:11 123:19,22 128:16 130:18 132:2 136:2 159:24 160:25 161:4 163:14 164:1 165:1,14,22 166:4 167:20 168:21 169:7,11,20,22 170:4,7 172:12 173:13,20, 25 180:24

**justice** 175:24

**Justin** 4:23 122:6

---

**K**

**keeping** 45:13

**Kessle** 142:2,3,12,17 143:5,7 144:7,8 164:12

**khaki** 52:24

**kids** 24:21 25:2

**kids'** 156:20

**killed** 68:9

**kind** 15:4 37:13 48:12 49:3 64:17 81:7,18 88:2 96:21 119:16,18 121:5 175:3

**knee** 67:9

**knew** 41:1,3 46:22 47:3 52:13 94:16 125:1

**knocked** 104:21 105:25 165:22

---

**L**

**label** 31:25 65:10

**labor** 158:8,10,11

**laid** 92:3 103:6 148:13,20, 22,25

**lane** 64:11

**lanes** 178:7,10,14

**large** 31:8 33:16 34:14 40:7, 8 98:25 103:10

**largely** 110:23

**lasted** 148:2

**late** 63:19 95:12

**Laux** 5:1 6:1 7:8,12,24 8:3, 7,11,15,21,25 9:6,9,11,17 13:1 14:24 15:2 19:24 29:15 33:10 34:1 39:23 49:19 51:14 54:9 58:14 60:13,24 61:2,12,16 63:19 64:9,18 65:7,12 66:12 68:3 69:4 72:9 75:20 80:3 81:22 82:15 85:13 87:8 90:3,24 93:1 94:21,23 95:10,12 99:13,14, 15,25 100:3 102:16 104:6 105:4,12,21 106:7,10 109:19 125:10,14 127:15 134:13,24 136:19 137:9,12, 14,19,21 138:3,14 152:8 156:3,8 157:15 159:19 163:21 166:15,18,20 167:3 168:3,10 171:18 172:25 173:4,11 176:6,19 179:15 180:23 181:8 182:13,16 183:8,18

**law** 11:17,19,24 12:8,9,12 21:5 23:16,21,22 118:18,21

125:11 126:16 140:20 141:16 142:20,21 143:19 144:5,10,15 150:24 153:2 170:8

**lawsuit** 140:23 141:24 154:23 155:5,7

**lawsuits** 156:7,13

**lawyer** 124:17 176:8

**lawyers** 145:10

**layoff** 149:4

**layout** 64:17

**lead** 155:18

**leadership** 148:4

**leads** 87:20

**leave** 15:10 30:4 43:4,9 46:5,6,7 55:15 59:5,9 125:9, 17 146:6,17 148:11 149:13 151:23 152:12 153:22 160:15 170:23 174:23

**leaving** 24:7 150:15 151:8

**led** 15:10 87:20 121:20 150:15,23 151:8,19 152:12 153:22 182:20,21

**left** 24:6 30:9 43:4,14,15,17 58:6 62:6 100:1 101:3 102:3 122:14 141:21 142:12 143:15 144:7 146:22 148:3, 18 150:3,10 151:14 152:1,2 157:3

**left-hand** 61:10

**leftover** 101:11

**legal** 5:10 154:18 157:22 158:11

**Leigh** 4:2

**Leslie** 127:21,22

**level** 36:3 124:25 131:7,8, 13 160:22 161:7 163:13 179:5

**Lexis-nexis** 154:21 157:24 158:20,24

**license** 18:25 172:16,18 173:2,8

**Licensed** 119:19



**www.ArkansasRealtimeReporting.com**

**licenses** 18:20

**life** 30:3 33:17 121:24 145:11 157:20 173:13

**light** 9:14 179:1

**lights** 30:7 178:18

**liking** 69:2,3

**Lile** 143:19 144:5,10,14 145:10

**lines** 12:12

**lip** 101:7,12,21,25

**listed** 111:7

**listening** 181:3

**live** 11:6 27:22,23 40:13,14 129:23 147:9,11,15

**lived** 21:21 24:18 93:19,22 153:18 156:22,24 165:3

**lives** 27:24 129:19,23 130:4

**living** 122:1 128:21 129:1,5

**Lloyd** 4:1,17 131:17 138:7 159:2

**loads** 145:1

**lobbed** 58:11

**local** 153:14

**location** 39:6 165:9

**locations** 39:5 57:4

**locked** 178:10,11

**lodged** 100:25 101:5 102:3

**long** 5:20 9:4 12:13 13:19 16:8,23 17:8 19:2,13 20:10 21:10 22:20 23:10,25 24:16 25:20 26:20 38:23 53:16 54:7 55:22 60:11 68:10 70:24 85:11 94:25 96:10 106:12 107:20 121:3 123:13 133:4 142:6 143:4 144:14 146:14 149:11 151:2 152:2, 17,20

