IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

DON LLOYD COOK                                          PLAINTIFF

V.                    Case No. 4:22-CV-548-KGB

RYAN WINGO, individually,
JEFF SHEELER, individually,
JOHN S. JOE, individually,
WILLIAM J. BRYANT, individually and
JOHN DOES 1-5, individually                            DEFENDANTS


ORAL DEPOSITION OF

LT. BOBBY G. BROWN
WEDNESDAY, AUGUST 23, 2023
10:07 A.M. TO  1:23 P.M.

ZOOM VIDEOCONFERENCE


APPEARANCES:

ON BEHALF OF PLAINTIFF:
    MICHAEL J. LAUX
    LAUX LAW FIRM
    400 WEST CAPITOL AVENUE, SUITE 1700
    LITTLE ROCK, ARKANSAS 72201

ON BEHALF OF DEFENDANTS:
    JUSTIN BRASCHER
    ASSISTANT ATTORNEY GENERAL
    ARKANSAS ATTORNEY GENERAL'S OFFICE
    323 CENTER STREET, SUITE 200
    LITTLE ROCK, ARKANSAS 72201

    ALSO PRESENT:  DON COOK, PLAINTIFF


AMY WAID, CCR #853
WAID REPORTING
P.O BOX 10385
CONWAY, ARKANSAS 72034
(501) 620-0982
waidreporting@gmail.com

**EXHIBIT**

**7**

ZOOM VIDEOCONFERENCE

2

1                        INDEX

2     STYLE AND NUMBER . . . . . . . . . . . . . . . . . . 1

3     APPEARANCES  . . . . . . . . . . . . . . . . . . . . 1

4     EXHIBITS . . . . . . . . . . . . . . . . . . . . . . 2

5     CAPTION  . . . . . . . . . . . . . . . . . . . . . . 3

6     DIRECT EXAMINATION BY MR. LAUX . . . . . . . . . . . 4

7     CROSS-EXAMINATION BY MR. BRASCHER . . . . . . . . . 118

8     REDIRECT EXAMINATION BY MR. LAUX  . . . . . . . . . 126

9     DEPOSITION CONCLUDED . . . . . . . . . . . . . . . 131

10    CERTIFICATE OF REPORTER . . . . . . . . . . . . . . 132

11

12                       EXHIBITS

13    PLAINTIFF'S                                   MARKED

14    Exhibit 1    Sheeler Incident Report (3 pgs) . . . . . . 73

15    Exhibit 2    Wingo Incident Report (2 pgs) . . . . . . . 73

16    Exhibit 3    7/23/21 Arrest Report (1 pg) . . . . . . . .

17    Exhibit 4    5/28/21 Affidavit for Arrest (3 pgs) . . . . . .

18    Exhibit 5    Ark Times photos (1 pg)  . . . . . . . . . . .

19    Exhibit 6    Wingo photo (1 pg) . . . . . . . . . . . . .

20    Exhibit 7    6/4/20 ASP ERT After Action Report (6 pgs)  . 99

21    Exhibit 8    6/25/20 Lt. Brown Memorandum (4 pgs) . . . . 101

22    Exhibit 9    IACP Crowd Management April 2019 (25 pgs) . . .

23

24    [Reporter's Note:  Upon agreement of Counsel, Exhibits 3, 4,

25     5, 6, and 9 are also attached.]

ZOOM VIDEOCONFERENCE

3

1                          CAPTION

2      ANSWERS AND ORAL DEPOSITIONS OF LT. BOBBY G. BROWN, a

3  witness produced at the request of the plaintiff, taken

4  pursuant to the Arkansas Rules of Civil Procedure in the

5  above-styled and numbered cause on the 23rd day of August,

6  2023, before Amy Waid, Arkansas Supreme Court Certified Court

7  Reporter #853, at 10:07 a.m.

8                    * * * * * * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                              PROCEEDINGS

2           THEREUPON,

3                      LT. BOBBY G. BROWN,

4           THE WITNESS HEREINBEFORE NAMED, having

5           been first duly cautioned and sworn by me

6           to testify to the truth, the whole truth,

7           and nothing but the truth, testified on their

8           oath as follows, to-wit:

9                      DIRECT EXAMINATION

10  BY MR. LAUX:

11  Q    Good morning, sir.  I wonder if I could ask you to state

12  your full name for the record.

13  A    Bobby G. Brown.

14           MR. LAUX:  Please let the record reflect that

15           this is the deposition of Bobby G. Brown taken per

16           notice among the parties.  This deposition will

17           proceed in accordance with the rules of the Eastern

18           District of Arkansas, Federal District Court, the

19           rules of the Supreme Court of Arkansas, and any and

20           all local applicable rules.

21  Q    (By Mr. Laux)  Are you employed with the Arkansas State

22  Police, sir?

23  A    Yes, sir.

24  Q    Is your current rank lieutenant?

25  A    Yes, sir.

ZOOM VIDEOCONFERENCE

5

1   Q    My name is Mike Laux.  I represent the plaintiff in this

2   case.  May I refer to you just as Lt. Brown?  That will do?

3   A    Yes, sir.

4   Q    Okay.  Lt. Brown, do you understand that you've been

5   identified as a witness in a federal lawsuit captioned

6   *Cook v. Wingo, et al.*?

7   A    Yes, sir.

8   Q    And you're here today to give a deposition in that matter;

9   correct?

10  A    Correct.

11  Q    Have you ever given a deposition before?

12  A    Yes, sir.

13  Q    On how many occasions would you estimate?

14  A    Five or six times.

15  Q    Were any or all of them related to your profession as a

16  law enforcement officer?

17  A    Yes, sir.

18  Q    Did you say four or five of them?

19  A    Five or six.  Five or six.

20  Q    Five or six.  Okay.  And we'll get to that in a second.

21       Now, you've given a deposition before, but let me very

22  briefly go over the rules so that we have a clean record.

23  Okay?

24  A    Okay.

25  Q    And you're represented today by Justin Brascher of the

6

1  Arkansas Attorney General's Office; correct?

2  A    Yes, sir.

3  Q    And Mr. Brascher is a good attorney, and I'm sure he's

4  given you the rules, but let me just go through them very

5  quickly.  As you can see, we have a court reporter here who's

6  taking down everything that we say; therefore, it's important

7  for us to speak audibly instead of with gestures like we

8  sometimes do in face-to-face communications.  Do you

9  understand?

10 A    Yes, sir.

11 Q    So we try to avoid shrugs of the shoulders or shakes of

12 the head and things like that.  Okay?

13 A    Yes, sir.

14 Q    Moreover, because we're doing this deposition via Zoom, we

15 might have some technical difficulties.  So I'll be sure to

16 wait until you're done with an answer before I pose my next

17 question.  And I'm going to ask you to wait until my question

18 is complete before you answer even if you know where I'm going

19 with the question.  Okay?

20 A    Yes, sir.

21 Q    All right.  If I ask you a question and it doesn't make

22 sense, which is bound to happen, please let me know, and I'll

23 restate it so that it does make sense.  Okay?

24 A    Okay.  Yes, sir.

25 Q    And again, with Zoom and everything else, if I say

ZOOM VIDEOCONFERENCE

7

1   something and I mumble or you don't quite hear it, please let

2   me know, and I'll repeat it louder.   Okay?

3   A      Yes, sir.

4   Q      The bottom line is that if I ask you a question and you

5   don't tell me there's a problem with the question, and you

6   don't tell me that you haven't totally heard the question, and

7   you answer, I'm going to rely on your answer.   Okay?

8   A      Yes, sir.

9   Q      All right.   So without getting too far downfield, when is

10  the last time that you gave a deposition ever -- or when's the

11  last time you gave a deposition?

12  A      Probably been a couple of years.

13  Q      And what were the general circumstances of the litigation

14  or proceeding in which you gave your deposition?

15  A      It was a DWI crash.

16              THE COURT REPORTER:   Could you say that again?

17  A      A DWI crash.

18  Q      (By Mr. Laux)   Okay.   So let me ask the question, and

19  maybe we can save some time.   Of the five to six times that

20  you've given a deposition, have any of them been in civil as

21  opposed to criminal litigation or court proceedings?

22  A      I believe the DWI crash was a civil matter.

23  Q      Oh, okay.   So let me ask you this:   Have any of the --

24  have any of the matters that you've given depositions in

25  related to any acts or omissions alleged against Ryan Wingo?

ZOOM VIDEOCONFERENCE

8

1  A    No, sir.

2  Q    How about Jeff Sheeler?

3  A    No, sir.

4  Q    How about John S. Joe?

5  A    No, sir.

6  Q    Or is it -- I'm sorry.  Yes, John S. Joe.

7  A    No, sir.

8  Q    Did any of the depositions involve litigation or

9  proceedings related to a protest or a riot of any kind?

10  A    No, sir.

11  Q    Were you a named party in any of the litigation or

12  proceedings in which you gave depositions?

13  A    No, sir.

14  Q    Have you ever been named as a defendant in a civil

15  lawsuit?

16  A    No, sir.

17  Q    Okay.  Now, in June of 2020, you were a lieutenant with

18  the Arkansas State Police; correct?

19  A    Yes, sir.

20  Q    Maybe it's a time -- a good time here.  Let me give you a

21  little bit of a roadmap.  So I'm going to ask you questions in

22  -- kind of in segments.  I'm first going to ask just a very

23  little bit about your background and education.  I'm going to

24  ask a little bit about your pre-Arkansas-State-Police

25  employment very briefly.

ZOOM VIDEOCONFERENCE

9

1   A     Okay.

2   Q     Then I'm going to ask you about some of the roles and

3   responsibilities for lieutenants like yourself in June of 2020.

4   And then I'm going to start to ask questions about what I'll be

5   referring to as "the George Floyd protests," which occurred in

6   late May, early June 2020.  So just as an overview, that's

7   where we're kind of going to go today.  Okay?

8   A     Okay.

9   Q     So when did you begin your employment with the Arkansas

10  State Police?

11  A     March of 1996.

12  Q     Okay.  Congratulations to you on a very long tenure.  Hard

13  to believe that '96 is so far away, you know, in -- in a sense.

14        So where were you born, sir?

15  A     Dardanelle, Arkansas.

16  Q     And did you attend high school there?

17  A     Yes, sir.

18  Q     And you graduated high school, obviously.  What year did

19  you graduate?

20  A     1988.

21  Q     Okay.  After graduating from high school, did you pursue

22  any type of non-law-enforcement education?

23  A     Indirectly.  To answer your question, I went into the

24  Army, and I went to college while I was in the Army.

25  Q     I see.  You -- you enrolled in the armed forces -- in the

10

1   Army branch of the armed forces?

2   A    Correct.

3   Q    Excellent.  And thank you for your -- your service.

4   A    Thank you.

5   Q    I'm going to go out on a limb here and say that you were

6   honorably discharged, of course?

7   A    Yes, sir.

8   Q    And how long were you in the Army, Lieutenant?

9   A    I spent seven years --

10  Q    I mean -- I'm sorry -- active duty.  I'm sorry.

11  A    I spent seven years active duty.

12  Q    Okay.  And -- and it sounds like you did some college in

13  there somewhere.

14  A    Yes, sir.

15  Q    Can you briefly describe where you went or the place you

16  attended and what courses you studied?

17  A    I studied some criminal justice courses, and I did some

18  core courses, like Comp I and Comp II, some math courses.  I

19  also CLEP'd a couple courses out.  And later in life, I ended

20  up earning my bachelor's degree, so.

21  Q    I see.  And sounds like you -- you front-loaded a bunch of

22  courses and credits, and maybe you stepped away for a bit, went

23  back, and got the B.A.

24  A    Yes, sir.

25  Q    When did you earn your bachelor's degree?

ZOOM VIDEOCONFERENCE

11

1   A    20 --

2   Q    Approximately?

3   A    -- 2020.

4   Q    Okay.  And from where, sir?

5   A    Purdue Global University.

6   Q    Very good.  Okay.  So what were the -- the years -- the

7   seven years that you were in the Army, what were those years?

8   A    1989 -- well -- yes, '89 to '96.

9   Q    So pretty much -- I don't know if enrolled is the right

10  word, but you -- pretty much you -- you joined the Army pretty

11  much right out of high school?

12  A    Correct.

13  Q    After you were honorably discharged from the Army, what

14  was next in terms of your employment career?

15  A    I went -- I went straight to troop school, and --

16  Q    And --

17  A    -- also I was in the Army Reserve as well.

18  Q    What is troop school?

19  A    State police recruit school.

20  Q    Would that be the equivalent of, like, for lack of a

21  better phrase, a police academy?

22  A    Correct.

23  Q    That's where you learn the -- that's where you're

24  initially trained, and you learn some of the fundaments of

25  being a state trooper?

ZOOM VIDEOCONFERENCE

12

1  A    A state trooper and a police officer; correct.

2  Q    Okay.  And then is that a State-of-Arkansas-certified-type

3  program?

4  A    Yes, sir.

5  Q    And did you physically go to, like, a brick-and-mortar

6  building for this training?

7  A    Yes, sir.

8  Q    Where was that?

9  A    Camden, Arkansas.

10 Q    Okay.  Did you graduate from troop school with any of the

11 defendants in this case:  Wingo, Sheeler, Joe, Col. Bryant?

12 A    No, sir.

13 Q    You mentioned that, in addition to troop school, you were

14 in the Army Reserve; is that correct?

15 A    Yes, sir.

16 Q    And just very briefly, what was the extent of that work or

17 that -- those duties?

18 A    I was a military police officer in the Reserves.  I did

19 several different units until 2008 when I --

20 Q    I see.

21 A    -- when I retired.

22 Q    Got it.  Did you work at all in the Arkansas Military

23 Department?

24 A    I was in the -- I'm assuming the National Guard is what

25 you're talking about?

13

1  Q    Well, you know, I -- I have had cases with the Arkansas

2  Military Department, and I know that it's kind of a National

3  Guard and Arkansas kind of a thing.  You -- were you on the

4  National Guard side of it?

5  A    I was in the National Guard from 1987 until I joined the

6  regular Army in '89.

7  Q    I see.  Okay.  But -- but in -- during your Army Reserve,

8  you were -- what -- is it -- is it Camp Robinson?

9  A    Camp Robinson here in North Little Rock, yes.

10  Q    You were not there for any period of time, were you?

11  A    No, sir.

12  Q    Okay.  All right.  So after the Army Reserve -- well, let

13  me just short-circuit this a bit.  Did you have any

14  non-law-enforcement jobs prior to joining the Arkansas State

15  Police in 1996?

16  A    No, sir.

17  Q    Okay.  Are there any jobs of any import that you had that

18  we haven't discussed between 1990 and 1996?

19  A    No, sir.

20  Q    Okay.  Now, you understand that this -- I'm not asking you

21  to agree with the allegations, but you understand that the

22  allegations in this case are that Ryan Wingo used excessive

23  force when he used his 12-gauge beanbag shotgun and fired

24  beanbag rounds, or at least one beanbag round, at the

25  plaintiff, Don Cook.  You understand that to be the essence of

14

1    this complaint, that that act was excessive force.  Do you

2    understand that?

3    A    Yes, I understand.

4    Q    Okay.  I know you were -- well, were you present,

5    physically present, during any -- well, let me take a step back

6    here.

7         Just for clarity, you're aware that there were protests in

8    Little Rock between May 30th and, give or take, June 7th that

9    had been referred to as "the George Floyd protests"; correct?

10   A    Yes, sir.

11   Q    So if I use that phrase, "George Floyd protests," you

12   understand that I'm talking about that time frame; right?

13   A    Yes, sir.

14   Q    And there were -- I guess, were reportedly a couple of

15   incidents in Conway, Arkansas.  Unless I mention Conway, I'll

16   be talking strictly about the George Floyd protests in

17   Little Rock.  Okay?

18   A    Yes, sir.

19   Q    All right.  So were you present on the street, at the

20   Capitol, in the vicinity of any of the George Floyd protests

21   occurring during that time frame?

22                   MR. BRASCHER:  Object to form.

23                   Go ahead.

24                   MR. LAUX:  You can answer.

25                   MR. BRASCHER:  Yeah, go ahead.

ZOOM VIDEOCONFERENCE

15

1   A    Yes, I was.

2   Q    (By Mr. Laux)  So if I were just to say we have May 30th

3   through June 7th, are you able to identify what days you may

4   have been present?

5   A    Generally, yes.

6   Q    Could you give me that information to the best of your

7   recollection?

8   A    Yes, I can.

9   Q    Please do.

10  A    I was present at the Capitol on June 1st for sure and June

11  2nd.

12              THE WITNESS:  All right if I refer to this memo?

13              May I refer to this --

14              MR. BRASCHER:  He's -- he's --

15              THE WITNESS:  May I refer to this memo?

16              MR. LAUX:  If you've -- if you've exhausted your

17         memory on that, yeah, feel free, sir.

18              THE WITNESS:  It's Exhibit 8 that you --

19              MR. BRASCHER:  Yeah, you're --

20              MR. LAUX:  Yes, sir.  You may.  Yes, sir.

21              MR. BRASCHER:  -- you're perfectly --

22              MR. LAUX:  Thank you for asking.

23              MR. BRASCHER:  -- fine looking over that, yeah.

24              THE WITNESS:  All right.

25              MR. BRASCHER:  Let the record reflect he's

ZOOM VIDEOCONFERENCE

16

1        taking a look at Exhibit 8 to refresh his

2        recollection.

3               THE WITNESS:  I'm sorry.

4               MR. BRASCHER:  No.  Nothing to be sorry about.

5               MR. LAUX:  And also for the record, I would just

6        note that Mr. Cook, the plaintiff, has signed on

7        maybe about two minutes ago.

8  A    And May 31st -- May 31st, June 1st, June 2nd, and I guess

9  I was there through the 7th.  May 31st through June 7th --

10 Q    (By Mr. Laux)  Okay.  So --

11 A    -- that I was at the Capitol.

12 Q    Okay.  So -- I didn't hear that.  At -- okay.  Yes.  Okay.

13      So it sounds like -- and we can talk in -- you know, in a

14 -- in a bit about the respective length of time of the periods.

15 But sounds like you were present, at least at some point, on

16 the 31st of May through the 7th of June.  True?

17               MR. BRASCHER:  Object --

18 A    Yes, sir.

19               MR. BRASCHER:  -- object to form.

20               Go ahead.

21 Q    (By Mr. Laux)  Okay.  Were -- were you present in the

22 vicinity of Ryan Wingo when he was firing or when he fired his

23 beanbag shotgun?

24 A    No, sir.

25 Q    Okay.  So fair to say that, to the extent that Ryan Wingo

ZOOM VIDEOCONFERENCE

17

1  struck Don Cook in the face with an impact round, you did not

2  -- you did not personally observe that?

3  A    No, sir.

4  Q    Okay.  We can talk about the standard and whether it falls

5  above or below.  But you don't dispute that Ryan Wingo struck

6  Don Cook with a beanbag projectile, do you?

7                   MR. BRASCHER:  Object to form.

8                   Go ahead and answer.

9  A    I do not.

10 Q    (By Mr. Laux)  Okay.  Now, it's my understanding,

11 Lieutenant, that you authored or signed off on two documents

12 that have been produced.  The first of them is an ERT

13 after-action report, and the second is an ERT memo that was

14 drafted and given to your division commander.

15     Do you know the two documents that I speak of?

16 A    Yes, sir.

17 Q    And those are marked as exhibits today; correct?

18 A    Yes, sir.

19 Q    Are you aware, Lieutenant, of any other documents that you

20 may have authored or signed off on relating at all to the

21 George Floyd protests?

22 A    Yes.

23 Q    Can you describe what those documents would be?

24 A    Many use --

25 Q    Again, excluding the two that I mentioned.

ZOOM VIDEOCONFERENCE

18

1    A    Yes.  Many use-of-force reports.  We had to -- many

2    use-of-force reports.

3    Q    Did I hear you correctly; did you say that you authored or

4    signed off on many use-of-force reports?

5    A    Yes.

6    Q    Okay.  And would that include a use-of-force report that

7    was related to Ryan Wingo's striking Don Cook?

8    A    Yes.

9    Q    Now, in interrogatory answers, I have been told that that

10   document is labeled as Arkansas State Police Document

11   Bates-stamp 22.  I can't find Bates-stamp 22.  Do you have a

12   copy of that document, Lieutenant?

13              MR. LAUX:  Or do you, Justin?

14              MR. BRASCHER:  Yeah, that's more of a question

15        for me.  I'll tell you what, Mike; I will -- or

16        Mr. Laux, I will -- I'll take a look.  I -- 22 --

17        let's see.  I have, if you're referring to, ASP 0022.

18        Is that the number that you're referring to?

19              MR. LAUX:  I believe so.  It should be a

20        use-of-force report.

21              MR. BRASCHER:  That -- it is not a use-of-force

22        report -- at least what I'm looking at.

23              MR. LAUX:  That was referenced by, I think,

24        Bryant in his -- or in -- in Col. Bryant's

25        interrogatories, I ask about the use-of-force report,

ZOOM VIDEOCONFERENCE

19

1            and it directs me to 22, I believe.  Let me

2            double-check on that.

3                 (Sotto voce discussion between witness and

4            Mr. Brascher.)

5                 MR. LAUX:  And -- and by the way, if I'm off and

6            you know -- if I'm off and you know where it is, you

7            know, I would, hopefully --

8                 MR. BRASCHER:  I don't have the specific number

9            off the top of my head, but, Mr. Laux, if we -- if

10           you want, during a break or something, I can

11           certainly figure out --

12                MR. LAUX:  Okay.

13                MR. BRASCHER:  -- what the correct number is.

14                MR. LAUX:  Okay.  That'd be great.  Let's -- we

15           can do it that way.

16  Q    (By Mr. Laux)  Okay.  Other than uses -- other than

17  use-of-force reports, Lieutenant, is there anything else that

18  you may have authored or drafted about the George Floyd

19  protest?

20  A    Not that I recall.

21  Q    Okay.  Approximately -- again, I know you're not going to

22  remember exactly, but approximately, when you say many, how

23  many use-of-force reports do you estimate?

24  A    I -- I do not know.

25  Q    I mean, could it be more than 50?

ZOOM VIDEOCONFERENCE

20

```
 1  A     I'm -- I'm not going to venture a guess on the number.

 2  Q     Okay.  Would --

 3  A     I --

 4  Q     -- it be more than -- would it -- I mean, would it be more

 5  than five?

 6  A     Yes, sir.

 7  Q     Okay.  And what were some of the types of force that you

 8  can recall was used that triggered your duty to submit a

 9  use-of-force report?

10  A     We have to do a use-of-force report for any type of

11  deployment of gas, PepperBall uses, types of that.  So if we

12  deploy one canister of gas, that's a use of force.  So we --

13  every time we throw a gas, that's a use of force.  So every --

14  we have to do a use of force for each canister of gas, so

15  that's why there's -- I don't know how many I had to do.

16  Q     I understand.  Thank you.

17        And so if someone deploys a canister of tear gas and it

18  misfires and goes sideways and goes to an unoccupied area under

19  a bush, no one is affected by it, nobody is affected by it at

20  all, you still have to document that use of force; is that

21  true?

22              MR. BRASCHER:  Object to form.

23              Go ahead and answer.

24  A     Yes, sir.

25  Q     (By Mr. Laux)  Okay.  So would it be fair to say that if
```

WAID REPORTING

21

1    one were to determine how many tear gas canisters, beanbag

2    projectiles, less-than-lethal discharges, if one were able to

3    tabulate how many of those occurred, there should be at least

4    that many use-of-force reports?

5                   MR. BRASCHER:  Object to form.

6                   Go ahead and answer.

7    A    Yes, sir.

8    Q    (By Mr. Laux)  It doesn't mean that there aren't a few

9    related to an arrest, but it means there would be at least that

10   many; correct?

11                  MR. BRASCHER:  Object to form.

12                  Go ahead and answer.

13   A    Yes, sir.

14   Q    (By Mr. Laux)  Do you recall drafting or signing off on

15   any use-of-force reports related to the George Floyd protests

16   that involved the physical arrest of a individual?

17                  MR. BRASCHER:  Object to form.

18                  Go ahead and answer.

19   A    I -- I don't recall.

20   Q    (By Mr. Laux)  Okay.

21   A    I can't recall right now.

22   Q    Did you have a title of any type related to the

23   George Floyd protests?  And what I mean by that is field

24   commander, incidents -- you know, did you have any type of

25   title that was related to your role, not simply as a

ZOOM VIDEOCONFERENCE

22

1   lieutenant, but as a lieutenant who's handling these protests?

2   A    Yes, sir.

3   Q    And what was that title, sir?

4   A    Commander of the Emergency Response Team.

5   Q    Did you say manager or commander?

6   A    Commander.

7   Q    Commander.  Can you please tell me what your duties --

8   your role -- what your responsibilities are in that role for

9   situations like the protests.

10  A    Overall management of the members of the Emergency

11  Response Team.  That -- that includes making sure that they're

12  all there; making sure they're all fed; making sure they have

13  water; making sure, if they have injuries, that they're --

14  they're seen to; making sure --

15  Q    I --

16  A    -- they have --

17  Q    -- I hate to interrupt you, but when you said "making sure

18  they're fed" -- I'm sorry to interrupt you, but when you say

19  "making sure they're fed," for instance, who's the "they" that

20  you're referring to?

21  A    The ERT members.

22  Q    Okay.  Okay.

23  A    That's --

24  Q    Please --

25  A    -- that's who I'm responsible for, the members of the

ZOOM VIDEOCONFERENCE

23

1  Emergency Response Team.

2  Q     Understood.

3  A     State police.

4  Q     Are you responsible for any of the tactical decisions that

5  take place?

6  A     Yes.

7  Q     What would be --

8  A     With a caveat --

9  Q     -- examples of --

10  A     -- with a caveat -- with a caveat to that, sir.

11  Q     Well, tell me that caveat, if you could.

12  A     Okay.  Lt. Joe is the platoon leader --

13                  MR. BRASCHER:  Go ahead.

14  A     -- Lt. Joe is the platoon leader, which is the --

15  basically the field commander.  So he -- he's -- he's allowed

16  to make decisions in the field.  Like if he's getting stuff

17  thrown at him, he's allowed to make decisions, tactical

18  decisions, right then and there, rules-of-engagement decisions.

19  That make sense?

20  Q     (By Mr. Laux)  I think so.  When I say "tactical," I mean

21  relating to the entirety of the -- the team, where -- from

22  where to approach, the pace at which you have people vacate.

23  Sometimes you have to think on your feet and change -- change

24  based on the dynamic of the situation.  Who would be the person

25  responsible for those more global-type of tactical decisions?

ZOOM VIDEOCONFERENCE

24

1   A    That's usually done by the platoon leader, because he's

2   the one that has the overall picture of what's going on at the

3   scene, what the crowd's doing, where he needs to move his

4   people, stuff like that.

5   Q    In June of 2020, was John S. Joe subordinate to you?

6   A    Correct, yes.

7   Q    Certainly, if -- on the scene, if you and he had a

8   disagreement about a tactical decision, your input would

9   outweigh his; correct?

10              MR. BRASCHER:  Object to form.

11              Go ahead and answer.

12  A    Yes.

13  Q    (By Mr. Laux)  Let me -- let me re-ask it.  If you

14  understood it -- I -- I guess you said yes.  But I'm just

15  saying, basically, you had authority to affirm or to overrule

16  any decision that he made in the field?

17              MR. BRASCHER:  Object to --

18  A    Correct.

19              MR. BRASCHER:  -- object to form.

20              Go ahead and answer, yes.

21  A    I -- I stand by every decision he made with this.

22  Q    (By Mr. Laux)  I understand that.

23  A    Yeah.

24  Q    But what I'm saying is, is that if you didn't, you had the

25  authority to prevent him from doing that.

ZOOM VIDEOCONFERENCE

25

1  A    Yes, sir.  That's correct.

2  Q    Okay.  Did you have a chain of command on -- in June of

3  2020?

4  A    Yes, sir.

5  Q    Could you take me through that chain of command as far

6  below you as you can go and up to the top.

7  A    Okay.  You want me to start with the top?

8  Q    Whatever is best for you, sir.

9  A    Col. Bryant was the director of state police; and then I

10 had a division commander, which was Maj. Aaron; and then

11 myself; and then --

12 Q    And then --

13 A    -- and then it went --

14 Q    -- did you have a group of sergeants beneath you?

15 A    -- then I -- then I had Scott Joe, Lt. Joe.  He was a

16 platoon leader; and then we had Sgt. Stewart, and he was an

17 assistant platoon leader; and then we had four squad leaders --

18 which -- I think squad leaders -- back then.  It was Sgt. --

19 Q    If the -- if the ERT after-action report, which is marked

20 as Exhibit 7, relates to five squads, would that be accurate?

21 A    It could have been broken down to five squads.  It just --

22 Q    Okay.

23 A    -- depends on --

24 Q    Okay.

25 A    -- how he broke -- so Lt. Joe broke them down that day.

ZOOM VIDEOCONFERENCE

26

1  It could've been a grenadier squad, which is the ones carrying

2  the less-lethal.

3  Q    You made reference to Scott Joe.  Is that John S. Joe?

4  A    Correct.

5  Q    He sometimes goes by Scott?

6  A    That's his middle name.  Yes.  Yes, sir.

7  Q    Understood.  Okay.  So have you, in your career,

8  Lieutenant, had SWAT training?

9  A    Yes, sir.

10 Q    Did that SWAT training -- well, strike that.

11      Anything in your SWAT training that you learned or the

12 skill set that you have that is relevant -- is there anything

13 that is relevant to your roles -- to your responsibilities

14 during the George Floyd protests?

15             MR. BRASCHER:  Object to form.

16             Go ahead and answer.

17 A    I would say yes.

18 Q    (By Mr. Laux)  I mean, I know it gives you an awareness,

19 probably, that maybe a rank-and-file officer doesn't have.  But

20 is there any type of -- like, for instance, you didn't have to

21 breach any -- any buildings or dwellings; right?

22             MR. BRASCHER:  Object to form.

23             Go ahead.

24 A    I did not, no.

25 Q    (By Mr. Laux)  So my -- that's just an example.  Is there

ZOOM VIDEOCONFERENCE

27

1  anything like that, any of the specialized skill sets of SWAT

2  -- other than an awareness of, you know, things -- that is

3  pertinent to your role during the George Floyd protests?  I

4  just ask so that we can sweep that out of the way if we -- if

5  we can.

6                    MR. BRASCHER:  Object to form.

7                    Go ahead and answer.

8  A    I would -- I guess not, no.  No, sir.

9  Q    (By Mr. Laux)  And again, with the understanding that, you

10 know, you're a seasoned, complete officer and, you know, to the

11 extent that you -- you know, you have that process in your

12 mind, I understand.

13      Okay.  So we're going to move on to questions about SWAT

14 involvement, and I'm going to move away from that.

15      Based on the interrogatories from one of the defendants --

16 I think, Col. Bryant -- it indicated that you attended Field

17 Force training in Alabama.  Is that accurate?

18 A    Yes, sir.

19 Q    What is Field Force training?

20 A    It's basically riot-control training put on by -- by FEMA,

21 federal -- the federal government.

22 Q    So crowd control is definitely an aspect of the training

23 that you received?

24 A    Yes, sir.

25 Q    Did you earn any type of a certificate or credits or a

ZOOM VIDEOCONFERENCE

28

1   degree or anything like that from this training?

2   A    A -- a completion certificate, yes, sir.

3   Q    Do you recall when you completed the -- the training?

4   A    I believe it was 2015.

5   Q    Okay.

6   A    I don't know what month.

7   Q    Did you receive any manuals or instructions or literature

8   during the training?

9   A    We had a class manual.

10  Q    Do you still -- did you keep that manual and -- and use it

11  for future reference?

12  A    I'm sure I kept it.  I don't know if I referred to it.

13  Q    Would the instructions in the training for crowd control

14  be pertinent to the role that you occupied during the George

15  Floyd protests at all?

16  A    Yes, sir.

17  Q    What is the Emergency Response Team, ERT?

18  A    That is a team that was formed for -- to respond to civil

19  servants; natural disasters, such as tornadoes, floods, stuff

20  like that; manhunts.  We also assist federal agencies with

21  large search warrants, stuff like that.

22  Q    What are some of the skills or the training that is

23  required that is above and beyond a state trooper?

24  A    They each go through the -- the Mobile Field Force

25  training as prescribed through the -- the Alabama course.  We -

29

1   - we -- we follow that course guidelines, whether we send them

2   through the same course or we teach it to them ourselves.

3   Also, we -- we also do some search-and-rescue training.  And we

4   also do less-lethal training.  If they're a grenadier -- if

5   they're selected as a grenadier, they go through a less-lethal

6   course by a certified less-lethal instructor.

7   Q    Did you receive training in less-than-lethal force by a

8   certified instructor?

9   A    I have.  Yes, I have.

10  Q    Probably a while ago, but when was that; do you recall?

11  A    Oh, I was on a SWAT team then.  It's been -- maybe 2010.

12  It's been a while.

13  Q    Okay.  Now, state troopers can learn about their duties

14  that they have in a variety of ways, for instance, general

15  orders or policies; correct?

16                MR. BRASCHER:  Object to form.

17                Go ahead and answer.

18  A    Yes, sir.

19  Q    (By Mr. Laux)  And another source for police protocol

20  might be model policies that are issued by certain law

21  enforcement agencies.  Would you agree with that?

22                MR. BRASCHER:  Object to form.

23                Go ahead and answer.

24  A    Yes.  There -- there are some model policies that -- I'm

25  sure that other agencies use.

ZOOM VIDEOCONFERENCE

30

1  Q    (By Mr. Laux)  And -- and that the Arkansas State Police

2  would use or encourage.  Would you agree with that?

3              MR. BRASCHER:  Object to form.

4              Go ahead and answer.

5  A    I guess I don't understand -- are you -- are you referring

6  to a specific policy that we model?  I guess --

7  Q    (By Mr. Laux)  Well, you --

8  A    -- I don't understand the question.

9  Q    -- you understand that the use of force by a police

10 officer is -- is measured under the objective reasonableness

11 standard articulated in *Graham v. Connor*.  You're aware of

12 that; correct?

13 A    Yes, sir.

14 Q    Yeah.  And so there are certain policies and protocols

15 that exist in law enforcement which reflect that objective

16 reasonableness standard.  Do you agree with that?

