IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

DON LLOYD COOK                                    PLAINTIFF

V.                    Case No. 4:22-CV-548-KGB

RYAN WINGO, individually,
JEFF SHEELER, individually,
JOHN S. JOE, individually,
WILLIAM J. BRYANT, individually and
JOHN DOES 1-5, individually                       DEFENDANTS


ORAL DEPOSITION OF

CAPT. JEFFREY SHEELER
WEDNESDAY, AUGUST 23, 2023
3:06 P.M. TO 4:34 P.M.

ZOOM VIDEOCONFERENCE


APPEARANCES:

ON BEHALF OF PLAINTIFF:
    MICHAEL J. LAUX
    LAUX LAW FIRM
    400 WEST CAPITOL AVENUE, SUITE 1700
    LITTLE ROCK, ARKANSAS 72201

ON BEHALF OF DEFENDANTS:
    NOAH WATSON
    ASSISTANT ATTORNEY GENERAL
    ARKANSAS ATTORNEY GENERAL'S OFFICE
    323 CENTER STREET, SUITE 200
    LITTLE ROCK, ARKANSAS 72201


AMY WAID, CCR #853
WAID REPORTING
P.O BOX 10385
CONWAY, ARKANSAS 72034
(501) 620-0982
waidreporting@gmail.com

EXHIBIT

8

ZOOM VIDEOCONFERENCE

2

1                          INDEX

2    STYLE AND NUMBER . . . . . . . . . . . . . . . . . . . 1

3    APPEARANCES  . . . . . . . . . . . . . . . . . . . . . 1

4    EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . 2

5    CAPTION  . . . . . . . . . . . . . . . . . . . . . . . 3

6    DIRECT EXAMINATION BY MR. LAUX . . . . . . . . . . . . 4

7    CROSS-EXAMINATION BY MR. WATSON . . . . . . . . . . . 63

8    REDIRECT EXAMINATION BY MR. LAUX  . . . . . . . . . . 64

9    DEPOSITION CONCLUDED  . . . . . . . . . . . . . . . . 64

10   CERTIFICATE OF REPORTER . . . . . . . . . . . . . . . 65

11

12                        EXHIBITS

13   PLAINTIFF'S                                       MARKED

14   Exhibit 10    Sheeler Answers to Interrogatories (9 pgs)  . 15

15

16

17

18

19

20

21

22

23

24

25

ZOOM VIDEOCONFERENCE

3

1                           CAPTION

2      ANSWERS AND ORAL DEPOSITIONS OF CAPT. JEFFREY SHEELER, a

3   witness produced at the request of the plaintiff, taken

4   pursuant to the Arkansas Rules of Civil Procedure in the

5   above-styled and numbered cause on the 23rd day of August,

6   2023, before Amy Waid, Arkansas Supreme Court Certified Court

7   Reporter #853, at 3:06 p.m.

8                   * * * * * * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ZOOM VIDEOCONFERENCE

4

```
 1                    PROCEEDINGS
 2         THEREUPON,
 3                 CAPT. JEFFREY SHEELER,
 4         THE WITNESS HEREINBEFORE NAMED, having
 5         been first duly cautioned and sworn by me
 6         to testify to the truth, the whole truth,
 7         and nothing but the truth, testified on their
 8         oath as follows, to-wit:
 9                 DIRECT EXAMINATION
10 BY MR. LAUX:
11 Q    Good afternoon, Capt. Sheeler.  Could I ask you to please
12 state your full name for the record?
13 A    It's Jeffrey, J-E-F-F-R-E-Y, Paul, P-A-U-L, Sheeler,
14 S-H-E-E-L-E-R.
15             MR. LAUX:  Please let the record reflect that
16         this is the deposition of -- of Jeff Sheeler taken in
17         the matter of Cook v. Wingo, et al.  This deposition
18         will proceed in accordance with the rules of the
19         Eastern District of Arkansas Federal District Court,
20         the Supreme Court of Arkansas Rules, and any and all
21         local applicable rules.
22 Q    (By Mr. Laux)  Capt. Sheeler, do you understand that
23 you've been named as a defendant in a federal lawsuit called
24 Cook v. Wingo, et al.?
25 A    Yes, sir.
```

ZOOM VIDEOCONFERENCE

5

1   Q    And I'm not asking you to agree with the allegations, but

2   you understand that the thrust of the lawsuit alleges excessive

3   force against Ryan Wingo in the use of beanbag projectiles

4   directed at the plaintiff, Don Cook.

5        Do you understand those to be the thrust of the

6   allegations of the complaint?

7   A    Yes, sir.

8   Q    Have you ever given a deposition before, sir?

9   A    Yes, sir.

10  Q    On approximately how many occasions would you estimate?

11  A    I believe two.

12  Q    Did those two depositions relate to your work as a law

13  enforcement officer?

14  A    Yes, sir.

15  Q    Were those criminal or civil -- was it criminal or civil

16  litigation or proceedings, if you know?

17  A    I think it was one of each.

18  Q    Okay.  In the civil proceeding, when would you estimate

19  you gave deposition testimony?

20  A    That is the most recent, so I remember it well.  That was

21  2019.

22  Q    And just generally speaking, do you recall what the

23  allegations at the heart of that litigation might have been?

24  A    Discriminatory conduct by the agency.

25  Q    Was it an employment discrimination lawsuit, or was it a

6

1  discrimination in police practices lawsuit allegation?

2  A    Employment.  It was an employee.

3  Q    Was the employee a minority of either gender or race or

4  ethnicity?

5  A    Yes.

6  Q    And was that employee an African-American man or woman?

7  A    Yes.

8  Q    African-American man?

9  A    Yes.

10 Q    And this African-American man, who was at one point

11 employed by the Arkansas State Police, he alleged

12 discriminatory actions in his termination or in his discipline?

13 A    Yes.  He wasn't -- he retired, so the lawsuit came after

14 retirement.

15 Q    I see.  Generally speaking, again, not that you endorse or

16 believe the allegations, but what were his allegations?

17 A    That he'd been denied promotion and such from privileges

18 that come with promotion over the years of his career.

19 Q    Were you a defendant or party in that case or a witness?

20 A    I'm a witness.

21 Q    And do you know what the -- how that matter resolved or if

22 it resolved?

23 A    It's still ongoing.  I think it's --

24 Q    Is that right?

25 A    Yes, sir.

ZOOM VIDEOCONFERENCE

7

1   Q    Okay.

2   A    That's my understanding of it.  COVID delayed, obviously,

3   some of the stuff, but we're -- the last time I was told about

4   it, it was still ongoing.

5   Q    Understood.  And last question on that topic:  Do you

6   recall the name of the litigant?

7   A    That's Siegfried Lewis.

8   Q    L-E-W or L-O-U?

9   A    L-E-W-I-S.

10  Q    On that last name?

11  A    Yes.  L-E-W-I-S.  Lewis --

12  Q    Thank you.

13  A    Yeah, L-E-W-I-S.

14  Q    Thank you.  Okay.  Well, you're represented this afternoon

15  by Assistant Attorney General Noah Watson; is that correct?

16  A    Yes, sir.

17  Q    And Mr. Watson is a good lawyer.  I'm sure he's prepped

18  you a bit on the deposition, and you've got a little bit of

19  experience, but let me very briefly go over the rules so that

20  we have a clean record.  Okay?

21  A    Okay.

22  Q    I'm going to be asking you a series of questions to which

23  hopefully you have the answers.  Yes, no, I don't know, and I

24  don't remember are all perfectly fine answers as long as

25  they're accurate and truthful.  Okay?

8

1  A    Okay.

2  Q    You and I are doing a good job of taking turns speaking

3  and not speaking over each other.  Let's continue that.  Okay?

4  A    Okay.

5  Q    If I say something that doesn't make sense, which is bound

6  to happen, please let me know, and I will rephrase the question

7  so that it does make sense.  Okay?

8  A    Okay.

9  Q    And particularly, because we're doing this deposition via

10 Zoom with all of its inherent technical problem possibilities

11 as well as my occasional habit to talk too fast, if I say

12 something that you don't quite hear or if my words run

13 together, please let me know, and I'll repeat the question so

14 that you can hear it.  Okay?

15 A    Okay.

16 Q    If you don't say there's something wrong with the question

17 or you didn't quite hear it and you answer it, I'm going to

18 presume that you heard it and understood it, and I'm going to

19 rely on your answer.  Okay?

20 A    Understood.

21 Q    Okay.  Very good.  And once again, we'll try to get you

22 out of here.

23 A    Okay.

24 Q    So it's -- I believe that, off the record, you told me

25 that your current position at the Arkansas State Police is that

ZOOM VIDEOCONFERENCE

9

1   of captain; correct?

2   A    Yes, that's correct.

3   Q    And you were promoted -- I didn't recall the year.  When

4   was that?

5   A    February of 2023.

6   Q    Okay.  Wonderful.  What rank did you occupy in June of

7   2020?

8   A    Lieutenant.

9   Q    All right.  Now, when were you first employed by the

10  Arkansas State Police?

11  A    Actually, 25 years ago today.

12  Q    Wow.

13  A    Yeah.

14  Q    Congratulations.

15  A    Thank you.

16  Q    That's an impressive tenure.  And you began as a trooper,

17  presumably?

18  A    Yes, sir.

19  Q    And then you were promoted throughout the course of your

20  career?

21  A    Yes, sir.

22  Q    Very good.  So just to give you a bit of an overview, I'm

23  just going to ask you a few questions about your background,

24  education, and employment history very briefly.

25  A    Okay.

ZOOM VIDEOCONFERENCE

10

1  Q     Then I'm going to go on a little bit to your employment

2  history at the Arkansas State Police.  And then I'm probably

3  going to focus on the events of June 1, 2020.  Okay?

4  A     Okay.

5  Q     Now, again, you understand that the allegations of this

6  lawsuit are that my client, Don Cook, who was struck in the

7  face with a beanbag projectile on June 1, 2020, he alleges that

8  -- that Ryan Wingo used excessive force in delivering those --

9  that projectile round to him.

10       You understand that that's the allegation; correct?

11 A     Yes, sir, I do.

12 Q     Now, we can debate whether or not that use of force was

13 justified.  In fact, that's what we're doing here.  But you

14 don't dispute, do you, that Ryan Wingo fired a projectile at

15 Don Cook?  Do you dispute that fact?

16 A     No.

17 Q     Did you observe with your own two eyes that act?

18 A     No.

19 Q     So just so we're clear, and we can short-circuit probably

20 a lot of questions, to the extent that Ryan Wingo used his

21 12-gauge beanbag shotgun and delivered a beanbag projectile to

22 Don Cook, you didn't see that with your own two eyes?

23 A     No.

24 Q     Okay.  You don't dispute that that happened, do you?

25 A     No.

ZOOM VIDEOCONFERENCE

11

1   Q    Okay.  I've looked over some of the records tendered by

2   Mr. Watson's office in this case, and as best I can tell, you

3   drafted or authored one report relating to activities of

4   June 1, 2020.  Did you draft more than one report describing

5   June 1, 2020, to your knowledge?

6   A    No.

7   Q    The report that I'm referring to has been marked as

8   Exhibit 1.  It's a three-page document, Plaintiff 0001 to 0003.

9   Do you have that document in front of you, Captain?

10  A    Yes, sir.

11  Q    Okay.  So did you -- for the most part, did you author

12  this document?

13  A    I did.

14  Q    And to the extent that it has a narrative portion on the

15  second page, you authored that narrative portion in its

16  entirety?

17  A    I did.

18  Q    Okay.  And you're not aware of any other report that you

19  drafted, other than this one, pertaining to June 1; correct?

20  A    That's correct.

21  Q    Now, for clarity's sake, you agree with me, do you not,

22  that in Little Rock -- and I'm just focusing on Little Rock

23  rather than Conway -- in Little Rock between May 30, 2020, and

24  approximately June 7, 2020, there were a series of public

25  protests that people have been referring to as "the George

ZOOM VIDEOCONFERENCE

                                                                    12

1   Floyd protests."  Do you agree with that?

2   A     Yes.

3                   MR. WATSON:  Object to form.

4   A     Yes.

5   Q     (By Mr. Laux)  If -- if I use the -- okay.  And you can

6   answer that question.  Sometimes we lawyers will make

7   objections kind of bookmarking it for the record.  If

8   Mr. Watson tells you not to answer a question, then, you know,

9   you'll defer to him on that.  But otherwise, you can answer

10  these questions despite our objections.  Okay?

11  A     Okay.

12  Q     So if I were to refer to the George Floyd protest, you'll

13  know what I'm talking about; correct?

14  A     Correct.

15  Q     And unless I say otherwise, I'll be referring just to the

16  Little Rock aspect of it and not to whatever happened in

17  Conway.  Okay?

18  A     Okay.

19  Q     All right.  So were you on active duty during the

20  George Floyd protest on June 1, 2020?

21  A     I was.

22  Q     Were you on active duty during any other date of the

23  George Floyd protests, again, approximately June -- I'm sorry

24  -- May 30th to June 7th?

25  A     All of those dates.

13

1   Q     So you were in active duty in some way, shape, or form on

2   each of the days that we've just mentioned?

3   A     I think it was nine days total.

4   Q     Okay.  All right.  I'm going to ask you just a few

5   questions about your background, and then we'll catch back up

6   to June of 2020.  Okay?

7   A     Okay.

8   Q     Where -- what city or town were you born in, sir?

9   A     Jackson, Mississippi.

10  Q     Oh, interesting.  And at some point, I suppose you came

11  and began residing in Arkansas?

12  A     I was three years old.

13  Q     Okay.  And tell me what went into the decision.  I'm just

14  kidding.  Did you go to grade school and to law school -- I'm

15  sorry -- to high school in Arkansas?

16  A     I did, yes.

17  Q     And where did you graduate from high school, sir?

18  A     Arkadelphia High School.  Arkadelphia, Arkansas.

19  Q     At some point, you got into law enforcement; correct?

20  A     Correct.

21  Q     Did you have any law enforcement professional experience

22  prior to joining the Arkansas State Police?

23  A     I did not.

24  Q     So between the time that you graduated high school and

25  joining the department, or the -- the state police, did you

14

1  pursue any type of non-law-enforcement-related education in

2  there?

3  A     Yes.

4  Q     Can you just give me very briefly a description of -- of

5  that education?

6  A     So an undergraduate degree in business and economics, and

7  then a master's degree in criminal justice, so I guess that

8  wouldn't apply.  That was the law enforcement-related --

9  Q     Yes.

10  A     -- the question, that was law enforcement.  But the

11  undergraduate --

12  Q     No, I --

13  A     -- the undergraduate degree, yes, definitely.

14  Q     Excellent.  And -- and where did you earn those

15  undergraduate degrees?

16  A     That was from Ouachita Baptist University in Arkadelphia,

17  Arkansas.

18  Q     Understood.  And the master's in criminal justice, where

19  did you earn that?

20  A     That was here at the University of Arkansas at Little

21  Rock.

22  Q     Understood.  Okay.  Did you have any full-time employment

23  between high school graduation and starting at the Arkansas

24  State Police Department -- the Arkansas State Police?

25  A     I did.

15

1   Q      Can you just briefly give me a description of that

2   employment?

3   A      I was a salesman for a steel -- a -- what's the word I'm

4   looking for? -- publicly traded steel company.  I was a

5   salesman there for two years and decided that's not what I--

6   the track that I wanted to take.  And so I transitioned away

7   from that path into more of a social sciences path, which led

8   to another full-time job eventually -- I had to work some

9   part-time jobs before -- led to a full-time job in a mental

10  health facility.

11  Q      I see.

12  A      And I was employed there --

13  Q      Wow.

14  A      Yeah.  I was employed there full time for three years.

15  Q      Understood.  Now, if we take a look at what we've marked

16  as Exhibit 10 -- again, in the hopes of short-circuiting some

17  of this -- can you have a look at that document?  You'll note

18  that it's a -- I think in total, a nine-page document, and

19  there's a verification sheet at the back of it.

20  A      Okay.

21                    (Whereupon, Plaintiff's Exhibit 10 was marked

22          for identification and is attached hereto.)

23  Q      (By Mr. Laux)  Do you recall providing answers to these

24  questions as reflected in Exhibit 10?

25  A      I do.

ZOOM VIDEOCONFERENCE

16

1   Q    And the verification sheet was never signed; is that

2   correct?

3   A    It appears so.

4   Q    So while we're here -- and if you need a few minutes,

5   please feel free -- but could you just verify that the -- that

6   the information contained in these answers is accurate and

7   complete?

8   A    Okay.  Give me a minute, and I'll --

9   Q    Yes, indeed, sir.  Take your --

10  A    -- I'll go quick as I can.

11       I believe this is accurate.

12  Q    Could I direct your attention to page 4, Number 9?

13  A    Okay.

14  Q    Number 9 asks you to describe "each and every occasion in

15  which you have discharged a firearm and/or less-lethal

16  munition."

17       First of all, let me ask you this question:  Do you

18  consider the PepperBall system -- I guess as it's termed -- do

19  you consider that to be "less-lethal munition"?

20  A    I do.

21  Q    Now, Number 7, in your answer to Number 9, indicates that

22  on June the 1st of 2020, you fired a less-lethal weapon, namely

23  "one foam impact round."

24       Do you see that?

25  A    Yes, sir.

17

1   Q    Did you fire any PepperBall rounds on that date?

2   A    No.

3   Q    Did you see any PepperBall rounds fired on that date?

4   A    Yes.

5   Q    Who did you observe to fire pepper bound -- sorry --

6   PepperBall rounds on that date?

7   A    Individuals unknown, but several members of the Arkansas

8   State Police Emergency Response Team.

9   Q    Okay.  Can you describe for me, Captain, you know, to like

10  a lay person, what is a "foam impact round"?

