**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

DON LLOYD COOK                                                                                    **Plaintiff**

v.                                                  **No. 4:22-cv-00548-KGB**

RYAN WINGO, individually;
JEFF SHEELER, individually;
JOHN S. JOE, individually; and
WILLIAM J. BRYANT, individually                                        **Defendants**[1]

### BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Throughout the United States, rioters had injured and killed law-enforcement officers and civilians. In Little Rock, rioters were attacking officers with commercial-grade fireworks and other dangerous objects, shooting guns downtown, and destroying and setting fire to property. In these circumstances, Don Lloyd Cook knowingly decided to stay out well past a lawfully imposed curfew. Then, he suddenly appeared in front of the line of officers who were clearing the Capitol grounds. When he was about 10 feet away from the line, he faced the officers, and with a red face and clinched fists, started yelling angrily. Two officers observed Cook's interaction with the line and independently determined that use of force was necessary to protect the safety of the officers. One used a beanbag round. The other used a foam impact round. Both were the least lethal options available to the officer.

Cook filed this lawsuit about only one of those uses of force, and a host of claims related to it. But the officer's use of force was objectively reasonable under the circumstances, and even

---

[1] Originally, Cook sued five unnamed ASP troopers. *See* Compl. ¶ 8, Doc. 1. Cook recently moved to dismiss those troopers, so the Defendants will proceed under the assumption that the Court will grant that motion. *See* Mot. Dismiss, Doc. 14; Br. Supp. Mot. Dismiss, Doc. 15.

if not, Cook's right to be free from the use of a beanbag round was not clearly established because no case squarely governs these facts. The Defendants are entitled to qualified immunity.

## Facts

### 1. National and Local Tensions

The days and weeks following George Floyd's death were an undeniably and understandably tense time. *See generally* Derrick Bryson Taylor, *George Floyd Protests: A Timeline*, New York Times (Nov. 5, 2021) [hereinafter, "*Protests Timeline*"], https://www.nytimes.com/article/george-floyd-protests-timeline.html[2]; *see also* Compl. ¶ 15–17. Nevertheless, many of the protests that began peacefully devolved into rioting after nightfall. *See Protests Timeline*; *see also In Little Rock, rally near Capitol turns violent*, Ark. Dem.-Gazette (May 31, 2020) [hereinafter, "*Little Rock Rally Turns Violent*"], https://www.arkansasonline.com/news/2020/may/31/in-lr-rally-near-capitol-turns-violent-/.[3] These "nights of unrest" involved "shootings, looting and vandalism." *Protests Timeline*. Throughout the nation, "officers were shot and wounded" and "injured after being struck by cars." *Id.* Civilians were killed too. *Id.* Minneapolis's own mayor accused the rioters of "domestic terrorism." *Id.*

The situation in Little Rock echoed that in other cities because "Arkansas . . . was not immune to the anger, frustrations and fear of police violence voiced by protests of Mr. Floyd's death." Compl. ¶ 17, Doc. 1. On May 31, 2020, the Little Rock "[p]rotests took a violent turn," with riotous protestors hitting "at least one police officer . . . with rocks," "shooting fireworks at" officers, and smashing car and building windows near the Capitol. *Little Rock Rally Turns Violent*; Ex. 3, ¶ 5

---

[2] A copy of the article is attached as Exhibit 1.

[3] A copy of the article is attached as Exhibit 2.

(Cpt. Sheeler Decl.); Ex. 4, ¶ 11 (Cpt. Joe Decl.); Ex. 5, ¶ 12 (Cpl. Wingo Decl.). Throughout the Little Rock protests, riotous protestors also threw at officers large artillery-shell fireworks, compression bombs, frozen water bottles, bricks, sticks, liquid-filled balloons, and slingshot ball bearings. Ex. 6, at 56:5–16 (Cook Dep.); Ex. 7, at 121:9–18 (Lt. Brown Dep.); Ex. 8, at 34:1 (Cpt. Sheeler Dep.); Ex. 3, ¶ 5 (Cpt. Sheeler Decl.); Ex. 4, ¶ 11 (Cpt. Joe Decl.); Ex. 5, ¶ 13 (Cpl. Wingo Decl.). The Arkansas National Guard even had to be called up. Ex. 7, at 47:25–48:1 (Lt. Brown Dep.); Ex. 3, ¶ 6 (Cpt. Sheeler Decl.).

Because of these events, on June 1, 2020, Little Rock Mayor Frank Scott instituted a 10 p.m. curfew. Ex. 9 (Little Rock June 1, 2020 Press Release); Ex. 6, at 55:18–21 (Cook Dep.). The Capitol building was the epicenter of the protests in Little Rock, so to enforce the curfew, the ASP, in coordination with the National Guard, mustered at Woodlane Street and 7th Street in Little Rock, which is at the southeast of the Capitol grounds. Ex. 3, ¶ 6 (Cpt. Sheeler Decl.); Ex. 4, ¶ 6 (Cpt. Joe Decl.); Ex. 5, ¶ 6 (Cpl. Wingo Decl.). They then formed a line across Woodland and onto the Capitol grounds. Ex. 3, ¶ 7 (Cpt. Sheeler Decl.); Ex. 4, ¶ 7 (Cpt. Joe Decl.); Ex. 5, ¶ 7 (Cpl. Wingo Decl.).



By that time, things had already turned into a "civil disturbance," with people "not listening to lawful commands" and "throwing objects at the police." Ex. 7, at 49:20–50:7 (Lt. Brown Dep.). Around 10:30 p.m., law enforcement announced to protestors that the 10 p.m. curfew was in effect and informed them that it was time to disperse. Ex. 3, ¶ 10 (Cpt. Sheeler Decl.); Ex. 4, ¶ 9 (Cpt. Joe Decl.); Ex. 5, ¶ 10 (Cpl. Wingo Decl.). Many protesters did not leave after multiple dispersal orders, so law enforcement advanced north up Woodlane Street and used CS gas to disperse protesters who were unlawfully gathered past curfew. Ex. 3, ¶ 13 (Cpt. Sheeler Decl.); Ex. 4, ¶ 12 (Cpt. Joe Decl.); Ex. 5, ¶ 13 (Cpl. Wingo Decl.).

