Neutral

As of: July 30, 2024 5:20 PM Z

# Marks v. Bauer

United States Court of Appeals for the Eighth Circuit

December 13, 2023, Submitted; July 12, 2024, Filed

No. 23-1420

**Reporter**
2024 U.S. App. LEXIS 17076 *; __ F.4th __; 2024 WL 3382568

Ethan Daniel Marks, Plaintiff - Appellee v. Benjamin M. Bauer, acting in his individual capacity as a Minneapolis Police Officer, Defendant - Appellant

**Prior History:** [*1] Appeal from United States District Court for the District of Minnesota.

*Marks v. Bauer*, 2023 U.S. Dist. LEXIS 18871, 2023 WL 1478015 (D. Minn., Feb. 1, 2023)

## Core Terms

Marks, shot, crowd, projectile, push, seizure, launcher, shooting, objectively reasonable, use deadly force, circumstances, fired, reasonable officer, perimeter, training, immediate threat, district court, use of force, force used, deployed, charges, unarmed, arrest, video, Zone, feet, qualified immunity, excessive force, serious injury, deadly force

## Case Summary

### Overview

HOLDINGS: [1]-In a *42 U.S.C.S § 1983* excessive force suit, the trial court did not err in denying appellant's motion for summary judgment because there was a genuine dispute of material fact concerning whether appellant intended to use deadly force when he shot appellee in the face.

### Outcome
Judgment affirmed.

## LexisNexis® Headnotes

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Evidence > Burdens of Proof > Allocation

Torts > Public Entity Liability > Immunities > Qualified Immunity

Civil Rights Law > ... > Immunity From Liability > Local Officials > Individual Capacity

### *HN1*[ ]  Immunity From Liability, Defenses

The appellate court reviews a district court's qualified immunity determination de novo. Qualified immunity shields government officials from *42 U.S.C.S § 1983* lawsuits and liability unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known. A claimant bears the burden of showing a police officer violated a constitutional right and the unlawfulness of his conduct was clearly established at the time. A right is clearly established when the law is sufficiently clear at the time of the challenged conduct that every reasonable official would understand that what he is doing is unlawful.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

### *HN2*[ ]  Search & Seizure, Scope of Protection

To establish a *Fourth Amendment* violation, a claimant must show both that a seizure occurred and the seizure was unreasonable. The word seizure readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful.

Michael Laux

Exhibit 1

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

### [HN3](#) Search & Seizure, Scope of Protection

The appellate court thinks it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Torts > Public Entity Liability > Excessive Force

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Torts > Public Entity Liability > Immunities > Qualified Immunity

### [HN4](#) Appellate Review, Standards of Review

The appellate court evaluates objective reasonableness from the point of view of the officer at the precise moment that the seizure is effectuated. The appellate court generally considers the totality of the circumstances, but it is well-established that absent probable cause for an officer to believe the suspect poses an immediate threat of death or serious bodily injury to others, use of deadly force is not objectively reasonable. Where the record does not conclusively establish the lawfulness of an officer's use of force, summary judgment on the basis of qualified immunity is inappropriate.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

### [HN5](#) Search & Seizure, Scope of Protection

When considering the evolving nature of the situation and the immediacy of the threat posed by a claimant, it is important to note that the appellate court assesses the reasonableness of the response to the threat by looking primarily at the threat present at the time an officer deploys the force. The appellate court focuses on the seizure itself—the shooting—and not on the events leading up to it.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Torts > Public Entity Liability > Excessive Force

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

### [HN6](#) Immunity From Liability, Defenses

To be clearly established, the contours of the constitutional right at issue must be sufficiently clear such that every reasonable officer would have understood that what he is doing violates that right. A plaintiff may establish a right is clearly established by pointing to existing circuit precedent that would put a reasonable officer on notice that his specific use of force in a particular circumstance would violate the plaintiff's right not to be seized by excessive force. Officers are held liable for transgressing bright lines, not for bad guesses in gray areas. Whether the constitutional right at issue was clearly established is a question of law for the court to decide.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Torts > Public Entity Liability > Excessive Force

### [HN7](#) Law Enforcement Officials, Excessive Force

Caselaw clearly establishes that a police officer is not permitted to use deadly force on an individual, who previously posed a threat to others, but no longer presents an immediate threat.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

### [HN8](#) Law Enforcement Officials, Excessive Force

Less-lethal force can amount to deadly force depending on the situation.

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

**HN9**[ ] **Jury Trials, Province of Court & Jury**

The severity of the suspect's reaction is a matter for the jury to decide.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Torts > Public Entity Liability > Excessive Force

**HN10**[ ] **Law Enforcement Officials, Excessive Force**

Caselaw establishes that the critical factor in an excessive force case involving less than lethal force is whether the suspect posed a realistic threat to the safety of the officer or a risk of flight that justified the degree of force used.

**Counsel:** For Ethan Daniel Marks, Plaintiff - Appellee: Kathryn H. Bennett, Robert Bennett, Marc Evan Betinsky, Andrew J. Noel, Greta Ann Wiessner, ROBINS & KAPLAN, Minneapolis, MN.

For Benjamin M. Bauer, acting in his individual capacity as a Minneapolis Police Officer, Defendant - Appellant: Sharda R. Enslin, Heather Passe Robertson, Kristin R. Sarff, CITY ATTORNEY'S OFFICE, Minneapolis, MN.

