IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**DON LLOYD COOK**                                                    **PLAINTIFF**

**v.**                              **Case No. 4:22-cv-00548 KGB**

**RYAN WINGO,** *et al.*                                             **DEFENDANTS**

<u>**OPINION AND ORDER**</u>

Before the Court is defendants Corporal Ryan Wingo, Captain Jeff Sheeler, Captain John
S. Joe, and Colonel William J. Bryant's motion for summary judgment (Dkt. No. 19).  Plaintiff
Don Lloyd Cook brings this action pursuant to 42 U.S.C. § 1983 against defendants in their
individual capacities as members of the Arkansas State Police ("ASP") (Dkt. No. 1).  Mr. Cook
alleges that defendants violated his rights under the First, Fourth, and Fourteenth Amendments
during a protest in Little Rock, Arkansas, on June 1, 2020, and during the events that followed
(*Id.*, ¶ 222).  Mr. Cook alleges that Corporal Wingo violated his rights under the Fourth
Amendment on the night of the protest (*Id.*, ¶¶ 152–66); that Captain Joe is liable for his failure to
intervene (*Id.*, ¶¶ 184–91); that Corporal Wingo and Captain Sheeler violated his rights with
respect to Mr. Cook's arrest one year after the protest (*Id.*, ¶¶ 207–16); that Corporal Wingo,
Captain Sheeler, and Captain Joe violated his rights under the First Amendment (*Id.*, ¶¶ 167–83);
that Colonel Bryant is liable as a supervisor (*Id.*, ¶¶ 192–206); and that Corporal Wingo, Captain
Sheeler, and Captain Joe participated in a civil conspiracy to violate Mr. Cook's constitutional
rights (*Id.*, ¶¶ 217–22).

Defendants filed this motion for summary judgment contending that no genuine dispute of
material fact exists and that they are entitled to judgment on each of Mr. Cook's claims as a matter
of law (Dkt. No. 19).  Mr. Cook responded in opposition, and defendants filed a reply (Dkt. Nos.

26; 32).  Mr. Cook also provided notice to the Court of a decision by the Eighth Circuit Court of

Appeals regarding qualified immunity, *Marks v. Bauer*, No. 23-1420 (8th Cir. July 12, 2024) (Dkt.

No. 37).  For the following reasons, the Court grants, in part, and denies, in part, defendants'

motion for summary judgment (Dkt. No. 19).

## I.      Factual Background

### A.      Status Of The Record Evidence

Defendants filed a joint statement of undisputed material facts, and Mr. Cook filed a

response (Dkt. Nos. 21; 28).  Defendants filed a reply (Dkt. No. 32).

Federal Rule of Civil Procedure 56(c) requires that "[a] party asserting that a fact cannot

be or is genuinely disputed must support the assertion by:  (A) citing to particular parts of materials

in the record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only), admissions,

interrogatory answers, or other materials; or (B) showing that the materials cited do not establish

the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  Under Federal Rule of Civil Procedure

56(e), "[i]f a party fails to properly support an assertion of fact or fails to properly address another

party's assertion of fact as required by Rule 56(c), the court may:  (1) give an opportunity to

properly support or address the fact; (2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials—including the facts

considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate

order."  Fed. R. Civ. P. 56(e).

Defendants, in their reply, assert that Mr. Cook "cited the record to dispute only two

paragraphs of Defendants' Statement of Undisputed Facts," (Dkt. No. 32, at 2 (citing Dkt. No. 21,

¶¶ 17, 35)), arguing that this Court should "accept the remainder of the undisputed facts as a matter of course." ( *Id.*, at 2–3). This Court has examined the parties' filings and record evidence. The Court disagrees with and rejects defendants' position for reasons explained in this Order based on the Court's review of the record evidence submitted by the parties.

At several points throughout his response to defendants' statement of undisputed material facts, Mr. Cook objects to the materiality of the factual allegation. The Court addresses each objection in turn.

### B.    The Record Evidence And The Parties' Allegations

George Floyd's death, on May 25, 2020, lead to many protests throughout the United States (Dkt. No. 28, ¶ 1). Defendants contend that at least some of the peaceful protests devolved into violence, including shootings, looting, and vandalism (*Id.*, ¶ 2). Mr. Cook does not admit nor deny these allegations; he maintains with citation to record evidence that in this case he never refused to follow any officer commands and never advanced in the direction of any police officers (*Id.*).[1]

Throughout the nation officers were shot, wounded, and injured after being struck by cars, and civilians were killed (*Id.*, ¶ 3). Mr. Cook does not admit nor deny these allegations; he maintains with citation to record evidence that in this case he never refused to follow any officer commands and never advanced in the direction of any police officers (*Id.*).[2]

Arkansas in June 2020 was not immune to the anger, frustration, and fear of police violence voiced by protesters of Mr. Floyd's death (*Id.*, ¶ 4). Defendants contend that on May 31, 2020,

---

[1]  At this stage of the litigation, as to Mr. Cook's objection, the Court does not find events that occurred outside of Little Rock, Arkansas, on June 1, 2020, material to the claims and defenses in this case. The parties may request that the Court revisit this issue prior to trial.
[2]  At this stage of the litigation, as to Mr. Cook's objection, the Court does not find events that occurred outside of Little Rock, Arkansas, on June 1, 2020, material to the claims and defenses in this case. The parties may request that the Court revisit this issue prior to trial.

the Little Rock protests took a violent turn, with riotous protestors hitting at least one police officer with rocks, shooting fireworks at officers, and smashing car and building windows near the Capitol (*Id.*, ¶ 5). Mr. Cook does not admit nor deny these allegations; he maintains with citation to record evidence that in this case he never refused to follow any officer commands and never advanced in the direction of any police officers (*Id.*).[3] Further, he maintains with citation to record evidence that he never saw any protesters advance toward the police line and that he did not see any protesters hit with pepper balls or with foam impact rounds (*Id.*).

Defendants contend, without referencing any specific date, that riotous protesters threw large artillery-shell fireworks, frozen water bottles, slingshot ball bearings, and compression bombs at officers (*Id.*, ¶ 6). Defendants assert that these things also happened on June 1, 2020 (*Id.*, ¶ 7).[4] In response to both assertions, Mr. Cook admits with citation to record evidence that, on June 1, 2020, he saw a single male protestor throw a water bottle toward police officers and denies the remainder of the statements, citing additional record evidence that Colonel Bryant could not state for certain that any trooper was injured by any protestor projectiles and was unaware of any Workmen's Compensation claims filed by any troopers for injuries sustained during the protests (*Id.*). Mr. Cook also maintains that, prior to being hit, he never saw any protestors advance toward the police line and did not see any protesters hit with pepper balls or foam impact rounds (*Id.*).

---

[3] At this stage of the litigation, as to Mr. Cook's objection, the Court does not find events that occurred outside of Little Rock, Arkansas, on June 1, 2020, material to the claims and defenses in this case. The Court is aware of no record evidence that Mr. Cook participated in a protest prior to the June 1, 2020, protest at issue in this litigation. The parties may request that the Court revisit this issue prior to trial.

[4] At this stage of the litigation, as to Mr. Cook's objection, the Court finds events that occurred at the protest in Little Rock, Arkansas, on June 1, 2020, that is the subject of this litigation material to the claims and defenses in this case. The parties may request that the Court revisit this issue prior to trial.

On June 1, 2020, a 10 p.m. curfew was in effect, which Mr. Cook admits (*Id.*, ¶ 8).[5]  Mr. Cook admits that he knew about the curfew (*Id.*, ¶ 9).  Based on undisputed record evidence, the curfew exempted "individuals who are traveling to or from work.  Those found violating the curfew on first occurrence will be issued a warning.  Further violations will result in a citation." (Dkt. No. 19-9).

All parties agree that law enforcement in front of the Capitol building began issuing dispersal orders around 10:30 p.m. (Dkt. No. 28, ¶ 10).  Tear gas was eventually deployed to disperse those unlawfully gathered after curfew (*Id.*, ¶ 11).  Mr. Cook admits this allegation, but he maintains with citation to record evidence that he was not an individual "unlawfully gathered after curfew" in that he never refused to follow any officer commands and never advanced in the direction of any police officers (*Id.*).

Defendants assert that, like other nights after curfew, riotous protesters threw dangerous objects at the officers, including artillery-shell fireworks, frozen water bottles, rocks, sticks, slingshot ball bearings, and liquid-filled balloons (*Id.*, ¶ 12).  Mr. Cook admits that, on June 1, 2020, he saw a single male protestor throw a water bottle toward police officers but does not know whether the water was frozen; Mr. Cook denies the remainder of the statement (*Id.*).[6]  Mr. Cook cites record evidence that Colonel Bryant could not state for certain that any trooper was injured

---

[5]  At this stage of the litigation, as to Mr. Cook's objection, the Court finds events that occurred at the protest in Little Rock, Arkansas, on June 1, 2020, that is the subject of this litigation material to the claims and defenses in this case.  The parties may request that the Court revisit this issue prior to trial.

[6]  At this stage of the litigation, as to Mr. Cook's objection, the Court finds events that occurred at the protest in Little Rock, Arkansas, on June 1, 2020, that is the subject of this litigation material to the claims and defenses in this case.  The parties may request that the Court revisit this issue prior to trial.

by any protestor projectiles and was unaware of any Workmen's Compensation claims filed by any troopers for injuries sustained during the protests (*Id.*).

Defendants assert that Mr. Cook did not leave the Capitol grounds, failing to comply with the 10 p.m. curfew and that, when Mr. Cook saw officers approaching from the south, he decided to walk north (*Id.*, ¶¶ 13–14).  Mr. Cook admits that he walked north but denies the remainder of the allegation, maintaining with citation to record evidence that he never refused to follow any officer's commands and never advanced in the direction of any police officers (*Id.*).[7]

Defendants assert that, although Mr. Cook went north, Mr. Cook's car was parked "[a] couple of blocks" east of the Capitol building (*Id.*, ¶ 15).  Mr. Cook admits with citation to record evidence that he walked north, away from the Capitol and away from the police line, in compliance with ASP trooper commands, that he never refused to follow any officer commands, and that he never advanced in the direction of any police officers (*Id.*).

Defendants assert, and Mr. Cook admits, that Mr. Cook started out "[w]alking along one of the sidewalks." (*Id.*, ¶ 16).

Defendants assert that, while walking away, Mr. Cook would "turn around" to look at the officers (*Id.*, ¶ 17).  Mr. Cook disputes this characterization as vague and unclear to the extent that it implies that he ever turned his body around and faced the police line (*Id.*).  Further, Mr. Cook denies this assertion but admits with citation to record evidence that, after he began walking northerly, away from the ASP trooper line which marched northward, Mr. Cook saw tear gas cannisters fired by the troopers landing near him; asserts that he never turned around and faced the

---

[7]  At this stage of the litigation, as to Mr. Cook's objection, the Court finds events that occurred at the protest in Little Rock, Arkansas, on June 1, 2020, that is the subject of this litigation material to the claims and defenses in this case.  The parties may request that the Court revisit this issue prior to trial.

police line; and asserts that he periodically looked back over his right shoulder to assess the distance between himself and the sweeping police line behind him (*Id.*).

Defendants assert that eventually Mr. Cook turned and walked onto the grass (*Id.*, ¶ 18). Mr. Cook states that he can neither admit nor deny this allegation and maintains that, even if Mr. Cook trespassed which Mr. Cook maintains he did not, Corporal Wingo's use of force was objectively unreasonable under the circumstances (*Id.*).[8]

Defendants assert that, while Mr. Cook was walking, Mr. Cook was moving through tear gas (*Id.*, ¶ 19). Defendants also assert that Mr. Cook emerged from landscaping and a cloud of tear gas (*Id.*, ¶ 21). In response to both assertions, Mr. Cook denies that he "emerged" from anywhere and objects to these assertions as inaccurately stated; Mr. Cook maintains with citation to record evidence that, after he began walking northerly away from the ASP trooper line which marched northward, he saw tear gas cannisters fired by the troopers landing near him; maintains that he never turned his body around and faced the police line; and maintains that he periodically looked back over his right shoulder to assess the distance between himself and the sweeping police line (*Id.*, ¶¶ 19, 21).

Defendants assert and Mr. Cook denies that, around 10:40 p.m., the officers first saw Mr. Cook (*Id.*, ¶ 20).