**longer** 24:5 40:13 87:15 90:7

**looked** 52:13 73:9,11,12, 15,18,20,23 83:21 84:1 87:22 127:11 136:7 173:1

**lost** 77:21 90:1 106:5

**lot** 12:16,19 28:15 49:22 56:3 149:15 168:12

**loud** 67:4,8

**Louis** 24:10,13,14,18,25 151:17 152:13 155:17 157:4 165:15 167:14

**Louisiana** 15:14,17,22,25 16:9 146:3,4,6 147:17,20

**love** 69:8 145:7,11

**loved** 147:4

**lower** 77:1 101:14,25 102:11 105:24 119:7 131:7

**lucky** 165:25

**lumped** 175:3

**Lunarline** 22:17,20,22,24 23:6 149:14,18,19,21 150:11,15 151:3

**lying** 183:1

---

**M**

**M-A-R-K-S** 38:22

**made** 104:15 125:1 146:7 147:24

**main** 10:2 118:10

**make** 6:23 7:7,22 32:10 34:18 35:21 37:14 43:12 48:17 119:15 129:17 149:15

**makes** 19:23 51:9 129:17

**making** 89:23 162:12 181:25

**male** 104:17

**man** 56:8,12,13 67:12

**man's** 67:10

**manifest** 159:11

**manifestations** 160:2 176:21,24

**mark** 65:24

**marked** 65:5 66:2,8,15 170:19

**marketing** 13:14 14:16,19

16:4,21 17:7 26:15 145:20

**marketing-related** 16:22

**Marks** 38:20,23 39:2 40:9 41:7 42:1,20 43:4,21,23 45:14 135:10,12,14,16,19

**marriage** 120:18,23 121:1 123:5,9,10

**married** 13:25 14:2,6,8

**mask** 92:10

**Master's** 13:8 119:19 141:12 143:25 144:4,6,15, 17,20 145:18

**match** 63:7

**material** 137:9

**math** 24:21 93:21 129:17

**matter** 175:16 180:19,25

**matters** 181:3

**maximum** 145:1

**MBA** 13:11 145:21 146:10

**meal** 42:4,8

**meaning** 49:7 61:15 70:17 71:3,24 179:23

**means** 6:13 12:5 109:3

**meant** 31:7,9 176:14

**medical** 84:3,10 109:3 113:5 117:15 130:12,13 172:9

**medically** 117:14

**medication** 119:9,12

**medications** 6:17

**medicine** 125:5

**medium** 40:6

**meet** 38:17 39:3

**megaphone** 55:11 56:1

**member** 35:3

**members** 109:15,25

**memory** 33:1,5 39:18 40:1 84:23,25 98:14 102:19 103:4 164:3

**MEMS** 97:9,10,11

**mental** 32:10

**mentioned** 10:6,11,16 107:25 117:11 167:16 182:13

**met** 39:1,2

**method** 50:19

**Mexico** 17:3,8 18:1 146:24, 25 147:1,10,23 148:6 165:4 167:1 181:14,17

**Mike** 136:10 137:8

**miles** 129:24

**mind** 17:21 43:12 64:16 85:3 166:12

**mind-altering** 6:20

**Minneapolis** 67:8

**minor** 68:10

**minute** 30:4,14,19 155:23

**minutes** 8:2,4 55:24 60:17 61:18,24 71:2,3,6,7,8 84:24 85:8,15,16,18 86:8,10 87:6, 10 97:23 168:3

**Miranda** 132:20,21,22

**missing** 101:12,21

**Mississippi** 178:2,6

**Missouri** 24:10

**mitigate** 181:5

**moment** 7:20 59:3 98:12 156:11

**money** 146:8,9 162:12

**monitors** 103:15

**month** 21:11 123:16 126:14 149:23 150:12 151:4 156:16

**months** 19:7 121:14 122:2 123:15 125:21 144:16 149:25 150:2,14 179:9

**morning** 8:8 37:23 60:25 110:6,8,9 111:14 114:18,20 130:23 138:18 180:1

**mother** 25:3 113:7 156:21 157:8,9

**mother's** 157:7

**motion** 27:10 74:14 154:20



DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 58 of 64

Index: motor..parties

157:23 158:2,3,4

**motor** 177:22,24

**mouth** 108:16 153:18 177:16

**move** 10:25 13:17 19:14 23:1 24:11 30:23 40:20 54:17,19 58:19 159:13 160:5

**moved** 14:4 15:17,22 24:12,13 76:11 106:17 107:8,17 128:2,6,8,18 129:2,13 130:7 154:12 157:6

**moving** 28:5 55:3 58:16,23 74:13 81:12 128:10 130:5

**multiple** 39:5 80:14 103:14 105:24 106:5 155:9 169:14 180:8

**murder** 67:9

**mutual** 39:1 150:17

**mystery** 173:5,6

**N**

**names** 17:15 57:19 64:7

**narrow** 36:9 39:16 45:4 108:14

**navigate** 36:20

**Neat** 147:18

**necessarily** 60:5 76:10 78:5 117:16 162:20

**neck** 67:10,12

**needed** 8:5 31:9 32:7 36:19 150:25 151:11 179:4

**newly** 21:20

**news** 32:17

**Nicaragua** 33:24 34:2

**night** 33:6 41:20 42:24 53:9 57:25 61:7 63:13,16 97:4,14 105:20 117:3 136:2

**nights** 35:9 37:2 38:1,2

**Nissan** 45:17,18,19,23 46:12 57:4 58:1,3 115:22

**NLCRC-21-1221** 138:11

**nod** 5:24

**noise** 56:4

**nonlethal** 104:20 105:10

**nonprofit** 153:12

**nonviolent** 67:12

**north** 59:12,17,18,20,22,23, 25 64:22 65:8 69:17 70:7,11 71:9,23 74:24 75:1,2 137:4 138:9 170:22 171:4

**northbound** 178:6

**nose** 77:3 133:15,18

**note** 104:12

**notes** 104:16 125:18 168:13

**noticing** 51:11

**November** 117:23 123:23 126:2,14 127:23 152:18

**number** 39:20 66:2,15 115:15 137:6,23,25 138:4,6, 10

**numbered** 66:11 104:5

**numbering** 104:11,14

**nurse** 14:12 98:8

**nurses** 103:14 104:24

**O**

**object** 33:10 49:19 51:14 54:9 58:14 60:13 68:3 69:4 72:9 80:3 81:22 82:15 85:13 87:8 90:3,24 93:1 102:16 105:4,21 109:19 134:13,24 159:19 163:21 171:17 172:24 173:3,10 176:15 180:22 181:7 183:8