17              MR. BRASCHER:  Object --

18 A    Yes.

19              MR. BRASCHER:  -- object to form.

20              Go ahead.

21 A    Yes, sir.

22 Q    (By Mr. Laux)  And -- and that can be found sometimes in a

23 department's general orders; yes?

24              MR. BRASCHER:  Object to form.

25              Go ahead.

ZOOM VIDEOCONFERENCE

31

```
 1  A    Yes, sir.
 2  Q    (By Mr. Laux)  Or in their policies such as a use of force
 3  policy?
 4              MR. BRASCHER:  Object to form.
 5              Go ahead.
 6  A    Yes, sir.
 7  Q    (By Mr. Laux)  And another source could be, for instance,
 8  model policies that are issued by recognized agencies, such as
 9  the International Association of Chiefs of Police.  Do you
10  agree with that?
11              MR. BRASCHER:  Object to form.
12              Go ahead.
13  A    Yes, sir.
14  Q    (By Mr. Laux)  Are you familiar with the IACP?
15  A    Yes, sir.
16  Q    It reports to be "the world's largest and most influential
17  professional association for police leaders," and it "is
18  committed to advancing the safety of communities worldwide."
19      Do you -- that's from their website.  Do you dispute that
20  the IACP is the largest and most influential professional
21  association for police members?
22              MR. BRASCHER:  Object to form.
23              Go ahead.
24  A    I don't dispute that.  That -- that's very well known.
25  Q    (By Mr. Laux)  And so the IACP has what it -- what it
```

ZOOM VIDEOCONFERENCE

32

1  calls a "policy center."  And through the policy center, it

2  provides officers with professional resources.  Are you aware

3  of that?

4  A   Yes, sir, I am.

5  Q   One of the resources that the IACP provides is model

6  policies governing police conduct.  Do you agree with that?

7           MR. BRASCHER:  Object to form.

8           Go ahead.

9  A   I'm -- I assume they do.  I -- I've never --

10  Q   (By Mr. Laux)  When I use the phrase "model policy," I'm

11  basing it on the IACP definition.  And it says that (as read):

12  "Model policies provide officers with concrete guidance and

13  directives by describing the manner in which the actions,

14  tasks, and operations are to be performed."

15     Is that your understanding of a model policy, the goal of

16  a model policy?

17           MR. BRASCHER:  Object to form.

18           Go ahead.

19  A   Yes, sir.

20  Q   (By Mr. Laux)  Okay.  Are you -- have you ever been a

21  member of the IACP?

22  A   No, sir, I have not.

23  Q   Are you a member of any type of fraternal order of police

24  or a law enforcement union?

25  A   No, sir.

ZOOM VIDEOCONFERENCE

33

1  Q    Okay.  I'm going to say a few sentences here and make a

2  statement or two, and I'm going to ask you if you agree or

3  disagree with some of the things I'm saying.

4      You agree with me that, generally speaking, individuals

5  have a right to peaceably protest in this country; right?

6  A    Yes, sir.

7  Q    Now, do you agree with me that protesting police

8  misconduct -- well, strike that.

9      You -- I'm not asking you to weigh in on the George Floyd

10  controversy.  But you agree with me that the George Floyd

11  protests reflected protests regarding perceived police

12  brutality and excessive force.  Do you agree with that?

13                  MR. BRASCHER:  Object to form.

14                  Go ahead.

15  A    Yes, sir.

16  Q    (By Mr. Laux)  And in that way, the George Floyd protests

17  were a bit different than other protests, for instance,

18  protests over nuclear energy or saving the whales.  Do you

19  agree with that?

20                  MR. BRASCHER:  Object to form.

21                  Go ahead.

22  A    Yes, sir, they were.

23  Q    (By Mr. Laux)  And I think the chief difference is, is

24  that police officers, like yourself, they have to be present at

25  protests to make sure that things stay peaceable; correct?

ZOOM VIDEOCONFERENCE

34

1          MR. BRASCHER:  Object to form.

2          Go ahead.

3   A    Yes, sir.

4   Q    (By Mr. Laux)  But at a George Floyd protest, unlike,

5   again, a Save The Whales protest, the officers are actually the

6   subject matter of the protest.  Do you agree?

7          MR. BRASCHER:  Object to form.

8          Go ahead.

9   A    Yes, sir.

10  Q    (By Mr. Laux)  So to the extent that First Amendment

11  beliefs are articulated at protests, the First Amendment belief

12  articulated at the George Floyd protests, was a First Amendment

13  concern about the very officers who were in charge of

14  maintaining peace and order.  Agreed?

15         MR. BRASCHER:  Object to form.

16         Go ahead.

17  A    Yes, sir.

18  Q    (By Mr. Laux)  Now, I'm just asking you a legitimate --

19  you know, just a question.  I don't doubt your professionalism.

20  Is it -- was it -- is it more -- well, strike that.

21      Have you ever been present in the police capacity at a

22  protests or a riot prior to the George Floyd protest?

23  A    No, sir.

24  Q    Okay.  Considering that the First Amendment, again

25  generally speaking, thoughts articulated were about excessive

35

1  force, were you any more judicious about your use of force or

2  authorizing force than you would have been at a

3  non-police-brutality-type protest.

4               MR. BRASCHER:  Object to form.

5               Go ahead.

6               MR. LAUX:  You know, I'll withdraw that

7          question.  That was a bad question.

8  Q    (By Mr. Laux)  You're familiar with the term "impact

9  projectiles"; correct?

10 A    Yes, sir.

11 Q    And can you just give me a -- just a basic definition of

12 what those are?

13 A    It's a less-lethal projectile that's fired from a

14 platform, whether it's a 12-gauge shotgun or a 40-millimeter,

15 and it's -- it's either going to be direct or indirect to cause

16 pain compliance to an individual.

17 Q    When you say "fired from a platform," what did you mean by

18 that?

19 A    A platform which -- which is like a 12-gauge or a --

20 Q    Okay.

21 A    -- 40-millimeter.

22 Q    You don't mean a platform like a raised platform --

23 A    No.  It's a --

24 Q    -- that one would --

25 A    -- it's a weapons platform where it --

ZOOM VIDEOCONFERENCE

36

1   Q    I understand.  Impact projectiles are kinetic, meaning

2   that they represent a transfer of energy.  Do you agree with

3   that?

4                MR. BRASCHER:  Object -- object to form.

5                Go ahead.

6   A    Yes, sir.

7   Q    (By Mr. Laux)  Okay.  And beanbag projectiles are impact

8   projectiles; correct?

9                MR. BRASCHER:  Object to form.

10                Go ahead.

11   A    Yes, sir.

12   Q    (By Mr. Laux)  I'm not saying they're synonymous, but they

13   fall under that umbrella.

14   A    Yes, sir.

15   Q    Okay.  The Arkansas State Police used beanbag projectiles

16   or beanbag shotguns in June of 2020.  Am I correct?

17                MR. BRASCHER:  Object to form.

18                Go ahead.

19   A    Yes, sir.

20   Q    (By Mr. Laux)  Have you ever seen a copy of the

21   plaintiff's complaint in this case?

22   A    No, sir.

23   Q    Okay.  I'm going to bring it up on the screen very briefly

24   just because I want to show you an illustration and ask you

25   about it.  Okay?

ZOOM VIDEOCONFERENCE

                                                                    37

1   A     Okay.

2                 MR. LAUX:  One second.  I was doing so good.

3                 MR. BRASCHER:  This might be a good opportunity

4         just to take -- I have to use the restroom -- if we

5         want to just take a brief break.

6                 MR. LAUX:  Could we -- can I just get this one

7         out?  If -- if -- I'm pretty sure I can get it up

8         right now.  I -- it'll be literally 30 seconds.  And

9         if I don't, then by all means.

10                Okay.  All right, just a real quick question.

11                And I'm sorry -- I'm sorry, Mr. Brascher.

12  Q     (By Mr. Laux)  So on plaintiff's complaint on page 12 at

13  Paragraph 48, there is an Image Number 13.  And this image

14  doesn't purport to be any gun used by the ASP, but it is a --

15  but it is a tactical 12-gauge beanbag shotgun.

16      Can you see that image on the screen, sir?

17  A     Yes, I can.

18  Q     Does that generally resemble the type of beanbag shotgun

19  that was used by ASP on -- during the George Floyd protests?

20                MR. BRASCHER:  Object to form.

21                Go ahead.

22  A     Well, there's a lot of differences in the -- the shotguns

23  that were used.

24  Q     (By Mr. Laux)  I understand.  If -- does it generally

25  resemble it?  I'm not asking you to say it's the same.

ZOOM VIDEOCONFERENCE

38

1        MR. BRASCHER:  Object to form.

2        Go ahead.

3  A    Generally, yes, I guess.  It's a 12-gauge shotgun

4  converted with orange stocks, but doesn't have a --

5  Q    (By Mr. Laux)  Okay.

6  A    -- doesn't have a pistol grip.  Ours doesn't have pistol

7  grips.

8  Q    Okay.

9        MR. LAUX:  And, Mr. Brascher, I'm so sorry to be

10        -- hopefully not -- rude, but by all means, we can

11        take that break.

12        MR. BRASCHER:  Thank you very much.

13        (Whereupon, a recess was taken, after which the

14        proceedings continued as follows, to-wit:)

15  BY MR. LAUX:

16  Q    Lt. Brown, do you by -- was there a particular model --

17  make or model of the 12-gauge shotguns that were used by the

18  Arkansas State Police in June of 2020?

19  A    Yes, sir.

20  Q    Can you tell me, to the best of your understanding or

21  recollection, what those -- what that was, the specs?

22  A    It's a Remington -- Remington 11-87 --

23  Q    If you -- and if you need to consult anything at all,

24  please feel free.

25        (Sotto voce discussion between witness and

ZOOM VIDEOCONFERENCE

39

1          Mr. Brascher.)

2   A     11-87.  I believe so.  Remington 11-87.

3   Q     (By Mr. Laux)  You're saying 11 --

4   A     -- 11-87 --

5   Q     11-87 --

6   A     -- 12-gauge.  12-gauge.

7   Q     Okay.  So hypothetically -- you know, assuming that

8   there's something out there online -- if one were to Google

9   Remington 11-87 12-gauge, you would expect them to find

10  examples of the type of gun used at the time?

11               MR. BRASCHER:  Object to form.

12               Go ahead.

13  A     Yes, sir.

14  Q     (By Mr. Laux)  Okay.  Now, with devices or weapons like

15  that, when you purchase them, they come with -- with specs, or

16  with the dos and don'ts, of the device; correct?

17               MR. BRASCHER:  Object to form.

18               Go ahead.

19  A     I have no idea.

20  Q     (By Mr. Laux)  Have you ever looked at the specifications

21  for the Remington 11-87 12-gauge beanbag shotgun?

22  A     I have not.

23  Q     Have you ever used one in the field?

24  A     Define "the field," I guess.

25  Q     Have you ever used one in the course of your professional

40

1  responsibilities?

2  A    Just at the range.  I never used one in the line of duty.

3  I have not.

4  Q    Okay.  You've never --

5  A    In training --

6  Q    -- and that's --

7  A    --at the range.

8  Q    -- I guess that's what I meant by in the field, in the

9  line of duty.  Have you ever had the -- you know, have you ever

10  had the unfortunate, or however you want to term it,

11  opportunity to use it in your line of duty as an officer?

12  A    I have not.

13  Q    Okay.  But you've used it at the range; is that correct?

14  A    Correct.

15  Q    On how many times -- on how many occasions would you say

16  you've practiced the 12-gauge beanbag shotgun at the range?

17  A    I couldn't tell you, because I used -- I used to be an

18  instructor, so I used to have to shoot it a lot.

19  Q    You were an instructor on the 12-gauge beanbag shotgun?

20  A    Less -- I was a less-lethal instructor, so that was one of

21  the platforms that I instructed on, so we had to shoot it a

22  lot.  So I can't tell you how many times I've shot one.  I

23  don't know.

24  Q    Have you trained troopers on how to use one of those

25  devices?

ZOOM VIDEOCONFERENCE

41

1  A    Yes.

2  Q    Have you trained Wingo, Sheeler, or Joe?

3  A    I have not.

4  Q    I don't -- is it a fair statement to say that you've

5  trained officers or troopers on the device, but you have never

6  read the specifications of the device?

7                  MR. BRASCHER:  Object to form.

8                  Go ahead.

9  A    Correct.  They don't -- to -- to answer your question more

10 specifically, they don't come with an instruction sheet.

11 Q    (By Mr. Laux)  It's your testimony that when these devices

12 are purchased from the manufacturer, there's no literature that

13 comes with it?

14                 MR. BRASCHER:  Object to form.

15                 Go ahead.

16 A    I'm sure there's like a -- I'm sure there is, but you

17 don't -- it's not something you read -- it's not a -- I'm sure

18 there is, but it's not something you're going to read on how to

19 operate this piece of equipment because you're trained on how

20 to use it in recruit school, so you're very familiar with it.

21 And it's -- it's a simple piece of equipment to operate as

22 well.

23 Q    (By Mr. Laux)  There might be slight or subtle differences

24 between various makes and models; correct?

25                 MR. BRASCHER:  Object to form.

ZOOM VIDEOCONFERENCE

42

1          Go ahead.

2   A    No, sir, there is not.

3   Q    (By Mr. Laux)  Not a one?

4   A    We all use -- we use the same model, Remington 11-87.

5   Q    I understand that, but what I'm saying is -- is that --

6   well, let's put it this way.  Are you saying that there are --

7   that when you guys purchased these shotguns new, are you saying

8   that there was no literature in there that, for simplicity's

9   sake, has a list of dos and don'ts about operating it?

10  A    When --

11          MR. BRASCHER:  Object to form.

12          Go ahead.

13  A    When you're issued the -- the shotgun or the less-lethal

14  shotgun, you're just issued the shotgun.  You don't -- you're

15  not issued anything else.  Whether it's in --

16  Q    (By Mr. Laux)  You --

17  A     -- recruit school or in the less-lethal, that's all

18  you're issued is a shotgun.  You're not issued --

19  Q    You don't just --

20  A     -- anything else.

21  Q    I'm sorry.  I didn't mean to speak over you.

22  A    That's all you're issued is the -- the weapon.  That's it.

23  Q    Well, issued, I think, is different than purchasing.  I'm

24  just -- I'm just saying here, you don't dispute that when a

25  12-gauge -- when a Remington 11-87 12-gauge beanbag shotgun is

ZOOM VIDEOCONFERENCE

43

1  purchased, you don't dispute that it comes with information on

2  how to operate it, do you?

3                    MR. BRASCHER:  Object to form.

4                    Go ahead.

5  A    Can I -- can I change the model on that?  I apologize.

6  It's an 870 shotgun.  I -- I apologize.  11-87 is an automatic.

7  It's an 870 shotgun.  I apologize on that.

8                    (Simultaneous speaking.)

9  Q    Not a problem at all.

10  A    Okay.

11  Q    But --

12  A    11-87 is the automatic --

13  Q    870?

14  A    Correct.

15  Q    11-870?

16  A    No, it's a 870.  The 11-87 is an automatic version.  I

17  apologize.

18  Q    Okay.

19                    MR. BRASCHER:  It's okay.

20  Q    (By Mr. Laux)  870.

21      So now that we've got that figured out, you agree with me

22  that that device probably came with operating -- with an

23  operating manual?

24                    MR. BRASCHER:  Object to form.

25                    Go ahead.

ZOOM VIDEOCONFERENCE

44

1  A    It could have.  I don't -- I'm -- I'm not involved in the

2  purchasing or picking it up from the supply room.  That's --

3  that would be the armor version -- the armor people.  I'm not

4  involved in that part of it, so.

5  Q    (By Mr. Laux)  My -- my question is just kind of

6  straightforward.  Do you agree that it comes with an operating

7  manual, do you disagree with that, or are you saying you don't

8  know?

9  A    I don't know.  I --

10  Q    Okay.  Okay.

11  A    -- I never -- I never take one out of a box, so.

12  Q    You've never seen one, for instance, correct?

13            MR. BRASCHER:  Object to form.

14            Go ahead.

15  A    I didn't understand -- I -- I didn't hear the question.

16  Q    (By Mr. Laux)  Well, you testified that you're unaware of

17  whether any type of information or operator's manual

18  accompanies these shotguns when they're purchased.  And so

19  because you don't know if that exists or if those exist, I

20  thought I could presume that you certainly have never seen an

21  -- an operating manual related to that weapon.  Is that --

22  A    Correct.  I've --

23  Q    -- a fair statement?

24            MR. BRASCHER:  Object to.  Form.

25            Go ahead.

ZOOM VIDEOCONFERENCE

45

1   A      -- I've -- yeah, I've never seen one.

2   Q      (By Mr. Laux)   I'm sorry.

3   A      Oh, I've never --

4   Q      I didn't --

5   A      -- seen one.   I've never seen one.

6   Q      Okay.   Thank you.

7   A      I don't recall seeing one.

8   Q      Understood.   Now, when I look at the Emergency Response

9   Team policy, which was tendered in discovery, and that's at

10  ASP 710 -- I'm just going to read a bit from it.   It begins by

11  articulating the policy, and it says -- and again, you know, I

12  can't wait for you to get it, but hopefully I can read this.

13  It says (as read):   "The Arkansas State Police Emergency

14  Response Team, ERT, will strive to effectively manage crowds

15  during protests, demonstrations, civil disturbances, and

16  riots," and then it continues on.

17        So it sounds like that the Arkansas State Police

18  recognizes the difference between, say, a protest and a civil

19  disturbance; correct?

20                  MR. BRASCHER:   Object to form.

21                  Go ahead.

22  A      Yes, sir.

23  Q      (By Mr. Laux)   Not every protest is a civil disturbance.

24  Do you agree with that?

25                  MR. BRASCHER:   Object to form.

ZOOM VIDEOCONFERENCE

46

1          Go ahead.

2   A    That is correct.

3   Q    (By Mr. Laux)  Okay.  Is it your opinion that on June the

4   1st, 2020 -- well, let me ask you:  How would you characterize

5   the George Floyd protests on June 1, 2020?  Would you call that

6   a protest, a demonstration, a civil disturbance, a riot, or

7   some other term?

8               MR. BRASCHER:  Object to form.

9               Go ahead.

10  A    I believe all of those.

11  Q    (By Mr. Laux)  You believe that at some point on June 1,

12  2020, there was a riot; is that right?

13              MR. BRASCHER:  Object to form.

14              Go ahead.

15  A    More -- I'd say more -- it started out a -- I don't know

16  if it was a protest or not because I didn't -- I didn't really

17  visualize a protest when I was there; but it did become a -- a

18  civil unrest.  And that's why I believe Scott Joe -- or Lt. Joe

19  made the decision that he did, but I --

20  Q    (By Mr. Laux)  Well, only he --

21  A    -- but I'm assuming --

22  Q    -- only he knows why.

23  A    That -- that is correct.  I can't speak for him.

24  Q    I'm -- I'm sorry to interrupt you.

25       Only he knows his -- his --

47

1  A    Yeah, you're right.

2  Q    -- intentions; right?

3  A    Correct.

4  Q    Okay.  So at what time did you arrive at the Capitol

5  grounds on June 1, approximately?

6  A    I don't -- I don't know.

7  Q    Was it daylight?

8  A    I -- I don't recall.  The nights kind of -- the days kind

9  of morphed together, so I -- I don't -- I don't recall.

10  Q    Do you recall at what approximate time you left the

11  Capitol grounds on June the 1st, even if it got into the early

12  morning hours of June the 2nd?

13  A    I left at the same time everybody else did.  I don't know

14  what time that was.  I'd have to refer to the -- my --

15  Q    When you --

16  A    -- after-action --

17  Q    -- when you say "everybody else," who are -- are you

18  referring to troopers or --

19  A    I'm saying the whole --

20  Q    -- protestors --

21  A    -- the team -- the team.  We all left at the same time,

22  our ERT team.

23  Q    How many members of the ERT team are you referring to

24  leaving at the same time?

25  A    It's kind of hard to say because we were -- we had other

ZOOM VIDEOCONFERENCE

48

1   departments and also the National Guard there as well, so I

2   don't -- I can't -- it's -- I can't really tell -- tell you how

3   many personnel we had there at that time.

4   Q    You don't remember exactly when you got there, and you

5   don't remember exactly when you left; is that true?

6   A    I would have to look at the -- my form to tell you exactly

7   what time I left.

8   Q    On the -- on the -- on June 1st?

9   A    Correct.

10  Q    Please do.

11                THE WITNESS:  Okay.

12                MR. BRASCHER:  Oh, yeah, go ahead.

13                THE WITNESS:  Sorry.

14                MR. BRASCHER:  No, you're good.

15                (Sotto voce discussion between witness and

16           Mr. Brascher.)

17  A    I don't know.  I can't -- I can't tell you.  It was --

18  Q    (By Mr. Laux)  So again --

19  A    -- it was usually in the early morning hours after -- it's

20  usually -- it was usually after midnight when we got back to

21  the command center, so I can't . . .

22  Q    So again, you don't remember exactly when you got there,

23  and you don't remember exactly when you left, in particular to

24  June 1?

25  A    I don't know.  No.

49

1   Q    Okay.

2   A    No, sir.

3   Q    So you believe that this -- you said you didn't see a

4   protest.  What did you mean by that, your testimony?

5   A    I -- I would assume they were there to protest, a peaceful

6   protest, but I didn't see that because I wasn't there.  So I --

7   I didn't see that.  That's what --

8   Q    I thought --

9   A    -- I meant.

10  Q    -- I -- I thought you said that you were there on the

11  Capitol grounds.

12  A    I was, but not --

13  Q    Is it your -- is it your testimony that while you were

14  there, you never saw a peaceable protest?

15  A    That's correct.

16              MR. BRASCHER:  Object to form.

17              Go ahead.

18              THE WITNESS:  I'm sorry.

19  A    Yes, sir, that's correct.

20  Q    (By Mr. Laux)  So -- so what would you characterize that

21  gathering at the time that you arrived?

22  A    It was a civil unrest when I was there -- when I arrived.

23  Q    Is that the -- is that the same as the phrase "civil

24  disturbance" that's used in the Emergency Response Team policy?

25  A    Yes, sir.

ZOOM VIDEOCONFERENCE

50

1  Q    Okay.  Describe for me, if you would, what characteristics
2  led you to categorize what you saw as civil disturbance?
3  A    That's individuals not listening to lawful commands,
4  throwing objects at the police, stuff like that.
5  Q    When you say "not listening to lawful commands," what type
6  of commands are you referring to?
7  A    "Disperse."  "Leave the area."
8  Q    Now, failing to leave the area timely might constitute an
9  infraction of some kind, but you agree with me that that's not
10  violence; correct?
11                MR. BRASCHER:  Object to form.
12                Go ahead.
13  A    Correct.  Throwing stuff is, though.
14  Q    (By Mr. Laux)  A -- a protester vacating the area but not
15  quick enough for the officer's liking, that's not violence;
16  correct?
17                MR. BRASCHER:  Object to form.
18                Go ahead.
19  A    Just standing around, not leaving the area is not violent,
20  but throwing stuff and -- and approaching and aggressively
21  approaching the police is the violent part.
22  Q    (By Mr. Laux)  Aggressively approaching the police is
23  violence; is that your testimony?
24  A    Yes, sir.
25  Q    And -- and can you give me an example of what you mean by

ZOOM VIDEOCONFERENCE

51

1   that?  What are the circumstances?

2   A    You're being told to disperse the area, and you keep

3   approaching; you keep advancing towards the line --

4   Q    I'm -- I'm --

5   A    I'm sorry.

6                   MR. BRASCHER:  If he could be allowed --

7                   Go ahead and finish your answer.

8   A    -- and you keep --

9   Q    (By Mr. Laux)  That was me.  I'm sorry.  That's -- please

10  go.

11  A    -- you keep -- you keep approaching or advancing towards

12  the line, whether it's walking or walking fast, at a fast pace,

13  or running, that's aggressive.

14  Q    Is it violence?

15  A    It shows an intent for violence.  So that's an assumption

16  of violence.

17  Q    Vacating the area slower -- well, strike that.

18       Even if a protester does not listen to commands to vacate,

19  and, in fact, turns around and begins to approach the police

20  line, even in that situation, any force used upon that person

21  has to be objectively reasonable; correct?

22                   MR. BRASCHER:  Object to form.

23                   Go ahead.

24  A    All force has to be reasonable.  That is correct.

25  Q    (By Mr. Laux)  Okay.  Do you agree with me that at

ZOOM VIDEOCONFERENCE

52

1   protests where certain individuals are behaving violently, law

2   enforcement officials such as yourself have a duty to

3   distinguish between those violent individuals and other

4   protesters?

5               MR. BRASCHER:  Object to form.

6               Go ahead.

7   A    I'm sorry.  Could you repeat that one more time?  I

8   apologize.

9   Q    (By Mr. Laux)  Do you -- sure.  Do you agree that during

10  protests, like the George protest -- George Floyd protests,

11  that state troopers like yourself and the defendants in this

12  case, you guys have a duty -- to the extent that there's

13  violent people there, you've got to distinguish between who is

14  violent and who is just peacefully protesting; correct?

15              MR. BRASCHER:  Object to form.

16              Go ahead.

17  A    Of course.  Yes.

18  Q    (By Mr. Laux)  Now, do you agree that less-than-lethal

19  weapons, such as beanbag projectiles -- do you think it's

20  within the standard of care for police officers or within the

21  -- you know, the police -- proper police protocol to use

22  beanbag projectiles to disperse crowds?

23              MR. BRASCHER:  Object to form.

24              Go ahead.

25  A    No.

ZOOM VIDEOCONFERENCE

53

1  Q    (By Mr. Laux)  You can't fire a beanbag shotgun

2  indiscriminately to clear an area; correct?

3  A    That's --

4              MR. BRASCHER:  Object to form.

5              Go ahead.

6  A    -- that's correct.

7  Q    (By Mr. Laux)  Do you agree with me that in the protest --

8  well, strike that.

9      Do you agree with me that impact projectiles such as

10  beanbag shotguns should generally be used only in direct fire

11  with the aim -- in regard to the -- to the subject -- the

12  targeted subject?

13  A    Yes.

14              MR. BRASCHER:  Object to form.

15              Go ahead.

16  A    Yes.

17  Q    (By Mr. Laux)  And by that I mean, don't you agree with me

18  that -- well, strike that.

19      The upper body or the face or the head should never be

20  aimed for when using a beanbag projectile; correct?

21              MR. BRASCHER:  Object to form.

22              Go ahead.

23  A    That is correct.

24  Q    (By Mr. Laux)  The goal is to strike the lower abdomen or

25  legs of a violent individual and only with a view to addressing

ZOOM VIDEOCONFERENCE

54

1  an imminent threat of injury to either law enforcement

2  officials or the public.  Fair?

3                MR. BRASCHER:  Object to form.

4                Go ahead.

5  A    Yeah, there are certain target areas you're -- you're

6  trying to hit with a -- with a direct impact, and it's not in

7  the head; correct.

8  Q    (By Mr. Laux)  I mean, there's always a risk any time you

9  use any type of a device, but the risk of -- of fatality is

10 increased significantly when impact projectiles are fired at

11 the upper body and head area.  Do you agree?

12               MR. BRASCHER:  Object to form.

13               Go ahead.

14 A    There is more likely -- yes, you are correct.

15 Q    (By Mr. Laux)  Now, beanbag projectiles should not be used

16 by an officer on a raised platform because it increases the

17 likelihood that the upper body or head will be struck when

18 compared with firing from the ground level.

19      Do you agree with that statement?

20               MR. BRASCHER:  Object to form.

21               Go ahead.

22 A    No, sir, I do not.

23 Q    (By Mr. Laux)  You don't believe that the incidence of

24 upper torso and head injuries with beanbag projectiles is

25 greater when they are fired from above the target than in

ZOOM VIDEOCONFERENCE

55

1  direct line with the target; is that right?

2              MR. BRASCHER:  Object to form.

3              Go ahead.

4  A    I -- yeah, I guess if you had the angle, yes, I guess it

5  could increase.

6  Q    (By Mr. Laux)  So you do agree with what I said before?

7  A    It could increase, yes.

8  Q    Right.  We can debate on whether the increased risk is

9  negligible or considerable, but you agree with me that it

10 presents an increased risk.  Do you?

11 A    Yeah --

12             MR. BRASCHER:  Object to form.

13             Go ahead.

14 A    -- that -- yeah, the -- at that angle, yes, it could.

15 Q    (By Mr. Laux)  Targeting the face or head may result in

16 skull fracture and brain injury or damage to the eyes,

17 including permanent blindness, or even death.

18     Do you agree with that statement?

19             MR. BRASCHER:  Object to form.

20             Go ahead.

21 A    It could.

22 Q    (By Mr. Laux)  Kinetic-impact projectiles should not be

23 targeted at the head, face, or neck no matter what.  Do you

24 agree?

25             MR. BRASCHER:  Object to form.

56

1          Go ahead.

2  A    Only in the event of deadly force that's authorized.

3  That's the only -- that's the only time.

4  Q    (By Mr. Laux)  You agree with me that if a trooper -- if

5  -- again, if a trooper intends -- no, only Ryan Wingo knows

6  what he intended -- but if a trooper intends to use a beanbag

7  projectile and aims it at a person's head or neck or upper

8  body, you agree with me that that constitutes a use of deadly

9  force; correct?

10          MR. BRASCHER:  Object to form.

11          Go ahead.

12  A    If that was his intent.

13  Q    (By Mr. Laux)  Yes, sir, if -- with that caveat; do you

14  agree?

15          MR. BRASCHER:  Object to form.

16  A    I don't -- I don't know.  I can't answer what his intent

17  was.

18  Q    (By Mr. Laux)  I -- I'm -- please, I hope I'm not

19  misunderstood.  I'm not asking you to -- to speculate as to

20  Wingo's intent.  That's what I meant by saying only Wingo knows

21  his intent.  What I'm asking you is along the lines of a

22  hypothetical, which I'm entitled to ask of witnesses.  And the

23  hypothetical is this:  If, if, if a trooper is aiming a beanbag

24  projectile at a protester's head, neck, or upper body, you

25  agree with me that that constitutes a use of deadly force.  Do

ZOOM VIDEOCONFERENCE

57

1  you agree, or do you disagree?

2                MR. BRASCHER:  Object to form.

3                Go ahead.

4  A    I -- I don't agree with the use of deadly force.  I agree

5  that it could lead to very serious injuries to the person, and

6  it would -- I don't want to lose my words -- I apologize -- if

7  you were aiming it at the head, one most likely would think

8  that there's going to be very serious injuries to the head.

9  Q    (By Mr. Laux)  So I'm just -- that was just a follow-up

10 question based on your testimony.  I thought I heard you say

11 that one should never, ever fire -- an officer should never

12 fire a beanbag at someone's head, neck, or upper body unless

13 the use of deadly force is justified.  Didn't you testify that

14 in so many words?

15                MR. BRASCHER:  Object to form.

16                Go ahead.

17 A    Yeah, I guess I may have said that.

18 Q    (By Mr. Laux)  Okay.  And so, therefore, what that --

19 because officers cannot use deadly force against -- strike

20 that.

21     Therefore, if an officer knowingly targets those areas,

22 that would constitute a use of deadly force.  Whether the

23 person dies or not is a different question, but the use would

24 be a use of deadly force in that officer's mind.  Do you agree?

25                MR. BRASCHER:  Object to form.

ZOOM VIDEOCONFERENCE

58

1          Go ahead.

2  A    I can't really answer that he was -- would be thinking

3  that, but he would objectively think that this guy's going to

4  get hurt real bad and possibly, you know . . .

5  Q    (By Mr. Laux)  Well, this isn't -- this isn't -- this

6  isn't objective.  This is a subjective hypothetical.  Again,

7  I'm going to ask it one more time just so I make sure that

8  we're clear.  I'm not asking you to read Ryan Wingo's mind.

9  I'm asking you to accept a condition of my hypothetical.  And

10 that condition is that the hypothetical officer that I'm

11 speaking of has an intent to hit a protester in the head, neck,

12 or upper body with a beanbag projectile.  You probably think a

13 trooper like that doesn't exist, but for the purpose of this

14 hypothetical, will you indulge me?

15 A    Okay.

16 Q    Okay.  Given that condition, if that officer engages in

17 that act with that intent, that would be a use of deadly force

18 by that officer.  Do you agree or do you disagree?

19              MR. BRASCHER:  Object to form.

20              Go ahead.

21 A    It -- I think technically it would be considered, yes.

22              (Technical difficulties.)

23              THE WITNESS:  I think he froze.  He froze on us.

24              MR. BRASCHER:  Yeah, he did.  I hope he comes

25         back.

ZOOM VIDEOCONFERENCE

59

1          THE WITNESS:  Come back to us.

2          MR. LAUX:  Unbelievably, you froze up on me.

3          THE WITNESS:  Come back to us.

4          MR. BRASCHER:  So he did answer --

5          MR. LAUX:  That was like, the suspense is --

6          (Simultaneous speaking.)

7          MR. LAUX:  -- the suspense is killing me.  I

8     didn't hear the answer.

9          THE WITNESS:  I said -- I said, yes, that is

10     correct.

11  Q    (By Mr. Laux)  Okay.  And -- and again, such an officer,

12  then, would need to justify that use of force based on the

13  standard in *Graham*; correct?

14  A    Yes, sir.

15  Q    And that would mean that that officer would have to have

16  an objectively reasonable basis to believe that death or

17  serious bodily harm was imminent.  Do you agree?

18          MR. BRASCHER:  Object to form.

19  A    Yes, sir.

20  Q    (By Mr. Laux)  Okay.  Do you -- without -- you know,

21  perhaps you know the policy, chapter and verse; perhaps you

22  don't.  But as you sit here today, do you believe that all of

23  your actions during the George -- well, strike that -- all of

24  your actions during June the 1st were compliant with the ERT

25  policy?