11  A    What it is, is exactly as it sounds.  It's a foam ball

12  that's fired out of a 40-millimeter delivery system.  It leaves

13  the tube of the -- of the weapon a couple hundred feet a

14  second.  It's not very fast.  And it's soft, pliable, almost --

15  not as hard as a tennis ball, maybe a little less firmness of a

16  tennis ball.

17  Q    What is it intended to accomplish?

18  A    Compliance.  Pain compliance if necessary.

19  Q    To the extent that there are rules of -- that there are

20  rules attendant to the deployment of less-lethal munitions or

21  impact projectiles, would those rules apply to the foam impact

22  round?

23  A    Yes.

24  Q    So is it a fair statement to say that a trooper should not

25  fire foam impact rounds at an individual's head, neck, or upper

18

1   body?

2   A      Head and neck.

3   Q      And when you were using your foam impact rounds on -- or

4   round on June 1, 2020, were you on top of an armored vehicle?

5   A      Yes.

6   Q      And is that referred to as a BEAR?

7   A      Yes, sir.

8   Q      And were you in the turret of the BEAR when you deployed

9   your foam impact round?

10  A      I was behind the turret operator, so I was on top of the

11  BEAR, not positioned in the actual turret.

12  Q      You were elevated --

13  A      I was sitting on --

14  Q      -- higher than ground level.  Is that true?

15  A      That's true.

16  Q      Can you estimate the height of the platform on which you

17  stood or sat --

18  A      Sat.

19  Q      -- when you fired the foam round?  Essentially --

20  A      (Simultaneous speaking.)

21  Q      -- I don't know how tall a BEAR is.

22  A      Yeah.  It's about 14 feet.

23  Q      Now, have you been trained in crowd-management measures as

24  a trooper?

25  A      Yes.

ZOOM VIDEOCONFERENCE

19

1  Q    Have you been trained in the indications and counter

2  indications for use of impact projectiles?

3  A    I don't understand that question.

4  Q    Have you been trained on the do's and don'ts of using

5  impact projectiles?

6  A    Yes.

7  Q    Was that training provided by the Arkansas State Police?

8  A    Yes.

9  Q    An impact projectile is a kinetic device, meaning that it

10 delivers force and energy with the projectiles that it fires.

11 Is that fair?

12              MR. WATSON:  Object to form.

13 A    Yes.

14 Q    (By Mr. Laux)  And a 12-gauge beanbag shotgun delivers

15 impact projectiles; correct?

16 A    Correct.

17 Q    Were you equipped with a 12-gauge beanbag shotgun on June

18 1, 2020?

19 A    No.

20 Q    What is the device that you use to fire foam impact

21 rounds?  Is it gun-like?

22 A    Yes.  It's a 40-millimeter launcher.  A single -- a single

23 launcher is what they call it.

24 Q    Okay.  And so it -- it looks and it handles like a long

25 gun?

20

1    A     Essentially, yes.

2    Q     Okay.  Have you ever been trained or have you ever been

3    taught that impact projectile -- projectiles should not be used

4    by an individual or trooper who is elevated higher than the

5    subject target?

6    A     No.

7    Q     Have you ever been taught or trained that when a trooper

8    uses a device like that from an elevated position, it increases

9    the likelihood of striking the upper body, neck, or head?

10   A     No.

11   Q     You're an experienced trooper and a high-ranking officer.

12   Intuitively, can you see how shooting down at persons on the

13   ground when you're elevated 14 or so feet off the ground -- can

14   you see how that might increase the likelihood of striking the

15   individual in the upper body or head?

16   A     At certain ranges, possibly.

17   Q     And we can debate on whether that increased risk is

18   negligible or considerable.  But do you agree that when you're

19   firing from up down, the risk of injury to the face, for

20   instance, is a bit higher?

21   A     It could be.

22   Q     Okay.  One of the interrogatory questions asked about

23   prior complaints regarding misconduct against you.  You

24   answered that question.  Did you answer that question

25   completely?  And I guess I could direct you to --

ZOOM VIDEOCONFERENCE

21

1   A      I think I saw it.

2   Q      -- it looks like Number --

3   A      -- Number 5.

4   Q      Yes, sir, Number 5.

5   A      That's correct.

6   Q      Okay.   Thank you.

7          I asked you about any other reports that you might have

8   drafted other than Exhibit 1, and you said not to your

9   knowledge or no; correct?

10  A      Correct.

11  Q      Are you aware of any other documents, be they memorandum

12  or any type of note or official communication that purports to

13  describe the events of June 1, 2020, at the George Floyd

14  protests in Little Rock?

15  A      As it pertains to Don Cook or just in general?

16  Q      Just in general.   That day, however.

17  A      I -- I believe there were several incident reports

18  generated by individuals like myself.

19  Q      Okay.   So I am just curious about things that you have

20  drafted.   Are you saying that you've drafted multiple incident

21  reports from the date of June 1, 2020?

22  A      No, just one.

23  Q      Okay.   So I'm just focusing on stuff --

24  A      Okay.

25  Q      -- that came from your hand.

ZOOM VIDEOCONFERENCE

22

1   A    Okay.

2   Q    So let's just talk about the whole universe of documents.

3   Did you draft or author any documents describing June 1, 2020

4   other than what we've marked as Exhibit 1, to your knowledge?

5   A    No.

6   Q    Do you know if a use-of-force report was generated based

7   on your actions of June 1, 2020?

8   A    I would have generated a use-of-force report.

9   Q    And would that be reflective of your use of the single

10  foam impact round?

11  A    Yes.

12  Q    Do you agree with me that every -- whether it's a shotgun

13  -- a beanbag shotgun or the PepperBall system or a foam impact

14  round -- every pull of the trigger is its own independent use

15  of force?

16  A    With some --

17              MR. WATSON:  Object to form.

18  A    -- with some munitions, yes.  With some, it was -- it's

19  one event.

20  Q    (By Mr. Laux)  Okay.  So with -- with what weapon or

21  device would several pulls of the trigger constitute but one

22  use of force in your mind?

23              MR. WATSON:  Object to form.

24  A    Did you ask me what weapon?

25  Q    (By Mr. Laux)  Well, here, let me tie up.  Here's what I

23

1  think, and -- and you might disagree.  I -- I think that the

2  law holds that whether it's a regular firearm, like a Glock, or

3  a beanbag shotgun or the PepperBall system, as I understand it,

4  I believe that every pull of the trigger represents a use of

5  force.  Some situations maybe only need two pulls of the

6  trigger and that's justified; others maybe you need 17 and

7  that's justified.  But each pull of the trigger represents a

8  decision to use force.  Do you agree with that, generally

9  speaking, or do you not?

10               MR. WATSON:  Object to form.

11  A    I -- I would agree with that, that you made the decision

12  to continue to employ force, but I don't agree that each one is

13  investigated or documented separately.

14  Q    (By Mr. Laux)  Well, I'm not sure about the documenting

15  and separating.  I'm just saying that however it is documented,

16  that's another story.

17  A    Okay.

18  Q    I'm just saying, do you agree that each time you pull the

19  trigger, you have to justify each pulling of the trigger?

20  A    I do, yes.

21               MR. WATSON:  Object to form.

22               (Simultaneous speaking.)

23               MR. WATSON:  Object to form.

24               Go ahead.

25  Q    (By Mr. Laux)  For instance --

ZOOM VIDEOCONFERENCE

24

1   A     I -- I agree.

2   Q     For instance, if --

3   A     Yeah, if someone's complying, you can't continue to employ

4   force.

5   Q     Right.  So, for instance, sometimes it's justified to --

6   to pull the trigger twice to neutralize a threat, but it might

7   not be justified to pull it eight times; right?

8   A     Right.

9   Q     Okay.  So in that respect, do you agree that if -- if

10  the -- well, strike that.

11      You pulled the trigger once on your foam impact round;

12  correct?

13  A     Correct.

14  Q     And so you drafted a single use-of-force report about that

15  use of force; correct?

16  A     Correct.

17  Q     Is that -- that's the foam impact round that is described

18  in your report; correct?

19              THE WITNESS:  Do we have that, the use-of-force

20        report?

21  A     It -- it would be, yes.  I don't have that report --

22  Q     (By Mr. Laux)  Okay.  And we'll --

23  A     -- in front of me.

24  Q     -- and we'll get to that in just a second.  Did you have

25  a chain of command, above and below, on June 1, 2020?

25

1   A    I did.

2   Q    Could you briefly take me from the top of the chain down

3   as far as you can?

4   A    The top of the chain was the director or the colonel.

5   Q    Yes, sir.

6   A    Under the -- under -- at that -- at that particular time,

7   the lieutenant colonel was not present, so it would've gone to

8   the major, who I reported to, then the SWAT commander, and then

9   underneath me would have been two sergeants under my control.

10  They were on the ground with SWAT.

11  Q    Now, would the major have been Maj. Aaron?

12  A    No.  It was Maj. Marks.

13  Q    Thank you.

14  A    He is retired now.  Yeah.

15  Q    And we're talking about June 1; correct?

16  A    Correct.

17  Q    So your -- who was your immediate supervising officer on

18  June 1, 2020?

19  A    Mine?

20  Q    Yours, sir.

21  A    Maj. Marks.

22  Q    Okay.  Who were the two sergeants beneath you that you

23  identified?

24  A    Well, they were my team leaders, Sgt. Chad Staley and --

25  actually, I missed -- Philip was a lieutenant, so I had a

ZOOM VIDEOCONFERENCE

1  lieutenant and a sergeant -- Philip Hydron.

2  Q    Can you repeat that last name?  The --

3  A    Hydron?

4  Q    -- the last one you said.

5  A    Hydron.

6  Q    How's that --

7  A    H-Y- --

8  Q    -- spelled?

9  A    -- H -- H-Y-D-R-O-N.

10 Q    Okay.  Were you a member of the Emergency Response Team on

11 June 1, 2020?

12 A    No.

13 Q    Were you a member of the SWAT team on that date?

14 A    Yes.

15 Q    And you've been trained in SWAT procedures and protocol

16 through the years, I presume?

17 A    Yes.

18 Q    I want to see if we can agree on a few things.  You don't

19 have to agree to these things, but I'd like to see if you agree

20 or disagree.  Okay?

21 A    Okay.

22 Q    So obviously -- well, I shouldn't say obviously.  We

23 Americans have a right to peaceably protest; correct?

24           MR. WATSON:  Object to form.

25 A    Yes, correct.

ZOOM VIDEOCONFERENCE

27

1   Q    (By Mr. Laux)   And that's a constitutional right, yes?

2                    MR. WATSON:   Object to form.

3   A    Yes.

4   Q    (By Mr. Laux)   And you're familiar, at least to some

5   extent, with some of the amendments to the US Constitution, I

6   would imagine, yes?

7   A    With some of them?   I mean -- yes.

8   Q    Do you agree with me that -- that protesting is an

9   exercise -- peaceful protesting is an exercise of First

10  Amendment rights?

11                   MR. WATSON:   Object to form.

12  A    I agree.

13  Q    (By Mr. Laux)   And you further agree with me, I imagine,

14  that the Fourth Amendment is the amendment to the Constitution

15  which protects individuals from unreasonable searches and

16  seizures of the person and of the home; correct?

17                   MR. WATSON:   Object to form.

18                   THE WITNESS:   Can I answer it?

19                   MR. WATSON:   Yes.

20  A    Yes.

21  Q    (By Mr. Laux)   Technically speaking, excessive force is a

22  seizure under the Fourth Amendment.   Do you agree?

23                   MR. WATSON:   Object to form.

24  A    I agree.

25  Q    (By Mr. Laux)   And when we look at uses of force committed

ZOOM VIDEOCONFERENCE

28

1  by officers against individuals, that's analyzed under the

2  legal standards promulgated in the case of *Graham v. Connor*.

3  Are you -- do you agree with that?

4              MR. WATSON:  Object to form.

5  A    I agree.

6  Q    (By Mr. Laux)  And the standard that's promulgated in

7  *Graham v. Connor* is basically the objective reasonableness

8  standard.  Do you agree?

9              MR. WATSON:  Object to form.

10 A    I agree.

11 Q    (By Mr. Laux)  An officer can use force on an individual

12 as long as it -- as long as it's objectively reasonable based

13 on the circumstances; correct?

14             MR. WATSON:  Object to form.

15 A    Correct.

16 Q    (By Mr. Laux)  Okay.  Now, the George -- well, have you

17 ever worked a protest -- a public protest as an officer prior

18 to the George Floyd protests?

19 A    Not in that same capacity, but I was -- I was assigned to

20 someone VIP security.  Does that make sense?

21 Q    It was a protest, though?  How --

22 A    There -- there was a group, PETA, that was in town --

23 Q    Got it.

24 A    -- I'm going back 20 years -- because Stephens, Inc. --

25 which is a large investment house in the South headquartered

ZOOM VIDEOCONFERENCE

29

1   here -- owned or invested in a company that did animal testing.

2   And PETA found that out and targeted the executives of Stephens

3   to include marching on the roads and streets of Little Rock and

4   coming to the residences of the executives.

5   Q    Understood.  Now, those PETA protesters were -- you know,

6   whether it was lawful or not, they were -- they were expressing

7   First Amendment beliefs; correct?

8                MR. WATSON:  Object to form.

9   A    Yes.

10  Q    (By Mr. Laux)  And protests are different.  And I'll take

11  -- as an example, you understand that the George Floyd protest

12  was a protest where, generally speaking, the First Amendment

13  belief was an effort to bring attention to perceived police

14  brutality or excessive force.  Do you agree with that?

15               MR. WATSON:  Object to form.

16  A    Yes, I agree.

17  Q    (By Mr. Laux)  You know, protests for PETA or for saving

18  the whales or nuclear energy, while those are also First

19  Amendment issues, the difference between those protests and the

20  George Floyd protest is that the George Floyd protest was

21  directed at police, whereas the other ones are not.  Do you

22  agree?

23               MR. WATSON:  Object to form.

24  A    I agree.

25  Q    (By Mr. Laux)  When we look over the Arkansas State Police

1   policies pertaining to -- sorry.

2       When I -- I know that you were not a member of the

3   Emergency Response Team on June the 1st.  But when one looks at

4   the Emergency Response Team policy, it reads as follows, in

5   part -- and I'll just say this is ASP 710, but I'm just going

6   to read a part of it.  It says (as read):  Policy:  It says

7   "The Arkansas State Police Emergency Response Team will strive

8   to effectively manage crowds during protests, demonstrations,

9   civil -- civil disturbances and riots," and then it continues

10  on.

11      You agree with me that a public protest, in and of itself,

12  does not necessarily constitute a civil disturbance?  Do you

13  agree with that?

14                  MR. WATSON:  Object to form.

15  A    I agree.

16  Q    (By Mr. Laux)  And, likewise, it doesn't, in and of

17  itself, equate to being a riot.  Do you agree with that?

18                  MR. WATSON:  Object to form.

19  A    I agree.

20  Q    (By Mr. Laux)  Now, using those terms that seem to be in

21  sequential order of seriousness, how would you describe the

22  George Floyd protests during your involvement on June 1, 2020?

23  Would you use one of those four words, or terms, or would you

24  use something else?

25  A    It was a riot.

ZOOM VIDEOCONFERENCE

31

1    Q    You believe that on June 1st of 2020 there was a riot

2    involved during the George Floyd protests?

3    A    Yes.

4    Q    And is that based on your own personal perception and

5    observations?

6    A    Yes.

7    Q    Have you ever seen footage of January 6th at the National

8    Capitol?

9    A    I have.

10   Q    Do you believe that to be at any time a riot based on the

11   video footage you've seen?

12   A    Yes.  You could use that word.

13   Q    Do you believe that the riot, as you've termed it, in

14   Little Rock on June 1, 2020, was equal to January 6th, more

15   serious, less serious, or something else?

16              MR. WATSON:  Object to form.

17   Q    (By Mr. Laux)  And, again, I just mean, in terms of -- in

18   terms of the classification riot, protest, civil disturbance.

19              MR. WATSON:  Same objection.

20   A    Repeat the question again.

21   Q    (By Mr. Laux)  It was a bad question.  I'll withdraw it.

22        Are you aware of any troopers who were injured by

23   protesters on June 1, 2020?

24   A    I -- I can't say that day.  I know -- I know we did suffer

25   some minor injuries.  I just don't know if it was on that day

ZOOM VIDEOCONFERENCE

32

1   or any of the other nine days.

2   Q    And I'm not asking you to testify to whether there truly

3   was or not.  I'm just asking if you're aware of any injuries to

4   troopers on June 1, 2020, caused by protesters.

5   A    I know there were injuries, but I can't say if it was on

6   June 1 or another day, but troopers were injured.

7   Q    (By Mr. Laux)  So again -- and, I mean, I want to just be

8   clear that we want to keep our testimony focused on what we can

9   testify to -- I'm not asking you to state that no one was

10  injured on that date.  I'm just asking you if you have any

11  personal knowledge of any trooper injured by a protester on

12  June 1, 2020.

13  A    Well, I can't remember the dates, so I -- I don't know if

14  -- if I can answer your question.  You're -- you're -- you're

15  pinning it down to June 1, and can't say -- the injuries that I

16  know about, I know -- I can't say that I don't know of any,

17  because I do know of some; I just don't know if it was on the

18  June 1.

19  Q    I understand.

20  A    Okay.

21  Q    And so -- and that's what I meant a little bit earlier

22  about the form of certain answers.

23       So is it fair to say that there may have been troopers who

24  were injured by protesters on June 1, 2020, but you're just not

25  certain if that's accurate?