Like other nights, the protesting continued to devolve after curfew. Civilians fired "a series of gunshots on at least two occasions." Ex. 8, at 34:2–3 (Cpt. Sheeler Dep.). Some threw artillery-shell fireworks, compression bombs, frozen water bottles, bricks, sticks, liquid-filled balloons, and

slingshot ball bearings at the officers. Ex. 6, at 56:5–16 (Cook Dep.); Ex. 7, at 121:9–18 (Lt. Brown Dep.); Ex. 8, at 34:1 (Cpt. Sheeler Dep.); Ex. 3, ¶ 5 (Cpt. Sheeler Decl.); Ex. 4, ¶ 11 (Cpt. Joe Decl.); Ex. 5, ¶ 13 (Cpl. Wingo Decl.). Some engaged in "[c]riminal conduct, criminal acts, destruction of property, [and setting] fires." Ex. 8, at 33:9–11 (Cpt. Sheeler Dep.). In other words, "[i]t was a riot." *Id.* at 30:25. This was the situation reasonable officers found themselves in on the night of June 1, the night after the most violent night of the protests. Ex. 7, at 126:17–24 (Lt. Brown Dep.).

### 2. The Defendants

There are four Defendants in this case. First, Colonel William J. Bryant. Colonel Bryant was formerly the ASP's Colonel and Director. He held these positions during the May and June 2020 protests. Colonel Bryant was not onsite at the Little Rock Capitol building during the protests. *See* Ex. 10 (Col. Bryant Decl.).

Second, Captain Jeff Sheeler. Captain Sheeler is the ASP's Troop A Commander. During the May and June 2020 protests, he was a lieutenant and was in Little Rock to address safety concerns related to the protests. Specifically, he was the supervisor for and member of the ASP Special Weapons and Tactics unit (SWAT). On June 1, his responsibility was to provide cover for the law-enforcement line, using either lethal force or nonlethal force, as necessary. Captain Sheeler observed Cook's interaction with the law-enforcement line and independently determined that action was necessary. Thus, he employed a foam impact round, fired from a 40 mm single launcher. *See* Ex. 3 (Cpt. Sheeler Decl.).

Third, Captain John Scott Joe. Captain Joe is the ASP's Troop K Commander. During the May and June 2020 protests, he was a lieutenant and was in Little Rock to address safety concerns related to the protests. Specifically, he was the supervisor for and member of the ASP's Emergency

5

Response Team (ERT). Captain Joe was not aware of the incident giving rise to this case until after the fact. *See* Ex. 4 (Cpt. Joe Decl.).

Fourth, Corporal Ryan Wingo. Corporal Wingo is a corporal in ASP's Troop K. During the May and June 2020 protests, he was a trooper first class and was in Little Rock to address safety concerns related to the protests. Specifically, he was a member of the ASP's ERT, and on June 1, 2020, was acting as a grenadier with the responsibility of providing less-lethal coverage for the line. Corporal Wingo observed Cook's interaction with the law-enforcement line and independently determined that action was necessary to stop a potentially dangerous alteration between Cook and the line. Thus, he fired the least lethal weapon at his disposal—a beanbag round from a 12-gauge shotgun. *See* Ex. 5 (Cpl. Wingo Decl.).

### 3.  Cook's Night Out

In the nights before June 1, 2020, Cook had not attended any of the protests in Little Rock that had occurred after George Floyd's death. Ex. 6, at 35:2–6 (Cook Dep.). Something was different about that night.

For supper on June 1, Cook met a friend at U.S. Pizza Company. *Id.* at 38:16–39:4. Cook patronized U.S. Pizza "[a]t least once a week." *Id.* at 40:22–24. And, although he "do[esn't] have an exact memory" of how much alcohol he drank on June 1, he "would drink to intoxication" on other visits. *Id.* at 39:12–20, 45:8–11. At some point during dinner, Cook decided to go to the Capitol to join the protests, though his friend declined to join him. *Id.* at 43:17–22.

Between 8:00 and 8:30 p.m., Cook parked "[a] couple of blocks" east of the Capitol building. *Id.* at 47:5–20. When he walked up, he saw protestors on the street, sidewalks, and grass in front of the Capitol. *Id.* at 48:8–21. He did nothing other than "walk[]" around "in front of the

Capitol in the street . . . and the stairs." *Id.* at 54:15–16, 55:5–9. He was "look[ing] to see if [he] knew anybody." *Id.* at 52:12–14.

Cook knew there was a 10 p.m. curfew. *Id.* at 55:18–21. And he eventually heard the officers' commands to leave. *Id.* at 55:10–15. But it was only when Cook saw the law-enforcement line moving up Woodlane that he decided it was time to go. *Id.* at 58:19–59:7. Although his car was parked to the east, Cook began walking north. *Id.* at 59:11–12. He started out "[w]alking along one of the sidewalks." *Id.* at 69:22–24. As Cook walked, he was "going through tear gas." *Id.* at 69:20–21. He would "[p]eriodically" "turn around and look" "[a]nd then keep walking." *Id.* at 72:18–73:7. Eventually, he turned and meandered onto the grass. *Id.* at 75:25–76:7; Ex. 7, at 71:16 (Lt. Brown Dep.) (Cook's counsel describing Cook as "meandering around").

### 4.  The Incident

Well after curfew, around 10:40 p.m., the officers first saw Cook. Ex. 3, ¶ 16 (Cpt. Sheeler Decl.); Ex. 5, ¶ 15 (Cpl. Wingo Decl.). He emerged from landscaping and a cloud of tear gas. Ex. 6, at 69:20–21 (Cook Dep.); Ex. 5, ¶ 15 (Cpl. Wingo Decl.). The line nearest Cook was spread thin, with little support. Ex. 11, at 1 (Cpl. Wingo Incident Report). And the officers saw that Cook was red faced, had clinched fists, and was yelling at the officers. Ex. 3, ¶ 16 (Cpt. Sheeler Decl.); Ex. 5, ¶ 16 (Cpl. Wingo Decl.). They thus inferred that Cook was angry or highly agitated Ex. 3, ¶ 16 (Cpt. Sheeler Decl.); Ex. 5, ¶ 16 (Cpl. Wingo Decl.).