**Judges:** Before ERICKSON, MELLOY, and STRAS, Circuit Judges. STRAS, Circuit Judge, dissenting.

**Opinion by:** ERICKSON

## Opinion

ERICKSON, Circuit Judge.

Ethan Marks, who was 19 years old at the time, sustained a ruptured eyeball, a fractured eye socket, and a traumatic brain injury when Minneapolis Police Officer Benjamin Bauer shot him with a chemical-filled projectile from approximately five to ten feet away. Marks sued Officer Bauer under *42 U.S.C. § 1983*, alleging violations of the Fourth and *Fourteenth Amendments*. The district court[1] denied Officer Bauer's motion for summary judgment on Marks' excessive force claim, finding that genuine issues of material fact precluded a grant of qualified immunity. This interlocutory appeal followed. We affirm.

## I. BACKGROUND

On May 28, 2020, three days after protests had erupted [*2] in response to the death of George Floyd, Marks and his mother went to an area near the Minneapolis Police Department's ("MPD") Third Precinct building to help clean up damage caused by rioting and looting. When Marks arrived, hundreds of people, including protestors, were in the area. At approximately 5:30 p.m., Officer Bauer as well as other SWAT team officers responded to the area on a report that an individual in the crowd had been stabbed. As the SWAT team drove toward the scene, the officers were informed of the presence of a large crowd in the area with some people throwing rocks at approaching officers. When the SWAT van entered the area, it was hit with frozen water bottles, a rock, and other objects.

Officer Bauer exited the SWAT van, moved toward the area where people were throwing objects, and deployed his launcher at the individuals from a distance. Officer Bauer then provided protection for the other officers loading the stabbing victim into the back of a police SUV. When he returned to the SWAT van, Officer Bauer learned of a report that there was an injured person who had been struck by a baseball bat. Officer Bauer ran toward the area of the injured woman and positioned [*3] himself to help establish a perimeter for the officers who were trying to evacuate her from the area.

Marks' mother, a registered nurse, tried to approach the injured woman to offer medical assistance. MPD Officer Jonathan Pobuda, who was also helping form a perimeter around the victim, blocked Marks' mother with his arm and ordered her to stand back. After this interaction, Marks stepped over a large, corrugated pipe laying on the ground, walked over to Officer Pobuda, who is six feet tall and weighs 265 pounds, and shouted with one of his hands clenched in a fist, "Back up, bitch!" Marks' shouting drew the attention of Officer Bauer, who turned and saw Marks strike Officer Pobuda and try to grasp his riot baton. Officer Pobuda pushed Marks back

---

[1] The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

with his baton, causing him to lose his balance and stumble backwards over the corrugated pipe. A bystander with outstretched arms stepped into the space between Marks and Officer Pobuda.

After pushing Marks away, Officer Pobuda no longer perceived Marks as a threat and concluded no additional force was necessary. Despite the apparent amelioration of the threat, Officer Bauer believed a "bad assault" was occurring. Without warning, Officer Bauer **[*4]** shot Marks in the face from approximately five to ten feet[2] away with a projectile. From the time Officer Bauer raised the launcher to when he fired it, only a half a second had transpired. The projectile used by Officer Bauer has an exit muzzle velocity of approximately 200 miles per hour and releases an inflammatory chemical agent upon impact. The chemical-filled projectile hit Marks' right eye and exploded, rupturing his right eyeball, fracturing his eye socket, and causing a traumatic brain injury. Marks is now legally blind in that eye.

The launcher used by Officer Bauer fires 40-millimeter "high energy munitions." In the best-case scenario, the projectile leaves the target's body surface intact while causing enough injury to incapacitate the target. Under the worst-case scenario, the weapon can cause serious injury or death. Although the launcher is categorized as a "less lethal" weapon, it is not non-lethal, as the manufacturer's warning expressly states: "This product may cause serious injury or death to you or others."

Given the risk of serious injury or death, MPD SWAT officers are trained to consider which "zone" of the body to target when deciding where to shoot. Zone 1 is **[*5]** the area officers are trained to consider first and consists of large muscle groups, such as the buttocks, thighs, and calves. Zone 2 of the body consists of medium muscle groups and encompasses the abdominal area. Zone 3 includes the chest (the "center mass"), spine, neck, and head. Because Zone 3 carries the greatest risk for serious injury or death, MPD training instructs officers to shoot at Zone 3 only when "maximum effectiveness is desired to meet a level of threat escalating to deadly force." The MPD also provides training on the optimal deployment range for firing projectiles, with 10 to 90 feet being the optimal range for most projectiles.

Officer Bauer was trained and qualified to carry the launcher at issue approximately six years before he shot Marks. To be qualified to carry and use the launcher, Officer Bauer was required to undergo annual training and written tests in addition to field testing that involves firing the launcher at designated targets. The goal of the training is to ensure that SWAT members are "more proficient" with their weapons than regular MPD officers. During the George Floyd protests, Officer Bauer estimated that he personally fired approximately 500 **[*6]** projectiles using the 40 MM Tactical launcher. Officer Bauer admitted as part of this litigation that the launcher is an accurate weapon. The district court found that Officer Bauer had established himself as an accurate shooter.