Defendants maintain that the law-enforcement line nearest Mr. Cook was spread thin with little support; Mr. Cook denies this assertion (*Id.*, ¶ 22). Given the record evidence presented on

---

[8] At this stage of the litigation, as to Mr. Cook's objection, the Court finds events that occurred at the protest in Little Rock, Arkansas, on June 1, 2020, that is the subject of this litigation material to the claims and defenses in this case. The parties may request that the Court revisit this issue prior to trial.

this issue at this stage of the litigation, the Court does not deem this allegation admitted; the Court views it as disputed.[9]

Defendants assert that, from the officers' perspective, Mr. Cook was red faced, had clinched fists, and was yelling at the officers (*Id.*, ¶ 23).[10]  Mr. Cook denies this assertion (*Id.*). Defendants assert that the officers reasonably inferred that Mr. Cook was angry or extremely agitated (*Id.*, ¶ 24).  Mr. Cook denies this assertion (*Id.*).  Given the record evidence presented on this issue at this stage of the litigation, the Court does not deem these allegations admitted; the Court views these allegations as disputed.[11]

According to defendants, the distance between the law-enforcement line and Mr. Cook closed between the time the officers first saw Mr. Cook and when Mr. Cook was eventually hit with a beanbag round (*Id.*, ¶ 25).  Mr. Cook denies this assertion with citations to record evidence and maintains that he never refused to follow any officer commands and never advanced in the direction of any police officers (*Id.*).  Further, Mr. Cook notes that Captain Sheeler, in his affidavit, avers that Captain Sheeler was 10 to 15 feet behind the police line when Mr. Cook was 10 feet in front of the police line, which totals a distance of 20 to 25 feet but yet, in that same affidavit, Captain Sheeler attests to a distance of about 60 feet or 20 yards at the same time (*Id.*).

---

[9]  At this stage of the litigation, as to Mr. Cook's objection, the Court finds events that occurred at the protest in Little Rock, Arkansas, on June 1, 2020, that is the subject of this litigation material to the claims and defenses in this case.  The parties may request that the Court revisit this issue prior to trial.

[10]  Based on the record evidence before the Court, Captain Sheeler testified when deposed both that Mr. Cook was shouting in the time between when Mr. Cook turned back toward the police line and when Mr. Cook was struck by Corporal Wingo's beanbag and that Mr. Cook's mouth was not moving and his teeth were clenched (Dkt. No. 19-8, at 49:18–51:16).

[11]  At this stage of the litigation, as to Mr. Cook's objection, the Court finds events that occurred at the protest in Little Rock, Arkansas, on June 1, 2020, that is the subject of this litigation material to the claims and defenses in this case.  The parties may request that the Court revisit this issue prior to trial.

Defendants assert that, when Mr. Cook was about 10 feet from the line, he turned to face the sparse officer line, though defendants concede Mr. Cook did not "advance" on the officers (*Id.*, ¶ 26). However, when deposed, Captain Sheeler asserted that Mr. Cook did advance toward the line (Dkt. No. 19-8, at 49:18–50:4). Mr. Cook admits that he did not advance on anyone on June 1, 2020, and that he never refused to follow any officer commands and never advanced in the direction of any police officers (Dkt. No. 28, ¶ 26 ).[12]

Defendants assert that the officers did not know whether Mr. Cook had a concealed gun or other weapon, but from the officers' perspective, he could have had one (*Id.*, ¶ 27). Mr. Cook denies this assertion (*Id.*). Given the record evidence presented on this issue at this stage of the litigation, the Court does not deem these allegations admitted.

Defendants assert that Corporal Wingo saw Mr. Cook's demeanor and proximity to the line (*Id.*, ¶ 28). Mr. Cook denies this assertion with citation to record evidence (*Id.*). Mr. Cook cites Captain Sheeler's affidavit where Captain Sheeler avers that he was 10 to 15 feet behind the police line while Mr. Cook was 10 feet in front of the police line, which totals a distance of 20 to 25 feet (*Id.*). Further, in that same affidavit, Captain Sheeler attests to a distance of 60 feet or 20 yards at the same time (*Id.*).[13]

Defendants assert that, because Corporal Wingo was concerned about an imminent altercation between Mr. Cook and the officer nearest Mr. Cook, Corporal Wingo fired his less-

---

[12] At this stage of the litigation, as to Mr. Cook's objection, the Court finds events that occurred at the protest in Little Rock, Arkansas, on June 1, 2020, that is the subject of this litigation material to the claims and defenses in this case. The parties may request that the Court revisit this issue prior to trial.

[13] At this stage of the litigation, as to Mr. Cook's objection, the Court finds events that occurred at the protest in Little Rock, Arkansas, on June 1, 2020, that is the subject of this litigation material to the claims and defenses in this case. The parties may request that the Court revisit this issue prior to trial.

lethal beanbag-round 12-gauge shotgun (*Id.*, ¶ 29).  Mr. Cook denies this, incorporating his prior citation to record evidence (*Id.*).

Defendants assert and Mr. Cook admits that Corporal Wingo fired three beanbag rounds at Mr. Cook (*Id.*, ¶ 30).

Defendants assert that the third hit Mr. Cook on the right side of his face (*Id.*, ¶ 31).  Mr. Cook admits this, and he further asserts with citation to record evidence that Corporal Wingo stated that the reason he needed to fire three lead-filled beanbag munitions at Mr. Cook was because of problems with Corporal Wingo's vision (*Id.*).  According to Mr. Cook, this statement supports Mr. Cook's assertion that Corporal Wingo was firing his less-lethal 12-gauge beanbag shotgun indiscriminately at Mr. Cook and, by inference, other protesters (*Id.*).  According to record evidence, Mr. Cook fell to the ground and is unsure whether he lost consciousness (Dkt. No. 26-7, at 77:20–24).

Defendants assert that Corporal Wingo had been trained on the use of beanbag rounds and that, on June 1, 2020, Corporal Wingo aimed this beanbag round at Mr. Cook's center mass, in compliance with this training (Dkt. No. 28, ¶ 32).  Mr. Cook denies this assertion (*Id.*).  Given the record evidence presented on this issue at this stage of the litigation, the Court does not deem these allegations admitted.

Defendants assert that Captain Sheeler independently saw Mr. Cook, determined that action was necessary, and fired a foam impact round from a 40mm single launcher (*Id.*, ¶ 33). Corporal Wingo, in his incident report, explained that the impact of Captain Sheeler's foam round caused Mr. Cook to bend forward at which time he was struck in the face by Corporal Wingo's

beanbag round (Dkt. No. 26-2, at 2).[14]  Mr. Cook denies this assertion with citation to record evidence, maintains that he was not struck by a foam impact round fired by Captain Sheeler, suffered no injuries to any part of his body other than his face and mouth, that Metropolitan Emergency Medical Services ("MEMS") paramedic Amanda Burks did not observe any bruises or welts on Mr. Cook's arms or legs, and that there is no objective evidence or medical evidence to support defendants' assertion on this point (Dkt. No. 28, ¶ 33).  Mr. Cook requests an inference that Captain Sheeler "fabricated a narrative where he used force on [Mr. Cook] in order to make [Corporal Wingo's] use of force seem more reasonable and not appear to be an outlier." (*Id.*).  Given the record evidence presented on this issue at this stage of the litigation, the Court does not deem these allegations admitted.

Defendants assert that "[n]o defendant had animus towards [Mr.] Cook because of his protected expression." (*Id.*, ¶ 34).  Mr. Cook denies this assertion and affirmatively asserts that "[t]he failure to apprehend or arrest [Mr. Cook] on June 1, 2020—and the failure to try to locate him—allows a reasonable inference that [Corporal Wingo] and [Captain Sheeler] were not interested in pursuing law enforcement-related goals but rather bore a retaliatory animus against

---

[14]  The Court notes that Captain Sheeler also stated during his deposition that, before either he or Corporal Wingo fired at Mr. Cook, an unknown officer fired multiple pepper ball rounds, hitting Mr. Cook in the back as he moved northward away from the officer line (Dkt. No. 26-5, at 49:5–51:12).  As Captain Sheeler put it in his incident report, the pepper ball rounds "were hitting [Mr. Cook] in the back as he was being driven from the area." (Dkt. No. 26-1, at 2).  Captain Sheeler states that it was after the officers stopped firing the pepper balls that Mr. Cook turned to face the officers (Dkt. No. 26-5, at 50:9–25).  The Court further notes that Corporal Wingo described the use of pepper balls in his incident report but wrote that Mr. Cook began advancing towards the officer line first, was then shot by the pepper ball rounds, and then continued advancing (Dkt. No. 26-2, at 2).  The defendants do not mention either version of the pepper ball incident in their motion, briefing, or statement of facts (Dkt. Nos. 19; 20; 21; 32).  Mr. Cook mentions the pepper balls only to deny that they were ever fired (Dkt. No. 26, at 19).

[Mr. Cook]." (*Id.*).  Given the record evidence presented on this issue at this stage of the litigation, the Court does not deem these allegations admitted.

Defendants assert that no one has ever filed a complaint against Corporal Wingo for using excessive force, nor has he been investigated for using excessive force (*Id.*, ¶ 35).  Mr. Cook denies this assertion and relies upon Corporal Wingo's involvement and the allegations in the matter of *Donner v. Wingo*, Case No. 26-cv-21-1309, currently pending in Pulaski County Circuit Court and premised on police misconduct captured on camera in May 2019 (Dkt. No. 28, ¶ 35).  In *Donner*, Corporal Wingo is accused of causing "painful and permanent injuries" to Charles Donner when he, among other things, "slam[med] Charles Donner against Plaintiff's vehicle…" (*Id.*).

Defendants further assert that Colonel Bryant was unaware of any potential risk that Corporal Wingo would use alleged excessive force on June 1, 2020 (*Id.*, ¶ 36).  Mr. Cook denies this allegation, incorporating his prior citation to record evidence on this point regarding Corporal Wingo's involvement and the allegations in the matter of *Donner v. Wingo*, Case No. 26-cv-21-1309 (*Id.*).

Defendants assert and Mr. Cook admits that no one other than Mr. Cook was hit with a beanbag round during the May and June 2020 protests (*Id.*, ¶ 37).

### C.    Additional Factual Allegations From The Record

In their statements of material facts, neither party discusses certain matters that bear on the pending motion for summary judgment, including but not limited to events that occurred after Mr. Cook was struck by Corporal Wingo's beanbag round the night of June 1, 2020 (Dkt. Nos. 21; 28). These matters and events are integral to several of the claims, arguments, and defenses raised by the parties.  The Court therefore sets forth these additional factual allegations drawn directly from

pleadings and the record evidence provided by the parties. The Court does not accept these factual allegations as true. Instead, the Court sets them out to provide context for the legal analysis.

Mr. Cook alleges in his complaint that, upon information and belief, Captain Joe "acted as a scene commander and directed subordinate ASP troopers as the troopers deployed munitions—beanbag projectiles—at peaceful protestors, many of whom were attempting to leave the Capitol grounds." (Dkt. No. 1, ¶ 32). Mr. Cook also alleges in his complaint that, under Captain Joe's command at the scene, Corporal Wingo "began discharging beanbag projectiles at the protestors." (*Id.*, ¶ 33). Mr. Cook maintains that Captain Joe's "decision to authorize the use of bean bag shotguns, munitions and other less-than-lethal weapons violated accepted police supervisory protocol and ASP policies governing the use of such weapons because the circumstances known to [him] did not indicate their use." (*Id.*, ¶ 46).

Mr. Cook testified that the next thing he remembered after being hit with Corporal Wingo's beanbag round was someone on top of him pulling his arms behind his back and zip tying his wrists (Dkt. No. 19-6, at 77:25–78:16). Lieutenant Brown testified that Mr. Cook was brought behind the police line by the "arrest team" and that he instructed them to hand Mr. Cook over to the "National Guard Arrest Team." (Dkt. No. 19-7, at 61:9–19). Lieutenant Brown testified that he then instructed the National Guard Arrest Team to have Mr. Cook looked at by a Metropolitan Emergency Medical Services ("MEMS") team and then taken to Pulaski County Jail (*Id.*). Corporal Wingo wrote in his incident report that, after Mr. Cook was struck by the beanbag round and fell to the ground, "an ERT arrest team went to [his] location and placed him under arrest." (Dkt. No. 19-11, at 2). Captain Sheeler wrote in his incident report that law enforcement lost track of Mr. Cook after he was turned over to MEMS and before he could be taken to the Pulaski County Jail (Dkt. No. 26-1, at 2).

Mr. Cook testified that he ended up in an ambulance that brought him to a hospital but that he does not remember where the ambulance came from or how he ended up away from the officers (Dkt. No. 19-6, at 89:23–90:21).  MEMS Paramedic Burks wrote in a declaration that she treated Mr. Cook the night of June 1, 2020, and transported him to the University of Arkansas for Medical Sciences ("UAMS") Emergency department by ambulance (Dkt. No. 26-4, ¶¶ 9, 16).  According to Paramedic Burks, when Mr. Cook presented, he was bleeding profusely from his face and mouth, and there were no zip-ties binding his wrists (*Id.*, ¶¶ 6–7).  Paramedic Burks diagnosed Mr. Cook with an avulsion—a wound in which part of the body has been torn off or removed through trauma—to his bottom lip, missing teeth with a possible fractured jaw (*Id.*, ¶ 11).  Paramedic Burks did not observe any bruises or welts on Mr. Cook's arms or legs (*Id.*, ¶ 9).  Further, Paramedic Burks did not detect any pepper spray residue or odor on Mr. Cook at any time during her treatment of him and did not observe any signs of Mr. Cook's having been exposed to pepper spray, such as eye inflammation, coughing and trouble breathing (*Id.*, ¶ 14).  Paramedic Burks did not experience this phenomenon either while treating Mr. Cook (*Id.*).  Mr. Cook contends that he had emergency surgery and sustained physical, mental, and emotional damage as a result of these events (Dkt. No. 1, ¶¶ 56–67, 148–51).