**objection** 39:23 63:19 64:18 94:21 95:12 105:12 127:15 176:4 179:14

**observations** 168:19

**observe** 46:13 53:6 56:5 99:17

**obstructing** 133:23 134:3

**obstruction** 175:16

**occasion** 23:4 44:23

**occasionally** 45:11,12 72:23

**occupation** 26:20

**occur** 107:3,7 134:23 177:25 181:22

**occurred** 107:11,13 161:14 169:11 183:6

**occurring** 31:13 35:8 46:10,21 155:12 175:12

**occurs** 106:12 107:6

**October** 40:21 117:23 123:23 126:2,14 127:23 128:8,19

**odd** 93:21

**offense** 68:10

**offer** 15:12,15 146:7

**offered** 133:11

**office** 4:5,25 8:8 37:19

**officer** 10:23 79:25 80:1 83:16 131:1,10,17,23 149:10 171:14 174:7,15,16, 17 183:6

**officers** 54:1,4 56:15 58:21 68:17 71:17,19 80:5,14,16, 17,21 84:12,22 85:3,12,20 86:8 87:15 88:23 89:19,24 132:5 138:18 170:11 174:1, 5,6 183:1

**official** 169:3

**officially** 16:5

**oldest** 35:20 155:1

**one-half** 17:9

**one-year** 144:20

**ongoing** 141:3

**online** 16:21 146:9,19 147:4

**open** 8:9 131:10

**opened** 23:8,9

**openly** 7:22 175:2

**operating** 102:21,24

**operations** 133:23 134:4

175:16

**opportunity** 9:10 32:2,3 144:6 145:2

**opposite** 99:21 101:1 147:14

**option** 175:15,19 176:2,9

**oral** 108:13

**order** 7:9,17 40:6

**orders** 181:4

**ordinary** 46:18

**originally** 10:24 141:20

**outcome** 139:11,22,23 155:7

**overcomes** 159:14

**overt** 51:16,18,20 53:6 54:4 56:5

**Owen** 23:14,19 24:5 150:16 151:3,5,8,14,23,24 152:3

**oxygen** 92:10

**P**

**paid** 42:4,20 153:15

**pain** 28:23 76:19 77:15,18 100:5,11 118:20

**pains** 118:19 119:1,3 164:10

**pajamas** 131:1 133:1

**paper** 64:8

**parallel** 59:25 70:8,9,14,15 71:10 72:22

**Pardon** 126:12

**park** 46:1,4,9 117:22 124:1 125:20

**parked** 46:4,8,14,16 57:5,7, 10,14,18 59:19 170:21

**part** 5:16 68:21 82:5 101:12 109:5 116:13 124:24 134:20 158:9 165:24 169:10

**part-time** 154:16,17

**parties** 50:16 51:12 56:6



DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 59 of 64

Index: partner..professional

**partner** 24:2 140:21 142:4

**partnership** 140:21 141:20,22 142:1 143:10,16 144:3

**party** 9:14

**pass** 166:10 183:17

**passed** 178:20

**passengers** 178:20

**past** 89:14 175:3 176:17 178:8

**patent** 140:23

**Pathfinder** 45:17

**patient** 94:14 104:17,19

**Patrol** 174:17

**pattern** 160:6

**pause** 61:22

**pavilion** 88:1,8

**pay** 42:8 180:17

**Payne** 4:25 15:4 29:13,17 30:16 34:3 61:3 64:11 65:10 77:7 122:5,8 135:11 155:25 156:6,9,12 166:12,17,19,22, 24 167:5 168:2

**payroll** 154:6

**pending** 4:12 138:8,9

**people** 12:5 19:17 36:16,17 41:1,13 42:17 46:15 48:15, 16 49:6,22 53:2 55:3,14,23, 25 56:18,20,24 59:2 63:25 88:2 103:8 104:24 114:2 147:22 151:11 153:13,16 158:23,24 159:2 168:25

**pepper** 169:14 180:8

**perceive** 58:25

**percent** 73:16,17

**perfectly** 9:3

**perform** 159:9 160:11 161:2,8 178:22,25

**period** 21:9 29:22,25 54:14 67:13,15,16

**Periodically** 72:21

**periods** 177:6

**person** 62:18,24 83:13 84:3 91:19,20 172:9,13 178:17

**person's** 78:11

**personal** 143:12

**PF135** 66:13

**Phd** 13:12,13 14:14,18,23 15:19,23 16:5 141:9 143:23 145:23

**phone** 37:8,10 38:6 110:13 114:2 115:15 116:1,3 131:20

**phones** 115:17

**physical** 160:2 169:10 176:21,24

**physically** 37:6

**physicians** 104:23 167:19

**picked** 46:20 58:5 115:4,7, 19,23 116:5

**piece** 64:8

**pink** 52:25 62:1,25

**pizza** 39:4,11 40:3,5,6,10, 23 41:10 42:2,21 43:1,4,16, 17,18 44:15,21 45:5,6,24 136:3

**place** 55:18 147:9,11,12,14, 15,18,24

**places** 105:24 106:5

**Plaintiff's** 66:10 137:22 138:5

**Plaintiffs** 104:4

**plan** 8:11

**planned** 8:13

**plastic** 125:3

**play** 62:16

**played** 61:8 62:20

**playing** 61:17

**plea** 133:11

**pocket** 180:17

**point** 6:25 8:19 9:5 33:3 43:12 53:3 55:14 58:13 60:9 74:21 75:3 76:5 77:16,20 79:20 80:2,25 81:4,21 82:8

84:17 87:14 90:1,7 92:16 93:7 94:2 96:12,17 99:10,17 104:20 106:17,25 107:18 111:21 112:10,13 117:9 123:9 125:7 131:11 133:2,7 134:1,3,5,6,10 142:2,24 171:4 172:7