ZOOM VIDEOCONFERENCE

60

```
 1   A    Yes, sir.
 2   Q    Okay.  And did you, with your own two eyes, see any
 3   beanbag projectiles fired by any trooper on June 1, 2020?
 4   A    I did not.
 5   Q    Whether it's online or in the complaint or some other
 6   source, have you ever seen the plaintiff, Don Cook?  Have you
 7   ever seen an image of him?
 8   A    Yes.
 9   Q    So you might not have known him from Moses in June of
10   2020, but now you have an idea of what this guy looks like?
11   A    Yes.
12   Q    Do you recall seeing that man -- that gentleman on June
13   the 1st of 2020?
14   A    Yes.
15   Q    You recall -- okay -- you recall -- you have a independent
16   recollection of Mr. Cook from June 1st, 2020; is that correct?
17               MR. BRASCHER:  Object to form.
18               Go ahead.
19   A    Yes.
20   Q    (By Mr. Laux)  Okay.  Well, by all means, please tell me
21   every detail that you can recall about what your observations
22   were of Mr. Cook.
23   A    All right.  An individual was brought back behind the
24   skirmish line where I was, which is the skirmish line -- which
25   is all the troopers and the guardsmen.
```

ZOOM VIDEOCONFERENCE

61

1  Q    Can I interrupt you for just a second, sir?

2  A    Yes.

3  Q    So is it fair to say that the first time that you saw

4  Mr. Cook would have been after he sustained his injuries?

5                    MR. BRASCHER:  Object to form.

6                    Go ahead.

7  A    Yes.

8  Q    (By Mr. Laux)  Please continue.  I'm sorry to interrupt.

9  A    The arrest team, which is a couple of troopers, brought an

10 individual up, which later identified as Mr. Cook, brought him

11 to me.  He was bleeding from the mouth.  I instructed them to

12 hand him off to the National Guard Arrest Team, and I

13 instructed them to take him across the bridge, which is towards

14 Children's Hospital, to the -- where a MEMS team was set up to

15 have him looked at by medical personnel and to have a trooper

16 sit on him.  And after he was cleared by MEMS, he was supposed

17 to be taken to Pulaski County Jail.  That's the last time I --

18 that's the last time I saw him after I handed him off to the

19 National Guard Arrest Team.

20 Q    When you first saw Mr. Cook, was he -- were his hands

21 restrained in a zip tie?

22 A    I'm assuming they were.  They were behind his back.  I

23 don't know -- I don't know what -- how he was restrained.  I'm

24 assuming it was zip ties.  That's what we use.

25 Q    Well, were his hands restrained behind --

ZOOM VIDEOCONFERENCE

62

1   A    Yes.

2   Q    -- his back?

3   A    Yes, sir.

4   Q    Okay.  Mr. Cook was in the custody of the Arkansas State

5   Police at that time.  True?

6   A    Yes --

7                MR. BRASCHER:  Object to form.

8                Go ahead.

9   A    -- yes, he was.

10  Q    (By Mr. Laux)  His -- his freedom of movement was

11  restrained; correct?

12  A    He was -- he was under arrest.

13  Q    You believe that Mr. Cook was under arrest when you saw

14  him?

15  A    Yes.

16  Q    Who was the arresting officer?

17  A    I do not know.

18  Q    Who were the two troopers that brought him to you?

19  A    I do not know.

20  Q    You made no notation of that anywhere?

21  A    They were wearing gas masks.  I have no idea who they

22  were.

23  Q    Did they have badge numbers on their chests?

24  A    No, sir.

25  Q    Were they members of the Arkansas State Police?

ZOOM VIDEOCONFERENCE

63

1   A     Yes, sir.

2   Q     So to this day, as we sit here today, you don't know who

3   those two were?

4   A     No, sir.

5   Q     No troopers have ever come forward in light of this

6   litigation and said to you, "Hey, I was one of the people that

7   brought that guy to you"?

8   A     No, sir.

9   Q     Have you ever attempted to determine the identity of those

10  officers at any time after June the 1st, 2020?

11  A     No, sir.

12  Q     Why not?

13  A     I never was asked to.

14  Q     Well, sometimes we do things even though we're not asked;

15  right?  Fair?

16  A     I -- yes.  But I didn't know -- my assumption was that his

17  information was taken down by the arrest team as per protocol,

18  so.

19  Q     Well, regardless of his identification, those two officers

20  could have given you insight on Mr. Cook's actions prior to you

21  seeing him, couldn't they have?

22                MR. BRASCHER:  Object to form.

23                Go ahead.

24  A     I don't know what good that would have done.  That wasn't

25  information I needed.

ZOOM VIDEOCONFERENCE

64

1   Q    (By Mr. Laux)  Well, Mr. -- you said that Mr. Cook was

2   under arrest; correct?

3   A    Correct.

4   Q    And that means that law enforcement agencies intended to

5   charge him with a crime; correct?

6                   MR. BRASCHER:  Object to form.

7                   Go ahead.

8   A    Correct.

9   Q    (By Mr. Laux)  Don't you agree that one or both of those

10  troopers might have had evidence that was relevant to that

11  criminal investigation?

12                  MR. BRASCHER:  Object to form.

13                  Go ahead.

14  A    Could have.

15  Q    (By Mr. Laux)  You never bothered to find out.  True?

16                  MR. BRASCHER:  Object to form.

17                  Go ahead.

18  A    Correct.

19  Q    (By Mr. Laux)  To the extent that those officers observed

20  Mr. Cook do something that was exculpatory or indicative of his

21  innocence, you never determined whether they had that

22  information; correct?

23                  MR. BRASCHER:  Object to form.

24                  Go ahead.

25  A    Correct.

ZOOM VIDEOCONFERENCE

65

1    Q    (By Mr. Laux)  In your -- strike that.

2         Do you think there's any way to determine today the

3    identity of those two troopers, be it by records or logs or CAD

4    reports?

5    A    I don't know -- I don't know what information I could give

6    you.  They were just the arresting.  Arresting officer would

7    have been Wingo.  He's the one that saw the violation.  They

8    just took him into custody and brought him back for medical

9    treatment.  That's all they are.

10   Q    I think my question was just --

11              MR. LAUX:  Ms. Court Reporter, could you read

12         back my last question, please?

13              THE COURT REPORTER:  Yeah.  Okay, question was:

14         Do you think there's any way to determine today the

15         identity of those two troopers, be it by records or

16         logs or CAD reports.

17              MR. LAUX:  Thank you.

18   Q    (By Mr. Laux)  So whether you characterize them as

19   arresting officers or not, I'm just asking you if there's any

20   way to identify who those two troopers were.

21   A    I'm not sure.  Unless we just ask.

22   Q    Well, hypothetically, you could send an --

23   A    I don't know if there's -- sorry.

24   Q    I'm sorry?

25   A    I didn't mean to interrupt you.  Unless we just --

ZOOM VIDEOCONFERENCE

66

1  Q    I'm sorry.

2  A    -- unless we just ask, I don't know -- I don't know --

3  Q    Well, you --

4  A    -- I don't know --

5              (Simultaneous speaking.)

6  Q    -- you read my mind.  You could send an all Arkansas State

7  Police email, and you could say, "Hey, y'all, who are the two

8  of you guys who dropped off this guy on June the 1st?"  Maybe

9  people would respond; maybe they wouldn't.  But you could do

10 that; right?

11             MR. BRASCHER:  Object to form.

12             Go ahead.

13 A    I -- I can ask, yes.

14 Q    (By Mr. Laux)  And if those troopers are men of integrity,

15 they will surely say, "It was me"; right?

16             MR. BRASCHER:  Object to form.

17             Go ahead.

18 A    You would think, yes.

19 Q    (By Mr. Laux)  Assuming that they still work there; right?

20 A    Yes.

21 Q    All right.  I'm going to ask your counsel to see if he

22 could facilitate your doing that after the deposition; okay,

23 sir?

24             MR. LAUX:  And I'm talking to -- to the witness.

25        I know he's not reproving.  I'm just letting him know

67

1          that's what I intend to do.  We can discuss it, you

2          and me, Justin.

3    Q    (By Mr. Laux)  Okay.  What was Mr. -- when you said that

4    you sent him to another area, how did he get from where you

5    were to that area?

6    A    He was walked.

7    Q    What was the approximate distance from your area to the

8    area where you sent him?

9    A    Maybe a quarter mile or less from the Capitol --

10   Q    Who walked --

11   A    I'm sorry.  -- from the Capitol across 630 to Children's

12   Hospital -- almost to Children's Hospital.

13   Q    Are you saying that he was basically walked to the

14   hospital?

15   A    To the waiting ambulance, there's a -- where the medical

16   team was set up.

17   Q    Okay.  Where was the medical team set up?

18   A    Right across the interstate, right -- almost -- almost to

19   Children's Hospital --

20   Q    Just south --

21   A    -- parking lot.

22   Q    -- just south -- south of 630?

23   A    Correct.

24   Q    Okay.

25   A    Yes.  On -- on MLK.

ZOOM VIDEOCONFERENCE

68

1  Q    Okay.

2  A    MLK, yes.

3  Q    Who -- who walked him that distance?

4  A    Some National Guard soldiers.  I don't know who they were.

5  Q    Do you know the identity of those gentlemen?

6  A    I don't know who they were.

7  Q    Do you know -- I mean, you didn't go with them; correct?

8  A    No, I did not.

9  Q    So as soon as they left your view, you don't know exactly

10 where they went, but you believe it was to that staging area?

11 A    That would have been my assumption.

12 Q    Okay.  You said that you assigned, I think, a couple

13 troopers to "sit on him."  What did you mean by that?

14 A    I asked a trooper to go -- to ask another trooper -- it's

15 kind of a convoluted thing.  I asked a trooper to ask another

16 trooper, who wasn't involved in this situation and to the

17 disturbance, to wait for him to get cleared by -- get checked

18 out by MEMS, and then when they finished with him, he was to be

19 taken to Pulaski County Jail and booked in for disorderly

20 conduct.

21 Q    Was Mr. Cook -- were his -- was his -- were his clothing

22 checked incident to his arrest?

23 A    I don't know what you mean.

24 Q    Well, when a person is arrested, there is a cursory body

25 search of that person; correct?

ZOOM VIDEOCONFERENCE

69

1      MR. BRASCHER:  Object to form.

2      Go ahead.

3   A    That is protocol.

4   Q    (By Mr. Laux)  Yeah.  And to the extent that a person does

5   not want to divulge their identification and they have a wallet

6   on their person, seizing and examining their wallet incident to

7   arrest might provide you information on who that person is;

8   right?

9   A    That is correct.

10  Q    Do you know if Mr. Cook's wallet was seized or obtained or

11  reviewed at any time around your involvement in this case?

12  A    I do not.

13  Q    When these troopers dropped him off to you, did they

14  indicate who he was?

15  A    They did not.

16  Q    Did you ask who he was?

17  A    I did not.

18  Q    Did you ask Mr. Cook what his name was?

19  A    I did not.

20  Q    Did you have any conversations with Mr. Cook during your

21  encounter with him?

22  A    Not that I recall.

23  Q    Did he say anything that you heard, whether it was

24  directed to you or someone else?

25  A    Not that I recall.

ZOOM VIDEOCONFERENCE

70

```
 1   Q    How would you describe his physical being in terms of
 2   whether he had injuries or not?
 3   A    He looked disheveled, and he was bleeding from the mouth,
 4   and, of course, he was cuffed behind his back.  And I just
 5   looked at him a second, and then I directed the guardsmen to
 6   take him back for medical care.
 7   Q    Approximately, how long would you say you were in his
 8   proximity -- physical proximity?
 9   A    Seconds.  I don't know.  Less than 30 seconds.  Not very
10   long.
11   Q    What was he wearing at the time in terms of his clothing?
12   A    At the time -- the only reason I know is because I -- I
13   watched the video just a little bit ago.  That's -- that's the
14   only reason I know what he was wearing.  Just a -- just a --
15   Q    I'm not sure I heard you describe it.  What was he
16   wearing?
17                MR. BRASCHER:  Sorry.  I'll --
18                THE WITNESS:  Oh, go ahead.
19                MR. BRASCHER:  -- I'll step in here.  I'm sorry.
20           What he's referring to is, we watched a video this
21           morning in preparation for this deposition.  And he's
22           saying that is the only reason that he's aware of
23           what Mr. Cook was wearing is because he had watched
24           that video this morning.
25                That's what you're trying to say; right?
```

ZOOM VIDEOCONFERENCE

71

1      THE WITNESS:  Correct.

2      MR. LAUX:  I appreciate that.

3   Q   (By Mr. Laux)  And so if you would just describe, whether

4   it's from your own personal recollection or from the video --

5   A   Just --

6   Q   -- what was Mr. Cook wearing on June 1.

7   A   From the video, he was wearing a light-colored pink polo

8   shirt and, like, shorts or something.

9   Q   Are you aware -- is this video you're describing a Video B

10  where at approximately three minutes and 18 seconds or

11  thereabouts, you see a person who resembles Mr. Cook as well as

12  some tear gas canisters and whatnot?  Is that what you're

13  describing?

14  A   It was a YouTube video.  It was a YouTube video.

15  Q   Okay.

16  A   And he was meandering around the front Capitol area.

17  Q   Right.  So the two videos that you're -- you're

18  referencing right now, one of them is the one I just described,

19  and one of them is a YouTube video?

20  A   Correct.

21  Q   Okay.  And did you -- do you recall what the color of his

22  shorts were that he was wearing?

23  A   Were they, like, green or something?  Like an olive green,

24  maybe, or something?  I don't know.

25  Q   Just asking you what you recall.

72

1  A    I don't recall.  I didn't pay that --

2  Q    Okay.

3  A    -- much attention.

4  Q    Okay.  Now, are you aware of any other video that depicts

5  Mr. Cook at any time during June 1st or June 2nd, other than

6  the two videos we've just discussed?

7  A    No, sir.

8  Q    Are you aware of any video that shows Mr. Cook violently

9  or aggressively approaching a police line?

10  A    No, sir.

11  Q    Other than the descriptions that are contained in

12  Sheeler's report and Wingo's report, are you aware of any other

13  statements that exist that purport to describe Mr. Cook's

14  conduct at any time during that protest?

15  A    No, sir.

16  Q    Are you aware of any objective evidence that supports the

17  descriptions contained in Mr. Wingo's report?

18  A    No, sir.

19  Q    Same question regarding Mr. Sheeler.

20  A    No, sir.

21  Q    So in terms of their beliefs as to Mr. Cook's actions

22  before he was injured, you're only aware of those two sources

23  of information; is that true?

24  A    That is correct.

25  Q    Okay.  There's a policy -- there's a policy at the

ZOOM VIDEOCONFERENCE

73

1  Arkansas State Police on the PepperBall system.  Are you aware

2  of that?

3  A    I'm aware there is a policy, yes.

4  Q    Right.  I don't mean that you necessarily know it

5  verbatim, but you know that it exists; right?

6  A    Yes, sir.

7  Q    And have you had an opportunity to review the reports of

8  Wingo and Sheeler prior to today's date?

9  A    The --

10 Q    Or today?

11 A    -- which reports are you referring to?

12 Q    Their -- they've been marked as Exhibits 1 and 2.

13             (Whereupon, Plaintiff's Exhibits 1 and 2 were

14       marked for identification and are attached hereto.)

15 A    Okay.  Yes.

16 Q    So --

17 A    I don't --

18             THE WITNESS:  I'm sorry.

19             MR. BRASCHER:  You're fine.

20 Q    (By Mr. Laux)  Okay.  You're familiar with those

21 documents; correct?

22 A    Yes.

23 Q    All right.  Now, if you look at Sheeler's document -- or

24 his report, which is Exhibit 1, he describes a -- a white male

25 engaging ERT members, and he was refusing commands to leave.

74

1   And he had a white shirt and red shorts.  And rounds -- I'm

2   paraphrasing -- PepperBall rounds were hitting him in the back

3   as he was being driven from the area.

4        What kind of PepperBalls were used during the George Floyd

5   protests on June 1?

6   A    Like, what brand?  Or I guess I don't --

7   Q    Well, the policy describes the PepperBall system as

8   (as read):  "consisting of compressed air, or carbon dioxide,

9   launching device that delivers .68 caliber projectiles filled

10  with, but not limited to, water, dye marker, a solid core, or a

11  powder or liquid pelargonic acid, commonly known as tear gas."

12       The PepperBall system that was used on June 1, 2020, what

13  -- what did it deliver?  What was the payload?

14  A    It would be an assumption on my part to -- to answer that

15  -- that one.

16  Q    You don't know what the PepperBall system discharged on

17  June 1 of 2020?

18  A    I don't know exactly what was in the PepperBall.  I cannot

19  -- I can't -- I can't answer what's inside of that PepperBall.

20  I'm -- I'm not familiar with the system -- I'm -- I'm not

21  trained on the system.  I don't know what's inside of the

22  PepperBall itself, so.

23  Q    Well, the use --

24  A    I'm sorry.

25  Q    -- of these PepperBall -- the use of the PepperBall system

ZOOM VIDEOCONFERENCE

75

 1  is something that would fall under your authority as a field --

 2  well, in your role at the George Floyd protest; correct?

 3                    MR. BRASCHER:   Object --

 4  A    Correct.

 5                    MR. BRASCHER:   -- object to form.

 6                    Go ahead.

 7  A    Correct.

 8  Q    (By Mr. Laux)   I mean, you could step in and say -- and,

 9  you know, whether it's a good idea or a bad idea is irrelevant,

10  but you -- you have the authority to say, "We're not using

11  PepperBall system today, fellas"; correct?

12                    MR. BRASCHER:   Object to form.

13                    Go ahead.

14  A    That is correct.

15  Q    (By Mr. Laux)   So again, I -- I -- and I don't mean to

16  belabor the point -- you're telling me that these -- this

17  system was deployed on June the 1st of 2020, but you're not

18  sure what it was delivering?

19                    MR. BRASCHER:   Object to form, and asked and

20         answered.

21                    Go ahead.

22  A    Delivering PepperBalls, but I don't know what's inside the

23  PepperBall.  I don't know.

24  Q    (By Mr. Laux)   Well, I -- I tried to go through this line.

25  It was -- it -- so it wasn't delivering water; correct?

ZOOM VIDEOCONFERENCE

76

1   A    Correct.

2   Q    It wasn't delivering a dye marker.  True?

3   A    Correct.

4   Q    It wasn't delivering a solid core, was it?

5   A    Correct.

6   Q    Okay.  So it was delivering tear gas.  Is that a fair

7   statement?

8                    MR. BRASCHER:  Object to form.

9                    Go ahead.

10  A    Is that what the policy -- is that what it says in the --

11  Q    (By Mr. Laux)  Yeah.  There was --

12  A    -- I don't know --

13  Q    -- there's --

14  A    -- what the policy says.  I'm -- I'm sorry.  I --

15  Q    That's okay.  They give --

16  A    (Simultaneous speaking.)

17  Q    -- four examples, and Number 4 is a powdered or liquid 5

18  percent Pelargonic.  That's B -- I'm sorry -- Pelargonic, P as

19  in Paul, E-L-A-R-G-O-N-I-C, acid.  Vanillylamide, and that's

20  V -- I hacked that -- that's V-A-N-I-L-L-Y-L-A-M-I-D-E.  And

21  then in parentheses it says PAVA, P-A-V-A, all caps.

22       So starting again, a powdered or liquid 5 percent PAVA

23  and/or chlorobenzylidene malononitrile, or CS, commonly known

24  as tear gas.

25       Do you --

ZOOM VIDEOCONFERENCE

77

```
 1  A    Could you repeat that, please?
 2  Q    -- feel confident testifying that --
 3           THE WITNESS:  He froze again.  I'm sorry.
 4           MR. BRASCHER:  You -- you --
 5           THE WITNESS:  I'm sorry.
 6           MR. BRASCHER:  -- there was a glitch while you
 7        were saying that, so he was asking you to repeat it.
 8           MR. LAUX:  Can you access ASP 716, Mr. Brascher?
 9           MR. BRASCHER:  Is it --
10           MR. LAUX:  I'll tell you what --
11           MR. BRASCHER:  -- these --
12           MR. LAUX:  -- I'll tell you what -- I'll tell
13        you what, I -- let me -- let me put it up on the
14        screen.  I'm sorry.  Let me put it up on the screen.
15        I'm taking up time.
16            (Sotto voce discussion between witness and
17        Mr. Brascher.)
18  Q   (By Mr. Laux)  Okay.  Based on my understanding, the
19  PepperBall system can deliver various things.  Do you agree
20  with me that the PepperBall system that was used during the
21  George Floyd protests was -- falls under the category of
22  Number 4?
23           MR. BRASCHER:  Object to form.
24           Go ahead.
25  A    I cannot tell you it was Number 4, but that would be my
```

ZOOM VIDEOCONFERENCE

78

1  assumption it was Number 4 because it wasn't water, and it

2  wasn't a dye, and it wasn't a solid core.

3  Q    (By Mr. Laux)   Okay.

4  A    But that would be my assumption that it was Number 4.

5  Q    I understand.   And -- and I won't take you out on a limb.

6  I get -- I get the confines of your testimony.

7  A    Yeah, I -- that -- that would be my assumption as far as

8  those.

9  Q    You agree with me that if a person was pelted with a

10  PepperBall system with the Number 4 payload, that that

11  individual would probably smell or reek of teargas, their

12  clothing and whatnot.   Would you agree with that?

13               MR. BRASCHER:   Object to form.

14               Go ahead.

15  A    He would have some type of contamination.   That is

16  correct.

17  Q    (By Mr. Laux)   And that would be detectable -- in the

18  moments after that occurring, that would be detectable on that

19  person -- on that individual's person.   Do you agree with me?

20               MR. BRASCHER:   Object to form.

21               Go ahead.

22  A    In most instances, I -- I would assume, yes.

23  Q    (By Mr. Laux)   Okay.   What would you estimate the crowd to

24  be on June 1st at its height?

25  A    Probably 300 or so, give or take.

79

1  Q    And what was roughly the square blockage that this group

2  was occupying?  Were they concentrated in one area, or were

3  they kind of spread out or something else?

4  A    When I was -- well, when we first started, it was more

5  towards the interstate and pushed them back towards the Capitol

6  -- which allowed them to spread out -- the Capitol grounds and

7  that large parking lot just east of the Capitol, so it gave

8  them a larger area.

9  Q    It would be a violation of policy to fire a beanbag

10 projectile at a person who is ambulating away from the

11 officers.  Do you agree?

12                 MR. BRASCHER:  Object to form.

13                 Go ahead.

14 A    Yes.  If he's not posing a threat, yes.

15 Q    (By Mr. Laux)  Can you briefly tell me what

16 Sgt. Jay McAllister's -- McAllister's role on June was -- 1

17 was, if any?

18 A    He is -- or he was the grenadier team leader.

19 Q    Okay.

20 A    The less-lethal team leader.

21 Q    And he was a sergeant, so that would put him below you in

22 terms of subordinates and also below Scott John -- Scott Joe;

23 correct?

24 A    That is correct.

25 Q    And the same would go for -- would the same go for

ZOOM VIDEOCONFERENCE

80

1  Ronnie Stewart?

2  A    Yes, sir.

3  Q    Okay.  So directing your attention to Exhibit 1 -- oh, by

4  the way, would you-- if at any time you need to take a break,

5  Lieutenant, you feel free to do so.  Just let Mr. Brascher

6  know, or me.

7      Directing your attention to Exhibit Number 1, this is a

8  three-page document, which is the incident report by

9  Jeff Sheeler; correct?

10  A    Yes, sir.

11  Q    Now, you've seen Sheeler's report, and you've seen Wingo's

12  report; correct?

13              MR. BRASCHER:  Object --

14  A    Yes, sir.

15              MR. BRASCHER:  -- object to form.

16              Go ahead.

17  A    Yes, sir, I have.

18  Q    (By Mr. Laux)  As it relates to Mr. Cook, those guys are

19  describing, in part, the same occurrence; correct?

20              MR. BRASCHER:  Object to form.

21              Go ahead.

22  A    Yes, they are.

23  Q    (By Mr. Laux)  Okay.  So my first question for you on

24  Exhibit 1 is, do you notice how the incident date is

25  handwritten, and it appears to be some type of whiteout used

81

1  there?

2  A    Yes.

3  Q    Do you know why that is -- why that's like that?

4  A    I do not.

5  Q    If two incident reports are generated around the same

6  general time, you would expect them to have incident report

7  numbers that are fairly similar or sequential, wouldn't you?

8            MR. BRASCHER:  Object to form.

9            Go ahead.

10 A    Not necessarily in our system.

11 Q    (By Mr. Laux)  Okay.  Can you explain why Sheeler

12 describes Mr. Cook's weight as 165 while Wingo describes it as

13 275?

14 A    I cannot.

15 Q    When you read the narrative portion of Sheeler's report,

16 did it raise any red flags with you in terms of proper police

17 conduct?

18            MR. BRASCHER:  Object to form.

19            Go ahead.

20 A    It did not.

21 Q    (By Mr. Laux)  When he describes his usage of various

22 devices, you believe that those descriptions are consistent

23 with proper police protocol?

24 A    Yes, sir.

25 Q    And you believe they're consistent with any policies or

ZOOM VIDEOCONFERENCE

82

1  guidelines governing the use of less-than-lethal weapons?

2  A    Yes, sir.

3  Q    Sheeler writes in the last paragraph -- strike that -- the

4  last sentence of his report here:  "Efforts to identify him

5  with MEMS records have been negative to this point."

6        Do you see that?

7  A    Yes, sir.

8  Q    So it would seem that Sheeler was unaware or did not --

9  did not know the identity of Mr. Cook on June the 1st; is that

10  right?

11  A    Correct.

12              MR. BRASCHER:  Object to form.

13  A    Correct.

14  Q    (By Mr. Laux)  Do you know if Sheeler searched the body of

15  Mr. Cook incident to arrest?

16              MR. BRASCHER:  Object to form.

17              Go ahead.

18  A    I do not.

19  Q    (By Mr. Laux)  Do you know what efforts Sheeler took with

20  regards to MEMS records to identify Mr. Cook?

21  A    I do not.

22  Q    Is it possible that trying to identify an individual that

23  way violates the HIPAA privacy laws?

24              MR. BRASCHER:  Object to form.

25              Go ahead.

ZOOM VIDEOCONFERENCE

83

1   A    I do not know.

2   Q    (By Mr. Laux)  Is it your understanding that officers can

3   access individual's medical records to try to identify who they

4   are when charging a misdemeanor?

5                    MR. BRASCHER:  Excuse me.

6   A    Sorry.  Could you say that one more time?  Could you

7   repeat the question, please?

8   Q    (By Mr. Laux)  When police officers are contemplating

9   charging an individual with a misdemeanor, do you think it

10  violates HIPAA for that officer to try to learn the identity of

11  that person by looking through people's medical records?

12                   MR. BRASCHER:  Object to form.

13                   Go ahead.

14  A    I do not know.

15  Q    (By Mr. Laux)  Has anyone ever, to your knowledge, spoken

16  to Sheeler and asked him about precisely what he did in terms

17  of MEMS records as reflected in his report?

18                   MR. BRASCHER:  Object to form.

19                   Go ahead.

20  A    I don't know.

21  Q    (By Mr. Laux)  Are you aware of any other protester, other

22  than Mr. Cook, who was injured on the evening of June the 1st,

23  2020?

24  A    I have no knowledge of any others.

25  Q    Have you ever discussed the contents of Sheeler's report

ZOOM VIDEOCONFERENCE

84

1  with Sheeler?

2  A    I have not.

3  Q    Have you ever discussed the content of Wingo's report with

4  Wingo?

5  A    I have not.

6           MR. BRASCHER:  I don't know if it was loud

7        enough.  He said, "I have not."

8  A    Oh, I'm sorry.  I have not.

9  Q    (By Mr. Laux)  Okay.  Have you -- thank you.  Have you

10  ever discussed the content, specifically the narrative

11  portions, of those reports with any other colleague?

12  A    Of these reports?  I have not.

13  Q    Yes.

14  A    I have not.

15  Q    If those reports each purport to describe the encounter

16  with Mr. Cook, do you agree with me that they are quite

17  inconsistent?

18           MR. BRASCHER:  Object to form.

19           Go ahead.

20  A    There are some inconsistencies, but they're not -- but --

21  but that would -- that would be normal with two different

22  people writing a report.

23  Q    (By Mr. Laux)  Based on Wingo's report, he was firing his

24  beanbag shotgun from a turret; correct?

25           MR. BRASCHER:  Object to form.

ZOOM VIDEOCONFERENCE

85

1   A    No, sir.

2   Q    (By Mr. Laux)  I'm wrong on that?

3   A    Correct.  That was --

4   Q    Okay.  And I thank you --

5   A    -- Sheeler.

6   Q    -- for correcting me.

7   A    That was Sheeler.

8   Q    Sheeler was firing a PepperBall system device from a

9   turret; correct?

10                  MR. BRASCHER:  Object to form.

11  A    No, sir.

12  Q    (By Mr. Laux)  All right.  I will get this right.  Was

13  there -- bear with me for a second.

14       Okay.  Sheeler, in his report here, says that -- on the

15  first paragraph on page -- Plaintiff 2, Sheeler says that -- it

16  says (as read):  "I was stationed on top of the BEAR and was

17  supporting the turret operator."

18       So I was a little bit wrong there, but Sheeler was on top

19  of the BEAR; correct?

20                  MR. BRASCHER:  Object to form.

21                  Go ahead.

22  A    Yes, sir.

23  Q    (By Mr. Laux)  And the BEAR is an armored vehicle;

24  correct?

25                  MR. BRASCHER:  Object to form.

ZOOM VIDEOCONFERENCE

86

1          Go ahead.

2    A    Yes, sir.

3    Q    (By Mr. Laux)   Being on top of the BEAR makes you elevated

4    relative to people whose feet are on the ground.   Do you agree?

5               MR. BRASCHER:   Object to form.

6               Go ahead.

7    A    Yes, sir.

8    Q    (By Mr. Laux)   Sheeler was firing impact projectiles from

9    an elevated position.   Do you agree?

10              MR. BRASCHER:   Object to form.

11              Go ahead.

12   A    Yes, he was.

13   Q    (By Mr. Laux)   Do you believe that's consistent with

14   police protocol governing impact projectiles?

15              MR. BRASCHER:   Object to form.

16              Go ahead.

17   A    Yes.

18   Q    (By Mr. Laux)   Okay.   So you recognize, however, that

19   firing from that position increases the likelihood of serious

20   injury or death; right?

21              MR. BRASCHER:   Object to form.

22              Go ahead.

23   A    It decreases your accuracy is what I -- I would say.

24   Q    (By Mr. Laux)   Do you agree with me that the more times a

25   projectile is fired in the area of an individual, the more

87

1   increased the likelihood of bystander injury there is?

2                   MR. BRASCHER:  Object to form.

3                   Go ahead.

4   A    If -- If you miss, yes, sir.

5   Q    (By Mr. Laux)  You kind of testified earlier to this, but

6   when, for instance, Sheeler talks about rounds hitting this

7   individual in the back -- plural, "rounds" -- that means that

8   each firing is its own use of force; correct?

9                   MR. BRASCHER:  Object to form.

10                  Go ahead.

11  A    Not on the PepperBall.

12  Q    (By Mr. Laux)  Explain what you mean by that.

13  A    With PepperBall you're firing multiple rounds at the same

14  time, so you're not -- it's not a use of force each round of

15  firing PepperBall.

16  Q    So what you're saying is, is when you squeeze the trigger,

17  it has almost an automatic-type of an effect?

18  A    Well, you have to fire -- you have to pull the trigger

19  each time, but it's -- you're doing it fast.

20  Q    Okay.  Well, so you agree with me, though, that each time

21  you pull that trigger, that is an independent use of force?

22                  MR. BRASCHER:  Object to form.

23                  Go ahead.

24  A    You are using force, yes, each time that round goes down,

25  but it's not -- we don't call it -- we don't technically have

ZOOM VIDEOCONFERENCE

88

1  to do a use of force like -- like on beanbag round.  Each time

2  you do a -- shoot a beanbag round, that's a use of force that

3  you'd have to justify each round.  But on a PepperBall, it's

4  different because of the impact of a PepperBall; it's less

5  velocity, less impact.

6  Q    (By Mr. Laux)  Well, I'm not trying to change your

7  testimony.  I just want to get it --

8  A    (Simultaneous speaking.)

9  Q    -- I just want to get it straight.  It's your testimony

10 that each pulling of the trigger is not an independent use of

11 force when it comes to PepperBall --

12 A    PepperBalls.

13 Q    -- system?

14 A    Correct.

15 Q    So to you, then, I suppose, pulling that trigger once is

16 no different than pulling that trigger 12 times?

17                 MR. BRASCHER:  Object to form.

18                 Go ahead.

19 A    On -- on one individual PepperBall, no.

20 Q    (By Mr. Laux)  One pull of the trigger on that individual

21 is a use of force, a single use of force; and 12 pulls on that

22 trigger is a single use of force.  Is that your testimony?

23                 MR. BRASCHER:  Object to form.

24                 Go ahead.

25 A    Yes.

89

1   Q    (By Mr. Laux)  Well, where does it end?  Does 25 pulls of

2   the trigger also constitute a single use of force?

3                    MR. BRASCHER:  Object to form.

4                    Go ahead.

5   A    Correct.

6   Q    (By Mr. Laux)  50, five-zero, pulls of that trigger -- if

7   that's physically possible with these weapons --

8   A    I don't --

9   Q    -- that is, in your mind, a single use of force?

10                   MR. BRASCHER:  Object to form.

11                   Go ahead.

12  Q    (By Mr. Laux)  When it comes to the PepperBall system.

13  A    I think that's understood.  Yes, sir.

14  Q    Okay.  So, in your mind, an officer doesn't have to

15  justify each pulling of the trigger; he or she only needs to

16  justify the collective pulling of the trigger?