ZOOM VIDEOCONFERENCE

33

1   A     Correct.  That's --

2   Q     Okay.  Fair --

3   A     -- that's a better way.

4   Q     -- fair enough.  Now, did you see with your own eyes on

5   June 1, 2020, conduct by protesters that you would consider to

6   be riotous or violent?

7   A     Yes.

8   Q     Please describe what you saw.

9   A     Criminal conduct, criminal acts, destruction of property,

10  fires being set, objects which could cause injury being thrown

11  in the direction of law enforcement.

12  Q     Now, an officer cannot use force or deadly force to

13  prevent property damage alone; correct?

14  A     Correct.  Correct.

15              MR. WATSON:  Object to -- sorry --

16  Q     And so --

17              MR. WATSON:  -- object to form.

18  Q     (By Mr. Laux)  And so I'm not endorsing any of the stuff

19  that went on with property damage or fires, but I want to keep

20  the question focused on violence toward troopers.  Can you just

21  describe for me what you saw on June 1 as it relates to

22  violence toward troopers?  Sounds like you said they were

23  throwing some stuff.  If you could elaborate in that regard.

24  A     Rocks that they were getting from the flower beds, the

25  decorative rocks, you know, from around the Capitol, frozen

ZOOM VIDEOCONFERENCE

34

1   water bottles, slingshot ball bearings.  There were gunshots.

2   We heard -- I heard a series of gunshots on at least two

3   occasions that we don't know -- no one was struck, so we're not

4   sure if those were aimed gunshots, but they were close.

5   Q    Did you see someone firing a weapon that produced the

6   gunshot sound?

7   A    No.  I did not --

8   Q    Is it --

9   A    -- (simultaneous speaking).

10  Q    -- is it conceivable that you heard fireworks or

11  firecrackers?

12  A    No, it was a gunshot.

13  Q    It's not possible that it was a firecracker?

14  A    No.  It's -- I know what a gunshot is, and it was several

15  in rapid succession.

16  Q    Understood.  How do you know that protesters were putting

17  ball bearings into slingshots?

18  A    That was reported.  I didn't see it, but that was reported

19  in some of the after-action talk.  We found -- I think --

20  Q    And I don't mean to doubt the veracity of your colleagues,

21  but I want to make sure -- but I want to make sure we're

22  talking about what you saw.  You did not see ball bearings with

23  slingshots, did you?

24  A    I did not.

25  Q    Okay.  So could we just -- we could wrap this up if you

ZOOM VIDEOCONFERENCE

35

1   just tell me what you saw.  Did you see frozen water bottles

2   thrown?

3   A    I did.  And I did see a picture of a backpack that had a

4   slingshot in it that we found.  You know, members of the ERT

5   found that.  I did see that in pictures.  They were documenting

6   that stuff with photos.

7   Q    Fair enough.

8   A    I did see -- I did see --

9   Q    Fair enough.

10  A    -- (simultaneous speaking) but yes.  Water bottles, yes.

11  Rocks --

12  Q    Have we --

13  A    -- yes.

14  Q    -- water bottles, rocks.  Have we exhausted your

15  descriptions of the violence that you saw committed by

16  protesters aimed toward troopers like yourself?

17  A    Immediate recall sitting here today, yes.

18  Q    Right.  Did you see any frozen water bottles or rocks make

19  contact with any trooper?

20  A    I can't say that.  I don't -- I don't remember a specific

21  instance.  I -- I wasn't focused on them.  I was focused on

22  out.

23  Q    Now, do you agree with me that the failure to vacate the

24  premises upon command might not be a good idea, but in and of

25  itself, it does not justify the use of force on the person who

ZOOM VIDEOCONFERENCE

36

1  is not timely complying.

2                    MR. WATSON:  Object to form.

3  A    I agree with that.

4  Q    (By Mr. Laux)  Do you agree with me that even if they're

5  irritating and taking their own you-know-what time to move, if

6  a person is moving away from the police line, there's no

7  justification for using force on that person in the form of

8  less-lethal munitions.  Do you agree with that, or do you not

9  agree with that?

10                    MR. WATSON:  Object to form.

11  A    Well, I don't think it's that simple.  I think if you

12  -- if you're gaining compliance, you want to continue that

13  compliance, so that less-lethal force may continue to be

14  employed as long as you're getting that compliance.

15  Q    (By Mr. Laux)  I guess what I'm trying to say is, if a

16  person is vacating as commanded but is not doing it as quickly

17  as you believe they should -- maybe they're stopping

18  occasionally, but they're generally going the direction you're

19  commanding -- under that hypothetical circumstance, using force

20  in the form of impact munitions would not be justified.  Do you

21  agree?

22                    MR. WATSON:  Object to form.

23  A    I would agree.

24  Q    (By Mr. Laux)  Now, even if one of these protesters is

25  unruly and, rather than going due North, let's say, turns

ZOOM VIDEOCONFERENCE

37

1  around physically, unarmed, and begins to shake their fist or

2  give the officers a piece of their mind while facing them going

3  the opposite direction as they are commanded, that in and of

4  itself does not justify the use of force against that person.

5  Do you agree with that or disagree?

6             MR. WATSON:  Object to form.

7  A    I disagree.

8  Q    (By Mr. Laux)  So you understand that in order to use

9  force on a person, an officer has to have an objectively

10 reasonable basis to fear death or serious bodily injury that is

11 imminent; correct?

12            MR. WATSON:  Object to form.

13 A    To employ deadly force.

14 Q    (By Mr. Laux)  If you answered, I couldn't hear you.

15 A    I said, to employ deadly force.

16 Q    Right.

17 A    Yes, that is correct, sir, but not any -- not impact

18 force.

19 Q    What, in your opinion, is the standard for using

20 less-lethal munitions on an unarmed protester?

21 A    Compliance.  If you're gaining that compliance.  In this

22 particular case, it was -- in the scope --

23 Q    Now --

24 A    -- of things, it was all about compliance.

25 Q    -- do you believe that an officer can use a 12-gauge

38

1   beanbag shotgun to disperse crowds?

2   A    I don't believe you should fire wildly into the crowd, no.

3   Q    I'm -- I don't know about wildly.  I'm just saying, is it

4   a proper function of -- a 12-gauge shotgun beanbag projectile,

5   is it a proper function to use that device to disperse crowds?

6   A    It could be, yes.

7   Q    And you believe that's consistent with the Arkansas State

8   Police policy on less-lethal munitions?

9   A    Yes.

10  Q    Is that how you were trained?  That beanbag projectiles

11  can be used to disperse crowds?

12  A    Not to disperse crowds.  To gain compliance.

13  Q    Well, I -- I used the phrase "disperse crowds" before, and

14  you -- and you agreed with that.  Are you changing that?

15  A    Well, you said you didn't want to say "wildly."  What --

16  what you're describing is I'm firing into a crowd and hitting

17  random people.  And that's not what the beanbag is for.

18  Q    Let's say that the officer delivers several rounds of

19  beanbag projectiles precisely where he or she wants.  There's

20  nothing wild or unintended by that use of force.  Are you

21  saying that that is an appropriate use of force when the goal

22  is to disperse a crowd?

23  A    If they're being non-compliant, yes.

24  Q    If they're not moving in the direction that you're

25  commanding them to go, you believe it's justified to use

ZOOM VIDEOCONFERENCE

39

1   beanbag projectiles to disperse that crowd?

2   A    Not in that circumstance, I don't believe so.

3   Q    Well, so then you agree with me that -- using a 12-gauge

4   beanbag shotgun to disperse a crowd, even if that crowd is not

5   compliant with your commands, you agree with me that that's not

6   a justified usage of that device?  Or do you not agree?

7               MR. WATSON:  Object to form.

8   A    I -- I don't think I can agree in the form that you put

9   the question.  It can be justified.

10  Q    (By Mr. Laux)  Are you familiar with the International

11  Association of Chiefs of Police?

12  A    I know who they are, yes.

13  Q    Do you agree with me that that's an authoritative law

14  enforcement agency in the United States?

15              MR. WATSON:  Object to form

16  A    I know policies are set by their recommendations.

17  Q    (By Mr. Laux)  They issue model policies that are intended

18  to serve as guidelines for police conduct.  Do you agree?

19  A    I agree.

20  Q    Have you ever read the model policy from the IACP related

21  to crowd management?

22  A    No.

23  Q    Do you think using impact projectiles to disperse crowds

24  is consistent with the model policy of the IACP?

25  A    I don't know.

ZOOM VIDEOCONFERENCE

40

1  Q    Do you know anything about the type of PepperBall system

2  that was used by troopers on June 1, 2020?  And by that I mean,

3  were they delivering water or dye or tear gas or something

4  else, if you know?

5  A    I believe the contents of the actual ball is a -- is a

6  capsaicin-type powder.  So it was a -- you know, a tear-gas

7  effect, a PepperBall -- or a pepper-spray-type effect, is

8  what's achieved by the ball breaking open.

9  Q    Would it be like OC or like tear gas, or are-- are those

10  two synonymous?

11  A    It would -- it could be.  They're not synonymous, but

12  those -- that PAVA round that's in there, I think it achieves

13  that same effect.

14  Q    If someone were hit with repeated rounds of PepperBall,

15  you would expect that person to show indications of those

16  strikes in the form of that very strong odor of the pepper

17  spray, would you not?

18  A    Yes.

19  Q    And they might even have some bruising to their bodies

20  from where the impact of the rounds occurred.  Would you agree

21  with that?

22  A    Yes.

23  Q    So, like, if someone were hit with multiple PepperBall

24  rounds and then was treated moments later by medics or medical

25  personnel, you would expect the medical personnel to be able to

ZOOM VIDEOCONFERENCE

41

1  detect the odor of the PepperBall on that person, would you

2  not?

3            MR. WATSON:  Object to form.

4  A    Well, that's where it differs from pepper spray.  Where

5  it's a powder, it doesn't stick to the individual like a spray.

6  That's my understanding.

7  Q    (By Mr. Laux)  So does that mean to say that you would or

8  you would not expect that to be detectable by medical

9  personnel?  Or do you not know?

10            MR. WATSON:  Object to form.

11  A    I don't know.

12  Q    (By Mr. Laux)  Okay.

13  A    It could be.

14  Q    Under the crowd management model -- model policy of the

15  IACP -- and incidentally, that's been marked as Exhibit 9.  You

16  can check out page 5 -- there is a use of force subtopic here,

17  Letter E.  And under 3(a), which describes restrictions and

18  limitations on the use of force, it indicates under smaller

19  case E that "impact projectiles shall not be fired

20  indiscriminately into crowds."

21      Do you see that there?

22  A    Which page is that on?

23  Q    I believe it's page 5, Captain, in the lower right-hand

24  corner.

25            MR. WATSON:  The second page 5

42

1  Q    (By Mr. Laux)  It's going to be section -- big -- big --

2  large case E:  Use of Force.

3  A    Okay.  Now I'm on the right page.

4  Q    Okay.  Small case e says:  "Impact projectiles shall not

5  be fired indiscriminately into crowds."

6        Do you see that?

7  A    Yes.

8  Q    Do you agree that that's a standard that's used at the

9  Arkansas State Police; correct?

10  A    I believe so, yes.

11  Q    Now, I think the key word there might be

12  "indiscriminately."  There -- are there instances where beanbag

13  projectiles can be fired into crowds?

14  A    I can't think of one.

15  Q    If you look below E, at Subsection ii, it indicates:

16  "Direct-fired impact munitions, to include beanbag and related

17  projectiles, may be used during civil disturbances against

18  specific individuals who are engaged in conduct that poses an

19  immediate threat of death or serious injury."

20        Do you see that?

21  A    Yes.

22  Q    Now, that's the same standard that I mentioned before,

23  "immediate threat of death or serious injury"; correct?

24  A    Correct.

25  Q    And so based on this model policy, that also refers to

ZOOM VIDEOCONFERENCE

43

1  less -- less-lethal weapons like direct-fired impact munitions,

2  like beanbag projectiles; correct?

3  A    I believe so.

4  Q    Okay.  So you can't use a beanbag projectile against an

5  individual unless that individual is engaged in conduct that

6  poses an immediate threat of death or serious injury to the

7  trooper or to the public.  Do you agree?

8                    MR. WATSON:  Object to form.

9  A    I don't agree.

10  Q    (By Mr. Laux)  What don't you agree about in what I just

11  said?

12  A    That you -- that you're limited to that circumstance.

13  Q    Okay.

14  A    If you have -- if you have someone that's refusing to get

15  on the ground, you could employ the impact munition to gain

16  their compliance.

17  Q    Does the failure to get on the ground constitute an

18  immediate threat of death or serious injury?

19                    MR. WATSON:  Object to form.

20  A    It -- it could in that context, that he could be armed, he

21  may have a gun you can't see, those kind of things.

22  Q    (By Mr. Laux)  Well, look, obviously, if the person is

23  armed, it's a different ball of wax.

24  A    If you know, yeah, right.

25  A    Yeah.  And you -- and -- and you might want to assume

44

1  folks are armed, in terms of protecting yourself, but you can't

2  assume that someone is armed if you have no indication that

3  they're armed and then use that as a justification to use

4  less-lethal force on them; correct?

5              MR. WATSON:  Object to form.

6  A    I think it's situation specific, but overall, yes, you're

7  right.

8  Q    (By Mr. Laux)  Look, if you have a reasonable belief that

9  a person is armed, hey, I get it.  But in this hypothetical,

10  I'm asking you about a situation where you have no basis to

11  believe that the person is armed; okay?

12  A    Okay.

13  Q    They're just failing to comply to get on the ground as

14  you've commanded them.  In that circumstance, that limited

15  hypothetical, do you believe that there's justification to use

16  less-lethal weapons such as a beanbag projectile on that

17  person?

18              MR. WATSON:  Object to form.

19  A    In that situation, no, I wouldn't use the beanbag.

20  Q    (By Mr. Laux)  Okay.

21              MR. WATSON:  Hey, Mike, I don't mean to cut you

22          off.  We're a little past 4:00.  How are you feeling

23          with your questions?

24              MR. LAUX:  I think I can tell you we'll be done

25          by a quarter after.  Is that acceptable?

ZOOM VIDEOCONFERENCE

45

1        THE WITNESS:  I can rock ahead.  I'm -- I'm good

2        -- I checked on the break; I'm good until 4:30.

3        MR. LAUX:  Well, that's very good of you.  We'll

4        get you out of here as soon as we can.  And I

5        definitely appreciate that candor.

6        MR. WATSON:   Thanks, Mike.

7   Q    (By Mr. Laux)  All right.  Let's look at Exhibit Number 1,

8   which is your report; okay?

9   A    Okay.

10  Q    Now, your report at the top -- so -- so let me take a step

11  back.  We just deposed Lt. Bobby G. Brown this morning.  And

12  you know who that is; correct?

13  A    Yes.

14  Q    Am I correct that on June 20 -- in June of 2020, he was

15  your superior, but today you're his superior?

16  A    We were both --

17  Q    And I don't mean it that way.  I don't mean --

18  A    Oh, I know.

19  Q    -- it that way.  But --

20  A    He was a lieutenant and I was a lieutenant in June of

21  2020.

22  Q    That's right.  I'm sorry.  You're absolutely right.

23  A    But in the context of the protests and -- and then the

24  subsequent riots, I was taking my lead from him.  He was a in

25  control --

ZOOM VIDEOCONFERENCE

46

1  Q    Understood.

2  A    Okay.

3  Q    Now, he testified that on your report he had to wait out

4  the date that you wrote for the incident date and the call

5  date.  And he had put in there by hand "6-1-2020," and then he

6  put his little initials there.

7       Do you see that reflected on Exhibit 1?

8  A    Yes.

9  Q    On what date did you draft this report, Exhibit 1?

10 A    Memory, I think I drafted it on June the 3rd, but I

11 misremembered -- everything ran together.  If you remember,

12 these are continuous operations running for several days;

13 several different events occur -- I misremembered the actual

14 date of this event as -- as the wrong date.

15 Q    You draft -- okay.  Just so we're clear, did you draft

16 this on June the 3rd?

17 A    On June the 3rd, yes.  I believe that's right.

18 Q    And you -- you were describing events of June the 1st?

19 A    Yes.

20 Q    So at the time, did you think that these events had

21 occurred on that day that you were drafting it?

22 A    No.  I was trying to go back two days in history, and I

23 put the wrong date.  It actually occurred on the 1st.  I had it

24 -- I had it off by a day.  I don't remember if it was a day

25 early or a day late.  I had it off by a day.

ZOOM VIDEOCONFERENCE

47

1  Q    Are you saying that you drafted this on the 1st, but you

2  accidentally put the 3rd?

3  A    No.

4              MR. WATSON:  Object to form.

5  A    I drafted it approximately on the 3rd, but I attributed

6  the events of June 1 to the wrong date.

7  Q    (By Mr. Laux)  What you describe in the narrative portion

8  of your report is what you observed and perceived on June 1,

9  2020; is that true?

10 A    That's true.

11 Q    Now, why is it that Lt. Brown, who's not the author of

12 this report, would be the person correcting these dates rather

13 than, for instance, yourself?

14 A    That's a good question.  Just sheer volume.  ERT, who he

15 commanded, was keeping the official book, if you want to call

16 it that, of all generated reports.  And at some point, he went

17 back through for accuracy and -- and to be thorough, and we

18 noticed that that was the wrong date that that actually

19 occurred on, because it didn't line up with the other use of

20 force and incident reports, so he corrected that.

21 Q    Did he bring that to your attention, or did someone else

22 bring that to your attention?

23 A    I don't -- I don't recall.  It's very possible.

24 Q    Is there any reason why you didn't make that correction

25 yourself once you were notified about the --

ZOOM VIDEOCONFERENCE

48

1  A    I -- I may not have been notified --

2  Q    -- mistake or the --

3  A    -- I may not have been --

4  Q    -- clerical error?

5  A    -- notified until much -- I may not have been notified

6  until much later when it was already -- it was already over; it

7  was already done.