The distance between the line and Cook closed. Ex. 8, at 49:18–22 (Cpt. Sheeler Dep.); Ex. 3, ¶ 16 (Cpt. Sheeler Decl.); Ex. 5, ¶ 18 (Cpl. Wingo Decl.). When Cook was about 10 feet away, he turned to face the sparse officer line, though (according to him) he did not "advance" on them. Ex. 8, at 64:2–5 (Cpt. Sheeler Dep.); Ex. 3, ¶ 16 (Cpt. Sheeler Decl.); Ex. 5, ¶ 16 (Cpl. Wingo Decl.); Ex. 6, at 74:20–22 (Cook Dep.) (admitting that "[he] do[esn't] know" if his

"direction ever change[d]" during the encounter); Ex. 6, at 170:10–12 (Cook Dep.) (claiming he "did [not] advance toward any police officers"). The officers did not know whether Cook had a concealed gun or other weapon. Ex. 8, at 64:6–8 (Cpt. Sheeler Dep.); Ex. 3, ¶ 17 (Cpt. Sheeler Decl.); Ex. 17 (Cpl. Wingo Decl.). But he could have had one, like other unknown individuals that night. Ex. 8, at 34:2–3, 64:6–8 (Cpt. Sheeler Dep.); Ex. 3, ¶ 17 (Cpt. Sheeler Decl.); Ex. 17 (Cpl. Wingo Decl.).

There was a reasonable concern about an imminent safety threat to the officers on the line. Ex. 5, ¶ 18 (Cpl. Wingo Decl.). Captain Sheeler fired a nonlethal foam impact round at Cook to gain compliance. Ex. 3, ¶ 18 (Cpt. Sheeler Decl.). Corporal Wingo aimed his least-lethal weapon— a beanbag-round fired from a 12-gauge shotgun—at Cook's center mass, in compliance with all his training, and fired three beanbag rounds. Ex. 5, ¶¶ 18–21 (Cpl. Wingo Decl.). The first two shots missed due to environmental factors. Ex. 5, ¶ 19 (Cpl. Wingo Decl.). When Cook went down, Captain Sheeler and Corporal Wingo immediately stopped using force, and then officers broke the line, went to Cook, arrested him, and brought him to a staging area behind the line for medical treatment. Ex. 6, at 81:7–8 (Cook Dep.); Ex. 7, at 61:9–19, 62:12 (Lt. Brown Dep.).

## Legal Standard

Summary judgment should be granted if the Defendants "show[] [that] there is no genuine dispute regarding any material fact and that [they are] entitled to judgment as a matter of law." *McGowen, Hurst, Clark & Smith, P.C. v. Commerce Bank*, 11 F.4th 702, 710 (8th Cir. 2021). Once the Defendants show an initial entitlement to summary judgment, Cook must "show a genuine dispute" exists by "identify[ing] 'specific facts' that are in dispute, thus 'show[ing] that there is [more than] some metaphysical doubt as to the material facts.'" *Id.* (second and third alterations in original) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)).

"If, taking the record as a whole, a reasonable fact finder could not find for the nonmovant, there is no genuine dispute of material fact." *Id.* And even if there is a dispute, the Court simply views the record in favor of the nonmovant. *Westwater v. Church*, 60 F.4th 1124, 1129 (8th Cir. 2023).

## Analysis

The Defendants are asserting qualified immunity, and there are two questions relevant to that analysis:

- Did the plaintiff "demonstrate the deprivation of a constitutional or statutory right"?

- Was "the [alleged] right clearly established at the time of the deprivation"?

*McDaniel v. Neal*, 44 F.4th 1085, 1089 (8th Cir. 2022) (quoting *Jones v. McNeese*, 675 F.3d 1158, 1161 (8th Cir. 2012)). If the answer to either one is *no*, then the Defendants are entitled to qualified immunity. *Watson v. Boyd*, 2 F.4th 1106, 1112 (8th Cir. 2021).

A right is clearly established only "if a reasonable officer in the same position [as the defendant] would understand his conduct violates the right." *Ching ex rel. v. Jordan v. City of Minneapolis*, 73 F.4th 617, 620 (8th Cir. 2023). In other words, it must be "beyond debate" that the challenged conduct is unconstitutional. *Id.* (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011)). In general, it is either the Supreme Court's caselaw or the Eighth Circuit's caselaw that is relevant to determine if a right is clearly established. *See Sok Kong Tr. for Map Kong v. City of Burnsville*, 960 F.3d 985, 992 (8th Cir. 2020). It is the rare case that extra-circuit precedent can clearly establish a right, requiring "a robust consensus" from nonbinding courts. *Perry v. Adams*, 993 F.3d 584, 587 (8th Cir. 2021) (quoting *Graham v. Barnette*, 970 F.3d 1075, 1090 (8th Cir. 2020)).

1. **Corporal Wingo did not use excessive force against Cook, and even if he did, Cook's right was not clearly established.**

An officer's use of force is not excessive if his "actions are 'objectively reasonable' in light of the facts and circumstances confronting" him. *McDaniel*, 44 F.4th at 1090 (quoting *Lombardo v. City of St. Louis*, 141 S. Ct. 2239, 2241 (2021)). This analytical focus is on "the perspective of a reasonable officer on the scene," not the clarity that comes "with the 20/20 vision of hindsight." *Waters v. Madson*, 921 F.3d 725, 739 (8th Cir. 2019) (quoting *Chambers v. Pennycook*, 641 F.3d 898, 905–06 (8th Cir. 2011)). "Qualified immunity protects 'reasonable mistakes' of fact. 'The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Williams*, 27 F.4th at 1351 (citations omitted).

Courts must therefore pay "careful attention to the facts and circumstances of each particular case" because two cases are rarely the same. *McDaniel*, 44 F.4th at 1090 (quoting *Lombardo*, 141 S. Ct. at 2241). This "inquiry is based on the totality of the relevant circumstances, including 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Westwater*, 60 F.4th at 1128 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Cook brings this claim only against Corporal Wingo. Compl. ¶¶ 152–66, Doc. 1. Taking the undisputed material facts (and the disputed ones in Cook's favor), it was not clearly established that a reasonable officer in Corporal Wingo's shoes violated Cook's constitutional rights.

Immediately after George Floyd's death, American citizens engaged in passionate protests. Compl. ¶ 15, Doc. 1. And while many of the protesters engaged in constitutionally protected activity, *id.* ¶ 23, many protests devolved into "nights of unrest, with reports of shootings, looting

and vandalism." *Protests Timeline*. During the rioting, "officers were shot and wounded" and "injured after being struck by cars." *Id.* Numerous civilians were also killed. *Id.* Even in George Floyd's home city (and two days before the incident at issue in this case), things got so bad that the Minneapolis mayor accused rioters of engaging in "domestic terrorism." *Id.* Then, on June 1, officials released autopsies concluding that Floyd's death was a homicide. *Id.* This was the state of the nation, and "Arkansas in June 2020 was not immune to the anger, frustrations and fear of police violence voiced by protesters of Mr. Floyd's death." Compl. ¶ 17, Doc. 1.