The level of force used by Officer Bauer against Marks caused the crowd to react. Almost immediately after Marks was shot in the eye, individuals screamed at Officer Bauer and the crowd began to inch closer to the perimeter. One bystander shouted, "Hey! Hey! Point blank?" Officer Bauer yelled back, "Yes!" Within 30 seconds of shooting Marks, the officers successfully evacuated the injured person and began to retreat. Within three minutes of the shooting, the officers jumped in their vehicles and sped away from the scene. Neither Officer Bauer nor Officer Pobuda rendered aid to Marks and he was not arrested.

The MPD referred Marks encounter with Officer Pobuda to the Hennepin County Attorney's office for possible criminal charges, including assault or attempting to disarm a police officer. After reviewing the materials, which included the MPD body camera footage and Officer Pobuda's report of the incident, the county attorney declined to prosecute, concluding **[*7]** no felony charges were warranted. The MPD then sent the materials to the Minneapolis City Attorney's Office for consideration of misdemeanor charges. An independent prosecutor in the St. Paul Office reviewed the matter and declined to charge Marks, concluding there was "insufficient evidence" and the "facts/circumstances do not support charges."

After Marks commenced this action, Officer Bauer moved for summary judgment asserting he was entitled to qualified immunity because he intended to hit Marks in the torso, not the face. It was not until Officer Bauer's

---

[2] There is varying evidence in the record as to the distance between Marks and Officer Bauer at the time Officer Bauer aimed and fired at Marks. The district court stated the distance was five to ten feet, noting that Officer Bauer during an interview about the incident stated he shot from just beyond the minimum safe standoff range of five feet. A forensic video specialist estimated the distance between the launcher's muzzle and Marks' head was between 70 and 80 inches.

reply brief that he claimed there was no seizure under the *Fourth Amendment*. The district court found Officer Bauer's argument not only untimely but also that it failed on the merits. The district court denied Officer Bauer's motion, determining that, regardless of his subjective intent or motivation, Officer Bauer used force that was not objectively reasonable under the circumstances. And even if subjective intent was relevant in the analysis as Officer Bauer argued, the district court found there was a genuine dispute of material fact concerning whether Officer Bauer intended to use deadly force when he shot Marks in the face. In addition, the **[*8]** district court found that even if the force used by Officer Bauer was considered non-deadly, the force used on Marks was unreasonable given the facts and circumstances confronting Officer Bauer. Lastly, the district court pointed to existing precedent that put Officer Bauer on notice that deadly force is appropriate only in response to a significant threat of death or serious physical injury to the officer or others, which was not present when Officer Bauer shot Marks, and it would have been clear to a reasonable officer in Officer Bauer's position that the high degree of force used by Officer Bauer was disproportionate to the threat before him.

Officer Bauer appeals, contending his deployment of the projectile did not result in a seizure and the force used was objectively reasonable because the crimes Marks was suspected of committing were "severe," Marks posed an immediate threat to the safety of Officer Pobuda, and it was a "tense, uncertain, and rapidly evolving situation."

## II. DISCUSSION

*HN1*[⬆] The Eighth Circuit reviews a district court's qualified immunity determination *de novo*. *Burbridge v. City of St. Louis, 2 F.4th 774, 779 (8th Cir. 2021)*. Qualified immunity shields government officials from *§ 1983* lawsuits and liability unless the official's conduct **[*9]** violates a clearly established constitutional or statutory right of which a reasonable person would have known. See *Davitt v. Spindler-Krage, 96 F.4th 1068, 1071 (8th Cir. 2024)*. Marks bears the burden of showing Officer Bauer violated a constitutional right and the unlawfulness of his conduct was clearly established at the time. *Martinez v. Sasse, 37 F.4th 506, 509 (8th Cir. 2022)*. A right is "clearly established" when the law is "sufficiently clear" at the time of the challenged conduct "that every reasonable official would understand that what he is doing is unlawful." *D.C. v. Wesby, 583 U.S. 48, 63, 138 S. Ct. 577, 199 L. Ed. 2d 453 (2018)* (cleaned up).

A. Seizure

Officer Bauer contends deploying a projectile against an "assaultive protestor" is insufficient force to constitute a seizure under the *Fourth Amendment*. *HN2*[⬆] To establish a *Fourth Amendment* violation, Marks must show both that a seizure occurred and the seizure was unreasonable. *Dundon v. Kirchmeier, 85 F.4th 1250, 1255 (8th Cir. 2023)*. "The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to *restrain movement*, even when it is ultimately unsuccessful." *California v. Hodari D., 499 U.S. 621, 626, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991)* (emphasis added).

While we have noted that "[prior] decisions did not place officers on notice that the existence of a seizure depends on the type of force applied for the purpose of dispersing a crowd," *Dundon, 85 F.4th at 1256*, Officer Bauer was not dispersing a crowd the moment he aimed and shot Marks. The video footage **[*10]** shows that, before Marks was shot, Officer Bauer's general deployment of projectiles allowed officers to form a perimeter and evacuate the stabbing victim. It also shows the officers were able to form a second perimeter around another injured individual. By this time, most of the crowd had retreated and only a couple dozen individuals remained around the second individual who needed medical attention.

As to his actions directed at Marks, Officer Bauer expressly testified he used force to restrain Marks' movement, stating:

> Well, with the -- the way he was acting, how he jumped on -- into the -- with -- like I said, with the officer -- I believe it was Officer Pobuda, so I'll refer to that -- and punching Officer Pobuda, he was on top of him, I thought there was a bad assault going on. And that's when I reacted to it. And I thought that if it kept going, then it would get worse. So I -- that's why I decided -- this is a fast-action thing, and I deployed the 40 at him, sir.