Captain Sheeler testified that another ASP officer attempted to locate Mr. Cook after June 1, 2020, by reviewing MEMS ambulance records but that they were unsuccessful and concluded that Mr. Cook was not transported by ambulance (Dkt. No. 19-8, at 54:2–55:8).  Ms. Burks wrote in her declaration that she has never been asked to help identify the individual she treated the night of the June 1, 2020, protest (Dkt. No. 26-4, ¶ 18).  Mr. Cook maintains that, "[b]etween June 3, 2020 and November 25, 2020, [he] was never contacted by ASP regarding his participation" in the events of June 1, 2020 (Dkt. No. 1, ¶ 69).

Mr. Cook maintains that he wore a salmon-colored short-sleeved golf shirt and a pair of beige cargo shorts the night of June 1, 2020, not a white shirt or red shorts (Dkt. No. 1, ¶¶ 27, 41).

Captain Sheeler testified that he ultimately identified Mr. Cook after Mr. Cook "came forward with a complaint, identifying himself as a victim of a use of force." (Dkt. No. 19-8, at 55:22–56:11).  Captain Sheeler asserts that he was able to identify Mr. Cook because another officer showed him an image from a Zoom call that involved Mr. Cook and the ASP's legal department (*Id.*).  The warrant for Mr. Cook's arrest was not issued until after Mr. Cook made this claim for the injuries he sustained on June 1, 2020 (*Id.*, at 56:12–15).

Mr. Cook contends that, on November 25, 2020, almost six months after the protest, he filed a claim with the Arkansas State Claims Commission ("Claims Commission") seeking compensation for medical expenses related to the injuries he sustained on June 1, 2020 (Dkt. No. 1, ¶ 71).  Mr. Cook asserts that, prior to November 25, 2020, neither Corporal Wingo nor Captain Sheeler "submitted or signed an incident report" regarding Mr. Cook's participation in the events of June 1, 2020 (*Id.*, ¶ 72).  Mr. Cook asserts that, on May 4, 2021, during the pendency of his claim, "an ASP Attorney had him give a videotaped statement regarding his involvement" in the events of June 1, 2020, and that, upon information and belief, the "act of videotaping a claimant's unsworn statement in a claims commission case was out of the ordinary and done for the purpose of providing a defense. . . or for otherwise protecting the troopers. . . related to their conduct on June 1, 2020." (*Id.*, ¶¶ 74–75).

Mr. Cook asserts in his complaint that neither Corporal Wingo nor Captain Sheeler "submitted or signed an incident report on June 1, 2020 regarding [Mr. Cook's] actions on that date." (*Id.*, ¶ 68).  However, at some point, Corporal Wingo and Captain Sheeler prepared incident reports that they signed (*Id.*, ¶ 99; *see also id.*, at 49–53 (incident reports executed by Corporal

Wingo and Captain Sheeler)).   Mr. Cook contends that, as related to Mr. Cook, there are misrepresentations in these incident reports (*Id.*, ¶¶ 103–31).

Mr. Cook asserts that, on May 28, 2021, Captain Sheeler submitted an affidavit to a judge in an effort to obtain an arrest warrant for Mr. Cook related to alleged criminal activity by Mr. Cook at the June 1, 2020, event (*Id.*, ¶ 77; *see also id.*, at 43–45 (Captain Sheeler's May 28, 2021, affidavit)).   Mr. Cook asserts that Captain Sheeler made misrepresentations in his affidavit, including the following:

(1)   That Mr. Cook was struck in the back with pepper balls fired by ERT members;

(2)   That Mr. Cook was wearing a white shirt and red shorts;

(3)   That, around the time he was being struck with pepper balls, Mr. Cook "[s]uddenly. . . turned around and began shouting at the ERT Members in an aggressive manner and began to approach the line with clenched fists";

(4)   That Captain Sheeler fired a foam impact round at Mr. Cook's upper thigh from a distance of approximately 20 yards; and

(5)   That Captain Sheeler's foam impact round struck Mr. Cook in the upper thigh/groin area and stopped Mr. Cook's advance.

(*Id.*, ¶¶ 81–82).   On the affidavit, Captain Sheeler described the particular criminal offense Mr. Cook was alleged to have violated as obstructing governmental operations pursuant to Arkansas Code Annotated § 5-54-102(b)(1) (*Id.*, ¶ 79; *see also id.*, at 43–45 (Captain Sheeler's May 28, 2021, affidavit)).

Mr. Cook asserts that a pepper ball is a "projectile containing a powdered chemical that is fired from a gun and explodes upon contact, irritating one's eyes and nose in a manner similar to pepper spray." (*Id.*, ¶ 83).   Mr. Cook alleges that the first responder who encountered him on June 1, 2020, was asked whether he detected any pepper spray odor or residue on Mr. Cook and responded that he did not (*Id.*, ¶ 61).   Mr. Cook also maintains that there are no notations in his

University of Arkansas for Medical Sciences ("UAMS") medical records indicating that anyone detected pepper spray odor or residue on Mr. Cook when he was admitted to UAMS on June 1, 2020 (*Id.*, ¶ 66).

Mr. Cook alleges in his complaint that the misrepresentations by Captain Sheeler in the affidavit were intentional and made in an attempt to justify Corporal Wingo's use of force against Mr. Cook by falsely portraying Mr. Cook as a threatening physical aggressor to support fraudulent misdemeanor charges (*Id.*, ¶ 85). Mr. Cook further alleges that this charge also was intended by Corporal Wingo, Captain Sheeler, and/or Captain Joe to intimidate Mr. Cook, frustrate his Claims Commission case, and further chill Mr. Cook's First Amendment rights (*Id.*, ¶ 86).

Based on Captain Sheeler's affidavit, a warrant issued for Mr. Cook's arrest on a charge of obstructing governmental operations in violation of Arkansas Code Annotated § 5-52-102(a)(1), a class C misdemeanor (*Id.*, ¶ 87; *see also id.*, at 46 (arrest warrant for Mr. Cook)).

On July 23, 2021, according to Mr. Cook, Mr. Cook was arrested at his home, handcuffed, and escorted to a waiting marked ASP police vehicle (*Id.*, ¶ 88). Mr. Cook maintains he was arrested by ASP troopers who are not named as defendants in this action (*Id.*). Mr. Cook was taken to jail, booked, fingerprinted, and placed in a jail cell (*Id.*, ¶ 97).

Based on the events of June 1, 2020, on May 21, 2021, Mr. Cook was charged with obstructing governmental operations (Dkt. No. 26-3). Mr. Cook represents that his prosecution for obstructing governmental operations ended in a pretrial diversion agreement (Dkt. No. 1, ¶¶ 132, 212). Mr. Cook further maintains that, because he satisfied his responsibilities under the pretrial diversion agreement, his criminal case was dismissed (*Id.*, ¶ 133).

## II.     Legal Standards

### A.     Summary Judgment

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); *UnitedHealth Group Inc. v. Exec. Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Federal Rule of Civil Procedure 56 and noting that summary judgment is proper if there is no genuine issue of material fact in dispute for trial).

Under such circumstances, the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322. "In ruling on a motion for summary judgment '[t]he district court must base the determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'" *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923–24 (8th Cir. 2004) (internal citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Johnson Regional Medical Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) (quoting *Howland v. Kilquist*, 833 F.2d 639, 642 (7th Cir. 1987)).

Parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

**B.      Liability Under 42 U.S.C. § 1983 And Qualified Immunity**

Section 1983 provides a cause of action against any "person" who, acting "under color of" state law, deprives the plaintiff of "rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Government employees may be sued under § 1983 in either their official or individual capacities. *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999). In this case, Mr. Cook brings only individual capacity claims.

Officers sued under § 1983 in their individual capacities can raise qualified immunity as a defense. This doctrine "shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Partlow v. Stadler*, 774 F.3d 497, 501 (8th Cir. 2014). Courts use a two-step inquiry to determine whether qualified immunity applies: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Id.* Plaintiffs must meet both steps to defeat qualified immunity, and courts can begin the analysis with either step. *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015).

### III.     Analysis

#### A.     Heck v. Humphrey

In *Heck v. Humphrey*, the Supreme Court held that a district court must dismiss a § 1983 claim if "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence," unless the plaintiff proves "that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck v. Humphrey*, 512 U.S. 477, 487 (1994).  Before turning to the substance of defendants' motion for summary judgment, the Court considers whether any of Mr. Cook's claims are barred by the *Heck* doctrine.

The *Heck* doctrine applies only when a state "conviction or sentence" is at issue. *Id.*  Based on the events of June 1, 2020, on May 21, 2021, Mr. Cook was charged with obstructing governmental operations (Dkt. No. 26-3).  Had this prosecution ended in a "conviction or sentence," his claim for false arrest—and perhaps certain of his other claims as well—would imply that the conviction or sentence was invalid.  However, based on record evidence before the Court, Mr. Cook's prosecution for obstructing governmental operations ended in a pretrial diversion agreement (Dkt. No. 1, ¶ 212).  The Eighth Circuit Court of Appeals has held that pretrial diversion agreements, to the extent that they are contracts between a defendant and the state in which the state agrees to forgo prosecution in return for certain conditions, are not "convictions or sentences" for the purposes of *Heck*.  *Mitchell v. Kirchmeier*, 28 F.4th 888, 895 (8th Cir. 2022).  Therefore, on the record before the Court, this Court cannot conclude that Mr. Cook's claims are barred by the *Heck* doctrine.  Defendants have not met their burden to prove they are entitled to summary judgment or qualified immunity from Mr. Cook's claims on this basis.

### B.   Excessive Force Claim Against Corporal Wingo

Mr. Cook claims that Corporal Wingo used excessive force when Corporal Wingo shot three lead-filled beanbag rounds from a 12-gauge shotgun at Mr. Cook, the third of which hit Mr. Cook in the right side of his face (Dkt. Nos. 1, ¶¶ 152–66; 26, at 15–21; 28, ¶¶ 30–31).  Corporal Wingo maintains that he did not use excessive force against Mr. Cook and that, even if he did, there was no caselaw clearly establishing the alleged Fourth Amendment right (Dkt. No. 19, ¶ 3).  Viewing the record evidence in the light most favorable to Mr. Cook, there are genuine disputes of material fact that preclude this Court from entering summary judgment in favor of defendants on this claim.  A reasonable jury could conclude that Mr. Cook's account of the moments before Corporal Wingo fired the beanbag rounds is true, and if Mr. Cook's account is true, then Corporal Wingo is not entitled to qualified immunity on the excessive force claim.

Determining whether an officer's use of force violated the Fourth Amendment requires a two-step analysis.  *Graham v. Connor*, 490 U.S. 386, 395–96 (1989); *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989).  First, the Court must consider whether the use of force constituted a seizure within the meaning the Fourth Amendment.  *Graham*, 490 U.S. at 396.  Second, the Court must consider whether the use of force was objectively unreasonable.  *Id.*

A seizure within the meaning of the Fourth Amendment occurs "when there is a governmental termination of freedom of movement through means intentionally applied." *Brower*, 489 U.S. at 597.  The paradigmatic Fourth Amendment seizure involves application of force to the body of a person with the purpose of arresting that person.  *See California v. Hodari D.*, 499 U.S. 621, 624–25 (1991) (explaining the basis of the Fourth Amendment definition of "seizure" in the common law understanding of arrest).  The fact that a plaintiff was not arrested does not change this analysis.  *Marks v. Bauer*, 107 F.4th 840, 846 (8th Cir. 2024) (citing *Pollreis*

*v. Marzoff*, 66 F.4th 726, 731 (8th Cir. 2023)).  "[A] seizure is effected by the slightest application of physical force despite later escape." *Ludwig v. Anderson*, 54 F.3d 465, 471 (8th Cir. 1995) (internal quotations omitted) (citing *Hodari D.*, 499 U.S. at 625).  This standard governs seizures by physical force when the officer's purpose in using the force was to apprehend the person.  *Cf. Dundon v. Kirchmeier*, 85 F.4th 1250, 1256 (8th Cir. 2023) (examining the use of force for the purpose of dispersing a crowd and observing that there is "a potential distinction between force used with intent to apprehend and force used with intent to disperse or repel").