**pointed** 62:19

**pointing** 77:4 99:5,25 100:1

**police** 29:4 30:7 31:6 32:6,9 34:25 50:7,21 51:6,12 52:7 53:6 55:10,23 56:24 58:11, 12 59:9,21 60:12,15,18 62:7 63:24 67:13 70:24 71:24 72:5,7,16 81:21 82:3,10 87:15 89:6,24 104:19 105:16 131:10 170:11,14,25 171:14 174:11 178:17 180:6,19

**policies** 158:1,14

**polo** 62:25

**poor** 34:19 36:8

**portion** 180:4

**position** 113:10

**possession** 124:10 125:6, 9,16,17 126:5,15 136:21

**possibly** 32:24,25 40:8 49:16 62:21 71:4 83:17 117:23

**post** 67:3,6,8,17,19 68:1,6, 12,21,22,23,24 69:1,3,6,7, 14 81:8

**posted** 182:22

**potentially** 42:2

**pounding** 130:24 131:3,9

**practice** 12:13,14 20:23 22:12 23:8,9,10,20 25:10 151:9

**practiced** 12:15

**practices** 120:10

**practicing** 5:9 12:9 18:18 20:24 21:5 118:22

**prefer** 166:14

**premises** 170:23

**prescribe** 119:5

**prescribed** 119:9,12

**presence** 50:7,21 51:12 53:7 60:12 174:7

**present** 35:3,5 37:11 53:16 56:7 103:13

**presented** 104:17 145:3

**president** 24:15

**pretty** 68:8 97:18 98:12 102:14 134:16 142:19 149:20 150:11,12

**prevailed** 140:25 141:6

**prevalent** 32:16

**prevent** 173:17

**previous** 106:9

**primarily** 12:16

**primary** 156:20,24 157:9

**prior** 29:10 31:18 33:9,17 34:25 37:2 55:25 74:23 94:6,10 111:25 118:1,6,14 119:11 121:12 123:19 125:10 138:20 139:9 141:8, 11 161:4 163:5,11,14 164:1, 13,14,25 165:14,22 166:2,6, 7 167:21,24 171:10,12,19 173:13 179:19

**prison** 67:16

**privacy** 5:12 18:13 19:2 21:3,4 23:21,22 24:15 26:15,16,17 148:9 149:6,9 150:18 151:9,20,22 153:7 157:25 158:14

**problem** 13:2 20:6 30:15 31:9,11 177:19

**problems** 164:23 177:10

**Procedure** 4:9,10

**procedures** 117:16 130:12

**proceed** 9:16

**proceedings** 176:3

**process** 35:11

**produce** 150:19

**professional** 84:4,10 109:3



DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 60 of 64

Index: professionals..remote

professionals 113:6 172:9

professor 16:2,18 17:5 145:5,7

program 13:12 14:14 15:20,23 143:23 144:15,18, 20 145:18,23 146:10,19 157:25

progress 32:21

project 158:15

projectile 104:18 171:13 172:8

proof 124:24

prosecutor 134:21

protective 7:9,17

protest 10:1 33:19,21 46:7, 9,21 47:3 50:22 104:20 116:18

protesters 47:16

protesting 33:16

protestor 56:13 72:1,2 82:5,11

protestors 48:3 50:9,14,20 51:8,13 52:4,6,12 53:7 170:25

protestors' 52:10

protests 31:1 32:13,16,21, 22 33:4,6,9,13 34:14,23 135:20

provide 155:6

provided 66:10

provisions 4:10

proximity 174:11

psychiatrist 117:18,19 118:1,6,10 119:2,14 126:2, 13,19,22 127:3,4,9,12,19 176:10,11,14

psychiatry 130:11,17

psychologist 176:14

psychology 119:20

public 31:13 138:23 139:1, 4,19 140:4 175:6 180:20 181:1

Pulaski 133:3,4

pull 46:12 78:12

pulled 29:3 78:21 80:13,21 92:18 105:6 108:21 112:15 124:22

pulling 77:25

pulls 79:25

pulse 92:14

punk 67:14 68:18

purpose 58:25

purposes 108:6

pursuant 4:9

put 34:3 65:8 78:12 88:13 92:25 105:9 117:20 125:3 131:18 161:2 170:24 177:16

Q

question 6:1,7,9,12,14 7:2 13:1 25:25 27:18 33:11 34:4 36:1 50:17 53:22 60:14 61:7 63:15 72:10 75:23 85:14 89:22 90:4 91:18 108:6 109:20 112:19 124:3

questioning 168:22 182:14

questions 8:12,14 30:21 60:22 157:17 164:25 166:13 168:6,12,14,16,19 170:15 176:20 178:24 181:8

quick 27:11 44:14

quickly 78:17 148:17,21 149:20 150:11,12

quotes 104:21 105:9

R

Ragon 23:14,19 24:5 150:15 151:3,5,8,14,23,24 152:3

random 90:23

rate 178:8

ratings 127:11

reach 153:9,13

reached 155:10

react 36:18

Reacting 36:17

read 67:4,7 68:8 79:3 106:8, 9 132:18,21,22

reading 67:4

reads 67:8

ready 87:23,24

realize 92:16 120:13

reason 21:17,19 28:20 35:13 44:5 110:20 118:10 120:16 124:14 128:10 130:5,7 142:14 149:3 150:5, 9 155:5 160:14 161:23