17  A    We're talking about the PepperBall; correct?

18  Q    Yes, sir.  Yes, sir.

19  A    On an individual?

20  Q    Yeah.

21  A    Correct.  That's my understanding of the --

22  Q    Aren't there some --

23  A    -- PepperBall.

24  Q    -- but aren't there some instances where pulling the

25  trigger twice might be justified, but pulling it 30 times might

ZOOM VIDEOCONFERENCE

90

```
 1  be unjustified?
 2              MR. BRASCHER:  Object to form.
 3              Go ahead.
 4  A    Of course.
 5  Q   (By Mr. Laux)  Well, then how does one determine where the
 6  situation goes from justified to unjustified if they're
 7  collectively just one use of force?
 8              MR. BRASCHER:  Object to form.
 9              Go ahead.
10  A    Because the officer is trained to use the amount of force
11  necessary to stop that action.  Whatever the action is that's
12  going on, he's going to use that amount of force, whatever is
13  necessary, to stop it, whether it's two  PepperBalls or ten
14  PepperBalls.  That's how -- that's how he was trained.
15  Q   (By Mr. Laux)  Well, in a given situation, if, let's say,
16  four PepperBalls are required to neutralize the threat, four,
17  wouldn't that make using 20 excessive?
18              MR. BRASCHER:  Object to form.
19              Go ahead.
20  A    Yes.
21  Q   (By Mr. Laux)  So again, I'm not trying to bicker with
22  you.  I'll be honest; I'm of the belief that -- whether it's a
23  gun or a shotgun projectile, a beanbag, or the PepperBall
24  system, I'm of the opinion that an officer has to justify every
25  pull of the trigger.  Now, when it comes to the PepperBall
```

ZOOM VIDEOCONFERENCE

91

1  system, you disagree with me?

2  A    Correct.

3              MR. BRASCHER:  Object to form.

4              Go ahead.

5  A    Correct.

6  Q    (By Mr. Laux)  And you believe that your belief -- or you

7  believe that your opinion on this is consistent with the use of

8  force policy at the Arkansas State Police?

9              MR. BRASCHER:  Object to form.

10             Go ahead.

11 A    As I understand it, yes.

12 Q    (By Mr. Laux)  And by the way, it's just you and

13 Mr. Brascher in that room; correct?

14 A    Yes, sir.

15 Q    Okay.  Sorry.  I've heard some feedback.

16     Okay.  So again -- well, let me ask you this:  In

17 Wingo's -- strike that.

18     Should impact projectiles like a beanbag shotgun be used

19 when the operator's vision is compromised?

20 A    No.

21 Q    So when Wingo, in his report, says the following --

22             MR. BRASCHER:  Sorry, Mike -- Mike, sorry, what

23         exhibit is Wingo's report?

24             MR. LAUX:  I'm sorry.  That's Exhibit Number 2.

25         And I'm referencing Plaintiff 00005.

92

1          MR. BRASCHER:  Thank you.

2          MR. LAUX:  Yeah.  I'm sorry.  I wasn't precise.

3   Q    (By Mr. Laux)  I'm going to read a portion of Wingo's

4   report narrative (as read):  "Due to the poor lighting at

5   night, wearing a gas mask and a face shield, and the thickness

6   of the CS gas that was deployed, it took multiple shots before

7   striking the unknown male."

8      Now, it sounds like what Wingo was saying is that he had

9   to shoot multiple times because his vision was somewhat

10  compromised.  Do you -- is that how you read this portion?

11         MR. BRASCHER:  Object to form.

12         Go ahead.

13  A    I -- I read that he had trouble making the shot, yes.

14  Q    (By Mr. Laux)  But he had trouble making the shot because

15  of factors related to his vision or acuity.  Do you agree or do

16  you disagree based on what he wrote?  I know you weren't there.

17  A    Based on the report, yes.

18  Q    Yeah.  Is it consistent with the policy on impact

19  projectiles to fire a beanbag shotgun when your vision is

20  compromised?

21  A    You have to have a clear target.

22  Q    You can't have a clear target if your vision is

23  compromised; correct?

24         MR. BRASCHER:  Object to form.

25         Go ahead.

ZOOM VIDEOCONFERENCE

93

1  A    Correct.

2  Q    (By Mr. Laux)  Okay.  So you don't see a problem with

3  Wingo telling -- with Wingo reporting here that he fired his

4  beanbag shotgun multiple times because of various factors

5  affecting his vision?  You don't -- you don't -- that didn't

6  raise any red flags with you when you read it; is that true?

7                  MR. BRASCHER:  Object to form.

8                  Go ahead.

9  A    No, it did not.

10  Q    (By Mr. Laux)  As we sit here today, do you see any

11  problem with his description of why he fired multiple shots at

12  the -- at plaintiff?

13  A    My assumption was that his vision was clear when he fired

14  the last shot.  That's the assumption I had, so.

15  Q    Which means he fired several shots when his vision was not

16  clear; correct?

17  A    Correct.  Correct, yes.

18  Q    So I'm asking you if -- as a supervising trooper, do you

19  have any type of a problem with that from a police policy or

20  protocol perspective?

21                  MR. BRASCHER:  Object to form.

22                  Go ahead.

23  A    I didn't at the time.  I did not.

24  Q    (By Mr. Laux)  How about right now?

25  A    I guess I don't understand.

ZOOM VIDEOCONFERENCE

94

1  Q    As you and I are --

2  A    I guess --

3  Q    -- kind of analyzing and dissecting his words here today

4  at your deposition, and we're talking about his purported

5  problems with vision as necessitating multiple rounds of his

6  beanbag shotgun, as we sit here and dissect that today, you and

7  me, do you have any red flags about his conduct that he

8  describes here?

9  A    Not necessarily his conduct, but his decision --

10            MR. BRASCHER:  I'm really sorry.  I'm going

11        object to form.

12            Go ahead.

13  A    -- his decision-making in firing when he didn't have a

14  clear shot with his -- due to his masking with the gas and the

15  poor lighting.

16  Q    (By Mr. Laux)  Wingo fired -- Wingo using that device

17  without clear acuity and vision is something he should not have

18  done.  Do you agree with that, or do you disagree with that?

19            MR. BRASCHER:  Object to form.

20            Go ahead.

21  A    In my opinion, that goes against what he was -- how he was

22  trained.

23  Q    (By Mr. Laux)  What he describes there is a breach --

24  A    In his report.

25  Q    -- of police protocol --

95

```
1   A    In his report.  That's --
2   Q    -- do you agree?
3   A    -- in his report.  Correct.
4   Q    You agree with that; right?
5                MR. BRASCHER:  Object to form.
6                Go ahead.
7   A    In his report, yes.
8   Q    (By Mr. Laux)  Well, his report is a reflection of what he
9   considers to be reality; right?
10               MR. BRASCHER:  Object to form.
11               Go ahead.
12  A    It would assume so, yes.
13  Q    (By Mr. Laux)  Right.  So I'm just saying, all we have --
14  maybe he'll testify differently, but regarding the report, that
15  represents a deviation from proper police protocol in terms of
16  less-than-lethal weapons.  Do you agree?
17               MR. BRASCHER:  Object to form.
18               Go ahead.
19  A    Against the way he was -- the way we train them; correct.
20  Q    (By Mr. Laux)  And you train consistently with accepted
21  police protocol; right?
22  A    Yes, sir.
23  Q    So when he goes against his training, he's going against
24  police protocol?
25               MR. BRASCHER:  Object to form.
```

ZOOM VIDEOCONFERENCE

96

1   A    It would assume, yes.  Yes, sir.

2   Q    (By Mr. Laux)  What Wingo describes is conduct that

3   increased the likelihood of injury to protesters.  Do you

4   agree?

5             MR. BRASCHER:  Object to form.

6             Go ahead.

7   A    It could, yes.

8   Q    (By Mr. Laux)  Again, we can talk about whether that

9   increased risk is negligible or considerable, but we agree that

10  it's an increased risk to bystanders.  Do you agree?

11            MR. BRASCHER:  Object to form.

12            Go ahead.

13  A    Yes.

14  Q    (By Mr. Laux)  I mean, every shot that is fired

15  conceivably could hit an unintended target; right?

16            MR. BRASCHER:  Object to form.

17            Go ahead.

18  A    It could, yes.

19  Q    (By Mr. Laux)  With each shot fired, the risk of serious

20  bodily injury increases.  Agreed?

21            MR. BRASCHER:  Object to form.

22            Go ahead.

23  A    It could injure someone, yes.  I don't know about

24  seriously.  But yes, it could.

25  Q    (By Mr. Laux)  Fair.  Fair enough.  I'll take it.

ZOOM VIDEOCONFERENCE

97

1    Are -- are you aware of whether or not Wingo was ever

2  disciplined or counseled for the conduct that he describes here

3  in his narrative?

4  A    I do not.

5  Q    To your knowledge, has anyone taken him aside and said,

6  "Hey, this is not the way you should be using this

7  less-than-lethal weapon"?  To your knowledge, has anyone ever

8  taken him aside and told him that?

9              MR. BRASCHER:  Object to form.

10              Go ahead.

11  A    I don't know.

12  Q    (By Mr. Laux)  Even if a protester who is vacating the

13  area decides to be a tough guy and turns around -- unarmed, but

14  turns around and starts to confront the police, that doesn't in

15  and of itself justify the use of force against that person,

16  does it?

17  A    It could, yes.

18  Q    It could, but it doesn't -- it doesn't necessarily;

19  correct?

20              MR. BRASCHER:  Object to form.

21  A    It's situational.  I don't -- yeah.

22  Q    (By Mr. Laux)  We're in agreement.  But I'm just saying,

23  in and of itself, turning and approaching an oncoming police

24  line, probably not a good idea; but in and of itself, it

25  doesn't justify the use of force against that person because

1  it's situational; correct?

2                MR. BRASCHER:  Object to form.

3                Go ahead.  If you don't understand the

4          question, then you --

5                THE WITNESS:  Yeah, I -- it's --

6                MR. BRASCHER:  -- don't understand the question.

7                THE WITNESS:  -- it's all --

8  Q    (By Mr. Laux)  Let me ask it a different way.  The mere

9  act of turning around without a weapon and confronting an

10 oncoming police line in and of itself doesn't justify the use

11 of less-than-lethal force on that -- strike that -- doesn't

12 justify a beanbag projectile on that person.  Can we agree to

13 that?

14                MR. BRASCHER:  Object to form.

15                Go ahead.

16 A    There's nothing else is going on?  No warning?  Nothing

17 like that?

18 Q    (By Mr. Laux)  Right.

19 A    Correct.

20 Q    At some point, the -- at some point, the behavior could

21 escalate, and then all bets are off; but merely approaching the

22 line, even -- even in a belligerent way, does not in and of

23 itself justify the use of force against that person.  Can we

24 agree on that?

25                MR. BRASCHER:  Object to form.

ZOOM VIDEOCONFERENCE

99

1       Go ahead.

2   A    Yeah, just as a show of protest, no.

3   Q    (By Mr. Laux)  Okay.  Fair.  I'll take it.

4       All right.  Did you have anything to do, Lieutenant, with

5   the July 2021 arrest of Mr. Cook?

6   A    I did not.

7   Q    May I direct your attention to Exhibit Number 7.

8               MR. BRASCHER:  Can you --

9               MR. LAUX:  Which begins with Plaintiff 125.

10              MR. BRASCHER:  125, okay.  All right.

11              (Whereupon, Plaintiff's Exhibit 7 was marked for

12          identification and is attached hereto.)

13  Q    (By Mr. Laux)  So this is an ERT after-action report.  And

14  it says:  "Date of request:  June 4."

15      Can you tell me what that means?  Does that mean that this

16  information pertains only to that day, or does it mean

17  something else?

18              MR. BRASCHER:  Let's see if we can get the rest

19          of it here.

20              Is it just that one page, Mr. Laux?

21              MR. LAUX:  No, it's Plaintiff 125 to 130.

22  A    That's this -- I believe it -- I'm -- I believe it's just

23  that date, and it pertains to that date.

24  Q    (By Mr. Laux)  Okay.  So --

25  A    I haven't seen one of these forms in a while, so I believe

ZOOM VIDEOCONFERENCE

100

1  it's -- it just --

2  Q    -- so if things are --

3  A    -- pertains to that date.

4  Q    -- operating according to plan, should one of these have

5  been generated each day of the protests, or was there something

6  distinct about June 4?

7  A    No.  It should -- it should be each day there should be

8  one generated.

9  Q    If I've never seen one for June 1 -- it could be a variety

10 of things, but if I've never seen one, do you know why that

11 would be?

12 A    I have no clue.

13 Q    Have you ever seen an ETR [sic] after-action report which

14 pertains to June 1?

15 A    I don't recall.

16 Q    To the extent that this document, Exhibit 7, has

17 handwriting on it, do you know whose handwriting that is?  For

18 instance, page 1 -- strike that.  I'm sorry.

19     If I direct you to page 130 -- Plaintiff 130, was this

20 report completed by Lt. Joe?

21           MR. BRASCHER:  We're trying to get Plaintiff

22      130.  Give us just a moment.

23           MR. LAUX:  I'm sorry.

24           MR. BRASCHER:  Okay.  So there's 128.

25           THE WITNESS:  There's 128.

ZOOM VIDEOCONFERENCE

101

1          MR. BRASCHER:  There's 130.

2          THE WITNESS:  I got them out of order.  That's

3      my fault.  All right.

4  A    Yes --

5  Q    (By Mr. Laux)  Okay.

6  A    -- Lt. Joe.

7  Q    Now, is there a reason why it's -- it's not signed by a

8  reviewing ETR supervisor?

9  A    ERT?

10  Q    If -- yeah, that's what I meant to say.  I'm sorry.

11  A    Yes.

12  Q    Why is that?

13  A    Because it was completed by a supervisor.

14  Q    Okay.  Fair enough.  And then you reviewed this report at

15  some point, and you signed off on it; correct?

16  A    That's correct.

17  Q    Do you know if that would have been on June the 4th or at

18  some subsequent date?

19  A    I -- I don't recall --

20  Q    Okay.

21  A    -- if they -- what date -- I couldn't tell you what day it

22  was.

23  Q    Okay.  Exhibit 8 is a memorandum from yourself to

24  Maj. Jason Aaron, that starts on Plaintiff 131.

25          (Whereupon, Plaintiff's Exhibit 8 was marked for

ZOOM VIDEOCONFERENCE

102

1        identification and is attached hereto.)

2   Q    Do you see that document?

3   A    Yes, sir.

4              MR. BRASCHER:  You got it?

5   Q    (By Mr. Laux)  Did you have an opportunity to review this

6   document at any time prior to your deposition?

7   A    Yes, sir.

8   Q    Did you review it today by chance?

9   A    Yes, sir, just today.

10  Q    When you reviewed it today, did anything jump out at you

11  as being inaccurate or some -- in some way -- well, inaccurate?

12  A    I skimmed over it, so nothing jumped out.

13  Q    Okay.

14  A    I skimmed over it, so I didn't really dig into it.

15  Q    Whose decision was it to deploy the beanbag shotguns on

16  June the 1st?

17  A    Deploy them, as in -- what do you mean by "deploy"?

18  Q    Well, in your memorandum here on page 3 of 4,

19  Plaintiff 133, about a third of the way down, you indicate that

20  Sgt. Stewart made the decision to deploy less-lethal and

21  chemical munitions to disperse the crowd.

22       Do you see that portion there?

23  A    Yes.

24  Q    So what is meant by "the decision to deploy"?  Does that

25  mean to equip the troopers with them, or does that mean to fire

ZOOM VIDEOCONFERENCE

103

1  them?

2  A    That means to fire them.

3  Q    So does that mean to say that Sgt. Stewart fired beanbag

4  projectiles to disperse the crowd?

5  A    He didn't himself, no.

6  Q    Okay.  So that's what I'm getting at.  What does it mean

7  here to make the decision to deploy?  Is that him saying you

8  guys may use that when you want?

9                MR. BRASCHER:  Object to form.

10               Go ahead.

11 A    No.  That means he would have directed the individuals to

12 deploy in a certain manner.  I don't know how he did it.  I

13 don't know.

14 Q    (By Mr. Laux)  Are you suggesting that he said something

15 along the lines of, "Shoot that guy over there.  Now shoot that

16 guy over there"?  Are you saying that he -- he made the

17 decision on the firing of these things, or are you saying

18 something else?

19               MR. BRASCHER:  Object to form.

20               Go ahead.

21 A    He gave the -- usually, it's the authorization for the

22 grenadiers to either deploy gas or deploy a less-lethal

23 munition at an aggressor.  I don't know if there was an

24 aggressor or they just deployed gas.  I don't know.

25 Q    (By Mr. Laux)  Did you know at the time that you drafted

ZOOM VIDEOCONFERENCE

104

1   this memorandum?

2              MR. BRASCHER:  Object to form.

3              Go ahead.

4   A   I don't know.

5   Q   (By Mr. Laux)  Okay.  A couple lines down you write:  "At

6   this time several gunshots rang out in the crowd."

7       Is that something that's based on your own perception, or

8   was that something told to you by someone else?

9              MR. BRASCHER:  Give me a moment to find that

10           line.

11             THE WITNESS:  Where -- where are we?  On page 3

12           still?

13             MR. LAUX:  Like three lines down from the one we

14           just talked about.

15             THE WITNESS:  Oh, okay.  All right.

16  Q   (By Mr. Laux)  Is that something that you personally

17  perceived, or is that something that was told or conveyed to

18  you by someone else?

19  A   That was conveyed to me.  I wasn't there.

20  Q   Okay.  Do you know who conveyed that to you?

21  A   I -- I don't.  But my assumption would be Sgt. Stewart.

22  He would've been reporting to me, so.

23  Q   I appreciate that.  But can you say definitively who gave

24  you that information?

25  A   I -- no, I cannot.

ZOOM VIDEOCONFERENCE

105

1  Q    Okay.  So a few lines down, you write again (as read):

2  "Sgt. Stewart made the decision to again deploy" less-than --

3  "less-lethal and chemical munitions in an attempt to disperse

4  the crowd for their protection as well as the troopers."

5      So you've already written something like that above.

6  You're writing something like that here.  Does that -- that

7  represents a second usage of the less-lethal munitions by

8  Sgt. Stewart?

9              MR. BRASCHER:  Object to form.

10             Go ahead.

11 A    A second order to deploy either gas or a less-lethal by

12 Sgt. Stewart, yes.

13 Q    (By Mr. Laux)  Now, is he making that decision for

14 himself, or is he making that decision for others?

15 A    For others.  He has that authority.  As the -- as the

16 commander on the ground, yes, he has that authority.

17 Q    So this doesn't represent his actions of actually firing a

18 beanbag round.  It represents his -- articulating his consent

19 for his troopers to do that?

20 A    Correct.

21 Q    Well, why would he make that -- why would he give that

22 message on more than one occasion, or more than once?

23 A    You want me to answer for him or what my assumption is?

24 Q    Well, with all due respect, this is out of your

25 memorandum.

ZOOM VIDEOCONFERENCE

106

```
 1  A    Okay.

 2  Q    What was your understanding of this when you wrote it?

 3  A    There was two different instances --

 4  Q    Okay.

 5  A    -- of -- of disturbances.

 6  Q    Okay.  So is it fair, then, to say that in between his

 7  first decision and the second one we just read, there must have

 8  been a period in there where he did not want projectiles used?

 9              MR. BRASCHER:  Object to form.

10              Go ahead.

11  A    Yes.

12  Q    (By Mr. Laux)  Okay.  And so after the second time he says

13  it, or authorizes it, according to your memorandum, if we go

14  just a few more lines down, you write (as read):  "Sgt. Stewart

15  gave the command to deploy gas and less-lethal munitions again

16  to clear the intersection and protect the ERT team members and

17  the Capitol building."

18       Now, in the earlier ones you say "less-than-lethal and

19  chemical."  And here you say "gas and less-lethal".  Are we

20  still talking about the same collection of less-lethal?

21  A    Yes.

22  Q    Okay.  So are you writing that when he gives this

23  authorization, to your knowledge, then you are going to see a

24  cascade of projectiles being used?  And again, almost like

25  "Fire when ready" kind of a thing.  Is that what you're trying
```

ZOOM VIDEOCONFERENCE

107

1  to convey?

2                MR. BRASCHER:  Object to form.

3  A    No, sir.

4  Q    (By Mr. Laux)  Are you trying to convey that he's just

5  alerting them to their authority to use beanbag projectiles

6  based on their discretion?

7  A    Based on the threat; correct.

8  Q    So basically, he's giving them the green light to use it

9  when they've determined that it's necessary?

10               MR. BRASCHER:  Object to form.

11               Go ahead.

12 A    Correct.

13 Q    (By Mr. Laux)  If he hadn't given the green light, they

14 would not have been authorized to use the beanbag shotguns.  Is

15 that a fair statement?

16               MR. BRASCHER:  Object to form.

17               Go ahead.

18 A    That's correct.

19 Q    (By Mr. Laux)  So is it, therefore, a fair statement to

20 say that Sgt. Stewart -- I'm sorry.  Yeah, well -- on -- on

21 Sunday, May the 31st, Sgt. Stewart was responsible for the

22 decision to -- for the officers or the troopers to use their

23 projectiles?

24               MR. BRASCHER:  Object to form.

25               Go ahead.

108

1   A    Yes.

2   Q    (By Mr. Laux)  And if we turn the page -- if we go to the

3   bottom here, and we turn the page, you write here that "Lt. Joe

4   made the decision" -- and we're referring now to June 1 --

5   "Lt. Joe made the decision to deploy less-lethal and chemical

6   munitions to protect the crowd and the troopers."  That's at

7   Plaintiff page 134.

8       So on the 31st, it was Sgt. Stewart who made the decision,

9   but on the 1st, it was Lt. Joe; is that fair?

10                  MR. BRASCHER:  Object to form.

11                  Go ahead.

12  A    That is correct.

13  Q    (By Mr. Laux)  And I would presume that since you wrote

14  that Sgt. Stewart did this on three separate occasions, and you

15  write the following day indicating only one for Lt. Joe, would

16  it be fair to say that Lt. Joe only made that decision and

17  verbalized it on one occasion on June the 1st?

18                  MR. BRASCHER:  Object to form.

19                  Go ahead.

20  A    That would be my assumption.

21  Q    (By Mr. Laux)  Can we extrapolate from that that May 31st

22  was a more -- was more of a civil disturbance than June the

23  1st?

24                  MR. BRASCHER:  Object to form.

25                  Go ahead.

ZOOM VIDEOCONFERENCE

109

1   A     I don't know.  I wasn't at the Capitol on the 31st for

2   this part of it.

3   Q     (By Mr. Laux)  Well, earlier in your testimony -- maybe we

4   were imprecise, but my notes show that you were present on May

5   31st.

6   A     I was in Conway at first, and then I went to the Capitol

7   at the end.  But for this first part of when -- when

8   Sgt. Stewart was making these decisions, I wasn't there.

9   Q     Okay.  But you were knowledgeable enough through whatever

10  sources to draft a memorandum memorializing these events;

11  right?

12                  MR. BRASCHER:  Object to form.

13                  Go ahead.

14  A     With information provided to me, yes.

15  Q     (By Mr. Laux)  Fair enough.  All I'm saying is this:  On

16  the 31st, there -- the decision was made to deploy less-lethal

17  and chemical munitions on three separate occasions, and on the

18  1st, it was just one occasion.  Agreed?

19                  MR. BRASCHER:  Object to form.

20                  Go ahead.

21  A     Well, in the memo, that's what it says.  That doesn't mean

22  that's the only time that he made a decision.  That's just how

23  many times it was written in the memo.

24  Q     (By Mr. Laux)  I understand that.  But every time that he

25  does make a decision as depicted in your memo, it represents a

110

1   time; right?

2   A    Yes.

3   Q    And so based on your memo, without a time-traveling

4   machine, we have to accept that on at least three occasions,

5   Stewart said use less-lethal munitions -- again, May 31st --

6   and on the following day the 1st, Joe only made that same order

7   on one occasion; correct?

8                    MR. BRASCHER:  Object to form.

9                    Go ahead.

10  Q    (By Mr. Laux)  In terms of what is documented in the

11  official record here.

12  A    Yes.  It was kind of --

13  Q    Okay.  So --

14                   MR. BRASCHER:  Hold on.  Let him --

15                   THE WITNESS:  Yeah.

16                   MR. BRASCHER:  -- finish.

17                   Go ahead and finish your answer.

18  A    It was kind of -- on the 31st, it was a movement.  It

19  started out at the interstate, and it was moving up to the

20  Capitol.  On the 1st, it was kind of one solid movement, if

21  that makes sense.  So it wasn't like -- it was like one event,

22  and the 31st was several events, if that makes more sense.

23  But --

24  Q    (By Mr. Laux)  So -- so you're -- you're not willing to --

25  you can't extrapolate that there was a greater degree of risk

ZOOM VIDEOCONFERENCE

111

1  to troopers on the 31st than there was on June the 1st?

2                 MR. BRASCHER:  Object to form.

3                 Go ahead.

4  A    I can't -- I can't quantify a risk to the troopers based

5  on crowd size.  I -- I don't know what the crowd size was on

6  the 31st because I was there at the end -- end of it, and so

7  I --

8  Q    (By Mr. Laux)  Fair enough.

9  A    -- I can't say that.

10  Q    Fair enough.  Was there any type of -- are you familiar

11  with the phrase "sentinel event"?

12  A    No.

13  Q    So in hospitals, sometimes when there's been a problem, a

14  death during surgery or something that -- it's called a

15  sentinel event, and that means that it's an event that we need

16  to examine to make sure it doesn't happen again.  Something

17  went wrong, and we need to get to the bottom of it.

18      Accepting that layperson definition, do you know if there

19  was ever any type of a sentinel event meeting or gathering

20  regarding Ryan Wingo's use of force on June the 1st?

21  A    I do not.

22                 MR. LAUX:  I might be finished.  If I could have

23         five minutes to look over my notes.

24                 MR. BRASCHER:  No problem.

25                 MR. LAUX:  Okay.

ZOOM VIDEOCONFERENCE

112

1        (Whereupon, a recess was taken, after which the

2        proceedings continued as follows, to-wit:)

3 BY MR. LAUX:

4 Q    You -- Lt. Brown, you believe that Wingo's reporting of

5 this, as reflected in his narrative, is an accurate statement

6 in regard to what occurred that evening; right?

7              MR. BRASCHER:  Object to form.

8              Go ahead.

9 A    Yes.

10 Q    (By Mr. Laux)  And you also believe that Sheeler's report

11 is accurate as to what he observed that -- on June 1st;

12 correct?

13             MR. BRASCHER:  Object to form.

14             Go ahead.

15 A    Yeah, pretty much.  Yes.

16 Q    (By Mr. Laux)  Well, what part are you not willing to --

17 what part are you not willing to say is accurate?

18 A    I apologize.  I've got too many papers here.

19      Yeah, it's pretty much . . .

20 Q    You're okay with it?

21 A    I think just the descriptions of -- of the -- of the

22 individual was off.

23 Q    On whose report?

24 A    I believe they have a little different descriptions.  One

25 says -- Sheeler says -- was it -- white shirt, gray shorts.

ZOOM VIDEOCONFERENCE

113

1  Q    Do you think that's accurate?

2  A    And Wingo says --

3              (Witness reviews documents.)

4  Q    I -- I'm -- I'm sorry to jump in here, but are you -- I --

5  I guess you're trying to determine what parts of Sheeler's

6  report you believe are not totally accurate.  Is that what

7  you're doing?

8              MR. BRASCHER:  I believe he's looking at both

9         reports.

10             THE WITNESS:  Yeah, I'm just making sure that --

11             Okay.

12 Q    (By Mr. Laux)  Let me ask it again.  Do you believe

13 Wingo's narrative to be accurate in regards to his interaction

14 with Mr. Cook?

15             MR. BRASCHER:  And I'd object to form.

16             Go ahead.

17 A    Yeah.  Yes.  Sorry.

18 Q    (By Mr. Laux)  Sure.  Do you believe the narrative of

19 Sheeler pertaining to his observations of Mr. Cook are

20 accurate?

21             MR. BRASCHER:  Object to form.

22             Go ahead.

23             And specifically are you looking for --

24             THE WITNESS:  Yeah.

25             MR. BRASCHER:  -- where it describes --

114

1            THE WITNESS:  Yeah --

2            MR. BRASCHER:  -- clothing?

3            THE WITNESS:  -- yeah, his -- I might be --

4            MR. LAUX:  I don't --

5            THE WITNESS:  -- missing it.

6  Q    (By Mr. Laux)  I don't want to jump on you, but if I

7  recall, you had mentioned that you had said something about

8  what Sheeler says Mr. Cook was wearing; and then I asked you,

9  Do you find that accurate?

10      Let me ask you:  Is the clothing description by Sheeler of

11  Mr. Cook accurate, in your opinion?

12  A    I don't know.  Because from the video I saw something

13  different than what he has, so I don't -- I don't know.

14  Q    Video is objective; correct?

15  A    Exactly.  Exactly.  So I don't know -- I can't --

16  Q    Video is objective; right?

17  A    Yes.  So I can't --

18  Q    And even -- and even if --

19  A    -- that's the only --

20  Q    -- they're accurate --

21  A    -- you asked me is the description of him accurate.  I

22  can't say the description -- I can't say a hundred percent yes,

23  because from what I remember about the video is not the same --

24  exactly the same as what he says here.  So I don't know --

25  Q    Right.  I agree.  Okay.  I understand your testimony.

115

1      Do you agree with me that video footage is objective,

2 meaning that it doesn't have a dog in the race?  It is what it

3 is; right?

4 A    Yeah.  Yeah.

5 Q    And -- and regardless of the trustworthiness of the

6 officer, a report is subjective because it consists of that

7 officer's perception.  Do you agree?

8               MR. BRASCHER:  Object to form.

9               Go ahead.

10 A    That's -- that's what he remembers.

11 Q    (By Mr. Laux)  Where video footage contradicts an

12 officer's report, you agree with me that the more accurate

13 source of information would be the objective video footage;

14 right?

15               MR. BRASCHER:  Object to form.

16               Go ahead.

17 A    It could, yes.

18 Q    (By Mr. Laux)  Well, (audio interference) with you a bit

19 on this one.

20 A    Oh, you froze again.

21 Q    You say it --

22 A    You froze again.

23 Q    -- "it could."  And I respect you, and you're very

24 diplomatic guy.  But all I'm saying is that (audio

25 interference) is, you know, one of the benefits of video is

116

1  that it puts to rest a --

2  A    Yes.

3  Q    -- he said/she said situation potentially; right?

4  A    Yes.

5  Q    And where a person like Mr. Cook says, I was dressed a

6  certain way, and Sheeler says, Mr. Cook was dressed another

7  way, the video footage could put that debate to rest; correct?

8              MR. BRASCHER:  Object to form.

9              Go ahead.

10 A    It could.

11 Q    (By Mr. Laux)  In this case, the video footage confirms

12 that Sheeler's description of what Mr. Cook was wearing is

13 inaccurate.  Do you agree with that?

14             MR. BRASCHER:  Object to form.

15             Go ahead.

16 A    By his report, it's not the same as on the video.  Fair.

17 Q    (By Mr. Laux)  Do you have an opinion as to which source

18 of information is more reliable, the video footage or Sheeler's

19 report?

20 A    You can watch the video and see.  The video, of course, if

21 that was Mr. Cook on the video.  That's -- I don't --

22             (Technical difficulties.)

23             MR. BRASCHER:  He froze up again.

24             THE WITNESS:  Oh.  You're frozen.

25 Q    (By Mr. Laux)  I froze up a bit there.

117

```
1   A    Oh, you're back.

2   Q    You said the video; correct?

3   A    If that was Mr. Cook on the video I saw, yes, that's --

4              MR. LAUX:  Shoot.

5              THE WITNESS:  Did you go?  Are you back?

6              Did he leave?

7              THE COURT REPORTER:  Do you guys want to go off

8         the record for a minute?  Because he's frozen on my

9         end too.

10             MR. BRASCHER:  And now he's dropped.

11             THE COURT REPORTER:  We're off the record.

12             (Whereupon, due to technological difficulties, a

13        recess was taken, after which the proceedings

14        continued as follows, to-wit:)

15  BY MR. LAUX:

16  Q    And -- and we're totally about to wrap up, sir.  But did I

17  hear your answer to that last question as saying that you

18  believe that video footage would be more reliable than

19  Sheeler's report as it relates -- as it relates to Mr. --

20  A    (Simultaneous speaking), yes.

21  Q    -- as it relates --

22             MR. BRASCHER:  He's --

23  Q    (By Mr. Laux)  -- to Mr. Cook's attire or what -- his

24  clothing on June 1?

25  A    If that was Mr. Cook in -- in the video that I saw, it's a
```

ZOOM VIDEOCONFERENCE

118

1    different clothing description than what's in the narrative.

2    Q    And you believe that person to be Mr. Cook, as you sit

3    here; right?

4    A    That's what I was told, yes.  I don't --

5    Q    Okay.

6    A    -- know the man, but yes.

7    Q    You're not aware of Mr. Cook changing clothes at any time

8    that evening, are you?

9    A    No, sir.

10   Q    Okay.  At any time, did you tell Mr. Cook words to the

11   effect of, "Well, you shouldn't have been out after curfew"?

12   A    No, sir.

13   Q    Merely being out after curfew is not in and of itself

14   grounds to use force on a person.  Agreed?

15              MR. BRASCHER:  Object to form.

16              Go ahead.

17   A    Correct.

18              MR. LAUX:  Lieutenant, I think that's all I

19        have.  I thank you very much for your time today,

20        sir.

21              THE WITNESS:  Thank you.

22              MR. BRASCHER:  I've got just a few questions for

23        you, Lieutenant.  Just a few.

24              THE WITNESS:  Awesome.

25                   CROSS-EXAMINATION

ZOOM VIDEOCONFERENCE

119

1 BY MR. BRASCHER:

2 Q    Okay.  Could you explain to me what the communication was

3 like on June 1st between your subordinates and the people above

4 you?

5 A    Okay.  I was communicating -- first -- when we first

6 started, I was at a command center talking directly to

7 Col. Bryant.

8 Q    And by "first started," you mean May 30th --

9 A    Yes.

10 Q    -- and 31st?

11 A    May -- May -- May 30th, 31st.

12    I was first at a command center talking to Col. Bryant

13 directly and then communicating with -- with Lt. Joe, and that

14 communication became a problem -- I can't remember what day --

15 the 31st.  Is that the day we went to Conway?  Yes.  We went to

16 Conway.  Sgt. Joe -- Lt. Joe and I went to Conway, and

17 Sgt. Stewart went to the Capitol.

18    And after that, I remained with Lt. Joe because -- and

19 then communicated directly with Col. Bryant from the Capitol --

20 because it's hard for me to communicate with Lt. Joe from --

21 from the command center because he had -- he had to make

22 decisions on the ground, and it's hard to make that link.  And

23 so via radio, I would communicate with Col. Bryant to make --

24 so he would have the information to make that high-level

25 command decisions, where we needed to go, where he wants to go.