8  Q    Okay.  You witnessed a person wearing a white shirt and

9  red shorts being repeatedly hit in the back as he was being

10 driven from the area.  And he was being hit with PepperBall --

11 PepperBalls; correct?

12 A    Correct, except that I got the color combination wrong.

13 Q    What do you mean --

14 A    He was -- he was --

15 Q    -- by that, sir?

16 A     -- he was actually wearing a colored shirt, a reddish

17 shirt, and white shorts.  My --

18 Q    When --

19 A    -- my recall, I had the colors off.

20 Q    You think he was wearing a red shirt and white shorts?

21 A    It was a pinkish shirt and white shorts.

22 Q    I'm sure at the time you didn't know Don Cook from Moses.

23 But whether it's video footage or online or looking at the

24 complaint, do you have an idea of what Don Cook looks like

25 right now?

ZOOM VIDEOCONFERENCE

49

```
1   A     Yes.

2   Q     Is it your testimony today that you are describing

3   Don Cook in the narrative section of this report?

4   A     I am.

5   Q     You believe that Don Cook was hit multiple times with

6   PepperBalls?

7   A     Yes.

8   Q     Is that true?

9   A     Yes.

10  Q     Do you believe that?

11  A     I saw him.

12  Q     You saw Don Cook refusing commands to leave and hit with

13  PepperBalls multiple times; is that true?

14  A     That's true.

15  Q     You don't know, as we sit here today, the identity of the

16  trooper who fired those; is that also true?

17  A     That's true.

18  Q     You believe and you -- you observed with your own eyes

19  Mr. Cook suddenly turn around and begin shouting at ERT members

20  in an aggressive manner, approaching the line with clenched

21  fists?  You saw that with your own two eyes?

22  A     I did.

23  Q     You believe he appeared very agitated; correct?

24  A     Correct.

25  Q     You fired your foam impact round after the PepperBall
```

ZOOM VIDEOCONFERENCE

50

1  barrage?

2  A    Yes.

3  Q    And it stopped his advance toward the line?

4  A    Immediately.

5  Q    So he was going north slower than you would have preferred

6  -- in fact, you call it "refusing commands" -- but then he

7  abruptly turned back south and began to confront your line; is

8  that true?

9  A    So he was being hit in the back.  He began to comply by

10 walking away; the barrage stopped; and he -- when the barrage

11 stopped, he spun and started coming back.

12 Q    Was I --

13 A    So they --

14 Q    -- correct on my --

15 A    -- gave him a chance --

16 Q    -- directions?

17 A    I'm sorry.  I talked over you.

18     They -- they hit him with the -- they hit him with the

19 PepperBall and gave him a chance to comply, then he made his --

20 he turned and came back.

21 Q    Did all the PepperBalls hit him in the back?

22 A    That's my recollection.

23 Q    So was I correct before that when he was going away from

24 the line, he was going north?

25 A    That's right.

51

1  Q    When he was hit with the PepperBalls in the back, he was

2  directed north?

3  A    Yes.

4  Q    And then he abruptly turned around 180 degrees and began

5  to advance in a south -- in a southerly direction.

6  A    Southeasterly direction, yes.

7  Q    Did you say easterly?

8  A    South, southeasterly direction, yes.

9  Q    Fair enough.  How far would you estimate he traveled from

10 the point of his pivot to when you dropped him with your foam

11 impact round?

12 A    Three or four feet.

13 Q    Was Mr. Cook saying anything at the time that he

14 approached with clenched fists, appearing agitated?

15 A    I couldn't tell.  His mouth wasn't moving, but his teeth

16 were clenched.

17 Q    You saw that his fists were clenched; correct?

18 A    I did.

19 Q    And therefore, you must have noticed that he didn't appear

20 to have any weaponry in those hands; right?

21 A    Right.

22 Q    Again, who knows what's in his pockets, but you didn't

23 have any indication that he was armed at the time, did you?

24 A    No.

25 Q    Where did you get the notion that Mr. Cook was

52

1    approximately 165 pounds?  Was that just your estimation?

2         And that's on page 1.

3    A    Yeah.  That was just my estimation at the time.

4    Q    Did you see Ryan Wingo on the grounds of the Capitol at or

5    around this time?

6    A    No.

7    Q    Did you see him at all that evening on the 1st of June

8    2020 that you can recall?

9    A    I -- no.

10   Q    Did you speak to Don Cook at any time on June 1, 2020?

11   A    No.

12   Q    And I mean -- I guess what I mean by that is directly to

13   him as opposed to commands you might be issuing in general?

14   A    No, I had no contact with him.

15   Q    Did he say anything to you at any time before or after he

16   was injured?

17   A    No.

18   Q    Did you have any role in putting zip ties on his arms?

19   A    No.

20   Q    Or his wrists?  No?

21   A    No, sir.

22   Q    Did you ever lay hands on him at any time that evening?

23   A    No, sir.

24   Q    Was Mr. Cook arrested on June 1, 2020, if you know?

25   A    He was being -- he was being detained to get medical

53

1  attention, and then he was going to be processed.  We never got

2  that far before he left.  For --

3  Q    You agree that he --

4                 (Simultaneous speaking)

5  Q    -- you agree that he was in police custody; correct?

6  A    Correct.

7              MR. LAUX:  Amy, your mute is off.

8              THE COURT REPORTER:  Sorry.

9              MR. LAUX:  Thank you.

10 Q    (By Mr. Laux)  After he was hit with Wingo's beanbag

11 projectile, based on what you know of this matter, his freedom

12 was restricted; correct?

13 A    Correct.

14 Q    And certainly when he was zip-tied at the wrists, as he's

15 testified to, that would represent a -- an in-custody

16 situation; correct?

17 A    Correct.

18 Q    Now, sometimes when officers arrest a person, they'll

19 perform a search of that person's -- that individual's person,

20 or body, incident to that arrest; correct?

21 A    Correct.

22 Q    And if an individual, for instance, has a wallet on them

23 with, say, a driver's license, that might be a way that an

24 officer can ascertain the possibility of that person's

25 identity; agreed?

54

1  A    Agreed.

2  Q    Can you tell me any and all efforts that you made at any

3  time to identify the person that was -- that you describe in

4  your narrative?  What attempts did you make to identify that

5  person by name?

6  A    None.  My attention went back to the crowd.

7  Q    Well, there -- the last sentence in your narrative says

8  that:  "Efforts to identify him with MEMS records have been

9  negative to this point."

10 A    I -- I didn't make that -- I wasn't making those

11 inquiries.  Someone else in the department was making those

12 inquiries.  But I --

13 Q    Okay.

14 A    -- I knew that that was -- had been done.

15 Q    Do you know who engaged in these efforts?

16 A    I believe Capt. Lann.

17 Q    Now, I -- I know you're not a privacy expert, but wouldn't

18 an officer need a warrant to look through medical records in --

19 in light of the HIPAA protections and what have you?

20            MR. WATSON:  Object to form.

21 A    Not in this instance.  We were just looking for transport

22 records for who was transported by MEMS from the Capitol.  They

23 would have identified, obviously, anyone that was in their

24 ambulance.  That's when we determined that he didn't take an

25 ambulance, that this person did not get transferred via MEMS.

55

1  We do that -- we -- we do that routinely.

2  Q    (By Mr. Laux)  So this doesn't relate to medical records.

3  It relates more to a ledger kept by MEMS.

4  A    Yes.  Yes.

5  Q    And someone, to your knowledge, checked that ledger, and

6  you determined that Mr. Cook was not transported via ambulance

7  to a hospital; is that right?

8  A    That's right.

9  Q    Do you know which -- strike that.

10       Do you know which ERT members moved Mr. Cook behind the

11  BEAR to get him medical attention?

12  A    I don't.

13  Q    Did you -- strike that.

14       I think you testified that you didn't make any efforts to

15  identify him; is that correct?

16  A    That's right.

17  Q    Have you -- at some point you were able to identify the

18  person that was hit by Wingo -- well, strike that.

19       At some point, the Arkansas State Police was able to

20  identify him; correct?

21  A    Correct.

22  Q    Do you know who made that identification?

23  A    I did.

24  Q    And what caused you to identify or what caused you to be

25  able to identify Mr. Cook?

56

1   A    To my understanding, he came forward with a complaint,

2   identifying himself as a victim of a use of force.  I'm not

3   sure what context it was -- it was taken.  But a picture was

4   supplied to me of Mr. Cook, and I was asked, "Is this the

5   individual that you saw on the Capitol grounds that was

6   struck?"  And I identified him.

7   Q    Who provided you with the photograph or the image?

8   A    That was Capt. Lann, Brad Lann.

9   Q    Do you know where Capt. Lann got the footage or the image?

10  A    I believe he got it from our legal department via a Zoom

11  call that -- that Don Cook had gotten on with them.

12  Q    Is it an accurate statement to say that a warrant was not

13  issued for Don Cook's arrest until after he made a claim for

14  injuries sustained on June 1?

15  A    That's accurate.

16  Q    I forgot that there is another document in here.  You

17  prepared an affidavit in this case -- in the criminal case

18  against Mr. Cook; correct?

19  A    Correct.

20  Q    And that's actually Exhibit Number 4, which is Plaintiff's

21  page 00010 to 00012.

22       This largely reflects your report for the most part;

23  correct?

24  A    Yes.

25  Q    Now, you made this affidavit -- which is a sworn statement

57

1  -- you made this affidavit after determining who Mr. Cook was;

2  correct?

3  A    Correct.

4  Q    And in this affidavit on page Plaintiff 00011, you're

5  still identifying him -- or describing him, rather, as wearing

6  a white shirt and red shorts; correct?

7  A    Correct.

8  Q    By that time, you knew that that was inaccurate, didn't

9  you, or did you not?

10  A    I think we only knew that when he brought that point.

11  Q    I'm sorry.  I didn't hear that.

12  A    I think -- I think we only knew that when Don Cook brought

13  the point that he was not wearing those clothes.

14  Q    Well, the Arkansas State Police was in possession of

15  footage from that evening of June 1; correct?

16  A    I wasn't in possession of it.  I didn't see it.

17  Q    Well, that's why I said Arkansas State Police and not you.

18  A    Yes, I think that -- I think that's correct.  I -- I --

19  the Arkansas Capitol Police was.  I'm not sure at what point we

20  got the footage.

21  Q    Had you seen any video of Mr. Cook prior to signing this

22  affidavit?  And I mean video of Mr. Cook from June 1, 2020.

23  A    I have not.

24  Q    In your report you describe what you believe Mr. Cook's

25  actions to be immediately preceding his being struck by

                                                                58

1   Ryan Wingo; correct?

2   A     Correct.

3   Q     So first question:  Did you see Mr. Cook hit by the

4   projectile beanbag even if you didn't know where it came from?

5   A     I -- no, I couldn't tell what happened.

6   Q     Okay.  And don't mean to suggest otherwise.  I should look

7   at your report again.

8         I guess it was later that you were informed that --

9   A     I -- I thought my round did that.  I -- I thought my round

10  was the one that took him down.  I -- I had no knowledge that a

11  second or another round had been fired.

12  Q     When you write in your report, "Almost simultaneously he

13  was engaged with a beanbag round from a member of ERT on the

14  line and collapsed on the lawn and did not move" -- when you

15  wrote that in your report, is that describing something you

16  observed?

17  A     Well, I knew later that ERT did that, but at the time it

18  happened, I did not know that someone else fired.  But yes,

19  that describes something I observed.

20  Q     Well, that's kind of where I was getting at.  Maybe I

21  phrased it the wrong way.  You saw Mr. Cook get hit by a

22  beanbag projectile and drop, but at the time it was happening,

23  you didn't know he was being hit with a beanbag projectile; is

24  that true?

25  A     That's true.

59

1  Q    And therefore, you didn't see who shot the beanbag

2  projectile or where it came from; correct?

3  A    Correct.

4  Q    And so when you write this in your report, you were

5  informed later about that fact; true?

6  A    True.

7  Q    Let me put it a different way.  What you write in your

8  report comes from a source other than yourself?

9       Let me ask it another way.  I'll withdraw it.

10      When you write about Mr. Cook almost simultaneously being

11  engaged with a beanbag round, that's something you learned

12  after the fact?

13  A    That's something I learned after the fact, yes.

14  Q    And from whom or what was the source of that information,

15  if you recall?

16  A    I don't recall.  Just, like I said earlier, AAR,

17  commanders sitting around talking.  Obviously, we were

18  concerned there'd been an injury -- substantial injury to a

19  civilian, and we couldn't account for that civilian.  We didn't

20  know who he was.

21  Q    Do you -- are you aware of any video footage that depicts

22  Mr. Cook turning around and confronting the line as you wrote

23  in your report?

24  A    No.

25  Q    (Audio interference) wearing a BWC, body worn camera, at

ZOOM VIDEOCONFERENCE

60

1    -- on the evening of June 1, 2020?

2    A    I didn't hear the first part of the question.

3    Q    Were you wearing a body cam at all on the evening of

4    June 1, 2020?

5    A    No.

6    Q    Do you know if Ryan Wingo was?  You probably don't know.

7    A    He was not.

8    Q    You know that he was not, but you probably learned that

9    after the fact, or did you know that at the time?

10   A    I -- the Arkansas State Police doesn't utilize the body

11   worn camera.

12   Q    I see.  All right.  And we are about to wrap up here.

13        Have we discussed all of the acts of violence that you

14   personally observed from protesters toward troopers on the

15   evening of June 1, 2020?

16   A    I think so.

17   Q    Are you aware of any video footage that depicts

18   Ryan Wingo's description of firing the -- the beanbag

19   projectile at Mr. Cook and what Mr. Cook was doing at the time?

20   A    No.

21   Q    Did you have anything to do with the physical arrest of

22   Mr. Cook in July of 2021?

23   A    Yes.  I coordinated it and ordered it.

24   Q    Were you physically there at his home address?

25   A    No.

ZOOM VIDEOCONFERENCE

61

1  Q    Did you tell the North Little Rock Police Department --

2  did you give them the information that they required for them

3  to effectuate the arrest?

4  A    We effected the arrest, the Arkansas State Police.  Well,

5  I gave two of my troopers the --

6  Q    Well, are Sims and Merz Arkansas State Police officers --

7  troopers?

8  A    No.

9  Q    And -- and I know we're getting -- we're going to get you

10  out of there in two seconds.

11      Just briefly, if you could, look at the one-page

12  Exhibit 3, sir.

13              THE WITNESS:  Can I see that?

14  Q    (By Mr. Laux)  Plaintiff's 0008. Based on this document,

15  it would seem that the arresting officers were B. Sims and

16  CSA Merz, M-E-R-Z.  Is that right?

17  A    I see that.  I don't know who those people are.  The

18  troopers --

19  Q    Do you believe that --

20  A    -- I sent were --

21  Q    Who would you say the arresting officers were of Mr. Cook

22  on that date?

23  A    I sent Tpr. Cash and, I'm almost positive it was,

24  Tpr. Kennedy to effect the arrest.  Don't hold me to that.  I

25  know it was Tpr. Cash.  I sent two state troopers to his house.

ZOOM VIDEOCONFERENCE

62

1   They affected the arrest and transported him to the jail.

2        I'm not -- I don't know if these are intake guys or who

3   these guys are.  These are not troopers.

4   Q    Did anyone identify Mr. Cook on the date of his arrest in

5   June of 2021?  Like as in, "Here's the photograph.  That's the

6   guy."

7   A    I -- I supplied a photograph to the troopers.  I said,

8   "You're going to this house.  You're looking for this man.

9   This is his name.  He's got this warrant."  They were given a

10  copy of the warrant.  They knocked on the door.  He answered.

11  They identified him.  He was arrested.

12  Q    Last three questions.  So is it fair to say that you --

13  you don't -- you don't know why the name Sims and Merz are

14  on --

15  A    I --

16  Q    -- Exhibit Number 3?

17  A    The only thing -- just based on my experience with the

18  jail -- the only thing, it says:  "Agency Received From:  State

19  Police.  Agency Transferred To:  Pulaski County Sheriff's

20  Office"  These are deputies that would have booked him into the

21  jail.  So --

22  Q    Okay.

23  A    -- you know, a technical thing maybe, but they're not the

24  actual arresting officers.  They may have been the processing

25  officers, but they were not the arresting officers.

63

1    Q    Is there a reason why you didn't go and effectuate the

2    arrest yourself?

3    A    It's not necessary for a lieutenant to do that.  I had

4    other obligations or other duties.  I could have, but it wasn't

5    necessary.

6    Q    Did you ever see Mr. Cook throwing a water bottle, bricks,

7    or rocks or fluid filled balloons or any object at any trooper

8    at any time on June 1, 2020?

9    A    No.

10   Q    Okay.

11             MR. LAUX:  I think that's all the questions I

12        have.  Mr. Watson might have some questions for you,

13        but I believe I'm done with my questions in chief.

14             MR. LAUX:  Thank you very much, Captain, for

15        your time.

16             THE WITNESS:  Thank you.

17                  CROSS-EXAMINATION

18   BY MR. WATSON

19   Q    All right, Captain, I just have a few quick questions.

20        First of all, on the night of June 1, 2020, when you first

21   identified Mr. Cook -- obviously, you didn't know him by name

22   -- but when you first identified Mr. Cook, were there crowds

23   around?

24   A    No.

25   Q    Okay.  So Mr. Cook was alone?

ZOOM VIDEOCONFERENCE

64

1  A    Yes.

2  Q    Okay.  Second, when you engaged him with your foam round,

3  how far was he from the line of the trooper -- the ERT line, or

4  SWAT line?

5  A    10 feet.

6  Q    And at that time -- obviously, now you know different; but

7  at the time, he could have potentially been armed?