The officers in Little Rock faced tensions similar to those elsewhere in the country. On May 31, 2020, the Little Rock "[p]rotests took a violent turn," with riotous protestors hitting "at least one police officer . . . with rocks" and smashing car and building windows near the Capitol. *Little Rock Rally Turns Violent*. Riotous protestors were even "shooting fireworks at" officers. *Id.*

On June 1, in response to the previous night's violence and destruction, Little Rock Mayor Frank Scott instituted a 10 p.m. curfew, effective immediately. Ex. 9 (Little Rock June 1, 2020 Press Release); Ex. 6, at 55:18–21 (Cook Dep.). Each night around 10:30 p.m., the ASP announced that a curfew was in effect and that anyone remaining on the Capitol grounds needed to leave. Ex. 3, ¶ 11 (Cpt. Sheeler Decl.); Ex. 4, ¶ 10 (Cpt. Joe Decl.); Ex. 5, ¶ 11 (Cpl. Wingo Decl.). By that time, things had already turned into a "civil disturbance," with people "not listening to lawful commands" and "throwing objects at the police." Ex. 7, at 49:20–50:7 (Lt. Brown Dep.). Thus, many protesters would not leave after multiple dispersal orders, so law enforcement would advance and use CS gas to disperse protesters who were unlawfully protesting past curfew. Ex. 3, ¶ 13 (Cpt. Sheeler Decl.); Ex. 4, ¶ 12 (Cpt. Joe Decl.); Ex. 5, ¶ 13 (Cpl. Wingo Decl.).

As the officers advanced, the protesting devolved into rioting. Ex. 3, ¶ 12 (Cpt. Sheeler Decl.); Ex. 4, ¶ 11 (Cpt. Joe Decl.); Ex. 5, ¶ 12 (Cpl. Wingo Decl.). Each night, people would

throw dangerous objects at the officers, including artillery-shell fireworks, compression bombs, frozen water bottles, rocks, bricks, sticks, slingshot ball bearings, and liquid-filled balloons. Ex. 7, at 121:9–18 (Lt. Brown Dep.); Ex. 8, at 34:1 (Cpt. Sheeler Dep.); Ex. 3, ¶ 12 (Cpt. Sheeler Decl.); Ex. 4, ¶ 11 (Cpt. Joe Decl.); Ex. 5, ¶ 12 (Cpl. Wingo Decl.). Even Cook, on the night he was injured, saw someone throwing things at the officers. Ex. 6, at 56:5–16 (Cook Dep.). At least one ASP officer sustained injuries from people confronting the officers. Ex. 8, at 332:5–6 (Cpt. Sheeler Dep.); *Little Rock Rally Turns Violent*. And on the night in question, officers heard multiple strings of gunshots nearby. Ex. 8, at 34:2–3 (Cpt. Sheeler Dep.). There can be no doubt: The constitutionally protected expression had ended; "[i]t was a riot." Ex. 8, at 30:25 (Cpt. Sheeler Dep.).

Thus, when the ASP line encountered Cook, the "circumstances [were] tense, uncertain, and rapidly evolving." *Williams*, 27 F.4th at 1351 (quoting *Graham*, 490 U.S. at 396–97). From the perspective of the officers, a man suddenly emerged from landscaping and a cloud of tear gas in front of them, meandering "out on the grass." Ex. 6, at 69:20–25 (Cook Dep.); *id.* at 76:5–7; Ex. 7, at 71:16 (Lt. Brown Dep.) (Cook's counsel describing Cook as "meandering around"); Ex. 5, ¶ 15 (Cpl. Wingo Decl.). When the officers saw Cook, he looked angry. He was red faced, had clenched fists, and was yelling at the officers. Ex. 3, ¶ 16 (Cpt. Sheeler Decl.); Ex. 5, ¶ 16 (Cpl. Wingo Decl.). The line nearest Cook was spread thin, with little support. Ex. 11, at 1 (Cpl. Wingo Incident Report). As the officers advanced, the distance continued to close between them and Cook. Ex. 8, at 49:18–22 (Cpt. Sheeler Dep.); Ex. 3, ¶ 16 (Cpt. Sheeler Decl.); Ex. 5, ¶ 18 (Cpl. Wingo Decl.). While the distance closed, Cook regularly stopped to "turn around over [his] shoulder and look" towards the officers and "then keep walking." Ex. 6, at 72:22–73:7 (Cook Dep.).

When Cook was about 10 feet from the line, he faced the officers, yelling with clinched fists and red face, though he did not "advance" on the officers. Ex. 8, at 64:2–5 (Cpt. Sheeler Dep.);

Ex. 6, at 74:20–22 (Cook Dep.) (admitting that "[he] do[esn't] know" if his "direction ever change[d]" during the encounter); Ex. 6, at 170:10–12 (Cook Dep.) (claiming he "did [not] advance toward any police officers").[4] Where he was, the ASP line was sparse, so safety was a genuine concern. Ex. 5, ¶ 18 (Cpl. Wingo Decl.); Ex. 11, at 1 (Cpl. Wingo Incident Report). The officers did not know whether Cook had a concealed gun or other weapon, but he could have had one. Ex. 8, at 64:6–8 (Cpt. Sheeler Dep.); Ex. 3, ¶ 17 (Cpt. Sheeler Decl.); Ex. 17 (Cpl. Wingo Decl.). But they did know that unknown individuals had already rapidly shot guns nearby and others were throwing dangerous objects at them. Ex. 6, at 56:5–16 (Cook Dep.); Ex. 7, at 121:9–18 (Lt. Brown Dep.); Ex. 8, at 34:1–3 (Cpt. Sheeler Dep.); Ex. 3, ¶ 12 (Cpt. Sheeler Decl.); Ex. 4, ¶ 11 (Cpt. Joe Decl.); Ex. 5, ¶ 12 (Cpl. Wingo Decl.). The late-night rioting that had already happened across the United States and resulted in deaths and serious injuries, including to law enforcement, would have weighed on their minds. *Protests Timeline*.