In analyzing Officer Bauer's claim that his actions did not amount to a seizure, we find the Supreme Court's guidance in Brower on whether a seizure has occurred helpful:

> [I]n determining whether there has been a seizure **[*11]** in a case such as this, to distinguish between a roadblock that is designed to give the

oncoming driver the option of a voluntary stop (e.g., one at the end of a long straightaway), and a roadblock that is designed precisely to produce a collision (e.g., one located just around a bend). In determining whether the means that terminates the freedom of movement is the very means that the government intended we cannot draw too fine a line, or we will be driven to saying that one is not seized who has been stopped by the accidental discharge of a gun with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg. *HN3*[🔼] We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.

*Brower v. Cnty. of Inyo, 489 U.S. 593, 598-99, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989)*. The projectile aimed and purposefully deployed at Marks by Officer Bauer stopped Marks and achieved the result Officer Bauer intended. The record demonstrates that Officer Bauer applied force to restrain and stop Marks.

That Marks was not arrested does not change the analysis. See *Pollreis v. Marzolf, 66 F.4th 726, 731 (8th Cir. 2023)* (concluding the plaintiff, while not arrested or detained, was seized, even if only for a moment). In *Ludwig v. Anderson, 54 F.3d 465, 469 (8th Cir. 1995)*, Ludwig **[*12]** was never arrested, but instead died after an officer shot him to stop him from attempting to get across the street. The Court determined that Ludwig was seized twice during the encounter in a potentially unreasonable manner: (1) when an officer attempted to hit Ludwig with his police car, and (2) when Ludwig was shot. *Id. at 471*. Under the facts and circumstances of this case, Marks was seized when Officer Bauer shot him with a projectile. See id.; see also *Hodari D., 499 U.S. at 625* (explaining a seizure can be "effected by the slightest application of physical force").

B. Reasonableness of Seizure

Officer Bauer next contends his actions were objectively reasonable. The parties disagree over whether Officer Bauer used deadly force. In the district court, Officer Bauer did not argue that the use of deadly force would have been objectively reasonable in this situation. Rather, he contended that he did not use deadly force because he intended to hit Marks in the torso, not the face. According to Officer Bauer, the projectile struck Marks in the face because Marks' body dropped suddenly before the launcher was deployed.

*HN4*[🔼] We evaluate objective reasonableness from the point of view of the officer at the precise moment that the **[*13]** seizure is effectuated. *Banks v. Hawkins, 999 F.3d 521, 525-26 (8th Cir. 2021)*. We generally consider the totality of the circumstances, but "it is well-established that absent probable cause for an officer to believe the suspect poses an immediate threat of death or serious bodily injury to others, use of deadly force is not objectively reasonable." *Id. at 525* (cleaned up). "Where the record does not conclusively establish the lawfulness of an officer's use of force, summary judgment on the basis of qualified immunity is inappropriate." Id.

Here, the force used by Officer Bauer consisted of a projectile shot from a less lethal launcher at close range at Marks' face—an area of the body that MPD training instructed its officers has the greatest potential for serious or fatal injury. Officer Bauer claims he aimed at Marks' torso; therefore, he did not deploy deadly force. On this record, a genuine issue of material fact exists concerning whether Officer Bauer intended to use deadly force when he shot Marks in the face. In contrast to Officer Bauer's claim, Marks notes Officer Bauer's training and skill as a marksman. He also points to the videos, which he contends show Officer Bauer tracking Marks' head, and his expert who opined that at the time **[*14]** of discharge, the gun was elevated at Zone 3 on Marks' body, not Zone 2. In addition, the district court noted that Officer Bauer provided unclear deposition testimony about where he was aiming. Regardless of Officer Bauer's intent, the evidence in the record supports a conclusion that Officer Bauer used force capable of causing serious or fatal injury to Marks, who at the time he was shot with the chemical projectile was unarmed, had been pushed several feet away from Officer Pobuda, and was stumbling backwards.

Nonetheless, whether Officer Bauer used deadly or non-deadly force need not be conclusively resolved at this stage because viewing the record in the light most favorable to Marks and drawing all reasonable inferences in his favor, while also viewing the facts from the perspective of a reasonable officer on the scene, Officer Bauer has failed to show his use of force was objectively reasonable as a matter of law. Officer Bauer asserts shooting Marks was objectively reasonable because a reasonable officer would have suspected Marks had committed "multiple serious and violent crimes," he posed an immediate threat to Officer Pobuda's safety, and the incident was a tense, uncertain, **[*15]** and rapidly evolving situation. Officer Bauer's assertions overstate the evidence in the record at the moment he decided to pull the trigger and shoot

Marks in the face.

We first consider the nature of the crimes Officer Bauer purports Marks had committed in the moments preceding the shooting. The video of the encounter lends little support to Officer Bauer's characterization of Marks' conduct. It shows that at one point, Marks appeared to strike Officer Pobuda and that Marks grabbed at Officer Pobuda's baton. Whether Marks was grasping at the baton to maintain his balance or attempting to disarm Officer Pobuda is a dispute not resolved by the video and is a material factual dispute for the trier of fact. In addition, the record contains evidence that the MPD referred Marks' conduct toward Officer Pobuda initially to the County Attorney's Office for felony charges and subsequently to the City Attorney's Office for consideration of misdemeanor charges. Each office independently reviewed the materials provided by the MPD, including the video footage, and each declined to press charges against Marks. While a jury might accept Officer Bauer's characterization of the incident as a "bad assault," **[*16]** contrary evidence exists in the record such that a reasonable jury could find that the force Officer Bauer used in response to the brief altercation between Marks and Officer Pobuda was excessive.