In this case, record evidence supports that the officers intentionally applied force to Mr. Cook with the purpose of constraining his movement and apprehending him.  Mr. Cook, Lieutenant Brown, and Captain Sheeler all testified that, after Mr. Cook was hit in the face by Corporal Wingo's beanbag round, his hands were zip tied behind his back and that Mr. Cook was brought behind the police line (Dkt. Nos. 19-6, at 78:12–81:6; 19-7, at 61:20–62:15; 19-8, at 53:10–17).  Lieutenant Brown testified that Mr. Cook was brought behind the police line by the "arrest team" and that he instructed them to hand Mr. Cook off to the "National Guard Arrest Team" who were in turn instructed to have Mr. Cook examined by medical personnel and then taken to Pulaski County Jail (Dkt. No. 19-7, at 61:9–19).  Corporal Wingo wrote in his incident report that, after Mr. Cook was struck by the beanbag round and fell to the ground, "an ERT arrest team went to [his] location and placed him under arrest." (Dkt. No. 19-11, at 2).  Captain Sheeler stated that law enforcement lost track of Mr. Cook after he was turned over to MEMS and before he could be taken to the Pulaski County Jail (Dkt. No. 26-1, at 2).

It was clearly established on June 1, 2020, that incapacitating a person with a beanbag round, zip tying the person's hands behind the person's back, and detaining the person with the intent of taking him to jail constituted a seizure for purposes of the Fourth Amendment.  That the

officers may have lost track of Mr. Cook when MEMS personnel took him away in an ambulance does not change this conclusion.

The Court next turns to Mr. Cook's claim that the force used to effect this seizure was excessive. Excessive force claims under the Fourth Amendment are governed by a reasonableness standard. *Graham*, 490 U.S. at 395. To determine whether the force used to seize a suspect was unreasonable and therefore excessive for Fourth Amendment purposes, the Court must consider "the totality of the circumstances." *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985). "Relevant factors include (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Mitchell v. Kirchmeier*, 28 F.4th 888, 898 (8th Cir. 2022) (alteration in original) (internal quotations omitted) (citing *Graham*, 490 U.S. at 396). This is an objective standard that considers the use of force from the perspective of a reasonable officer on the scene and embodies "allowance for the fact that police officers are often forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. The reasonableness inquiry is not confined to facts about the behavior of the person against whom force was applied; facts about the surrounding circumstances in which an officer makes the decision to use force are relevant to the Court's assessment of the use of force from the perspective of a reasonable officer on the scene. *See Bernini v. City of St. Paul*, 665 F.3d 997, 1006 (8th Cir. 2012) (discussing the size of a crowd and noncompliant behavior of some of its members as parts of the totality of circumstances analysis used to determine whether force was reasonable).

For purposes of the qualified immunity analysis, even if the Court determines that Corporal Wingo's use of force was unconstitutionally excessive, Corporal Wingo is still entitled to qualified

immunity unless the unconstitutionality of his conduct was clearly established at the time of the incident. *Partlow v. Stadler*, 774 F.3d 497, 501 (8th Cir. 2014).

The Eighth Circuit Court of Appeals has "held time and again that, if a person is not suspected of a serious crime, is not threatening anyone, and is neither fleeing nor resisting arrest, then it is unreasonable for an officer to use more than *de minimis* force against him." *Mitchell*, 28 F.4th at  898 (citing *Jackson v. Stair*, 944 F.3d 704, 713 (8th Cir. 2019); *Div. of Emp. Sec. v. Bd. of Police Comm'rs*, 864 F.3d 974, 978–79 (8th Cir. 2017); *Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013), *abrogated on other grounds by Laney v. City of St. Louis*, 56 F.4th 1153, 1157 n.2 (8th Cir. 2023); *Montoya v. City of Flandreau*, 669 F.3d 867, 872–73 (8th Cir. 2012); *Shannon v. Koehler*, 616 F.3d 855, 862–63 (8th Cir. 2010)).  *See also Marks*, 107 F.4th at 849–850 (finding that it was clearly established on May 28, 2020, that it is unlawful for a police officer to shoot an unarmed man with less-lethal munitions during a tense protest when that man was posing no imminent threat to officers or anyone else).  Suspicion that a person may have committed a nonviolent misdemeanor such as trespassing or obstructing a government function does not rise to the level of a "serious crime" that would justify more the *de minimis* force. *Mitchell*, 28 F.4th at 898.  The Eighth Circuit Court of Appeals observed that its cases clearly establish that the use of substantially gentler force than shotgun-propelled, lead-filled beanbag rounds constitutes more than *de minimis* force. *Id.*, at 899 (citing *Small*, 708 F.3d at 1005–06; *Montoya*, 669 F.3d at 870, 872–73; *Shannon*, 616 F.3d at 858, 863–64).  This is true regardless of whether the rounds are aimed at a person's face or body. *Id.*  This constitutional standard for the use of more than *de minimis* force by law enforcement was clearly established before the events on June 1, 2020, at issue here. *Id.*

The facts of *Mitchell v. Kirchmeier* bear a resemblance to those in this case. *Id.* The plaintiff in that case, Marcus Mitchell, was shot in the face by a lead-filled beanbag round fired from a 12-gauge shotgun by a law enforcement officer during a January 2017 protest of the construction of an oil pipeline across Native American tribal land. *Id.*, at 893–94. Mr. Mitchell was shot when he refused to move after law enforcement gave an order and countdown to disperse. *Id.*, at 894. When Mr. Mitchell was shot, he was standing still and not approaching the officers. *Id.*, at 893.

The Eighth Circuit held that the officers who shot Mr. Mitchell were not entitled to qualified immunity. *Id.*, at 899. The *Mitchell* court held that, at the time of the 2017 protest, Eighth Circuit Court of Appeals cases clearly established that gentler treatment than the use of shotgun-propelled, lead-filled beanbag rounds constituted more than *de minimis* force, regardless of whether the officers were aiming at Mr. Mitchell's face or body. *Id.*, at 898. Further, the *Mitchell* court held that prior cases clearly established that more than *de minimis* force by police officers is not justified against a person who is not a suspect of a serious crime—in Mr. Mitchell's case trespassing and obstructing a government function, both nonviolent misdemeanors, did not count as a serious crime—was not threatening anyone, and was not fleeing or resisting arrest. *Id.*

This Court views the record evidence in the light most favorable to Mr. Cook, the nonmoving party. A reasonable jury could determine that Mr. Cook's account of the facts is true, and if Mr. Cook's account of the facts is true, then like the officers in *Mitchell*, Corporal Wingo is not entitled to qualified immunity on Mr. Cook's Fourth Amendment excessive force claim. In Mr. Cook's account, Mr. Cook was walking North away from the line of officers approaching from the South and was complying with the officers' commands (Dkt. No. 28, ¶¶ 21, 25). Mr. Cook periodically looked back over his shoulder to gauge the distance from the approaching line

and, when looking over his shoulder, was struck in the face by Corporal Wingo's beanbag round (*Id.*). Mr. Cook had been around other protestors earlier in the night, but at this point, Mr. Cook was moving independently of any others (*Id.*, ¶¶ 20–29). According to Mr. Cook, prior to being hit, Mr. Cook never saw any protesters advance toward the police line (Dkt. No. 26-7, at 180:4–7); never saw any protesters hit with pepper balls or with foam impact rounds (*Id.*, at 180:8–12); never refused to follow any officer commands (*Id.*, at 170:7–9); never advanced in the direction of any police officers (*Id.*, at 170:10–12); and prior to being struck with the flying object—a lead-filled beanbag fired by Corporal Wingo–never heard warnings that force was imminent (*Id.*, at 171:12–16).

Further, there is inconsistent record evidence as to the time these events occurred (Dkt. Nos. 28, ¶¶ 10, 20; 19-6). There also is inconsistent record evidence on the distance Mr. Cook was from the line, with estimates of 20 to 25 feet or 60 feet or 20 yards (Dkt. No. 19-3, ¶¶ 8, 16, 18). Defendants provide inconsistent record evidence on whether Mr. Cook did not "advance" on the officers, taking the position for this filing that Mr. Cook did not advance on officers (Dkt. No. 28, ¶ 26; Dkt. No. 19-8, at 49:18–50:4). Defendants do not argue that, at the time he was shot, Mr. Cook was a suspect of any crime, let alone a serious crime (Dkt. Nos. 20, at 10–16; 32, at 4–5). One year after the incident, Mr. Cook was arrested for obstructing governmental operations, but even if Mr. Cook were at the time a suspect of a misdemeanor such as obstructing governmental operations, this does not rise to the level of a serious crime that would justify more than *de minimis* force. *See Mitchell*, 28 F.4th at 898. If Mr. Cook's version of events is accepted as true, and the Court accepts his version of events as true at this stage of the litigation for purposes of resolving the pending motion, Mr. Cook was not threatening anyone (Dkt. No. 28, ¶¶ 21, 23, 25). He was

not fleeing from or resisting arrest (*Id.*, ¶ 25).  In fact, he was walking away from approaching officers in an attempt to comply with their commands (*Id.*).

It was clearly established in 2017, three years before the events at issue in this case, that using more than *de minimis* force in such circumstances is unconstitutional excessive force, and it was clearly established that far gentler uses of force than lead filled beanbag rounds from a 12-gauge shotgun are more than *de minimis*.  For these reasons, Corporal Wingo is not entitled to qualified immunity on Mr. Cook's Fourth Amendment excessive force claim.

Defendants argue that Mr. Cook's case is not analogous to *Mitchell* and is more analogous to *White v. Jackson*, 865 F.3d 1064 (8th Cir. 2017) (Dkt. No. 20, at 15).  In *White*, one defendant, DeWayne Matthews, walked toward a police line during a night of protests.  865 F.3d at 1072.  Officers gave a loud verbal command to turn around.  *Id.*, at 1072–73.  Mr. Matthews continued to approach the police line, and an officer yelled that he was under arrest.  *Id.*, at 1073.  After this second warning, Mr. Matthews continued advancing toward the police line, and an officer fired a beanbag round.  *Id.*  After being hit by one beanbag round, Mr. Matthews continued advancing toward the police line and was shot several more times.  *Id.*, at 1079.  The Eighth Circuit held that Mr. Matthews' proximity to a violent crowd and continued advances toward the police line after multiple warnings made the officer's use of the shotgun-propelled beanbag round reasonable.  *Id.*, at 1079–80.

The facts of *White* are similar to those in this case only to the extent that they both relate to a protest and both involve the plaintiff being shot with a beanbag round.  Viewing the evidence in the light most favorable to Mr. Cook, as this Court is required to do at this stage of the litigation, this is where the similarities end.

Like Mr. Mitchell, and unlike Mr. Matthews, if the record evidence before the Court is viewed in the light most favorable to Mr. Cook, Mr. Cook was not behaving in any way that could plausibly be interpreted as threatening (Dkt. No. 28, ¶¶ 21, 23, 25).  Like Mr. Mitchell, and unlike Mr. Matthews, Mr. Cook was not advancing toward a police line (*Id.*, ¶ 26).  To the extent that the facts in this case differ from those at issue in *Mitchell*, the facts in this case viewed in the light most favorable to Mr. Cook demonstrate that a reasonable jury could conclude that Corporal Wingo's use of a force was unconstitutional.  Where Mr. Mitchell was standing still, Mr. Cook was walking away from the officers (*Id.*, ¶ 21).  Where Mr. Mitchell was refusing to move after a law enforcement order and countdown, Mr. Cook was complying with a law enforcement order by walking away from the protest (*Id.*).  Like Mr. Mitchell, Mr. Cook had been a part of a tense protest (Dkt. No. 20, at 12).  Unlike Mr. Mitchell who was standing near other protestors whose numbers could plausibly have made an officer feel fear that force was necessary, the record evidence viewed in the light most favorable to Mr. Cook describes Mr. Cook as acting independently of others (Dkt. No. 28, ¶¶ 20–29).

Defendants present a different set of facts and argue that Mr. Cook was not walking away when Corporal Wingo shot him but that Mr. Cook in fact had turned to face the officers, was about 10 feet away, and was "red faced, had clenched fists, and was yelling at the officers" (Dkt. No. 20, at 12).[15]  Defendants' assertions demonstrate that there are genuine issues of material fact in

---

[15]  The Court notes defendants' concern about inaccuracies and misrepresentations in Mr. Cook's filings (Dkt. No. 32, at 8–9).  The Court addresses these concerns when setting forth the factual background in this case.

Further, having reviewed all record evidence before it, the Court has concerns at this stage of the litigation regarding defendants' factual allegations and representations regarding the record. For example, defendants write that, "[a]t the very least, Cook was displaying anger with clinched fists when he turned to look over his shoulder at the officers" with a citation to Mr. Cook's deposition (Dkt. No. 20, at 13 n.4).  The cited section of Mr. Cook's deposition contains no such facts.  Defendants write that the "[t]he undisputed evidence shows that 'Cook was angry or

dispute that should be decided by a jury.  At this stage, the Court views the record evidence in the light most favorable to nonmoving party Mr. Cook to resolve the pending motion.