reasons 26:23,24 122:23 123:7 128:13 150:8 165:17 175:21

recall 33:1,19,23 34:16,20 37:23 38:4 42:9,23 44:2 47:1 48:14 51:24 55:16,17, 18 62:4 67:17 71:15 76:8 77:23 78:25 83:1,4,6,9 85:4 87:16 89:3,6,8,9,15 93:3,8 95:18 96:1,13,14 97:8 103:9 104:1,23 105:19 106:3,20 113:1,3,9,19 116:20 117:1, 20 121:10,15 123:18 126:7, 8 132:7,19,20 134:5,12 135:23 136:16,24,25 137:5 171:8 176:25 179:1

receive 11:12,21 14:23 16:5 176:7

received 8:7 11:13 14:20 15:12 170:3 180:1

recent 164:3

recently 6:16,19

recognize 57:12 67:3

recollection 97:21 110:9 115:1 116:8 117:4 130:24 139:8 165:20

recommendation 127:6

recommended 175:20

reconstructive 107:11,21, 24 111:23

record 4:24 5:23 6:5 30:16

61:3 64:12 122:10 136:19 137:21 171:21

recovery 114:10

recruited 146:13 148:22,24

Recruitment 154:20 157:23 158:3,4

red 169:25

refer 127:4

referred 12:11

referring 33:12 48:19 49:1 60:24 68:17 160:13 162:6 182:7

refuse 170:7

registered 14:12

regular 41:5 45:1 83:21

regularly 110:16

regulations 134:4

related 12:17 27:19 110:23 130:10 131:25 162:25 164:25 167:21 168:14 174:20 177:10 181:15

relates 28:12

relating 136:20

relation 7:10 34:24 35:4 50:9,15,20,21 56:17 64:15 78:9 108:8 118:24 123:21 128:16 132:11

relinquished 126:15

remaining 108:21

remarried 22:2

remember 7:8 12:2 21:15 34:10,15 35:16 37:5 38:2,7, 8 39:10 40:3 44:1 57:7,9,11, 13,15,19 62:9 63:7,12,16 64:17 67:5,21 75:13,16,25 82:19,23 83:13 85:25 86:1,4 88:19 90:12 91:8,22 96:20, 23 98:2,8,16,18 101:4,9 107:20 111:23 113:15 116:3 117:5 132:5,22 133:21 140:9 147:20 168:21 170:15 176:22

remnants 108:15

remote 23:3



DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 61 of 64

Index: remotely..slightly

**remotely** 19:15,18 24:11

**removed** 165:3,10,11,22 166:25 167:6

**rented** 158:17,19

**repeat** 6:9 112:19

**rephrase** 6:10

**reporter** 4:2 5:4,21 15:6 25:17 34:19 106:8 108:6

**reports** 104:19

**represent** 155:21 156:18

**represented** 5:1

**request** 7:9

**require** 36:2 170:4

**requiring** 35:19

**research** 5:10 154:18 157:22 158:2,12,13

**residence** 156:20,24 157:10

**resident** 20:13 23:3

**resigned** 26:23

**resolution** 133:9

**resources** 11:14,15 26:9 27:10

**respect** 67:13

**response** 168:18

**restate** 75:23 108:6

**resting** 172:7

**result** 118:11 120:25 169:11

**returned** 164:22,24

**review** 7:20 9:13 179:25

**reviewed** 9:11

**reviewing** 9:24

**rid** 148:1

**ride** 97:4

**right-hand** 100:6

**rights** 10:1,9 79:3 132:18, 20,21,22 141:1

**rigorous** 162:4

**road** 62:6,8,9 65:16 70:5

**Rock** 4:7 18:7 19:10,20 20:13 21:22 22:8,11,23 23:3,7,16 25:2,6,7 27:24 35:9 40:13 93:19,22 94:6,10 120:6 128:22,23 129:2,13 137:4 138:10 152:13 154:25 157:1,4 159:8 165:8 178:4