ZOOM VIDEOCONFERENCE

120

1   Q    Sure.  Okay.

2   A    Yeah.

3   Q    You testified that you've never been present in a law

4   enforcement capacity at a protest or a riot before.  Obviously,

5   you've had a long career.  Would you acquiesce to -- if there

6   was a document or something saying that you had been present in

7   a law enforcement capacity at one of those, would you agree

8   with that document?

9   A    Yes, sir.

10  Q    Okay.  When -- you were an instructor on less-lethal

11  weapons; is that right?

12  A    I was.

13  Q    Was.

14       While you were -- I'm assuming that there were a lot more

15  less-lethal weapons that you were working with than just the

16  Remington 870 12-gauge; is that right?

17  A    Correct.

18  Q    Okay.  And the Remington 870 12-gauge, when it's issued to

19  you, you said that it just comes in the gun; right?  It's just

20  the gun; right?

21  A    Correct.

22  Q    You don't get it in a box that's with a FedEx label on it

23  or anything; right?

24  A    No, sir.

25  Q    Okay.  So if there is some instruction manual that comes

ZOOM VIDEOCONFERENCE

121

1   with it, do you get that?

2   A    No, sir.

3   Q    Okay.  You said that things were being thrown at you guys

4   on June 1st.  Can you describe everything that was being thrown

5   at you?

6                    MR. LAUX:  I'm going to have to object to the

7          foundation.

8                    But you can answer the question.

9   A    Frozen water bottles, rocks, bricks -- like, you know, not

10  like cinder block, but bricks -- balloons filled with -- I

11  don't know what they were filled with -- different things,

12  sticks, other things.  I don't know what all it was.

13  Q    (By Mr. Brascher)  Were there any fireworks --

14  A    Oh, yeah.

15  Q    -- or munitions?

16  A    I'm sorry.  Yes.  Artillery shells, which is the large

17  fireworks.  That's the way it started out on May 30th, I think

18  it was.

19  Q    You -- for Mr. Cook, you were not the arresting officer of

20  Mr. Cook; right?

21  A    I was not.

22  Q    So as the person who was not the arresting officer, would

23  it be normal for you to, then, insert yourself into the arrest

24  of an individual?

25  A    No, sir.

122

1   Q    Is it standard or normal to issue a question out to the

2   entire Arkansas State Police to try to get their answer on

3   something?

4   A    Not usually, no.

5               MR. BRASCHER:  The -- if I can point us back to,

6          Mr. Laux, the specific part of the -- where we had

7          the four different things that could be in the

8          PepperBalls.  Do you remember what specific page or

9          exhibit that was?

10              THE WITNESS:  I think the policy.

11              MR. LAUX:  It was not an exhibit, but it would

12         be from the emergency -- I believe it's from the

13         emergency response --

14              MR. BRASCHER:  Okay.  That's right.

15   Q    (By Mr. Brascher)  I'll just ask this.  You remember from

16   that being read that it said "but not limited to"; right?

17   A    Yes.

18   Q    So it means that that could be more than the four things

19   that were characterized in that list; correct?

20   A    (Nonverbal response.)

21         Correct.  I'm sorry.  Yes.

22   Q    Okay.

23   A    (Indiscernible.)

24   Q    Talk to me about the computer system that you guys use to

25   file incident reports with the Arkansas State Police.

ZOOM VIDEOCONFERENCE

123

```
 1  A    Oh, it's very archaic.  You know, it could be -- when you
 2  -- when you input your information, it could be -- the days
 3  could be wrong; the incident numbers could be wrong; or it
 4  could have dual incident numbers; names could be wrong.
 5  There's a myriad of things that can be wrong with it, and you
 6  have to go in there and -- the supervisor has to go in there
 7  and change it or send it back to the trooper to get it changed.
 8  Q    Is there an auto-populate function where if you put in
 9  someone's name, it'll fill out the rest of the information?
10  A    Yes, you can drag and drop if you've got a person's name,
11  and it'll auto-populate their address and weight and -- and the
12  height and field number and all that stuff.
13  Q    And then last couple of things.  You -- Mr. Cook was not,
14  as far as you're aware, search incident --
15              MR. BRASCHER:  Oh, we lost Mr. Laux.
16              THE COURT REPORTER:  Hold on.  Yeah.  Off the
17         record.  He just fell off.
18              MR. BRASCHER:  Okay.
19              (Whereupon, due to technical difficulties, a
20         recess was taken, after which the proceedings
21         continued as follows, to-wit:)
22              MR. LAUX:  Okay.  I'm going to -- I'm going to
23         finish the deposition without the video component.
24         Okay?
25              MR. BRASCHER:  Okay.  Appreciate it.
```

124

```
 1              MR. LAUX:  Okay.
 2              MR. BRASCHER:  So we just got a couple questions
 3          left here.
 4              MR. LAUX:  And just to recap, though, you were
 5          describing technical difficulties with
 6          communications, is that correct, Lieutenant?
 7              THE WITNESS:  Technical difficulties with the
 8          computer -- report system.
 9          Right?
10              MR. BRASCHER:  Yes.
11              MR. LAUX:  Okay.
12              THE WITNESS:  Yes.
13              MR. LAUX:  Got it.
14          Okay.  Mr. Brascher, you can -- you can
15          continue, Mr. Brascher.  Thank you for your patience.
16              MR. BRASCHER:  No problem.
17              Ms. Waid, are we on the record?
18              THE COURT REPORTER:  Yes, go ahead.
19              MR. BRASCHER:  Okay.  Thank you.
20              MR. LAUX:  Yes.
21  BY MR. BRASCHER:
22  Q    So when Mr. Cook was arrested, to the best of your
23  knowledge, he wasn't searched incident to arrest, or at least
24  you didn't search in incident --
25  A    I did not --
```

ZOOM VIDEOCONFERENCE

1  Q    -- to arrest?

2  A    I did not search him.

3  Q    Okay.  Is it ever practice to -- if an individual is

4  injured, that you don't immediately search them to arrest --

5  incident to arrest?

6  A    Can you repeat that?

7  Q    If an individual is injured, might you try to get them

8  attention before you do the incident to arrest search?

9  A    It depends on the injuries.

10  Q    Okay.

11  A    I -- I would think with his injuries, he should have been

12  searched.

13  Q    Okay.

14  A    That's -- that's what I thought.

15  Q    Okay.  And then regarding the order on -- to use

16  less-lethal weaponry, and there was talk about the three

17  different orders on May 31st --

18  A    Yeah.

19  Q    -- why were there three different orders on May 31st?

20  A    Because it seemed like there was three different instances

21  of -- of disturbances.  It was like there was one, and then

22  there was a cessation of disturbance; and then it started back

23  up again, so there's another order, cessation of disturbance,

24  and another order.  And then on the 1st, it was just one solid

25  disturbance.

ZOOM VIDEOCONFERENCE

126

```
1   Q    Okay.  So on the 1st, it would be more like a standing
2   order because there was --
3   A    Correct.
4   Q    -- no real pause?
5   A    Correct.
6   Q    Okay.
7   A    A pause in action, I guess, you could call it.
8   Q    Okay.
9              MR. BRASCHER:  That's all I've got.  Nothing
10         further.
11             MR. LAUX:  I have just a few.
12                       REDIRECT EXAMINATION
13  BY MR. LAUX:
14  Q    In your opinion, Lt. Brown, what was the most violent of
15  the evenings of the George Floyd protests?
16  A    The most violent?
17  Q    The most challenging to police, the most violent -- you
18  know, the most, you know, combative protesters, that line of --
19  A    Oh, okay.  It was, in my opinion, probably the 31st, where
20  we had two different places we were -- we were at, two
21  different scenarios, two different situations we -- we had to
22  deal with.  It was probably the most --
23  Q    Fair to say -- fair --
24  A    -- probably the most violent.
25  Q    -- fair to say you were stretched more thinly on the 31st
```

ZOOM VIDEOCONFERENCE

127

1   compared to the 1st?

2   A    Oh, greatly, yes.

3   Q    Now, I believe it's Exhibit 8 which is your memorandum of

4   June 25, 2020; correct?

5              MR. BRASCHER:  We got to -- we're -- we're

6        finding it here.

7              MR. LAUX:  Sure.

8              THE WITNESS:  Where are we at?  Say that again.

9   Q    (By Mr. Laux)  Is -- your memorandum, what exhibit is it?

10  A    8.

11  Q    Okay.  When you drafted that exhibit -- strike.

12       When you drafted that memorandum, Exhibit 8, did you draft

13  that on June 25th?

14  A    That is correct.

15  Q    By June 25th, had you reviewed Wingo and Sheeler's

16  reports?

17  A    I don't recall.

18  Q    Well, would it have been your pattern and practice to have

19  read those reports before drafting that memorandum, you know, a

20  couple of weeks later?

21  A    Yes, we went through a lot of reports, a lot of reports,

22  so I don't know the exact date we -- we did all the reports.

23  Q    You'll notice that next to your name on that memorandum

24  there appears to be initials; correct?

25  A    Correct.

ZOOM VIDEOCONFERENCE

128

1   Q     Is that your penmanship?

2   A     That is.

3   Q     If you look at Sheeler's report, Exhibit Number 1 --

4   A     Uh-huh.

5   Q     -- am I correct -- am I correct that that same set of

6   initials is written next to the handwritten 6/1/20?

7   A     That is correct.

8   Q     Did you write the 6/1/20 on those -- in those boxes?

9   A     Looks like my handwriting, yes.

10  Q     Why would you -- why would you be putting a date on

11  Sheeler's report?

12  A     Because it -- evidently it would have the wrong date on

13  it.

14  Q     Is it possible that Sheeler's report was not drafted in

15  June of 2020?

16  A     That would be -- I -- I wouldn't think it would be.

17  Q     I understand.  Is it conceivable?

18  A     That it wasn't -- it was drafted when?

19  Q     Is it conceivable that that report was not drafted during

20  the month of June 2020?

21              MR. BRASCHER:  Object to form.

22              Do you understand what he's asking?

23  A     Are you saying the report was done later than June?

24  Q     (By Mr. Laux)  I'm asking you if it is possible that

25  Sheeler completed that report sometime subsequent to June 2020.

129

1    MR. BRASCHER:  Object to form.

2    Go ahead.

3  A    It's always possible.  I don't -- I don't know when he did

4  it.

5  Q    (By Mr. Laux)  So it would seem that Sheeler put a date on

6  there that you believe to be inaccurate; is that fair?

7    MR. BRASCHER:  Object to form.

8    Go ahead.

9  A    The date on the incident -- the date of the incident and

10  the call date was incorrect, so I corrected it.

11  Q    (By Mr. Laux)  Do you recall what he listed as the

12  incident date that required your correction?

13  A    No, I don't.

14  Q    Can you rule out that Sheeler didn't draft that report

15  after Mr. Cook made a claim for damages against the state?

16  A    No, I can't rule it out.  I don't know when -- I don't

17  know when this was done.

18  Q    And again, just as we're sitting here today, do you have a

19  recollection of using -- of whiting out what he wrote and

20  putting what you wrote?

21  A    No.  No, sir.

22  Q    Do you recall any conversations with Sheeler regarding his

23  information in those boxes that you corrected?

24  A    No, sir.

25  Q    Have you ever seen any --

130

1   A    (Simultaneous speaking.)

2   Q    -- have you ever seen any video of Mr. Cook giving a

3   statement or a deposition at this point?

4   A    No, sir, I have not.

5   Q    You mentioned before during Mr. Brascher's questioning

6   that some of the protesters were throwing water bottles,

7   bricks, balloons filled with fluid.  Do you recall that

8   testimony?

9   A    Yes, sir.

10  Q    And you guys don't have an easy job when you've got to

11  handle protests and balance the constitutional protections.

12  But you agree with me that part of your duty is determining

13  whom among the protesters are guilty or are observed to be

14  doing those aggressive things versus those who are not;

15  correct?

16  A    Correct.

17                  MR. BRASCHER:  Object to form.

18                  Go ahead.

19  A    Correct.

20  Q    (By Mr. Laux)  And lastly, you don't have -- other than

21  Wingo -- other than what's drafted in Wingo's report and

22  Sheeler's report, you don't have any evidence at all that

23  Mr. Cook was throwing any foreign objects or debris at

24  officers, do you?

25  A    I do not.

ZOOM VIDEOCONFERENCE

131

1          MR. BRASCHER:  Object to form.

2          Go ahead.

3  A    I do not.

4  Q    (By Mr. Laux)  But you do believe that he turned towards

5  the approaching line with clenched fists; correct?

6          MR. BRASCHER:  Object to form.

7          Go ahead.

8  A    Do I believe that?

9  Q    (By Mr. Laux)  Well, that is what one of -- that's what, I

10 believe, Sheeler or Wingo says, and you believe that that's

11 accurate, what they say; correct?

12 A    That is correct.

13         MR. LAUX:  Okay.  And that's it for me, sir.

14         MR. BRASCHER:  Nothing further.

15         (Thereupon, the deposition was concluded at

16    1:23 p.m.)

17

18

19

20

21

22

23

24

25

ZOOM VIDEOCONFERENCE

132

REPORTER'S CERTIFICATE

I, AMY WAID, Certified Court Reporter in and for the State of Arkansas, do hereby certify as follows:

(1) that on August 23, 2023, LT. BOBBY G. BROWN was duly sworn by me prior to the taking of testimony as to the truth of the matters attested to and contained therein;

(2) that the foregoing pages contain and are a true and correct transcription of the proceedings as reported verbatim by me via the voice-writing method to the best of my ability and transcribed and reduced to typewritten form by myself or under my direction and supervision, and subject to appropriate changes submitted by witness, if any, during their requested reading and signing of this deposition according to the Arkansas Rules of Civil Procedure;

(3) that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and that I am not a relative or employee of any attorney employed by the parties hereto;

(4) that I am not financially or otherwise interested in the outcome of this action that affects or has a substantial tendency to affect impartiality or requires me to relinquish control of an original or copies of a deposition transcript before it is certified, or that requires me to provide any service not made available to all parties to the action;

(5) and that I have no contract with the parties, attorneys, or persons with an interest in the action; and that I am not knowingly identified on a preferred provider list, whether written or oral, for any litigant, insurance company, or third-party administrator involved in this matter.

This transcript is prepared at the request of plaintiff's counsel, and all fees are billed directly to Laux Law Firm in compliance with the Arkansas Board of Court Reporter Examiners Regulations Section 19.

Witness my hand and seal this 24th day of September, 2023.

*Amy Waid*

Amy Waid
Certified Court Reporter #853
P.O. Box 10385, Conway, Arkansas 72034

Amy Waid
Arkansas Supreme
Court-Certified
Court Reporter
CCR No. 853

WAID REPORTING

| A | | | | |
|---|---|---|---|---|
| | 126:7 | 50:20 | 120:7 | 53:22, 54:4 |
| | 132:10 | 50:22, 72:9 | 130:12 | 54:13 |
| Aaron 25:10 | 132:12 | aggressor | Agreed | 54:21, 55:3 |
| 101:24 | 132:15 | 103:23 | 34:14 | 55:13 |
| abdomen | 132:16 | 103:24 | 96:20 | 55:20, 56:1 |
| 53:24 | actions | ago 16:7 | 109:18 | 56:11, 57:3 |
| ability | 32:13 | 29:10 | 118:14 | 57:16, 58:1 |
| 132:7 | 59:23 | 70:13 | agreement | 58:20 |
| able 15:3 | 59:24 | agree 13:21 | 2:24, 97:22 | 60:18, 61:6 |
| 21:2 | 63:20 | 29:21, 30:2 | ahead 14:23 | 62:8, 63:23 |
| above-styled | 72:21 | 30:16 | 14:25 | 64:7, 64:13 |
| 3:5 | 105:17 | 31:10, 32:6 | 16:20, 17:8 | 64:17 |
| academy | active | 33:2, 33:4 | 20:23, 21:6 | 64:24 |
| 11:21 | 10:10 | 33:7, 33:10 | 21:12 | 66:12 |
| accept 58:9 | 10:11 | 33:12 | 21:18 | 66:17, 69:2 |
| 110:4 | acts 7:25 | 33:19, 34:6 | 23:13 | 70:18, 75:6 |
| accepted | acuity | 36:2, 43:21 | 24:11 | 75:13 |
| 95:20 | 92:15 | 44:6, 45:24 | 24:20 | 75:21, 76:9 |
| Accepting | 94:17 | 50:9, 51:25 | 26:16 | 77:24 |
| 111:18 | addition | 52:9, 52:18 | 26:23, 27:7 | 78:14 |
| access 77:8 | 12:13 | 53:7, 53:9 | 29:17 | 78:21 |
| 83:3 | address | 54:11 | 29:23, 30:4 | 79:13 |
| accompanies | 53:17 | 54:19, 55:6 | 30:20 | 80:16 |
| 44:18 | addressing | 55:9, 55:18 | 30:25, 31:5 | 80:21, 81:9 |
| accuracy | 53:25 | 55:24, 56:4 | 31:12 | 81:19 |
| 86:23 | administr... | 56:8, 56:14 | 31:23, 32:8 | 82:17 |
| accurate | 132:17 | 56:25, 57:1 | 32:18 | 82:25 |
| 25:20 | advancing | 57:4, 57:4 | 33:14 | 83:13 |
| 27:17 | 31:18, 51:3 | 57:24 | 33:21, 34:2 | 83:19 |
| 112:5 | 51:11 | 58:18 | 34:8, 34:16 | 84:19 |
| 112:11 | affect | 59:17, 64:9 | 35:5, 36:5 | 85:21, 86:1 |
| 112:17 | 132:13 | 77:19, 78:9 | 36:10 | 86:6, 86:11 |
| 113:1 | Affidavit | 78:12 | 36:18 | 86:16 |
| 113:6 | 2:17 | 78:19 | 37:21, 38:2 | 86:22, 87:3 |
| 113:13 | affirm | 79:11 | 39:12 | 87:10 |
| 113:20 | 24:15 | 84:16, 86:4 | 39:18, 41:8 | 87:23 |
| 114:9 | after-action | 86:9, 86:24 | 41:15, 42:1 | 88:18 |
| 114:11 | 17:13 | 87:20 | 42:12, 43:4 | 88:24, 89:4 |
| 114:20 | 25:19 | 92:15 | 43:25 | 89:11, 90:3 |
| 114:21 | 47:16 | 94:18, 95:2 | 44:14 | 90:9, 90:19 |
| 115:12 | 99:13 | 95:4, 95:16 | 44:25 | 91:4, 91:10 |
| 131:11 | 100:13 | 96:4, 96:9 | 45:21, 46:1 | 92:12 |
| acid 74:11 | agencies | 96:10 | 46:9, 46:14 | 92:25, 93:8 |
| 76:19 | 28:20 | 98:12 | 48:12 | 93:22 |
| acquiesce | 29:21 | 98:24 | 49:17 | 94:12 |
| 120:5 | 29:25, 31:8 | 114:25 | 50:12 | 94:20, 95:6 |
| act 14:1 | 64:4 | 115:1 | 50:18, 51:7 | 95:11 |
| 58:17, 98:9 | aggressive | 115:7 | 51:23, 52:6 | 95:18, 96:6 |
| action 2:20 | 51:13 | 115:12 | 52:16 | 96:12 |
| 90:11 | 130:14 | 116:13 | 52:24, 53:5 | 96:17 |
| 90:11 | aggressively | | 53:15 | 96:22 |

97:10, 98:3
98:15, 99:1
103:10
103:20
104:3
105:10
106:10
107:11
107:17
107:25
108:11
108:19
108:25
109:13
109:20
110:9
110:17
111:3
112:8
112:14
113:16
113:22
115:9
115:16
116:9
116:15
118:16
124:18
129:2
129:8
130:18
131:2
131:7
aim 53:11
aimed 53:20
aiming
 56:23, 57:7
aims 56:7
air 74:8
al 5:6
Alabama
 27:17
 28:25
alerting
 107:5
allegations
 13:21
 13:22
alleged
 7:25
allowed

23:15
23:17, 51:6
79:6
ambulance
 67:15
ambulating
 79:10
Amendment
 34:10
 34:11
 34:12
 34:24
amount
 90:10
 90:12
Amy 1:20
 3:6, 132:2
 132:24
analyzing
 94:3
and/or
 76:23
angle 55:4
 55:14
answer 6:16
 6:18, 7:7
 7:7, 9:23
 14:24, 17:8
 20:23, 21:6
 21:12
 21:18
 24:11
 24:20
 26:16, 27:7
 29:17
 29:23, 30:4
 41:9, 51:7
 56:16, 58:2
 59:4, 59:8
 74:14
 74:19
 105:23
 110:17
 117:17
 121:8
 122:2
answered
 75:20
answers 3:2
 18:9
apologize

43:5, 43:6
43:7, 43:17
52:8, 57:6
112:18
APPEARANCES
 1:12, 2:3
appears
 80:25
 127:24
applicable
 4:20
appreciate
 71:2
 104:23
 123:25
approach
 23:22
 51:19
approaching
 50:20
 50:21
 50:22, 51:3
 51:11, 72:9
 97:23
 98:21
 131:5
appropriate
 132:8
approximate
 47:10, 67:7
approxima...
 11:2, 19:21
 19:22, 47:5
 70:7, 71:10
April 2:22
archaic
 123:1
area 20:18
 50:7, 50:8
 50:14
 50:19, 51:2
 51:17, 53:2
 54:11, 67:4
 67:5, 67:7
 67:8, 68:10
 71:2, 74:3
 79:2, 79:8
 86:25
 97:13
areas 54:5
 57:21

Ark 2:18
Arkansas
 1:1, 1:15
 1:17, 1:18
 1:23, 3:4
 3:6, 4:18
 4:19, 4:21
 6:1, 8:18
 9:9, 9:15
 12:9, 12:22
 13:1, 13:3
 13:14
 14:15
 18:10, 30:1
 36:15
 38:18
 45:13
 45:17, 62:4
 62:25, 66:6
 73:1, 91:8
 122:2
 122:25
 132:2
 132:9
 132:20
 132:25
armed 9:25
 10:1
armor 44:3
 44:3
armored
 85:23
Army 9:24
 9:24, 10:1
 10:8, 11:7
 11:10
 11:13
 11:17
 12:14, 13:6
 13:7, 13:12
arrest 2:16
 2:17, 21:9
 21:16, 61:9
 61:12
 61:19
 62:12
 62:13
 63:17, 64:2
 68:22, 69:7
 82:15, 99:5
 121:23

124:23
125:1
125:4
125:5
125:8
arrested
 68:24
 124:22
arresting
 62:16, 65:6
 65:6, 65:19
 121:19
 121:22
arrive 47:4
arrived
 49:21
 49:22
articulated
 30:11
 34:11
 34:12
 34:25
articulating
 45:11
 105:18
Artillery
 121:16
aside 97:5
 97:8
asked 63:13
 63:14
 68:14
 68:15
 75:19
 83:16
 114:8
 114:21
asking
 13:20
 15:22, 33:9
 34:18
 37:25
 56:19
 56:21, 58:8
 58:9, 65:19
 71:25, 77:7
 93:18
 128:22
 128:24
ASP 2:20
 18:17

WAID REPORTING

37:14
37:19
45:10, 77:8
aspect
27:22
assigned
68:12
assist
28:20
assistant
1:17, 25:17
association
31:9, 31:17
31:21
assume 32:9
49:5, 78:22
95:12, 96:1
assuming
12:24, 39:7
46:21
61:22
61:24
66:19
120:14
assumption
51:15
63:16
68:11
74:14, 78:1
78:4, 78:7
93:13
93:14
104:21
105:23
108:20
attached
2:25, 73:14
99:12
102:1
attempt
105:3
attempted
63:9
attend 9:16
attended
10:16
27:16
attention
72:3, 80:3
80:7, 99:7
125:8

attested
132:4
attire
117:23
attorney
1:17, 1:17
6:1, 6:3
132:11
attorneys
132:16
audibly 6:7
audio
115:18
115:24
August 1:9
3:5, 132:3
authored
17:11
17:20, 18:3
19:18
authority
24:15
24:25, 75:1
75:10
105:15
105:16
107:5
authoriza...
103:21
106:23
authorized
56:2
107:14
authorizes
106:13
authorizing
35:2
auto-popu...
123:8
123:11
automatic
43:6, 43:12
43:16
automatic...
87:17
available
132:14
AVENUE 1:14
avoid 6:11
aware 14:7
17:19

30:11, 32:2
70:22, 71:9
72:4, 72:8
72:12
72:16
72:22, 73:1
73:3, 83:21
97:1, 118:7
123:14
awareness
26:18, 27:2
Awesome
118:24

**B**

B.A 10:23
bachelor's
10:20
10:25
back 10:23
14:5, 25:18
48:20
58:25, 59:1
59:3, 60:23
61:22, 62:2
65:8, 65:12
70:4, 70:6
74:2, 79:5
87:7, 117:1
117:5
122:5
123:7
125:22
background
8:23
bad 35:7
58:4, 75:9
badge 62:23
balance
130:11
balloons
121:10
130:7
based 23:24
27:15
57:10
59:12
77:18
84:23
92:16

92:17
104:7
107:6
107:7
110:3
111:4
basic 35:11
basically
23:15
24:15
27:20
67:13
107:8
basing
32:11
basis 59:16
Bates-stamp
18:11
18:11
beanbag
13:23
13:24
13:24
16:23, 17:6
21:1, 36:7
36:15
36:16
37:15
37:18
39:21
40:16
40:19
42:25
52:19
52:22, 53:1
53:10
53:20
54:15
54:24, 56:6
56:23
57:12
58:12, 60:3
79:9, 84:24
88:1, 88:2
90:23
91:18
92:19, 93:4
94:6, 98:12
102:15
103:3
105:18

107:5
107:14
bear 85:13
85:16
85:19
85:23, 86:3
begins
45:10
51:19, 99:9
BEHALF 1:13
1:16
behaving
52:1
behavior
98:20
belabor
75:16
belief
34:11
90:22, 91:6
beliefs
34:11
72:21
believe
7:22, 9:13
18:19, 19:1
28:4, 39:2
46:10
46:11
46:18, 49:3
54:23
59:16
59:22
62:13
68:10
81:22
81:25
86:13, 91:6
91:7, 99:22
99:22
99:25
112:4
112:10
112:24
113:6
113:8
113:12
113:18
117:18
118:2
122:12

127:3
129:6
131:4
131:8
131:10
131:10
belligerent
98:22
beneath
25:14
benefits
115:25
best 15:6
25:8, 38:20
124:22
132:6
bets 98:21
better
11:21
beyond
28:23
bicker
90:21
billed
132:19
bit 8:21
8:23, 8:24
10:22
13:13
16:14
33:17
45:10
70:13
85:18
115:18
116:25
bleeding
61:11, 70:3
blindness
55:17
block
121:10
blockage
79:1
Board
132:20
Bobby 1:9
3:2, 4:3
4:13, 4:15
132:3
bodily

59:17
96:20
body 53:19
54:11
54:17, 56:8
56:24
57:12
58:12
68:24
82:14
booked
68:19
born 9:14
bothered
64:15
bottles
121:9
130:6
bottom 7:4
108:3
111:17
bound 6:22
box 1:22
44:11
120:22
132:25
boxes 128:8
129:23
brain 55:16
branch 10:1
brand 74:6
Brascher
1:16, 2:7
5:25, 6:3
14:22
14:25
15:14
15:19
15:21
15:23
15:25, 16:4
16:17
16:19, 17:7
18:14
18:21, 19:4
19:8, 19:13
20:22, 21:5
21:11
21:17
23:13
24:10

24:17
24:19
26:15
26:22, 27:6
29:16
29:22, 30:3
30:17
30:19
30:24, 31:4
31:11
31:22, 32:7
32:17
33:13
33:20, 34:1
34:7, 34:15
35:4, 36:4
36:9, 36:17
37:3, 37:11
37:20, 38:1
38:9, 38:12
39:1, 39:11
39:17, 41:7
41:14
41:25
42:11, 43:3
43:19
43:24
44:13
44:24
45:20
45:25, 46:8
46:13
48:12
48:14
48:16
49:16
50:11
50:17, 51:6
51:22, 52:5
52:15
52:23, 53:4
53:14
53:21, 54:3
54:12
54:20, 55:2
55:12
55:19
55:25
56:10
56:15, 57:2
57:15

57:25
58:19
58:24, 59:4
59:18
60:17, 61:5
62:7, 63:22
64:6, 64:12
64:16
64:23
66:11
66:16, 69:1
70:17
70:19
73:19, 75:3
75:5, 75:12
75:19, 76:8
77:4, 77:6
77:8, 77:9
77:11
77:17
77:23
78:13
78:20
79:12, 80:5
80:13
80:15
80:20, 81:8
81:18
82:12
82:16
82:24, 83:5
83:12
83:18, 84:6
84:18
84:25
85:10
85:20
85:25, 86:5
86:10
86:15
86:21, 87:2
87:9, 87:22
88:17
88:23, 89:3
89:10, 90:2
90:8, 90:18
91:3, 91:9
91:13
91:22, 92:1
92:11
92:24, 93:7

93:21
94:10
94:19, 95:5
95:10
95:17
95:25, 96:5
96:11
96:16
96:21, 97:9
97:20, 98:2
98:6, 98:14
98:25, 99:8
99:10
99:18
100:21
100:24
101:1
102:4
103:9
103:19
104:2
104:9
105:9
106:9
107:2
107:10
107:16
107:24
108:10
108:18
108:24
109:12
109:19
110:8
110:14
110:16
111:2
111:24
112:7
112:13
113:8
113:15
113:21
113:25
114:2
115:8
115:15
116:8
116:14
116:23
117:10

117:22
118:15
118:22
119:1
121:13
122:5
122:14
122:15
123:15
123:18
123:25
124:2
124:10
124:14
124:15
124:16
124:19
124:21
126:9
127:5
128:21
129:1
129:7
130:17
131:1
131:6
131:14
Brascher's
130:5
breach
26:21
94:23
break 19:10
37:5, 38:11
80:4
brick-and...
12:5
bricks
121:9
121:10
130:7
bridge
61:13
brief 37:5
briefly
5:22, 8:25
10:15
12:16
36:23
79:15
bring 36:23

broke 25:25
25:25
broken
25:21
brought
60:23, 61:9
61:10
62:18, 63:7
65:8
Brown 1:9
2:21, 3:2
4:3, 4:13
4:15, 5:2
5:4, 38:16
112:4
126:14
132:3
brutality
33:12
Bryant 1:6
12:11
18:24, 25:9
27:16
119:7
119:12
119:19
119:23
Bryant's
18:24
building
12:6
106:17
buildings
26:21
bunch 10:21
bush 20:19
bystander
87:1
bystanders
96:10

C

CAD 65:3
65:16
caliber
74:9
call 46:5
87:25
126:7
129:10

called
111:14
calls 32:1
Camden 12:9
Camp 13:8
13:9
canister
20:12
20:14
20:17
canisters
21:1, 71:12
capacity
34:21
120:4
120:7
Capitol
1:14, 14:20
15:10
16:11, 47:4
47:11
49:11, 67:9
67:11
71:16, 79:5
79:6, 79:7
106:17
109:1
109:6
110:20
119:17
119:19
caps 76:21
CAPTION 2:5
3:1
captioned
5:5
carbon 74:8
care 52:20
70:6
career
11:14, 26:7
120:5
carrying
26:1
cascade
106:24
case 1:4
5:2, 12:11
13:22
36:21
52:12

69:11
116:11
cases 13:1
categorize
50:2
category
77:21
cause 3:5
35:15
cautioned
4:5
caveat 23:8
23:10
23:10
23:11
56:13
CCR 1:20
center 1:18
32:1, 32:1
48:21
119:6
119:12
119:21
CENTRAL 1:2
certain
29:20
30:14, 52:1
54:5
103:12
116:6
certainly
19:11, 24:7
44:20
certificate
2:10, 27:25
28:2, 132:1
certified
3:6, 29:6
29:8, 132:2
132:14
132:24
certify
132:2
cessation
125:22
125:23
chain 25:2
25:5
challenging
126:17
chance

102:8
change
23:23
23:23, 43:5
88:6, 123:7
changed
123:7
changes
132:8
changing
118:7
chapter
59:21
character...
50:1
characterize
46:4, 49:20
65:18
character...
122:19
charge
34:13, 64:5
charging
83:4, 83:9
checked
68:17
68:22
chemical
102:21
105:3
106:19
108:5
109:17
chests
62:23
chief 33:23
Chiefs 31:9
Children's
61:14
67:11
67:12
67:19
chloroben...
76:23
cinder
121:10
circumsta...
7:13, 51:1
civil 3:4
7:20, 7:22
8:14, 28:18

45:15
45:18
45:23, 46:6
46:18
49:22
49:23, 50:2
108:22
132:9
claim
129:15
clarity
14:7
class 28:9
clean 5:22
clear 53:2
58:8, 92:21
92:22
93:13
93:16
94:14
94:17
106:16
cleared
61:16
68:17
clenched
131:5
CLEP'd
10:19
clothes
118:7
clothing
68:21
70:11
78:12
114:2
114:10
117:24
118:1
clue 100:12
Col 12:11
18:24, 25:9
27:16
119:7
119:12
119:19
119:23
colleague
84:11
collection
106:20

collective
89:16
collectively
90:7
college
9:24, 10:12
color 71:21
combative
126:18
come 39:15
41:10, 59:1
59:3, 63:5
comes 41:13
43:1, 44:6
58:24
88:11
89:12
90:25
120:19
120:25
command
25:2, 25:5
48:21
106:15
119:6
119:12
119:21
119:25
commander
17:14
21:24, 22:4
22:5, 22:6
22:7, 23:15
25:10
105:16
commands
50:3, 50:5
50:6, 51:18
73:25
committed
31:18
commonly
74:11
76:23
communicate
119:20
119:23
communicated
119:19
communica...
119:5