8  A    He could have been.

9            MR. WATSON:  All right.  That's all I've got.

10                  REDIRECT EXAMINATION

11 BY MR. LAUX

12 Q    At the time -- you fired your impact round simultaneously

13 with Wingo's beanbag projectile.  We know that now; correct?

14 A    Correct.

15 Q    At the time that you decided to use that level of force,

16 was Mr. Cook presenting an immediate threat of death or serious

17 bodily injury to anyone.

18 A    I don't know.

19            MR. LAUX:  Okay.  That's all the questions that

20        I have.

21            MR. WATSON:  That's it.

22            MR. LAUX:  Are we all done?  Okay.

23            Off the record.

24            (Thereupon the deposition was concluded at

25        4:34 p.m.)

ZOOM VIDEOCONFERENCE

65

REPORTER'S CERTIFICATE

    I, AMY WAID, Certified Court Reporter in and for the State of Arkansas, do hereby certify as follows:

    (1) that on August 23, 2023, CAPT. JEFFREY SHEELER was duly sworn by me prior to the taking of testimony as to the truth of the matters attested to and contained therein;
    (2) that the foregoing pages contain and are a true and correct transcription of the proceedings as reported verbatim by me via the voice-writing method to the best of my ability and transcribed and reduced to typewritten form by myself or under my direction and supervision, and subject to appropriate changes submitted by witness, if any, during their requested reading and signing of this deposition according to the Arkansas Rules of Civil Procedure;
    (3) that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and that I am not a relative or employee of any attorney employed by the parties hereto;
    (4) that I am not financially or otherwise interested in the outcome of this action that affects or has a substantial tendency to affect impartiality or requires me to relinquish control of an original or copies of a deposition transcript before it is certified, or that requires me to provide any service not made available to all parties to the action;
    (5) and that I have no contract with the parties, attorneys, or persons with an interest in the action; and that I am not knowingly identified on a preferred provider list, whether written or oral, for any litigant, insurance company, or third-party administrator involved in this matter.

    This transcript is prepared at the request of plaintiff's counsel, and all fees are billed directly to Laux Law Firm in compliance with the Arkansas Board of Court Reporter Examiners Regulations Section 19.

    Witness my hand and seal this 24th day of September, 2023.

_Amy Waid_

Amy Waid
Certified Court Reporter #853
P.O. Box 10385, Conway, Arkansas 72034

Amy Waid
Arkansas Supreme
Court-Certified
Court Reporter
CCR No. 853

WAID REPORTING

**A**

AAR 59:16
Aaron 25:11
ability
  65:7
able 40:25
  55:17
  55:19
  55:25
above-styled
  3:5
abruptly
  50:7, 51:4
absolutely
  45:22
acceptable
  44:25
accidentally
  47:2
accomplish
  17:17
account
  59:19
accuracy
  47:17
accurate
  7:25, 16:6
  16:11
  32:25
  56:12
  56:15
achieved
  40:8
achieves
  40:12
act 10:17
action
  65:10
  65:12
  65:15
  65:16
actions
  6:12, 22:7
  57:25
active
  12:19
  12:22, 13:1
activities
  11:3
acts 33:9

60:13
actual
18:11, 40:5
46:13
ability
62:24
address
60:24
administr...
65:17
advance
50:3, 51:5
affect
65:13
affidavit
56:17
56:25, 57:1
57:4, 57:22
African-A...
6:6, 6:8
6:10
after-action
34:19
afternoon
4:11, 7:14
agency 5:24
39:14
62:18
62:19
aggressive
49:20
agitated
49:23
51:14
ago 9:11
agree 5:1
11:21, 12:1
20:18
22:12, 23:8
23:11
23:12
23:18, 24:1
24:9, 26:18
26:19
26:19, 27:8
27:12
27:13
27:22
27:24, 28:3
28:5, 28:8
28:10
29:14

29:16
29:22
29:24
30:11
30:13
30:15
30:17
30:19
35:23, 36:3
36:4, 36:8
36:9, 36:21
36:23, 37:5
39:3, 39:5
39:6, 39:8
39:13
39:18
39:19
40:20, 42:8
43:7, 43:9
43:10, 53:3
53:5
agreed
38:14
53:25, 54:1
ahead 23:24
45:1
aimed 34:4
35:16
al 4:17
4:24
allegation
6:1, 10:10
allegations
5:1, 5:6
5:23, 6:16
6:16, 10:5
alleged
16:3
6:11
alleges 5:2
10:7
ambulance
54:24
54:25, 55:6
amendment
27:10
27:14
27:14
27:22, 29:7
29:12
29:19
amendments

27:5
Americans
26:23
Amy 1:20
3:6, 53:7
65:2, 65:24
analyzed
28:1
and/or
16:15
animal 29:1
answer 8:17
8:19, 12:6
12:8, 12:9
16:21
20:24
27:18
32:14
answered
20:24
37:14
62:10
answers
2:14, 3:2
7:23, 7:24
15:23, 16:6
32:22
appear
51:19
APPEARANCES
1:12, 2:3
appeared
49:23
appearing
51:14
appears
16:3
applicable
4:21
apply 14:8
17:21
appreciate
45:5
approached
51:14
approaching
49:20
appropriate
38:21, 65:8
approxima...
5:10, 11:24

12:23, 47:5
52:1
area 48:10
Arkadelphia
13:18
13:18
14:16
Arkansas
1:1, 1:15
1:18, 1:19
1:23, 3:4
3:6, 4:19
4:20, 6:11
8:25, 9:10
10:2, 13:11
13:15
13:18
13:22
14:17
14:20
14:23
14:24, 17:7
19:7, 29:25
30:7, 38:7
42:9, 55:19
57:14
57:17
57:19
60:10, 61:4
61:6, 65:2
65:9, 65:20
65:25
armed 43:20
43:23, 44:1
44:2, 44:3
44:9, 44:11
51:23, 64:7
armored
18:4
arms 52:18
arrest
53:18
53:20
56:13
60:21, 61:3
61:4, 61:24
62:1, 62:4
63:2
arrested
52:24
62:11

arresting
  61:15
  61:21
  62:24
  62:25
ascertain
  53:24
asked 20:22
  21:7, 56:4
asking 5:1
  7:22, 32:2
  32:3, 32:9
  32:10
  44:10
asks 16:14
ASP 30:5
aspect
  12:16
assigned
  28:19
Assistant
  1:17, 7:15
  46:22
Association
  39:11
assume
  43:25, 44:2
attached
  15:22
attempts
  54:4
attendant
  17:20
attention
  16:12
  29:13
  47:21
  47:22, 53:1
  54:6, 55:11
attested
  65:4
attorney
  1:17, 1:18
  7:15, 65:11
attorneys
  65:16
attributed
  47:5
Audio 59:25
August 1:10
  3:5, 65:3
author

11:11, 22:3
47:11
62:17
authored
  11:3, 11:15
authorita...
  39:13
available
  65:14
AVENUE 1:15
aware 11:18
  21:11
  31:22, 32:3
  59:21
  60:17

B

back 13:5
  15:19
  28:24
  45:11
  46:22
  47:17, 48:9
  50:7, 50:9
  50:11
  50:20
  50:21, 51:1
  54:6
background
  9:23, 13:5
backpack
  35:3
bad 31:21
ball 17:11
  17:15
  17:16, 34:1
  34:17
  34:22, 40:5
  40:8, 43:23
balloons
  63:7
Baptist
  14:16
barrage
  50:1, 50:10
  50:10
based 22:6
  28:12, 31:4
  31:10
  42:25
  53:11

61:14
62:17
basically
  28:7
basis 37:10
  44:10
beanbag 5:3
  10:7, 10:21
  10:21
  19:14
  19:17
  22:13, 23:3
  38:1, 38:4
  38:10
  38:17
  38:19, 39:1
  39:4, 42:12
  42:16, 43:2
  43:4, 44:16
  44:19
  53:10, 58:4
  58:13
  58:22
  58:23, 59:1
  59:11
  60:18
  64:13
BEAR 18:6
  18:8, 18:11
  18:21
  55:11
bearings
  34:1, 34:17
  34:22
beds 33:24
began 9:16
  13:11, 50:7
  50:9, 51:4
begins 37:1
BEHALF 1:13
  1:16
belief
  29:13, 44:8
beliefs
  29:7
believe
  5:11, 6:16
  8:24, 16:11
  21:17, 23:4
  31:1, 31:10
  31:13

36:17
  37:25, 38:2
  38:7, 38:25
  39:2, 40:5
  41:23
  42:10, 43:3
  44:11
  44:15
  46:17, 49:5
  49:10
  49:18
  49:23
  54:16
  56:10
  57:24
  61:19
  63:13
beneath
  25:22
best 11:2
  65:6
better 33:3
big 42:1
  42:1
billed
  65:19
bit 7:18
  7:18, 9:22
  10:1, 20:20
  32:21
Board 65:20
Bobby 45:11
bodies
  40:19
bodily
  37:10
  64:17
body 18:1
  20:9, 20:15
  53:20
  59:25, 60:3
  60:10
book 47:15
booked
  62:20
bookmarking
  12:7
born 13:8
bottle 63:6
bottles
  34:1, 35:1

35:10
35:14
35:18
bound 8:5
  17:5
Box 1:22
  65:25
Brad 56:8
break 45:2
breaking
  40:8
bricks 63:6
briefly
  7:19, 9:24
  14:4, 15:1
  25:2, 61:11
bring 29:13
  47:21
  47:22
brought
  57:10
  57:12
Brown 45:11
  47:11
bruising
  40:19
brutality
  29:14
BRYANT 1:6
business
  14:6
BWC 59:25

C

call 19:23
  46:4, 47:15
  50:6, 56:11
called 4:23
cam 60:3
camera
  59:25
  60:11
candor 45:5
capacity
  28:19
Capitol
  1:15, 31:8
  33:25, 52:4
  54:22, 56:5
  57:19

capsaicin...
40:6
Capt 1:9
3:2, 4:3
4:11, 4:22
54:16, 56:8
56:9, 65:3
captain 9:1
11:9, 17:9
41:23
63:14
63:19
CAPTION 2:5
3:1
career 6:18
9:20
case 1:4
6:19, 11:2
28:2, 37:22
41:19, 42:2
42:4, 56:17
56:17
Cash 61:23
61:25
catch 13:5
cause 3:5
33:10
caused 32:4
55:24
55:24
cautioned
4:5
CCR 1:20
CENTER 1:18
CENTRAL 1:2
certain
20:16
32:22
32:25
certainly
53:14
CERTIFICATE
2:10, 65:1
certified
3:6, 65:2
65:14
65:24
certify
65:2
Chad 25:24
chain 24:25

25:2, 25:4
chance
50:15
50:19
changes
65:8
changing
38:14
check 41:16
45:2, 55:5
chief 63:13
Chiefs
39:11
circumstance
36:19, 39:2
43:12
44:14
circumsta...
28:13
city 13:8
civil 3:4
5:15, 5:15
5:18, 30:9
30:9, 30:12
31:18
42:17, 65:9
civilian
59:19
59:19
claim 56:13
clarity's
11:21
classific...
31:18
clean 7:20
clear 10:19
32:8, 46:15
clenched
49:20
51:14
51:16
51:17
clerical
48:4
client 10:6
close 34:4
clothes
57:13
collapsed
58:14

colleagues
34:20
colonel
25:4, 25:7
color 48:12
colored
48:16
colors
48:19
combination
48:12
come 6:18
comes 59:8
coming 29:4
50:11
command
24:25
35:24
commanded
36:16, 37:3
44:14
47:15
commander
25:8
commanders
59:17
commanding
36:19
38:25
commands
39:5, 49:12
50:6, 52:13
committed
27:25
35:15
communica...
21:12
company
15:4, 29:1
65:17
complaint
5:6, 48:24
56:1
complaints
20:23
30:12
complete
16:7
completely
20:25
compliance
17:18

17:18
36:12
36:13
36:14
37:21
37:21
37:24
38:12
43:16
65:20
compliant
39:5
comply
44:13, 50:9
50:19
complying
24:3, 36:1
conceivable
34:10
concerned
59:18
concluded
2:9, 64:24
conduct
5:24, 33:5
33:9, 39:18
42:18, 43:5
confront
50:7
confronting
59:22
Congratul...
9:14
Connor 28:2
28:7
consider
16:18
16:19, 33:5
considerable
20:18
consistent
38:7, 39:24
constitute
22:21
30:12
43:17
Constitution
27:5, 27:14
constitut...
27:1
contact

35:19
52:14
contain
65:5
contained
16:6, 65:4
contents
40:5
context
43:20
45:23, 56:3
continue
8:3, 23:12
24:3, 36:12
36:13
continues
30:9
continuous
46:12
contract
65:15
control
25:9, 45:25
65:13
Conway 1:23
11:23
12:17
Cook 1:3
4:17, 4:24
5:4, 10:6
10:15
10:22
21:15
48:22
48:24, 49:3
49:5, 49:12
49:19
51:13
51:25
52:10
52:24, 55:6
55:10
55:25, 56:4
56:11
56:18, 57:1
57:12
57:21
57:22, 58:3
58:21
59:10
59:22

| | | | | |
|---|---|---|---|---|
| 60:19 | 48:11 | 33:9, 33:9 | 31:24 | delivery |
| 60:19 | 48:12 | 56:17 | 31:25, 32:6 | 17:12 |
| 60:22 | 49:23 | CROSS-EXA... | 46:21 | demonstra... |
| 61:21, 62:4 | 49:24 | 2:7, 63:17 | 46:24 | 30:8 |
| 63:6, 63:21 | 50:14 | crowd 38:2 | 46:24 | denied 6:17 |
| 63:22 | 50:23 | 38:16 | 46:25 | department |
| 63:25 | 51:17, 53:5 | 38:22, 39:1 | 46:25 | 13:25 |
| 64:16 | 53:6, 53:12 | 39:4, 39:4 | 65:21 | 14:24 |
| Cook's | 53:13 | 39:21 | days 13:2 | 54:11 |
| 56:13 | 53:16 | 41:14, 54:6 | 13:3, 32:1 | 56:10, 61:1 |
| 57:24 | 53:17 | crowd-man... | 46:12 | depicts |
| coordinated | 53:20 | 18:23 | 46:22 | 59:21 |
| 60:23 | 53:21 | crowds 30:8 | deadly | 60:17 |
| copies | 55:15 | 38:1, 38:5 | 33:12 | deployed |
| 65:13 | 55:20 | 38:11 | 37:13 | 18:8 |
| copy 62:10 | 55:21 | 38:12 | 37:15 | deployment |
| corner | 56:18 | 38:13 | death 37:10 | 17:20 |
| 41:24 | 56:19 | 39:23 | 42:19 | deposed |
| correct | 56:23, 57:2 | 41:20, 42:5 | 42:23, 43:6 | 45:11 |
| 7:15, 9:1 | 57:3, 57:6 | 42:13 | 43:18 | deposition |
| 9:2, 10:10 | 57:7, 57:15 | 63:22 | 64:16 | 1:8, 2:9 |
| 11:19 | 57:18, 58:1 | CSA 61:16 | debate | 4:16, 4:17 |
| 11:20 | 58:2, 59:2 | curious | 10:12 | 5:8, 5:19 |
| 12:13 | 59:3, 64:13 | 21:19 | 20:17 | 7:18, 8:9 |
| 12:14 | 64:14, 65:6 | current | decided | 64:24, 65:9 |
| 13:19 | corrected | 8:25 | 15:5, 64:15 | 65:14 |
| 13:20, 16:2 | 47:20 | custody | decision | depositions |
| 19:15 | correcting | 53:5 | 13:13, 23:8 | 3:2, 5:12 |
| 19:16, 21:5 | 47:12 | cut 44:21 | 23:11 | deputies |
| 21:9, 21:10 | correction | | decorative | 62:20 |
| 24:12 | 47:24 | D | 33:25 | describe |
| 24:13 | counsel | | defendant | 16:14, 17:9 |
| 24:15 | 65:10 | damage | 4:23, 6:19 | 21:13 |
| 24:16 | 65:19 | 33:13 | DEFENDANTS | 30:21, 33:8 |
| 24:18 | counter | 33:19 | 1:7, 1:16 | 33:21, 47:7 |
| 25:15 | 19:1 | date 12:22 | defer 12:9 | 54:3, 57:24 |
| 25:16 | County | 17:1, 17:3 | definitely | described |
| 26:23 | 62:19 | 17:6, 21:21 | 14:13, 45:5 | 24:17 |
| 26:25 | couple | 26:13 | degree 14:6 | describes |
| 27:16 | 17:13 | 32:10, 46:4 | 14:7, 14:13 | 41:17 |
| 28:13 | course 9:19 | 46:4, 46:5 | degrees | 58:19 |
| 28:15, 29:7 | Court 1:1 | 46:9, 46:14 | 14:15, 51:4 | describing |
| 33:1, 33:13 | 3:6, 3:6 | 46:14 | delayed 7:2 | 11:4, 22:3 |
| 33:14 | 4:19, 4:20 | 46:23, 47:6 | delivered | 38:16 |
| 33:14 | 53:8, 65:2 | 47:18 | 10:21 | 46:18, 49:2 |
| 37:11 | 65:20 | 61:22, 62:4 | delivering | 57:5, 58:15 |
| 37:17, 42:9 | 65:24 | dates 12:25 | 10:8, 40:3 | description |
| 42:23 | COVID 7:2 | 32:13 | delivers | 14:4, 15:1 |
| 42:24, 43:2 | criminal | 47:12 | 19:10 | 60:18 |
| 44:4, 45:12 | 5:15, 5:15 | day 3:5 | 19:14 | descriptions |
| 45:14 | 14:7, 14:18 | 21:16 | 38:18 | 35:15 |

despite
 12:10
destruction
 33:9
detained
 52:25
detect 41:1
detectable
 41:8
determined
 54:24, 55:6
determining
 57:1
device 19:9
 19:20, 20:8
 22:21, 38:5
 39:6
difference
 29:19
different
 29:10
 43:23
 46:13, 59:7
 64:6
differs
 41:4
direct 2:6
 4:9, 16:12
 20:25
direct-fired
 42:16, 43:1
directed
 5:4, 29:21
 51:2
direction
 33:11
 36:18, 37:3
 38:24, 51:5
 51:6, 51:8
 65:7
directions
 50:16
directly
 52:12
 65:19
director
 25:4
disagree
 23:1, 26:20
 37:5, 37:7
discharged