Corporal Wingo identified Cook's angry demeanor and proximity to the line. Ex. 5, ¶ 16 (Cpl. Wingo Decl.); Ex. 6, at 78:5–7 (Cook Dep.) (admitting that "[he] do[esn't] know" "from how far away [he] got hit"). The threat was also apparent to Captain Sheeler, who had a bird's-eye view of the situation. Ex. 8, at 18:3–22 (Cpt. Sheeler Dep.); Ex. 3, ¶ 8 (Cpt. Sheeler Decl.). Corporal Wingo fired a total of three beanbag rounds. Ex. 5, ¶ 18 (Cpl. Wingo Decl.). Only the third shot, which hit Cook, is relevant to the case. *See Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (holding that a seizure only occurs if the officer "appli[ed] . . . physical force to the body of a person" or, "where that is absent, submission to the assertion of authority" (emphasis omitted) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)); *LaCross v. City of Duluth*, 713 F.3d

---

[4] At the very least, Cook was displaying anger with clinched fists when he turned to look over his shoulder at the officers. Ex. 6, at 74:6–9 (Cook Dep.). Under the totality of the circumstances, whether Cook was fully turned to officers and partially turned to the officers is not material.

1155, 1158 (8th Cir. 2013) (holding that "a *de minimis* use of force is insufficient to support a claim").

Corporal Wingo used beanbag rounds because he reasonably perceived an imminent risk to his fellow officers' safety. Ex. 5, ¶ 18 (Cpl. Wingo Decl.). He aimed center mass, in compliance with all his training. Ex. 5, ¶ 21 (Cpl. Wingo Decl.). Captain Sheeler also independently deemed action necessary, so he fired a nonlethal foam impact round at Cook. Ex. 3, ¶ 18 (Cpt. Sheeler Decl.). The officers' actions dealt with the threat, and neither fired another shot. Instead, officers placed Cook under arrest and immediately took him to a staging area for medical treatment. Ex. 6, at 81:7–8 (Cook Dep.); Ex. 7, at 61:9–19, 62:12 (Lt. Brown Dep.).

With 20/20 hindsight, we now know that the beanbag round unfortunately and accidentally hit Cook in the face. But that's not the end of the analysis. Under the totality of the circumstances, Corporal Wingo's use of a beanbag round was objectively reasonable because he reasonably feared for his fellow officers' safety.

Moreover, it was not clearly established that Corporal Wingo's use of a beanbag round under these circumstances was unconstitutional. The Eighth Circuit appears to have addressed officers' use of beanbags in only two cases. First, in *White v. Jackson*, the Eighth Circuit granted qualified immunity to officers who "fire[d] rubber bullets and bean bags at [the plaintiff] while he was approaching the police skirmish line" because "he was in the vicinity of a violent crowd of people and proceeding directly toward the police skirmish line," he was failing to obey orders "to stop approaching the line," and "continued to move toward the police line" after being hit with the "nonlethal projectiles." *White v. Jackson*, 865 F.3d 1064, 1079 (8th Cir. 2017). "Under these circumstances a reasonable officer could have concluded that [the plaintiff] had been a part of the

14

violent crowd, that his advances toward the skirmish line posed a threat to officer safety, and that he disobeyed officer orders to stop." *Id.*

Then, in *Mitchell v. Kirchmeier*, the right at issue was the right to be free from "the use of more than *de minimis* force" when a plaintiff did not "threaten[] anyone," "fle[e]," or "resist[] arrest." 28 F.4th 888, 898 (8th Cir. 2022). The complaint alleged that Mitchell was just such a plaintiff, so the use of a beanbag round—as a use of more than *de minimis* force—against him would have been unconstitutional. *Id.* at 899. Thus, the court reversed the granting of a motion to dismiss. *Id.* at 903. But the court cautioned that "discovery [may] tell[] a different story" than the complaint, and officers may then be entitled to qualified immunity. *Id.* at 899 (citing *Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012)).

The discovery in this case tells a different story than the solitary Cook peacefully protesting. This is a story about tense circumstances throughout the nation, including in Little Rock, where law-enforcement officers had been injured and killed by rioting citizens. It is a story about, on the very night in question, rioters shooting guns, pelting officers with dangerous objects, destroying property, and setting fires. And it is a story about Corporal Wingo having to make a split-second decision about how to protect their fellow officers in a rapidly changing situation where an angry man suddenly appeared facing officers with clinched fists. This case is very near to *White*, but at the very least, it falls in the unexplored middle between *White* and *Mitchell*.

Thus, in the circumstances present here, there is no caselaw regarding the use of beanbags to clearly establish Cook's right, assuming the disputed facts in Cook's favor. Courts ought to be especially careful because of the dearth of caselaw on beanbag rounds. As the Eleventh Circuit held when it granted qualified immunity to officers, the caselaw does not even contain "roughly

15

analogous" situations to beanbag rounds because they "lie[] in the unwashed middle" of deadly force and nonlethal weapons. *Glenn v. City of Columbus*, 375 F. App'x 928, 933 (11th Cir. 2010).[5]

As Eighth Circuit caselaw says, "[O]fficers are entitled to qualified immunity unless existing precedent *squarely governs* the specific facts at issue." *Gerling v. City of Hermann*, 2 F.4th 737, 744 (8th Cir. 2021) (emphasis added) (internal quotation marks omitted) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)). The fact that beanbag rounds are of a different category for which no relevant caselaw exists is sufficient for Corporal Wingo to be entitled to qualified immunity. *See McManemy v. Tierney*, 970 F.3d 1034, 1037, 1040 (8th Cir. 2020) (holding that precedent about a "knee-drop maneuver" that was "near-deadly force" did not "squarely govern" a case where the defendant allegedly "used a knee to repeatedly bash [the plaintiff] in the head").

Here, the threats to officer safety abounded—from the national level where officers were injured and killed, to the local level where rioters were already throwing dangerous objects at officers and gunshots resounded nearby, to the personal level where an angry, potentially armed man was 10 feet from an ASP officer and might have been prepared to go one-on-one with the officer. *See Cook v. City of Bella Vista*, 582 F.3d 840, 850 (8th Cir. 2009) (explaining that "threat[s] to an officer's safety can justify the use of force in cases involving relatively minor crimes and suspects who are not actively resisting arrest or attempting to flee" (cleaned up)). Qualified immunity is appropriate here, and the Court should grant the Defendants' motion for summary judgment on Cook's excessive-force claim.