HN5[↑] Next, when considering the evolving nature of the situation and the immediacy of the threat posed by Marks, it is important to note that we assess the reasonableness of the response to the threat by looking primarily at the threat present at the time an officer deploys the force. See *id. at 525-26* ("[W]e focus on the seizure itself—here, the shooting—and not on the events leading up to it."). On this record, a reasonable jury could find that at the time Marks was shot, he did not pose an immediate threat to Officer Pobuda or to anyone else at the scene because Officer Pobuda had successfully pushed an unarmed Marks away from him, causing him to stumble and fall backwards. The push created several feet of space between the two men—sufficient space for a bystander with outstretched arms to step into the space between them. After the separation, Officer Pobuda did not believe further use of force was necessary. Resolving factual disputes in Marks' favor, as we are required to do at this stage of the proceedings, **[*17]** Officer Bauer has failed to demonstrate that when he aimed and shot a falling and unarmed Marks in the face, a reasonable officer could have believed that Marks posed an immediate threat to the safety of the officers or others. See *Rusness v. Becker Cnty., 31 F.4th 606, 614 (8th Cir. 2022)* ("The party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences.").

While Officer Bauer asserts that this was a tense and rapidly changing situation such that he was compelled to make a split-second decision to shoot, the video evidence shows that the situation at the time of the shooting was dramatically different than when the officers first arrived and encountered a hostile crowd. When the officers first arrived, they were outnumbered with some individuals shouting and throwing things. Even so, the officers were able to establish a perimeter quickly and the crowd calmed down. The officers were then able to successfully evacuate the first injured individual without incident. They were then working, without interference from the crowd, on assisting a second injured individual. The situation escalated when Marks reacted **[*18]** after he observed Officer Pobuda push his mother, who, as a registered nurse, was merely volunteering to help provide medical assistance to the injured person. That threat, however, was brief and extinguished quickly and effectively, as Officer Pobuda was able to push Marks back, causing him to stumble backwards. See *Banks, 999 F.3d at 530 n.8* ("Even when making 'split-second judgments' in 'tense, uncertain, and rapidly evolving' circumstances, *Graham, 490 U.S. at 397*, officers cannot ignore what they know.").

Based on the evidence in the record, a reasonable officer could have observed there was no need to rush to Officer Pobuda's aid by firing a projectile at close range because Marks was no longer engaged with Officer Pobuda or threatening anyone else. See *id. at 527* (concluding an officer who either (a) fires instinctively, without a warning or a split-second pause to assess the situation, or (b) after ascertaining the suspect was no longer acting in an aggressive or threatening manner does not act in an objectively reasonable manner under the *Fourth Amendment*). Although a jury might agree with Officer Bauer's assessment of the situation and find his use of force was objectively reasonable, the evidence when viewed in the light most favorable to Marks **[*19]** demonstrates a violation of Marks' constitutional right to be free from excessive force when, under these circumstances, Officer Bauer shot Marks in the face at close range with a chemical projectile.

C. Clearly Established

Officer Bauer also argues that it was not clearly

established on May 28, 2020, that deploying a projectile against an "assaultive protestor" would constitute excessive force under the *Fourth Amendment*. *HN6*[↑] To be clearly established, the contours of the constitutional right at issue must be sufficiently clear such that every reasonable officer would have understood that what he is doing violates that right. *Boudoin v. Harsson, 962 F.3d 1034, 1039 (8th Cir. 2020)*. A plaintiff may establish a right is clearly established by pointing to existing circuit precedent that would put a reasonable officer on notice that his specific use of force in a particular circumstance would violate the plaintiff's right not to be seized by excessive force. *Banks, 999 F.3d at 528*. Officers are held liable for "transgressing bright lines," not for "bad guesses in gray areas." *Boudoin, 962 F.3d at 1040*. "[W]hether the constitutional right at issue was 'clearly established' is a question of law for the court to decide." *Rohrbough v. Hall, 586 F.3d 582, 586 (8th Cir. 2009)*.

Marks does not need to identify an identical case to show that Officer Bauer's conduct was **[*20]** previously held to be unlawful. *Banks, 999 F.3d at 528*; see also *Glover v. Paul, 78 F.4th 1019, 1024-25 (8th Cir. 2023)* (noting "[t]here is no requirement [ ] that [a] [plaintiff] marshal a case in which 'the very action in question has previously been held unlawful,' so long as the unlawfulness of the action is apparent in light of preexisting law") (quoting *Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)*); *Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)* ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").

*HN7*[↑] Our cases clearly establish that a police officer is not permitted to use deadly force on an individual, who previously posed a threat to others, but no longer presents an immediate threat. *Cole Est. of Richards v. Hutchins, 959 F.3d 1127, 1134 (8th Cir. 2020)* (stating "it was clearly established that a few seconds is enough time to determine an immediate threat has passed, extinguishing a preexisting justification for the use of deadly force"). This is neither a situation where Officer Bauer was under attack nor a situation where he received a blow to the head in a rapidly evolving situation. Instead, he saw a 6-foot, 205-pound, 19-year-old unarmed Marks squaring off against a 6-foot, 265-pound, 37-year-old armed Officer Pobuda. Within 4 seconds, Officer Pobuda had forced Marks away with such force that he was "kind of falling" when Officer Bauer **[*21]** fired his shot. At the time of this incident, it was clearly established that it is unlawful to shoot an unarmed man who was falling and posing no imminent threat to officers or to anyone else.