The Court addresses one other contention.  Defendants assert that the officers did not know whether Mr. Cook had a concealed gun or other weapon, but from the officers' perspective, he could have had one (Dkt. No. 28, ¶ 27).  Mr. Cook denies this assertion (*Id.*).  Given the record evidence presented on this issue at this stage of the litigation, the Court does not deem these allegations admitted.  Further, defendants provide no record evidence to establish this as a reasonable suspicion of objective officers on the scene in regard to Mr. Cook at the time of the events of June 1, 2020.  The Eighth Circuit Court of Appeals previously determined that, by 2009, "*Nance v. Sammis* shows it was clearly established that an individual does not pose an immediate threat of serious physical harm to others when, although that person is seemingly in possession of a gun, he does not raise it toward another or otherwise appear 'ready to shoot' in the moment." *Cole, as the Personal Representative of the Estate of Richards v. Hutchins*, 959 F.3d 1127, 1134 (8th Cir. 2020) (citing *Nance v. Sammis*, 586 F.3d 604, 611 (8th Cir. 2009)).  Again, no record evidence supports such an assertion as to Mr. Cook, and the Court views the record evidence at this stage in the light most favorable to Mr. Cook.

There are genuine disputes over outcome determinative material facts as to this claim, and summary judgment on this claim is inappropriate on the record evidence before the Court.  For these reasons, the Court denies defendants' request for qualified immunity and defendants' motion

---

extremely ag[]itated' and 'was red faced, had clinched fists, and was yelling at officers' when he was approximately 10 feet from the sparsely populated police line, with the distance closing." (Dkt. No. 32, at 5).  However, as discussed above, there is record evidence that calls defendants' factual allegations into question on this point.

Disagreement with these facts is at the core of Mr. Cook's argument against defendants' motion for summary judgment.

for summary judgment on Mr. Cook's Fourth Amendment excessive force claim against Corporal Wingo.

### C.   Failure to Intervene Claim Against Captain Joe

Mr. Cook claims that Captain Joe is liable for failure to intervene to prevent Corporal Wingo's use of excessive force (Dkt. No. 26, at 23–24).[16]  Defendants assert that Captain Joe did not fail to intervene because Corporal Wingo's use of force did not violate clearly established rights so no duty arose and that, even if a duty arose, Captain Joe was unaware of the use of force until after the incident (Dkt. No. 19, ¶ 5).

To examine this claim, the Court considers that:

> [t]he Eighth Circuit has held that a police officer may be liable if he does not intervene to prevent the use of excessive force when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.

*Robinson v. Payton*, 791 F.3d 824, 829 (8th Cir. 2015) (internal quotations omitted) (quoting *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009)); *see also Krout v. Goemmer*, 583 F.3d 557, 565 (8th Cir. 2009) (finding case law clearly established on this constitutional right as of July 2006).

Construing all reasonable inferences from the record evidence in favor of Mr. Cook, the Court concludes that no reasonable jury could find that Captain Joe failed to intervene to prevent the use of excessive force.  The record evidence before the Court establishes that Captain Joe stated that he did not command or observe Corporal Wingo's beanbag round discharge or his interaction with Mr. Cook (Dkt. No. 19-4, ¶ 14).  Captain Joe further stated that this is the only incident he is

---

[16]   Mr. Cook presented evidence with the summary judgment filings that alludes to a separate failure to intervene claim against Captain Sheeler, but because Mr. Cook did not include in his complaint a claim against Captain Sheeler for failure to intervene, the Court cannot consider that claim here (Dkt. Nos. 26, at 24; 1, ¶¶ 184–91).

aware of when beanbag rounds were fired at protestors during the May and June 2020 protests and that he did not know that Corporal Wingo had fired beanbag rounds until after the incident had already occurred (*Id.*, ¶ 15).  Mr. Cook's only evidence to refute this is evidence that Captain Joe was a supervisory officer and present at the protest on June 1, 2020 (Dkt. No. 26, at 24; Dkt. No. 26-11, at 2).

On the record evidence before it, construing all reasonable inferences in favor of Mr. Cook, the Court determines that defendants are entitled to summary judgment on Mr. Cook's failure to intervene claim against Captain Joe.

### D.      False Arrest Claims Against Corporal Wingo And Captain Sheeler

Mr. Cook claims that Corporal Wingo and Captain Sheeler falsely arrested him on July 23, 2021 (Dkt. No. 1, ¶¶ 207–16).  Mr. Cook does not cite the constitutional amendment that he maintains supports his false arrest claim (*Id.*).  In his complaint, Mr. Cook invokes the First, Fourth, and Fourteenth Amendments in support of his claims (Dkt. No. 1, ¶ 222).  Corporal Wingo and Captain Sheeler assert that they had probable cause to make the arrest of Mr. Cook and, therefore, are entitled to summary judgment on this claim (Dkt. No. 19, ¶ 7).  The Court examines Mr. Cook's allegations of false arrest, and defendants' assertions, under the circumstances of this case. Although the Court understands that Mr. Cook's false arrest claims relate to the events of July 23, 2021, the Court begins its analysis examining the events of June 1, 2020.

### 1.      Warrantless Arrest June 1, 2020

A warrantless arrest generally does not violate the Fourth Amendment when it is supported by probable cause that the arrestee committed a misdemeanor offense in the presence of an arresting officer.  *Johnson v. McCarver*, 942 F.3d 405, 409 (8th Cir. 2019) (citing *Nieves v. Bartlett*, 139 S. Ct. 1715, 1723–24 (2019)); *Atwater v. City of Lago Vista*, 532 U.S. 318, 354

(2001)).  The officers are entitled to qualified immunity on this Fourth Amendment claim if Mr. Cook's arrest was supported by at least arguable probable cause.  *Johnson*, 942 F.3d at 409 (citing *Waters v. Madson*, 921 F.3d 725, 741 (8th Cir. 2019); *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005)).  Arguable probable cause exists if it turns out that an officer lacked adequate grounds for an arrest but made an objectively reasonable mistake about the existence of probable cause.  *Id.* (citing *Borgman v. Kedley*, 646 F.3d 518, 523 (8th Cir. 2011)).  This standard gives officers "substantial latitude in interpreting and drawing inferences from factual circumstances," though "such latitude is not without limits."  *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999) (internal quotation omitted).  To determine whether an officer's mistaken belief that the officer had probable cause was objectively reasonable—and therefore whether the officer had arguable probable cause—a court must weigh all the evidence relevant to the officer, both for and against a finding of probable cause, "not merely the sufficiency of the incriminating evidence."  *Id.*

For purposes of analyzing their motion for summary judgment, defendants have the burden of identifying which criminal law Mr. Cook is alleged to have violated.  *See, e.g., Welch v. Dempsey*, 51 F.4th 809, 813 (8th Cir. 2022) (concluding that the defendant failed to "identify any law that [plaintiff] was arguably violating when he pepper-sprayed her in the face.").  However, probable cause for any offense is sufficient to invoke qualified immunity.  *Webster v. Westlake*, 41 F.4th 1004, 1012 (8th Cir. 2022) ("[Q]ualified immunity may apply if there was probable cause or arguable probable cause to arrest [someone] for any crime at the time of the arrest.").  The Court is not constrained in its Fourth Amendment review by the arresting officer's subjective reason for the arrest.  *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("[An arresting officer's] subjective reason for making [an] arrest need not be the criminal offense as to which the known facts provide probable cause."); *Wood v. Wooten*, 986 F.3d 1079, 1081 (8th Cir. 2021) ("[T]he validity of the

arrest should be judged by whether the arresting officers actually had probable cause for the arrest, rather than by whether the officers gave the arrested person the right reason for the arrest." (alteration in original) (quoting *United States v. Lester*, 647 F.2d 869, 873 (8th Cir. 1981))).

Defendants claim that the arresting officers had three different bases for arguable probable cause: (1) obstructing governmental operations, Arkansas Code Annotated § 5-54-102(a)(1); (2) failure to disperse, Arkansas Code Annotated § 5-71-206(a); and (3) disorderly conduct, Arkansas Code Annotated § 5-71-207(a)(6) (Dkt. No. 20, at 22–24).

Viewing the record evidence in the light most favorable to Mr. Cook as the nonmoving party, the Court cannot conclude as a matter of law that Corporal Wingo and Captain Sheeler had probable cause or arguable probable cause to arrest Mr. Cook based on the events of June 1, 2020.

Mr. Cook argues that there was no probable cause to arrest him because the various after-action reports of Corporal Wingo and Captain Sheeler describe Mr. Cook's height and weight so differently and because those reports misidentify the color of Mr. Cook's clothes (Dkt. No. 26, at 25–26). Mr. Cook argues that the person described in these reports is therefore not him at all (*Id.*, at 26). However, as defendants point out, it is undisputed that Mr. Cook was the only person hit with beanbag rounds during the protest (Dkt. Nos. 28, ¶ 37; 32, at 6).

Defendants argue that there was probable cause for arresting Mr. Cook because, in failing to disperse on June 1, 2020, Mr. Cook interfered with the police officers' ability to enforce the curfew (Dkt. No. 20, at 23). Defendants maintain that Little Rock Mayor Frank Scott, Jr., signed an executive order to reinstitute a nighttime curfew to begin on June 1, 2020, and occur nightly from 10:00 p.m. to 5:00 a.m. (Dkt. Nos. 19-9; 20, at 23). Mr. Cook admits there was a curfew in effect and that he knew about the curfew (Dkt. No. 28, ¶¶ 8–9). Based on undisputed record evidence, the curfew exempted "individuals who are traveling to or from work. Those found

violating the curfew on first occurrence will be issued a warning.  Further violations will result in a citation." (Dkt. No. 19-9).

It is not clear whether defendants Corporal Wingo and Captain Sheeler rely solely upon the curfew violation as an alleged basis for probable cause–or arguable probable cause–to arrest Mr. Cook.  *See, e.g., Luong v. House*, 669 F. Supp. 3d 735, 750–751 (S.D. Iowa 2023) (examining this issue).  Based on the record evidence before the Court viewed in the light most favorable to Mr. Cook, the Court cannot find as a matter of law that the curfew alone provided probable cause– or even arguable probable cause–to arrest Mr. Cook approximately one year later on July 23, 2021, for alleged actions taken by Mr. Cook on June 1, 2020.  In its analysis, the Court considers the language of the executive order signed by Little Rock Mayor Frank Scott, Jr., which only sanctions issuing a warning on the first offense and citations for subsequent violations, but the Court acknowledges that "'if an arrest is otherwise reasonable, the fact that it is not for an 'arrestable' offense [under state law] does not make it unconstitutional."  *See United States v. Burtton,* 599 F.3d 823, 830 (8th Cir. 2010) (quoting *Thomas v. City of Peoria,* 580 F.3d 633, 637 (7th Cir. 2009)) (upholding an arrest for an infraction under Nebraska law); *see also Virginia v. Moore,* 553 U.S. 164, 176 (2008) ("We conclude that warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and that while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections.").  Here, disputed genuine issues of material fact preclude this Court from finding that the arrest of Mr. Cook on July 23, 2021, for events on June 1, 2020, was otherwise reasonable as a matter of law.  For these reasons, the Court does not find the curfew alone to be a basis for probable cause–or arguable probable cause– to arrest Mr. Cook at this stage of the litigation.

The Court next examines the three statutes upon which defendants rely for their justification of arresting Mr. Cook.  First, with regard to obstructing governmental operations, "[a] person commits the offense of obstructing governmental operations if the person . . . [k]nowingly obstructs, impairs, or hinders the performance of any governmental function."  Ark. Code Ann. § 5-54-102(a).  A "governmental function" is "any activity that a public servant is legally authorized to undertake on behalf of any governmental unit he or she serves."  Ark. Code Ann. § 5-54-101.

As discussed above, there are genuine issues of material fact in dispute.  A reasonable jury could determine that Mr. Cook's account of the events of June 1, 2020, is true, and to resolve defendants' motion for summary judgment on this claim, this Court must accept as true Mr. Cook's account of the events of June 1, 2020, and construe all reasonable inferences from the record evidence in his favor.  The police did not start announcing the order to disperse until around 10:30 p.m., and defendants assert that the ASP line encountered Mr. Cook around 10:40 p.m. (*Id.*, ¶¶ 10, 20).  Mr. Cook denies that the ASP first saw Mr. Cook around 10:40 p.m., which  is consistent with Mr. Cook's deposition testimony regarding these events (*Id.*, ¶ 20; *see also* Dkt. No. 19-6). On the record evidence, there are disputed issues of material fact about the time these events occurred.