**Rogue** 45:17,18,19,23 46:12 57:4 58:1,4 115:22

**room** 88:10 95:9 96:7,8 97:19 98:1,2,3,15 102:21,24 103:2,5,11 106:18,22 107:3, 5,7,17 109:12,23 110:11 111:12

**roped** 89:1

**rough** 38:11 41:24 49:17

**roughly** 11:25 56:22 99:6 127:22,25 141:15

**round** 169:18 180:11 183:13

**roundish** 99:7

**Rules** 4:9,10

**running** 64:22

**runs** 64:21

**Ruston** 147:22

**Ryan** 182:19

---

**S**

**S-P-I-E-G-A-L** 120:9

**Sacramento** 10:21

**safe** 128:15

**sags** 101:16

**salmon** 52:25

**San** 19:11,13,14

**scale** 34:14

**scars** 101:10

**scattered** 48:7,8 49:9 50:6

**school** 11:17,19,24 12:9 13:6,9 118:19,21 121:25 141:16 142:20 145:8,9 146:1 147:6 154:25

**Scottrade** 24:10,14,16 151:15,19 152:3,6,10,12,20

**screwed** 25:17

**searched** 172:20,21

**seconded** 154:20 157:23

**seconds** 61:25 62:17 73:1, 3 131:25 132:10

**sections** 103:7

**security** 7:10,18 61:7

**sense** 19:23 51:9 129:17 174:12,14

**separate** 21:8,9 43:7,8,9 138:24 139:4 150:23 175:12

**separated** 123:3,4

**September** 126:23 127:25 163:5

**server** 42:22,23

**service** 96:23 151:12

**sessions** 120:23,25 122:4 123:16

**set-up** 22:12 151:9 152:25

**settled** 140:19 155:11

**severe** 164:23

**Shaking** 177:8

**Shaky** 177:7

**shave** 179:21

**Sheeler** 174:6

**shirt** 52:25 62:1,25 169:23

**shoot** 137:22

**shop** 152:25

**short** 9:8 30:17 61:4 122:12 157:16 168:8

**shortly** 22:12 106:25 119:22,23 142:12 165:8

**shorts** 52:24 62:2,25 170:1

**shot** 104:18 112:9,11,14,22 113:2

**shoulder** 72:24 74:1,3,7

**show** 50:6 106:4

**showed** 90:22 95:2,13

**showing** 61:6

**shown** 43:7 171:7

**Shreveport** 147:21

**siblings** 11:4

**side** 52:3,4,10 71:22,23,25 72:1,2 74:7 77:7,9,11,12 86:9 99:21,25 100:2,6,14,19 101:1,3,22 102:3 112:17,18 178:16

**sidelines** 104:19

**sides** 52:2,10

**sidewalk** 70:3 71:12 75:5, 13,18,25 76:6,11 79:13

**sidewalks** 48:14 49:4 69:24 70:17,19,20

**signed** 7:8,11 136:15,24

**significant** 161:20 166:6

**signing** 136:16

**signs** 51:11 52:15

**similar** 41:23 63:9 139:18

**simply** 36:5 69:11,13

**simultaneously** 22:14

**sir** 9:17

**sit** 85:4

**sitting** 76:13 82:23 83:12, 13 84:24 86:12 97:23,25 98:2 103:16 159:12

**situation** 31:13 32:4,8 41:23

**situations** 32:9

**size** 49:25 88:9 99:4,7 103:11 168:20

**skill** 179:5

**skills** 36:8

**skin** 165:15 181:19,20,21 182:5

**sleep** 131:4

**sleeping** 177:14

**Slight** 92:8

**slightly** 75:4



DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 62 of 64

Index: slow..teamed

slow 15:7

slumber 177:10,19

small 147:18

smaller 103:12

smart 36:12

Smith 127:21,22 128:5,6

social 36:7,22 119:19

socially 36:13

solved 173:7

someone's 69:1,3 78:3

son 35:17,18,19,20 36:1,19
37:4 38:4 128:19,24 131:12,
14 153:16 155:1,22 156:19
162:11,21

sons 40:16

sort 12:8,14,21,22 25:18
32:13 33:19 55:13 60:12
81:21 83:4 87:23 88:5 153:6
155:11 160:6 162:14

sorts 6:4 162:7

sound 64:3

Sounds 9:6

source 47:1

south 50:11,12 64:22
89:11,12 171:5

space 109:7

speak 20:5 86:17 113:5
114:3 115:11

specialize 135:16

specific 12:14 25:12 26:24
28:12 29:2 33:1,5 35:13,15,
18 44:2 48:9,11 51:24 61:20
69:22 79:20,23 100:12,13,
17,20 104:10 135:23
174:13,14

specifically 57:3,7 105:19
138:11 182:19

spectrum 35:20 36:2

speed 58:23 178:9

spell 38:21

spelled 17:17 120:8,14

spending 36:21,22,25 37:4

Spiegal 120:5,8 121:3,6,9
123:14

spoke 86:16,17

spot 46:20 58:6,8 79:21,23
100:12,13,17,20 172:7
182:2

spring 154:9,11 178:1
182:10,11

Springdale 143:20

Springs 182:25

St 24:10,13,14,18,25 151:17
152:13 155:17 157:4 165:15
167:14

staging 81:8,20 82:17 84:6
87:18,21

stairs 55:7 59:14,15

stamp 34:3 137:22

stand 80:21

standing 80:1,24 85:20,23,
25 88:23

start 7:6 9:21 10:19 12:8
33:15

started 22:18 23:22 26:7,17
27:2 29:6 37:23 53:1 55:14
58:16 59:12 117:18 123:1
148:18

starting 12:15 53:11 104:5

startups 149:15 153:14

state 4:3 16:15 29:24 138:7
146:7,14,15,18 147:13
169:3 170:14

state-issued 172:15

statement 173:19 178:19,
22 179:4

states 4:12 18:22 31:8

stay 19:20 30:3 178:19

stayed 25:3 116:23 117:2

staying 117:9

step 60:20

stepped 98:12 131:12,16

steps 64:21

stipulate 64:9,12 134:21

stitched 107:1,6

stomach 78:19

stood 85:6,8 86:8

stop 74:13 126:21

stopped 20:15 38:12 74:14
121:6 128:2,5 177:21

stopping 182:24

straight 74:24 75:5,6,7,9,
10,12 80:9 140:8 142:19

street 4:6 48:10,14,19 55:6,
7,8 57:9,19 59:14,15 62:13,
14 64:2,7,21 74:4,7 83:21