119:13
communica...
119:2
119:14
communica...
6:8, 124:6
communities
31:18
Comp 10:18
10:18
company
132:17
compared
54:18
127:1
complaint
14:1, 36:21
37:12, 60:5
complete
6:18, 27:10
completed
28:3
100:20
101:13
128:25
completion
28:2
compliance
35:16
132:20
compliant
59:24
component
123:23
compressed
74:8
compromised
91:19
92:10
92:20
92:23
computer
122:24
124:8
conceivable
128:17
128:19
conceivably
96:15
concentrated
79:2

concern
34:13
concluded
2:9, 131:15
concrete
32:12
condition
58:9, 58:10
58:16
conduct
32:6, 68:20
72:14
81:17, 94:7
94:9, 96:2
97:2
confident
77:2
confines
78:6
confirms
116:11
confront
97:14
confronting
98:9
Congratul...
9:12
Connor
30:11
consent
105:18
considerable
55:9, 96:9
considered
58:21
Considering
34:24
considers
95:9
consistent
81:22
81:25
86:13, 91:7
92:18
consistently
95:20
consisting
74:8
consists
115:6
constitute

50:8, 57:22
89:2
constitutes
56:8, 56:25
constitut...
130:11
consult
38:23
contain
132:5
contained
72:11
72:17
132:4
contamina...
78:15
contempla...
83:8
content
84:3, 84:10
contents
83:25
continue
61:8
124:15
continued
38:14
112:2
117:14
123:21
continues
45:16
contract
132:15
contradicts
115:11
control
27:22
28:13
132:13
controversy
33:10
conversat...
69:20
129:22
converted
38:4
convey
107:1
107:4
conveyed

104:17
104:19
104:20
convoluted
68:15
Conway 1:23
14:15
14:15
109:6
119:15
119:16
119:16
Cook 1:3
1:19, 5:6
13:25, 16:6
17:1, 17:6
18:7, 60:6
60:16
60:22, 61:4
61:10
61:20, 62:4
62:13, 64:1
64:20
68:21
69:18
69:20
70:23, 71:6
71:11, 72:5
72:8, 80:18
82:9, 82:15
82:20
83:22
84:16, 99:5
113:14
113:19
114:8
114:11
116:5
116:6
116:12
116:21
117:3
117:25
118:2
118:7
118:10
121:19
121:20
123:13
124:22
129:15

130:2
130:23
Cook's
63:20
69:10
72:13
72:21
81:12
117:23
copies
132:13
copy 18:12
36:20
core 10:18
74:10, 76:4
78:2
correct 5:9
5:10, 6:1
8:18, 10:2
11:12
11:22, 12:1
12:14, 14:9
17:17
19:13
21:10, 24:6
24:9, 24:18
25:1, 26:4
29:15
30:12
33:25, 35:9
36:8, 36:16
39:16
40:13
40:14, 41:9
41:24
43:14
44:12
44:22
45:19, 46:2
46:23, 47:3
48:9, 49:15
49:19
50:10
50:13
50:16
51:21
51:24
52:14, 53:2
53:6, 53:20
53:23, 54:7
54:14, 56:9

59:10
59:13
60:16
62:11, 64:2
64:3, 64:5
64:8, 64:18
64:22
64:25
67:23, 68:7
68:25, 69:9
71:1, 71:20
72:24
73:21, 75:2
75:4, 75:7
75:11
75:14
75:25, 76:1
76:3, 76:5
78:16
79:23
79:24, 80:9
80:12
80:19
82:11
82:13
84:24, 85:3
85:9, 85:19
85:24, 87:8
88:14, 89:5
89:17
89:21, 91:2
91:5, 91:13
92:23, 93:1
93:16
93:17
93:17, 95:3
95:19
97:19, 98:1
98:19
101:15
101:16
105:20
107:7
107:12
107:18
108:12
110:7
112:12
114:14
116:7
117:2

118:17
120:17
120:21
122:19
122:21
124:6
126:3
126:5
127:4
127:14
127:24
127:25
128:5
128:5
128:7
130:15
130:16
130:19
131:5
131:11
131:12
132:6
corrected
129:10
129:23
correcting
85:6
correction
129:12
correctly
18:3
could've
26:1
counsel
2:24, 66:21
132:10
132:19
counseled
97:2
country
33:5
County
61:17
68:19
couple 7:12
10:19
14:14, 61:9
68:12
104:5
123:13
124:2

127:20
course 10:6
28:25, 29:1
29:2, 29:6
39:25
52:17, 70:4
90:4
116:20
courses
10:16
10:17
10:18
10:18
10:19
10:22
court 1:1
3:6, 3:6
4:18, 4:19
6:5, 7:16
7:21, 65:11
65:13
117:7
117:11
123:16
124:18
132:2
132:20
132:24
crash 7:15
7:17, 7:22
credits
10:22
27:25
crime 64:5
criminal
7:21, 10:17
64:11
CROSS-EXA...
2:7, 118:25
crowd 2:22
27:22
28:13
78:23
102:21
103:4
104:6
105:4
108:6
111:5
111:5
crowd's

24:3
crowds
  45:14
  52:22
CS 76:23
  92:6
cuffed 70:4
curfew
  118:11
  118:13
current
  4:24
cursory
  68:24
custody
  62:4, 65:8

**D**

damage
  55:16
damages
  129:15
Dardanelle
  9:15
date 73:8
  80:24
  99:14
  99:23
  99:23
  100:3
  101:18
  101:21
  127:22
  128:10
  128:12
  129:5
  129:9
  129:9
  129:10
  129:12
day 3:5
  25:25, 63:2
  99:16
  100:5
  100:7
  101:21
  108:15
  110:6
  119:14
  119:15

132:21
daylight
  109:8
  47:7
days 15:3
  47:8, 123:2
deadly 56:2
  56:8, 56:25
  57:4, 57:13
  57:19
  57:22
  57:24
  58:17
deal 126:22
death 55:17
  59:16
  86:20
  111:14
debate 55:8
  116:7
debris
  130:23
decides
  97:13
decision
  24:8, 24:16
  24:21
  46:19, 94:9
  102:15
  102:20
  102:24
  103:7
  103:17
  105:2
  105:13
  105:14
  106:7
  107:22
  108:4
  108:5
  108:8
  108:16
  109:16
  109:22
  109:25
decision-...
  94:13
decisions
  23:4, 23:16
  23:17
  23:18
  23:18

23:25
  109:8
  119:22
  119:25
decreases
  86:23
defendant
  8:14
defendants
  1:7, 1:16
  12:11
  27:15
  52:11
Define
  39:24
definitely
  27:22
definition
  32:11
  35:11
  111:18
definitively
  104:23
degree
  10:20
  10:25, 28:1
  110:25
deliver
  74:13
  77:19
delivering
  75:18
  75:22
  75:25, 76:2
  76:4, 76:6
delivers
  74:9
demonstra...
  46:6
demonstra...
  45:15
Department
  12:23, 13:2
department's
  30:23
departments
  48:1
depends
  25:23
  125:9
depicted

109:25
depicts
  72:4
deploy
  20:12
  102:15
  102:17
  102:17
  102:20
  102:24
  103:7
  103:12
  103:22
  103:22
  105:2
  105:11
  106:15
  108:5
  109:16
deployed
  75:17, 92:6
  103:24
deployment
  20:11
deploys
  20:17
deposition
  1:8, 2:9
  4:15, 4:16
  5:8, 5:11
  5:21, 6:14
  7:10, 7:11
  7:14, 7:20
  66:22
  70:21, 94:4
  102:6
  123:23
  130:3
  131:15
  132:9
  132:14
depositions
  3:2, 7:24
  8:8, 8:12
describe
  10:15
  17:23, 50:1
  70:1, 70:15
  71:3, 72:13
  84:15
  121:4

described
  71:18
describes
  73:24, 74:7
  81:12
  81:12
  81:21, 94:8
  94:23, 96:2
  97:2
  113:25
describing
  32:13, 71:9
  71:13
  80:19
  124:5
description
  93:11
  114:10
  114:21
  114:22
  116:12
  118:1
descriptions
  72:11
  72:17
  81:22
  112:21
  112:24
detail
  60:21
detectable
  78:17
  78:18
determine
  21:1, 63:9
  65:2, 65:14
  90:5, 113:5
determined
  64:21
  107:9
determining
  130:12
deviation
  95:15
device
  39:16, 41:5
  41:6, 43:22
  54:9, 74:9
  85:8, 94:16
devices
  39:14

40:25
41:11
81:22
dies 57:23
difference
33:23
45:18
differences
37:22
41:23
different
12:19
33:17
42:23
57:23
84:21, 88:4
88:16, 98:8
106:3
112:24
114:13
118:1
121:11
122:7
125:17
125:19
125:20
126:20
126:21
126:21
differently
95:14
difficulties
6:15, 58:22
116:22
117:12
123:19
124:5
124:7
dig 102:14
dioxide
74:8
diplomatic
115:24
direct 2:6
4:9, 35:15
53:10, 54:6
55:1, 99:7
100:19
directed
69:24, 70:5
103:11

directing
80:3, 80:7
direction
132:7
directives
32:13
directly
119:6
119:13
119:19
132:19
director
25:9
directs
19:1
disagree
33:3, 44:7
57:1, 58:18
91:1, 92:16
94:18
disagreement
24:8
disasters
28:19
discharged
10:6, 11:13
74:16
discharges
21:2
disciplined
97:2
discovery
45:9
discretion
107:6
discuss
67:1
discussed
13:18, 72:6
83:25, 84:3
84:10
discussion
19:3, 38:25
48:15
77:16
disheveled
70:3
disorderly
68:19
disperse
50:7, 51:2

52:22
102:21
103:4
105:3
dispute
17:5, 31:19
31:24
42:24, 43:1
dissect
94:6
dissecting
94:3
distance
67:7, 68:3
distinct
100:6
distinguish
52:3, 52:13
District
1:1, 1:1
4:18, 4:18
disturbance
45:19
45:23, 46:6
49:24, 50:2
68:17
108:22
125:22
125:23
125:25
disturbances
45:15
106:5
125:21
division
1:2, 17:14
25:10
divulge
69:5
document
18:10
18:10
18:12
20:20
73:23, 80:8
100:16
102:2
102:6
120:6
120:8
documented

110:10
documents
17:11
17:15
17:19
17:23
73:21
113:3
dog 115:2
doing 6:14
24:3, 24:25
37:2, 66:22
87:19
113:7
130:14
Don 1:3
1:19, 13:25
17:1, 17:6
18:7, 60:6
don'ts
39:16, 42:9
dos 39:16
42:9
double-check
19:2
doubt 34:19
downfield
7:9
draft
109:10
127:12
129:14
drafted
17:14
19:18
103:25
127:11
127:12
128:14
128:18
128:19
130:21
drafting
21:14
127:19
drag 123:10
dressed
116:5
116:6
driven 74:3
drop 123:10

dropped
66:8, 69:13
117:10
dual 123:4
due 92:4
94:14
105:24
117:12
123:19
duly 4:5
132:4
duties
12:17, 22:7
29:13
duty 10:10
10:11, 20:8
40:2, 40:9
40:11, 52:2
52:12
130:12
dwellings
26:21
DWI 7:15
7:17, 7:22
dye 74:10
76:2, 78:2
dynamic
23:24

| E |
| --- |

E-L-A-R-G...
76:19
earlier
87:5
106:18
109:3
early 9:6
47:11
48:19
earn 10:25
27:25
earning
10:20
east 79:7
Eastern 1:1
4:17
easy 130:10
education
8:23, 9:22
effect

87:17
118:11
effectively
  45:14
efforts
  82:4, 82:19
either
  35:15, 54:1
  103:22
  105:11
elevated
  86:3, 86:9
email 66:7
emergency
  22:4, 22:10
  23:1, 28:17
  45:8, 45:13
  49:24
  122:12
  122:13
employed
  4:21
  132:10
  132:11
employee
  132:11
employment
  8:25, 9:9
  11:14
encounter
  69:21
  84:15
encourage
  30:2
ended 10:19
energy
  33:18, 36:2
enforcement
  5:16, 29:21
  30:15
  32:24, 52:2
  54:1, 64:4
  120:4
  120:7
engages
  58:16
engaging
  73:25
enrolled
  9:25, 11:9
entire

122:2
entirety
  23:21
entitled
  56:22
equip
  102:25
equipment
  41:19
  41:21
equivalent
  11:20
ERT 2:20
  17:12
  17:13
  22:21
  25:19
  28:17
  45:14
  47:22
  47:23
  59:24
  73:25
  99:13
  101:9
  106:16
escalate
  98:21
essence
  13:25
estimate
  5:13, 19:23
  78:23
et 5:6
ETR 100:13
  101:8
evening
  83:22
  112:6
  118:8
evenings
  126:15
event 56:2
  110:21
  111:11
  111:15
  111:15
  111:19
events
  109:10
  110:22

everybody
  47:13
  47:17
evidence
  64:10
  72:16
  130:22
evidently
  128:12
exact
  127:22
exactly
  19:22, 48:4
  48:5, 48:6
  48:22
  48:23, 68:9
  74:18
  114:15
  114:15
  114:24
EXAMINATION
  2:6, 2:8
  4:9, 126:12
examine
  73:12
  111:16
Examiners
  132:20
examining
  69:6
example
  26:25
  50:25
examples
  23:9, 39:10
  76:17
Excellent
  10:3
excessive
  13:22, 14:1
  33:12
  34:25
  90:17
excluding
  17:25
exculpatory
  64:20
Excuse 83:5
exhausted
  15:16
exhibit
  2:14, 2:15

2:16, 2:17
2:18, 2:19
2:20, 2:21
2:22, 15:18
16:1, 25:20
73:24, 80:3
80:7, 80:24
91:23
91:24, 99:7
99:11
100:16
101:23
101:25
122:9
122:11
127:3
127:9
127:11
127:12
128:3
exhibits
  2:4, 2:12
  2:24, 17:17
examine
  73:12
  73:13
exist 30:15
  44:19
  58:13
  72:13
exists
  44:19, 73:5
expect 39:9
  81:6
explain
  81:11
  87:12
  119:2
extent
  12:16
  16:25
  27:11
  34:10
  52:12
  64:19, 69:4
  100:16
extrapolate
  108:21
  110:25
eyes 55:16
  60:2

F

face 17:1
  53:19
  55:15
  55:23, 92:5
face-to-face
  6:8
facilitate
  66:22
fact 51:19
factors
  92:15, 93:4
failing
  50:8
fair 16:25
  20:25, 41:4
  44:23, 54:2
  61:3, 63:15
  76:6, 96:25
  96:25, 99:3
  101:14
  106:6
  107:15
  107:19
  108:9
  108:16
  109:15
  111:8
  111:10
  116:16
  126:23
  126:23
  126:25
  129:6
fairly 81:7
fall 36:13
  75:1
falls 17:4
  77:21
familiar
  31:14, 35:8
  41:20
  73:20
  74:20
  111:10
far 7:9
  9:13, 25:5
  78:7
  123:14
fast 51:12

51:12
87:19
fatality
54:9
fault 101:3
fed 22:12
22:18
22:19
federal
4:18, 5:5
27:21
27:21
28:20
FedEx
120:22
feedback
91:15
feel 15:17
38:24, 77:2
80:5
fees 132:19
feet 23:23
86:4
fell 123:17
fellas
75:11
FEMA 27:20
field 21:23
23:15
23:16
24:16
27:16
27:19
28:24
39:23
39:24, 40:8
75:1
123:12
figure
19:11
figured
43:21
file 122:25
fill 123:9
filled 74:9
121:10
121:11
130:7
financially
132:12
find 18:11

39:9, 64:15
104:9
114:9
finding
127:6
fine 15:23
73:19
finish 51:7
110:16
110:17
123:23
finished
68:18
111:22
fire 53:1
53:10
57:11
57:12, 79:9
87:18
92:19
102:25
103:2
106:25
fired 13:23
16:22
35:13
35:17
54:10
54:25, 60:3
86:25, 93:3
93:11
93:13
93:15
94:16
96:14
96:19
103:3
fireworks
121:13
121:17
firing
16:22
54:18
84:23, 85:8
86:8, 86:19
87:8, 87:13
87:15
94:13
103:17
105:17
Firm 1:14

132:20
first 4:5
8:22, 17:12
34:10
34:11
34:12
34:24, 61:3
61:20, 79:4
80:23
85:15
106:7
109:6
109:7
119:5
119:5
119:8
119:12
fists 131:5
five 5:14
5:18, 5:19
5:19, 5:20
7:19, 20:5
25:20
25:21
five-zero
89:6
flags 81:16
93:6, 94:7
floods
28:19
Floyd 9:5
14:9, 14:11
14:16
14:20
17:21
19:18
21:15
21:23
26:14, 27:3
28:15, 33:9
33:10
33:16, 34:4
34:12
34:22
37:19, 46:5
52:10, 74:4
75:2, 77:21
126:15
fluid 130:7
follow 29:1

follow-up
57:9
following
91:21
108:15
110:6
follows 4:8
38:14
112:2
117:14
123:21
132:2
footage
115:1
115:11
115:13
116:7
116:11
116:18
117:18
force 13:23
14:1, 20:7
20:12
20:13
20:14
20:20
27:17
27:19
28:24, 29:7
30:9, 31:2
33:12, 35:1
35:1, 35:2
51:20
51:24, 56:2
56:9, 56:25
57:4, 57:13
57:19
57:22
57:24
58:17
59:12, 87:8
87:14
87:21
87:24, 88:1
88:2, 88:11
88:21
88:21
88:22, 89:2
89:9, 90:7
90:10
90:12, 91:8

97:15
97:25
98:11
98:23
111:20
118:14
forces 9:25
10:1
foregoing
132:5
foreign
130:23
form 14:22
16:19, 17:7
20:22, 21:5
21:11
21:17
24:10
24:19
26:15
26:22, 27:6
29:16
29:22, 30:3
30:19
30:24, 31:4
31:11
31:22, 32:7
32:17
33:13
33:20, 34:1
34:7, 34:15
35:4, 36:4
36:9, 36:17
37:20, 38:1
39:11
39:17, 41:7
41:14
41:25
42:11, 43:3
43:24
44:13
44:24
45:20
45:25, 46:8
46:13, 48:6
49:16
50:11
50:17
51:22, 52:5
52:15
52:23, 53:4

53:14
53:21, 54:3
54:12
54:20, 55:2
55:12
55:19
55:25
56:10
56:15, 57:2
57:15
57:25
58:19
59:18
60:17, 61:5
62:7, 63:22
64:6, 64:12
64:16
64:23
66:11
66:16, 69:1
75:5, 75:12
75:19, 76:8
77:23
78:13
78:20
79:12
80:15
80:20, 81:8
81:18
82:12
82:16
82:24
83:12
83:18
84:18
84:25
85:10
85:20
85:25, 86:5
86:10
86:15
86:21, 87:2
87:9, 87:22
88:17
88:23, 89:3
89:10, 90:2
90:8, 90:18
91:3, 91:9
92:11
92:24, 93:7
93:21

94:11
94:19, 95:5
95:10
95:17
95:25, 96:5
96:11
96:16
96:21, 97:9
97:20, 98:2
98:14
98:25
103:9
103:19
104:2
105:9
106:9
107:2
107:10
107:16
107:24
108:10
108:18
108:24
109:12
109:19
110:8
111:2
112:7
112:13
113:15
113:21
115:8
115:15
116:8
116:14
118:15
128:21
129:1
129:7
130:17
131:1
131:6
132:7
formed
28:18
forms 99:25
forward
63:5
found 30:22
foundation
121:7

four 5:18
25:17
76:17
90:16
90:16
122:7
122:18
fracture
55:16
frame 14:12
14:21
fraternal
32:23
free 15:17
38:24, 80:5
freedom
62:10
front 71:16
front-loaded
10:21
froze 58:23
58:23, 59:2
77:3
115:20
115:22
116:23
116:25
frozen
116:24
117:8
121:9
full 4:12
function
123:8
fundaments
11:24
further
126:10
131:14
future
28:11

G

gas 20:11
20:12
20:13
20:14
20:17, 21:1
62:21
71:12

74:11, 76:6
76:24, 92:5
92:6, 94:14
103:22
103:24
105:11
106:15
106:19
gathering
49:21
111:19
general
1:17, 7:13
29:14
30:23, 81:6
General's
1:17, 6:1
generally
15:5, 33:4
34:25
37:18
37:24, 38:3
53:10
generated
81:5, 100:5
100:8
gentleman
60:12
gentlemen
68:5
George 9:5
14:9, 14:11
14:16
14:20
17:21
19:18
21:15
21:23
26:14, 27:3
28:14, 33:9
33:10
33:16, 34:4
34:12
34:22
37:19, 46:5
52:10
52:10
59:23, 74:4
75:2, 77:21
126:15
gestures

6:7
getting 7:9
23:16
103:6
give 5:8
8:20, 14:8
15:6, 35:11
50:25, 65:5
76:15
78:25
100:22
104:9
105:21
given 5:11
5:21, 6:4
7:20, 7:24
17:14
58:16
63:20
90:15
107:13
gives 26:18
106:22
giving
107:8
130:2
glitch 77:6
Global 11:5
global-type
23:25
go 5:22
6:4, 9:7
10:5, 12:5
14:23
14:25
16:20, 17:8
20:23, 21:6
21:12
21:18
23:13
24:11
24:20, 25:6
26:16
26:23, 27:7
28:24, 29:5
29:17
29:23, 30:4
30:20
30:25, 31:5
31:12
31:23, 32:8

32:18
33:14
33:21, 34:2
34:8, 34:16
35:5, 36:5
36:10
36:18
37:21, 38:2
39:12
39:18, 41:8
41:15, 42:1
42:12, 43:4
43:25
44:14
44:25
45:21, 46:1
46:9, 46:14
48:12
49:17
50:12
50:18, 51:7
51:10
51:23, 52:6
52:16
52:24, 53:5
53:15
53:22, 54:4
54:13
54:21, 55:3
55:13
55:20, 56:1
56:11, 57:3
57:16, 58:1
58:20
60:18, 61:6
62:8, 63:23
64:7, 64:13
64:17
64:24
66:12
66:17, 68:7
68:14, 69:2
70:18, 75:6
75:13
75:21
75:24, 76:9
77:24
78:14
78:21
79:13
79:25

79:25
80:16
80:21, 81:9
81:19
82:17
82:25
83:13
83:19
84:19
85:21, 86:1
86:6, 86:11
86:16
86:22, 87:3
87:10
87:23
88:18
88:24, 89:4
89:11, 90:3
90:9, 90:19
91:4, 91:10
92:12
92:25, 93:8
93:22
94:12
94:20, 95:6
95:11
95:18, 96:6
96:12
96:17
96:22
97:10, 98:3
98:15, 99:1
103:10
103:20
104:3
105:10
106:10
106:13
107:11
107:17
107:25
108:2
108:11
108:19
108:25
109:13
109:20
110:9
110:17
111:3
112:8

112:14
113:16
113:22
115:9
115:16
116:9
116:15
117:5
117:7
118:16
119:25
119:25
123:6
123:6
124:18
129:2
129:8
130:18
131:2
131:7
goal 32:15
53:24
goes 20:18
20:18, 26:5
87:24, 90:6
94:21
95:23
going 6:17
6:18, 7:7
8:21, 8:22
8:23, 9:2
9:4, 9:7
10:5, 19:21
20:1, 24:2
27:13
27:14, 33:1
33:2, 35:15
36:23
41:18
45:10, 57:8
58:3, 58:7
66:21
90:12
90:12, 92:3
94:10
95:23
98:16
106:23
121:6
123:22
123:22

good 4:11
6:3, 8:20
11:6, 37:2
37:3, 48:14
63:24, 75:9
97:24
Google 39:8
governing
32:6, 82:1
86:14
government
27:21
graduate
9:19, 12:10
graduated
9:18
graduating
9:21
Graham
30:11
59:13
gray 112:25
great 19:14
greater
54:25
110:25
greatly
127:2
green 71:23
71:23
107:8
107:13
grenadier
26:1, 29:4
29:5, 79:18
grenadiers
103:22
grip 38:6
grips 38:7
ground
54:18, 86:4
105:16
119:22
grounds
47:5, 47:11
49:11, 79:6
118:14
group 25:14
79:1
Guard 12:24
13:3, 13:4

13:5, 48:1
61:12
61:19, 68:4
guardsmen
60:25, 70:5
guess 14:14
16:8, 20:1
24:14, 27:8
30:5, 30:6
38:3, 39:24
40:8, 55:4
55:4, 57:17
74:6, 93:25
94:2, 113:5
126:7
guidance
32:12
guidelines
29:1, 82:1
guilty
130:13
gun 37:14
39:10
90:23
120:19
120:20
gunshots
104:6
guy 60:10
63:7, 66:8
97:13
103:15
103:16
115:24
guy's 58:3
guys 42:7
52:12, 66:8
80:18
103:8
117:7
121:3
122:24
130:10

**H**

hacked
76:20
hand 61:12
132:21
handed

61:18
handle
 130:11
handling
 22:1
hands 61:20
 61:25
handwriting
 100:17
 100:17
 128:9
handwritten
 80:25
 128:6
happen 6:22
 111:16
hard 9:12
 47:25
 119:20
 119:22
harm 59:17
hate 22:17
he'll 95:14
head 6:12
 19:9, 53:19
 54:7, 54:11
 54:17
 54:24
 55:15
 55:23, 56:7
 56:24, 57:7
 57:8, 57:12
 58:11
hear 7:1
 16:12, 18:3
 44:15, 59:8
 117:17
heard 7:6
 57:10
 69:23
 70:15
 91:15
height
 78:24
 123:12
HEREINBEFORE
 4:4
hereto
 73:14
 99:12
 102:1

132:11
Hey 63:6
 66:7, 97:6
high 9:16
 9:18, 9:21
 11:11
high-level
 119:24
HIPAA 82:23
 83:10
hit 54:6
 58:11
 96:15
hitting
 74:2, 87:6
Hold 110:14
 123:16
honest
 90:22
honorably
 10:6, 11:13
hope 56:18
 58:24
hopefully
 19:7, 38:10
 45:12
hospital
 61:14
 67:12
 67:12
 67:14
 67:19
hospitals
 111:13
hours 47:12
 48:19
hundred
 114:22
hurt 58:4
hypothetical
 56:22
 56:23, 58:6
 58:9, 58:10
 58:14
hypotheti...
 39:7, 65:22

I

IACP 2:22
 31:14

31:20
 31:25, 32:5
 32:11
 32:21
idea 39:19
 60:10
 62:21, 75:9
 75:9, 97:24
identific...
 63:19, 69:5
 73:14
 99:12
 102:1
identified
 5:5, 61:10
 132:16
identify
 15:3, 65:20
 82:4, 82:20
 82:22, 83:3
identity
 63:9, 65:3
 65:15, 68:5
 82:9, 83:10
II 10:18
illustration
 36:24
image 37:13
 37:13
 37:16, 60:7
immediately
 125:4
imminent
 54:1, 59:17
impact 17:1
 35:8, 36:1
 36:7, 53:9
 54:6, 54:10
 86:8, 86:14
 88:4, 88:5
 91:18
 92:18
impartiality
 132:13
import
 13:17
important
 6:6
imprecise
 109:4
inaccurate

102:11
 102:11
 116:13
 129:6
incidence
 54:23
incident
 2:14, 2:15
 68:22, 69:6
 80:8, 80:24
 81:5, 81:6
 82:15
 122:25
 123:3
 123:4
 123:14
 124:23
 124:24
 125:5
 125:8
 129:9
 129:9
 129:12
incidents
 14:15
 21:24
include
 18:6
includes
 22:11
including
 55:17
inconsist...
 84:20
inconsistent
 84:17
incorrect
 129:10
increase
 55:5, 55:7
increased
 54:10, 55:8
 55:10, 87:1
 96:3, 96:9
 96:10
increases
 54:16
 86:19
 96:20
independent
 60:15

87:21
 88:10
INDEX 2:1
indicate
 69:14
 102:19
indicated
 27:16
indicating
 108:15
indicative
 64:20
indirect
 35:15
Indirectly
 9:23
Indiscern...
 122:23
indiscrim...
 53:2
individual
 21:16
 35:16
 53:25
 60:23
 61:10
 78:11
 82:22, 83:9
 86:25, 87:7
 88:19
 88:20
 89:19
 112:22
 121:24
 125:3
 125:7
individual's
 78:19, 83:3
individually
 1:5, 1:5
 1:6, 1:6
 1:7
individuals
 33:4, 50:3
 52:1, 52:3
 103:11
indulge
 58:14
influential
 31:16
 31:20

information
15:6, 43:1
44:17
63:17
63:25
64:22, 65:5
69:7, 72:23
99:16
104:24
109:14
115:13
116:18
119:24
123:2
123:9
129:23
infraction
50:9
initially
11:24
initials
127:24
128:6
injure
96:23
injured
72:22
83:22
125:4
125:7
injuries
22:13
54:24, 57:5
57:8, 61:4
70:2, 125:9
125:11
injury 54:1
55:16
86:20, 87:1
96:3, 96:20
innocence
64:21
input 24:8
123:2
insert
121:23
inside
74:19
74:21
75:22
insight

63:20
instance
22:19
26:20
29:14, 31:7
33:17
44:12, 87:6
100:18
instances
78:22
89:24
106:3
125:20
instructed
40:21
61:11
61:13
instruction
41:10
120:25
instructions
28:7, 28:13
110:19
instructor
29:6, 29:8
40:18
40:19
40:20
120:10
insurance
132:17
integrity
66:14
intend 67:1
intended
56:6, 64:4
intends
56:5, 56:6
intent
51:15
56:12
56:16
56:20
56:21
58:11
58:17
intentions
47:2
interaction
113:13
interest
132:16

interested
132:12
interference
115:18
115:25
Internati...
31:9
interroga...
18:25
27:15
interroga...
18:9
interrupt
22:17
22:18
46:24, 61:1
61:8, 65:25
intersection
106:16
interstate
67:18, 79:5
110:19
investiga...
64:11
involve 8:8
involved
21:16, 44:1
44:4, 68:16
132:17
involvement
27:14
69:11
irrelevant
75:9
issue 122:1
issued
29:20, 31:8
42:13
42:14
42:15
42:18
42:18
42:22
42:23
120:18
it'll 37:8
123:9
123:11

J

Jail 61:17
68:19
Jason
101:24
Jay 79:16
Jeff 1:5
8:2, 80:9
job 130:10
jobs 13:14
13:17
Joe 1:6
8:4, 8:6
12:11
23:12
23:14, 24:5
25:15
25:15
25:25, 26:3
26:3, 41:2
46:18
46:18
79:22
100:20
101:6
108:3
108:5
108:9
108:15
108:16
110:6
119:13
119:16
119:16
119:18
119:20
John 1:6
1:7, 8:4
8:6, 24:5
26:3, 79:22
joined
11:10, 13:5
joining
13:14
judicious
35:1
July 99:5
jump 102:10
113:4
114:6

jumped
102:12
June 8:17
9:3, 9:6
14:8, 15:3
15:10
15:10, 16:8
16:8, 16:9
16:16, 24:5
25:2, 36:16
38:18, 46:3
46:5, 46:11
47:5, 47:11
47:12, 48:8
48:24
59:24, 60:3
60:9, 60:12
60:16
63:10, 66:8
71:6, 72:5
72:5, 74:5
74:12
74:17
75:17
78:24
79:16, 82:9
83:22
99:14
100:6
100:9
100:14
101:17
102:16
108:4
108:17
108:22
111:1
111:20
112:11
117:24
119:3
121:4
127:4
127:13
127:15
128:15
128:20
128:23
128:25
justice
10:17

justified
 57:13
 89:25, 90:6
justify
 59:12, 88:3
 89:15
 89:16
 90:24
 97:15
 97:25
 98:10
 98:12
 98:23
Justin 1:16
 5:25, 18:13
 67:2

K

keep 28:10
 51:2, 51:3
 51:8, 51:11
 51:11
kept 28:12
killing
 59:7
kind 8:9
 8:22, 9:7
 13:2, 13:3
 44:5, 47:8
 47:8, 47:25
 50:9, 68:15
 74:4, 79:3
 87:5, 94:3
 106:25
 110:12
 110:18
 110:20
kinetic
 36:1
Kinetic-i...
 55:22
know 6:18
 6:22, 7:2
 9:13, 11:9
 13:1, 13:2
 14:4, 16:13
 17:15, 19:6
 19:6, 19:7
 19:21
 19:24

20:15
21:24
26:18, 27:2
27:10
27:10
27:11, 28:6
28:12
34:19, 35:6
39:7, 40:9
40:23, 44:8
44:9, 44:19
45:11
46:15, 47:6
47:13
48:17
48:25
52:21
56:16, 58:4
59:20
59:21
61:23
61:23
62:17
62:19, 63:2
63:16
63:24, 65:5
65:5, 65:23
66:2, 66:2
66:4, 66:25
66:25, 68:4
68:5, 68:6
68:7, 68:9
68:23
69:10, 70:9
70:12
70:14
71:24, 73:4
73:5, 74:16
74:18
74:21, 75:9
75:22
75:23
76:12, 80:6
81:3, 82:9
82:14
82:19, 83:1
83:14
83:20, 84:6
92:16
96:23
97:11

100:10
100:17
101:17
103:12
103:13
103:23
103:24
103:25
104:4
104:20
109:1
111:5
111:18
114:12
114:13
114:15
114:24
115:25
118:6
121:9
121:11
121:12
123:1
126:18
126:18
127:19
127:22
129:3
129:16
129:17
knowingly
 57:21
 132:16
knowledge
 83:15
 83:24, 97:5
 97:7
 106:23
 124:23
knowledge...
 109:9
known 31:24
 60:9, 74:11
 76:23
knows 46:22
 46:25, 56:5
 56:20

L

label

120:22
labeled
 18:10
lack 11:20
large 28:21
 79:7
 121:16
larger 79:8
largest
 31:16
 31:20
lastly
 130:20
late 9:6
launching
 74:9
Laux 1:13
 1:14, 2:6
 2:8, 4:10
 4:14, 4:21
 5:1, 7:18
 14:24, 15:2
 15:16
 15:20
 15:22, 16:5
 16:10
 16:21
 17:10
 18:13
 18:16
 18:19
 18:23, 19:5
 19:9, 19:12
 19:14
 19:16
 20:25, 21:8
 21:14
 21:20
 23:20
 24:13
 24:22
 26:18
 26:25, 27:9
 29:19, 30:1
 30:7, 30:22
 31:2, 31:7
 31:14
 31:25
 32:10
 32:20
 33:16