16:15
discipline
 6:12
discrimin...
 5:25, 6:1
discrimin...
 5:24, 6:12
discussed
 60:13
disperse
 38:1, 38:5
 38:11
 38:12
 38:13
 38:22, 39:1
 39:4, 39:23
dispute
 10:14
 10:15
 10:24
District
 1:1, 1:1
 4:19, 4:19
disturbance
 30:12
 31:18
disturbances
 30:9, 42:17
DIVISION
 1:2
do's 19:4
document
 11:8, 11:9
 11:12
 15:17
 15:18
 56:16
 61:14
documented
 23:13
 23:15
documenting
 23:14, 35:5
documents
 21:11, 22:2
 22:3
doing 8:2
 8:9, 10:13
 36:16
 60:19
Don 1:3

5:4, 10:6
 10:15
 10:22
 21:15
 48:22
 48:24, 49:3
 49:5, 49:12
 52:10
 56:11
 56:13
 57:12
don'ts 19:4
door 62:10
doubt 34:20
draft 11:4
 22:3, 46:9
 46:15
 46:15
drafted
 11:3, 11:19
 21:8, 21:20
 21:20
 24:14
 46:10, 47:1
 47:5
drafting
 46:21
driven
 48:10
driver's
 53:23
drop 58:22
dropped
 51:10
due 36:25
duly 4:5
 65:4
duties 63:4
duty 12:19
 12:22, 13:1
dye 40:3

E

earlier
 32:21
 59:16
early 46:25
earn 14:14
 14:19
easterly

51:7
Eastern 1:1
 4:19
economics
 14:6
education
 9:24, 14:1
 14:5
effect 40:7
 40:7, 40:13
 61:24
effected
 61:4
effectively
 30:8
effectuate
 61:3, 63:1
effort
 29:13
efforts
 54:2, 54:8
 54:15
 55:14
eight 24:7
either 6:3
elaborate
 33:23
elevated
 18:12, 20:4
 20:8, 20:13
Emergency
 17:8, 26:10
 30:3, 30:4
 30:7
employ
 23:12, 24:3
 37:13
 37:15
 43:15
employed
 6:11, 9:9
 15:12
 15:14
 36:14
 65:10
 65:11
employee
 6:2, 6:3
 6:6, 65:11
employment
 5:25, 6:2

9:24, 10:1
 14:22, 15:2
endorse
 6:15
endorsing
 33:18
energy
 19:10
 29:18
enforcement
 5:13, 13:19
 13:21
 14:10
 33:11
 39:14
enforceme...
 14:8
engaged
 42:18, 43:5
 54:15
 58:13
 59:11, 64:2
entirety
 11:16
equal 31:14
equate
 30:17
equipped
 19:17
error 48:4
ERT 35:4
 47:14
 49:19
 55:10
 58:13
 58:17, 64:3
Essentially
 18:19, 20:1
estimate
 5:10, 5:18
 18:16, 51:9
estimation
 52:1, 52:3
et 4:17
 4:24
ethnicity
 6:4
evening
 52:7, 52:22
 57:15, 60:1
 60:3, 60:15

event 22:19
46:14
events 10:3
21:13
46:13
46:18
46:20, 47:6
eventually
15:8
exactly
17:11
EXAMINATION
2:6, 2:8
4:9, 64:10
Examiners
65:20
example
29:11
Excellent
14:14
excessive
5:2, 10:8
27:21
29:14
executives
29:2, 29:4
exercise
27:9, 27:9
exhausted
35:14
Exhibit
2:14, 11:8
15:16
15:21
15:24, 21:8
22:4, 41:15
45:7, 46:7
46:9, 56:20
61:12
62:16
EXHIBITS
2:4, 2:12
expect
40:15
40:25, 41:8
experience
7:19, 13:21
62:17
experienced
20:11
expert

54:17
expressing
29:6
extent
10:20
11:14
17:19, 27:5
eyes 10:17
10:22, 33:4
49:18
49:21

F

face 10:7
20:19
facility
15:10
facing 37:2
fact 10:13
10:15, 50:6
59:5, 59:12
59:13, 60:9
failing
44:13
failure
35:23
43:17
fair 17:24
19:11
32:23, 33:2
33:4, 35:7
35:9, 51:9
62:12
familiar
27:4, 39:10
far 25:3
51:9, 53:2
64:3
fast 8:11
17:14
fear 37:10
February
9:5
federal
4:19, 4:23
feel 16:5
feeling
44:22
fees 65:19
feet 17:13

18:22
20:13
51:12, 64:5
filled 63:7
financially
65:12
fine 7:24
fire 17:1
17:5, 17:25
19:20, 38:2
firearm
16:15, 23:2
firecracker
34:13
firecrackers
34:11
fired 10:14
16:22, 17:3
17:12
18:19
41:19, 42:5
42:13
49:16
49:25
58:11
58:18
64:12
fires 19:10
33:10
33:19
fireworks
34:10
firing
20:19, 34:5
38:16
60:18
Firm 1:14
65:20
firmness
17:15
first 4:5
9:9, 16:17
27:9, 29:7
29:12
29:18, 58:3
60:2, 63:20
63:20
63:22
fist 37:1
fists 49:21
51:14

51:17
flower
33:24
Floyd 12:1
12:12
12:20
12:23
21:13
28:18
29:11
29:20
29:20
30:22, 31:2
fluid 63:7
foam 16:23
17:10
17:11
17:21
17:25, 18:3
18:9, 18:19
19:20
22:10
22:13
24:11
24:17
49:25
51:10, 64:2
focus 10:3
focused
32:8, 33:20
35:21
35:21
focusing
11:22
21:23
folks 44:1
follows 4:8
30:4, 65:2
footage
31:7, 31:11
48:23, 56:9
57:15
57:20
59:21
60:17
force 5:3
10:8, 10:12
19:10
22:15
22:22, 23:5
23:8, 23:12

24:4, 24:15
27:21
27:25
28:11
29:14
33:12
33:12
35:25, 36:7
36:13
36:19, 37:4
37:9, 37:13
37:15
37:18
38:20
38:21
41:16
41:18, 42:2
44:4, 47:20
56:2, 64:15
foregoing
65:5
forgot
56:16
form 12:3
13:1, 19:12
22:17
22:23
23:10
23:21
23:23
26:24, 27:2
27:11
27:17
27:23, 28:4
28:9, 28:14
29:8, 29:15
29:23
30:14
30:18
31:16
32:22
33:17, 36:2
36:7, 36:10
36:20
36:22, 37:6
37:12, 39:7
39:8, 39:15
40:16, 41:3
43:19, 44:5
44:18, 47:4

54:20, 65:7
forward
 56:1
found 29:2
 34:19, 35:4
 35:5
four 30:23
 51:12
Fourth
 27:14
 27:22
free 16:5
freedom
 53:11
front 11:9
 24:23
frozen
 33:25, 35:1
 35:18
full 4:12
 15:14
full-time
 14:22, 15:8
 15:9
function
 38:4, 38:5
further
 27:13

**G**

gain 38:12
 43:15
gaining
 36:12
 37:21
gas 40:3
 40:9
gender 6:3
general
 1:17, 7:15
 21:15
 21:16
 52:13
GENERAL'S
 1:18
generally
 5:22, 6:15
 23:8, 29:12
 36:18
generated

21:18, 22:6
22:8, 47:16
George
 11:25
 12:12
 12:20
 12:23
 21:13
 28:16
 28:18
 29:11
 29:20
 29:20
 30:22, 31:2
getting
 33:24
 36:14
 58:20, 61:9
give 9:22
 14:4, 15:1
 16:8, 37:2
 61:2
given 5:8
 62:9
Glock 23:2
go 7:19
 10:1, 13:14
 16:10
 23:24
 38:25
 46:22, 63:1
goal 38:21
going 7:22
 8:17, 8:18
 9:23, 10:1
 10:3, 13:4
 28:24, 30:5
 36:18
 36:25, 37:2
 42:1, 50:5
 50:23
 50:24, 53:1
 61:9, 62:8
good 4:11
 7:17, 8:2
 8:21, 9:22
 35:24, 45:1
 45:2, 45:3
 47:14
gotten
 56:11

grade 13:14
graduate
 13:17
graduated
 13:24
graduation
 14:23
Graham 28:2
 28:7
ground
 18:14
 20:13
 20:13
 25:10
 43:15
 43:17
 44:13
grounds
 52:4, 56:5
group 28:22
guess 14:7
 16:18
 20:25
 36:15
 52:12, 58:8
guidelines
 39:18
gun 19:25
 43:21
gun-like
 19:21
gunshot
 34:6, 34:12
 34:14
gunshots
 34:1, 34:2
 34:4
guy 62:6
guys 62:2
 62:3

**H**

H-Y 26:7
H-Y-D-R-O-N
 26:9
habit 8:11
hand 21:25
 46:5, 65:21
handles
 19:24

hands 51:20
 52:22
happen 8:6
happened
 10:24
 12:16, 58:5
 58:18
happening
 58:22
hard 17:15
head 17:25
 18:2, 20:9
 20:15
headquart...
 28:25
health
 15:10
hear 8:12
 8:14, 8:17
 37:14
 57:11, 60:2
heard 8:18
 34:2, 34:2
 34:10
heart 5:23
height
 18:16
HEREINBEFORE
 4:4
hereto
 15:22
 65:11
hey 44:9
 44:21
high 13:15
 13:17
 13:18
 13:24
 14:23
high-ranking
 20:11
higher
 18:14, 20:4
 20:20
HIPAA 54:19
history
 9:24, 10:2
 46:22
hit 40:14
 40:23, 48:9
 48:10, 49:5

49:12, 50:9
 50:18
 50:18
 50:21, 51:1
 53:10
 55:18, 58:3
 58:21
 58:23
hitting
 38:16
hold 61:24
holds 23:2
home 27:16
 60:24
hopefully
 7:23
hopes 15:16
hospital
 55:7
house 28:25
 61:25, 62:8
How's 26:6
hundred
 17:13
Hydron 26:1
 26:3, 26:5
hypothetical
 36:19, 44:9
 44:15

**I**

IACP 39:20
 39:24
 41:15
idea 35:24
 48:24
identific...
 15:22
 55:22
identified
 25:23
 54:23, 56:6
 62:11
 63:21
 63:22
 65:16
identify
 54:3, 54:4
 54:8, 55:15
 55:17

| | | | | |
|---|---|---|---|---|
| 55:20 | 9:16 | information | interesting | JOE 1:6 |
| 55:24 | in-custody | 16:6, 59:14 | 13:10 | JOHN 1:6 |
| 55:25, 62:4 | 53:15 | 61:2 | interference | 1:7 |
| identifying | inaccurate | informed | 59:25 | joining |
| 56:2, 57:5 | 57:8 | 58:8, 59:5 | Internati... | 13:22 |
| identity | incident | inherent | 39:10 | 13:25 |
| 49:15 | 21:17 | 8:10 | Interroga... | July 60:22 |
| 53:25 | 21:20, 46:4 | initials | 2:14 | June 9:6 |
| ii 42:15 | 47:20 | 46:6 | interroga... | 10:3, 10:7 |
| image 56:7 | 53:20 | injured | 20:22 | 11:4, 11:5 |
| 56:9 | incidentally | 31:22, 32:6 | Intuitively | 11:19 |
| imagine | 41:15 | 32:10 | 20:12 | 11:24 |
| 27:6, 27:13 | include | 32:11 | invested | 12:20 |
| immediate | 29:3, 42:16 | 32:24 | 29:1 | 12:23 |
| 25:17 | increase | 52:16 | investigated | 12:24, 13:6 |
| 35:17 | 20:14 | injuries | 23:13 | 16:22, 18:4 |
| 42:19 | increased | 31:25, 32:3 | investment | 19:17 |
| 42:23, 43:6 | 20:17 | 32:5, 32:15 | 28:25 | 21:13 |
| 43:18 | increases | 56:14 | involved | 21:21, 22:3 |
| 64:16 | 20:8 | injury | 31:2, 65:17 | 22:7, 24:25 |
| immediately | independent | 20:19 | involvement | 25:15 |
| 50:4, 57:25 | 22:14 | 33:10 | 30:22 | 25:18 |
| imminent | INDEX 2:1 | 37:10 | irritating | 26:11, 30:3 |
| 37:11 | indicates | 42:19 | 36:5 | 30:22, 31:1 |
| impact | 16:21 | 42:23, 43:6 | issue 39:17 | 31:14 |
| 16:23 | 41:18 | 43:18 | issued | 31:23, 32:4 |
| 17:10 | 42:15 | 59:18 | 56:13 | 32:6, 32:12 |
| 17:21 | indication | 59:18 | issues | 32:15 |
| 17:21 | 44:2, 51:23 | 64:17 | 29:19 | 32:18 |
| 17:25, 18:3 | indications | inquiries | issuing | 32:24, 33:5 |
| 18:9, 19:2 | 19:1, 19:2 | 54:11 | 52:13 | 33:21, 40:2 |
| 19:5, 19:9 | 40:15 | 54:12 | | 45:14 |
| 19:15 | indiscrim... | instance | J | 45:14 |
| 19:20, 20:3 | 41:20, 42:5 | 20:20 | | 45:20 |
| 22:10 | 42:12 | 23:25, 24:2 | J-E-F-F-R... | 46:10 |
| 22:13 | individual | 24:5, 35:21 | 4:13 | 46:16 |
| 24:11 | 20:4, 20:15 | 47:13 | Jackson | 46:17 |
| 24:17 | 28:11, 41:5 | 53:22 | 13:9 | 46:18, 47:6 |
| 36:20 | 43:5, 43:5 | 54:21 | jail 62:1 | 47:8, 52:7 |
| 37:17 | 53:22, 56:5 | instances | 62:18 | 52:10 |
| 39:23 | individual's | 42:12 | 62:21 | 52:24 |
| 40:20 | 17:25 | insurance | January | 56:14 |
| 41:19, 42:4 | 53:19 | 65:17 | 31:7, 31:14 | 57:15 |
| 42:16, 43:1 | individually | intake 62:2 | Jeff 1:5 | 57:22, 60:1 |
| 43:15 | 1:5, 1:5 | intended | 4:16 | 60:4, 60:15 |
| 49:25 | 1:6, 1:6 | 17:17 | Jeffrey 1:9 | 62:5, 63:8 |
| 51:11 | 1:7 | 39:17 | 3:2, 4:3 | 63:20 |
| 64:12 | individuals | interest | 4:13, 65:3 | justice |
| impartiality | 17:7, 21:18 | 65:16 | job 8:2 | 14:7, 14:18 |
| 65:13 | 27:15, 28:1 | interested | 15:8, 15:9 | justifica... |
| impressive | 42:18 | 65:12 | jobs 15:9 | 36:7, 44:3 |

44:15
justified
 10:13, 23:6
 23:7, 24:5
 24:7, 36:20
 38:25, 39:6
 39:9
justify
 23:19
 35:25, 37:4

K

keep 32:8
 33:19
keeping
 47:15
Kennedy
 61:24
kept 55:3
key 42:11
kidding
 13:14
kind 12:7
 43:21
 58:20
kinetic
 19:9
knew 54:14
 57:8, 57:10
 57:12
 58:17
knocked
 62:10
know 5:16
 6:21, 7:23
 8:6, 8:13
 12:8, 12:13
 17:9, 18:21
 22:6, 29:5
 29:17, 30:2
 31:24
 31:24
 31:25, 32:5
 32:13
 32:16
 32:16
 32:16
 32:17
 32:17
 33:25, 34:3

34:14
 34:16, 35:4
 38:3, 39:12
 39:16
 39:25, 40:1
 40:4, 40:6
 41:9, 41:11
 43:24
 45:12
 45:18
 48:22
 49:15
 52:24
 53:11
 54:15
 54:17, 55:9
 55:10
 55:22, 56:9
 58:4, 58:18
 58:23
 59:20, 60:6
 60:6, 60:8
 60:9, 61:9
 61:17
 61:25, 62:2
 62:13
 62:23
 63:21, 64:6
 64:13
 64:18
knowingly
 65:16
knowledge
 11:5, 21:9
 22:4, 32:11
 55:5, 58:10
knows 51:22

L

L-E-W 7:8
L-E-W-I-S
 7:9, 7:11
 7:13
L-O-U 7:8
Lann 54:16
 56:8, 56:8
 56:9
large 28:25
 42:2
largely