---

[5] The Seventh Circuit similarly explained that "[d]irect analogy to [other less-lethal-weapons] cases cannot be dispositive because impact weapon technology varies from case to case." *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 521 (7th Cir. 2012).

**2. Captain Sheeler, Captain Joe, and Corporal Wingo did not retaliate against Cook because Corporal Wingo's use of force was not causally connected to Cook's protected expression.**

To succeed on a First Amendment retaliation claim, Cook must prove (1) he was "engaged in protected First Amendment activity," (2) the officers "took an adverse action that would chill a person of ordinary firmness from continuing in the protected activity," and (3) "the officers would not have taken the adverse action but for harboring retaliatory animus against the plaintiff[] because of the exercise of [his] First Amendment rights.'" *Aldridge v. City of St. Louis*, 75 F.4th 895, 898–99 (8th Cir. 2023) (cleaned up).

The third element is dispositive here. To prove it, there must be "a 'causal connection' between the government defendant's [alleged] 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Id.* at 899 (quoting *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019)). If Cook cannot "demonstrate [he was] 'singled out' due to [his] protected expression," his claim fails. *Id.* (quoting *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010)). So if the Defendants' actions were "driven . . . by [their] understanding—however mistaken—of [their] official duties, then it was not 'retaliatory.'" *Id.* (quoting *Mitchell v. Kirchmeier*, 28 F.4th 888, 896 (8th Cir. 2022)). And, even if there was a retaliatory animus directed in general at the protestors, when "no individual" or "particular protestor" "was targeted for his or her speech," the claim fails. *Id.*

As explained throughout this brief, the Defendants had a good-faith basis that actions were not in violation of clearly established law. The Defendants acted on that belief and had no animus towards Cook because of his protected expression. Ex. 3, ¶ 19 (Cpt. Sheeler Decl.); Ex. 4, ¶ 16 (Cpt. Joe Decl.); Ex. 5, ¶ 22 (Cpl. Wingo Decl.). Instead, "[t]here is no evidence in the record of [the Defendants] indicating animus toward [Cook] or singling him out." *Aldridge*, 75 F.4th at 899.

Therefore, Cook's claim for First Amendment retaliation fails, and summary judgment should be granted.

### 3. Captain Joe did not fail to intervene because Corporal Wingo's use of force did not violate Cook's rights, and Captain Joe was unaware of the use of force until after the incident.

To succeed on his failure-to-intervene claim, Cook must show that Captain Joe (1) "observed or had reason to know that excessive force would be or was being used" and (2) "had both the opportunity and the means to prevent the harm from occurring." *Robinson v. Payton*, 791 F.3d 824, 829 (8th Cir. 2015) (quoting *Nance v. Sammis*, 586 F.3d 694, 612 (8th Cir. 2009)). Cook's claim fails both prongs.

First, if Corporal Wingo's alleged unconstitutional use of excessive force "was not clearly established," then Captain Joe "was not on fair notice that his failure to intervene . . . violated [Cook's] Fourth Amendment rights." *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 991 (8th Cir. 2015). And if Corporal Wingo engaged in "the *constitutional* use of *reasonable* force," then Captain Joe had "no duty to [intervene]." *McManemy v. Tierney*, 970 F.3d 1034, 1039 (8th Cir. 2020). Thus, if the Court grants Corporal Wingo qualified immunity on the excessive-force claim, it should also grant the Defendants' motion for summary judgment on this count.

Second, there are no facts that indicate that Captain Joe knew or had reason to know that Corporal Wingo fired beanbag rounds at Cook. Instead, he was stationed outside of sight of Corporal Wingo. Ex. 4, ¶ 14 (Cpt. Joe Decl.). Moreover, Captain Joe did not and would not have ordered ASP officers to use unlawful force on nonviolent protestors. Ex. 4, ¶ 13 (Cpt. Joe Decl.). And he did not know that Corporal Wingo—who was the only ASP officer to fire beanbag rounds—had fired the rounds until after the incident had already occurred. Compl. ¶ 131, Doc. 1; Ex. 4, ¶ 15 (Cpt. Joe Decl.); Ex. 3, ¶ 15 (Cpt. Sheeler Decl.); Ex. 5, ¶ 14 (Cpl. Wingo Decl.).

18

Because Captain Joe did not observe or have reason to know that Corporal Wingo was allegedly violating Cook's constitutional rights, he is not liable for failure to intervene. *Cf. Mitchell*, 28 F.4th at 901.

Finally, the court should "also find relevant . . . that there was only one [incident when an officer fired beanbag rounds]." *Grider v. Bowling*, 785 F.3d 1248, 1253 (8th Cir. 2015). Because there was no ASP-wide pattern for Captain Joe to be aware of and because Cook has "not put forward any evidence showing [Captain Joe] was aware of the [allegedly unconstitutional use of force] before it occurred or had the opportunity to take action to deescalate the situation," Captain Joe "is entitled to qualified immunity as a matter of law." *Id.*

### 4. Colonel Bryant is not liable as supervisor because Corporal Wingo does not have a very similar pattern of unconstitutional conduct (or any pattern for that matter).

Because Colonel Bryant "had no direct participation in [the] alleged constitutional violation," Cook must prove that Colonel Bryant "'(1) received notice of a pattern of unconstitutional acts committed by [Corporal Wingo], and (2) was deliberately indifferent to or authorized those acts.' . . . '[M]ere negligence in failing to detect and prevent a subordinate's conduct is not enough for liability.'" *Davis v. Buchanan Cnty.*, 11 F.4th 604, 624–25 (8th Cir. 2021) (first quoting *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015); and then quoting *Ripson v. Alles*, 21 F.3d 805, 809 (8th Cir. 1994)). "This 'rigorous standard' requires proof that the 'supervisor had notice of a pattern of conduct by [Corporal Wingo] that violated a clearly established constitutional right.'" *Id.* at 624 (quoting *Kingbaum*, 808 F.3d at 340). Thus, because Corporal Wingo did not violate Cook's clearly established rights, Colonel Bryant is not liable either.

Even if that didn't end the inquiry, Corporal Wingo's prior "misconduct must be very similar to the conduct giving rise to liability. In other words, [Colonel Bryant] must have notice of a

19

pattern of conduct that was sufficiently egregious in nature. A single incident, or a series of isolated incidents, is usually insufficient to infer a pattern." *Id.* (cleaned up).