Officer Pobuda testified that after effectively using his baton on Marks, Marks was no longer an immediate threat:

> **Q**: You did not perceive him to be a threat and didn't go after him at that point. Correct?
>
> **Officer Pobuda**: Are you talking about at the point in which we separated?
>
> **Q**: Yeah.
>
> **Officer Pobuda**: Correct. I did not pursue — I did not pursue him after our interaction, sir.
>
> **Q**: And you didn't think that further use of force by you on him was necessary?
>
> **Officer Pobuda**: No, sir.

*HN8*[↑] While Officer Bauer challenges the characterization of his use of force as deadly, we have previously noted that less-lethal force can amount to deadly force depending on the situation. See, e.g., *Ludwig, 54 F.3d at 473* (acknowledging that "an attempt to hit an individual with a moving squad car is an attempt to apprehend by use of deadly force"). Here, Officer Bauer testified that he knew a 40 MM Tactical Single Launcher can be considered deadly force. He was aware the manufacturer warned the product could cause serious injury or death. And he **[*22]** noted that he was trained using materials explaining that targeting was crucial to reduce injury potential. The evidence related to Officer Bauer's training reflects that the munitions were not described as non-lethal, but as less-lethal munitions, which if misused could cause death. To the extent that Officer Bauer used deadly force when he shot Marks, it was clearly established in May 2020 that the use of deadly force on a non-threatening suspect was objectively unreasonable.

The outcome would be the same even if Officer Bauer used less than deadly force by purportedly aiming for Marks' torso. After establishing a perimeter and evacuating the victim who was the subject of the dispatch, Officer Bauer, Officer Pobuda, and others successfully formed a new perimeter around a second injured victim. The video evidence shows that the crowd at this moment was compliant. Some members were assisting law enforcement. Another part of the crowd watched from a distance and recorded the events on

their phones. Unlike the individuals in *White v. Jackson, 865 F.3d 1064, 1072 (8th Cir. 2017)*, who were ordered to disperse and who saw police forming a skirmish line to disperse them, the crowd present at this scene had never been given a dispersal order. **[*23]** This case is also unlike the crowd in *Bernini v. City of St. Paul, 665 F.3d 997, 1001, 1006 (8th Cir. 2012)*, where officers suspected the individuals intended on penetrating the police line.

The video evidence in this case documents that the crowd was demonstrating no hostility toward the officers when Officer Bauer shot Marks in the face, who was unarmed and stumbling backwards to the ground away from Officer Pobuda. It was only after Officer Bauer shot Marks in the face that the crowd's hostility toward the officers began to escalate again. Given the compliant nature of the crowd at the moment of the shooting, which distinguishes this case from the ones cited by Officer Bauer, viewing the record in the light most favorable to Marks, Officer Bauer shot Marks at close range with a weapon that he knew could amount to deadly force. It would have been clear to a reasonable officer in Officer Bauer's position that this high degree of force was disproportionate to the threat before him.

In Montoya v. City of Flandreau, the Court held that a question of fact existed for the trier of fact where the plaintiff, though acting aggressively, was 10 to 15 feet away from the officer, and posed no threat to the officer at the time the officer engaged in a leg sweep **[*24]** causing the plaintiff to suffer a broken leg. *669 F.3d 867, 871 (8th Cir. 2012)*. The Montoya court further held that the excessive force claim was clearly established when the leg sweep maneuver was employed against a non-threatening, non-resisting, non-fleeing misdemeanant who was merely waving her hands in frustration. *Id. 872-73*. Similarly, in Johnson v. Carroll, the Court determined that macing and throwing to the ground an unarmed person who "posed at most a minimal safety threat to the officers" was not objectively reasonable as a matter of law, notwithstanding that the suspect was resistant as evidenced by her being charged with obstructing legal process. *658 F.3d 819, 827-28 (8th Cir. 2011)*.

In another case, *Rohrbough, 586 F.3d 582*, an officer confronted a suspect, who had raised his arms but had not assumed a fighting stance, and the officer pushed the suspect causing the suspect to resist and push back, which led the officer to punch the suspect in the face and take him down forcefully. The officer provided a different accounting of what happened. *Id. at 587*.

*HN9*[] The Court determined the severity of the suspect's reaction is a matter for the jury to decide. Id. The Court noted that a jury could conclude that the suspect's push was *de minimis* or inconsequential such that a reasonable officer **[*25]** would have known that a response that included punching the suspect in the face, taking him to ground face first, landing on top of him, and causing serious injury was unlawful. Id.

*HN10*[] Our cases establish that the critical factor in an excessive force case involving less than lethal force is whether the suspect "posed a realistic threat to the safety of [the officer] or a risk of flight that justified the degree of force used." *Westwater v. Church, 60 F.4th 1124, 1129 (8th Cir. 2023)*. The Court noted the following:

> [C]ontrolling Supreme Court and Eighth Circuit precedents prior to May 2018 drew fine lines in determining when police officers' use of non-deadly force was objectively reasonable in making an arrest or other seizure. Our cases clearly established that it was objectively unreasonable to use more than *de minimis* force to seize a non-threatening misdemeanant who was not fleeing, resisting arrest, or ignoring officer commands.