Defendants emphasize the fact that "chaos reigned" because, according to defendants, that night civilians in Little Rock had been shooting guns and destroying property and had been throwing fireworks and other objects at officers (Dkt. No. 20, at 23).  However, this is a disputed fact.  Moreover, there is no record evidence, and in fact no argument by defendants, that any defendant witnessed Mr. Cook engage in these acts or that defendants had any reason to think that Mr. Cook did.  Based on defendants' factual assertions, the only information officers on the scene had that night is that, when Mr. Cook was about 10 feet from the line, he turned to face the sparse

officer line (Dkt. No. 28, ¶ 26).  Defendants offer contradictory evidence on whether, when at the line, Mr. Cook did  "advance" on the officers, with defendants taking the position for this motion that Mr. Cook did not advance (*Id.*, ¶ 26; Dkt. No. 19-8, at 49:18–50:4), while  Mr. Cook maintains that he did not advance on anyone on June 1, 2020; he maintains that he never refused to follow any officer commands and never advanced in the direction of any police officers (Dkt. No. 28, ¶ 26).  According to Mr. Cook, he was walking away from police when the events giving rise to this claim occurred (*Id.*, ¶ 17).

Based on the record evidence before the Court, construed in the light most favorable to Mr. Cook, the Court concludes that the obstructing a government function charge does not as a matter of law provide a basis for even arguable probable cause to arrest Mr. Cook.

The second and third bases for probable cause claimed by defendants—failure to disperse and disorderly conduct—both center on failure to disperse.  "A person commits the offense of failure to disperse if, during a riot or an unlawful assembly, he or she refuses or knowingly fails to disperse when ordered to disperse by a law enforcement officer or other person engaged in enforcing or executing the law."  Ark. Code Ann. § 5-71-206(a).  "A person commits the offense of disorderly conduct if, . . . recklessly creating a risk of public inconvenience, annoyance, or alarm, he or she . . . [c]ongregates with two (2) or more other persons in a public place and refuses to comply with a lawful order to disperse or a law enforcement officer . . . ."  Ark. Code Ann. § 5-71-207(a)(6).  When the record evidence is viewed in the light most favorable to Mr. Cook, the Court concludes that neither failure to disperse nor disorderly conduct provide a basis for even arguable probable cause to arrest Mr. Cook.

There are genuine disputes of outcome determinative material facts as to whether probable cause or even arguable probable cause existed to arrest Mr. Cook based on events that occurred on June 1, 2020.

### 2.     Warrant For Arrest Based On Fabricated Police Reports

Mr. Cook alleges in his complaint that he was arrested on July 23, 2021, pursuant to a warrant (Dkt. No. 1, ¶ 87; *see also id.*, at 46 (arrest warrant for Mr. Cook)).  This Court acknowledges that it is firmly established that "[a]n arrest executed pursuant to a facially valid warrant generally does not give rise to a cause of action under 42 U.S.C. § 1983 against the arresting officer."  *Fair v. Fulbright*, 844 F.2d 567, 569 (8th Cir. 1988) (citation omitted). However, to the extent Mr. Cook asserts that officers falsified police reports leading to his arrest, any deprivation of Mr. Cook's liberty before his trial is governed by the Fourth Amendment and its prohibition against unreasonable seizures. *Johnson*, 942 F.3d at 410–11 (citing *Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 368–69 (2017)); *see also Odom v. Kaizer*, 884 F. Supp. 2d 923, at 930 n.1 (D. N.D. 2012) (examining this Fourth Amendment claim in the context of *Heck*-barred claims and the tort of malicious prosecution).[17]

It was clearly established at the time of the events giving rise to Mr. Cook's lawsuit that police fabrications leading to wrongful pretrial detention and wrongful arrest violate Fourth Amendment rights.  In other words, the right under the Fourth Amendment to a determination of probable cause based upon a truthful factual showing was clearly established at the time of the events that are the subject of this action. *Manuel*, 580 U.S. at 368–69; *Hunter v. Namanny,* 219

---

[17] Any post-trial claim based on the alleged false report requires a showing that the report was used to deprive Mr. Cook of liberty in some way. *Johnson*, 942 F.3d at 411 (citing *Winslow v. Smith*, 696 F.3d 716, 735 (8th Cir. 2012)).  Although Mr. Cook alleges that he was put into a jail cell after his arrest pretrial (Dkt. No. 1, ¶ 97), the Court does not understand that Mr. Cook suffered any post-trial deprivation of liberty from the record evidence before it.

F.3d 825, 829 (8th Cir. 2000); *Hulse v. Hall,* 205 F.3d 1346 (table), 1999 WL 1295320, *1 (8th Cir.1999) (unpublished per curiam); *Bagby v. Brondhaver,* 98 F.3d 1096, 1098 (8th Cir. 1996); *Moody v. St. Charles Cnty.*, 23 F.3d 1410, 1411–12 (8th Cir. 1994) (determining that an allegation that an officer lied in an affidavit that served as the basis for an arrest warrant is actionable under § 1983).[18]  It was also clearly established at the time of the events giving rise to Mr. Cook's lawsuit that this Fourth Amendment right is violated when information is provided, either deliberately or in reckless disregard of the truth, that is material to the determination of probable cause and without which a warrant would not have issued.  *See Franks v. Delaware,* 438 U.S. 154, 155 (1978).  An official who causes such a deprivation is subject to § 1983 liability.  *See Bagby v. Brondhaver*, 98 F.3d 1096, 1098 (8th Cir. 1996); *Burk v. Beene,* 948 F.2d 489, 494 (8th Cir. 1991).

---

[18]  Absolute immunity is an affirmative defense that neither Corporal Wingo nor Captain Sheeler address in their summary judgment filings.  *See, e.g., Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982).  Rule 8(c) requires affirmative defenses to be pleaded in a party's answer and failure to plead an affirmative defense generally results in a waiver of that defense.  *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 715 (8th Cir. 2008).  The purpose of the pleading requirement is to give the opposing party notice of the affirmative defense and the opportunity to rebut it.  *First Nat'l Bank v. Pictet Overseas Trust Corp., Ltd.*, 477 F.3d 616, 622 (8th Cir. 2007).  Therefore, the Eighth Circuit has held that "[w]hen an affirmative defense 'is raised in the trial court in a manner that does not result in unfair surprise,. . . technical failure to comply with Rule 8(c) is not fatal." *Id.* (internal quotations omitted) (quoting *Fin. Timing Publ'ns, Inc. v. Compugraphic Corp.*, 893 F.2d 936, 944 n.9 (8th Cir. 1990)).  To the extent there is any issue in this case about absolute immunity, a police officer is entitled only to qualified immunity when acting as a "complaining witness" in a non-adversarial context, as opposed to absolute immunity as a testimonial witness in an adversarial proceeding.  *See Malley v. Briggs,* 475 U.S. 335 (1986) (police officer was not entitled to absolute immunity, but rather qualified immunity, in applying for an arrest warrant on the basis of a felony complaint and affidavit he prepared that failed to state probable cause; absolute immunity did not apply because the officer's function in seeking the arrest warrant was similar to that of a complaining witness, and complaining witnesses were not absolutely immune at common law); *Odom v. Kaizer,* 417 F. App'x. 611, 611 (8th Cir. 2011) (unpublished per curiam) (police officer was not entitled to absolute immunity on Fourth Amendment claim where he knowingly gave false information while testifying in support of issuance of an arrest warrant; citing *Malley).*

When a "police officer deliberately or recklessly makes false statements to demonstrate probable cause for an arrest warrant, the warrant may be invalidated under *Franks v. Delaware*, 438 U.S. 154 (1978)." *Williams v. City of Alexander, Ark.*, 772 F.3d 1307, 1311 (8th Cir. 2014) (citation omitted).  "To establish a *Franks* violation, the plaintiff must prove '1) that a false statement knowingly and intentionally, or with reckless disregard to the truth, was included in the affidavit, and 2) that the affidavit's remaining content is insufficient to provide probable cause.'" *Id.* (quoting *United States v. Box*, 193 F.3d 1032, 1034–35 (8th Cir. 1999)).

The second part of the inquiry requires that the Court determine whether an officer giving false information in support of an arrest or a search warrant is entitled to qualified immunity if the information presented, after proper correction for that which is false, would still support a finding of probable cause.  *See, e.g., Hunter,* 219 F.3d at 830; *Hulse,* 1999 WL 1295320, *1; *cf. Bagby,* 98 F.3d at 1099 (leaving open the issue of whether the "corrected affidavit" doctrine should apply in the case of a deliberate falsehood).  Proper correction as contemplated by these cases includes not only excising the information that is false but also adding information known to the authorities, which, if originally included, would have tended to vitiate the determination of probable cause. *See, e.g., Hunter,* 219 F.3d at 830.

When making a determination of probable cause for a complaint and arrest warrant, a judicial officer must consider "the persuasiveness of the facts relied upon by the complaining officer" and "not accept without question the complaint's mere conclusion that the person. . . has committed a crime."  *Giordenello v. United States,* 357 U.S. 480, 485–86 (1958).  The determination requires information sufficient to lead a prudent person to believe there is a fair probability the accused, and not someone else, committed the offense or offenses for which the complaint and arrest warrant are sought.  *See id.; Wong Sun v. United States,* 371 U.S. 471, 481

n.9 (1963); *Hunter*, 219 F.3d at 830–31.  While the determination of probable cause requires something less than a *prima facie* case and is to be made upon commonsense consideration of the totality of the circumstances, mere suspicion, surmise, and conjecture are not enough.  *See Hunter,* 219 F.3d at 830–31.

With regard to the first *Franks* factor, at this stage of the litigation, construing the record evidence in the light most favorable to Mr. Cook, the Court determines that there are genuine issues of material fact in dispute regarding whether Corporal Wingo and Captain Sheeler knowingly and intentionally, or with reckless disregard to the truth, provided false information in their incident reports and whether Captain Sheeler did so in his affidavit.  On July 23, 2021, Mr. Cook was arrested, and Mr. Cook alleges a "fabricated narrative" by defendants (Dkt. No. 28, ¶ 33).  Defendants assert that, on the night of June 1, 2020, Captain Sheeler independently saw Mr. Cook, determined that action was necessary, and fired a foam impact round from a 40mm single launcher (*Id.*).  Corporal Wingo, in his incident report, explained that the impact of Captain Sheeler's foam round caused Mr. Cook to bend forward at which time he was struck in the face by Corporal Wingo's beanbag round (Dkt. No. 26-2, at 2).  Mr. Cook denies these assertions with citation to record evidence, maintains that he was not struck by a foam impact round fired by Captain Sheeler, suffered no injuries to any part of his body other than his face and mouth, that Paramedic Burks did not observe any bruises or welts on Mr. Cook's arms or legs, and that there is no objective evidence or medical evidence to support defendants' assertion on this point (Dkt. No. 28, ¶ 33).  Mr. Cook requests an inference that Captain Sheeler "fabricated a narrative where he used force on [Mr. Cook] in order to make [Corporal Wingo's] use of force seem more reasonable and not appear to be an outlier." (*Id.*).

Mr. Cook also maintains that both Corporal Wingo and Captain Sheeler's incident reports include "material misrepresentations" and that his arrest was not supported by "probable cause" (Dkt. No. 1, ¶¶ 209–10).  Mr. Cook sufficiently relies upon record evidence that, when construed in his favor, supports this contention at this stage of the proceeding.

Further, if defendants were found to have provided false information in their incident reports and affidavit submitted in support of the request for a warrant, when the Court excises that false information from the documents, the facts, when viewed in the light most favorable to Mr. Cook, establish that the remaining content in Captain Sheeler's affidavit, especially when considered with additional information known to the authorities that would have tended to vitiate the determination of probable cause, is insufficient to provide probable cause or arguable probable cause as a matter of law so as to entitle Corporal Wingo and Captain Sheeler to summary judgment on Mr. Cook's Fourth Amendment false arrest claims.

That the officers allowed a substantial length of time to pass before seeking Mr. Cook's arrest does not factor into this Court's analysis of Mr. Cook's Fourth Amendment claim.  Likewise, whether the officers subjectively thought there was probable cause to arrest is irrelevant to a Fourth Amendment analysis.  *See Johnson*, 942 F.3d at  410.

For the reasons explained in this Order, the Court determines that neither Corporal Wingo nor Captain Sheeler are entitled to qualified immunity on this claim.  This Court cannot determine on the disputed record evidence that, even if Corporal Wingo and Captain Sheeler did provide false information to establish probable cause, arguable probable cause still existed based on the remaining information to support Mr. Cook's arrest for events on the night of June 1, 2020.  There are genuine issues of material fact in dispute based on the record evidence before the Court, and those issues of material fact must be decided by a jury at trial to resolve which account is true.

For these reasons, defendants are not entitled to qualified immunity on Mr. Cook's claim based on the Fourth Amendment for false arrest. The Court denies defendants' motion for summary judgment with regard to the false arrest claim based on the Fourth Amendment.