streets 64:22 89:16

stress 118:24 119:7 162:10
176:16

strike 171:20

struck 178:15 183:7

struggles 36:13,15 121:1

struggling 64:7 67:4

study 144:23

stuff 12:17,21 142:22 153:2
160:21 161:25

subjects 16:20

substantial 155:12

successful 181:25 182:5

successor 141:1

sudden 69:21 72:14 89:20

suddenly 73:8

sued 140:18,20 141:2,4
154:25 155:12

suffer 169:9

suffered 173:19 174:20

sufficient 134:22

sufficiently 113:23

suggestions 176:7

suit 143:7

Suite 4:6

suits 140:15 155:3

summer 145:1

supervisory 9:25 10:3,16

suppose 26:14

surgeon 108:13 112:15

surgeries 108:3,7,11
117:11,16 130:10,16 165:13

surgery 107:11,22,25
108:22,23 111:23 114:5,7,9,
13,15,20 165:2 166:1
181:14

surreal 178:18

surrounding 49:2

sustained 93:10 108:8

sweats 177:6

switch 149:1 150:24

switching 149:3

sworn 4:19

system 175:24

T

table 82:20 88:19,20 103:16

tad 103:11

taking 32:9 92:13 155:18
176:1 181:15

talk 5:19,20 31:1 42:21
44:12 101:20 103:22 116:9
135:19

talked 45:14 100:13 102:13
113:7 153:16 159:5 172:3

talking 37:5,7,10 38:5
62:13 71:5 100:21 114:2
116:25 122:14 175:4,8,9
177:22

targeted 72:7

tasks 28:16

teach 146:20,21,25 147:1,3,
4

teaching 16:3,16 17:6
146:9

team 151:22 166:16

teamed 142:25 143:2



DON LLOYD COOK vs RYAN WINGO, et al.
COOK, DON L. on 08/16/2023

Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 63 of 64

Index: tear..upfront

**tear** 64:7 69:20 70:25 71:16, 19

**Tech** 13:16,17 15:14,17,22 16:1,6,9 146:3,4,6 147:17, 20

**Technology** 19:9,13,21 140:25

**teeth** 101:14 102:11 105:24 106:6 107:25 108:12,15,22 109:6 165:3,11,21 166:25 167:6 181:15

**telling** 50:2 67:11 104:23 171:14

**temporarily** 164:7

**ten** 38:24 168:5

**tendered** 136:19

**Tension** 51:22

**tent** 82:21 88:5,8,13,15,21, 24

**tents** 87:25

**term** 10:8 68:19,20 79:5 119:14 144:23

**termination** 176:2

**terms** 30:2 50:23 129:22

**terrible** 29:5

**testified** 4:19 173:12 174:10 175:2

**testimony** 170:13 171:2 173:6 183:22

**Texas** 125:11 126:16 164:22

**therapist** 119:15,18,21 120:2,4,6,16 121:11,13,15, 18 122:15,24 123:1,13,19, 21

**therapy** 120:23,25 123:8

**Theresa** 155:25 156:1,3,5, 18

**thing** 12:22 27:21 65:10 66:6 82:21 87:18 88:1,2,5, 20 90:12 91:7 102:25

**things** 6:4 36:10 85:2 113:13 142:16 153:11 159:24 177:18

**thinking** 50:25

**thirty** 79:17

**thought** 7:14 31:9,15 33:3 35:11,12 100:10 124:25 131:25

**thoughts** 31:4,7 32:12,15, 20 44:1 59:3 135:20 136:5 147:10

**thousand** 50:4

**threat** 68:9

**three-day** 107:13

**threshold** 12:12 142:21 143:10 153:2

**threw** 56:15

**throw** 54:1 56:8

**throws** 56:23

**thumbdrive** 8:18

**tied** 79:5

**ties** 78:15

**Tightness** 160:4

**time** 11:2,23 14:14 15:20 17:11,13 18:16 20:5,12,25 21:7,15 24:22 27:1 28:21 29:22,25 30:7 31:15 34:3 36:21,22,25 37:4 44:25 47:8 53:8,9 54:14 55:16,17,19 56:22,24 57:1 58:11 59:5,6 60:16 68:10 70:24 71:1,9 72:18,21 74:16,18 75:5 78:2 85:10 94:19 99:2 106:3 111:16 114:3 116:24,25 123:3,4,11 126:6 128:18 129:2,12 153:17 155:8 169:6,14,17,22,25 170:7,10 172:15 173:21 179:8,11 182:3

**timeline** 37:14

**times** 45:9 112:2 123:18 139:9

**timestamp** 61:18,21 63:2

**timing** 160:6

**title** 18:11

**today** 79:20 132:7 171:7,10 179:22,23

**told** 20:6 56:18,20 79:1 84:17 98:14 111:5 112:8,21, 22 115:25 131:19 132:14 134:11 164:9

**top** 77:25 78:3,8,11 80:1 131:12 148:4

**topic** 30:24 33:21 136:2

**totally** 6:8 25:17

**touch** 111:9 112:2

**touching** 79:9

**tough** 67:14

**tour** 20:20

**towel** 92:24

**town** 147:18

**track** 45:13

**training** 32:6,9

**transferred** 126:9

**transgressions** 175:3

**transportation** 170:5

**trauma** 104:16

**traumatic** 175:23

**travel** 19:22 170:14

**traveled** 23:4

**treated** 172:10

**treatment** 163:20 167:9

**trial** 145:10

**trigger** 177:19

**trouble** 27:12 177:14

**truck** 178:6,7,11,16 182:8

**true** 137:19 170:19 179:9

**turn** 72:16,20,23 73:4

**turned** 72:19,20 73:9,11,12, 14,17,20,23 76:14 137:11

**turning** 171:5

**twins** 17:24 129:16

**two-story** 131:5

**type** 82:20,21 88:1,20 153:2 169:2,10

**types** 177:18

**typical** 37:24 38:13

**typically** 134:21 162:19 166:15

───────

**U**

**UAMS** 96:19,20 97:15,16 104:17 109:23

**Uh-huh** 10:10 11:16 19:16 21:13 29:1 39:9 45:7 62:15 65:15,18 91:9 106:16 107:16 122:20 127:24 129:9 135:9 145:17,25 150:1 152:23 154:1 167:2 177:9 182:12

**uh-huhs** 6:4

**ultimately** 140:24 178:19

**unable** 161:17

**unarmed** 67:12

**uncertainty** 121:23,24,25 122:19

**undergo** 108:3,8 130:14

**undergoing** 130:14

**undergrad** 122:15 142:20

**undergraduate** 11:11 33:20 34:7,8 121:13

**underlying** 136:20

**underneath** 88:21,24

**underscore** 61:15

**understand** 5:13 6:7,9,22, 25 7:4 10:9 50:17 171:2

**understanding** 5:5 9:21 174:4,16

**understood** 6:13

**underwent** 117:17 130:17

**uniform** 83:19,23,25 84:1,9

**uniformed** 131:1

**United** 4:12 31:8

**university** 11:10,20 13:10, 15 15:14 16:15 17:3 33:19 122:17 129:6,7,10 145:5 146:3,24

**upfront** 7:7



DON LLOYD COOK vs RYAN WINGO, et al.   Case 4:22-cv-00548-KGB   Document 19-6   Filed 09/28/23   Page 64 of 64