33:23, 34:4
34:10
34:18, 35:6
35:8, 36:7
36:12
36:20, 37:2
37:6, 37:12
37:24, 38:5
38:9, 38:15
39:3, 39:14
39:20
41:11
41:23, 42:3
42:16
43:20, 44:5
44:16, 45:2
45:23, 46:3
46:11
46:20
48:18
49:20
50:14
50:22, 51:9
51:25, 52:9
52:18, 53:1
53:7, 53:17
53:24, 54:8
54:15
54:23, 55:6
55:15
55:22, 56:4
56:13
56:18, 57:9
57:18, 58:5
59:2, 59:5
59:7, 59:11
59:20
60:20, 61:8
62:10, 64:1
64:9, 64:15
64:19, 65:1
65:11
65:17
65:18
66:14
66:19
66:24, 67:3
69:4, 71:2
71:3, 73:20
75:8, 75:15
75:24

| | | | | |
|---|---|---|---|---|
| 76:11, 77:8 | 104:13 | 130:20 | 34:18 | light 63:5 |
| 77:10 | 104:16 | 131:4 | legs 53:25 | 107:8 |
| 77:12 | 105:13 | 131:9 | length | 107:13 |
| 77:18, 78:3 | 106:12 | 131:13 | 16:14 | light-col... |
| 78:17 | 107:4 | 132:20 | less-lethal | 71:7 |
| 78:23 | 107:13 | law 1:14 | 26:2, 29:4 | lighting |
| 79:15 | 107:19 | 5:16, 29:20 | 29:5, 29:6 | 92:4, 94:15 |
| 80:18 | 108:2 | 30:15 | 35:13 | likelihood |
| 80:23 | 108:13 | 32:24, 52:1 | 40:20 | 54:17 |
| 81:11 | 108:21 | 54:1, 64:4 | 42:13 | 86:19, 87:1 |
| 81:21 | 109:3 | 120:3 | 42:17 | 96:3 |
| 82:14 | 109:15 | 120:7 | 79:20 | liking |
| 82:19, 83:2 | 109:24 | 132:20 | 102:20 | 50:15 |
| 83:8, 83:15 | 110:10 | lawful 50:3 | 103:22 | limb 10:5 |
| 83:21, 84:9 | 110:24 | 50:5 | 105:3 | 78:5 |
| 84:23, 85:2 | 111:8 | laws 82:23 | 105:7 | limited |
| 85:12 | 111:22 | lawsuit 5:5 | 105:11 | 74:10 |
| 85:23, 86:3 | 111:25 | 8:15 | 106:15 | 122:16 |
| 86:8, 86:13 | 112:3 | layperson | 106:19 | line 7:4 |
| 86:18 | 112:10 | 111:18 | 106:20 | 40:2, 40:9 |
| 86:24, 87:5 | 112:16 | lead 57:5 | 108:5 | 40:11, 51:3 |
| 87:12, 88:6 | 113:12 | leader | 109:16 | 51:12 |
| 88:20, 89:1 | 113:18 | 23:12 | 110:5 | 51:20, 55:1 |
| 89:6, 89:12 | 114:4 | 23:14, 24:1 | 120:10 | 60:24 |
| 90:5, 90:15 | 114:6 | 25:16 | 120:15 | 60:24, 72:9 |
| 90:21, 91:6 | 115:11 | 25:17 | 125:16 | 75:24 |
| 91:12 | 115:18 | 79:18 | less-than | 97:24 |
| 91:24, 92:2 | 116:11 | 79:20 | 105:2 | 98:10 |
| 92:3, 92:14 | 116:17 | leaders | less-than... | 98:22 |
| 93:2, 93:10 | 116:25 | 25:17 | 21:2, 29:7 | 104:10 |
| 93:24 | 117:4 | 25:18 | 52:18, 82:1 | 126:18 |
| 94:16 | 117:15 | 31:17 | 95:16, 97:7 | 131:5 |
| 94:23, 95:8 | 117:23 | learn 11:23 | 98:11 | lines 56:21 |
| 95:13 | 118:18 | 11:24 | 106:18 | 103:15 |
| 95:20, 96:2 | 121:6 | 29:13 | letting | 104:5 |
| 96:8, 96:14 | 122:6 | 83:10 | 66:25 | 104:13 |
| 96:19 | 122:11 | learned | level 54:18 | 105:1 |
| 96:25 | 123:15 | 26:11 | lieutenant | 106:14 |
| 97:12 | 123:22 | leave 50:7 | 4:24, 8:17 | link 119:22 |
| 97:22, 98:8 | 124:1 | 50:8, 73:25 | 10:8, 17:11 | liquid |
| 98:18, 99:3 | 124:4 | 117:6 | 17:19 | 74:11 |
| 99:9, 99:13 | 124:11 | leaving | 18:12 | 76:17 |
| 99:20 | 124:13 | 47:24 | 19:17, 22:1 | 76:22 |
| 99:21 | 124:20 | 50:19 | 22:1, 26:8 | list 42:9 |
| 99:24 | 126:11 | led 50:2 | 80:5, 99:4 | 122:19 |
| 100:23 | 126:13 | left 47:10 | 118:18 | 132:17 |
| 101:5 | 127:7 | 47:13 | 118:23 | listed |
| 102:5 | 127:9 | 47:21, 48:5 | 124:6 | 129:11 |
| 103:14 | 128:24 | 48:7, 48:23 | lieutenants | listen |
| 103:25 | 129:5 | 68:9, 124:3 | 9:3 | 51:18 |
| 104:5 | 129:11 | legitimate | life 10:19 | listening |

50:3, 50:5
literally
  37:8
literature
  28:7, 41:12
  42:8
litigant
  132:17
litigation
  7:13, 7:21
  8:8, 8:11
  63:6
little 1:15
  1:18, 8:21
  8:23, 8:24
  13:9, 14:8
  14:17
  70:13
  85:18
  112:24
LLOYD 1:3
local 4:20
logs 65:3
  65:16
long 9:12
  10:8, 70:7
  70:10
  120:5
look 16:1
  18:16, 45:8
  48:6, 73:23
  111:23
  128:3
looked
  39:20
  61:15, 70:3
  70:5
looking
  15:23
  18:22
  83:11
  113:8
  113:23
looks 60:10
  128:9
lose 57:6
lost 123:15
lot 37:22
  40:18
  40:22
  67:21, 79:7

120:14
127:21
127:21
loud 84:6
louder 7:2
lower 53:24
Lt 1:9
  2:21, 3:2
  4:3, 5:2
  5:4, 23:12
  23:14
  25:15
  25:25
  38:16
  46:18
  100:20
  101:6
  108:3
  108:5
  108:9
  108:15
  108:16
  112:4
  119:13
  119:16
  119:18
  119:20
  126:14
  132:3

          M

machine
  110:4
maintaining
  34:14
Maj 25:10
  101:24
making
  22:11
  22:12
  22:12
  22:13
  22:14
  22:17
  22:19
  92:13
  92:14
  105:13
  105:14
  109:8

113:10
male 73:24
  92:7
malononit...
  76:23
man 60:12
  118:6
manage
  45:14
management
  2:22, 22:10
manager
  22:5
manhunts
  28:20
manner
  32:13
  103:12
manual 28:9
  28:10
  43:23, 44:7
  44:17
  44:21
  120:25
manuals
  28:7
manufacturer
  41:12
March 9:11
marked 2:13
  17:17
  25:19
  73:12
  73:14
  99:11
  101:25
marker
  74:10, 76:2
mask 92:5
masking
  94:14
masks 62:21
math 10:18
matter 5:8
  7:22, 34:6
  55:23
  132:18
matters
  7:24, 132:4
McAllister's
  79:16

79:16
mean 10:10
  19:25, 20:4
  21:8, 21:23
  23:20
  26:18
  35:17
  35:22
  42:21, 49:4
  50:25
  53:17, 54:8
  59:15
  65:25, 68:7
  68:13
  68:23, 73:4
  75:8, 75:15
  87:12
  96:14
  99:15
  99:16
  102:17
  102:25
  102:25
  103:3
  103:6
  109:21
  119:8
meandering
  71:16
meaning
  36:1, 115:2
means 21:9
  37:9, 38:10
  60:20, 64:4
  87:7, 93:15
  99:15
  103:2
  103:11
  111:15
  122:18
meant 40:8
  49:9, 56:20
  101:10
  102:24
measured
  30:10
medical
  61:15, 65:8
  67:15
  67:17, 70:6
  83:3, 83:11

meeting
  111:19
member
  32:21
  32:23
members
  22:10
  22:21
  22:25
  31:21
  47:23
  62:25
  73:25
  106:16
memo 15:12
  15:15
  17:13
  109:21
  109:23
  109:25
  110:3
memorandum
  2:21
  101:23
  102:18
  104:1
  105:25
  106:13
  109:10
  127:3
  127:9
  127:12
  127:19
  127:23
memoriali...
  109:10
memory
  15:17
MEMS 61:14
  61:16
  68:18, 82:5
  82:20
  83:17
men 66:14
mention
  14:15
mentioned
  12:13
  17:25
  114:7
  130:5

mere 98:8
merely
 98:21
 118:13
message
 105:22
method
 132:6
MICHAEL
 1:13
middle 26:6
midnight
 48:20
Mike 5:1
 18:15
 91:22
 91:22
mile 67:9
military
 12:18
 12:22, 13:2
mind 27:12
 57:24, 58:8
 66:6, 89:9
 89:14
minute
 117:8
minutes
 16:7, 71:10
 111:23
misconduct
 33:8
misdemeanor
 83:4, 83:9
misfires
 20:18
missing
 114:5
misunders...
 56:19
MLK 67:25
 68:2
Mobile
 28:24
model 29:20
 29:24, 30:6
 31:8, 32:5
 32:10
 32:12
 32:15
 32:16

38:16
38:17, 42:4
43:5
models
41:24
moment
100:22
104:9
moments
78:18
month 28:6
128:20
morning
4:11, 47:12
48:19
70:21
70:24
morphed
47:9
Moses 60:9
mouth 61:11
70:3
move 24:3
27:13
27:14
movement
62:10
110:18
110:20
moving
110:19
multiple
87:13, 92:6
92:9, 93:4
93:11, 94:5
mumble 7:1
munition
103:23
munitions
102:21
105:3
105:7
106:15
108:6
109:17
110:5
121:15
myriad
123:5

N

name 4:12
 5:1, 26:6
 69:18
 123:9
 123:10
 127:23
named 4:4
 8:11, 8:14
names 123:4
narrative
 81:15
 84:10, 92:4
 97:3, 112:5
 113:13
 113:18
 118:1
National
 12:24, 13:2
 13:4, 13:5
 48:1, 61:12
 61:19, 68:4
natural
 28:19
necessarily
 73:4, 81:10
 94:9, 97:18
necessary
 90:11
 90:13
 107:9
necessita...
 94:5
neck 55:23
 56:7, 56:24
 57:12
 58:11
need 38:23
 59:12, 80:4
 111:15
 111:17
needed
 63:25
 119:25
needs 24:3
 89:15
negative
 82:5
negligible
 55:9, 96:9

neither
 132:10
neutralize
 90:16
never 32:9
 40:2, 40:4
 41:5, 44:11
 44:11
 44:12
 44:20, 45:1
 45:3, 45:5
 49:14
 53:19
 57:11
 57:11
 63:13
 64:15
 64:21
 100:9
 100:10
 120:3
new 42:7
night 92:5
nights 47:8
non-law-e...
 9:22, 13:14
non-polic...
 35:3
Nonverbal
 122:20
normal
 84:21
 121:23
 122:1
North 13:9
notation
 62:20
note 2:24
 16:6
notes 109:4
 111:23
notice 4:16
 80:24
 127:23
nuclear
 33:18
number 2:2
 18:18, 19:8
 19:13, 20:1
 37:13
 76:17

77:22
77:25, 78:1
78:4, 78:10
80:7, 91:24
99:7
123:12
128:3
numbered
3:5
numbers
62:23, 81:7
123:3
123:4

O

oath 4:8
object
14:22
16:17
16:19, 17:7
20:22, 21:5
21:11
21:17
24:10
24:17
24:19
26:15
26:22, 27:6
29:16
29:22, 30:3
30:17
30:19
30:24, 31:4
31:11
31:22, 32:7
32:17
33:13
33:20, 34:1
34:7, 34:15
35:4, 36:4
36:4, 36:9
36:17
37:20, 38:1
39:11
39:17, 41:7
41:14
41:25
42:11, 43:3
43:24
44:13

| | | | | |
|---|---|---|---|---|
| 44:24 | 86:10 | 129:7 | 14:21 | 29:11, 45:3 |
| 45:20 | 86:15 | 130:17 | 78:18 | 48:12 |
| 45:25, 46:8 | 86:21, 87:2 | 131:1 | Office 1:17 | 70:18, 80:3 |
| 46:13 | 87:9, 87:22 | 131:6 | 6:1 | 84:8 |
| 49:16 | 88:17 | objective | officer | 104:15 |
| 50:11 | 88:23, 89:3 | 30:10 | 5:16, 12:1 | 115:20 |
| 50:17 | 89:10, 90:2 | 30:15, 58:6 | 12:18 | 116:24 |
| 51:22, 52:5 | 90:8, 90:18 | 72:16 | 26:19 | 117:1 |
| 52:15 | 91:3, 91:9 | 114:14 | 27:10 | 121:14 |
| 52:23, 53:4 | 92:11 | 114:16 | 30:10 | 123:1 |
| 53:14 | 92:24, 93:7 | 115:1 | 40:11 | 123:15 |
| 53:21, 54:3 | 93:21 | 115:13 | 54:16 | 126:19 |
| 54:12 | 94:11 | objectively | 57:11 | 127:2 |
| 54:20, 55:2 | 94:19, 95:5 | 51:21, 58:3 | 57:21 | okay 5:4 |
| 55:12 | 95:10 | 59:16 | 58:10 | 5:20, 5:23 |
| 55:19 | 95:17 | objects | 58:16 | 5:24, 6:12 |
| 55:25 | 95:25, 96:5 | 50:4 | 58:18 | 6:19, 6:23 |
| 56:10 | 96:11 | 130:23 | 59:11 | 6:24, 7:2 |
| 56:15, 57:2 | 96:16 | observations | 59:15 | 7:7, 7:18 |
| 57:15 | 96:21, 97:9 | 60:21 | 62:16, 65:6 | 7:23, 8:17 |
| 57:25 | 97:20, 98:2 | 113:19 | 83:10 | 9:1, 9:7 |
| 58:19 | 98:14 | observe | 89:14 | 9:8, 9:12 |
| 59:18 | 98:25 | 17:2 | 90:10 | 9:21, 10:12 |
| 60:17, 61:5 | 103:9 | observed | 90:24 | 11:4, 11:6 |
| 62:7, 63:22 | 103:19 | 64:19 | 115:6 | 12:2, 12:10 |
| 64:6, 64:12 | 104:2 | 112:11 | 121:19 | 13:7, 13:12 |
| 64:16 | 105:9 | 130:13 | 121:22 | 13:17 |
| 64:23 | 106:9 | obtained | officer's | 13:20, 14:4 |
| 66:11 | 107:2 | 69:10 | 50:15 | 14:17 |
| 66:16, 69:1 | 107:10 | obviously | 57:24 | 16:10 |
| 75:3, 75:5 | 107:16 | 9:18, 120:4 | 115:7 | 16:12 |
| 75:12 | 107:24 | occasion | 115:12 | 16:12 |
| 75:19, 76:8 | 108:10 | 105:22 | officers | 16:12 |
| 77:23 | 108:18 | 108:17 | 32:2, 32:12 | 16:21 |
| 78:13 | 108:24 | 109:18 | 33:24, 34:5 | 16:25, 17:4 |
| 78:20 | 109:12 | 110:7 | 34:13, 41:5 | 17:10, 18:6 |
| 79:12 | 109:19 | occasions | 52:20 | 19:12 |
| 80:13 | 110:8 | 5:13, 40:15 | 57:19 | 19:14 |
| 80:15 | 111:2 | 108:14 | 63:10 | 19:16 |
| 80:20, 81:8 | 112:7 | 109:17 | 63:19 | 19:21, 20:2 |
| 81:18 | 112:13 | 110:4 | 64:19 | 20:7, 20:25 |
| 82:12 | 113:15 | occupied | 65:19 | 21:20 |
| 82:16 | 113:21 | 28:14 | 79:11, 83:2 | 22:22 |
| 82:24 | 115:8 | occupying | 83:8 | 22:22 |
| 83:12 | 115:15 | 79:2 | 107:22 | 23:12, 25:2 |
| 83:18 | 116:8 | occurred | 130:24 | 25:7, 25:22 |
| 84:18 | 116:14 | 9:5, 21:3 | official | 25:24, 26:7 |
| 84:25 | 118:15 | 112:6 | 110:11 | 27:13, 28:5 |
| 85:10 | 121:6 | occurrence | officials | 29:13 |
| 85:20 | 128:21 | 80:19 | 52:2, 54:2 | 32:20, 33:1 |
| 85:25, 86:5 | 129:1 | occurring | oh 7:23 | 34:24 |

| | | | | |
|---|---|---|---|---|
| 35:20, 36:7 | 101:23 | 105:22 | 125:19 | 80:19 |
| 36:15 | 102:13 | oncoming | original | 109:2 |
| 36:23 | 103:6 | 97:23 | 132:13 | 109:7 |
| 36:25, 37:1 | 104:5 | 98:10 | outcome | 112:16 |
| 37:10, 38:5 | 104:15 | ones 26:1 | 132:12 | 112:17 |
| 38:8, 39:7 | 104:20 | 106:18 | outweigh | 122:6 |
| 39:14, 40:4 | 105:1 | online 39:8 | 24:9 | 130:12 |
| 40:13 | 106:1 | 60:5 | overall | particular |
| 43:10 | 106:4 | operate | 22:10, 24:2 | 38:16 |
| 43:18 | 106:6 | 41:19 | overrule | 48:23 |
| 43:19 | 106:12 | 41:21, 43:2 | 24:15 | parties |
| 44:10 | 106:22 | operating | overview | 4:16 |
| 44:10, 45:6 | 109:9 | 42:9, 43:22 | 9:6 | 132:10 |
| 46:3, 47:4 | 110:13 | 43:23, 44:6 | | 132:11 |
| 48:11, 49:1 | 111:25 | 44:21 | P | 132:15 |
| 50:1, 51:25 | 112:20 | 100:4 | | 132:15 |
| 57:18 | 113:11 | operations | P-A-V-A | parts 113:5 |
| 58:15 | 114:25 | 32:14 | 76:21 | party 8:11 |
| 58:16 | 118:5 | operator | p.m 1:10 | patience |
| 59:11 | 118:10 | 85:17 | 131:16 | 124:15 |
| 59:20, 60:2 | 119:2 | operator's | P.O 1:22 | pattern |
| 60:15 | 119:5 | 44:17 | 132:25 | 127:18 |
| 60:20, 62:4 | 120:1 | 91:19 | pace 23:22 | Paul 76:19 |
| 65:13 | 120:10 | opinion | 51:12 | pause 126:4 |
| 66:22, 67:3 | 120:18 | 46:3, 90:24 | page 37:12 | 126:7 |
| 67:17 | 120:25 | 91:7, 94:21 | 85:15 | PAVA 76:21 |
| 67:24, 68:1 | 121:3 | 114:11 | 99:20 | 76:22 |
| 68:12 | 122:14 | 116:17 | 100:18 | pay 72:1 |
| 71:15 | 122:22 | 126:14 | 100:19 | payload |
| 71:21, 72:2 | 123:18 | 126:19 | 102:18 | 74:13 |
| 72:4, 72:25 | 123:22 | opportunity | 104:11 | 78:10 |
| 73:15 | 123:24 | 37:3, 40:11 | 108:2 | peace 34:14 |
| 73:20, 76:6 | 123:25 | 73:7, 102:5 | 108:3 | peaceable |
| 76:15 | 124:1 | opposed | 108:7 | 33:25 |
| 77:18, 78:3 | 124:11 | 7:21 | 122:8 | 49:14 |
| 78:23 | 124:14 | oral 1:8 | pages 132:5 | peaceably |
| 79:19, 80:3 | 124:19 | 3:2, 132:17 | pain 35:16 | 33:5 |
| 80:23 | 125:3 | orange 38:4 | papers | peaceful |
| 81:11, 84:9 | 125:10 | order 32:23 | 112:18 | 49:5 |
| 85:4, 85:14 | 125:13 | 34:14 | paragraph | peacefully |
| 86:18 | 125:15 | 101:2 | 37:13, 82:3 | 52:14 |
| 87:20 | 126:1 | 105:11 | 85:15 | pelargonic |
| 89:14 | 126:6 | 110:6 | paraphrasing | 74:11 |
| 91:15 | 126:8 | 125:15 | 74:2 | 76:18 |
| 91:16, 93:2 | 126:19 | 125:23 | parentheses | 76:18 |
| 99:3, 99:10 | 127:11 | 125:24 | 76:21 | pelted 78:9 |
| 99:24 | 131:13 | 126:2 | parking | penmanship |
| 100:24 | olive 71:23 | orders | 67:21, 79:7 | 128:1 |
| 101:5 | omissions | 29:15 | part 44:4 | people |
| 101:14 | 7:25 | 30:23 | 50:21 | 23:22, 24:4 |
| 101:20 | once 88:15 | 125:17 | 74:14 | 44:3, 52:13 |

63:6, 66:9
84:22, 86:4
119:3
people's
83:11
PepperBall
20:11, 73:1
74:2, 74:7
74:12
74:16
74:18
74:19
74:22
74:25
74:25
75:11
75:23
77:19
77:20
78:10, 85:8
87:11
87:13
87:15, 88:3
88:4, 88:11
88:19
89:12
89:17
89:23
90:23
90:25
PepperBalls
74:4, 75:22
88:12
90:13
90:14
90:16
122:8
perceived
33:11
104:17
percent
76:18
76:22
114:22
perception
104:7
115:7
perfectly
15:21
performed
32:14

period
13:10
106:8
periods
16:14
permanent
55:17
person
23:24
51:20, 57:5
57:23
68:24
68:25, 69:4
69:6, 69:7
71:11, 78:9
78:19
78:19
79:10
83:11
97:15
97:25
98:12
98:23
116:5
118:2
118:14
121:22
person's
56:7
123:10
personal
71:4
personally
17:2
104:16
personnel
48:3, 61:15
persons
132:16
perspective
93:20
pertaining
113:19
pertains
99:16
99:23
100:3
100:14
pertinent
27:3, 28:14
pg 2:16

2:18, 2:19
pgs 2:14
2:15, 2:17
2:20, 2:21
2:22
photo 2:19
photos 2:18
phrase
11:21
14:11
32:10
49:23
111:11
physical
21:16, 70:1
70:8
physically
12:5, 14:5
89:7
picking
44:2
picture
24:2
piece 41:19
41:21
pink 71:7
pistol 38:6
38:6
place 10:15
23:5
places
126:20
plaintiff
1:3, 1:13
1:19, 3:3
5:1, 13:25
16:6, 60:6
85:15
91:25
93:12, 99:9
99:21
100:19
100:21
101:24
102:19
108:7
plaintiff's
2:13, 36:21
37:12
73:13
99:11

101:25
132:19
plan 100:4
platform
35:14
35:17
35:19
35:22
35:22
35:25
54:16
platforms
40:21
platoon
23:12
23:14, 24:1
25:16
25:17
please 4:14
6:22, 7:1
15:9, 22:7
22:24
38:24
48:10, 51:9
56:18
60:20, 61:8
65:12, 77:1
83:7
plural 87:7
point 16:15
46:11
75:16, 82:5
98:20
98:20
101:15
122:5
130:3
police 4:22
8:18, 9:10
11:19
11:21, 12:1
12:18
13:15
18:10, 23:3
25:9, 29:19
30:1, 30:9
31:9, 31:17
31:21, 32:6
32:23, 33:7
33:11
33:24

34:21
36:15
38:18
45:13
45:17, 50:4
50:21
50:22
51:19
52:20
52:21
52:21, 62:5
62:25, 66:7
72:9, 73:1
81:16
81:23, 83:8
86:14, 91:8
93:19
94:25
95:15
95:21
95:24
97:14
97:23
98:10
122:2
122:25
126:17
policies
29:15
29:20
29:24
30:14, 31:2
31:8, 32:6
32:12
81:25
policy 30:6
31:3, 32:1
32:1, 32:10
32:15
32:16, 45:9
45:11
49:24
59:21
59:25
72:25
72:25, 73:3
74:7, 76:10
76:14, 79:9
91:8, 92:18
93:19
122:10

polo 71:7
poor 92:4
 94:15
portion
 81:15, 92:3
 92:10
 102:22
portions
 84:11
pose 6:16
posing
 79:14
position
 86:9, 86:19
possible
 82:22, 89:7
 128:14
 128:24
 129:3
possibly
 58:4
potentially
 116:3
powder
 74:11
powdered
 76:17
 76:22
practice
 125:3
 127:18
practiced
 40:16
pre-Arkan...
 8:24
precise
 92:2
precisely
 83:16
preferred
 132:16
preparation
 70:21
prepared
 132:19
prescribed
 28:25
present
 1:19, 14:4
 14:5, 14:19
 15:4, 15:10

16:15
16:21
33:24
34:21
109:4
120:3
120:6
presents
 55:10
presume
 44:20
 108:13
pretty 11:9
 11:10
 11:10, 37:7
 112:15
 112:19
prevent
 24:25
prior 13:14
 34:22
 102:6
 132:4
privacy
 82:23
probably
 7:12, 26:19
 29:10
 43:22
 58:12
 78:11
 78:25
 97:24
 126:19
 126:22
 126:24
problem 7:5
 43:9, 93:2
 93:11
 93:19
 111:13
 111:24
 119:14
 124:16
problems
 94:5
Procedure
 3:4, 132:9
proceed
 4:17

proceeding
 7:14
 132:11
proceedings
 4:1, 7:21
 8:9, 8:12
 38:14
 112:2
 117:13
 123:20
 132:6
process
 27:11
produced
 3:3, 17:12
profession
 5:15
professional
 31:17
 31:20, 32:2
 39:25
professio...
 34:19
program
 12:3
projectile
 17:6, 35:13
 53:20, 56:7
 56:24
 58:12
 79:10
 86:25
 90:23
 98:12
projectiles
 21:2, 35:9
 36:1, 36:7
 36:8, 36:15
 52:19
 52:22, 53:9
 54:10
 54:15
 54:24
 55:22, 60:3
 74:9, 86:8
 86:14
 91:18
 92:19
 103:4
 106:8
 106:24

107:5
107:23
proper
 52:21
 81:16
 81:23
 95:15
protect
 106:16
 108:6
protection
 105:4
protections
 130:11
protest 8:9
 19:19, 33:5
 34:4, 34:5
 34:6, 34:22
 35:3, 45:18
 45:23, 46:6
 46:16
 46:17, 49:4
 49:5, 49:6
 49:14
 52:10, 53:7
 72:14, 75:2
 99:2, 120:4
protester
 50:14
 51:18
 58:11
 83:21
 97:12
protester's
 56:24
protesters
 52:4, 96:3
 126:18
 130:6
 130:13
protesting
 33:7, 52:14
protestors
 47:20
protests
 9:5, 14:7
 14:9, 14:11
 14:16
 14:20
 17:21
 21:15

21:23, 22:1
22:9, 26:14
27:3, 28:15
33:11
33:11
33:16
33:17
33:18
33:25
34:11
34:12
34:22
37:19
45:15, 46:5
52:1, 52:10
52:10, 74:5
77:21
100:5
126:15
130:11
protocol
 29:19
 52:21
 63:17, 69:3
 81:23
 86:14
 93:20
 94:25
 95:15
 95:21
 95:24
protocols
 30:14
provide
 32:12, 69:7
 132:14
provided
 109:14
provider
 132:16
provides
 32:2, 32:5
proximity
 70:8, 70:8
public 54:2
Pulaski
 61:17
 68:19
pull 87:18
 87:21
 88:20

90:25
pulling
  88:10
  88:15
  88:16
  89:15
  89:16
  89:24
  89:25
pulls 88:21
  89:1, 89:6
purchase
  39:15
purchased
  41:12, 42:7
  43:1, 44:18
purchasing
  42:23, 44:2
Purdue 11:5
purport
  37:14
  72:13
  84:15
purported
  94:4
purpose
  58:13
pursuant
  3:4
pursue 9:21
pushed 79:5
put 27:20
  42:6, 77:13
  77:14
  79:21
  116:7
  123:8
  129:5
puts 116:1
putting
  128:10
  129:20

Q

quantify
  111:4
quarter
  67:9
question
  6:17, 6:17

6:19, 6:21
7:4, 7:5
7:6, 7:18
9:23, 18:14
30:8, 34:19
35:7, 35:7
37:10, 41:9
44:5, 44:15
57:10
57:23
65:10
65:12
65:13
72:19
80:23, 83:7
98:4, 98:6
117:17
121:8
122:1
questioning
  130:5
questions
  8:21, 9:4
  27:13
  118:22
  124:2
quick 37:10
  50:15
quickly 6:5
quite 7:1
  84:16

R

race 115:2
radio
  119:23
raise 81:16
  93:8
raised
  35:22
  54:16
rang 104:6
range 40:2
  40:7, 40:13
  40:16
rank 4:24
rank-and-...
  26:19
re-ask
  24:13

read 32:11
41:6, 41:17
41:18
45:10
45:12
45:13, 58:8
65:11, 66:6
74:8, 81:15
85:16, 92:3
92:4, 92:10
92:13, 93:6
105:1
106:7
106:14
122:16
127:19
reading
  132:8
ready
  106:25
real 37:10
  58:4, 126:4
reality
  95:9
really
  46:16, 48:2
  58:2, 94:10
  102:14
reason
  70:12
  70:14
  70:22
  101:7
reasonable
  51:21
  51:24
  59:16
reasonabl...
  30:10
  30:16
recall
  19:20, 20:8
  21:14
  21:19
  21:21, 28:3
  29:10, 45:7
  47:8, 47:9
  47:10
  60:12
  60:15
  60:15

60:21
69:22
69:25
71:21
71:25, 72:1
100:15
101:19
114:7
127:17
129:11
129:22
130:7
recap 124:4
receive
  28:7, 29:7
received
  27:23
recess
  38:13
  112:1
  117:13
  123:20
recognize
  86:18
recognized
  31:8
recognizes
  45:18
recollection
  15:7, 16:2
  38:21
  60:16, 71:4
  129:19
record 4:12
  4:14, 5:22
  15:25, 16:5
  110:11
  117:8
  117:11
  123:17
  124:17
records
  65:3, 65:15
  82:5, 82:20
  83:3, 83:11
  83:17
recruit
  11:19
  41:20
  42:17
red 74:1

81:16, 93:6
94:7
REDIRECT
  2:8, 126:12
reduced
  132:7
reek 78:11
refer 5:2
  15:12
  15:13
  15:15
  47:14
reference
  26:3, 28:11
referenced
  18:23
referencing
  71:18
  91:25
referred
  14:9, 28:12
referring
  9:5, 18:17
  18:18
  22:20, 30:5
  47:18
  47:23, 50:6
  70:20
  73:11
  108:4
reflect
  4:14, 15:25
  30:15
reflected
  33:11
  83:17
  112:5
reflection
  95:8
refresh
  16:1
refusing
  73:25
regard
  53:11
  112:6
regarding
  33:11
  72:19
  95:14
  111:20

125:15
129:22
regardless
63:19
115:5
regards
82:20
113:13
regular
13:6
Regulations
132:20
related
5:15, 7:25
8:9, 18:7
21:9, 21:15
21:22
21:25
44:21
92:15
132:10
relates
25:20
80:18
117:19
117:19
117:21
relating
17:20
23:21
relative
86:4
132:11
relevant
26:12
26:13
64:10
reliable
116:18
117:18
relinquish
132:13
rely 7:7
remained
119:18
remember
19:22, 48:4
48:5, 48:22
48:23
114:23
119:14

122:8
122:15
remembers
115:10
Remington
38:22
38:22, 39:2
39:9, 39:21
42:4, 42:25
120:16
120:18
repeat 7:2
52:7, 77:1
77:7, 83:7
125:6
report 2:14
2:15, 2:16
2:20, 17:13
18:6, 18:20
18:22
18:25, 20:9
20:10
25:19
72:12
72:12
72:17
73:24, 80:8
80:11
80:12, 81:6
81:15, 82:4
83:17
83:25, 84:3
84:22
84:23
85:14
91:21
91:23, 92:4
92:17
94:24, 95:1
95:3, 95:7
95:8, 95:14
99:13
100:13
100:20
101:14
112:10
112:23
113:6
115:6
115:12
116:16

116:19
117:19
124:8
128:3
128:11
128:14
128:19
128:23
128:25
129:14
130:21
130:22
reported
132:6
reportedly
14:14
reporter
2:10, 3:7
6:5, 7:16
65:11
65:13
117:7
117:11
123:16
124:18
132:2
132:20
132:24
Reporter's
2:24, 132:1
reporting
1:21, 93:3
104:22
112:4
reports
18:1, 18:2
18:4, 19:17
19:23, 21:4
21:15
31:16, 65:4
65:16, 73:7
73:11, 81:5
84:11
84:12
84:15
113:9
122:25
127:16
127:19
127:21
127:21

127:22
represent
5:1, 36:2
105:17
represented
5:25
represents
95:15
105:7
105:18
109:25
reproving
66:25
request 3:3
99:14
132:19
requested
132:8
required
28:23
90:16
129:12
requires
132:13
132:14
resemble
37:18
37:25
resembles
71:11
Reserve
11:17
12:14, 13:7
13:12
Reserves
12:18
resources
32:2, 32:5
respect
105:24
115:23
respective
16:14
respond
28:18, 66:9
response
22:4, 22:11
23:1, 28:17
45:8, 45:14
49:24
122:13