56:22
late 46:25
launcher
 19:22
 19:23
Laux 1:14
 1:14, 2:6
 2:8, 4:10
 4:15, 4:22
 12:5, 15:23
 19:14
 22:20
 22:25
 23:14
 23:25
 24:22, 27:1
 27:4, 27:13
 27:21
 27:25, 28:6
 28:11
 28:16
 29:10
 29:17
 29:25
 30:16
 30:20
 31:17
 31:21, 32:7
 33:18, 36:4
 36:15
 36:24, 37:8
 37:14
 39:10
 39:17, 41:7
 41:12, 42:1
 43:10
 43:22, 44:8
 44:20
 44:24, 45:3
 45:7, 47:7
 53:7, 53:9
 53:10, 55:2
 61:14
 63:11
 63:14
 64:11
 64:19
 64:22
 65:20
law 1:14
 5:12, 13:14

13:19
 13:21, 14:8
 14:10, 23:2
 33:11
 39:13
 65:20
lawful 29:6
lawn 58:14
lawsuit
 4:23, 5:2
 5:25, 6:1
 6:13, 10:6
lawyer 7:17
lawyers
 12:6
lay 17:10
 52:22
lead 45:24
leaders
 25:24
learned
 59:11
 59:13, 60:8
leave 49:12
leaves
 17:12
led 15:7
 15:9
ledger 55:3
 55:5
left 53:2
legal 28:2
 56:10
less-lethal
 16:15
 16:19
 16:22
 17:20, 36:8
 36:13
 37:20, 38:8
 43:1, 44:4
 44:16
Letter
 41:17
level 18:14
 64:15
Lewis 7:7
 7:11
license
 53:23
lieutenant

9:8, 25:7
 25:25, 26:1
 45:20
 45:20, 63:3
light 54:19
likelihood
 20:9, 20:14
likewise
 30:16
limitations
 41:18
limited
 43:12
 44:14
line 36:6
 47:19
 49:20, 50:3
 50:7, 50:24
 58:14
 59:22, 64:3
 64:3, 64:4
list 65:17
litigant
 7:6, 65:17
litigation
 5:16, 5:23
little 1:15
 1:19, 7:18
 10:1, 11:22
 11:22
 11:23
 12:16
 14:20
 17:15
 21:14, 29:3
 31:14
 32:21
 44:22, 46:6
 61:1
LLOYD 1:3
local 4:21
long 7:24
 19:24
 28:12
 28:12
 36:14
look 15:15
 15:17
 27:25
 29:25
 42:15

43:22, 44:8
45:7, 54:18
58:6, 61:11
looked 11:1
looking
  15:4, 48:23
  54:21, 62:8
looks 19:24
  21:2, 30:3
  48:24
lot 10:20
lower 41:23
Lt 45:11
  47:11

**M**

M-E-R-Z
  61:16
Maj 25:11
  25:12
  25:21
major 25:8
  25:11
making
  54:10
  54:11
man 6:6
  6:8, 6:10
  62:8
manage 30:8
management
  39:21
  41:14
manner
  49:20
marching
  29:3
marked 2:13
  11:7, 15:15
  15:21, 22:4
  41:15
Marks 25:12
  25:21
master's
  14:7, 14:18
matter 4:17
  6:21, 53:11
  65:18
matters
  65:4

mean 27:7
  31:17, 32:7
  34:20, 40:2
  41:7, 44:21
  45:17
  45:17
  48:13
  52:12
  52:12
  57:22, 58:6
meaning
  19:9
meant 32:21
measures
  18:23
medical
  40:24
  40:25, 41:8
  52:25
  54:18, 55:2
  55:11
medics
  40:24
member
  26:10
  26:13, 30:2
  58:13
members
  17:7, 35:4
  49:19
  55:10
memorandum
  21:11
Memory
  46:10
MEMS 54:8
  54:22
  54:25, 55:3
mental 15:9
mentioned
  13:2, 42:22
Merz 61:6
  61:16
  62:13
method 65:6
MICHAEL
  1:14
Mike 44:21
  45:6
mind 22:22
  37:2

Mine 25:19
minor 31:25
minority
  6:3
minute 16:8
minutes
  16:4
misconduct
  20:23
misrememb...
  46:11
  46:13
missed
  25:25
Mississippi
  13:9
mistake
  48:2
model 39:17
  39:20
  39:24
  41:14
  41:14
  42:25
moments
  40:24
morning
  45:11
Moses 48:22
mouth 51:15
move 36:5
  58:14
moved 55:10
moving 36:6
  38:24
  51:15
multiple
  21:20
  40:23, 49:5
  49:13
munition
  16:16
  16:19
  43:15
munitions
  17:20
  22:18, 36:8
  36:20
  37:20, 38:8
  42:16, 43:1
mute 53:7

**N**

name 4:12
  7:6, 7:10
  26:2, 54:5
  62:9, 62:13
  63:21
named 4:4
  4:23
narrative
  11:14
  11:15, 47:7
  49:3, 54:4
  54:7
National
  31:7
necessarily
  30:12
necessary
  17:18, 63:3
  63:5
neck 17:25
  18:2, 20:9
need 16:4
  23:5, 23:6
  54:18
negative
  54:9
negligible
  20:18
neither
  65:10
neutralize
  24:6
never 16:1
  53:1
night 63:20
nine 13:3
  32:1
nine-page
  15:18
Noah 1:17
  7:15
non-compl...
  38:23
non-law-e...
  14:1
north 36:25
  50:5, 50:24
  51:2, 61:1
note 15:17

21:12
noticed
  47:18
  51:19
notified
  47:25, 48:1
  48:5, 48:5
notion
  51:25
nuclear
  29:18
Number 2:2
  16:12
  16:14
  16:21
  16:21, 21:2
  21:3, 21:4
  45:7, 56:20
  62:16
numbered
  3:5

**O**

oath 4:8
object 12:3
  19:12
  22:17
  22:23
  23:10
  23:21
  23:23
  26:24, 27:2
  27:11
  27:17
  27:23, 28:4
  28:9, 28:14
  29:8, 29:15
  29:23
  30:14
  30:18
  31:16
  33:15
  33:17, 36:2
  36:10
  36:22, 37:6
  37:12, 39:7
  39:15, 41:3
  41:10, 43:8
  43:19, 44:5
  44:18, 47:4

54:20, 63:7
objection
 31:19
objections
 12:7, 12:10
objective
 28:7
objectively
 28:12, 37:9
objects
 33:10
obligations
 63:4
observations
 31:5
observe
 10:17, 17:5
observed
 47:8, 49:18
 58:16
 58:19
 60:14
obviously
 7:2, 26:22
 26:22
 43:22
 54:23
 59:17
 63:21, 64:6
OC 40:9
occasion
 16:14
occasional
 8:11
occasionally
 36:18
occasions
 5:10, 34:3
occupy 9:6
occur 46:13
occurred
 40:20
 46:21
 46:23
 47:19
odor 40:16
 41:1
office 1:18
 11:2, 62:20
officer
 5:13, 20:11

25:17
28:11
28:17
33:12, 37:9
37:25
38:18
53:24
54:18
officers
28:1, 37:2
53:18, 61:6
61:15
61:21
62:24
62:25
62:25
official
21:12
47:15
Oh 13:10
45:18
okay 5:18
7:1, 7:14
7:20, 7:21
7:25, 8:1
8:3, 8:4
8:7, 8:8
8:14, 8:15
8:19, 8:21
8:23, 9:6
9:25, 10:3
10:4, 10:24
11:1, 11:11
11:18, 12:5
12:10
12:11
12:17
12:18, 13:4
13:6, 13:7
13:13
14:22
15:20, 16:8
16:13, 17:9
19:24, 20:2
20:22, 21:6
21:19
21:23
21:24, 22:1
22:20
23:17, 24:9
24:22

25:22
26:10
26:20
26:21
28:16
32:20, 33:2
34:25
41:12, 42:3
42:4, 43:4
43:13
44:11
44:12
44:20, 45:8
45:9, 46:2
46:15, 48:8
54:13, 58:6
62:22
63:10
63:25, 64:2
64:19
64:22
old 13:12
once 8:21
24:11
47:25
one-page
61:11
ones 29:21
ongoing
6:23, 7:4
online
48:23
open 40:8
operations
46:12
operator
18:10
opinion
37:19
opposed
52:13
opposite
37:3
oral 1:8
3:2, 65:17
order 30:21
37:8
ordered
60:23
original
65:13

Ouachita
14:16
outcome
65:12
overall
44:6
overview
9:22
owned 29:1

P

P-A-U-L
4:13
p.m 1:10
1:10, 3:7
64:25
P.O 1:22
65:25
page 11:15
16:12
41:16
41:22
41:23
41:25, 42:3
52:2, 56:21
57:4
pages 65:5
Pain 17:18
part 11:11
30:5, 30:6
56:22, 60:2
part-time
15:9
particular
25:6, 37:22
particularly
8:9
parties
65:10
65:11
65:15
65:15
party 6:19
path 15:7
15:7
Paul 4:13
PAVA 40:12
peaceably
26:23
peaceful

27:9
people
11:25
38:17
61:17
pepper 17:5
40:16, 41:4
pepper-sp...
40:7
PepperBall
16:18, 17:1
17:3, 17:6
22:13, 23:3
40:1, 40:7
40:14
40:23, 41:1
48:10
49:25
50:19
PepperBalls
48:11, 49:6
49:13
50:21, 51:1
perceived
29:13, 47:8
perception
31:4
perfectly
7:24
perform
53:19
person
17:10
27:16
35:25, 36:6
36:7, 36:16
37:4, 37:9
40:15, 41:1
43:22, 44:9
44:11
44:17
47:12, 48:8
53:18
53:19, 54:3
54:5, 54:25
55:18
person's
53:19
53:24
personal
31:4, 32:11

personally
 60:14
personnel
 40:25
 40:25, 41:9
persons
 20:12
 65:16
pertaining
 11:19, 30:1
pertains
 21:15
PETA 28:22
 29:2, 29:5
 29:17
pgs 2:14
Philip
 25:25, 26:1
photograph
 56:7, 62:5
 62:7
photos 35:6
phrase
 38:13
phrased
 58:21
physical
 60:21
physically
 37:1, 60:24
picture
 35:3, 56:3
pictures
 35:5
piece 37:2
pinkish
 48:21
pinning
 32:15
pivot 51:10
plaintiff
 1:3, 1:13
 3:3, 5:4
 11:8, 57:4
plaintiff's
 2:13, 15:21
 56:20
 61:14
 65:19
platform
 18:16

please 4:11
 4:15, 8:6
 8:13, 16:5
 33:8
pliable
 17:14
pockets
 51:22
point 6:10
 13:10
 13:19
 47:16
 51:10, 54:9
 55:17
 55:19
 57:10
 57:13
 57:19
police 6:1
 6:11, 8:25
 9:10, 10:2
 13:22
 13:25
 14:24
 14:24, 17:8
 19:7, 29:13
 29:21
 29:25, 30:7
 36:6, 38:8
 39:11
 39:18, 42:9
 53:5, 55:19
 57:14
 57:17
 57:19
 60:10, 61:1
 61:4, 61:6
 62:19
policies
 30:1, 39:16
 39:17
policy 30:4
 30:6, 38:8
 39:20
 39:24
 41:14
 42:25
portion
 11:14
 11:15, 47:7
poses 42:18

43:6
position
 8:25, 20:8
positioned
 18:11
positive
 61:23
possession
 57:14
 57:16
possibili...
 8:10
possibility
 53:24
possible
 34:13
 47:23
possibly
 20:16
potentially
 64:7
pounds 52:1
powder 40:6
 41:5
practices
 6:1
preceding
 57:25
precisely
 38:19
preferred
 50:5, 65:16
premises
 35:24
prepared
 56:17
 65:19
prepped
 7:17
present
 25:7
presenting
 64:16
presumably
 9:17
presume
 8:18, 26:16
prevent
 33:13
prior 13:22
 20:23

28:17
 57:21, 65:4
privacy
 54:17
privileges
 6:17
probably
 10:2, 10:19
 60:6, 60:8
problem
 8:10
Procedure
 3:4, 65:9
procedures
 26:15
proceed
 4:18
proceeding
 5:18, 65:11
proceedings
 4:1, 5:16
 65:6
processed
 53:1
processing
 62:24
produced
 3:3, 34:5
professional
 13:21
projectile
 10:7, 10:9
 10:14
 10:21, 19:9
 20:3, 38:4
 43:4, 44:16
 53:11, 58:4
 58:22
 58:23, 59:2
 60:19
 64:13
projectiles
 5:3, 17:21
 19:2, 19:5
 19:10
 19:15, 20:3
 38:10
 38:19, 39:1
 39:23
 41:19, 42:4
 42:13

42:17, 43:2
promoted
 9:3, 9:19
promotion
 6:17, 6:18
promulgated
 28:2, 28:6
proper 38:4
 38:5
property
 33:9, 33:13
 33:19
protecting
 44:1
protections
 54:19
protects
 27:15
protest
 12:12
 12:20
 26:23
 28:17
 28:17
 28:21
 29:11
 29:12
 29:20
 29:20
 30:11
 31:18
protester
 32:11
 37:20
protesters
 29:5, 31:23
 32:4, 32:24
 33:5, 34:16
 35:16
 36:24
 60:14
protesting
 27:8, 27:9
protests
 11:25, 12:1
 12:23
 21:14
 28:18
 29:10
 29:17
 29:19, 30:8

30:22, 31:2
45:23
protocol
26:15
provide
65:14
provided
19:7, 56:7
provider
65:16
providing
15:23
public
11:24
28:17
30:11, 43:7
publicly
15:4
Pulaski
62:19
pull 22:14
23:4, 23:7
23:18, 24:6
24:7
pulled
24:11
pulling
23:19
pulls 22:21
23:5
purports
21:12
pursuant
3:4
pursue 14:1
put 39:8
46:5, 46:6
46:23, 47:2
59:7
putting
34:16
52:18

Q

quarter
44:25
question
7:5, 8:6
8:13, 8:16
12:6, 12:8

14:10
16:17, 19:3
20:24
20:24
31:20
31:21
32:14
33:20, 39:9
47:14, 58:3
60:2
questions
7:22, 9:23
10:20
12:10, 13:5
15:24
20:22
44:23
62:12
63:11
63:12
63:13
63:19
64:19
quick 16:10
63:19
quickly
36:16
quite 8:12
8:17

R

race 6:3
ran 46:11
random
38:17
ranges
20:16
rank 9:6
rapid 34:15
read 30:6
30:6, 39:20
reading
65:8
reads 30:4
reason
47:24, 63:1
reasonable
28:12
37:10, 44:8
reasonabl...

28:7
recall 5:22
7:6, 9:3
15:23
35:17
47:23
48:19, 52:8
59:15
59:16
Received
62:18
recollection
50:22
recommend...
39:16
record 4:12
4:15, 7:20
8:24, 12:7
64:23
records
11:1, 54:8
54:18
54:22, 55:2
red 48:9
48:20, 57:6
reddish
48:16
REDIRECT
2:8, 64:10
reduced
65:7
refer 12:12
referred
18:6
referring
11:7, 11:25
12:15
refers
42:25
reflect
4:15
reflected
15:24, 46:7
reflective
22:9
reflects
56:22
refusing
43:14
49:12, 50:6
regard

33:23
regarding
20:23
regular
23:2
Regulations
65:20
relate 5:12
55:2
related
39:20
42:16
65:10
relates
33:21, 55:3
relating
11:3
relative
65:11
relinquish
65:13
rely 8:19
remember
5:20, 7:24
32:13
35:20
46:11
46:24
repeat 8:13
26:2, 31:20
repeated
40:14
repeatedly
48:9
rephrase
8:6
report 11:3
11:4, 11:7
11:18, 22:6
22:8, 24:14
24:18
24:20
24:21, 45:8
45:10, 46:3
46:9, 47:8
47:12, 49:3
56:22
57:24, 58:7
58:12
58:15, 59:4
59:8, 59:23

reported
25:8, 34:18
34:18, 65:6
Reporter
2:10, 3:7
53:8, 65:2
65:20
65:24
REPORTER'S
65:1
REPORTING
1:21
reports
21:7, 21:17
21:21
47:16
47:20
represent
53:15
represented
7:14
represents
23:4, 23:7
request 3:3
65:19
requested
65:8
required
61:2
requires
65:13
65:14
residences
29:4
residing
13:11
resolved
6:21, 6:22
respect
24:9
Response
17:8, 26:10
30:3, 30:4
30:7
restricted
53:12
restrictions
41:17
retired
6:13, 25:14
retirement

6:14
right 6:24
9:9, 12:19
13:4, 24:5
24:7, 24:8
26:23, 27:1
35:18
37:16, 42:3
43:24, 44:7
45:7, 45:22
45:22
46:17
48:25
50:25
51:20
51:21, 55:7
55:8, 55:16
60:12
61:16
63:19, 64:9
right-hand
41:23
rights
27:10
riot 30:17
30:25, 31:1
31:10
31:13
31:18
riotous
33:6
riots 30:9
45:24
risk 20:17
20:19
roads 29:3
rock 1:15
1:19, 11:22
11:22
11:23
12:16
14:21
21:14, 29:3
31:14, 45:1
61:1
rocks 33:24
33:25
35:11
35:14
35:18, 63:7
role 52:18

round 10:9
16:23
17:10
17:22, 18:4
18:9, 18:19
22:10
22:14
24:11
24:17
40:12
49:25
51:11, 58:9
58:9, 58:11
58:13
59:11, 64:2
64:12
rounds 17:1
17:3, 17:6
17:25, 18:3
19:21
38:18
40:14
40:20
40:24
routinely
55:1
rules 3:4
4:18, 4:20
4:21, 7:19
17:19
17:20
17:21, 65:9
run 8:12
running
46:12
Ryan 1:5
5:3, 10:8
10:14
10:20, 52:4
58:1, 60:6
60:18