There is no "very similar" pattern here. Before June 1, Corporal Wingo had discharged a "less lethal munition in the course of [his] professional law enforcement duties" only once. Ex. 12, at 4 (Cpl. Wingo's Interrogatory Responses). No complaints were filed against him. *Id.* at 2. Similarly, he had fired a deadly weapon only once. *Id.* at 4 (Cpl. Wingo's Interrogatory Responses). Again, no complaints were filed against him. *Id.* at 2.

Cook rests his claim on a single, unsimilar incident from Corporal Wingo's past, which already makes his claim suspect. *See Davis*, 11 F.4th at 624 ("A single incident . . . is usually insufficient to infer a pattern." (cleaned up)). According to Cook, Corporal Wingo "[k]nowingly ma[de] false statements about a traffic stop to dispatch operators," which supposedly "foreshadowed" the incident that led to this case. Compl. ¶¶ 197, 199, Doc. 1. The first problem with this is that there is no evidence that Corporal Wingo was untruthful. In fact, the only evidence shows just the opposite. Ex. 12, at 6 (Cpl. Wingo's Interrogatory Responses) (responding that Corporal Wingo has "[n]ever been untruthful in the course of [his] professional law enforcement duties").

But even if that wasn't sufficient, making a false statement to a dispatch operator is not "very similar" to allegedly using unconstitutional force with a beanbag round. For example, the Eighth Circuit has held that "dishonest acts" done in situations "unrelated" to the challenged dishonest conduct are not "very similar" and defeats the supervisor's liability. *Livers v. Schenck*, 700 F.3d 340, 356 (8th Cir. 2012); *see also Jane Doe A ex rel. Jane Doe B v. Special Sch. Dist. of St. Louis Cnty.*, 901 F.2d 642, 646 n.4 (8th Cir. 1990)) (reasoning that "sexual misconduct with adults" is not very similar to "sexual misconduct with children"), *construed in Livers*, 700 F.3d at 356.

Because Colonel Bryant was not aware of a pattern of very similar unconstitutional conduct by Corporal Wingo, he was not deliberately indifferent. "When the issue is qualified immunity [for] failure to . . . supervise, deliberate indifference is a subjective standard that 'entails a level of culpability equal to the criminal law definition of recklessness.'" *Krigbaum*, 808 F.3d at 341 (quoting *B.A.B., Jr. v. Bd. of Educ. of St. Louis*, 698 F.3d 1037, 1040 (8th Cir. 2012)). This means Colonel Bryant must have been both "aware of facts from which the inference could be drawn that a substantial risk of [unconstitutional] harm exists, and he must also [have] draw[n] the inference." *Id.* (first alteration in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Thus, Cook "must prove [Colonel Bryant] *personally knew* of the constitutional risk posed by [his] [alleged] inadequate . . . supervision." *Id.* (second alteration in original) (quoting *Walton v. Dawson*, 752 F.3d 1109, 1118 (8th Cir. 2014)).

As explained above, Corporal Wingo did not pose a constitutional risk for Colonel Bryant to be aware of that was very similar to his past conduct. And even if there was such a risk, Colonel Bryant was unaware of it. Ex. 10, ¶¶ 4–5 (Col. Bryant Decl.).

Therefore, the Court should grant the Defendant's motion for summary judgment on Cook's supervisory-liability claim against Colonel Bryant.

## 5. Captain Sheeler and Corporal Wingo had probable cause to arrest Cook.

For Cook to show he was falsely arrested under the Fourth Amendment, he must prove that the challenged "warrantless arrest . . . [was not] supported by probable cause." *Kingsley v. Lawrence Cnty.*, 964 F.3d 690, 697 (8th Cir. 2020) (quoting *Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011)). Probable cause exists if "the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Id.* (quoting *Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1059 (8th Cir. 2013)).

"To receive qualified immunity," however, the standard is lower: Officers were "required to have only 'arguable probable cause.'" *Quraishi v. St. Charles Cnty.*, 986 F.3d 831, 836 (8th Cir. 2021) (quoting *Peterson v. Kopp*, 754 F.3d 594, 598 (8th Cir. 2014)). "Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based on probable cause if the mistake is objectively reasonable." *Id.* (quoting *Peterson*, 754 F.3d at 598). In other words, if Captain Sheeler and Corporal Wingo "had a mistaken but objectively reasonable belief that [Cook] had committed a criminal offense, [he] lose[s]." *Id.* (cleaned up).

There are at least three offenses for which Captain Sheeler and Corporal Wingo had arguable probable cause to arrest Cook.

First, obstructing governmental operations. "A person commits th[is] offense . . . if the person . . . [k]nowingly obstructs, impairs, or hinders the performance of any governmental function." Ark. Code Ann. § 5-54-102(a)(1). A "governmental function" is "any activity that a public servant is legally authorized to undertake on behalf of any governmental unit he or she serves." *Id.* § 5-54-101(6). This is the offense for which Cook's arrest warrant was issued. Ex. 13, at 1 (Arrest Warrant and Probable Cause Aff.).

Second, failure to disperse. "A person commits the offense of failure to disperse if, during a riot or unlawful assembly, he or she refuses or knowingly fails to disperse when ordered to disperse by a law enforcement officer . . . ." Ark. Code Ann. § 5-71-206(a). There is a "riot" if three or more people "knowingly engage[] in tumultuous or violent conduct that creates a substantial risk of: (1) Causing public alarm; (2) Disrupting the performance of a governmental function; or (3) Damaging or injuring property or a person." *Id.* § 5-71-201(a). There is an "unlawful assembly" if three or more people "[a]ssemble[]" with "the purpose of engaging in conduct constituting a riot." *Id.* § 5-71-205(a).

Third, disorderly conduct. "A person commits the offense of disorderly conduct if, . . . recklessly creating a risk of public inconvenience, annoyance, or alarm, her or she . . . [c]ongregates with two (2) or more other persons in a public place and refuses to comply with a lawful order to disperse or a law enforcement officer . . . ." Ark. Code Ann. § 5-71-207(a)(6).