*Id. at 1130-31* (citations omitted).

While Officer Bauer highlights the scuffle that occurred between Marks and Officer Pobuda as the reason for the degree of force used, we must view the evidence in the light most favorable to Marks with respect to the central facts of the case. It is for a jury to interpret the nature and extent **[*26]** of the contact between Marks and Officer Pobuda. See *Rohrbough, 586 F.3d at 587* (explaining the severity of the suspect's reaction to the officer's conduct is a matter for the jury to decide). While Marks could have potentially faced a number of different charges for his conduct, while not dispositive but a fact for the jury to consider, prosecutors in two different offices reviewed the evidence presented by the MPD and declined to charge Marks with either a felony or a misdemeanor. The record also shows that Officer Pobuda who was engaging with Marks did not believe additional force beyond the push with his riot baton was necessary.

On this record, a reasonable jury could conclude that Marks was shot when he neither posed a threat to the officers or the public, nor was he fleeing or ignoring an officer's commands. On the other hand, a jury might agree with Officer Bauer's assessment of the situation

and find his use of force was objectively reasonable. Marks has made a compelling showing that Officer Bauer used more than *de minimis* force when he shot him in the face at close range with a chemical projectile that he knew could cause serious injury or death while Marks was no longer resisting but instead falling **[*27]** backwards to the ground. He used a high level of force despite being given fair notice that at the time of this incident it was objectively unreasonable to use more than *de minimis* force to seize a non-threatening misdemeanant who was not fleeing, resisting arrest, or ignoring officer commands. *Westwater, 60 F.4th at 1131*. On this record where disputed issues of material fact exist such that the issues of law cannot be decided without findings on the central fact issues, Officer Bauer is not entitled to qualified immunity.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's decision.

**Dissent by:** STRAS

## Dissent

STRAS, Circuit Judge, dissenting.

No Minnesotan can forget the violence in the wake of George Floyd's death. At the epicenter was Minneapolis's Third Precinct police station, which rioters burned to the ground. This case is about the chaos that came before.

I.

On the third day of rioting and property destruction in Minneapolis, Officer Benjamin Bauer and his fellow SWAT team members were called to the scene for a stabbing and encountered a large, out-of-control crowd. Almost immediately, they had water bottles and rocks thrown at them. As the officers helped the stabbing victim, they heard about another attack **[*28]** nearby, this time using a baseball bat. They formed a protective perimeter around the victim.

At that point, the situation turned from bad to worse. A woman tried to get through the perimeter, but an officer blocked her with his arm and ordered her to step back. The officer's actions angered her son, Ethan Marks, who screamed "[b]ack up, bitch," pushed the officer with both hands, and tried to grab his baton. After the officer regained control of it, he used it to push Marks. As Marks stumbled backwards, Officer Bauer fired a chemical round from his less-lethal launcher. The round struck Marks in the face, causing a traumatic brain injury and serious eye damage.

II.

Although this case is tragic, context matters. And here, given the chaos and violence quickly enveloping the officers, there is no way to conclude that Officer Bauer's actions *clearly* violated Marks's rights. *See Kelsay v. Ernst, 933 F.3d 975, 979 (8th Cir. 2019)* (en banc). Think of the split-second decision he faced: give a six-foot-tall, 200-pound man who had just attacked a fellow officer a second chance or neutralize him with a chemical round. With the benefit of hindsight, we now know that Officer Bauer may have made the wrong choice, but no one can identify a single **[*29]** case involving "similar circumstances" that would have provided "fair notice" that his actions "violated [a] *Fourth Amendment*" right. *White v. Pauly, 580 U.S. 73, 79, 137 S. Ct. 548, 196 L. Ed. 2d 463 (2017)* (per curiam); *see Kisela v. Hughes, 584 U.S. 100, 104, 138 S. Ct. 1148, 200 L. Ed. 2d 449 (2018)* ("Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." (internal quotation marks omitted)). Not one.

Indeed, two cases suggest just the opposite. Consider the strikingly similar case of *White v. Jackson. 865 F.3d 1064 (8th Cir. 2017)*. In the wake of a police shooting in Ferguson, Missouri, protestors grew violent. *See id. at 1069*. The officers fired smoke and tear-gas canisters and established a "skirmish line" to disperse the crowd. *Id. at 1072*. A bystander, however, ignored commands to stop and continued to walk toward the officers. *Id. at 1072-73*. Even though he had not threatened or attacked anyone, they shot him with "five bean bag rounds and four rubber bullets." *Id. at 1073*. We held that, under those circumstances, "a reasonable officer could have concluded that [he] had been a part of the violent crowd [and] that his advances toward the skirmish line posed a threat to officer safety." *Id. at 1079*.

A similar situation arose in *Bernini v. St. Paul. 665 F.3d 997 (8th Cir. 2012)*. The officers there confronted **[*30]** a crowd of "approximately 100 people" who threw "rocks and bags containing feces." *Id. at 1001*. To keep the group from marching toward the Republican National

Convention, the officers fired munitions "contain[ing] rubber pellets." *Id.* In reasoning resembling *White*, we concluded that the use of force was reasonable because the crowd was "acting as a unit" and "intended to break through [a] police line." *Id. at 1004, 1006*.