> E. **Retaliation Claims Against Corporal Wingo, Captain Sheeler, And Captain Joe**

Mr. Cook claims that Corporal Wingo, Captain Sheeler, and Captain Joe's actions during the June 1, 2020, protest, and their decision to arrest Mr. Cook approximately one year later, constituted retaliation against Mr. Cook in violation of the First Amendment (Dkt. No. 26, at 21; *see also* Dkt. No. 26-3, at 2–4 (Captain Sheeler's arrest warrant affidavit)). Defendants maintain that Corporal Wingo, Captain Sheeler, and Captain Joe did not have or act on any retaliatory animus against Mr. Cook and, therefore, did not unconstitutionally retaliate against Mr. Cook (Dkt. No. 19, ¶ 4).

"[A]s a general matter, the First Amendment prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech." *Aldridge v. City of St. Louis*, 75 F.4th 895, 898 (8th Cir. 2023) (internal quotations omitted) (citing *Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259 (2022); *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019)). To prevail on a First Amendment retaliation claim, a plaintiff must first show that they engaged in protected activity. *Aldridge*, 75 F.4th at 898. "If they can make that showing, then the focus shifts to whether the officers 'took [an] adverse action . . . that would chill a person of ordinary firmness from continuing in the [protected] activity.'" *Molina v. City of St. Louis*, 59 F.4th 334, 338 (8th Cir. 2023) (alteration in original) (quoting *Hoyland v. McMenomy*, 869 F.3d 644, 655 (8th Cir. 2017), *abrogated on other grounds by Nieves*, 139 S. Ct. at 1722). Finally, "the plaintiff must show that the defendant would not have taken the adverse action but for harboring 'retaliatory animus' against the plaintiff because of his exercise of his First Amendment rights."

*Mitchell*, 28 F.4th at 896 (quoting *Nieves*, 139 S. Ct. at 1722).  When a claim alleges a retaliatory arrest, to meet the third requirement, but for causation, a plaintiff  must also show that the officer acted without probable cause to arrest because "probable cause speaks to the objective reasonableness of an arrest . . . [and] its absence will—as in retaliatory prosecution cases— generally provide weighty evidence that the officer's animus caused the arrest, whereas the presence of probable cause will suggest the opposite."   *Nieves*, 139 S. Ct. at 1723–24 (internal citation omitted).

### 1.    Retaliation Claim Against Captain Joe

As a preliminary matter, the Court grants defendants' motion for summary judgment with regard to Mr. Cook's claim for retaliation against Captain Joe.  Mr. Cook has not argued that Captain Joe had any control over Corporal Wingo's decision to fire the beanbag rounds, that Captain Joe did anything more than authorize the use of force generally on June 1, 2020, or that Captain Joe was in any way involved in the decision to arrest Mr. Cook (Dkt. No. 26, at 21–23). "[A] plaintiff must be able to prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *White v. Jackson*, 865 F.3d 1064, 1076 (8th Cir. 2017) (quotation omitted).

Construing all reasonable inferences from the record evidence in favor of Mr. Cook, the Court concludes that no reasonable jury could find that Captain Joe singled out Mr. Cook due to Mr. Cook's protected expression.  Even if Captain Joe authorized the use of force generally on June 1, 2020, the record evidence before the Court establishes that Captain Joe stated that he did not command or observe Corporal Wingo's beanbag round discharge or his interaction with Mr. Cook (Dkt. No. 19-4, ¶ 14).  Captain Joe further stated that this is the only incident he is aware of when beanbag rounds were fired at protestors during the May and June 2020 protests and that he

did not know that Corporal Wingo had fired beanbag rounds until after the incident had already occurred (*Id.*, ¶ 15).  Other than unsupported allegations in his complaint, Mr. Cook comes forward with no record evidence demonstrating that Captain Joe played a role in the filing of the incident reports, the issuing of the warrant for Mr. Cook's arrest, or the arrest of Mr. Cook.

The Court finds on the record evidence before it, even when all reasonable inferences are construed in favor of Mr. Cook, that Captain Joe is entitled to qualified immunity on Mr. Cook's First Amendment retaliation claim and grants defendants' motion for summary judgment on this claim against Captain Joe.

### 2.      Retaliation Claims Based On Events of June 2020

The Court now turns to Mr. Cook's claims for retaliation against Corporal Wingo and Captain Sheeler based on the events of June 1, 2020.

Mr. Cook alleges in his complaint that, on June 1, 2020, he was participating in "a public protest of chronic excessive force committed by police officers, an overall lack of police accountability and an institutional tolerance within Arkansas' law enforcement apparatus of egregious, often violent, police misconduct" (Dkt. No. 1, ¶ 177).  Mr. Cook alleges that Corporal Wingo and Captain Sheeler's unconstitutional response to Mr. Cook was based on their animus toward the sentiments advanced by the June 1, 2020, events and by Mr. Cook's participating in advancing those sentiments (*Id.*, ¶¶ 179–83).

Defendants do not dispute that Mr. Cook's attendance at the protest on June 1, 2020, was protected First Amendment activity, nor do defendants dispute that being the subject of excessive police force, for example by being shot by a beanbag round or a foam impact round, would chill a person of ordinary firmness from continuing in the protected activity (Dkt. No. 20, at 17–18).

With regard to this claim, defendants maintain the contested issue is the third step of the inquiry:  whether defendants would have taken the adverse action but for their retaliatory animus towards Mr. Cook.  *Mitchell*, 28 F.4th at 896.  To prevail at this step, Mr. Cook must "establish a causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury."  *Aldridge*, 75 F.4th at 899 (citing *Nieves*, 139 S. Ct. at 1722).  In other words, Mr. Cook must demonstrate that he was "singled out" due to his protected expression.  *Id.*  Establishing that a defendant took an adverse action against Mr. Cook in response to protected conduct is insufficient.  *Mitchell*, 28 F.4th at 896.  To prevail, Mr. Cook must establish that the adverse action was not only a response to his conduct but that this response was driven by animus rather than by defendant's "understanding—however mistaken—of his official duties."  *Id.*

The Court first considers whether, based on the record evidence before the Court and drawing all reasonable inferences in Mr. Cook's favor, a reasonable jury could conclude that Corporal Wingo's decision to fire the beanbag rounds at Mr. Cook and Captain Sheeler's decision to fire the foam impact round at Mr. Cook, if Captain Sheeler's version is accepted as true, were motivated by retaliatory animus.  Defendants dispute that Corporal Wingo or Captain Sheeler were motivated by retaliatory animus because defendants assert that they had a good faith basis for believing that their actions were not in violation of clearly established law (Dkt. No. 20, at 17).  As discussed in the Court's analysis of Mr. Cook's excessive force claim, a reasonable jury could conclude that Corporal Wingo's actions—at least when the Court accepts as true Mr. Cook's account of events—were in violation of clearly established law.

As to Captain Sheeler's conduct the night of June 1, 2020, Mr. Cook argues that Captain Sheeler retaliated against Mr. Cook but does not argue that Captain Sheeler had any control over Corporal Wingo's specific decision to fire the beanbag rounds on the night of June 1, 2020 (Dkt.

No. 26, at 22).  In fact, while defendants argue that Captain Sheeler fired a foam impact round at Mr. Cook at the same time that Corporal Wingo fired the beanbag rounds,[19] Mr. Cook denies this (*Id.*, at 19).  Mr. Cook instead alleges that this "is a post-occurrence attempt to mitigate WINGO's excessive force by making it seem that PLAINTIFF was not targeted by WINGO but rather unexpectedly fell into WINGO's projectile's path." (Dkt. No. 28, ¶ 33).  Mr. Cook asserts that he is entitled to an inference that Captain Sheeler "fabricated a narrative where he used force on PLAINTIFF in order to make WINGO's use of force seem more reasonable and not appear to be an outlier." (*Id.*).

However, an officer is not liable for retaliation if his conduct was actually motivated by his understanding of his official duties, no matter how mistaken this understanding was.  *Mitchell*, 28 F.4th at 896.  This means that finding that an officer is not entitled to qualified immunity for excessive force is not dispositive of liability under a related retaliation claim.  A police officer is entitled to summary judgment on a retaliation claim unless a reasonable jury could find that he was motivated by retaliatory animus.  *See Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010) (finding that even when defendants were not entitled to qualified immunity for a

---

[19]  If a reasonable jury concludes that defendants' account is true and that Captain Sheeler did in fact fire a foam impact round at Mr. Cook at the same time that Corporal Wingo fired his beanbag rounds, the same Fourth Amendment analysis as applied to Corporal Wingo's use of force applies to evaluate Captain Sheeler's use of force.  *See, e.g., Kelly v. City of St. Paul*, Civil Case No. 09-461 JRT/JSM, 2010 WL 4272460, at *3, *6 (D. Minn. Oct. 18, 2010) (applying this analysis to examine an excessive force claim that involved the discharge of a "40-millimeter less-than-lethal 'marking round,'" which "round is similar to a foam baton or sponge round').  Viewing the record evidence before the Court in the light most favorable to Mr. Cook, a reasonable jury could conclude that use of force was unconstitutional.  Further, a reasonable jury could conclude that Captain Sheeler was motivated by retaliatory animus when he fired the foam impact rounds for the same reasons a reasonable jury could conclude that Corporal Wingo was motivated by retaliatory animus when Corporal Wingo fired the beanbag rounds.  There are factual disputes that a jury should resolve.

wrongful arrest claim they could still avoid liability for a First Amendment retaliation claim if a reasonable jury could not find that retaliatory animus was a substantial factor or "but-for" cause of the plaintiff's arrest). To avoid an adverse grant of summary judgment in a First Amendment retaliation case, a plaintiff "may not respond simply with general attacks upon the defendant's credibility," but rather "must present 'affirmative evidence from which a jury could find' that his constitutionally protected conduct informed the defendants' decisions." *Kilpatrick v. King*, 499 F.3d 759, 767, 769 (8th Cir. 2007) (quoting *Crawford–El v. Britton*, 523 U.S. 574, 600 (1998)).

As to Corporal Wingo's conduct on the night of June 1, 2020, Mr. Cook makes several arguments supporting the position that Corporal Wingo was motivated by retaliatory animus when he fired the beanbag rounds at Mr. Cook. First, Mr. Cook argues that his situation is different from those in many other retaliation cases because his protected speech was focused on criticizing the police officers themselves, and this supports the inference that a violent response by the police was motivated by retaliation for the criticism that the protest directed at the police officers (Dkt. No. 26, at 21). Second, Mr. Cook emphasizes his version of the facts—that he was non-violent, walking away from police, and attempting to comply with police commands—and argues that this "lends support that WINGO was shooting at protestors for sport not for any legitimate law enforcement purpose." (Dkt. No. 26, at 22–23). Third, Mr. Cook argues that any purported justification for shooting Mr. Cook is fatally undermined by the officer's failure to arrest him afterwards on the night of June 1, 2020 (*Id.*, at 23). Fourth, Mr. Cook argues that Corporal Wingo and Captain Sheeler's decision to arrest Mr. Cook one year after the protest when the officers learned that Mr. Cook filed a claim with the Claims Commission provides evidence of a continuing retaliatory animus against him (*Id.*, at 23). In support of this are the allegations surrounding Corporal Wingo's incident report and the purported misrepresentations in that report.

Viewing the record evidence in the light most favorable to Mr. Cook, the Court determines that a reasonable jury could find that Corporal Wingo was motivated by retaliatory animus when Corporal Wingo fired the beanbag rounds at Mr. Cook and swore out an incident report that included alleged misrepresentations about Mr. Cook.  There are factual disputes that a jury should resolve.  The Court therefore denies defendants' motion for summary judgment as it relates to Mr. Cook's claim for retaliation against Corporal Wingo.  Corporal Wingo is not entitled to qualified immunity or summary judgment on Mr. Cook's First Amendment retaliation claim based on the events of June 1, 2020.

As to Captain Sheeler's conduct on June 1, 2020, viewing the record evidence before the Court in the light most favorable to Mr. Cook, a reasonable jury could conclude that Captain Sheeler did not fire a foam impact round and that Captain Sheeler falsified his report about the events of June 1, 2020, in order to make Corporal Wingo's use of force seem more reasonable.  Further, this Court determines that a reasonable jury could conclude that Mr. Cook was engaged in protected First Amendment activity by attending the protest on June 1, 2020; that being the subject of a false police report that lead to an arrest not based on probable cause or even arguable probable cause would chill a person of ordinary firmness; and that, viewing the record evidence before the Court in the light most favorable to Mr. Cook, Captain Sheeler was motivated by retaliatory animus for the same reasons a reasonable jury could conclude that Corporal Wingo was motivated by retaliatory animus when he fired the beanbag rounds.  For all of these reasons, the Court denies the request for qualified immunity and the motion for summary judgment with regard to Mr. Cook's claim for retaliation against Captain Sheeler based on the events of June 1, 2020.