COOK, DON L. on 08/16/2023                                      Index: upper..Zoey

**upper** 61:10 131:8 165:9

**upstairs** 130:25

**V**

**vacate** 170:15

**vehicle** 177:22,24 178:15

**vehicles** 82:25 83:2 89:4,6 178:14

**verbalize** 76:25

**Verizon** 140:24

**Vermont** 28:1 40:15,20 128:3,6,8,10,19,24 129:1,20 130:4,5,8 154:13,15 174:22

**versus** 138:7

**vice** 24:15

**video** 9:10 60:21,24 61:7,8, 25 62:2,20 64:2 171:7,10 180:1 182:22,23 183:3

**view** 9:10

**Virginia** 13:16,17,19,24 14:4,9,13 15:11 16:6 141:9 143:15,21 145:23

**visit** 139:22

**visitations** 118:6

**visiting** 118:10 127:20

**visits** 45:9

**voice** 91:21,24

**volition** 80:11 127:3,5

**W**

**waiting** 7:17 98:1,2 103:2,4

**walk** 29:24 47:16 48:2 58:24 59:20 89:14 113:14

**walked** 52:13 79:19 81:7,9 89:10 143:14

**walking** 47:18,20 48:1 51:1, 2 54:16 59:12,16,18,22,23, 25 60:5,6,7,8,11,17 61:19 69:20,24 71:9,15 72:22 73:3,6 74:14,17,18,24 75:1 76:5 81:16 113:15

**wallet** 172:13,18,22 173:1

**Walmart** 20:20 21:2,16,17 22:7 149:21,23 150:2,3,10, 11

**wanted** 7:19,21 27:21 66:6 142:16 146:20 147:4 149:9 150:17 151:20 164:5 170:23 174:23

**wanting** 128:13 147:1

**warning** 171:14

**Washington** 22:25 23:1

**watch** 8:4,15,18,20,21

**watching** 8:24 183:3

**water** 56:8,9,23 58:10

**waves** 160:7

**ways** 12:2 150:23

**weapon** 52:21

**weapons** 52:18

**wearing** 52:23,24 62:25 63:7,8 83:14,17,19,21 84:1, 9 91:22 132:24 169:22,25 179:16

**wedding** 88:5

**Wednesday** 4:4

**week** 40:24,25 45:8,9 123:17 129:14

**weekend** 21:22 25:1 28:6 152:14

**weekends** 130:3

**weekly** 45:5,6

**weeks** 179:9

**weigh** 169:20

**welfare** 12:20,21

**welts** 169:9

**west** 47:20,21 48:1

**white** 45:20,22,23 52:24 62:1,25 169:23

**wife** 112:21 155:18 156:20

**wife's** 121:8

**Willis** 66:19,25 67:1

**Willis'** 68:12

**window** 107:13

**Wingo** 174:6,15,16 182:19, 24

**Wingo's** 174:7

**Winter** 125:24

**withdraw** 112:20

**Won** 155:8

**Wonderful** 147:11

**wondering** 114:12

**Wood** 64:5

**Woodlane** 64:11,24 65:1,2, 17 70:4,9,13,15,18 71:10 72:23

**Woodlawn** 62:11 64:3,10

**Woodrow** 62:12

**Woodward** 48:21 62:10,12

**word** 117:15 130:12 182:16

**words** 177:16

**work** 5:10 12:19 14:11 20:10 21:24 22:10,13 24:9 25:18 26:7 27:5,7 28:15 37:17,24 109:1,2,4 123:9,10 147:9,12,14,24,25 151:24 154:15 160:8,9,14 161:17 162:24,25 163:2

**work-related** 163:6

**workday** 38:16

**worked** 20:19 37:16,17,18, 21 38:10 41:1 153:11

**worker** 119:19

**working** 19:15,17,21 20:8, 16,18,21 21:23 24:11 25:8 27:2,8 30:5 48:17 87:2 143:19 144:3 153:19 154:2, 16 157:24 160:25 161:1,7 162:3,18 167:20 173:17

**works** 5:14 104:15 158:22

**world** 146:11 147:19

**worried** 162:11,12,21

**worse** 29:8,9 30:6

**wound** 107:7 112:1 178:15

**wounds** 107:1

**wrap** 181:11

**write** 65:14,16,21 157:25

**writing** 158:14

**written** 181:24

**wrong** 175:14

**X**

**xrays** 106:4

**Y**

**y'all** 86:9

**yanked** 80:9

**yard** 178:15 182:8

**year** 12:1 16:10,11 18:2 19:6 22:18,21 23:11,12 24:4,17,19 25:4 29:15 34:10 40:21 104:17 117:23 118:18 121:4 126:25 142:7,9 143:6 144:16,21 146:4 148:2 149:19 152:10,21 178:1 181:22 182:10

**years** 11:3 14:13 16:24 17:9,21 20:11,12 24:1 25:21 34:7 38:24 93:22 120:11 140:18 142:7 145:24 146:16,17 148:3 149:12 151:6 153:18 156:22

**yell** 53:19,23

**yelled** 51:25

**yelling** 51:21,22 52:2

**yesterday** 179:8,11,19

**York** 28:5 129:15

**Z**

**zip** 78:12,14 79:5 84:20 86:8 90:1,7

**Zoey** 17:20,23 22:4 129:13, 14