122:20
responsib...
9:3, 22:8
26:13, 40:1
responsible
22:25, 23:4
23:25
107:21
rest 99:18
116:1
116:7
123:9
restate
6:23
restrained
61:21
61:23
61:25
62:11
restroom
37:4
result
55:15
retired
12:21
review 73:7
102:5
102:8
reviewed
69:11
101:14
102:10
127:15
reviewing
101:8
reviews
113:3
right 6:21
7:9, 11:9
11:11
13:12
14:12
14:19
15:12
15:24
21:21
23:18
26:21, 33:5
33:5, 37:8
37:10
46:12, 47:1

| | | | | |
|---|---|---|---|---|
| 47:2, 55:1 | 54:9, 55:8 | 58:8 | 85:16 | 125:12 |
| 55:8, 60:23 | 55:10, 96:9 | 111:20 | 91:21 | seasoned |
| 63:15 | 96:10 | | 99:14 | 27:10 |
| 66:10 | 96:19 | S | 106:12 | second 5:20 |
| 66:15 | 110:25 | | 109:21 | 17:13, 37:2 |
| 66:19 | 111:4 | safety | 112:25 | 61:1, 70:5 |
| 66:21 | roadmap | 31:18 | 112:25 | 85:13 |
| 67:18 | 8:21 | said/she | 113:2 | 105:7 |
| 67:18, 69:8 | Robinson | 116:3 | 114:8 | 105:11 |
| 70:25 | 13:8, 13:9 | sake 42:9 | 114:24 | 106:7 |
| 71:17 | Rock 1:15 | save 7:19 | 116:5 | 106:12 |
| 71:18, 73:4 | 1:18, 13:9 | 34:5 | 116:6 | seconds |
| 73:5, 73:23 | 14:8, 14:17 | saving | 131:10 | 37:8, 70:9 |
| 82:10 | rocks 121:9 | 33:18 | scenarios | 70:9, 71:10 |
| 85:12 | role 21:25 | saw 49:14 | 126:21 | Section |
| 85:12 | 22:8, 22:8 | 50:2, 61:3 | scene 24:3 | 132:20 |
| 86:20 | 27:3, 28:14 | 61:18 | 24:7 | see 6:5 |
| 93:24, 95:4 | 75:2, 79:16 | 61:20 | school 9:16 | 9:25, 10:21 |
| 95:9, 95:13 | roles 9:2 | 114:12 | 9:18, 9:21 | 12:20, 13:7 |
| 95:21 | 26:13 | 117:3 | 11:11 | 18:17 |
| 96:15 | Ronnie 80:1 | 117:25 | 11:15 | 37:16, 49:3 |
| 98:18, 99:4 | room 44:2 | saying | 11:18 | 49:6, 49:7 |
| 99:10 | 91:13 | 24:15 | 11:19 | 60:2, 66:21 |
| 101:3 | roughly | 24:24, 33:3 | 12:10 | 71:11, 82:6 |
| 104:15 | 79:1 | 36:12, 39:3 | 12:13 | 93:2, 93:10 |
| 109:11 | round 13:24 | 42:5, 42:6 | 41:20 | 99:18 |
| 110:1 | 17:1, 87:14 | 42:7, 42:24 | 42:17 | 102:2 |
| 112:6 | 87:24, 88:1 | 44:7, 47:19 | Scott 25:15 | 102:22 |
| 114:16 | 88:2, 88:3 | 56:20 | 26:3, 26:5 | 106:23 |
| 114:25 | 105:18 | 67:13 | 46:18 | 116:20 |
| 115:3 | rounds | 70:22, 77:7 | 79:22 | seeing 45:7 |
| 115:14 | 13:24, 74:1 | 87:16, 92:8 | 79:22 | 60:12 |
| 116:3 | 74:2, 87:6 | 95:13 | screen | 63:21 |
| 118:3 | 87:7, 87:13 | 97:22 | 36:23 | seen 22:14 |
| 120:11 | 94:5 | 103:7 | 37:16 | 36:20 |
| 120:16 | rude 38:10 | 103:16 | 77:14 | 44:12 |
| 120:19 | rule 129:14 | 103:17 | 77:14 | 44:20, 45:1 |
| 120:20 | 129:16 | 109:15 | seal 132:21 | 45:5, 45:5 |
| 120:23 | rules 3:4 | 115:24 | search | 60:6, 60:7 |
| 121:20 | 4:17, 4:19 | 117:17 | 28:21 | 80:11 |
| 122:14 | 4:20, 5:22 | 120:6 | 68:25 | 80:11 |
| 122:16 | 6:4, 132:9 | 128:23 | 123:14 | 99:25 |
| 124:9 | rules-of-... | says 32:11 | 124:24 | 100:9 |
| riot 8:9 | 23:18 | 45:11 | 125:2 | 100:10 |
| 34:22, 46:6 | running | 45:13 | 125:4 | 100:13 |
| 46:12 | 51:13 | 76:10 | 125:8 | 129:25 |
| 120:4 | Ryan 1:5 | 76:14 | search-an... | 130:2 |
| riot-control | 7:25, 13:22 | 76:21 | 29:3 | segments |
| 27:20 | 16:22 | 85:14 | searched | 8:22 |
| riots 45:16 | 16:25, 17:5 | 85:15 | 82:14 | seized |
| risk 54:8 | 18:7, 56:5 | | 124:23 | 69:10 |

seizing 69:6
selected 29:5
send 29:1
65:22, 66:6
123:7
sense 6:22
6:23, 9:13
23:19
110:21
110:22
sent 67:4
67:8
sentence
82:4
sentences
33:1
sentinel
111:11
111:15
111:19
separate
108:14
109:17
September
132:21
sequential
81:7
sergeant
79:21
sergeants
25:14
serious
57:5, 57:8
59:17
86:19
96:19
seriously
96:24
servants
28:19
service
10:3
132:14
set 26:12
61:14
67:16
67:17
128:5
sets 27:1

seven 10:9
10:11, 11:7
Sgt 25:16
25:18
79:16
102:20
103:3
104:21
105:2
105:8
105:12
106:14
107:20
107:21
108:8
108:14
109:8
119:16
119:17
shakes 6:11
Sheeler 1:5
2:14, 8:2
12:11, 41:2
72:19, 73:8
80:9, 81:11
82:3, 82:8
82:14
82:19
83:16, 84:1
85:5, 85:7
85:8, 85:14
85:15
85:18, 86:8
87:6
112:25
113:19
114:8
114:10
116:6
128:25
129:5
129:14
129:22
131:10
Sheeler's
72:12
73:23
80:11
81:15
83:25
112:10

113:5
116:12
116:18
117:19
127:15
128:3
128:11
128:14
130:22
sheet 41:10
shells
121:16
shield 92:5
shirt 71:8
74:1
112:25
shoot 40:18
40:21, 88:2
92:9
103:15
103:15
117:4
short-cir...
13:13
shorts 71:8
71:22, 74:1
112:25
shot 40:22
92:13
92:14
93:14
94:14
96:14
96:19
shotgun
13:23
16:23
35:14
37:15
37:18, 38:3
39:21
40:16
40:19
42:13
42:14
42:14
42:18
42:25, 43:6
43:7, 53:1
84:24
90:23

91:18
92:19, 93:4
94:6
shotguns
36:16
37:22
38:17, 42:7
44:18
53:10
102:15
107:14
shots 92:6
93:11
93:15
shoulders
6:11
show 36:24
99:2, 109:4
shows 51:15
72:8
shrugs 6:11
sic 100:13
side 13:4
sideways
20:18
signed 16:6
17:11
17:20, 18:4
101:7
101:15
significa...
54:10
signing
21:14
132:8
similar
81:7
simple
41:21
simplicity's
42:8
simply
21:25
Simultaneous
43:8, 59:6
66:5, 76:16
88:8
117:20
130:1
single
88:21

88:22, 89:2
89:9
sir 4:11
4:22, 4:23
4:25, 5:3
5:7, 5:12
5:17, 6:2
6:10, 6:13
6:20, 6:24
7:3, 7:8
8:1, 8:3
8:5, 8:7
8:10, 8:13
8:16, 8:19
9:14, 9:17
10:7, 10:14
10:24, 11:4
12:4, 12:7
12:12
12:15
13:11
13:16
13:19
14:10
14:13
14:18
15:17
15:20
15:20
16:18
16:24, 17:3
17:16
17:18, 20:6
20:24, 21:7
21:13, 22:2
22:3, 23:10
25:1, 25:4
25:8, 26:6
26:9, 27:8
27:18
27:24, 28:2
28:16
29:18
30:13
30:21, 31:1
31:6, 31:13
31:15, 32:4
32:19
32:22
32:25, 33:6
33:15

| | | | | |
|---|---|---|---|---|
| 33:22, 34:3 | 121:2 | 125:24 | 45:17, 92:8 | squeeze |
| 34:9, 34:17 | 121:25 | someone's | source | 87:16 |
| 34:23 | 129:21 | 57:12 | 29:19, 31:7 | staging |
| 35:10, 36:6 | 129:24 | 123:9 | 60:6 | 68:10 |
| 36:11 | 130:4 | somewhat | 115:13 | stand 24:21 |
| 36:14 | 130:9 | 92:9 | 116:17 | standard |
| 36:19 | 131:13 | soon 68:9 | sources | 17:4, 30:11 |
| 36:22 | sit 59:22 | sorry 8:6 | 72:22 | 30:16 |
| 37:16 | 61:16, 63:2 | 10:10 | 109:10 | 52:20 |
| 38:19 | 68:13 | 10:10, 16:3 | south 67:20 | 59:13 |
| 39:13, 42:2 | 93:10, 94:6 | 16:4, 22:18 | 67:22 | 122:1 |
| 45:22, 49:2 | 118:2 | 37:11 | 67:22 | standing |
| 49:19 | sitting | 37:11, 38:9 | speak 6:7 | 50:19 |
| 49:25 | 129:18 | 42:21, 45:2 | 17:15 | 126:1 |
| 50:24 | situation | 46:24 | 42:21 | start 9:4 |
| 54:22 | 23:24 | 48:13 | 46:23 | 25:7 |
| 56:13 | 51:20 | 49:18, 51:5 | speaking | started |
| 59:14 | 68:16, 90:6 | 51:9, 52:7 | 33:4, 34:25 | 46:15, 79:4 |
| 59:19, 60:1 | 90:15 | 61:8, 65:23 | 43:8, 58:11 | 110:19 |
| 61:1, 62:3 | 116:3 | 65:24, 66:1 | 59:6, 66:5 | 119:6 |
| 62:24, 63:1 | situational | 67:11 | 76:16, 88:8 | 119:8 |
| 63:4, 63:8 | 97:21, 98:1 | 70:17 | 117:20 | 121:17 |
| 63:11 | situations | 70:19 | 130:1 | 125:22 |
| 66:23, 72:7 | 22:9 | 73:18 | specialized | starting |
| 72:10 | 126:21 | 74:24 | 27:1 | 76:22 |
| 72:15 | six 5:14 | 76:14 | specific | starts |
| 72:18 | 5:19, 5:19 | 76:18, 77:3 | 19:8, 30:6 | 97:14 |
| 72:20, 73:6 | 5:20, 7:19 | 77:5, 77:14 | 122:6 | 101:24 |
| 80:2, 80:10 | size 111:5 | 83:6, 84:8 | 122:8 | state 4:11 |
| 80:14 | 111:5 | 91:15 | specifically | 4:21, 8:18 |
| 80:17 | skill 26:12 | 91:22 | 41:10 | 9:10, 11:19 |
| 81:24, 82:2 | 27:1 | 91:22 | 84:10 | 11:25, 12:1 |
| 82:7, 85:1 | skills | 91:24, 92:2 | 113:23 | 13:14 |
| 85:11 | 28:22 | 94:10 | specifica... | 18:10, 23:3 |
| 85:22, 86:2 | skimmed | 100:18 | 39:20, 41:6 | 25:9, 28:23 |
| 86:7, 87:4 | 102:12 | 100:23 | specs 38:21 | 29:13, 30:1 |
| 89:13 | 102:14 | 101:10 | 39:15 | 36:15 |
| 89:18 | skirmish | 107:20 | speculate | 38:18 |
| 89:18 | 60:24 | 113:4 | 56:19 | 45:13 |
| 91:14 | 60:24 | 113:17 | spent 10:9 | 45:17 |
| 95:22, 96:1 | skull 55:16 | 121:16 | 10:11 | 52:11, 62:4 |
| 102:3 | slight | 122:21 | spoken | 62:25, 66:6 |
| 102:7 | 41:23 | Sotto 19:3 | 83:15 | 73:1, 91:8 |
| 102:9 | slower | 38:25 | spread 79:3 | 122:2 |
| 107:3 | 51:17 | 48:15 | 79:6 | 122:25 |
| 117:16 | smell 78:11 | 77:16 | squad 25:17 | 129:15 |
| 118:9 | soldiers | sounds | 25:18, 26:1 | 132:2 |
| 118:12 | 68:4 | 10:12 | squads | State-of-... |
| 118:20 | solid 74:10 | 10:21 | 25:20 | 12:2 |
| 120:9 | 76:4, 78:2 | 16:13 | 25:21 | statement |
| 120:24 | 110:20 | 16:15 | square 79:1 | 33:2, 41:4 |

44:23
54:19
55:18, 76:7
107:15
107:19
112:5
130:3
statements
72:13
STATES 1:1
stationed
85:16
stay 33:25
step 14:5
70:19, 75:8
stepped
10:22
Stewart
25:16, 80:1
102:20
103:3
104:21
105:2
105:8
105:12
106:14
107:20
107:21
108:8
108:14
109:8
110:5
119:17
sticks
121:11
stocks 38:4
stop 90:11
90:13
straight
11:15, 88:9
straightf...
44:6
street 1:18
14:19
stretched
126:25
strictly
14:16
strike
26:10, 33:8
34:20

51:17, 53:8
53:18
53:24
57:19
59:23, 65:1
82:3, 91:17
98:11
100:18
127:11
striking
18:7, 92:7
strive
45:14
struck 17:1
17:5, 54:17
studied
10:16
10:17
stuff 23:16
24:4, 28:19
28:21, 50:4
50:13
50:20
123:12
STYLE 2:2
subject
34:6, 53:11
53:12
132:8
subjective
58:6, 115:6
submit 20:8
submitted
132:8
subordinate
24:5
subordinates
79:22
119:3
subsequent
101:18
128:25
substantial
132:13
subtle
41:23
suggesting
103:14
SUITE 1:14
1:18
Sunday

107:21
supervising
93:18
supervision
132:7
supervisor
101:8
101:13
123:6
supply 44:2
supporting
85:17
supports
72:16
suppose
88:15
supposed
61:16
Supreme 3:6
4:19
sure 6:3
6:15, 15:10
22:11
22:12
22:12
22:13
22:14
22:17
22:19
28:12
29:25
33:5, 37:7
41:16
41:16
41:17, 52:9
58:7, 65:21
70:15
75:18
111:16
113:10
113:18
120:1
127:7
surely
66:15
surgery
111:14
suspense
59:5, 59:7
sustained
61:4

SWAT 26:8
26:10
26:11, 27:1
27:13
29:11
sweep 27:4
sworn 4:5
132:4
synonymous
36:12
system 73:1
74:7, 74:12
74:16
74:20
74:21
74:25
75:11
75:17
77:19
77:20
78:10
81:10, 85:8
88:13
89:12
90:24, 91:1
122:24
124:8

T

tabulate
21:3
tactical
23:4, 23:17
23:20
23:25, 24:8
37:15
take 14:5
14:8, 18:16
23:5, 25:5
37:4, 37:5
38:11
44:11
61:13, 70:6
78:5, 78:25
80:4, 96:25
99:3
taken 3:3
4:15, 38:13
61:17
63:17

68:19, 97:5
97:8, 112:1
117:13
123:20
132:11
talk 16:13
17:4, 96:8
122:24
125:16
talked
104:14
talking
12:25
14:12
14:16
66:24
89:17, 94:4
106:20
119:6
119:12
talks 87:6
target 54:5
54:25, 55:1
92:21
92:22
96:15
targeted
53:12
55:23
Targeting
55:15
targets
57:21
tasks 32:14
teach 29:2
team 22:4
22:11, 23:1
23:21
28:17
28:18
29:11, 45:9
45:14
47:21
47:21
47:22
47:23
49:24, 61:9
61:12
61:14
61:19
63:17

67:16
67:17
79:18
79:20
106:16
tear 20:17
21:1, 71:12
74:11, 76:6
76:24
teargas
78:11
technical
6:15, 58:22
116:22
123:19
124:5
124:7
technically
58:21
87:25
technolog...
117:12
tell 7:5
7:6, 18:15
22:7, 23:11
38:20
40:17
40:22, 48:2
48:2, 48:6
48:17
60:20
77:10
77:12
77:12
77:25
79:15
99:15
101:21
118:10
telling
75:16, 93:3
ten 90:13
tendency
132:13
tendered
45:9
tenure 9:12
term 35:8
40:10, 46:7
terms 11:14
70:1, 70:11

72:21
79:22
81:16
83:16
95:15
110:10
testified
4:7, 44:16
87:5, 120:3
testify 4:6
57:13
95:14
testifying
77:2
testimony
41:11, 49:4
49:13
50:23
57:10, 78:6
88:7, 88:9
88:22
109:3
114:25
130:8
132:4
thank 10:3
10:4, 15:22
20:16
38:12, 45:6
65:17, 84:9
85:4, 92:1
118:19
118:21
124:15
124:19
That'd
19:14
thereabouts
71:11
thickness
92:5
thing 13:3
68:15
106:25
things 6:12
27:2, 33:3
33:25
63:14
77:19
100:2
100:10

103:17
121:3
121:11
121:12
122:7
122:18
123:5
123:13
130:14
think 18:23
23:20
23:23
25:18
27:16
33:23
42:23
52:19, 57:7
58:3, 58:12
58:21
58:23, 65:2
65:10
65:14
66:18
68:12, 83:9
89:13
112:21
113:1
118:18
121:17
122:10
125:11
128:16
thinking
58:2
thinly
126:25
third
102:19
third-party
132:17
thought
44:20, 49:8
49:10
57:10
125:14
thoughts
34:25
threat 54:1
79:14
90:16
107:7

three 71:10
104:13
108:14
109:17
110:4
125:16
125:19
125:20
three-page
80:8
throw 20:13
throwing
50:4, 50:13
50:20
130:6
130:23
thrown
23:17
121:3
121:4
tie 61:21
ties 61:24
time 7:10
7:11, 7:19
8:20, 8:20
13:10
14:12
14:21
16:14
20:13
39:10, 47:4
47:10
47:13
47:14
47:21
47:24, 48:3
48:7, 49:21
52:7, 54:8
56:3, 58:7
61:3, 61:17
61:18, 62:5
63:10
69:11
70:11
70:12, 72:5
72:14
77:15, 80:4
81:6, 83:6
87:14
87:19
87:20

87:24, 88:1
93:23
102:6
103:25
104:6
106:12
109:22
109:24
110:1
118:7
118:10
118:19
time-trav...
110:3
timely 50:8
times 2:18
5:14, 7:19
40:15
40:22
86:24
88:16
89:25, 92:9
93:4
109:23
title 21:22
21:25, 22:3
to-wit 4:8
38:14
112:2
117:14
123:21
today 5:8
5:25, 9:7
17:17
59:22, 63:2
65:2, 65:14
73:10
75:11
93:10, 94:3
94:6, 102:8
102:9
102:10
118:19
129:18
today's
73:8
told 18:9
51:2, 97:8
104:8
104:17
118:4

top 19:9
  25:6, 25:7
  85:16
  85:18, 86:3
tornadoes
  28:19
torso 54:24
totally 7:6
  113:6
  117:16
tough 97:13
train 95:19
  95:20
trained
  11:24
  40:24, 41:2
  41:5, 41:19
  74:21
  90:10
  90:14
  94:22
training
  12:6, 26:8
  26:10
  26:11
  27:17
  27:19
  27:20
  27:22, 28:1
  28:3, 28:8
  28:13
  28:22
  28:25, 29:3
  29:4, 29:7
  40:5, 95:23
transcribed
  132:7
transcript
  132:14
  132:19
transcrip...
  132:6
transfer
  36:2
treatment
  65:9
tried 75:24
trigger
  87:16
  87:18
  87:21

88:10
88:15
88:16
88:20
88:22, 89:2
89:6, 89:15
89:16
89:25
90:25
triggered
  20:8
troop 11:15
  11:18
  12:10
  12:13
trooper
  11:25, 12:1
  28:23, 56:4
  56:5, 56:6
  56:23
  58:13, 60:3
  61:15
  68:14
  68:14
  68:15
  68:16
  93:18
  123:7
troopers
  29:13
  40:24, 41:5
  47:18
  52:11
  60:25, 61:9
  62:18, 63:5
  64:10, 65:3
  65:15
  65:20
  66:14
  68:13
  69:13
  102:25
  105:4
  105:19
  107:22
  108:6
  111:1
  111:4
trouble
  92:13
  92:14

true 16:16
  20:21, 48:5
  62:5, 64:15
  72:23, 76:2
  93:6, 132:5
trustwort...
  115:5
truth 4:6
  4:6, 4:7
  132:4
try 6:11
  83:3, 83:10
  122:2
  125:7
trying 54:6
  70:25
  82:22, 88:6
  90:21
  100:21
  106:25
  107:4
  113:5
turn 108:2
  108:3
turned
  131:4
turning
  97:23, 98:9
turns 51:19
  97:13
  97:14
turret
  84:24, 85:9
  85:17
twice 89:25
two 16:7
  17:11
  17:15
  17:25, 33:2
  60:2, 62:18
  63:3, 63:19
  65:3, 65:15
  65:20, 66:7
  71:17, 72:6
  72:22, 81:5
  84:21
  90:13
  106:3
  126:20
  126:20
  126:21

type 9:22
  20:10
  21:22
  21:24
  26:20
  27:25
  32:23
  37:18
  39:10
  44:17, 50:5
  54:9, 78:15
  80:25
  93:19
  111:10
  111:19
types 20:7
  20:11
typewritten
  132:7

       U

Uh-huh
  128:4
umbrella
  36:13
unarmed
  97:13
unaware
  44:16, 82:8
Unbelievably
  59:2
understand
  5:4, 6:9
  13:20
  13:21
  13:25, 14:2
  14:3, 14:12
  20:16
  24:22
  27:12, 30:5
  30:8, 30:9
  36:1, 37:24
  42:5, 44:15
  78:5, 91:11
  93:25, 98:3
  98:6
  109:24
  114:25
  128:17
  128:22

understan...
  17:10, 27:9
  32:15
  38:20
  77:18, 83:2
  89:21
  106:2
understood
  23:2, 24:14
  26:7, 45:8
  89:13
unfortunate
  40:10
unintended
  96:15
union 32:24
UNITED 1:1
units 12:19
University
  11:5
unjustified
  90:1, 90:6
unknown
  92:7
unoccupied
  20:18
unrest
  46:18
  49:22
upper 53:19
  54:11
  54:17
  54:24, 56:7
  56:24
  57:12
  58:12
usage 81:21
  105:7
use 14:11
  17:24
  20:12
  20:13
  20:14
  20:20
  28:10
  29:25, 30:2
  30:9, 31:2
  32:10, 35:1
  37:4, 40:11
  40:24
  41:20, 42:4

| | | | | |
|---|---|---|---|---|
| 42:4, 52:21 | 48:20 | 114:14 | 91:19, 92:9 | 98:16 |
| 54:9, 56:6 | 103:21 | 114:16 | 92:15 | warrants |
| 56:8, 56:25 | 122:4 | 114:23 | 92:19 | 28:21 |
| 57:4, 57:13 | | 115:1 | 92:22, 93:5 | watch |
| 57:19 | V | 115:11 | 93:13 | 116:20 |
| 57:22 | | 115:13 | 93:15, 94:5 | watched |
| 57:23 | V-A-N-I-L... | 115:25 | 94:17 | 70:13 |
| 57:24 | 76:20 | 116:7 | visualize | 70:20 |
| 58:17 | vacate | 116:11 | 46:17 | 70:23 |
| 59:12 | 23:22 | 116:16 | voce 19:3 | water 22:13 |
| 61:24 | 51:18 | 116:18 | 38:25 | 74:10 |
| 74:23 | vacating | 116:20 | 48:15 | 75:25, 78:1 |
| 74:25, 82:1 | 50:14 | 116:20 | 77:16 | 121:9 |
| 87:8, 87:14 | 51:17 | 116:21 | voice-wri... | 130:6 |
| 87:21, 88:1 | 97:12 | 117:2 | 132:6 | way 19:5 |
| 88:2, 88:10 | Vanillyla... | 117:3 | | 19:15, 27:4 |
| 88:21 | 76:19 | 117:18 | W | 33:16, 42:6 |
| 88:21 | variety | 117:25 | | 65:2, 65:14 |
| 88:22, 89:2 | 29:14 | 123:23 | Waid 1:20 | 65:20, 80:4 |
| 89:9, 90:7 | 100:9 | 130:2 | 1:21, 3:6 | 82:23 |
| 90:10 | various | VIDEOCONF... | 124:17 | 91:12 |
| 90:12, 91:7 | 41:24 | 1:11 | 132:2 | 95:19 |
| 97:15 | 77:19 | videos | 132:24 | 95:19, 97:6 |
| 97:25 | 81:21, 93:4 | 71:17, 72:6 | waidrepor... | 98:8, 98:22 |
| 98:10 | vehicle | view 53:25 | 1:25 | 102:11 |
| 98:23 | 85:23 | 68:9 | wait 6:16 | 102:19 |
| 103:8 | velocity | violates | 6:17, 45:12 | 116:6 |
| 107:5 | 88:5 | 82:23 | 68:17 | 116:7 |
| 107:8 | venture | 83:10 | waiting | 121:17 |
| 107:14 | 20:1 | violation | 67:15 | ways 29:14 |
| 107:22 | verbalized | 65:7, 79:9 | walked 67:6 | we've 43:21 |
| 110:5 | 108:17 | violence | 67:10 | 72:6 |
| 111:20 | verbatim | 50:10 | 67:13, 68:3 | weapon |
| 118:14 | 73:5, 132:6 | 50:15 | walking | 42:22 |
| 122:24 | verse 59:21 | 50:23 | 51:12 | 44:21, 97:7 |
| 125:15 | version | 51:14 | 51:12 | 98:9 |
| use-of-force | 43:16, 44:3 | 51:15 | wallet 69:5 | weaponry |
| 18:1, 18:2 | versus | 51:16 | 69:6, 69:10 | 125:16 |
| 18:4, 18:6 | 130:14 | violent | want 19:10 | weapons |
| 18:20 | vicinity | 50:19 | 25:7, 36:24 | 35:25 |
| 18:21 | 14:20 | 50:21, 52:3 | 37:5, 40:10 | 39:14 |
| 18:25 | 16:22 | 52:13 | 57:6, 69:5 | 52:19, 82:1 |
| 19:17 | video 70:13 | 52:14 | 88:7, 88:9 | 89:7, 95:16 |
| 19:23, 20:9 | 70:20 | 53:25 | 103:8 | 120:11 |
| 20:10, 21:4 | 70:24, 71:4 | 126:14 | 105:23 | 120:15 |
| 21:15 | 71:7, 71:9 | 126:16 | 106:8 | wearing |
| uses 19:16 | 71:9, 71:14 | 126:17 | 114:6 | 62:21 |
| 20:11 | 71:14 | 126:24 | 117:7 | 70:11 |
| usually | 71:19, 72:4 | violently | wants | 70:14 |
| 24:1, 48:19 | 72:8 | 52:1, 72:8 | 119:25 | 70:16 |
| 48:20 | 114:12 | vision | warning | 70:23, 71:6 |

71:7, 71:22
92:5, 114:8
116:12
website
 31:19
WEDNESDAY
 1:9
weeks
 127:20
weigh 33:9
weight
 81:12
 123:11
went 9:23
 9:24, 10:15
 10:22
 11:15
 11:15
 25:13
 68:10
 109:6
 111:17
 119:15
 119:15
 119:16
 119:17
 127:21
WEST 1:14
whales
 33:18, 34:5
whatnot
 71:12
 78:12
when's 7:10
white 73:24
 74:1
 112:25
whiteout
 80:25
whiting
 129:19
WILLIAM 1:6
willing
 110:24
 112:16
 112:17
Wingo 1:5
 2:15, 2:19
 5:6, 7:25
 12:11
 13:22

16:22
16:25, 17:5
41:2, 56:5
56:20, 65:7
73:8, 81:12
84:4, 91:21
92:8, 93:3
93:3, 94:16
94:16, 96:2
97:1, 113:2
127:15
130:21
131:10
Wingo's
18:7, 56:20
58:8, 72:12
72:17
80:11, 84:3
84:23
91:17
91:23, 92:3
111:20
112:4
113:13
130:21
withdraw
35:6
witness 3:3
4:4, 5:5
15:12
15:15
15:18
15:24, 16:3
19:3, 38:25
48:11
48:13
48:15
49:18
58:23, 59:1
59:3, 59:9
66:24
70:18, 71:1
73:18, 77:3
77:5, 77:16
98:5, 98:7
100:25
101:2
104:11
104:15
110:15
113:3

113:10
113:24
114:1
114:3
114:5
116:24
117:5
118:21
118:24
122:10
124:7
124:12
127:8
132:8
132:21
witnesses
 56:22
wonder 4:11
word 11:10
words 57:6
 57:14, 94:3
 118:10
work 12:16
 12:22
 66:19
working
 120:15
world's
 31:16
worldwide
 31:18
would've
 104:22
wrap 117:16
write 104:5
 105:1
 106:14
 108:3
 108:15
 128:8
writes 82:3
writing
 84:22
 105:6
 106:22
written
 105:5
 109:23
 128:6
 132:17
wrong 85:2

85:18
111:17
123:3
123:3
123:4
123:5
128:12
wrote 92:16
106:2
108:13
129:19
129:20

Y

y'all 66:7
yeah 14:25
15:17
15:19
15:23
18:14
24:23
30:14, 45:1
47:1, 48:12
54:5, 55:4
55:11
55:14
57:17
58:24
65:13, 69:4
76:11, 78:7
89:20, 92:2
92:18
97:21, 98:5
99:2
101:10
107:20
110:15
112:15
112:19
113:10
113:17
113:24
114:1
114:3
115:4
115:4
120:2
121:14
123:16
125:18

year 9:18
years 7:12
 10:9, 10:11
 11:6, 11:7
 11:7
YouTube
 71:14
 71:14
 71:19

Z

zip 61:21
 61:24
Zoom 1:11
 6:14, 6:25

0

00005 91:25
0022 18:17

1

1 2:2, 2:3
 2:14, 2:16
 2:18, 2:19
 46:5, 46:11
 47:5, 48:24
 60:3, 71:6
 73:12
 73:13
 73:24, 74:5
 74:12
 74:17
 79:16, 80:3
 80:7, 80:24
 100:9
 100:14
 100:18
 108:4
 117:24
 128:3
 132:3
1:23 1:10
131:16
10:07 1:10
 3:7
101 2:21
10385 1:22
10385,Conway

132:25
11 39:3
118 2:7
11-87 38:22
39:2, 39:2
39:4, 39:5
39:9, 39:21
42:4, 42:25
43:6, 43:12
43:16
11-870
43:15
12 37:12
88:16
88:21
125 99:9
99:10
99:21
126 2:8
128 100:24
100:25
12-gauge
13:23
35:14
35:19
37:15, 38:3
38:17, 39:6
39:6, 39:9
39:21
40:16
40:19
42:25
42:25
120:16
120:18
13 37:13
130 99:21
100:19
100:19
100:22
101:1
131 2:9
101:24
132 2:10
133 102:19
134 108:7
1-5 1:7
165 81:12
1700 1:14
18 71:10
19 132:20

1987 13:5
1988 9:20
1989 11:8
1990 13:18
1996 9:11
13:15
13:18
1st 15:10
16:8, 46:4
47:11, 48:8
59:24
60:13
60:16
63:10, 66:8
72:5, 75:17
78:24, 82:9
83:22
102:16
108:9
108:17
108:23
109:18
110:6
110:20
111:1
111:20
112:11
119:3
121:4
125:24
126:1
127:1

2
2 2:4, 2:15
2:15, 73:12
73:13
85:15
91:24
132:5
20 11:1
90:17
200 1:18
2008 12:19
2010 29:11
2015 28:4
2019 2:22
2020 8:17
9:3, 9:6
11:3, 24:5

25:3, 36:16
38:18, 46:4
46:5, 46:12
60:3, 60:10
60:13
60:16
63:10
74:12
74:17
75:17
83:23
127:4
128:15
128:20
128:25
2021 99:5
2023 1:9
3:6, 132:3
132:22
22 18:11
18:11
18:16, 19:1
23 1:9
132:3
23rd 3:5
24th 132:21
25 2:22
89:1, 127:4
25th 127:13
127:15
275 81:13
2nd 15:11
16:8, 47:12
72:5

3
3 2:5, 2:14
2:16, 2:17
2:24
102:18
104:11
132:10
30 37:8
70:9, 89:25
300 78:25
30th 14:8
15:2, 119:8
119:11
121:17
31st 16:8

16:8, 16:9
16:16
107:21
108:8
108:21
109:1
109:5
109:16
110:5
110:18
110:22
111:1
111:6
119:10
119:11
119:15
125:17
125:19
126:19
126:25
323 1:18

4
4 2:6, 2:17
2:21, 2:24
76:17
77:22
77:25, 78:1
78:4, 78:10
99:14
100:6
102:18
132:12
4:22-CV-5...
1:4
400 1:14
40-millim...
35:14
35:21
48 37:13
4th 101:17

5
5 2:18
2:25, 76:17
76:22
132:15
5/28/21
2:17

50 19:25
89:6
501 1:24

6
6 2:19
2:20, 2:25
6/1/20
128:6
128:8
6/25/20
2:21
6/4/20 2:20
620-0982
1:24
630 67:11
67:22
68 74:9

7
7 2:20
25:20, 99:7
99:11
100:16
7/23/21
2:16
710 45:10
716 77:8
72034 1:23
132:25
72201 1:15
1:18
73 2:14
2:15
7th 14:8
15:3, 16:9
16:9, 16:16

8
8 2:21
15:18, 16:1
101:23
101:25
127:3
127:10
127:12
853 1:20
3:7, 132:24

| 870 43:6 | | | | |
|---|---|---|---|---|
| 43:7, 43:13 | | | | |
| 43:16 | | | | |
| 43:20 | | | | |
| 120:16 | | | | |
| 120:18 | | | | |
| 89 11:8 | | | | |
| 13:6 | | | | |
| **9** | | | | |
| 9 2:22 | | | | |
| 2:25 | | | | |
| 96 9:13 | | | | |
| 11:8 | | | | |
| 99 2:20 | | | | |