S

S-H-E-E-L...
4:14
sake 11:21
salesman
15:3, 15:5
sat 18:17
18:18

saving
29:17
saw 21:1
33:8, 33:21
34:2, 35:1
35:15
49:11
49:12
49:21
51:17, 56:5
58:21
saying
21:20
23:15
23:18, 38:3
38:21, 47:1
51:13
says 30:6
30:6, 42:4
54:7, 62:18
school
13:14
13:14
13:15
13:17
13:18
13:24
14:23
sciences
15:7
scope 37:22
seal 65:21
search
53:19
searches
27:15
second
11:15
17:14
24:24
41:25
58:11, 64:2
seconds
61:10
section
42:1, 49:3
65:20
security
28:20
see 6:15
10:22

15:11
16:24, 17:3
20:12
20:14
26:18
26:19, 33:4
34:5, 34:18
34:22, 35:1
35:3, 35:5
35:8, 35:8
35:18
41:21, 42:6
42:20
43:21, 46:7
52:4, 52:7
57:16, 58:3
59:1, 60:12
61:13
61:17, 63:6
seen 31:7
31:11
57:21
seizure
27:22
seizures
27:16
sense 8:5
8:7, 28:20
sent 61:20
61:23
61:25
sentence
54:7
separately
23:13
separating
23:15
September
65:21
sequential
30:21
sergeant
26:1
sergeants
25:9, 25:22
series 7:22
11:24, 34:2
serious
31:15
31:15
37:10

42:19
42:23, 43:6
43:18
64:16
seriousness
30:21
serve 39:18
service
65:14
set 33:10
39:16
Sgt 25:24
shake 37:1
shape 13:1
Sheeler 1:5
1:9, 2:14
3:2, 4:3
4:11, 4:13
4:16, 4:22
65:3
sheer 47:14
sheet 15:19
16:1
Sheriff's
62:19
shirt 48:8
48:16
48:17
48:20
48:21, 57:6
shooting
20:12
short-cir...
10:19
short-cir...
15:16
shorts 48:9
48:17
48:20
48:21, 57:6
shot 59:1
shotgun
10:21
19:14
19:17
22:12
22:13, 23:3
38:1, 38:4
39:4
shouting
49:19

show 40:15
Siegfried
 7:7
signed 16:1
signing
 57:21, 65:8
simple
 36:11
Sims 61:6
 61:15
 62:13
simultaneous
 18:20
 23:22, 34:9
 35:10, 53:4
simultane...
 58:12
 59:10
 64:12
single
 19:22
 19:22, 22:9
 24:14
sir 4:25
 5:7, 5:8
 5:9, 5:14
 6:25, 7:16
 9:18, 9:21
 10:11
 11:10, 13:8
 13:17, 16:9
 16:25, 18:7
 21:4, 25:5
 25:20
 37:17
 48:15
 52:21
 52:23
 61:12
sit 49:15
sitting
 18:13
 35:17
 59:17
situation
 44:6, 44:10
 44:19
 53:16
situations
 23:5
slingshot

34:1, 35:4
slingshots
 34:17
 34:23
slower 50:5
Small 42:4
smaller
 41:18
social 15:7
soft 17:14
someone's
 24:3
soon 45:4
sorry 12:23
 13:15, 17:5
 30:1, 33:15
 45:22
 50:17, 53:8
 57:11
sound 34:6
sounds
 17:11
 33:22
source 59:8
 59:14
south 28:25
 50:7, 51:5
 51:8
southeast...
 51:6, 51:8
southerly
 51:5
speak 52:10
speaking
 5:22, 6:15
 8:2, 8:3
 18:20, 23:9
 23:22
 27:21
 29:12, 34:9
 35:10, 53:4
specific
 35:20
 42:18, 44:6
spelled
 26:8
spray 40:17
 41:4, 41:5
spun 50:11
Staley
 25:24

standard
 28:6, 28:8
 37:19, 42:8
 42:22
standards
 28:2
started
 50:11
starting
 14:23
state 4:12
 6:11, 8:25
 9:10, 10:2
 13:22
 13:25
 14:24
 14:24, 17:8
 19:7, 29:25
 30:7, 32:9
 38:7, 42:9
 55:19
 57:14
 57:17
 60:10, 61:4
 61:6, 61:25
 62:18, 65:2
statement
 17:24
 56:12
 56:25
States 1:1
 39:14
steel 15:3
 15:4
step 45:10
Stephens
 28:24, 29:2
stick 41:5
stood 18:17
stopped
 50:3, 50:10
 50:11
stopping
 36:17
story 23:16
STREET 1:18
streets
 29:3
strike
 24:10, 55:9
 55:13

55:18
strikes
 40:16
striking
 20:9, 20:14
strive 30:7
strong
 40:16
struck 10:6
 34:3, 56:6
 57:25
stuff 7:3
 21:23
 33:18
 33:23, 35:6
STYLE 2:2
subject
 20:5, 65:8
submitted
 65:8
Subsection
 42:15
subsequent
 45:24
substantial
 59:18
 65:13
subtopic
 41:16
succession
 34:15
suddenly
 49:19
suffer
 31:24
suggest
 58:6
SUITE 1:15
 1:18
superior
 45:15
 45:15
supervising
 25:17
supervision
 65:7
supplied
 56:4, 62:7
suppose
 13:10
Supreme 3:6

4:20
sure 7:17
 23:14, 34:4
 34:21
 34:21
 48:22, 56:3
 57:19
sustained
 56:14
SWAT 25:8
 25:10
 26:13
 26:15, 64:4
sworn 4:5
 56:25, 65:4
synonymous
 40:10
 40:11
system
 16:18
 17:12
 22:13, 23:3
 40:1

| T |
| --- |

take 15:6
 15:15, 16:9
 25:2, 29:10
 45:10
 54:24
taken 3:3
 4:16, 56:3
 65:11
talk 8:11
 22:2, 34:19
talked
 50:17
talking
 12:13
 25:15
 34:22
 59:17
tall 18:21
target 20:5
targeted
 29:2
taught 20:3
 20:7
team 17:8
 25:24

| | | | | |
|---|---|---|---|---|
| 26:10 | Thanks 45:6 | 33:23, 63:6 | 20:7, 26:15 | 18:15, 47:9 |
| 26:13, 30:3 | thing 62:17 | thrown | 38:10 | 47:10, 49:8 |
| 30:4, 30:7 | 62:18 | 33:10, 35:2 | training | 49:13 |
| tear 40:3 | 62:23 | thrust 5:2 | 19:7 | 49:14 |
| 40:9 | things | 5:5 | transcribed | 49:16 |
| tear-gas | 21:19 | tie 22:25 | 65:7 | 49:17, 50:8 |
| 40:6 | 26:18 | ties 52:18 | transcript | 58:24 |
| technical | 26:19 | time 7:3 | 65:14 | 58:25, 59:5 |
| 8:10, 62:23 | 37:24 | 13:24 | 65:19 | 59:6, 65:5 |
| Technically | 43:21 | 15:14 | transcrip... | truly 32:2 |
| 27:21 | think 5:17 | 23:18, 25:6 | 65:6 | truth 4:6 |
| teeth 51:15 | 6:23, 13:3 | 31:10, 36:5 | transferred | 4:6, 4:7 |
| tell 11:2 | 15:18, 21:1 | 46:20 | 54:25 | 65:4 |
| 13:13, 35:1 | 23:1, 23:1 | 48:22 | 62:19 | truthful |
| 44:24 | 34:19 | 51:13 | transitioned | 7:25 |
| 51:15, 54:2 | 36:11 | 51:23, 52:3 | 15:6 | try 8:21 |
| 58:5, 61:1 | 36:11, 39:8 | 52:5, 52:10 | transport | trying |
| tells 12:8 | 39:23 | 52:15 | 54:21 | 36:15 |
| tendency | 40:12 | 52:22, 54:3 | transported | 46:22 |
| 65:13 | 42:11 | 57:8, 58:17 | 54:22, 55:6 | tube 17:13 |
| tendered | 42:14, 44:6 | 58:22, 60:9 | 62:1 | turn 49:19 |
| 11:1 | 44:24 | 60:19, 63:8 | traveled | turned 50:7 |
| tennis | 46:10 | 63:15, 64:6 | 51:9 | 50:20, 51:4 |
| 17:15 | 46:20 | 64:7, 64:12 | treated | turning |
| 17:16 | 48:20 | 64:15 | 40:24 | 59:22 |
| tenure 9:16 | 55:14 | timely 36:1 | trigger | turns 8:2 |
| termed | 57:10 | times 24:7 | 22:14 | 36:25 |
| 16:18 | 57:12 | 49:5, 49:13 | 22:21, 23:4 | turret 18:8 |
| 31:13 | 57:12 | to-wit 4:8 | 23:6, 23:7 | 18:10 |
| termination | 57:18 | today 9:11 | 23:19 | 18:11 |
| 6:12 | 57:18 | 35:17 | 23:19, 24:6 | twice 24:6 |
| terms 30:20 | 60:16 | 45:15, 49:2 | 24:11 | two 5:11 |
| 30:23 | 63:11 | 49:15 | trooper | 5:12, 10:17 |
| 31:17 | third-party | told 7:3 | 9:16, 17:24 | 10:22, 15:5 |
| 31:18, 44:1 | 65:17 | 8:24 | 18:24, 20:4 | 23:5, 25:9 |
| testified | thorough | top 18:4 | 20:7, 20:11 | 25:22, 34:2 |
| 4:7, 46:3 | 47:17 | 18:10, 25:2 | 32:11 | 40:10 |
| 53:15 | thought | 25:4, 45:10 | 35:19, 43:7 | 46:22 |
| 55:14 | 58:9, 58:9 | topic 7:5 | 49:16, 63:7 | 49:21, 61:5 |
| testify 4:6 | threat 24:6 | total 13:3 | 64:3 | 61:10 |
| 32:2, 32:9 | 42:19 | 15:18 | troopers | 61:25 |
| testimony | 42:23, 43:6 | town 13:8 | 31:22, 32:4 | type 14:1 |
| 5:19, 32:8 | 43:18 | 28:22 | 32:6, 32:23 | 21:12, 40:1 |
| 49:2, 65:4 | 64:16 | Tpr 61:23 | 33:20 | typewritten |
| testing | three 13:12 | 61:24 | 33:22 | 65:7 |
| 29:1 | 15:14 | 61:25 | 35:16, 40:2 | |
| Thank 7:12 | 51:12 | track 15:6 | 60:14, 61:5 | **U** |
| 7:14, 9:15 | 62:12 | traded 15:4 | 61:7, 61:18 | |
| 21:6, 25:13 | three-page | trained | 61:25, 62:3 | unarmed |
| 53:9, 63:14 | 11:8 | 18:23, 19:1 | 62:7 | 37:1, 37:20 |
| 63:16 | throwing | 19:4, 20:2 | true 18:14 | undergrad... |

14:6, 14:11
14:13
14:15
underneath
25:9
understand
4:22, 5:2
5:5, 10:5
10:10, 19:3
23:3, 29:11
32:19, 37:8
understan...
7:2, 41:6
56:1
understood
7:5, 8:18
8:20, 14:18
14:22
15:15, 29:5
34:16, 46:1
unintended
38:20
United 1:1
39:14
universe
22:2
University
14:16
14:20
unknown
17:7
unreasonable
27:15
unruly
36:25
upper 17:25
20:9, 20:15
usage 39:6
use 5:3
10:12, 12:5
19:2, 19:20
22:9, 22:14
22:22, 23:4
23:8, 24:15
28:11
30:23
30:24
31:12
33:12
35:25, 37:4
37:8, 37:25

38:5, 38:20
38:21
38:25
41:16
41:18, 42:2
43:4, 44:3
44:3, 44:15
44:19
47:19, 56:2
64:15
use-of-force
22:6, 22:8
24:14
24:19
uses 20:8
27:25
utilize
60:10

V

vacate
35:23
vacating
36:16
vehicle
18:4
veracity
34:20
verbatim
65:6
verification
15:19, 16:1
verify 16:5
victim 56:2
video 31:11
48:23
57:21
57:22
59:21
60:17
VIDEOCONF...
1:11
violence
33:20
33:22
35:15
60:13
violent
33:6
VIP 28:20

voice-wri...
65:6
volume
47:14

W

Waid 1:20
1:21, 3:6
65:2, 65:24
waidrepor...
1:25
wait 46:3
walking
50:10
wallet
53:22
want 26:18
32:7, 32:8
33:19
34:21
34:21
36:12
38:15
43:25
47:15
wanted 15:6
wants 38:19
warrant
54:18
56:12, 62:9
water 34:1
35:1, 35:10
35:14
35:18, 40:3
63:6
Watson 1:17
2:7, 7:15
7:17, 12:3
12:8, 19:12
22:17
22:23
23:10
23:21
23:23
26:24, 27:2
27:11
27:17
27:19
27:23, 28:4

28:9, 28:14
29:8, 29:15
29:23
30:14
30:18
31:16
31:19
33:15
33:17, 36:2
36:10
36:22, 37:6
37:12, 39:7
39:15, 41:3
41:10
41:25, 43:8
43:19, 44:5
44:18
44:21, 45:6
47:4, 54:20
63:12
63:18, 64:9
64:21
Watson's
11:2
wax 43:23
way 13:1
33:3, 45:17
45:19
53:23
58:21, 59:7
59:9
we've 13:2
15:15, 22:4
weapon
16:22
17:13
22:20
22:24, 34:5
weaponry
51:20
weapons
43:1, 44:16
wearing
48:8, 48:16
48:20, 57:5
57:13
59:25, 60:3
WEDNESDAY
1:10
went 13:13
33:19

47:16, 54:6
WEST 1:15
whales
29:18
white 48:8
48:17
48:20
48:21, 57:6
wild 38:20
wildly 38:2
38:3, 38:15
WILLIAM 1:6
Wingo 1:5
4:17, 4:24
5:3, 10:8
10:14
10:20, 52:4
55:18, 58:1
60:6
Wingo's
53:10
60:18
64:13
withdraw
31:21, 59:9
witness 3:3
4:4, 6:19
6:20, 24:19
27:18, 45:1
61:13
63:16, 65:8
65:21
witnessed
48:8
woman 6:6
Wonderful
9:6
word 15:3
31:12
42:11
words 8:12
30:23
work 5:12
15:8
worked
28:17
worn 59:25
60:11
would've
25:7
Wow 9:12

```
  15:13
wrap 34:25
  60:12
wrists
  52:20
  53:14
write 58:12
  59:4, 59:7
  59:10
written
  65:17
wrong 8:16
  46:14
  46:23, 47:6
  47:18
  48:12
  58:21
wrote 46:4
  58:15
  59:22

          Y

yeah 7:13
  9:13, 15:14
  18:22, 24:3
  25:14
  43:24
  43:25, 52:3
year 9:3
years 6:18
  9:11, 13:12
  15:5, 15:14
  26:16
  28:24
you-know-...
  36:5

          Z

zip 52:18
zip-tied
  53:14
Zoom 1:11
  8:10, 56:10

          0

0001 11:8
00010 56:21
00011 57:4
```

```
00012 56:21
0003 11:8
0008 61:14

          1

1 2:2, 2:3
  10:3, 10:7
  11:4, 11:5
  11:8, 11:19
  12:20, 18:4
  19:18, 21:8
  21:13
  21:21, 22:3
  22:4, 22:7
  24:25
  25:15
  25:18
  26:11
  30:22
  31:14
  31:23, 32:4
  32:6, 32:12
  32:15
  32:18
  32:24, 33:5
  33:21, 40:2
  45:7, 46:7
  46:9, 47:6
  47:8, 52:2
  52:10
  52:24
  56:14
  57:15
  57:22, 60:1
  60:4, 60:15
  63:8, 63:20
  65:3
10 2:14
  15:16
  15:21
  15:24, 64:5
10385 1:22
10385,Conway
  65:25
12-gauge
  10:21
  19:14
  19:17
37:25, 38:4
39:3
```

```
14 18:22
  20:13
15 2:14
1-5 1:7
165 52:1
17 23:6
1700 1:15
180 51:4
19 65:20
1st 16:22
  30:3, 31:1
  46:18
  46:23, 47:1
  52:7

          2

2 2:4, 65:5
20 28:24
  45:14
200 1:18
2019 5:21
2020 9:7
  10:3, 10:7
  11:4, 11:5
  11:23
  11:24
  12:20, 13:6
  16:22, 18:4
  19:18
  21:13
  21:21, 22:3
  22:7, 24:25
  25:18
  26:11
  30:22, 31:1
  31:14
  31:23, 32:4
  32:12
  32:24, 33:5
  40:2, 45:14
  45:21, 47:9
  52:8, 52:10
  52:24
  57:22, 60:1
  60:4, 60:15
  63:8, 63:20
2021 60:22
62:5
2023 1:10
  3:6, 9:5
```

```
65:3, 65:22
23 1:10
  65:3
23rd 3:5
24th 65:21
25 9:11

          3

3 2:5
  61:12
  62:16
  65:10
3(a 41:17
3:06 1:10
  3:7
30 11:23
30th 12:24
323 1:18
3rd 46:10
  46:16
  46:17, 47:2
  47:5

          4

4 2:6
  16:12
  56:20
  65:12
4:00 44:22
4:22-CV-5...
  1:4
4:30 45:2
4:34 1:10
  64:25
400 1:15
40-millim...
  17:12
  19:22

          5

5 21:3
  21:4, 41:16
  41:23
  41:25
  65:15
501 1:24
```

```
          6

6-1-2020
  46:5
620-0982
  1:24
63 2:7
64 2:8, 2:9
65 2:10
6th 31:7
  31:14

          7

7 11:24
  16:21
710 30:5
72034 1:23
  65:25
72201 1:15
  1:19
7th 12:24

          8

853 1:20
  3:7, 65:24

          9

9 2:14
  16:12
  16:14
  16:21
  41:15
```