For each of these, the following facts are relevant. On June 1, 2020, Little Rock "Mayor Frank Scott, Jr. signed an executive order to reinstitute a nighttime curfew to begin [that day] and occur nightly from ten p.m. to five a.m." Ex. 9 (Little Rock June 1, 2020 Press Release). Thus, the officers were enforcing a lawfully enacted curfew. *Id.* At about 10:30 p.m., the ASP began issuing dispersal orders to the crowd. Ex. 3, ¶ 10 (Cpt. Sheeler Decl.); Ex. 4, ¶ 9 (Cpt. Joe Decl.); Ex. 5, ¶ 10 (Cpl. Wingo Decl.).

Around the officers, chaos reigned—civilians were shooting guns; others were throwing artillery-shell fireworks, compression bombs, frozen water bottles, rocks, bricks, sticks, slingshot ball bearings, and liquid-filled balloons at officers; and still others were destroying property and setting fires. Ex. 6, at 56:5–16 (Cook Dep.); Ex. 7, at 121:9–18 (Lt. Brown Dep.); Ex. 8, at 34:1 (Cpt. Sheeler Dep.); Ex. 3, ¶ 12 (Cpt. Sheeler Decl.); Ex. 4, ¶ 11 (Cpt. Joe Decl.); Ex. 5, ¶ 12 (Cpl. Wingo Decl.). "It was a riot." Ex. 8, at 30:25 (Cpt. Sheeler Dep.).

The ASP line encountered Cook around 10:40 p.m. Ex. 14, at 1 (Cpt. Sheeler's Incident Report Form); Ex. 12, at 1 (Cpl. Wingo's Incident Report Form); Ex. 3, ¶ 16 (Cpt. Sheeler's Decl.); Ex. 5, ¶ 15 (Cpl. Wingo's Decl.).

Cook knew "there was a curfew at 10 o'clock," but he stayed out anyway. Ex. 6, at 55:20 (Cook Dep.). His failure to disperse and abide by the curfew interfered with law enforcement's ability to enforce the curfew. That is sufficient to establish arguable (and actual) probable cause for these criminal violations. *Cf. RB v. State*, 2013 Ark. App. 377, 2013 WL 2457286 (holding that

a defendant violated § 5-54-102(a)(1) where he "failed to abide by" an officer's "lawful command" that was given to "secure the facility for the evening" and maintain "orderly function of the detention center").

### 6. Captain Sheeler, Captain Joe, and Corporal Wingo did not conspire to deprive Cook of a constitutional right, and if they did, any such right was not clearly established.

Finally, Cook makes a civil-conspiracy claim against Captain Sheeler, Captain Joe, and Corporal Wingo. To be successful, he must show the following four elements for each defendant: (1) "the deprivation of a constitutional right," (2) an agreement "between the defendant and at least one other person" to deprive him of that right, (3) "an overt act in furtherance of the conspiracy," and (4) "a resulting injury to" him. *Robinson v. Hawkins*, 937 F.3d 1128, 1134 (8th Cir. 2019). Cook fails to prove his claim for three reasons.

First, for the reasons discussed throughout this brief, the Defendants did not violate Cook's constitutional right to be free from the use of excessive force under these circumstances and with a beanbag round. At the very least, that right was not clearly established. *See Bradford v. Huckabee*, 330 F.3d 1038, 1040 (8th Cir. 2003) (explaining that success on a civil-conspiracy claim requires showing "facts to demonstrate the violation of a clearly established statutory or constitutional right").

Second, there was no agreement. Cook "must show evidence sufficient to support the conclusion that the defendants reached an agreement to deprive [him] of constitutionally guaranteed rights." *Burton v. St. Louis Bd. of Police Comm'rs*, 731 F.3d 784, 798–99 (8th Cir. 2013) (quoting *White v. McKinley*, 519 F.3d 806, 816 (8th Cir. 2008)). Here, there is "scant evidence from which a reasonable jury could infer that [the Defendants] conspired to deprive [Cook] of [his] constitutional rights." *Robinson v. Hawkins*, 937 F.3d 1128, 1134 (8th Cir. 2019). As explained, his rights

were not violated. Captain Sheeler and Captain Joe were unaware that Corporal Wingo had used beanbag rounds until after the incident. Ex. 8, at 58:3–11 (Cpt. Sheeler Dep.); Ex. 4, ¶ 14 (Cpt. Joe Decl.). That isn't enough to infer a conspiracy. Nor is Captain Sheeler's incident report, which had a minor inaccuracy by swapping the colors of Cook's shirt and shorts, sufficient to infer a conspiracy. Ex. 14, at 2 (Cpt. Sheeler's Incident Report); Ex. 8, at 48:8–21 (Cpt. Sheeler's Dep.); *see Robinson*, 937 F.3d at 1134–35 (holding that "multiple *material* inaccuracies" in a report were not sufficient (emphasis added)). In total, there is no evidence of an agreement.

Third, the intracorporate-conspiracy "doctrine provides that 'a local government entity cannot conspire with itself through its agents acting within the scope of their employment.'" *Kelly v. City of Omaha*, 813 F.3d 1070, 1078 (8th Cir. 2016) (quoting *L.L. Nelson Enters., Inc. v. Cnty. of St. Louis*, 673 F.3d 799, 812 (8th Cir. 2012)). The Eighth Circuit has declined to rule on whether this doctrine applies to officials in their individual capacities. *Burbridge v. City of St. Louis*, 2 F.4th 774, 783 (8th Cir. 2021). And it has not "definitively addressed the issue whether the . . . doctrine applies to § 1983 conspiracy claims." *Torres v. City of St. Louis*, 39 F.4th 494, 507 (8th Cir. 2022) (quoting *Faulk v. City of St. Louis*, 30 F.4th 739, 749 (8th Cir. 2022)). "Thus, because it is not clearly established that the intracorporate conspiracy doctrine does not apply" in this case, the Defendants are entitled to qualified immunity. *Id.*

In sum, the Defendants did not violate Cook's clearly established right. If such a right was clearly established, they did not agree to violate it. And regardless, the applicability of the intracorporate-conspiracy doctrine is not clearly established in these circumstances. Thus, Cook's civil-conspiracy claim fails.

## Conclusion

For these reasons, the Court should grant the Defendants' motion for summary judgment.

Respectfully submitted,

TIM GRIFFIN
Attorney General

By:    Noah P. Watson
Ark. Bar No. 2020251
Senior Assistant Attorney General

Justin Brascher
Ark. Bar No. 2023029
Assistant Attorney General

Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-1019
(501) 682-2591 fax
noah.watson@arkansasag.gov
justin.brascher@arkansas.gov

*Attorneys for Defendants*