If anything, Officer Bauer and the SWAT team faced even more danger. Like *White*, the officers were caught in the middle of race-related protests that were nearing a flashpoint. And as in *Bernini*, the officers formed a perimeter to protect a sensitive target. To be sure, Marks was neither a bystander in the wrong place at the wrong time, *see White, 865 F.3d at 1072-73*, nor a member of a larger group trying to breach a police line, *see Bernini, 665 F.3d at 1006*. But by attacking an officer, he had broken the law and become a danger. "[A] reasonable officer, looking at the legal landscape at the time . . . , could have interpreted [*White* and *Bernini*] as *permitting* the" use of force, rather than clearly prohibiting it.[3] *District of Columbia v. Wesby, 583 U.S. 48, 68, 138 S. Ct. 577, 199 L. Ed. 2d 453 (2018)* (emphasis added). At a minimum, "the constitutional question" was not "beyond debate." *Ashcroft v. Al-Kidd, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)*.

III.

The **[*31]** court concludes otherwise, but only by defining the right at a high level of generality. *See ante* at 13 ("[A] police officer is not permitted to use deadly force on an individual, who previously posed a threat to others, but no longer presents an immediate threat."); *see also Banks v. Hawkins, 999 F.3d 521, 532 (8th Cir. 2021)* (Stras, J., dissenting) (describing a "formulation so broad that it lack[ed] clarity [and] risk[ed] sweeping too broadly"). Yet "controlling authority or a robust consensus of cases . . . [must] clearly prohibit the officer's conduct in the *particular circumstances* before him." *Wesby, 583 U.S. at 63* (internal quotation marks and citation omitted); *see id.* (explaining that "specificity" is "especially important in the *Fourth Amendment* context" (quoting *Mullenix v. Luna, 577 U.S. 7, 13, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015)* (per curiam)). The court relies on three cases, but they lack factually "similar circumstances." *Id. at 64* (citation omitted).

The first one is *Montoya v. City of Flandreau*, but no one attacked an officer in that case. *669 F.3d 867, 869 (8th Cir. 2012)*. Rather, in response to a woman arguing with her ex-boyfriend from "ten to fifteen feet away" with "her hands above her head," an officer tackled her with a "leg sweep." *Id. at 871*. We held that the force used may have been excessive because "nothing in the record indicate[d] [that] [she] threatened or **[*32]** posed a danger to the safety of the officers." *Id.* There was no push, no struggle, no threat, not even a single word of profanity, before the takedown. Not to mention the absence of a violent crowd.

*Johnson v. Carroll* is also distinguishable. *658 F.3d 819 (8th Cir. 2011)*. It involved a woman who tried to prevent the arrest of her nephew by "interjecting her body between him and the officers." *Id. at 827*. The officers responded by "push[ing] her to the ground." *Id.* Viewing the facts in her favor, we concluded that the use of force was unreasonable because "[t]here [wa]s no evidence that [she] *actively pushed* the officers . . . , *threatened* them, or took any *other* action against them." *Id.* (emphasis added). Marks, by contrast, did each of those things.

*Rohrbough v. Hall* is even further afield. *586 F.3d 582 (8th Cir. 2009)*. An officer there pushed an individual who may have created a "disturbance in [an] optometry shop." *Id. at 585*. When the suspect "returned the push," the officer "punched [him] in the face . . . , took him to the ground face down, [and] landed on top of him." *Id.* We left it to a jury to decide whether the officer's reaction to the "*de minimis* or inconsequential" push was excessive. *Id. at 587*. No one in that case—not the suspect or anyone else—"pose[d] **[*33]** an immediate threat to the [officer's] safety." *Id. at 586*.

Marks relies on his own cases, but none gets him any closer to identifying a clearly established right. In two of them, officers shot men who were alone and posed no threat. *See Cole ex rel. Richards v. Hutchins, 959 F.3d 1127, 1133 (8th Cir. 2020)* (shooting a man who was holding a gun "either toward the ground or the sky" and "visibly retreating" from another man's home); *Ellison v. Lesher, 796 F.3d 910, 917 (8th Cir. 2015)* (firing at an unarmed man in his home). And in the other, an officer shot the *victim* of a carjacking. *See Craighead v. Lee, 399 F.3d 954, 959 (8th Cir. 2005)*.

---

[3] Qualified immunity is an objective standard, so it makes no difference that the officer who pushed Marks thought no further force was necessary. *See Pearson v. Callahan, 555 U.S. 223, 244, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)*. Besides, he was viewing the threat from a different vantage point. All that matters here is whether "a reasonable officer in [Officer Bauer's] position *could* have believed" he needed to use force to subdue Marks, not whether *everyone* on the scene thought so. *Kelsay, 933 F.3d at 981* (emphasis added).

Officer Bauer, by contrast, confronted a violent situation that only grew more precarious by the second. Along with his fellow SWAT team members, he faced a frenzied crowd and had to deal with multiple injured bystanders, one stabbed and another hit with a baseball bat. During the chaos, Officer Bauer made a "split-second judgment[]" to use his less-lethal launcher rather than giving an angry six-foot-tall man another chance to attack a fellow officer. *Graham v. Connor, 490 U.S. 386, 397, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)*. Despite the difficult choice he faced, the court allows this lawsuit to proceed. Today's message is unmistakable: "even in the absence of a clearly controlling legal rule, think twice before acting, regardless of whether your own life [or another's] is at stake, because a court **[*34]** may step in later and second-guess your decision." *Banks, 999 F.3d at 534* (Stras, J., dissenting). I respectfully dissent.

---

**End of Document**