### 3.   Retaliation Claims Based On 2021 Arrest

The Court now turns to Mr. Cook's claims for retaliation arising out of his 2021 arrest nearly one year after the protest.  Mr. Cook alleges in his complaint that Corporal Wingo and Captain Sheeler's incident reports that, as to Mr. Cook, included misrepresentations and that Captain Sheeler's misrepresentations in his affidavit submitted to support the issuance of an arrest warrant for Mr. Cook were intentional and made in an attempt to justify Corporal Wingo's use of force against Mr. Cook by falsely portraying Mr. Cook as a threatening physical aggressor to support fraudulent misdemeanor charges (Dkt. No. 1, ¶ 85).  Mr. Cook further alleges that this charge also was intended by Corporal Wingo, Captain Sheeler, and/or Captain Joe to intimidate Mr. Cook, frustrate his Claims Commission case, and further chill Mr. Cook's First Amendment rights (*Id.*, ¶ 86).

The Court concludes that it was clearly established at the time of the events giving rise to this action that Mr. Cook's filing with the Claims Commission was a protected First Amendment activity.  The Eighth Circuit has held repeatedly that methods of petitioning the government for redress of alleged grievances through both courts and court-like processes, such as through civil rights lawsuits, Equal Employment Opportunity Commission complaints, or prison grievances, is protected First Amendment activity.  *Tyler v. Univ. of Arkansas Bd. Of Trustees*, 628 F.3d 980, 986 (8th Cir. 2011); *Greenwood v. Ross*, 778 F.2d 448, 457 (8th Cir. 1985); *Lewis v. Jacks*, 486 F.3d 1025, 1029 (8th Cir. 2007).  Filing with the Claims Commission is another way of petitioning a government tribunal for wrongs allegedly perpetrated by the government.  *See Duit Const. Co. Inc. v. Bennett*, 796 F.3d 938, 939 (8th Cir. 2015) (explaining the function of the Claims Commission).

Second, it was clearly established at the time of the events giving rise to this action that being arrested would chill a person of ordinary firmness from exercising their First Amendment rights again in the future.  *Thurairajah v. City of Fort Smith*, 925 F.3d 979, 985 (8th Cir. 2019).

To establish the third component of a relation claim, but for causation, a plaintiff alleging retaliatory arrest must also show as a general matter that the officer acted without probable cause to arrest.  *Nieves*, 139 S. Ct. at 1723.  Here, defendants argue that Mr. Cook cannot establish the element of a causal connection (Dkt. No. 20, at 17–18).  As discussed above, there are genuine disputes of outcome determinative material facts as to whether probable cause or even arguable probable cause existed to arrest Mr. Cook based on events that occurred on June 1, 2020, making granting summary judgment on this claim inappropriate.  *See Foote v. Doe*, 679 F.Supp. 3d 775, 803–04 (S. D. Iowa 2023) (declining to grant summary judgment on retaliatory arrest claim when genuine dispute over whether probable cause to arrest existed).

Moreover,  the record evidence, when all  reasonable inferences are drawn in favor of Mr. Cook, could lead a reasonable jury to conclude that Captain Sheeler was motivated by retaliatory animus when he ordered Mr. Cook's arrest approximately one year after the protest.  Based upon record evidence before the Court, Captain Sheeler coordinated and ordered the arrest (Dkt. No. 19-8, at 60:21–62:25).  Captain Sheeler testified that he ordered Mr. Cook's arrest after identifying Mr. Cook from a photograph of a zoom call that was a part of Mr. Cook's Claims Commission case for damages based on the injuries he suffered during the events of June 1, 2020 (*Id.*, at 55:19– 56:15).  As discussed above, Captain Sheeler testified that the only attempt to locate Mr. Cook after June 1, 2020, involved reviewing ambulance transport records (*Id.*, at 54:21–55:8).  Mr. Cook argues that no attempt to locate him ever occurred (Dkt. No. 26, at 22).   Defendants argue that Captain Sheeler "had a good-faith basis that actions [sic] were not in violation of clearly

established law" and cite Captain Sheeler's declaration that he had no animus towards Mr. Cook because of his protected expression (Dkt. No. 20, at 17).  Mr. Cook argues that the failure to arrest Mr. Cook the night of June 1, 2020, combined with the arrest in response to his Claims Commission filing, provides evidence of continuing retaliatory animus against Mr. Cook (Dkt. No. 26, at 23).

Mr. Cook points to the fact that he was not arrested the night of the incident or shortly thereafter, even though he had his driver's license in his wallet and could easily have been identified at any point, as evidence for the inference that Corporal Wingo and Captain Sheeler knew they did not have probable cause to arrest him (Dkt. No. 26, at 26).  That the officers allowed a substantial length of time to pass before seeking Mr. Cook's arrest calls into question the officers' subjective beliefs about Mr. Cook's conduct and later arrest.  These subjective beliefs are relevant to this Court's First Amendment analysis.  *See Kilpatrick v. King*, 499 F.3d 759, 768 (8th Cir. 2007) (examining evidence of alleged retaliatory motive for First Amendment claim); *but see Johnson*, 942 F.3d at 410 (examining evidence for objective reasonableness for Fourth Amendment claim).

A reasonable jury viewing the record evidence in the light most favorable to Mr. Cook could find based on the failure to book Mr. Cook in jail the night of June 1, 2020; the limited efforts if any allegedly made to discover him after the fact; the misrepresentations, at least as to Mr. Cook, in Corporal Wingo and Captain Sheeler's incident reports about the events of June 1, 2020; the dispute over whether defendants had probable cause to arrest Mr. Cook; the misrepresentations in Captain Sheeler's affidavit presented in support of the request for an arrest warrant; and the temporal proximity between Mr. Cook's Claims Commission filing and Mr. Cook's ultimate arrest that Corporal Wingo and Captain Sheeler ordered Mr. Cook's arrest because

they were motivated to retaliate against Mr. Cook to intimidate Mr. Cook, frustrate his Claims Commission case, and further chill Mr. Cook's First Amendment rights.

For all of these reasons, the Court denies Mr. Wingo and Mr. Sheeler's request for qualified immunity and defendants' motion for summary judgment on Mr. Cook's First Amendment retaliation claims.

### F.  Supervisory Liability

Mr. Cook claims that Colonel Bryant is liable as a supervisor for Corporal Wingo's "demonstrable instance of making false statements during official police matters and engaging in untruthfulness during interactions with tax-paying Arkansans." (Dkt. No. 1, ¶¶ 192–206).

A supervisor who did not directly participate in the alleged constitutional violation is entitled to qualified immunity unless the plaintiff proves that the supervisor:  "(1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts."  *Davis v. Buchanan Cnty.*, 11 F.4th 604, 624 (8th Cir. 2021) (quoting *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015).   The notice requirement is a "rigorous standard."  *Id.*   It requires "notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right."  *Id.*   This notice must come in the form of misconduct that is very similar to the conduct at issue.  *Id.*   A "single incident cannot serve as notice for a pattern of misconduct."  *Brewington v. Keener*, 902 F.3d 796, 803 (8th Cir. 2018).

Based on the record evidence, the Court determines that Mr. Cook has not come forward with sufficient proof of prior, similar incidents of misconduct by Corporal Wingo to have given Colonel Bryant notice of a pattern of unconstitutional conduct sufficient to defeat Colonel Bryant's assertion of qualified immunity.   Mr. Cook alleges only one prior incident of misconduct by Corporal Wingo (Dkt. No. 1, ¶¶ 197, 199).   It involved Corporal Wingo allegedly making a false

statement about a traffic stop to a dispatch operator (*Id.*).  Defendants dispute the allegation that Corporal Wingo made these prior false statements and argue that that this prior incident was not for excessive force (Dkt. No. 20, at 20).  Even if this prior incident occurred as Mr. Cook alleges and involved excessive force, the Court determines that it is insufficient evidence to put Colonel Bryant on notice of a pattern of prior unconstitutional conduct for purposes of supervisory liability under controlling Eighth Circuit law.

Mr. Cook argues that Colonel Bryant's failure to discipline or investigate Corporal Wingo after the incident is grounds for supervisory liability because it constituted ratification (Dkt. No 26, at 25).  However, ratification is not a basis for individual supervisory liability because such a determination would violate the principle that a supervisor who does not directly participate in an employee's constitutional violation can only be liable for the violation when it was caused by the supervisor's failure to train or supervise his or her employees properly.  *See Livers v. Schenck*, 700 F.3d 340, 357 (8th Cir. 2012).

For these reasons, Colonel Bryant is entitled to qualified immunity as to Mr. Cook's supervisory liability claim.  The Court grants defendants' motion for summary judgment with regard to this claim.

### G.      Civil Conspiracy To Violate Constitutional Rights

Mr. Cook also claims that Corporal Wingo, Captain Sheeler, and Captain Joe engaged in a civil conspiracy to violate Mr. Cook's constitutional rights (Dkt. No. 1, ¶¶ 217–22).  Defendants argue that, even if all the elements of the civil conspiracy are met, the officers are still shielded from liability by qualified immunity because the Eighth Circuit has not yet ruled on whether the intracorporate conspiracy doctrine applies to government officials sued in their individual capacities (Dkt. No. 20, at 24–25).

To state a claim for conspiracy under 42 U.S.C. § 1983, the "plaintiff must show:  (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff."  *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008) (internal citation omitted).  The first element "requires allegations of specific facts tending to show a 'meeting of the minds' among the alleged conspirators."  *Murray v. Lene*, 595 F.3d 868, 870 (8th Cir. 2010).

Defendants argue that they are entitled to qualified immunity on the 42 U.S.C. § 1983 conspiracy claim because the law on the intracorporate conspiracy doctrine is not clearly established as it applies to § 1983 claims (Dkt. No. 20, at 24–25).  The intracorporate conspiracy doctrine "allows corporate agents acting within the scope of their employment to be shielded from constituting a conspiracy under § 1985."  *Meyers v. Starke*, 420 F.3d 738, 742 (8th Cir. 2005).  The rule derives from the nature of conspiracy, which requires an agreement between or among two or more separate persons.  This argument stems from *Ziglar v. Abbasi*, which held that officials were entitled to qualified immunity on § 1985 conspiracy claims because the lower courts were divided on the applicability of the intracorporate conspiracy doctrine in § 1985 cases.  *Ziglar v. Abbasi*, 582 U.S. 120 (2017).

In *Baude v. City of St. Louis*, 476 F. Supp. 3d 900, 915–16 (E.D. Mo. 2020), *aff'd sub nom. Baude v. Leyshock*, 23 F.4th 1065 (8th Cir. 2022), the court determined that, in the light of this landscape, it cannot be said that the law regarding the application of the intracorporate conspiracy doctrine in § 1983 cases is clearly established.  Similarly, in *Street v. Leyshock*, 41 F.4th 987, 990 (8th Cir. 2022), the Eighth Circuit Court of Appeals reached the same conclusion that the officers in that case were entitled to qualified immunity on the plaintiffs' conspiracy claims because the

54

unsettled nature of the intracorporate conspiracy doctrine meant that the officers did not violate a clearly established right.  *See also Torres v. City of St. Louis*, 39 F.4th 494, 507 (8th Cir. 2022), *reh'g denied*, Case No. 21-1761, 2022 WL 3151858 (8th Cir. Aug. 8, 2022) (same).

Given the uncertain applicability of the doctrine, this Court agrees that it was not clearly established that reasonable officers would have known that, at the time of the events giving rise to Mr. Cook's claims, the officers' agreeing and planning to violate Mr. Cook's constitutional rights and then taking steps to cover up their conduct would expose the officers to individual liability for a § 1983 conspiracy claim.  Therefore, defendants are entitled to qualified immunity on Mr. Cook's conspiracy claim.  The Court grants defendants' motion for summary judgment with regard to Mr. Cook's conspiracy claim.

## IV.    Conclusion

For the foregoing reasons, the Court grants, in part, and denies, in part, defendants' motion for summary judgment (Dkt. No. 19).  Specifically, the Court denies defendants' motion and denies the request for qualified immunity on Mr. Cook's claim that Corporal Wingo violated Mr. Cook's rights under the Fourth Amendment the night of the protest; grants defendants' motion on Mr. Cook's claim that Captain Joe is liable for his failure to intervene; denies defendants' motion and denies the request for qualified immunity on Mr. Cook's claim that Corporal Wingo and Captain Sheeler violated Mr. Cook's rights with respect to Mr. Cook's arrest one year after the protest; denies defendants' motion and denies the request for qualified immunity on Mr. Cook's claim that Corporal Wingo and Captain Sheeler violated Mr. Cook's rights under the First Amendment; grants defendants' motion on Mr. Cook's claim that Captain Joe violated Mr. Cook's rights under the First Amendment; grants defendants' motion on Mr. Cook's claim that Colonel Bryant is liable as a supervisor; and grants defendants' motion on Mr. Cook's claim that Corporal

Wingo, Captain Sheeler, and Captain Joe participated in a civil conspiracy to violate Mr. Cook's constitutional rights.

It is so ordered this 30th day of September, 2024.

Kristine G. Baker
Chief United States District Judge